**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-2(C)

Julie M. Murphy
Daniel Pereira
Stradley Ronon Stevens & Young, LLP
457 Haddonfield Rd., Suite 100
Cherry Hill, New Jersey 08002
T: (856) 321-2409
F: (856) 321-2415
E-Mail: jmmurphy@stradley.com
        dpereira@stradley.com

*Attorneys for Citizens Bank, N.A.*

In re:

NOSTRUM LABORATORIES, INC.,

                              Debtor.

Case No. 24-19611 (JKS)

Chapter 11

Judge: Hon. John K. Sherwood

**ORDER**
**GRANTING THE MOTION OF CITIZENS BANK, N.A.**
**FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE**

The relief set forth on the following pages, numbered two (2) through _____,      is

ORDERED.

Upon the motion (**"Motion"**)[1] of Citizens Bank, N.A. for an Order Approving the Appointment of Chapter 11 Trustee, dated October 6, 2024 and the Vladmir Kasparov of Portage Point Partners filed with the Motion; and it appearing that Mr. Kasparov, a disinterested person within the meaning of section 101(14) of the Bankruptcy Code; and the Court having determined that the appointment of a Trustee in this Chapter 11 case is mandatory as cause exists for the appointment of a Trustee pursuant to section 1104(a)(1) of the Bankruptcy Code and is also in the best interests of creditors, equity security holders, and other interests of the estate under section 1104(a)(2) and after due deliberation, and good and sufficient cause appearing therefor, it is hereby

### ORDERED, ADJUDGED, AND DECREED THAT:

1.      The appointment of Vladmir Kasparov, as Chapter 11 Trustee, is approved in the bankruptcy case of Nostrum Laboratories, Inc., as set forth herein, pursuant to section 1104(d) of the Bankruptcy Code, without bond.

2.      Upon qualifying as Trustee by filing the described bond, the Trustee shall take possession of the Debtor's property, operate the Debtor's business, and perform the duties required of a Trustee under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

3.      The Debtor, its officers, agents, and representatives shall turn over, deliver, and surrender to the Chapter 11 Trustee, upon his qualification, all property, assets, and control of the Debtor's business, immediately, and shall not hinder Mr. Kasparov in any way or manner, directly or indirectly, in his handling of the property and affairs of the Debtor, until further order of this Court.

4.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____          _____

                                                            Hon. Judge Sherwood

---

[1] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

6065956

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-2(C)

Julie M. Murphy
Daniel Pereira
Joseph Catuzzi
Stradley Ronon Stevens & Young, LLP
457 Haddonfield Rd., Suite 100
Cherry Hill, New Jersey 08002
T: (856) 321-2409
F: (856) 321-2415
E-Mail: jmmurphy@stradley.com
        dpereira@stradley.com
        jcatuzzi@stradley.com

*Attorneys for Citizens Bank, N.A.*

|  |  |
|---|---|
| In re:<br><br>NOSTRUM LABORATORIES, INC.,<br><br>              Debtor. | Case No. 24-19611 (JKS)<br><br>Chapter 11<br><br>Requested Hearing Date:  October 29, 2024 at 10:00 a.m. (*emergency application pending to expedite hearing date*)<br><br>Objection Deadline:  October 22, 2024<br><br>Judge: Hon. John K. Sherwood |

**EMERGENCYMOTION OF CITIZENS BANK, N.A. FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE OR, IN THE ALTERNATIVE, DISMISSAL OF THIS <u>CHAPTER 11 CASE</u>**

      Citizens Bank, N.A. ("Citizens"), by and through its undersigned counsel, hereby moves

on an emergent basis for the appointment of a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a)

or, in the alternative, dismissal of this chapter 11 case pursuant to 11 U.S.C. § 1112(b) for cause.

In support of this motion, Citizens respectfully represents as follows:

## INTRODUCTION

1.      On September 30, 2024 (the "Petition Date"), Nostrum[1] Laboratories Inc. ("Nostrum" or the "Debtor") filed a voluntary petition for relief (the "Petition") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in a transparent attempt to subvert the imminent commencement of a receivership that the United States District Court for the District of New Jersey (the "District Court") ordered just a few days earlier.

2.      In granting Citizens' emergency request for the appointment of a receiver, the District Court rebuked Nostrum for its lack of candor regarding, among other things, its insolvent financial position, and reprimanded Nostrum's litigation tactics, commenting: "I will be honest with you. I think [Nostrum] has done everything it can to delay and engage in all sorts of dilatory antics here."

3.      The Petition, which Nostrum filed the day before the District Court was scheduled to select and appoint a receiver to assume control over Nostrum's assets, reflects a continuation of Nostrum's years-long strategy: delay, obstruct and self-deal.[2]

4.      The findings District Court's findings supporting the appointment of a receiver likewise under Fed. R. Civ. P. 66[3], and the accompanying evidence, compel this Court to appoint a chapter 11 trustee for cause, including dishonesty, incompetence and gross mismanagement by the current management of the Debtor.

---

[1]      The Oxford English Dictionary defines "nostrum" as: a medicine, especially one that is not considered effective, prepared by an unqualified person. i.e. "a charlatan who sells nostrums."

[2]      Nostrum's financial deterioration and instability had been ongoing for years without Nostrum seeking relief from this Court.  Nostrum only sought relief the day before the District Court was scheduled to select a receiver to take over the company's grossly mismanaged operations.

[3]      The District Court granted the receivership motion after discovery and two evidentiary hearings during which a fulsome record was developed.

2

5.     Appointing a chapter 11 trustee also best protects the interests of creditors and the estate.

6.     Nostrum's management has proven incapable of acting in a fiduciary capacity.  In fact, the record confirms that, while its creditors have gone unpaid, the Debtor has: (a) paid for its management's personal expenses, including luxury vehicles (several Mercedes vehicles and even a Lamborghini); (b) transferred money to related companies in violation of its contractual obligations and instructions from Citizens to refrain from doing so; (c) liquidated Citizens' collateral (without Citizens' permission, without giving notice to Citizens, and without remitting the proceeds to Citizens) to fund ongoing losses; (d) grossly misrepresented the value of its assets; and (e) obstructed efforts to obtain information and access to source materials in the company's books and records.[4]

7.     The record developed before the District Court, including as recently as September 24, 2024, underscores that Nostrum's management's goal has always been self-dealing; Nostrum has never had a plan to pay its creditors.

8.     Rather than accept any responsibility, Nostrum's management has resorted to obfuscation and lies—denying access to its books and records and repeatedly casting off violations of loan documents, including the diversion of funds and payments to related entities, as being trivial or immaterial.

9.     As of the date hereof, a week into the case, Nostrum has failed to file any typical first day motions.  It has failed seek Court approval to utilize cash collateral (Citizens has objected) and to retain counsel.   Upon information and belief, Nostrum is utilizing cash collateral in contravention of the Bankruptcy Code.

---

[4]     Nostrum continued to engage in this conduct before and during the pendency of the receivership motion and even after the appointment of a fiscal agent to monitor its affairs and assets.

3

10.      Citizens' counsel has been advised that, as of October 5, 2024, filing counsel for Nostrum has or will withdraw from representation of the Debtor in this proceeding.

11.      A chapter 11 trustee is the only way creditors will receive any recovery in this case.

12.      With the recent withdrawal of counsel, time is of the essence as the Debtor disregards the Bankruptcy Code and the interests of any party other than current management.

13.      Thus, for all of the reasons set forth herein, Citizens respectfully requests this Court enter an Order directing the Office of the United States Trustee to appoint a chapter 11 trustee in this chapter 11 case.

## JURISDICTION

14.      This Court has jurisdiction over the subject matter of this motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue here is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A.      Loans to Nostrum**

15.      Prior to the Petition Date, Investors Bank, predecessor by merger to Citizens, extended three credit facilities to Nostrum: (a) a $5 million line of credit/term loan; (b) a $12 million revolving line of credit; and (c) a $5 million term loan (collectively, the "Loans").

16.      Nostrum's obligations to Citizens for the Loans are evidenced by, among other things, a Loan Agreement between Citizens, the Debtor, Nostrum Pharmaceuticals, LLC ("Pharma" or "Parent"), and the Debtor's president and CEO, Nirmal Mulye ("Mulye", and together with the Debtor and Pharma, the "Obligors"), dated as of December 31, 2020 (as amended, modified, and/or supplemented from time to time, the "Loan Agreement"). A true and

correct copy of the Loan Agreement is attached as <u>Exhibit A</u> to the Certification of Julie M. Murphy (the "Murphy Cert.").

17.     The Debtor's obligations to Citizens are further evidenced by: (a) a Line of Credit/Term Loan Note in the maximum amount of $5,000,000 by Nostrum, (b) a Revolving Credit Note in the maximum amount of $12,000,000, and (c) a Term Loan Note in the original principal amount of $5,000,000 (together, as the same may be amended, modified, supplemented and/or restated from time to time, the "Notes").  True and correct copies of the Notes are attached as <u>Exhibit B</u> to the Murphy Cert.

18.     Pursuant to a Security Agreement by the Debtor in favor of Citizens dated December 31, 2020 (the "Security Agreement"), the obligations of the Debtor to Citizens for the Loans are also secured by, among other things, a security interest in all of the Debtor's personal property, including without limitation, all accounts, chattel paper, deposit accounts, documents, general intangibles, goods, inventory, equipment, trademarks, contract rights, instruments, investment property, letter of credit rights, letters of credit, money, supporting obligations and proceeds and products of the foregoing (as more particularly described in the Security Agreement, the "Collateral") as well as a pledge of certain bonds to Citizens.  A true and correct copy of the Security Agreement is attached as <u>Exhibit C</u> to the Murphy Cert.

19.     The UCC-1 Financing Statement filed with the New Jersey Department of the Treasury on December 31, 2020 at Filing Number 54975457 (the "UCC-1") evidences the perfection of Citizens' security interest in the Collateral.   A true and correct copy of the UCC-1 is attached as <u>Exhibit D</u> to the Murphy Cert.

20.     The Loan Agreement, Notes, the Guaranty, the Security Agreement and all other documents evidencing the obligations of Obligors to Citizens for the Loans shall be hereinafter

referred to as the "Loan Documents."

21.     By the above-described Loan Documents, Citizens' liens extend to all of the Debtor's assets and all cash and cash proceeds thereof (the "Collateral").

**B.      The Forbearance Agreement**

22.     On or about October 31, 2022, after numerous defaults under the Loan Documents, the Debtor, Citizens, Mulye and Pharma entered into a forbearance agreement (the "Forbearance Agreement").  A true and correct copy of the Forbearance Agreement is attached as <u>Exhibit E</u> to the Murphy Cert.

23.     Pursuant to the Forbearance Agreement the Debtor acknowledged and/or agreed, among other things:

(a)     the continuing validity and binding effect and force of the Loan Documents (*id*., Section 2);

(b)     the existence of the Existing Defaults (as defined in the Forbearance Agreement) (*id.* Section 3);

(c)     that it had no defense, set off, counterclaim or challenge against the payment of any sums owing under the Loan Documents (*id*. Section 5);

(d)     that the full amount of the indebtedness under the Loan Documents was validly and duly owing to Citizens (*id*. Section 6);

(e)     that Citizens was owed $17,226,584.78, together with accruing interest (including PIK interest), costs and fees (*id*.); and

(f)     that any sale of Collateral, including Abbreviated New Drug Applications ("ANDAs") and Drug Master Files, would not occur without Citizens' prior written consent (*id*., Section 12(f)(vi).

24.     The Forbearance Agreement required payment in full of the debt to Citizens no later than December 31, 2022.  *Id.*.

25.     The Obligors did not pay Citizens in full on account of the Loans prior to December 31, 2022, and Citizens' obligation to forbear under the Forbearance Agreement expired.

**C.      The Pre-Petition Litigation – Appointment of a Fiscal Agent and Receiver**

26.      For nearly two years, Citizens, Nirmal Mulye, the Debtor's CEO and individual guarantor of the Citizens' debt, and Nostrum have been engaged in litigation and a robust record comprised of depositions, document discovery and two evidentiary hearings has developed.[5]

27.      On October 6, 2023, Citizens commenced litigation against the Debtor in the District Court  which was docketed at Case No. 23-20765 (the "Receivership Action") and moved for the appointment of a receiver (the "Receivership Motion").

28.      Citizens filed the Receivership Motion as a result of the Debtor's insolvency, gross mismanagement, suspected fraud in its financial statements and reporting and the inability or unwillingness of the Debtor to obtain financing, effectuate a sale of assets or otherwise take steps necessary to pay the Citizens indebtedness.

29.      On April 22, 2024, The Honorable Georgette Castner held a full day evidentiary hearing on the Receivership Motion and then received post-hearing objections, proposed findings of fact and conclusions of law from the parties.

30.      During the evidentiary hearing, Citizens presented an expert, Eric Slone, a certified public accountant with more than 40 years of experience, from Dalto Consulting, Inc., a consultant hired by the Debtor to assist with a turnaround plan.  A true and correct copy of the hearing transcript from the April 22, 2024 evidentiary hearing is attached as <u>Exhibit F</u> (the "4/22/24 Tr.") to the Murphy Cert.

31.      Mr. Slone testified regarding:

(a)      the insolvency of the Debtor (4/22/24 Tr., at p. 117);

---

[5]      The first phase of the litigation resulted in the appointment of a fiscal agent; after the fiscal agent filed his initial report, the District Court directed the appointment of a receiver.

(b)       Nostrum's refusal to create a turnaround plan (*id.* at 111);

(c)       Nostrum's refusal to create a refinancing plan (*id.* at 118);

(d)       numerous intercompany and related party transactions engaged by the Debtor (*id.* at p. 135-136);

(e)       the payment by the Debtor for four (4) Mercedes and one (1) Lamborghini (*id.* at 152);

(f)       the staggering amounts of accounts payable over ninety (90) days (id. at p. 137);

(g)       the persistent lack of cash on hand by the Debtor (id. at p. 147);

(h)       the misrepresentation of accounts receivables on certified reports submitted to Citizens (id. at 126-132);

(i)       the unreliability of audited and internally prepared financial statements presented by the Debtor, including the overstatement of the value of the Debtor's current assets and accounts receivable (*id.* at 132-136);

(j)       the likely margin manipulation by the Debtor reflected in, among other things, the variable manufacturing costs set forth on the financial statements provided to Citizens (*id.*);

(k)       the stark differences between projected revenues and actual receipts (*id.* at 108-109).

32.       On June 27, 2024, the District Court issued an opinion directing the appointment of a special fiscal agent to monitor Nostrum's business operations. A true and correct copy of Judge Castner's June 27 Opinion is attached as <u>Exhibit G</u> to the Murphy Cert.

33.       Judge Castner found that nearly every factor considered by courts deciding a motion to appoint a receiver under Fed. R. Civ. P. 66 weighed in favor of appointing a receiver, including Citizens' equitable interests in the Debtor's assets, Citizens' reasonably high likelihood of success on the merits, the precarious and unstable financial position of the Debtor, and the likelihood that the Debtor knowingly presented unrealistic projections and questionable invoices. *Id.*

34.     On July 29, 2024, the District Court appointed Keith Balla as the special fiscal agent and directed him, among other things, to provide written reports every sixty days with the first report to be due on September 16, 2024.  A true and correct copy of Judge Castner's July 29th Order is attached as <u>Exhibit H</u> to the Murphy Cert.

35.     The Order further directed Nostrum to "cooperate in good faith with the Special Fiscal Agent" and "timely and fully provide responses to requests made." *Id.* at ¶ 6.

**D.      Dishonesty: Misrepresentations to the District Court**

36.     The Debtor made numerous misrepresentations to the District Court throughout the underlying litigation, which, as explained below, the special agent exposed.

37.     For instance, Nostrum's chief financial officer made the following representations to the District Court during the April 22, 2024 receivership hearing:

(a)     Nostrum did not commit "any" misrepresentations in its financial statements (4/22 Tr. at 211: 3-5);

(b)     there was "no issue" with Nostrum not providing reserves for impaired long-term advances  (*id.* at 255:9-18);

(c)     Nostrum's financial condition as had a "positive" trend and painted a rosy financial picture of the company (*id*. at 218:10-21; 236:12-18);

(d)     Nostrum was "paying its vendors" (*id.* at 254:3-4);

(e)     Nostrum would "be settled in full within the next couple months" with its former logistics provider, Eversana.  (*id*. at 254:19-255:2.);

(f)     Nostrum was "current" on its payments to Citizens Bank  (*id*. at 255:5-8.);

(g)     Nostrum's "EBITDA is growing"  (*id*. at 238:14-15);

(h)     borrowing base had not "gone down" (*id*. at 237:15-18); and

(i)     he denied the unrealistic nature of Nostrum's financial projections. (*id*. at 238:17-19).

38.     None of the above testimony was true. Nostrum misrepresented the true state of its financial affairs to the District Court to avoid the immediate appointment of a receiver.

9

39.     As explained below, the special fiscal agent uncovered the truth, alerting the District Court to Nostrum's insolvency, mismanagement, and lack of cooperation.

40.     In addition to misrepresenting the company's financial state and affairs to delay the appointment of a receiver, Nostrum also advanced an objectively baseless argument that Citizens – contrary to all of its written communications with the company – agreed to an "indefinite" forbearance agreement that would extend for a millennium in order to delay a judgment.

41.     The District Court, recognizing the absurdity of Nostrum's argument, described Nostrum's "defense" as follows: "I've never heard a defense, I've never heard of one, where the argument is there is a forbearance agreement for posterity. I've never heard that. And I've looked, and I've never seen a case to support that."  A true and correct copy of the hearing transcript from the September 24, 2024 evidentiary hearing is attached as Exhibit I (the "9/24/24 Tr.") to the Murphy Cert.  The cited portion of this transcript appears at page 9 lines 12 through 15.

42.     Just as Nostrum misrepresented the state of its financial condition to delay the appointment of a receiver, the District Court recognized that Nostrum lodged baseless "defenses" during the underlying litigation to delay the issuance of judgment in Citizens' favor, which, the District Court indicated during the September 24, 2024 hearing was "beyond reasonably high." (*Id.* at 105:6-11.)

43.     The Court further observed that Nostrum's argument was part of the company's delay tactics and ruled that Nostrum "has done everything it can to delay and engage in all sorts of dilatory antics here." (*Id.* at 112:1-3.)

**E.     Balla Reports Obstruction, Material Overstatement of Asset Value Misrepresentations to Citizens and the District Court**

44.     On September 16, 2024, in accordance with Judge Castner's Order, Mr. Balla issued his initial report regarding the financial condition of Nostrum, its management, its ability

10

to continue operations and other matters within his purview (the "Balla Report").  A true and correct copy of the Balla Report is attached as Exhibit J to the Murphy Cert.

45.     The Balla Report detailed Nostrum's dishonesty and gross mismanagement, including but not limited to: (a) Nostrum's failure to pay creditors, (b) Nostrum's obstruction of the fiscal agent's duties, (c) Nostrum's material overstatement of assets; (d) Nostrum's dissipation of Citizens' collateral; (e) Nostrum's insolvency; and (f) Nostrum's mismanagement, evidenced by self-dealing and other improper accounting practices.

46.     At the time the Balla Report was filed, "[d]espite repeated requests, Nostrum Laboratories ha[d] not provided management's plan for stabilizing and/or growing the business no financial forecasts extending beyond December 2024." *Id.*, p. 22.

**F.     Nostrum's Failure to Pay Creditors**

48.     While Nostrum represented to the District Court that it was paying its vendors, Mr. Balla advised the Court that Nostrum's CFO "indicated that [the company] is currently only paying vendors that either: (a) provide goods and/or services critical to current operations (e.g., raw materials suppliers, third party logistics service providers, etc.) and (b) pose a significant threat of impending litigation." *Id.* at p. 8.

49.     The report further confirmed that "[Nostrum's] cash flow from operations has not been sufficient to extinguish vendor invoices in a timely manner." *Id.* at p. 14.

50.     And, while Nostrum represented to the District Court in April 2024 that it was on the verge of paying Eversana (a creditor it repeatedly failed to pay—even after entering into settlement agreements) in full, Mr. Balla's report identified that as of September 2024, Nostrum still had not paid Eversana.  (*Id.* at Ex. X.)

11

### G.    Nostrum's Obstruction of the Fiscal Agent's Access

47.    Despite Judge Castner's order that Nostrum cooperate in good faith and timely and fully provide responses to Mr. Balla, Nostrum repeatedly failed or refused to turn over information, arrange for interviews with its vendors and auditors and fully cooperate with Mr. Balla.[6]  *Id.* at p. 2.

48.    Among other things, Nostrum (a) refused to provide the financial statements of Nostrum's parent company to support (or refute) the value of an advance to the Parent on the Debtor's balance sheet as a current asset; (b) insisted that Nostrum's controller, Parashuram Sabale, be present at every interview between Mr. Balla's firm and Nostrum employees; (c) insisted that each such interview be recorded; and (d) directed its employees not to provide any documentation to Mr. Balla without prior written approval from Carlton Asher, its secretary and general counsel. *Id.* at pp. 3, 10.

### H.    Material Overstatement of Assets

49.    While Nostrum represented to the District Court that there were no issues with the manner that its assets were reported on its audited and management-prepared financial statements, the Balla Report found to the contrary.

50.    Specifically, Mr. Balla found material overstatements of the value of Nostrum's assets by nearly $40 million. *Id.* at p. 4 ("[I]t is our opinion that the working capital and net worth as of June 30, 2024 . . . are materially overstated by [$29,383,925.]"], *see also* p. 5 ("Our analysis of the detailed aged accounts receivable balances further supports the fact that the [Audited Financial Statement] has overstated current assets [by $7,935,836].").

---

[6]    Exhibit "O" to the Balla Report lists documents requested but not produced.  *Id.*, Ex. O.

51.     These misrepresentations relate primarily to four categories of assets – working capital, accounts receivable, deferred tax credits and ANDAs.

52.     After adjusting the financial statements to correct for the material overstatements, Mr. Balla reported that as of December 2022, Nostrum's working capital was *negative* $49,207,775 and its net worth was *negative* $12,090,912, and that after Mr. Balla made the appropriate adjustments, Nostrum was "rendered insolvent" from a balance sheet perspective. *Id.* at p. 5, 8.

53.     Significantly, Nostrum presented these misstated financials  to Citizens  and the District Court in support of Nostrum's story that its financial picture was "rosy," when the truth was the exact opposite.

### a.  Nostrum's Overstatement of the Value of Uncollectable Insider Loans

54.     The material overstatements identified in the Balla Report relate, in part, to $30 million in advances to the Parent and a related company, Asia Pacific Investment Holdings Limited ("Asia Pacific"), which Nostrum reported as "Current Assets" in its 2021 financial statement and as "Other Assets" in its 2022 financial statements.   The advance to the Parent was characterized as "Short-term advance – Nostrum" with a balance as of December 31, 2022 of $20,169,807 (the "Parent Advance), and the advance to Asia Pacific was characterized as "Advance – Asia Pacific" with a balance as of December 31, 2022 of $9,720,879 (the "Affiliate Loan" and together with the Parent Advance, the "Insider Loans"). *Id.* at p. 2.

55.     Mr. Balla requested that Nostrum provide copies of the audited financial statements ("AFS") and certain additional financial information of Pharma to determine if Pharma had sufficient liquid assets to repay the advance. *Id.* at 3.

56.      Nostrum's general counsel refused the request. *Id.* at 3.[7]

57.      Nostrum's auditor, RAM Associates and Company, LLC ("RAM"), likewise refused to provide any information reflecting the business purposes of the Insider Loans, information it would have been required to obtain to support the classification of the Insider Loans. *Id.* at 4.

58.      Interviews taken and other responses gathered by Mr. Balla failed to support Nostrum's ability to collect the Insider Loans, and no support was provided to substantiate the collectability of the Insider Loans, including the availability of liquid assets of Parent or Asia Pacific to repay these amounts. *Id.* at p. 4.

59.      The Balla Report explains that to support the classification of the Insider Loans as assets, Nostrum's auditor, RAM, was required but failed to obtain sufficient evidence of Pharma's and Asia Pacific's ability to repay the amounts and sufficiently understand Nostrum's legitimate business purposes for engaging in these insider transactions. *Id.* at p. 4.

60.      As a result of Nostrum's and its auditor's inability or refusal to provide support for the business purposes of these transactions or the Parent's and Asia Pacific's ability to repay the amounts due, the Balla Report concludes that reporting the Insider Loans as Current Assets in Nostrum's 2021 audited financial statement was a "material misstatement that overstated [Nostrum's] Current Assets as the amounts were not collectible within one year." *Id.* at p. 4.

---

[7]      Ironically, in response to the Balla Report, the Debtor's CFO dismissed Mr. Balla's "adjustments to these balances" as a reflection of a "narrow and pure accounting focus, without any knowledge or understanding of [Pharma's] underlying assets or its activities," which access and understanding were, of course, blocked by the Debtor.  *See* Declaration of James Grainer dated September 23, 2024, attached as Exhibit K to the Murphy Cert. at ¶ 19.

61.     The Balla Report further concluded that "the working capital and net worth as of June 30, 2024 (and as of the date of the AFS) are materially overstated by these amounts." *Id.* at p. 4.

**b. Nostrum's Overstatement of Uncollectable Accounts Receivable**

62.     While Nostrum represented to the Court that Citizens' borrowing base – which is based primarily on receivables – had not "gone down," Mr. Balla's report confirmed a radically different truth.

63.     Mr. Balla performed a detailed analysis of Nostrum's accounts receivable and noted that a "substantial portion" (nearly $8 million) of Nostrum's accounts receivable is likely uncollectable as over 361 days old. *Id.* at 5.

64.     Nostrum and its auditors failed to sufficiently reserve that balance as uncollectible accounts receivable, or reclassify the balance as non-current assets, resulting a material misstatement of Nostrum's current assets. *Id.* at 5.

**c. Nostrum's Overstatement of Deferred Tax Credit Assets**

65.     While Nostrum adamantly denied the impropriety of maintaining an over six million tax deferral "asset" on its books (*see* 4/22/24 Tr. at 255:19-25), Mr. Balla disagreed. *See* Balla Report at p. 8-9.

66.     Mr. Balla questioned the reported value of assets characterized as "Carried Forward Loss deferred tax asset" of $6,163,931 as of December 31, 2022, and $2,644,202 as of December 31, 2021. *Id.* at 8.

67.     These purported assets represent carried forward tax credits for net operating losses in prior tax years.

68.     Considering Nostrum's substantial operating losses for at least several years, default on its debts, and inability to satisfy obligations as they come due, Mr. Balla concluded that

15

reserves were necessary given that there was an "evident impairment of this deferred tax asset", which might never materialize if such losses continue.  *Id.* at p. 9.

69.    Nostrum failed, however, to establish and report any reserve against the deferred tax credits in its financial statements.  *Id.* at 9.

70.    To reflect proper accounting treatment, Mr. Balla fully reserved against the deferred tax credit balances, further reducing both Nostrum's "Other Current Assets" and its "Total Stockholder Equity" on its balance sheets.  *Id.* at 9.

### d.  Nostrum's Overstatement of the Value of the ANDAs.

71.    The Balla Report also concludes that Nostrum substantially overstated the value of its ANDAs due to a "material overstatement of forecast revenues." *Id.* at 21.

72.    While GAAP requires an annual valuation of indefinite-lived intellectual property, such as ANDAs, no such valuation had been prepared by Nostrum or its auditors since 2014.  *Id.* at p. 20

73.    Likewise, while the Financial Accounting Standards Board requires annual impairment testing for intangible assets such as intellectual property, neither Nostrum nor its auditor have tested the ANDAs for impairment since the purchase thereof in 2014.  *Id.* at p. 21.

74.    In concluding that the value of the ANDAs was materially overstated and should be written off, Mr. Balla compared the projected revenues for the ANDAs as set forth in the 2014 valuation to the projected revenues of the ANDAs by management as of 2024.  *Id.* at p. 20.

75.    Mr. Balla observed that while Nostrum advised its appraiser (in 2014) that it expected to have revenues of $38 million from its ANDAs, it projected just $2.2 million in 2024. *Id.* at 19-20.

I. **Nostrum's Dissipation of Citizens Collateral**

76.      Nostrum has dissipated ANDAs and inventory, and Citizens' Collateral is immediately at risk of continued dissipation.

77.      Mr. Balla reported that on June 17, 2024, after Judge Castner held the receivership hearing and while her decision was pending, Nostrum sold several ANDAs and "immediately" used the "sale proceeds . . . to meet [Nostrum's] current liability obligations," rather than paid to Citizens as proceeds of its Collateral.  *Id.* at 9.

78.      The ADNA sale during the pendency of the receivership motion evidences not only the inability of Nostrum to continue to operate without diminishing the value of Citizens' collateral, but Nostrum's contempt for the Court, its creditors, and contractual obligations.  *Id.* at 9.

79.      Nostrum neither notified Citizens nor sought Citizens' consent to sell the ANDAs and Citizens was not even aware of the sale until its disclosure in the Balla Report.[8]

80.      Consistent with myriad misrepresentations made to the District Court, Nostrum's CFO submitted a declaration to the District Court in response to the Balla Report falsely stating that the sale of the ANDAs did not constitute a breach of the loan agreement, yet both the Loan Agreement and the Forbearance Agreement explicitly prohibit such transaction.  *See*, Ex. K, 9/23/24 Grainer Decl., ¶9; Ex. A, Section 5.02(e) (prohibiting sale of ANDAs after an Event of Default); Ex. E, Section 12(f)(iv) (requiring Citizens' consent to any sale of assets, including ANDAs).

---

[8]      Prior to the ANDA sales in June 2024, the Debtor's CFO swore to the District Court that "it would be impossible, if not extremely difficult, to fraudulently transfer assets used in the pharmaceutical industry. By law, a transfer of an ANDA is highly regulated and requires significant regulatory controls . . ." *See*, Ex. L, Grainer Decl. Nov. 20, 2023, ¶ 50.  Yet, the only notice to Citizens regarding the sold ANDAs and use of proceeds was in the Balla Report.

17

81.    With respect to Nostrum's inventory, the Balla Report reflects a concern regarding possible mismanagement of finished inventory, or production of inventory levels beyond demand within expiration dates, as demonstrated by donated inventory in the amount of approximately $400,000 as of August 2024 and $170,000 as of August 2023, without any records or supporting information.  *See* Balla Report at p. 19.

82.    The same indicates both dissipation of Citizens' Collateral and, again, an overstatement of value by Nostrum on its financial statements.  *Id.*

**J.    Additional Evidence of Incompetence and Gross Mismanagement**

83.    While Nostrum has, for more than fifteen (15) months, failed to pay Citizens and numerous other creditors, the record confirms it has made payments to related companies, payments for personal expenses, has employed discredited financial professionals and, though the Citizens debt has been matured for more than two (2) years, has failed to put in place any plan to stabilize the business and pay creditors.

84.    Even the docket of this very recently filed case shows the Debtor's was making those payments at the expense of its employees (*see*, Claim No. 3 for deferred compensation), taxing authorities (*see* Claim No. 2), and other creditors, such as Citizens.

85.    Nostrum's conduct, and dismissal of such payments as "trivial", reflects its contempt for its creditors, the Court, the contracts it signs and the covenants to which it is bound and underscores the urgent need to replace current management with a trustee that will be a true fiduciary.

**a.    Payments to related companies at the expense of creditors**

86.    Two ***known*** examples of payments to related companies while Nostrum was not paying creditors are the millions paid to Enem Nostrum Remedies Private Limited ("EnEm"), a

related party owned by family members of Nostrum CEO, Nirmal Mulye, and thousands paid to

Pharma.

87.    The Balla Report highlights millions in dollars in payments to EnEm—a related

party owned by family members of Nostrum CEO, Nirmal Mulye. *Id.* p. 13.

88.    While Nostrum represented to Mr. Balla that EnEm research and development

activities have been minimal, Mr. Balla learned that EnEm was paid $1,600,000 in the first six

months of 2024 and $3,800,000 in 2023. *Id.*    No other purpose for such payments was provided

to Mr. Balla.

89.    Likewise, Nostrum has paid thousands of dollars in management fees to Pharma.

90.    After the occurrence of an Event of Default under the Loan Documents and

instruction by Citizens that all payments to Pharma for management fees should cease in

accordance therewith, Nostrum undisputedly paid the Parent more than $70,000.

91.    Mr. Grainer dismissed this payment as a "trivial amount." *See*, Ex. <u>L</u>, Grainer Decl.

Nov. 20, 2023, ¶ 50.

### b. Self-Dealing

92.    Mr. Balla discovered numerous suspicious payments made from Nostrum's

accounts with no apparent business purpose, including payments appearing to be "personal in

nature". *Id.* at 16-17.

93.    Among other things, Mr. Balla identified (a) automobile payments for a Mercedes

and Lamborghini[9], (b) payments to a residential apartment complex, (c) an unexplained $6,000

wire transfer from Nostrum's controller to Nostrum which the controller purported was a loan from

---

[9]    The District Court observed: "I mean, could there be another more extravagant vehicle than a
Lamborghini?" *See*, Ex. I, Tr. 9/42/24 Hrg., p. 41, Ln. 16-17.

himself to Nostrum, (d) approximately $22,100 in payments to Sam's Club; and (e) purchases from eBay totaling approximately $12,000 thousand. *Id.* at p. 16-17.

94.     Nostrum's response to the payment of Lamborghini expenses while creditors went unpaid: "the automobile was acquired. . . before the loans at issue were underwritten." *See*, Ex. L, Grainer Decl. Nov. 20, 2023, ¶ 55.

### c.  Nostrum's Employment of Discredited Financial Professionals

95.     With respect to Nostrum's audited financial statements, Mr. Balla expressed serious concern regarding the history of Nostrum and its independent auditor, RAM, of not finalizing audited financials in a reasonable timeframe, having not finalized the 2021 AFS until December 31, 2022, not finalized Nostrum's 2022 AFS until April 19, 2024, and having provided no 2023 audited financials as of the date hereof. *Id.* at 14.

96.     Indeed, RAM did not even commence its audit of Nostrum's 2023 financial statements until August 2024 – four months after the audit was due under Nostrum's loan agreement with Citizens. *Id.* at 14.

97.     During Mr. Balla's interview with Parameswara Ramachandran (a RAM partner), Mr. Ramachandran explained that Nostrum had not provided RAM with its 2023 trial balances until August 2024 and that RAM's delay in issuing an independent auditor's report for 2023 was due to its waiting for the Balla Report. *Id.* at 15.

98.     Mr. Balla documented his concern with these disclosures and explained that the timely preparation of audited financial statements is "invaluable to management when making key operational and financial decisions." *Id.* at 15.

99.     Further, the Balla Report notes that RAM, as Nostrum's independent auditor, must perform its own audit procedures, analytics, and confirmation to render its audit opinion on the financial statements of Nostrum taken as a whole.  *Id.* at 15.

100.    The Balla Report further explains that the United States Public Company Account Oversight Board issued a Disciplinary Order in 2023 sanctioning RAM for violations of applicable accounting rules and standards in connection with multiple audits as well as violations of quality control standards. *Id.* at 15.

101.    Among other things, the Disciplinary Order also revoked RAM's registration and barred Mr. Ramachandran from being an associated person of a registered public accounting firm. *Id.* at p. 15.

102.    Ultimately, the Balla Report opined that "a qualified or adverse going concern opinion" should have been issued by RAM in both 2021 and 2022 and that the financial condition of Nostrum further deteriorated through June 30, 2024. *Id.*

103.    In addition to using auditors sanctioned for failing to follow audit rules and procedures, the Debtor also employees an individual convicted of bank fraud[10] as one of its consultants.  Of course, Nostrum's CFO dismissively explains, "I understand that Mr. Anand's background was disclosed before the issuance of the loans in question." *See*, Ex. L, Grainer Decl. Nov. 20, 2023, ¶ 57.

**K.     Nostrum's Gross Mismanagement is Evidenced by its Failure to Have Any Plan Whatsoever**

104.    In spite of its dire financial straits, advice from Dalto that it needed a business plan and year-long litigation with Citizens over repayment of a $18MM matured debt, Nostrum has no plan.

---

[10] *See* https://www.justice.gov/archive/usao/nys/pressreleases/June08/anandallieddealssentencingpr.pdf.

105.    The Balla Report finds:

(a)    During interviews with Nostrum's executive management, Mr. Balla was informed that the executive management meets at least weekly to determine which vendors will be paid since cash flow is insufficient to pay vendor invoices in a timely manner;

(b)    Nostrum is currently paying vendors that either (i) provide goods or services critical to operations or (ii) pose a significant threat of impending litigation;

(c)    Nostrum's Kansas City facility operates only one 8-hour shift, five days a week because although its business operates on very thin margins and profitability is based on maximum utilization of plan operations, ideally three 8-hour shifts, seven days a week, Nostrum does not have sufficient sales revenue to operate more than the five 8-hour shifts weekly.

106.    During his investigation, prior to issuing the Balla Report, based on conversations with Nostrum's management, Mr. Balla determined that:

(a)    Nostrum has no plan to sell any of its intellectual property, including NDAs and ANDAs and did not have plans to sell any other assets to obtain additional revenue streams;

(b)    Nostrum does not currently have access to new debt financing and/or debt restructuring;

(c)    Nostrum has significantly reduced employee headcount and related costs but that further reductions are unlikely as Nostrum is already operating as leanly as possible;

(d)    Nostrum has not produced any plans for future cost reductions;

(e)    Nostrum has not identified any new equity streams.

*Id.* at pp. 23-24.

107.    Only after the Balla Report was issued did the Debtor provide its "business plan," which, the District Court confirmed amounted to "nothing more than unsubstantiated aspirations." *See*, Ex. I, Tr. Hrg. 9/24/24, p. 48:12-15.

108.    Nostrum's lack of a plan is likewise evident in this case.  To-date, it has not filed any typical first day motions, including permission to utilize cash collateral (to which Citizens

22

objects), permission to employ counsel, permission to pay critical vendors, permission to pay payroll or any other mechanisms that will need to be in place for the case to proceed and Nostrum's operations to continue.

109.    Nostrum did not plan for the payroll that it would need to make on October 4, 2024, instead seeking Citizens' consent thereto in a last-minute scurry on October 3, 2024.

110.    Nostrum's creditors have borne the burdens of the company's lack of plan for far too long and management should be replaced with a fiduciary that will act in the best interests of the estate.

**L.     The District Court's Findings Unequivocally Support Immediate Appointment of a Chapter 11 Trustee**

111.    On September 24, 2024, the Honorable Robert Kirsch held a hearing on Citizens' renewed motion for the appointment of a receiver, granted the application and found that Citizens sufficiently showed each prong necessary to justify the appointment of a receiver under Fed. R. Civ. P. 66. *See generally*, Ex. I, 9/24/24 Tr.

112.    The District Court observed that this "is a pretty simple, straightforward case" and, while the judge hearing the initial application for an appointment of a receiver was "very contemplative and very deliberative, and very measured . . . , another judge on these facts would have appointed a receiver right away." *Id.* at 6:22-25.

113.    Judge Kirsch further explained that "the underlying loan was for 22 something million. As I'm looking at you, 17 something million remains. And if my information is correct, the defendants haven't paid a cent on this since July of '23. Yet somehow, the defense's position presents a very rosy financial vista. ***Something is not making sense to me***." *Id.* at 9:2-7 (emphasis added).

114.    Judge Kirsch rejected Nostrum's attempt to further delay the proceedings by requesting additional discovery and advised Nostrum's counsel that: "I'm getting the distinct impression from my review of this record that delay is your friend, at every juncture, and I mean this with the utmost respect. At every turn, including a letter that I got from you yesterday seeking to postpone this ad infinitum, today, that *there is no juncture that the defense will resist to avoid joining this issue. And I'm telling you, no more*." *Id.* at 11:23-12:4 (emphasis added).

115.    Mr. Balla appeared at the hearing and testified about his observations and experience dealing with Nostrum and his well-reasoned report.

116.    At the conclusion of the hearing, Judge Kirsch announced that he would appoint a receiver over the operations of Nostrum. *Id.* at 103:8-13.

117.    In doing so, Judge Kirsch explained that he was relying on the substantial expertise of Mr. Balla "pointed out a number of irregularities" including "collectability issues; he testified to oddities where corporate employees are lending the company *de minimis* amounts of money, which is odd, to say the least; that there were advances and/or loans totaling $29 million to either a parent and/or related company; that there are insufficient reserves; that three ANDAs were sold to meet operating costs; and that the plan, so to speak, to increase sales, to launch new products, to get investors, *all were illusory, meaning aspirational, with no underlying, confirming substantiating commitments*." *Id.* at 103:6-104:11 (emphasis added).

118.    Judge Kirsch further explained that "[t]he exhaustive report prepared by the fiscal agent, his testimony today, unmistakably, unquestionably, unambiguously reflects a precarious financial position, including selling three ANDAs for $900,000, none of which went to the plaintiff, which nobody disputes has millions of dollars due and owing, but instead for operating expenses." *Id.* at 107:13-19.

119.    The court also observed that Nostrum "has done ***everything it can to delay*** and engage in all sorts of dilatory antics here," which the Court would no longer countenance. *Id.* at 112:1-3 (emphasis added).

120.    Considering the Debtor's dishonesty, incompetence and gross mismanagement of its affairs, as evidenced by, among other things, the extensive findings set forth in the Balla Report and Judge Kirsch's ruling that the appointment of a receiver over the Debtor was necessary, Citizens respectfully submits that the creditors in this case will be best served by the appointment of a chapter 11 trustee in this case.

## **RELIEF REQUESTED**

### A.    **Legal Standard for the Appointment of a Chapter 11 Trustee**

121.    A debtor-in-possession owes fiduciary duties to its creditors and the estate. *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998). These duties include the duty of care to safeguard estate assets, the duty of loyalty and the duty of impartiality. The rights of a debtor-in-possession are not absolute and may be forfeited if the debtor is incapable of fulfilling its fiduciary obligations. *See In re Morningstar Marketplace, Ltd.*, 544 B.R. 297, 303 (Bankr. M.D. Pa. 2016).

122.    Pursuant to 11 U.S.C. § 1104(a), courts are required to appoint a trustee upon the finding of cause, or if the appointment is in the interests of creditors, equity holders and the estate.

123.    Section 1104(a) states, in pertinent part:

> (a)    At any time after the commencement of the case but before confirmation of plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>
> > (1)    for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders

of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2)     if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

124.    Prepetition conduct alone is sufficient to warrant the appointment of a trustee. *In re Rivermeadows Assoc., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995) ("[T]he Code is clear that the prepetition conduct of the debtor's management may be the sole deciding factor' in the appointment of a chapter 11 trustee.); *Savino Oil*, 99 B.R. at 526 ("This prepetition course of conduct, in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee.").

125.    While Section 1104(a)(1) of the Bankruptcy Code identifies four grounds upon which "cause" may be found – fraud, dishonesty, incompetence or gross mismanagement – these are not exclusive grounds and additional ground may be determined on a case-by-case basis. *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1998); *In re Intercat Inc.*, 247 B.R. 911, 920-21 (Bankr. S.D. Ga. 2000).

126.    Additional factors may include:

(a)     Materiality of misconduct;

(b)     Evenhandedness or lack of same in dealings with insider or affiliated entities vis-à-vis other creditors or customers;

(c)     The existence of per-petition voidable preferences or fraudulent transfers;

(d)     Unwillingness or inability of management to pursue estate causes of action;

(e)     Conflicts of interest on the party of management interfering with its ability to fulfill fiduciary duties to the debtor;

(f)     Self-dealing by management or waste or squandering of corporate assets.

*Intercat, Inc.*, 247 B.R. at 920-21; *In re Nartron Corp.*, 330 B.R. 573, 592 (Bankr. W.D. Mich. 2005).

127.    "If 'current management' is found to have engaged in 'fraud, dishonesty, incompetence or gross mismanagement' due to acts or omissions that occurred either before or after the commencement of the case, the Court, pursuant to 11 U.S.C. § 1104(a), must direct the appointment of a trustee." *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989).

128.    "[T]he appointment of a trustee is mandatory upon a determination of cause, but also [] 'a determination of cause . . . is within the discretion of the court.'" *In re Marvel Entertainment Group Inc.*, 140 F3d at 472 (quoting *In re Sharon Steel*, 871 F.2d at 1228).

129.    Acrimony between the debtor and creditors of the estate may rise to the level of "cause," justifying the appointment of a trustee where it results in an insurmountable conflict between the debtor's interests and its fiduciary obligations to creditors.  *Id.*

130.    Further, a debtor's inability to satisfactorily explain the diversion of assets to an affiliate is evidence, at minimum, of incompetence or gross mismanagement and, at most, of actual fraud, justifying the appointment of a trustee.  *In re PRS Insurance Group, Inc.*, 274 B.R. 381, 387 (Bankr. D. Del. 2001).

**B.    Cause Exists For the Appointment of a Chapter 11 Trustee**

131.    As set forth in detail and as developed fully in the record before the District Court, cause exists for the immediate appointment of a chapter 11 trustee including, among other things, Nostrum's gross mismanagement and dishonesty.

132.    In determining to appoint a special fiscal agent and, more recently, a receiver, the District Court already found that Nostrum is grossly mismanaged, has dishonestly and materially overstated the value of assets, and has engaged in abusive stall tactics to enrich the company's

management at the expense of creditors. As explained below, these findings should apply with equal force to this motion.

133.    The standards for appointment of a receiver under Fed. R. Civ. P. 66 are strikingly similar to the standards for appointing a chapter 11 trustee under Section 1104 of the Bankruptcy Code, including gross mismanagement. Courts appointing receivers under Fed. R. Civ. P. 66 do so where there is a danger that property in which the plaintiff holds an equitable interest is at risk of being lost, injured, diminished in value or squandered. *See, e.g., Tanzer v. Huffines*, 408 F.2d 42, 43 (3d Cir. 1969) (recognizing that a "receiver may be appointed to avert further loss of assets through waste and mismanagement."). Likewise, where corporate funds are misused or fictitious invoices are presented as true, the appointment of a receiver is warranted. *See, e.g.*, *Kacmarski v. Eppehimer*, 2014 WL 7404538 (D.N.J. Dec. 30, 2014); *McDermott v. Russell*, 523 F. Supp. 347, 352 (E.D. Pa. 1981)

134.    Under Section 1104, appointment of a chapter 11 trustee is warranted on evidence of gross mismanagement, dishonesty, incompetence and self-dealing. While Citizens need not demonstrate every factor to justify the appointment of a chapter 11 trustee, as the fully developed record before the District Court shows, ***all*** of these factors are present here.

135.    Nostrum's dishonesty is reflected in inflated financial statements, the diversion of corporate funds for personal use, and the dissipation of Citizens' Collateral. *See*, *PRS Insurance Group, Inc.*, 274 B.R. at 385 ("Diversion of funds and misuse of corporate assets constitute fraud or dishonesty sufficient to warrant appointment of a trustee under section 1104(a)) (citing numerous cases in support).

136.    While Nostrum urged the District Court to view its business as stable, solvent, improving, and well managed, Mr. Balla's findings directly and bluntly contradict the story

Nostrum falsely presented to its creditors and the District Court.  Specifically, the Balla Report identified Nostrum's management's material misstatements and overstatement of its assets in its financial statements by nearly $40 million dating back to at least 2022.  Among other things, Nostrum's management mischaracterized and failed to adequately reserve against insider transactions of nearly $30 million, uncollectible receivables of nearly $8 million, and deferred tax credits of more than $6 million.  Nostrum likewise reported inflated values (by tens of millions of dollars) of its intellectual property on its financial statements, based on unreliable, stale and untested projections prepared in 2014.

137.    The Balla Report likewise identified many suspicious expenses indicating self-dealing during periods when creditors went unpaid, including payments made by Nostrum for a Lamborghini, a Mercedes, a residential apartment unit, and tens of thousands of dollars in purchases from Sam's Club and eBay.

138.    The sale of Citizens' Collateral and diversion of the proceeds thereof further illustrates Nostrum's dishonesty and brazen disregard for creditors and the Court.  The sale of the ANDAs (Citizens' collateral) occurred while Judge Castner was deliberating on the receivership motion, and after Nostrum told the Court that a transfer of the highly regulated ANDAs would be "impossible, if not extremely difficult."  Nostrum deliberately concealed this transaction from Citizens – no consent was sought, no notice given, no proceeds delivered – and the transaction only came to light after Mr. Balla inquired about a peculiar $900,000 cash infusion to the company. Nostrum then falsely represented to the Court in the Grainer Declaration that the sale was in accordance with the Loan Documents.

139.    The record is also replete with examples of Nostrum's gross mismanagement and incompetence.  Given the opportunity to show cooperation, full transparency and competent

management and to assure the fiscal agent, Citizens and the District Court that Citizens' interests

in its Collateral was secure, the Debtor instead erected roadblocks to delivery of information,

access to employees and access to vendors.  Nostrum hindered and delayed the flow of information

at every opportunity to conceal the overstatement of assets and management.  It refused to provide

financial information to the special fiscal agent and even attempted to delay the release of Mr.

Balla's report.

140.    The Balla Report also concluded that Nostrum employs a discredited financial

auditor who, among other things, failed to utilize established accounting methods, to obtain

sufficient support for various assets listed in Nostrum's financial statements, and to issue a

qualified or adverse going concern opinion as mandated under generally accepted accounting

principles.  Nostrum likewise failed to follow accounting standards requiring annual valuations of

ANDAs and impairment testing that, if followed, would have resulted in a significant write-down

of the value of those assets by tens of millions of dollars.

141.    Finally, the Balla Report's findings and conclusions make clear that current

management is incapable of being a fiduciary.  The Debtor's filing of this bankruptcy case

represents not an honest effort by the Debtor to deal with its creditors in good faith, but rather

simply the latest delay tactic in a years' long effort to thwart Citizens at every turn.  Indeed, the

filing of this bankruptcy case, after many months of acrimonious litigation with Citizens, was

precipitated by the determination by Judge Kirsch that a receiver should be appointed over the

business operations of the Debtor.

142.    Mr. Balla also testified, consistent with the testimony of Nostrum's former

restructuring consultant, that Nostrum has ***no plan*** whatsoever to sell assets to generate revenues,

has no access to new debt financing, cannot reduce costs beyond its current reductions, has no plan

for further cost reductions in any event, and has not identified any new equity streams.  While Nostrum belatedly delivered a "business plan" to Mr. Balla on September 16, 2024, Mr. Balla and Judge Kirsch concluded that the plan was purely aspirational, illusory, and unrealistic.

143.   The lack of a plan is evident in the dissipation of Citizens' Collateral during the pendency of a receivership motion, to (impermissibly) fund operating costs and ongoing losses.

144.   The lack of a plan is also evident in the filing of the Petition.  No first day motions have been filed.  The need to make October 4 payroll was not considered and instead became an emergency on October 3, 2024.

145.   As of today, a week after filing the Petition, Nostrum has no counsel[11].

146.   Nostrum has not presented any terms to Citizens or the Court for the use of cash collateral and, instead, upon information and belief, Nostrum is using cash collateral over Citizens' objection and without Court approval in contravention to the provision of the Bankruptcy Code.

147.   The District Court's record and the Balla Report's expansive documentation of the mismanagement, incompetence and gross ineptitude of Nostrum's management team is sufficient, standing alone, to justify the appointment of a chapter 11 trustee.  Indeed, just a few days before filing its Petition, Judge Kirsch concluded that the Balla Report, together with evidence already of record, were unquestionably sufficient evidence of financial malfeasance and mismanagement to justify the extraordinary relief of a receivership.

148.   The numerous findings set forth in the Balla Report, including material misstatements in the Debtor's financial statements, the Debtor's inability or refusal to provide support for substantial advances to affiliates, suspicious payments made by the Debtor for what appear to be personal expenses including, gallingly, payments made toward the financing of a

---

[11] Citizens' counsel was advised on October 5, 2024, that filing counsel for Nostrum has or will imminently withdraw from representing the Debtor.

Lamborghini, and the Debtor's utter inability to formulate any sort of plan to right the ship, justify the appointment of a chapter 11 trustee.

149.    Nostrum's Petition is nothing more than a last-ditch attempt by the Debtor's management to further delay dealing fairly with its creditors, to end-run Judge Kirsch's determination, and to maintain control of a floundering company.

150.    Based on the above-summarized circumstances, including the expansive findings set forth in the Balla Report and Judge Kirsch's determination approximately a week ago that control of Nostrum should be placed in the hands of a third party, Citizens respectfully submits that ample grounds exist for the appointment of a chapter 11 trustee.

**C.    In the Alternative, Nostrum's Bankruptcy Petition Should Be Dismissed so that Judge Kirsch May Proceed with the Appointment of a Receiver**

151.    Although ample grounds exist to find cause for the appointment of a chapter 11 trustee and that such appointment would be in the best interests of Nostrum's creditors and the estate, if this Court does not order the appointment of a chapter 11 trustee, this Court should dismiss Nostrum's bankruptcy petition as a bad faith filing.

152.    Section 1112(b) of the Bankruptcy Code provides that a chapter 11 case may be dismissed "for cause" and lists numerous factors that may constitute cause thereunder.

153.    "The factors listed in section 1112(b) are not exhaustive, and the Bankruptcy Code affords a bankruptcy court wide discretion to determine if cause exists. The bankruptcy court can consider other factors that may arise and use its equitable powers to reach a property result." *In re Tornheim*, 181 B.R. 161, 163 (Bankr. S.D.N.Y. 1995).

154.    Although not specifically enumerated in section 1112(b), "it is well settled that the filing of a bankruptcy petition in bad faith constitutes 'cause' for dismissal or conversion of a case under Bankruptcy Code Section 1112(b)." *See In re Artisinal 2015, LLC*, Case No. 17-12319, 2017

WL 5125545, at *8 (Bankr. S.D.N.Y. Nov. 3, 2017) (quoting *IN re Ancona*, No. 14-10532, 2016 WL 7868696, at *3 (Bankr. S.D.N.Y. Nov. 30, 2016)).

155.     Included among the factors that courts commonly implicate bad faith include where a debtor's filing is precipitated by a dispute between the debtor and a secured creditor that can be resolved in another forum and where the timing of the filing evidences an intent to frustrate a secured creditor. *In re Y.J. Sons & Co., Inc.*, 212 B.R. 793, 802 (D.N.J. 1997) (citing *IN re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394-95 (11th Cir. 1988)).

156.     The filing of a bankruptcy petition may also be considered to be made in bad faith where it is done with no reorganizational purpose. *See In re SGL Carbon Corp.*, 200 F.3d 154, 156 (3d Cir. 1999).

157.     "The Third Circuit Court of Appeals has held that where the circumstances indicate that person have willfully misconducted a corporate enterprise, bankruptcy courts may refuse to permit them to use the bankruptcy system to create a situation more favorable to their interests than the receivership already established." *In re Matter of Ofty Corp.*, 44 B.R. 479, 482 (Bankr. D. Del. 1984) (citing *In re Distillers Factors Corp.*, 187 F.2d 685, 689 (3d Cir.).

158.     In *Ofty Corporation*, a receiver who had been appointed to liquidate the debtor corporation moved to dismiss the debtor's bankruptcy petition or for the appointment of a trustee. 44 B.R. 479 (Bankr. D. Del. 1984).  After determining that the receiver had standing to challenge the bankruptcy filing, the bankruptcy court observed that the district court had already appointed a receiver to liquidate the debtor's assets after it found that the debtor's majority shareholders had acted in bad faith. *Id.* at 481.

159.     The court noted that the filing of the bankruptcy petition stayed the receiver's ability to fulfill his duties and placed control of the company back in the hands of the very parties

that the district court had already determined were mismanaging the corporation. *Id.* at 481-82. And the court observed that the bankruptcy petition was filed in an attempt to "end-run" the district court's receivership order. *Id.* at 482.

160.    Here, Judge Kirsch has already determined that Nostrum's precarious financial condition and gross mismanagement constituted an emergency and warranted the immediate appointment of a receiver to take control of Nostrum's business operations.  At the receivership hearing on September 24th, Judge Kirsch acknowledged Nostrum's relentless efforts to delay Citizens' pursuit of the amounts due to it under the Loans and expressed discontent for the baseless legal arguments Nostrum had attempted to advance to the delay the adjudication of Citizens' simple case.

161.    Judge Kirsch aptly expressed his "distinct impression from [his] review of this record that delay is [Nostrum's] friend, at every juncture." *See* 9/24/24 Tr. at11:23-12:4.

162.    Nostrum's filing of this bankruptcy case represents not a good faith attempt to deal honestly with its creditors, but rather simply its latest effort to hinder and delay Citizens' rights at every juncture.

163.    After years of litigation, many months of delay, and just days after Judge Kirsch announced his decision to appointment of a receiver over Nostrum, Nostrum's bankruptcy filing must be viewed for what it transparently is: a disingenuous attempt by Nostrum's management to subvert Judge Kirsch's findings of significant financial distress and gross mismanagement to regain control of a floundering business.

164.    While Citizens believes that the appointment of a chapter 11 trustee will best serve the interests of Nostrum's creditors and the estate, Citizens respectfully submits that, as an alternative, "cause" exists to warrant dismissal of Nostrum's bankruptcy petition.

**Proposed Chapter 11 Trustee**

165.    In light of the foregoing, Citizens Bank seeks to appoint Vladimir Kasparov of Portage Point Partners as the chapter 11 trustee in this case.  Mr. Kasparov has significant relevant experience in the pharmaceutical industry.  Most recently, Mr. Kasparov was appointed as chief restructuring officer of Teligent, Inc. a New Jersey based manufacturer and seller of generic pharmaceutical products in the United States and Canada.  For a variety of reasons, including the effects of COVID-19, Teligent filed for bankruptcy in 2021 to implement a marketing process for the sale of the Debtor's assets.  The sale resulted in the sales of three sets of assets to three different buyer-groups.  Mr. Kasparov is knowledgeable and experienced with the types of assets unique to this industry space, including ANDAs.

166.    The one point on which Citizens and the Debtor can agree is that only professionals experienced in the generic pharmaceutical industry would be positioned to keep the company operating.

167.    Portage possesses that requisite experience.

168.    Appointing Portage now as chapter 11 trustee will increase the probability that Nostrum might continue as a going concern, while Portage creates a plan that will benefit all stakeholders – something that Nostrum's current management has proven incapable and unwilling to do.

169.    Given the Debtor's counsel's sudden withdrawal, the Debtor's lack of a plan to pay payroll or any other expenses, and considering the Debtor's inability to operate without selling off Citizens' Collateral, the window of opportunity to salvage any value from the Debtor's operations is closing quickly.

170.    Portage is the best fit to maximize value for the benefit of all stakeholders.

**Waiver of Memorandum of Law**

171.    Citizens requests that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which Citizens relies is set forth herein and this motion does not raise any novel issues of law.

## CONCLUSION

Citizens respectfully requests that this Court enter an Order directing the Office of the United States Trustee to appoint a chapter 11 trustee in the Nostrum's bankruptcy case or, in the alternative, dismissing this chapter 11 case as a bad faith filing.

STRADLEY, RONON, STEVENS
& YOUNG, LLP

Date: October 6, 2024

/s/   Julie M. Murphy
Julie M. Murphy, Esquire
Daniel M. Pereira, Esquire
Joseph Catuzzi, Esq.
Stradley Ronon Stevens & Young LLP
457 Haddonfield Road, Suite 100
Cherry Hill, NJ  08002
Tel: (856) 321-2409
Fax: (856) 321-2415
E-Mail: jmmurphy@stradley.com
        dpereira@stradley.com
        jcatuzzi@stradley.com

Gretchen M. Santamour, Esq.
Stradley Ronon Stevens & Young LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Tel: (215) 564-8000
Email:  gsantamour@stradley.com
(*Admission Pro Hac Vice Pending*)

*Attorneys for Citizens Bank, N.A.*

6062911