**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

ANSELL GRIMM & AARON, P.C.
James G. Aaron, Esq.
Anthony D'Artiglio, Esq.
Ansell Grimm & Aaron, P.C.
365 Rifle Camp Road
Woodland Park, New Jersey 07424
Tel: (973) 247-9000
E-mail: adartiglio@ansell.law
*Proposed Attorneys for Nostrum Laboratories, Inc.*

In re:

NOSTRUM LABORATORIES, INC.,

        Debtor.

Case No.: 24-19611

Chapter 11

Honorable John K. Sherwood, U.S.B.J.

Hearing Date: October 15, 2024

## DEBTOR'S OPPOSITION TO CITIZEN BANK, N.A.'S MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE OR, IN THE ALTERNATIVE, DISMISSAL OF CHAPTER 11 CASE

Debtor Nostrum Laboratories, Inc. ("Debtor" or "NLI"), by and through its undersigned counsel, hereby opposes Secured Creditor Citizens Bank, N.A. ("Citizens") motion on an emergent basis for the appointment of a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a) or, in the alternative, dismissal of this chapter 11 case pursuant to 11 U.S.C. § 1112(b) (the "Motion").

### INTRODUCTION

1. On September 30, 2024, Debtor filed a Voluntary Petition for Non-Individuals Filing for Bankruptcy. Concurrent with the filing of this Motion, the Debtor filed motions to utilize its cash collateral to pay its employees, to extend the time to file its schedules and related documents, and an application to hear these motions on an expedited basis.

1

2.       The Debtor is an operating pharmaceutical business developing and manufacturing generic products for the United States market and has a well-defined business plan to commercialize generic products.

3.       As a pharmaceutical business, the Debtor is subject to numerous and strict regulations of agencies such as the Food and Drug Administration ("FDA") and Centers for Medicare and Medicaid Services ("CMS").

4.       As such, the Debtor's business is specialized and unique compared to other industries.

5.       Due to various factors that have since been resolved including short-term operational issues and a wrongful applied inflation penalty by the CMS that prevented Debtor from pursuing debt or equity financing for three years until it was settled recently, the Debtor had a temporary cash crunch which impacted operations.

6.       Unfortunately, Citizen's actions to appoint a receiver would have triggered a default under the DOJ agreement potentially creating a $50 million dollar liability that would have destroyed the company leaving its creditor body unable to recover in this Bankruptcy.

7.       One recalcitrant creditor on a premature motion before first day motions were filed, schedules are filed, or substitute counsel even entering the case seeking to appoint a trustee should not be permitted to dictate the future of this Bankruptcy. In short, this Motion is ***grossly premature***.

8.       Contrary to Citizens hyperbolic assertions predicated on a misunderstanding of the pharmaceutical industry and ignoring relevant points when convenient, management for the Debtor has a structured plan that it will implement in conjunction with the subject bankruptcy.

9.       Under the U.S. Trustee's Office and this Court's close supervision, Debtor will sell its assets to pay the creditors, including Citizens in full, while continuing to operate so as to maximize the value of its assets.

10. Management for the Debtor has specialized knowledge of the pharmaceutical industry, the value of its assets, and is uniquely positioned to continue operating the Debtor business.

11. Moreover, Citizens cannot meet its requisite standard to appoint a chapter 11 trustee or to dismiss the chapter 11 case, as NLI has been properly managed since its inception nearly *three decades ago* and no cause exists to grant either motion.

12. Indeed, the appointing of a chapter 11 trustee will interrupt the plan that debtor will institute moving forward and harm, not help, the Debtor and, most importantly, its large body of unsecured creditors.

13. Debtor respectfully requests that the Court deny Citizens' Motion, which is nothing more than an improper attempt by Citizens to hijack the Bankruptcy process, seeking to compel a process wherein the Trustee as the collection agent for Citizens rather than protect the unsecured creditor body as a whole.

## BACKGROUND

**I.    NLI Background.**

14. The Debtor is an operating pharmaceutical business developing and manufacturing generic products for the United States market that has manufacturing plants in Kansas City, Missouri (the "Kansas City Plant") and Bryan, Ohio (the "Ohio Plant").

15. The Debtor was formed by its Charmain of the Board and Chief Executive Officer Nirmal Mulye, Ph.D. in 1995, and has been operating its Kansas City and Ohio Plants since 2007 and 2015 respectively.

16. As such, the Debtor has been operating by management who has extensive knowledge in the specialized pharmaceutical space for decades.

3

**II.    Citizens Loan and the Forbearance Agreement.**

17.    On December 31, 2020, Citizens' predecessor, Investor Bank, extended three credit facilities to Debtor via a loan agreement totaling $22,000,000.00.

18.    As collateral for the loans, Debtor granted a perfected security interest in its business assets, including Debtor's accounts, goods, trademarks, contract rights, proceeds and products.

19.    On June 30, 2022, Citizens entered into an agreement with Debtor and Debtor's Chairman and Chief Executive Officer Nirmal Mulye, Pd. D. ("Mulye") granting an extension of the loan's maturity date to August 15, 2022.

20.    On October 31, 2022, Citizens, the Debtor and Mulye entered into a forbearance agreement (the "Forbearance Agreement") wherein Citizens agreed to forbear exercising rights and remedies against the Debtor until December 2, 2022 at the earliest, at which point the Debtor was to pay the outstanding loan amount.

21.    Prior to executing the Forbearance Agreement, Mulye conferred with Kenneth Dalto ("Dalto"), the principal of Dalto Consulting, Inc. ("Dalto Consulting"), who offered consulting services and experience in dealing with Citizens and its restructuring group.

22.    Dalto informed Mulye that Erin Kane, a member of Citizens' restructuring group, was engaged with the negotiation of the proposed Forbearance Agreement.

23.    After voicing his concern to Dalto about the expiration date of the Forbearance Agreement, Dalto spoke to Ms. Kane who advised that the Debtor would be granted an extension.

24.    Additionally, Ms. Kane provided assurances to James L. Grainer, Chief Financial Officer of Debtor ("Grainer") that extensions would be provided as needed.

25.    Thereafter, and due in large part to assurances made by Citizens, the Debtor and Mulye entered into the Forbearance Agreement.

26. Citizens reneged on its assurances that extensions would be provided and filed an action in the District of New Jersey captioned *Citizens Bank, N.A., v. Nostrum Laboratories, Inc. et al.; Civil Action No. 23-20765* on September 28, 2023 to recover the outstanding loan amount of $17.1 million.

### III. The Debtor's Recent Financial Hardships.

27. The Debtor has been facing relatively recent financial headwinds that has led to it being cash starved although the Debtor possesses significant value in its assets such as Abbreviated New Drug Applications ("ANDA"), commercialized, and two manufacturing facilities associated with the ANDAs.

28. In 2020, CMS wrongfully applied an inflation penalty for NLI's Nitrofurantoin product that created a liability of over $34,000,000.00, causing NLI to terminate its contract with CMS for this product.

29. The Department of Justice (the "DOJ") investigated NLI regarding rebates owed by NLI under the Medicaid Drug Rebate Program for over two years concluding with a settlement between NLI and the DOJ in 2023.

30. Significantly, the DOJ's investigation featured an extensive examination of the Debtor's finances since November of 2020, including many years of financial information, an inspection of Mulye personally, and every related company to the Debtor.

31. The DOJ did not find ***any wrongdoing*** and only found that the Debtor was credible and honest culminating in a settlement with the DOJ in 2023 – also representing in the Debtor shedding a $34,000,00.00 liability that has been burdening the Debtor from 2020 to 2023.

32. Importantly, if a receiver was appointed, as Citizens demanded, it would trigger a default under Debtor's settlement agreement with the DOJ, creating an uncontested liability of

$50,000,00.00, which is not in the Debtor's or creditor's best interest.[1]

33. Moreover, profits and sales temporarily plummeted because NLI lost exclusivity of Nitrofurantoin, a lead product, had to cancel a contract with CMS, and competition for several other products increased.

## IV. The Debtor's Plan.

34. The Debtor has a clearly delineated plan forward to strategically sell all or a substantial number of its assets while continuing to operate and grow its business.

35. The Debtor seeks to hire Raymond James, a financial services company that is highly regarded especially with respect to its pharmaceutical practice.

36. Indeed, the Debtor hired the same highly respected Raymond James bankers previously when it was in a similar situation resulting in selling four commercialized products for $75,000,000.00 while the Debtor's operations were allowed to continue.

37. Further, Debtor has already made significant financial progress in its continued goals of stabilizing and growing its business:

   a. Debtor has reduced its liabilities by nearly $40,000,000.00.

   b. Over the last years Debtor has reduced costs by nearly $30,000,000.00 and has initiated new measures that will provide additional cost savings of approximately $1,500,000.00.

   c. Debtor has obtained market approval and launch of new products such as Theophylline SR tablets and Fluoxetine Syrup.

38. Effectuating Debtor's clear plan forward is far more beneficial to the Debtors and

---

[1] It is possible that the DOJ could take the position that the appointment of a Trustee also triggers the liability confirming that the appointment of a Trustee harms the creditor body as a whole.

creditors than Citizens' proposition, which effectively includes the liquidation of the Debtor – a path that does not maximize the value of NLI.

V.     **Pre-Petition Litigation.**

39.     Citizens filed two complaints in the District of New Jersey seeking an award of the outstanding loan amount owed to it.

40.     The first complaint was filed on January 31, 2023, against Mulye before the Honorable Robert Kirsch, U.S.D.J.

41.     The second complaint was filed on September 28, 2023, against NLI and Nostrum Pharmaceuticals, LLC before the Honorable Georgette Castner, U.S.D.J.

42.     Prior to these matters being consolidated on August 12, 2024, Citizens brought a Motion to Appoint Receiver before Judge Castner, which included a full evidentiary hearing.

43.     On June 27, 2024 Judge Castner issued her opinion in which she did not find any wrongdoing on behalf of the Debtor and certainly did not find fraud, dishonesty, incompetence, or gross mismanagement.

44.     Judge Castner did conclude that "[t]he financial position of Nostrum Laboratories is subject to intense dispute between the parties, with each advancing competing claims about what precisely the evidence shows." *See* Declaration of Nirmal Mulye, Ph. D., **Exhibit C** at p. 20.

45.     Judge Castner also found that the appointment of a receiver "would do more harm than good", and that the Debtor "retains seemingly substantial value in ANDAs that could be sold to satisfy a judgment in this case." *See id.* at pp. 26 and 28.

46.     Citizens then renewed its Motion to Appoint Receiver before Judge Kirsch and a hearing was held on September 24, 2024 – only *a month and a half* after this aspect of the case was first before Judge Kirsch.

47. Thus, Judge Kirsch could not have had the same amount of familiarity in this complex matter that Judge Castner did who declined to appoint a receiver mere months prior.

48. Relying on the report authored by Keith Balla, Judge Kirsch announced that he would appoint a receiver over the Debtor.

**VI.    The Flawed Conclusions of the Balla Report.**

49. The Report of Special Fiscal Agent Keith S. Balla (the "Balla Report"), which Citizens almost exclusively relies on in its Motion, is predicated on incomplete information and a lack of understanding of the pharmaceutical industry.

50. Notably, Citizens thrust the Balla Report forward while failing to provide any firsthand knowledge in the entirety of their submission while the Debtor references numerous individuals who have direct and firsthand knowledge of Debtor's *actual* financial condition.

51. At the outset, the Balla Report only relies on financial information from 2021 to 2022, entirely ignoring improvements in NLI's operations, and its critical strategic initiatives as laid out in Debtor's business plan provided to Mr. Balla on September 18, 2024.

52. By relying solely on outdated information, the Balla Report did not analyze NLI's ongoing operations and its improvements focused on continuing its viability into 2024.

53. Additionally, the Balla Report applied a formalistic approach of Generally Accepted Accounting Principles ("GAAP"), without engaging in nuanced financial principles used to value *pharmaceutical* companies.

54. As such, the Balla Report is stale and cannot be used to accurately capture NLI's current financial condition and certainly cannot be used as the prevailing reason to appoint a chapter 11 trustee.

**A.  Citizens' Misleading and False Statements**

8

55. Citizens' Motion is riddled with erroneous and outright misleading statements that it relies on to show cause exists.

56. Debtor has done nothing to delay any proceedings, and instead has always acted transparently and in the best interest of NLI and its creditors.

57. Tellingly, no other creditors are acting remotely as aggressively as Citizens because the Debtor has been working with its creditors throughout it cash starved period.

58. Citizens' assertions that the Debtor has been anything but transparent to Mr. Balla is outright false, demonstrated by Citizens' failure to identify a single instance where requested information has not been provided.

59. Among the most egregious of Citizens' misstatements are the accusations of self-dealing levied against Mulye based on "appearances" alone.

60. For instance, the Balla Report cites NLI funds being used a residential apartment in Kansas City as an example of wrongdoing, when the apartment was used to accommodate employees visiting the Kansas City Plant.

61. Similarly, employees from Enem stayed at the apartment when they made business trips to NLI's Kansas City Plant to help on various projects.

62. By way of further example of misplaced assertions of self-dealing, Citizens Bank cites charges to Sam's Club and Ebay, when these charges were made to purchase discount office supplies.

63. Consistent with Citizens' aforementioned misleading assertions, RAM is an accounting firm that has been established since 1984, is in good standing, and is authorized to audit private companies. *See* Nirmal Decl. at **Exhibit D.**

64. Citizens' allegations that ANDAs were wrongfully sold is erroneous as the ANDAs

9

were sold in the regular course of the Debtor's business and the proceeds were used to maintain its operations.

65. At worst, there was a dispute at the prevailing contract terms, as there was language permitting the sale of ANDAs in the loan agreement that was not included in the Forbearance Agreement.

66. Citizens' also misunderstands the Debtor's relationship with EnEm as being one of self-dealing when in fact this relationship is critical to Debtor's business and its compliance with FDA regulations.

67. EnEm has been providing critical testing services for release of finished goods and raw materials, and continuing to provide services for quality assurance on an ongoing basis absent which Debtor would be unable to sell its products, or even keep them on the shelf. In addition, EnEm provides research and development services to NLI since its inception, which are needed to support FDA compliance which is needed for products which are awaiting for FDA marketing clearance.

68. Without EnEm's contributions, the Debtor would not be able to remain in compliance with FDA regulations rendering Citizens' over simplistic allegations misplaced.

## LEGAL ARGUMENT

**I.   Citizens Cannot Meet The High Bar Required To Appoint A Chapter 11 Trustee.**

69. It is well established that the appointment of a chapter 11 trustee is an extraordinary remedy that is the exception not the rule. *Official Comm. Of Unsecured Creditors of Cybergenetics Corp. v. Chinery (In re Cybernetics Corp.)*, 330 F.3d 548, 577 (3rd Cir. 2003); *U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 128 (D. Del. 2010) (citing *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3rd Cir. 1989)); *Official Comm. of Asbestos Pers. Injury*

10

*Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158, 160 (Bankr. D. Del. 2002)

70. In order to overcome this strong presumption, a party seeking the appointment of a trustee mush show (i) "cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case," or (ii) "if such appointment is in the interests of creditors, any equity holders, and other interests of the estate." *See* 11 U.S.C. §§ 1104(a)(1) & (2).

71. "The party moving for appointment of a trustee [...] must prove the need for a trustee under either subsection by clear and convincing evidence." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d. Cir. 1989).

72. "It is settled that appointment of a trustee should be the exception, rather than the rule." *Id.* at 1225.

73. "Appointing a trustee must be considered a last resort." *Official Comm. of Asbestos Claimants v. G-1 Holdings, Inc. (In re F-1 Holdings, Inc.)*, 295 B.R. 502, 511 (D.N.J. 2003) (citing *In re W.R. Grace & Co.*, 285 B.R. 148, 158 (D. Del. 2002)).

74. "In the usual chapter 11 proceeding, the debtor remains in possession throughout reorganization because 'current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate.'" *In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 474 (3d Cir. 1998) (quoting *In re v. Savino Oil & Heating Co.,* 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989)).

75. The strong presumption is that there is often no need for a trustee, which "finds its basis in the debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the

reorganization." *Id.* at 471.

76. Citizen plainly cannot overcome the presumption that there is no need for a trustee, nor can it show there is cause by clear and convincing evidence – because no such cause exists.

77. Citizens relies almost exclusively on the findings of the Balla Report, which the Debtor entirely rejects because it relies on incomplete information and a basic theory of accounting that chooses to ignore the intricacies of the pharmaceutical industries.

78. Indeed, it is impossible to capture an accurate representation of Debtor's finances as of late 2024, when the Balla Report only considered financial documents ***from 2021 and 2022***.

79. Even considering the Balla Report, clear and convincing evidence of cause cannot be shown by Citizens given the numerous other conflicting opinions of the Debtor's finances.

80. Indeed, Judge Castner found as such that the financial outlook of Debtor's business is "subject to intense dispute."

81. Thus, at the very worst, there are conflicting opinions about the condition of NLI's finances and Citizens definitively cannot show "fraud, dishonesty, incompetence, or gross mismanagement" necessary to find the appointment of a chapter 11 trustee necessary.

82. The Debtor is a small closely held business subject to a highly regulated and specialized industry. As such, any interruption to the Debtor's business, such as the imposition of an outside trustee, would prove particularly harmful.

83. The Debtor and Creditors, including Citizens, are best served with the Debtor's current management at the helm.

84. Debtor prepared a 13-week cash flow which demonstrates a plan to work within a constrained budget for the benefit of all creditors and without provisions for any payments that are not ordinary course payments.

85. Furthermore, Debtor will be filing an application to retain Raymond James to sell the assets of the company to satisfy all creditors, confirming that Debtor's management structure has both short and long term plans to provide value to the overall creditor body in an ordinary course Chapter 11 Bankruptcy.

86. Indeed, Debtor's conduct has been honest and forthright starkly contrasted with cases that did necessitate a chapter 11 trustee. *See, e.g., In re Paolino*, 53 B.R. 399 (E.D. Pa. 1985) (A chapter 11 trustee was appointed where the debtor engaged in check fraud among other reasons").

87. Citizens argument that acrimony exists between it and the Debtor, which gives rise to the requisite cause is misapplied and inapplicable here.

88. A finding of "acrimony" can only be found in a case-by-case basis "when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor, or as it is found in that case, when the parties begin working at a cross-purpose." *Id.* at 472-73.

89. Here, the Debtor only seeks to maximize value so that it may pay Citizens as a creditor, which can hardly be considered working at a cross-purpose and conversely shows that their interests are aligned.

90. The only conflict that exists between Citizens and Debor is the healthy conflict between such parties where Citizens wants to be compensated, which is insufficient to find acrimony. *Official Comm. of Asbestos Claimants,* 295 B.R. at 511 ("The mere existence of the adversary proceedings ... does not amount to cause for a trustee under § 1104(a)(1) or otherwise favor a trustee under § 1104(a)(2)")

91. Moreover, Citizens is only one of the Debtors creditors, none of the others of which have filed such an application (or any application) with the Court.

**II.    Debtor Is Subject To Significant Scrutiny In Chapter 11 Bankruptcy Without Appointment Of A Chapter 11 Trustee.**

92. There are numerous procedures in place in chapter 11 bankruptcy ensuring that Debtor must proceed in the best interest of the creditors, and making the appointment of a chapter 11 trustee wholly unnecessary.

93. The U.S. Trustee has established its *Operating Guidelines and Reporting Requirements of the United States Trustee for Chapter 11 Debtor in Possession and Chapter 11 Trustees* (the "Guidelines") in order to supervise the administration of chapter 11 cases.

94. The Guidelines impose broad advisory powers to the Trustee over the Debtor including (a) control over all of Debtor's bank accounts, (b) maintaining Debtor's bank accounts with a depository bank approved by the U.S. Trustee, (c) the Debtor must provide the U.S. Trustee with a physical inventory, and (d) the Debtor must transfer from the operating account to the Debtor's tax account sufficient funds to pay payroll liabilities upon payment of each payroll.

95. Additionally, the Debtor must provide the U.S. Trustee and this Court with a monthly operating report wherein Debtor must report every aspect of its business including a balance sheet, statements of cash receipts and disbursements, accounts receivable, statements of capital assets, schedule of payments to professions, schedule of payments to insiders, all bank statements and reconciliations, and descriptions of assets sold.

96. These requirements in the Guidelines and numerous others assures that all of Debtor's operations are subject to high scrutiny under the U.S. Trustee as well as this Court's supervision.

97. Accordingly, appointment of *another* level of supervision in the form of a chapter 11 trustee solely to satisfy the whims of one aggressive secured creditor who appears to view the Bankruptcy process at its personal collection agency is not warranted and justifies denial of the

14

Motion.

**III.   Cause Does Not Exist To Dismiss The Chapter 11 Bankruptcy**

98. A bankruptcy court can dismiss a chapter 11 bankruptcy "for cause", which is defined as various reasons listed in the statute including "gross mismanagement", "failure to maintain appropriate insurance that poses a risk to the estate or the public," and "failure to comply with an order of the court". 11 U.S.C.S. § 1112(b)(1)&(4).

99. The Bankruptcy Code provides several illustrations of the "cause" sufficient to merit conversion of a chapter 11 case, none, save one, of which Citizens suggests applies here. 11 U.S.C. § 1112(b)(4)(A)-(P).

100. "The threshold issue is whether Chapter 11 petitions may be dismissed for "cause" under 11 U.S.C.S. § 1112(b) if not filed in good faith." *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 160 (3d. Cir. 1999).

101. "[T]he absence of good faith constitutes 'cause' to dismiss a Chapter 11 petition under § 1112(b)." *Id.* at 160.

102. Notably, Citizens does not specify any particular grounds for "cause" in its Motion, because it cannot.

103. Likewise, there is nothing in the record to suggest that this bankruptcy was brought in bad faith.

104. Citizens desperately hinges its argument on the *In re Ofty Corp.* case, which is not binding on this Court and examines an entirely distinct set of circumstances. *See* 44 B.R. 479 (Bankr. D. Del. 1984).

105. Citizens glosses over the fact that a ***receiver***, not a creditor, brought the subject motion to dismiss in *In Re Ofty. See id.* at *3.

15

106. Additionally, the debtor business in *In re Ofty* was subject to liquidation by the District Court before the bankruptcy filing due to the majority shareholders "hav[ing] shown a pattern of self-benefitting" by using corporate assets to fund their excessive salaries, rent, and other personal expenses --- neither of which is the case here. *Id* at *3-4.

107. Accordingly, Citizens cannot meet the high bar to dismiss this chapter 11 bankruptcy case, and the Debtor as well as the creditors, including Citizens, are better served by bearing out the chapter 11 bankruptcy process. *See* 11 U.S.C.S. § 1112(b) (The court shall dismiss a case under this chapter if it is "in the best interest of creditors and the estate").

108. Citizens' own position contradicts itself as it states "that the appointment of a chapter 11 trustee will best serve the interests of Nostrum", but in the same breath seeks that the bankruptcy action be dismissed.

### Waiver of Memorandum of Law

109. Debtor requests that this Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which Debtor relies is set forth herein and novel issues of law are not raised herein.

### CONCLUSION

Debtor respectfully requests that this Court deny Citizens' Motion to Appoint a Chapter 11 Trustee in the subject bankruptcy case, and Citizens' motion to dismiss the subject bankruptcy case.

Dated: Woodland Park, New Jersey
       October 7, 2024

ANSELL GRIMM & AARON, P.C.

*s/Anthony J. D'Artiglio*
Anthony J. D'Artiglio, Esq.
James G. Aaron, Esq.
365 Rifle Camp Road
Woodland Park, New Jersey 07424
(973) 247-9000 Phone

16

(973) 247-9199 Facsimile
adartiglio@ansell.law

*Attorneys for the Debtor*

17