**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

ANSELL GRIMM & AARON, P.C.
James G. Aaron, Esq.
Anthony D'Artiglio, Esq.
Ansell Grimm & Aaron, P.C.
365 Rifle Camp Road
Woodland Park, New Jersey 07424
Tel:  (973) 247-9000
E-mail:  adartiglio@ansell.law
*Proposed Attorneys for Nostrum Laboratories,*
*Inc.*

In re:

NOSTRUM LABORATORIES, INC.,

              Debtor.

Case No.: 24-19611

Chapter 11

Honorable John K. Sherwood, U.S.B.J.

Hearing Date: October 15, 2024

**THE DEBTOR'S (I) OPPOSITION TO CITIZENS BANK, N.A.'S MOTION TO PROHIBIT DEBTOR'S USE OF CASH COLLATERAL; AND (II) DEBTOR'S CROSS MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO (A) UTILIZE CASH COLLATERAL TO PAY POST-PETITION ASSOCIATE WAGES, SALARIES, OTHER COMPENSATION AND REIMBURSABLE ASSOCIATE EXPENSES, (B) CONTINUE THE ASSOCIATE BENEFITS PROGRAMS, AND (C) CONTINUE TO PAY KEY VENDORS; AND (III) GRANTING RELATED RELIEF**

The above-captioned Debtor in possession (the "Debtor") respectfully states as follows in support of this motion:[1]

## Relief Requested

1.      The Debtor seeks entry of an order denying Citizens Bank, N.A.'s ("Citizens" or "Citizens Bank") Motion to Prohibit the Debtor's Use of Cash Collateral (the "Motion").

2.      The Debtor further seeks entry of interim and final orders, substantially in the form attached hereto as **Exhibit A** (respectively, the "Order": (i) authorizing the Debtor to utilize cash collateral for all ordinary operating expenses, including to pay post-petition wages, salaries, and other compensation from cash collateral; (ii) authorizing the Debtor to continue the Associates Benefits Program, as defined below; (iii) authorizing the Debtor to continue to pay Key Vendors, as defined below; and (iv) granting related relief (the "Cross-Motion").

## Jurisdiction and Venue

3.      The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.). The Debtor confirms its consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]      A detailed description of the Debtor and its business, including the facts and circumstances giving rise to the Debtor's Chapter 11 case, is set forth in the Declaration of Dr. Nirmal Mulye in Opposition to the Motion and in Support of the Cross-Motion (the "Mulye Declaration"), filed contemporaneously herewith.

5.     The statutory bases for the relief requested herein are Sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 9013-1, and 9013-5 of the Local Bankruptcy Rules for the District of New Jersey (the "Local Rules").

## Background

6.     The Debtor is engaged in the formulation and commercialization of specialty pharmaceutical products and controlled release, orally administered, branded and generic drugs.

7.     The Debtor manufactures several life-saving drugs that only it manufactures, such as theophylline SR in 100mg and 200mg dosages, which is used to treat a host of lung diseases.

8.     On September 30, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code ("Petition"). The Debtor is operating its business and assets as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

9.     Presently, the Debtor is unable to meet its payroll obligations, employee benefits obligations, and key vendor obligations going forward without use of the cash collateral.

10.    The Debtor is only monetizable as a going concern.  The Debtor's employees are a key factor in keeping the Debtor a going concern, because the Debtor cannot operate without its workforce, many of whom are specially trained in the Debtor's standard operating procedures and in regulatory compliance.

11.    Similarly, the Debtor's key vendors are essential to ensure the Debtor can continue operating and manufacturing life-saving pharmaceuticals.  The key vendors are critical not only to

business operations but to ensure that the Debtor is compliant with regulations by the Food & Drug
Administration (the "FDA").  Many of the Debtor's key vendors are vetted and approved by the
FDA for production of the highly regulated pharmaceuticals made by the Debtor.  To find new,
FDA-compliant vendors would be a long and costly process that would threaten to cease the
Debtor's operations and render it virtually worthless.

12.    If the Debtor ceases operations, the Debtor reasonably believes there will be
insufficient assets to ensure that both the secured and unsecured creditors are repaid.

13.    If the Debtor is not permitted to utilize cash collateral to continue the business as a
going concern, it could trigger a default under a settlement agreement with the United States of
America which would add a $50,000,000.00 claim to the unsecure creditor body.

14.    Moreover, if the Debtor ceases operations, many of the life-saving drugs it
manufactures will become unavailable to consumers, as Debtor is the ***only*** manufacturer of those
drugs.

15.    If the Debtor is permitted to continue its operations, the Debtor reasonably believes
it can generate significant, if not full value for the secured and unsecured creditors, as a result of a
confirmable plan.

16.    As described in the Mulye Declaration, the Debtor requires access to additional
liquidity and use of cash collateral to continue operating its business during this Chapter 11 case,
preserve and maximize the value of the bankruptcy estate for the benefit of all parties in interest,
ensure payment and retention of the Debtor's workforce, and ensure payment and maintenance of
a healthy working relationship with its key vendors.

17.    With access to cash collateral, the Debtor intends to satisfy its post-petition obligations as incurred in the ordinary course of business operations, specifically by honoring its post-petition obligations to its employees and key vendors.

### **The Debtor's Workforce**

18.    As of the Petition Date, the Debtor employs approximately 94 employees in its two manufacturing facilities in Kansas City and Ohio (the "Employees"), including approximately 92 full-time Employees and approximately one part-time Employee.  *See* Mulye Declaration ¶ ???.  In addition to the Employees, the Debtor also periodically retains individuals as independent contractors (together with the Employees, the "Associates").[2]

19.    The Associates perform a wide variety of functions which are critical to the manufacture, sale, and delivery of the Debtor's products and the ultimate preservation of value of the Debtor's estate.  *See* Mulye Declaration ¶ ???.

20.    In many instances, the Associates include personnel who are intimately familiar with the Debtor's, business, processes, and systems.  They are also familiar with the Debtor's standard operating procedures and the complex regulatory scheme inherent to the pharmaceutical industry.  These workers cannot be easily replaced.

21.    In addition, the Debtor is required to meet certain minimum requirements set by Federal and State regulations for the number of personnel operating machinery.  Therefore, cost-saving measures cannot significantly reduce the number of employees involved in the manufacturing process, making the workforce vital to the Debtor's ongoing business operations.

22.    Without the continued, uninterrupted services of the Associates, the Debtor's business operations will be materially impaired.

---

[2]    There is currently one independent contractor who is not an insider who works at the Ohio facility.

23.   Further, the vast majority, if not all of, the Associates rely on their compensation and benefits to pay their daily living expenses. These workers will be unfairly harmed if the Debtor is not permitted to pay compensation and provide benefits moving forward

24.   Moreover, if the Associates are harmed in this way, a mass resignation of the Debtor's workforce will render the Debtor worthless and unable to pay its secured and unsecured creditors.

25.   Consequently, the Debtor respectfully submits that the relief requested herein is necessary and appropriate under the facts and circumstances of this Chapter 11 proceeding.

## Associate Compensation and Benefits

26.   To minimize the personal hardship that the Associates could suffer if post-petition employment-related obligations remain unpaid during the administration of this Chapter 11 case, the Debtor seeks authority to: (a) pay and honor certain post-petition claims relating to, among other things, wages, salaries, sales commissions, other compensation, payroll processing services, federal, state, and local withholding taxes and other amounts withheld (including garnishments, applicable shares of insurance premiums, and taxes), reimbursable expenses, the non-insider employee incentive plans, health insurance, health and related benefits, workers' compensation benefits, life insurance, short- and long-term disability coverage, 401(k) plans and certain other benefits that the Debtor has historically provided in the ordinary course (collectively, the "Associate Compensation and Benefits")[3] and (b) pay all costs incident to the Associate Compensation and Benefits.

---

[3]      The descriptions of the Associate Compensation and Benefits set forth in this Motion constitute a summary only. The actual terms of the agreements, contracts, plans, programs, policies, and manuals governing the Associate Compensation and Benefits will govern in the event of any inconsistency with the description in this Motion. The Debtor requests authority to honor obligations related to Associate Compensation and Benefits in the ordinary course of business consistent with pre-petition practices, regardless of whether the Debtor inadvertently failed to

27.    Out of an abundance of caution, the Debtor requests authority to modify, change, or discontinue any of its Associate Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course during these Chapter 11 cases in the Debtor's sole discretion without the need for further Court approval, subject to applicable law.

### Key Vendors

28.    The Debtor contracts with a number of crucial vendors that are compliant with FDA regulations and ensure high-quality pharmaceuticals are produced for public consumption as well as vendors that provide for the basic needs of the Debtor's business operations (the "Key Vendors").

29.    It is exceedingly onerous to find new, compliant vendors for relevant pharmaceutical purposes, such as providing raw materials, machinery, and sterilization and maintenance services.  In many cases, it can take a year for the FDA to approve a new vendor. This would result in a pause in production of pharmaceuticals that not only endangers the public but the long-term viability of the Debtor.  *See* Declaration of Lynne Robertson, M.S., Ph.D.

30.    As for non-pharmaceutical Key Vendors, they are essential to the basic operations of the Debtor, such as by providing typical business services, supplies, and insurance to protect the Debtor's estate from any potential catastrophic economic issues.  The other Key Vendors include landlords, utility companies, and other providers of basic necessities for any business. Without these most fundamental Key Vendors, no business -- let alone a highly regulated pharmaceutical business like the Debtor -- could operate.

### Cash Collateral

---

include a particular benefit or aspect of compensation in the defined term "Associate Compensation and Benefits," and any such omitted benefit or aspect of compensation is hereby included in the defined term "Associate Compensation and Benefits" as used herein and in the Orders.

31.    Citizens asserts that it holds a perfected, first priority lien on and security interest in all of the Debtor's assets, including cash and proceeds thereof, to secure the Debtor's debt to Citizens which it alleges is now $18,417,875.62.

32.    Citizens alleges, and the Debtor agrees, that the Debtor does not have sufficient assets to fund its ordinary post-petition operations without use of the cash collateral.

33.    Without any explanation whatsoever, Citizen alleges that the "Debtor is incapable of providing Citizens adequate protection of Citizens' interest in cash collateral."

34.    Contrary to Citizens' assertion, the Debtor provided it with budget projections and cash flow projections for the years prior to filing Bankruptcy, and those financials had a 97% accuracy rate notwithstanding they were projections of future earnings and expenses.

35.    Contrary to Citizens' baseless assertion in its Motion made without any factual basis or support, to date, the Debtor has not utilized Citizens' cash collateral post-petition for any purpose other than that approved by Bankruptcy Court Order.

36.    Notably, Citizens concedes that the operations of the Debtor need to be maintained to preserve the Debtor's value (and, thus, the cash collateral needs to be used) but only wants the cash collateral to be used if Citizens gets to hand pick a Trustee to manage the business.

37.    Thus, there is not a dispute that the cash collateral needs to be used for an effective reorganization that provides value for the creditor body as a whole.  However, Citizens' efforts to hijack this Bankruptcy for it to be a private action designed to collect proceeds for the benefit of Citizens does not serve the interest of the creditor body as a whole.

38.   Thus, if the Court denies the Motion to Appoint a Receiver, the Court should deny Citizens' Motion and grant the Debtor's Cross-Motion to permit use of cash collateral to permit operations to proceed for the benefit of all creditors.

### Debtor's Thirteen Week Budget And Cash Flow Analysis

39.   For this year to date, the Debtor has collected approximately $19.1 million in revenue.   On average, the Debtor collected approximately $2.1 million per month.   While I anticipate that the Debtor will continue to average $2.1 million per month for the following thirteen weeks, or $6.3 million during that thirteen-week period, Debtor's proposed budget conservatively estimates collections of only $5.1 million during that period..   *See* Mulye Declaration ¶ 57.   Conversely, the Debtor anticipates an outgoing cash flow of approximately $4.99 million.   *See* Mulye Declaration ¶ 58.   This would result in a ***positive*** cash flow of approximately $112,000.00 over the following thirteen weeks.

40.   These estimates are conservative and serve to ensure the normal business functions of the Debtor continue and to allow it to improve its financial position for both itself and its creditors.

41.   The thirteen-week budget reflects an effective and simply plan to move forward as the Debtor transitions through Chapter 11.   Ultimately, even at this early stage, the Debtor anticipates positive cash flow, further bolstering its financial outlook.

### Debtor's Proposal To Provide Adequate Protection For Citizens

42.   Contrary to Citizens' assertions, Debtor is ready, willing, and able to provide adequate protection for Citizens as a condition of use of cash collateral.

43. <u>First</u>, Citizens is over secured, because the collateral is valued at $73 million, which is in excess of the amount of Citizens loan, which is only $18.4 million. *See* Mulye Declaration ¶¶ 64-65.

44. <u>Second</u>, Debtor proposes to make monthly payments to Citizens (starting at the end of October), in the amount of $35,000.00 to provide adequate protection payments to Citizens while the Bankruptcy proceeds.

45. <u>Third</u>, Debtor proposes to provide Citizens with an automatically perfected, valid, binding, continuing, enforceable, non-avoidable, fully perfected priming replacement lien on, and security interest in, all prepetition and post-petition property of the Debtor, and all products, proceeds, rents and profits thereof, up to the amount of any payments made from cash collateral.

46. <u>Fourth</u>, to the extent any other adequate protection proves insufficient to protect the Secured Creditor's interest in and to the cash collateral, Citizens shall have a super priority administrative expense claim, pursuant to Section 507(b) of the Bankruptcy Code, senior to any and all claims against the Debtor under Section 507(a) of the Bankruptcy Code, whether in this proceeding or in any superseding proceeding.

47. <u>Fifth</u>, Debtor will provide semi-monthly periodic accountings to Citizens, and the U.S. Trustee's office setting forth the cash receipts and disbursements made by the Debtor under this Order. Each reporting shall include information for the period ending on the fifteenth (15th) and last day of each month and such reporting periods shall run consecutively. Each reporting shall be delivered within four (4) business days of the conclusion of the reporting period prior reporting period.

48. The above proposals form Debtor ensure sufficient adequate protection of Citizens interest in cash collateral.

49.     It is crucial that the current management structure remain in place to ensure the Debtor's continued compliance with all regulatory requirements in advance of a sale transaction designed to return sufficient value to the creditor body.  *See* Robertson Declaration ¶ 2.

50.     The most viable path forward for the Debtor to pay its creditors is for it to continue to sell drug products and maintain its marketing authorizations, or Abbreviated New Drug Applications ("ANDAs").  *See* Robertson Declaration ¶ 3.

51.     If the business operations cease, complete liquidation of the assets, including real property, machines, equipment, raw materials, etc., will not yield much value -- likely not even enough to pay even one creditor, let alone the robust creditor body at issue in this case. *See* Robertson Declaration ¶ 4.

52.     In the Ohio facility, for example, liquidation and sale of the equipment would be subject to a mortgage lien on the equipment.  *See* Robertson Declaration ¶ 5.

53.     Since the Ohio building and equipment are both old, and because the facility is difficult to reach geographically, neither the equipment nor the facility would be worth much if sold apart from Debtor's product line and, in any case, it would have to undergo thorough cleaning and costly remediation prior to being sold.  *See* Robertson Declaration ¶ 6.

54.     Furthermore, the Ohio facility is approved for narcotics, which would represent an additional complication because of the stricter regulation of such products by the Drug Enforcement Agency (the "DEA") compared to those regulated by the Food & Drug Administration (the "FDA").  *See* Robertson Declaration ¶ 7.

55.     The Kansas City facility is also leased, as is all the equipment in it, so little to no value exists there in terms of liquidation and sale.  Like the Ohio facility, the Kansas City facility would have to undergo thorough cleaning and costly remediation prior to being sold.  *See*

Robertson Declaration ¶ 8.

56.    The Debtor's greatest assets are its ANDAs, however, those would be of little value if they were not maintained in compliance with local, state, and federal regulatory requirements. In order to do so, the Debtor must maintain its current payroll as well as continue to pay its key vendors, and maintain payments for insurance of catastrophic interruption to the production and sale of its products. *See* Robertson Declaration ¶ 9.

57.    The Debtor is a small, founder-led generic company.  Maintaining continuity in management and company culture promotes continuity in operations, thereby maintaining optimal value of the Debtor's assets so it can repay its creditors. *See* Robertson Declaration ¶ 27.

58.    The Debtor, like many small businesses, is a tight knit community of people who have worked together for a long time and have established a family like relationship and culture. *See* Robertson Declaration ¶ 28.

59.    The Debtor's management has in-depth experience dealing with its generic drug development, including drugs that are complex and difficult to formulate, particularly high barrier to entry products such as the Debtor's controlled release, narrow therapeutic index, and products containing controlled substances, which are regulated by the DEA. *See* Robertson Declaration ¶ 29.

60.    For optimal productivity and continued regulatory compliance, the Debtor needs to retain and compensate its two key manager: Dr. Nirmal Mulye, Founder, Chief Executive Officer, and Chairman of the Board; and John Forster, Executive Vice President of Operations. *See* Robertson Declaration ¶ 30.

61.    Dr. Mulye is the go-to scientific authority for all of the technical, operational, and laboratory sciences of the Debtor.  He is also ultimately accountable for, and intimately involved

in, all FDA regulated areas of the business, including regulatory compliance, regulatory sciences (including but not limited to Quality Assurance, Quality Control, Pharmacovigilance), and risk management. *See* Robertson Declaration ¶ 31.

62.     Mr. Forster has operational oversight of the technical operations of the Debtor, including but not limited to commercial manufacturing, packaging, laboratory testing, warehousing, shipping, and receiving. *See* Robertson Declaration ¶ 32.

63.     Based on the foregoing, the best way for the Debtor to pay all of its creditors is to continue the production and sale of its products and maintenance of its regulated assets -- its ANDAs. In order to do that, the Debtor must be allowed to use its collateral to maintain current payroll, pay required regulatory fees for the products and facilities, pay utilities, and make timely payments on leased equipment and machinery as well as rents, mortgages, and loans on its real property. In addition, to reduce the risk of catastrophic interruption of its operations, the Debtor must be allowed to pay its insurance premiums, including liability, Worker's Compensation, and health insurances for its current highly trained and competent employees. Finally, to maintain continuity for the employees and key vendors, as well as to reduce the risk of compliance failures that could interrupt the Debtor's ability gain revenue from the lawful sale of its regulated products and thereby pay its creditors, the Debtor should retain its two key managers, Dr. Nirmal Mulye and John Forster. *See* Robertson Declaration ¶ 33.

## Basis For Relief

**I.     Debtor Should Be Permitted To Use Cash Collateral For Ordinary Operating Expenses.**

64.     11 U.S.C. 363(c) permits a debtor in possession to utilize property of the estate in the ordinary course of business without notice and a hearing. However, 11 U.S.C. 363(c)(2)

restricts a debtor in possession from utilizing cash collateral unless "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provision of this section." 11 U.S.C. 363(e) provides that, as part of any hearing to use cash collateral, the Court shall condition the use of cash collateral "as necessary to provide adequate protection of [the secured lender's] interest."

65.    For purposes of Section 363, 11 U.S.C. 361 provides that adequate protection may be provided by an of the following, which are not all required for there to be adequate protection:

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title [11 USCS § 362], use, sale, or lease under section 363 of this title [11 USCS § 363], or any grant of a lien under section 364 of this title [11 USCS § 364] results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title [11 USCS § 503(b)(1)] as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

66.    Here, Debtor proposes providing adequate protection to Citizens for use of the cash collateral by affording Citizens protection under all three subsections of 11 U.SC. 361.

67.    Specifically, while Debtor's proposed budget actually shows an ***increase*** in available cash at the end of the 13-week period, to protect against any potential diminution in value of the Debtor's security interest, Debtor proposes paying Citizens $35,000.00 per month in adequate protection payments as a hedge against a possible decline in value of Citizens' collateral interest.

Furthermore, to the extent that any cash collateral is used to pay ordinary operating expenses as set forth in the Debtor's 13-week cash flow projections, Citizens will be afforded a priming,

replacement lien and a superior priority administrative expense claim (to the extent the lien is

insufficient) to ensure that it will receive full payment upon the sale of Debtor's assets for any

cash collateral used to keep operations running and ensure the Debtor has sufficient value to

effectuate a sale transaction.

68.    The Debtor reasonably believes this adequate protection (in addition to Citizens'

equity cushion and periodic reporting requirements) is more than sufficient to ensure Citizens

is protected while this Bankruptcy is pending while also ensuring that Debtor is able to operate

the business and preserve its value for the benefit of all creditors.  Notably, the purpose of

Chapter 11 is to "rehabilitate debtors and generally access to cash collateral is necessary in

order to operate a business." *See In re Stein*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).

69.    These types of adequate protections proposed by Debtor are the same or more

which Courts routinely permit as part of a cash collateral to ensure its continued use for the

benefit of the bankruptcy estate while also protecting the secured creditor.  *See, e.g., In re*

*Grove St. Realty Urban Renewal, LLC*, 2011 Bankr. LEXIS 1971 (Bankr. D.N.J. Jan. 25, 2011);

*In e Heritage Residential at Wilton's Corner*, TH-4, LLC 2009 Bankr. LEXIS 5179 (Bankr.

D.N.J. Apr. 3, 2009).

70.    Further, Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after

notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course

of business, property of the estate."  11 U.S.C. § 363(b)(1).  "In determining whether to authorize

the use, sale or lease of property of the estate under this section, courts require the debtor to show

that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery*

*Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999)

(collecting cases); *see also Armstrong World*, 29 B.R. at 397 (relying on section 363 to allow

contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *In re Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under Section 363(b)).

71.     As set forth below, the proposed uses for cash collateral are entirely reasonable, appropriate, and sound business decisions within the context of this Bankruptcy proceeding.

### A.     Compensation, Withholdings, and Related Obligations.

#### i.     Unpaid Obligations.

72.     The Debtor incurs obligations to their Associates for, among other things, wages, salaries, overtime, and other obligations described herein (collectively, the "Associate Compensation").

73.     The Debtor pays approximately 53 Associates -- over half of its workforce -- on an hourly basis (the "Hourly Associates") and the remaining approximately 41 Associates—are paid on a salaried basis (the "Salaried Associates").  The Debtor pays most of its Associates (both Hourly Associates and Salaried Associates) bi-weekly.

74.      The Debtor anticipates that it will be paying $1,091,000.00 over the following thirteen weeks on account of Associate Compensation

75.     The majority of the Debtor's payroll is made by direct deposit through electronic transfer of funds to the Associates' bank accounts or other electronic means.

76.     Failure to pay the Associate Compensation will result in financial hardship for the Associates and lead to the risk of widespread departures at all levels of the Debtor's corporate structure.  In light of the substantial benefit the Associates will continue to provide to the Debtor's

estates and the costs attendant to filling sudden vacancies, the Debtors hope to avoid imposing such a hardship on their Associates.

77.     The Debtor must pay its employees consistently or there is a legitimate concern that employees will most likely leave to find other more reliable opportunities to support themselves and their families.  The employees of the Debtor are already near the minimum needed to produce the pharmaceuticals and maintain regulatory compliance of the relevant ANDAs.  Loss of any of these highly trained and competent employees would have a negative impact the Debtor's ability to compliantly produce and sell its pharmaceuticals, and, as a result, prevent it from paying its creditors.  *See* Robertson Declaration ¶ 10.

78.     If the Debtor cannot retain its current employees, the process to find, hire, and train new employees to fill the gaps would take months to complete.  *See* Robertson Declaration ¶ 11.

79.     Importantly, a new employee typically takes months after completing training to become minimally productive, and even more time until the new employee might achieve the productivity of the existing, experienced employees.  This delay in productivity greatly increases the risk of failure to comply with the FDA's requirements for manufacturing, testing, selling, and assuring product integrity over its shelf life.  *See* Robertson Declaration ¶ 12.

80.     The Debtor requests authority to pay any Associate Compensation in the ordinary course and consistent with past practice and to continue paying the Associate Compensation in the ordinary course.  For the avoidance of doubt, as of the Petition Date, the Debtor does not believe that it owes Associate Compensation to any Associate in excess of the $15,150.00 statutory cap

imposed by Section 507(a)(4) of the Bankruptcy Code, but to the extent there are any such amounts, the Debtor seeks authority to pay such amounts pursuant to the Final Order only.

1.      Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Associate Compensation and Benefits to priority treatment to the extent such payments do not exceed $15,150.00 for each individual as provided for under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  As priority claims, the Debtor is required to pay these claims in full to confirm a Chapter 11 plan.  *See* U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan).  To the extent that an Associate receives no more than $15,150.00 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Associates and does not have any material negative impact on recoveries for general unsecured creditors.  To the extent an Associate is owed more than $15,150.00 on account of certain Associate Compensation and Benefits, the Debtor submits that the full payment of such obligations in the ordinary course is warranted under Section 363(b)(1) of the Bankruptcy Code and the doctrine of necessity.

2.      The Debtor's Associates are essential to the Debtor's business, and payment of the Associate Compensation and Benefits at this time is necessary to avoid potential material disruption to the Debtor's ordinary-course operations.

3.      Finding new qualified talent would be extremely difficult, particularly given current labor market conditions.  Such recruitment efforts would most likely require, among other things, higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Associates.

4.      Further, in light of the prepackaged nature of these Chapter 11 proceedings and the unimpaired treatment of Associate Compensation and Benefits and other general unsecured claims under a Chapter 11 plan, delaying payment of Associate Compensation and Benefits risks a needless, value-destructive disruption of the Debtor's business.

5.      Courts in this circuit have recognized that "[w]age priority has been a feature of the bankruptcy law since 1898." *See, e.g.*, *In re Garden Ridge Corp.*, No. 04-10324 (KJC), 2006 WL 521914, at *2 (Bankr. D. Del. Mar. 2, 2006) (citing 4 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 507.05[1] (15th ed. 2005)). Its purpose is to "alleviate hardship on workers...who may have no other source of income...." *Id.* (citing Collier on Bankruptcy ¶ 507.05[1]). This priority extends to certain other "benefits that are considered akin to compensation, such as vacation, severance and sick leave pay." *Id.* (emphasis added). Courts in this district and elsewhere have approved the payment of pre-petition severance obligations as part of requested first day relief. *See, e.g.*, *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. May 18, 2023) (authorizing the debtors to honor and pay pre-petition obligations including severance benefits); *In re Christopher & Banks Corp.*, No. 21-10269 (ABA) (Bankr. D.N.J. Jan 15, 2021) (same); *In re Modell's Sporting Goods, Inc.*, No. 20-14179 (VFP) (same) (Bankr. D.N.J. Mar. 13, 2020) (same); *In re RTW Retailwinds, Inc.*, No. 20-18445 (JKS) (Bankr. D.N.J. July 15, 2020) (same); *In re Big Village Holding LLC*, No. 23-10176 (CTG) (Bankr. D. Del. Feb. 9, 2023).

**ii.      Withholding And Deduction Obligations.**

6.      During each applicable payroll period, the Debtor routinely deduct certain amounts from Associates' paychecks, including garnishments, child support, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an applicable share of healthcare benefits and insurance premiums,

401(k) plan deferrals, legally-ordered deduction, and miscellaneous deductions (collectively, the "Deductions"), and forward such amounts to various third-party recipients.

7.     In addition to the Deductions, certain federal, state, and local laws require that the Debtor withholds certain amounts from Associates' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Associate Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities, as applicable. The Debtor must then match the Associate Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes ("Company Payroll Taxes," together with the Associate Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities in accordance with each of the authorities' guidelines, rules, schedules, or regulations, as applicable.

8.     The Debtors incurs and remits, as applicable, monthly Payroll Taxes and the Deductions (collectively, the "Withholding and Deduction Obligations").

9.     Any amounts held by the Debtor on account of the Withholding and Deduction Obligations are held in trust by the Debtor and are not property of the Debtor's estates. The Debtor does not believe it requires authorization to remit such payments to the appropriate third parties.  Out of an abundance of caution, however, the Debtor seeks authority to continue deducting and remitting amounts to the appropriate third parties, as applicable, in a manner consistent with historical practice for any unpaid Withholding and Deduction Obligations and to continue to honor the Withholding and Deduction Obligations in the ordinary course of business on a post-petition basis and consistent with past practice.

10.     The Debtor also seeks authority to pay the Withholding and Deduction Obligations to the appropriate third-party payees.  These amounts principally represent Associate earnings that governments, Associates, and judicial authorities have designated for deduction from Associates' wages.

11.     Certain Withholding and Deduction Obligations are not property of the Debtor's estate because the Debtor has withheld such amounts from Associates' wages on another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d).  Further, federal, state, and local laws require the Debtors to withhold certain tax payments from Associates' wages and to pay such amounts to the appropriate taxing authority.  26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).

75.     Because the Withholding and Deduction Obligations may not be property of the Debtor's estate, the Debtor requests authorization to transmit the Withholding and Deduction Obligations to the proper parties in the ordinary course of business.  *See In re Dameron*, 155 F.3d 718, 721 (4th Cir. 1998).  Similarly, state laws requires the Debtor to maintain the Workers' Compensation Program.  If the Debtor fails to maintain the Workers' Compensation Program, state laws may prohibit the Debtor from operating in those states.  Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtor's continued operations and the success of these Chapter 11 proceedings.

12.     The Debtor, therefore, respectfully requests that the Court recognize that the Withholding and Deduction Obligations are not property of the Debtor's estate and, regardless of whether the Debtor collected the amounts prior to the Petition Date, authorize the Debtor to transmit such monies to the proper parties in the ordinary course of business.

### iii.     **Reimbursable Expenses.**

13.     Prior to the Petition Date and in the ordinary course, the Debtor reimburses Associates or paid the credit card invoices of certain Associates for approved expenses incurred in connection with the performance of their assigned duties (the "Reimbursable Expenses"). The Reimbursable Expenses are largely on account of costs incurred related to (a) Associate travel for reasonable business-related purposes, (b) purchases of merchandise, or (c) payments to vendors for services. Associates who pay up front for Reimbursable Expenses apply for reimbursement of such expenses by submitting expense reports with detailed receipts of all costs incurred.

14.     Although the Debtor asks that reimbursement requests be submitted promptly, submission delays occasionally occur, and Associates may submit reimbursement requests for post-petition expenses.  Associates incurred the Reimbursable Expenses as business expenses on the Debtor's behalf and with the understanding that such expenses would be reimbursed fully.

15.     As of the Petition Date, the Debtor estimates that Reimbursable Expenses are owed in the aggregate of approximately $2,000.00 on account of accrued expenses prior to the Petition Date (the "Unpaid Reimbursable Expenses"), all of which is expected to come due during the Interim Period.

16.     The Debtors request authority to pay the Unpaid Reimbursable Expenses in the ordinary course and consistent with past practice and to continue paying the Reimbursable Expenses in the ordinary course on a post-petition basis.

**B.     Associate Benefits Programs.**

17.     The Debtors offer their eligible Associates the opportunity to participate in a number of insurance and benefits programs, including, among other programs, medical, dental, and vision plans, life insurance, accidental death and dismemberment insurance, accident insurance, tuition assistance programs, an employee assistance program, disability benefits, workers' compensation, retirement plans, paid time off, wellness benefits, and other employee benefit plans (collectively, the "Associate Benefits Programs"). The Associate Benefits Programs include benefit plans sponsored by the Debtor.

18.     As described below, failure to continue the Associate Benefits Programs could cause such eligible Associates to experience severe hardship.  In light of the substantial benefits the Associates have provided and will continue to provide to the Debtor's estate, the Debtor wishes to avoid imposing such a hardship.  The Debtor seeks authority to continue to provide Associate Benefits Programs in the ordinary course on a post-petition basis during the administration of these Chapter 11 proceedings.  As of the Petition Date, the Debtor estimates that it owes approximately $280,000.00 on account of the Associate Benefits Programs.  The Debtor anticipates that it will be paying $361,000.00 over the following thirteen weeks on account of the Associate  Benefits Programs.  The Associate Benefits Programs are described in greater detail below.

**i.     Health Benefit Plans.**

47.     The Debtor offers its eligible Associates the opportunity to participate in a number of health benefit plans, including medical, dental, and vision plans, as well as certain health

reimbursement and flexible spending accounts (collectively, the "Health Benefit Plans"). Specifically, the Debtor provides a primary healthcare plans (the "Primary Healthcare Plans") administered by Blue Cross Blue Shield ("BCBS"); supplemental plans administered by Aflac, Inc. (the "Supplemental Plans"); a dental plan (the "Dental Plan") administered by Delta Dental Insurance; and the choice of two life insurance plans administered by Standard Insurance Company and The Hartford Financial Services Group, Inc. (the "Life Insurance Plans"). The Debtor contributes approximately $72,500.00 per month to the Health Benefit Plans. The Debtor anticipates that it will be paying $290,000.00 over the following thirteen weeks on account of the Health Insurance Plans.

### ii.   **Retirement Plans**.

63.     The Debtor offers eligible Employees the opportunity to participate in a 401(k) plan (the "Retirement Plan"). The Debtor seeks authority to continue honoring its Retirement Plans obligations on a post-petition basis in the ordinary course of business and in a manner consistent with past practices.

64.     The Debtor offers eligible Employees the opportunity to participate in the Retirement Plan, which generally provides for pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code. The Debtor contributes approximately $41,250.00 per month to the Retirement Plan. The Debtor anticipates that it will be paying $165,000.00 over the following thirteen weeks on account of the Retirement Plan.

65.     Many Employees' retirement savings solely consist of the Retirement Plan, and many Associates choose to participate in the Retirement Plan because of the 401(k) Contribution provision. Continuing the Retirement Plan and its related Contributions are essential to maintaining

Employee morale and protecting Associate expectations.  In addition, the Debtor believes that the 401(k) Deductions are generally held in trust by the Debtor and are not property of its estate.

66.     The Debtor seeks the authority to (a) continue the Retirement Plan in the ordinary course of business on a post-petition basis, (b) remit all unremitted 401(k) Deductions collected in the ordinary course of business, and (c) pay any unpaid 401(k) Contributions in the ordinary course of business.

**iii.     Paid Time Off.**

67.      In the ordinary course of business, the Debtor provides paid time off to its eligible Associates, including sick pay, personal leaves of absence, bereavement leave, military leave of absence, and jury and witness duty leave ("Paid Time Off").  Paid Time Off generally accrues at specified rates up to a maximum amount based on the applicable state limit, if any.  Accruals of Paid Time Off, however, are not a current cash payment obligation.

68.     In addition, the Debtor provides certain other forms of paid and unpaid leave, including, for example, (a) paid holidays, (b) leave under the Family and Medical Leave Act, and (c) other paid and unpaid leaves of absence for personal reasons, including those required by law. Importantly, these other forms of paid and unpaid leave do not involve incremental cash outlays beyond standard payroll obligations.

69.     The Debtors believe that the continuation of Paid Time Off is essential to maintaining Associate morale during these Chapter 11 proceedings.  Further, the policies are broad-based programs upon which Associates have come to depend.  The Debtor anticipates that its Associates will utilize any accrued Paid Time Off in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtor's regular payroll obligations.

**C.     Non-Employee Workforce Obligations.**

70.     Certain of the Debtor's workforce are made up of various non-employee contractors that are paid on a 1099-basis (the "Non-Employee Compensation").   The Non-Employee Compensation are paid on a monthly basis.  Certain of the Non-Employee Compensation include reimbursements for reasonable out-of-pocket expenses in connection with work carried out.  The Debtor seeks authority to continue to continue the Non-Employee Compensation as well as reasonable reimbursements for expenses in the ordinary course on a post-petition basis during the administration of these Chapter 11 proceedings.  The Debtor estimates that the ongoing monthly cost of this compensation will be approximately $30,000.00.  As of the Petition Date, the Debtor estimates that it owes approximately $74,000.00 on account of the Non-Employee Benefits and $2,021.71 on account of reasonable reimbursements.   The Debtor anticipates that it will be paying $120,000.00 over the following thirteen weeks on account of Non-Employee Compensation.  The Debtor anticipates there will be additional reasonable reimbursements in the course of business but does not anticipate these reimbursements will exceed the $15,150.00 statutory cap imposed by Section 507(a)(4) of the Bankruptcy Code.

**D.      Key Vendor Obligations.**

71.     The Debtor has certain contractual relationships and obligations to vendors that are crucial to the productive operation of the Debtor's business (the "Key Vendors").  The Key Vendors range from utility companies and landlords to raw material and packaging vendors to equipment and sterilization vendors, to name a few.  These Key Vendors are necessary to ensure the Debtor's plants may continue to operate in a manner that is compliant with its regulatory obligations, local and federal health codes, and capable of producing safe pharmaceuticals.

72.     The Debtor estimates that the Key Vendor contracts will cost approximately $492,750.00 per month (the "Key Vendor Obligations").  As of the Petition Date, the Debtor

estimates that it owes approximately $478,000.00 on account of the Key Vendor Obligations. The Debtor anticipates that it will be paying $1,971,000.00 over the following thirteen weeks on account of the Key Vendor Obligations.

73.     Utilities, such as electric, gas, and water, must also be kept current at each facility so that machines can be powered, pharmaceuticals can be produced, and the equipment and facilities can be cleaned per FDA regulations. *See* Robertson Declaration ¶ 18.

### E.      License Obligations.

74.     The Debtor is legally required to make regular payments to the Drug Enforcement Agency (the "DEA") and the FDA to continue participating in DEA and FDA licensing programs These licenses are crucial to allow the Debtor to operate as a pharmaceutical manufacturer, particularly in light of the multiple drugs in its portfolio that are controlled substances, requiring DEA oversight, and in light of the Debtor's participation in the FDA's generic drug program to produce and distribute the pharmaceuticals from its lucrative generic drugs portfolio.

75.     The Debtor estimates that the FDA's license obligations will cost approximately $122,250.00 per month (the "FDA License Obligations"). As of the Petition Date, the Debtor estimates that it owes approximately $15,000.00 on account of the FDA License Obligations. The Debtor anticipates that it will be paying $489,000.00 over the following thirteen weeks on account of the FDA License Obligations.

76.     The Debtor must be enabled to pay all required regulatory fees. FDA requires the payment of a number of Generic Drug User Fees (GDUFA obligations). For the 2025 fiscal year, the generic drug user fee rates that apply to NLI include, at a minimum, a program fee (the "Program Fee") and a facility fee (the "Facility Fee"). The Program Fee is calculated based on the number of ANDAs the company holds. The Debtor is considered to be a large company

(having greater than twenty ANDAs), so the Program Fee is $1,891,664.00.  The Facility Fee for the Debtor as a domestic finished drug facility is $231,952.00.  *See* Robertson Declaration ¶ 13.

77.     There are three effects if an applicant fails to pay the program fee within twenty calendar days after the due date: (a) the parent company will be placed on a publicly available arrears list; (b) any ANDA submitted by the applicant or its affiliates will not be received; and (c) all drugs marketed pursuant to any ANDA held by such applicant or an affiliate of such applicant shall be deemed misbranded.  *See* Robertson Declaration ¶ 14.

78.     Drugs that are considered misbranded are barred from sale in the United States. Thus, the risk of not paying GDUFA Program fees is the catastrophic interruption to sale of the product -- which, naturally, means no revenues to the Debtor and no payments to the creditors. *See* Robertson Declaration ¶ 15.

79.      The Debtor estimates that the DEA's license obligations will cost approximately $12,000.00 per month (the "DEA License Obligations").  The Debtor anticipates that it will be paying $34,000.00 over the following thirteen weeks on account of the DEA License Obligations.

80.     The Debtor must be allowed to use its collateral to pay DEA registration fees. Although these fees will amount to a few thousand dollars, the penalties for failure to comply can be severe, including substantial fines, product seizures, and imprisonment of individuals considered accountable for such failures.  *See* Robertson Declaration ¶ 16.

**F.     Other Obligations.**

81.     The Debtor has obligations to pay for its debts as the Chapter 11 proceedings continue to prevent any additional defaults from occurring.  Any resulting default could cause a cascade effect that smothers the Debtor and prevents it from making payments.  The items covered by these loans include tangible assets owned by the Debtor, such as company motor vehicles.  A

needless default of these loans would result in the squandering of the Debtor's assets and equity in those assets.

82.    The Debtor estimates that the additional loan obligations will cost approximately $115,250.00 per month (the "Additional Loan Obligations").  The Debtor anticipates that it will be paying $461,000.00 over the following thirteen weeks on account of the Additional Loan Obligations.  The Debtor seeks authority to continue to pay the Additional Loan Obligations in the ordinary course on a post-petition basis.

83.    The Debtor has obligations to make payments to the Department of Justice ( "DOJ") and the Center for Medicare and Medicaid Services ("CMS") in furtherance of a settlement agreement reached by the Debtor, DOJ, and CMS (the "DOJ Settlement Agreement").  Under the terms of the DOJ Settlement Agreement, a default would both accelerate and inflate the damages, potentially needlessly wasting the Debtor's cash collateral that would be better served by paying its Secured and Unsecured Creditors.

84.    The Debtor estimates that the DOJ Settlement Agreement obligations will cost approximately $24,000.00 per month (the "Settlement Obligations").  The Debtor anticipates that it will be paying $70,000.00 over the following thirteen weeks on account of the Settlement Obligations.  The Debtor seeks authority to continue to pay the Settlement Obligations in the ordinary course on a post-petition basis.

85.    Payments must be made to satisfy other governmental obligations, including the DOJ, CMS, federal and state settlement agreements, and other local and state level obligations. *See* Robertson Declaration ¶ 17.

86.     The Debtor has obligations to make payments to the United States Trustee during the pendency of this Chapter 11 proceeding.  This is a legal requirement as part of any Chapter 11 proceeding and accordingly cannot be avoided or reduced.

87.     The Debtor estimates that the Trustee obligations will cost approximately $5,000.00 per month.  The Debtor anticipates that it will be paying $15,000.00 over the following thirteen weeks on account of the Trustee.  The Debtor seeks authority to continue to pay the Trustee in the ordinary course on a post-petition basis.

88.     The Debtor anticipates it will make payments to the United States Bankruptcy Court for any and all motions and other filings relevant to this Chapter 11 proceeding.

89.     The Debtor anticipates court fees of approximately $5,000.00 per month.  The Debtor anticipates that it will be paying $15,000.00 over the following thirteen weeks on account of court fees.  The Debtor seeks authority to pay any and all court fees in the ordinary course on a post-petition basis.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied.

76.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."  As set forth in this motion, the Debtor believes an immediate and orderly transition into Chapter 11 is critical to the viability of its operations and that any delay in granting the relief requested could hinder the Debtor's operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these Chapter 11 cases would severely disrupt the Debtor's operations at this critical juncture.  Payment of the Associate Compensation and Benefits and other relief discussed above is vital to a smooth transition into

Chapter 11. Accordingly, the Debtor submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

77.     To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Waiver of Memorandum of Law

78.     The Debtor respectfully requests that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtor relies is set forth herein and the Motion does not raise any novel issues of law.

### Reservation of Rights

79.     Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to Section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estates; or (g) a

waiver or limitation of any claims, causes of action or other rights of the Debtor or any other party

in interest against any person or entity under the Bankruptcy Code or any other applicable law.

## No Prior Request

80.     No prior request for the relief sought in this motion has been made to this or any

other court.

## Notice

81.     The Debtor will provide notice of this Motion to the following parties and/or their

respective counsel, as applicable: (a) the office of the United States Trustee for the District of New

Jersey; (b) the Debtor's top 20 unsecured creditors (on a consolidated basis), (c) the United States

Attorney's Office; (d) the Secured Creditors; and (f) any party that has requested notice pursuant

to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested,

no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests that the Court enter interim and final

orders, in substantially the forms submitted herewith, granting the relief requested herein and such

other relief as is just and proper under the circumstances.

**ANSELL GRIMM & AARON, P.C.**


Dated: October 11, 2024                    _____

                                           Anthony D'Artiglio, Esq.
                                           *Attorney for Debtor*
                                           *Nostrum Pharmaceuticals, Inc.*