| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| Caption in Compliance with D.N.J. LBR 9004-1(b) | |
| **McMANIMON, SCOTLAND & BAUMANN, LLC** 75 Livingston Avenue, Suite 201 Roseland, New Jersey 07068 (973) 622-1800 Anthony Sodono, III Email: asodono@msbnj.com Michele M. Dudas Email: mdudas@msbnj.com *(Local Counsel to McKesson Corporation and two corporate affiliates, ClarusONE Sourcing Services LLP and RxCrossroads)* | **BUCHALTER, A PROFESSIONAL CORPORATION** 18400 Von Karman Avenue, Suite 800 Irvine, California 92612-0514 Telephone: (949) 760-1121 Jeffrey K. Garfinkle (admitted pro hac vice) Email: jgarfinkle@buchalter.com *(Counsel for McKesson Corporation and two corporate affiliates, ClarusONE Sourcing Services LLP and RxCrossroads)* |
| In re: NOSTRUM LABORATORIES INC.      Debtor. | Case No. 24-19611 (JKS) Chapter 11 Honorable John K. Sherwood |

## INITIAL OPPOSITION OF McKESSON CORPORATION AND TWO CORPORATE AFFILIATES, CLARUSONE SOURCING SERVICES AND RxCROSSROADS 3PL LLC, TO DEBTOR'S MOTION FOR AN ORDER (I) ENJOINING McKESSON FROM VIOLATING THE AUTOMATIC STAY; (II) COMPELLING THE TURNOVER OF FUNDS; (III) COMPELLING PERFORMANCE UNDER THE CONTRACT; AND (IV) OTHER RELIEF

McKesson Corporation ("McKesson"), on behalf of itself and two corporate affiliates, ClarusONE Sourcing Services LLP ("ClarusONE") and RxCrossroads 3PL LLC ("RxCrossroads," and collectively with McKesson Corporation and ClarusONE, the "McKesson Entities") submits this Opposition to the motion filed by Debtor Nostrum Laboratories, Inc. ("Nostrum") entitled *Motion for Entry of Order (I) Enjoining Creditor-customer McKesson Corporation from Violating the Automatic Stay Pursuant to 11 U.S.C. §§ 362(a)(3), 362 (a)(6), 362(a)(7); (II) Compelling the Turnover of Funds Pursuant to 11 U.S.C. § 542(a)-(b); (III) Compelling Performance Under the Contract; and (IV) Granting Related Relief* (the "Motion"). McKesson states in response:

## PRELIMINARY STATEMENT

1.      As the Court knows, Nostrum commenced this chapter 11 case at the end of September 2024 with little pre-planning.  The case was filed in response to the then-imminent appointment of a federal court receiver at the request of Nostrum's senior secured lender, Citizens Bank, N.A. ("Citizens Bank").   A week later, Citizens Bank filed an emergency motion for the appointment of a Chapter 11 trustee or dismissal of the bankruptcy case (the "Trustee Motion"). [ECF 20].

2.      In support of the Trustee Motion, Citizens Bank submitted the transcript of an evidentiary hearing on the receivership action that took place on April 22, 2024 before the Honorable Georgette Castner, United States District Judge for the District of New Jersey. During that hearing, there was considerable testimony regarding Nostrum's accounts receivable and Citizens Bank's allegations that Nostrum overstated its accounts receivable. That testimony provides the general business framework under which the Motion must be viewed.

3.      During the April 22, 2024 hearing, Nostrum introduced the testimony of James Grainer, Nostrum's Chief Financial Officer.  During his testimony (ECF No. 20, Exh. F, pp. 247-249) (the "Grainer Testimony"),[1] Grainer explained discrepancies in the amount of accounts receivable reported to Citizens Bank in order to calculate borrowing base availability:

> Grainer:  "[W]e got paid, in part, [on a $4 million account receivable owed by Cardinal Health] and there's – there's no rebilling."

> Nostrum's Attorney: "And why is that?

> Grainer:   "The whole process is controlled by our third-party logistics company.  When a product is shipped, they render an invoice, okay, you have an invoice. And over time that invoice is subject to adjustments, approved and unapproved, it's subject to

---

[1] A true and accurate copy of the relevant portions of the Grainer Testimony is attached hereto as Exhibit A.

cash payments. So every month there's a reconciliation of adjustments approved, adjustments unapproved and cash received. What happened between April and May, there were adjustments that were unapproved in conjunction with receiving cash, and when that happens, the receivable then resets to being a current receivable. It's normal industry practice. It's done industry-wide by every 3PL throughout the pharmacy industry. There's no re-invoicing. There's one invoice that is sent by our third-party logistics company when the goods are shipped."

Nostrum's Attorney"  "You mentioned that there's a reconciliation process associated with this invoicing. What happens to the money that's unpaid?

Grainer:  "Unpaid?"

Nostrum's Attorney:  "Yes."

Grainer:  "There's an ongoing reconciliation process. There's an ongoing of new invoices, new adjustments, adjustments accepted, unaccepted, it's an ongoing, continuous process."

*        *        *

Judge Castner: "[W]hat's involved in the reconciliation process?"

Grainer:  "[A]s I said, goods are shipped, here's a receivable. This is a very complex industry. You have all sorts of chargebacks, rebates, Medicaid adjustments, whatever, returns. So the goods are shipped. There's an invoice. Then credits and adjustments come through, plus cash, you have real hard cash plus adjustments. Some of the adjustments we accept, i.e., a credit to CVS or to whomever, okay. If there's something that's not accepted, it gets reset as a new receivable, a current receivable, and it's just an ongoing, continuous process of the reconciliation process. It's a normal industry practice."

4.      On October 22, 2024, nearly one month after the bankruptcy case commenced, the

Debtor filed its "Customer Motion."  [ECF No. 78].  As explained in the Customer Motion (¶ 11),

"To preserve the[] critical relationships with Customers, and maintain the good rapport, Debor

[*sic*] usually provided certain chargebacks, rebates, credits for returned product, prompt payment

3

discounts, and administrative fees to Customers during the ordinary course of business. These Customer Programs are necessary tools to maintain honest and fair relationships between Debtor and Customers during the pendency of this Chater [*sic*] 11 case." (definitions omitted).

5.      On October 25, 2024, the Court entered an order (the "Interim Order") granting, on an interim basis, the Customer Motion.  Among other actions, the Interim Order authorized the following:

> The Debtor and Customers are authorized, but not directed, in the ordinary course of business to recoup and offset undisputed debts under their contracts regardless of whether the debts arose pre-petition or post-petition.

Interim Order, ¶ 6.

6.      In light of these general background facts, the obvious question is:  Why are we here?

7.      Following entry of the Interim Order, McKesson expressed its intention to exercise recoupment and setoff rights in the ordinary course of business and engaged Nostrum in discussions to i) clarify an ambiguity arising from the language of the Customer Motion as to whether the Interim Order governs the 3PL relationship administered by RxCrossroads, and ii) reach an understanding and agreement as to the mechanisms by which the post-bankruptcy reconciliations would take place, as described in the Grainer Testimony and in paragraph 11 of the Customer Motion, particularly in view of Nostrum's bankruptcy case and announced sales process.

8.      But then Nostrum simply stopped engaging in those discussions.  Instead, it chose to file the Motion making groundless allegations of violations of the stay against McKesson (and perhaps the two other McKesson Entities).[2] The Motion should be denied for the very simple

---

[2] In the Motion, Nostrum defines "McKesson" as just "McKesson Corporation" and only seeks relief against McKesson.  As the McKesson Entities read the Motion, Nostrum does not seek relief against either ClarusOne or

4

reason that the Interim Order expressly allows the actions alleged against McKesson.  In short, the

Motion alleges that actions McKesson was authorized to take under the Interim Order were

violative of the automatic stay; those allegations make no sense.

9.        Even if the Motion were to raise actions not expressly authorized under the Interim

Order, the Motion nevertheless fails. The contractual relationships between the parties are multi-

faceted and complicated. In the Motion, Nostrum utterly fails to present the relationships in a way

that describes the complexity of the agreed-upon rights and obligations of the parties.

10.       Instead, Nostrum chooses to paint with too broad a brush and ignores the details.

The Motion waylays specificity for confusing, and at times purely speculative, claims and

allegations. The truth is in the details and the Motion fails to put forward those details.

11.       For each of the reasons set forth below, McKesson respectfully requests that the

Motion be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

12.       On September 30, 2024, (the "Petition Date"), Nostrum filed its voluntary petition

for relief under chapter 11 of title 11 to the United States Code (the "Bankruptcy Code").  An

unsecured creditors' committee was appointed on October 21, 2024.  No chapter 11 trustee has

been appointed.

**I.        The Motion Was Filed in the Midst of Discussions Regarding the Entry of a
            Final Order on the Customer Motion and During the Reconciliation Process.**

13.       On October 22, 2024, at the urging of McKesson and Nostrum's two other large

wholesaler clients (Cardinal Health and Cencora f/k/a AmerisourceBergen), Nostrum filed the

Customer Motion.  On October 25, 2024, the Court entered the Interim Order.

---

RxCrossroads.  As such, in this Opposition, where appropriate and when discussing the contents of the Motion, the
term "McKesson" also is used.

14.    Motions similar to the Customer Motion are filed routinely in pharmaceutical bankruptcy cases because of the complex nature of the relationships between manufacturers and distributers, and Nostrum is no exception.  What is unique about Nostrum's bankruptcy case compared to the nearly four dozen or so other pharmaceutical manufacturer bankruptcy cases that have filed over the last decade (mostly in Delaware and New York) is that Nostrum waited a month to file the Customer Motion.[3]  This resulted in a great deal of uncertainty and confusion for the McKesson Entities and the two other large wholesalers.

15.    The business relationship between Nostrum and the McKesson Entities is governed by four operative agreements: (1) a "Core Distribution Agreement" dated February 4, 2016 (the "CDA"),[4] between McKesson and Nostrum; (2) a "Sourcing Framework Agreement" dated March 2, 2018 (the "SFA")[5] between ClarusONE[6] and Nostrum; (3) a "Member Purchase and Services Agreement" dated April 16, 2018 (the "PSA,"[7] and, together with the CDA, SFA and STC's, the "Distribution Agreements"), by and between McKesson and Nostrum; and (4) a "Logistics Services Agreement" dated May 1, 2023 (the "Logistics Agreement"),[8] between Nostrum and RxCrossroads.[9]  Because the relationship involves the sale of goods, the business relationship is also subject to certain applicable provisions of Article 2 of the Uniform Commercial Code

---

[3] By way of example, in the 2019 Chapter 11 bankruptcy case of *Rising Pharmaceuticals*, *et al.*, United States Bankruptcy Court for the District of New Jersey (Judge Papalia), Lead Case No. 19-13448-VFP, the debtors filed a customer motion as part of its petition day filings [ECF No. 14] and that motion was granted the next day [ECF No. 34].

[4] A true and correct copy of the CDA is attached as Exhibit 1 to the Declaration of Armando Fagundes (the "Fagundes Declaration"), filed contemporaneously herewith.

[5] A true and correct copy of the SFA is attached as Exhibit 2 to the Fagundes Declaration.

[6] ClarusONE acts as a product sourcing agent for its two members, McKesson and Walmart.

[7] A true and correct copy of the PSA (which includes McKesson Supplier Terms and Conditions (updated February 3, 2020 (the "STC's") is attached as Exhibit 3 to the Fagundes Declaration.  The STC's govern numerous aspects of the day-to-day relationship between McKesson and Nostrum.

[8] A true and correct copy of the Logistics Agreement is attached as Exhibit 4 to the Fagundes Declaration.

[9] RxCrossroads is an affiliate of McKesson that provides logistics services between McKesson and its customers.

("UCC"). The Distribution Agreements and the Logistics Agreement, read together, describe the quilt-like relationships among the various parties.[10]

16.     In application, at any point in time, such as the Petition Date, the payment and other obligations flowing between parties, including setoff and related rights, were considerable and complicated.  Because Nostrum failed to file a typical customer motion at the outset of this bankruptcy case, the McKesson Entities initiated an administrative freeze for all Nostrum-related payments and receivables on the Petition Date.  *See* Fagundes Declaration ¶ 12.  That freeze is only temporary.  The discussions related to the final order on the Customer Motion sought to clarify whether RxCrossroads and the 3PL business relationships are included within the Customer Motion and its court-approved provisions.  *See* Declaration of Jeffrey Garfinkle (the "Garfinkle Declaration"), filed contemporaneously herewith, ¶ 12.  On the face of the Customer Motion and the Interim Order, RxCrossroads appears to be included, but because of the magnitude of the dollars involved, the McKesson Entities sought confirmation nonetheless.[11]  *Id.* ¶ 11.

17.     After entry of the Interim Order, the parties had communications regarding the Customer Motion.  Specifically, McKesson was concerned that the Customer Motion did not expressly discuss the 3PL business relationship or mention RxCrossroads.  *See id.*  To that end, McKesson proposed clarifying language that, in turn, conflicted with a proposed revision suggested by another party in the discussions.  *Id.* ¶¶ 13-14.  The parties continued to communicate regarding these issues, with the last communication being a call between representatives of

---

[10] In the Motion, Nostrum inartfully alleges that all contracts are between Nostrum and McKesson.  *See* Motion ¶ 8 ("Debtor and McKesson have a longstanding relationship with a February 4, 2016 Core Distribution Agreement, a March 2, 2018 Sourcing Framework Agreement, an April 16, 2018 as amended July 1, 2023 Member Purchase and Services Agreement, and a March 1, 2023 Logistical Services Agreement.").  This broad-stroke (and false) approach is throughout the Motion.

[11] The Customer Motion broadly defines "Customers" as all of the Debtor's customers and the Interim Order covers all of the Debtor's customer programs without specification.

McKesson and Nostrum in mid-December, shortly before the holiday season. *Id.* ¶ 19. There was no further communication between the parties after that call until the Motion was filed on January 7, 2025. *Id.* ¶ 21.

18.     Because of the ongoing discussions, the hearing on a final order for the Customer Motion has been postponed on numerous occasions. The hearing is currently set for January 21, 2025.

## II.     Nostrum Requests Unsupported Payments.

19.     In the Motion, Nostrum refers to numerous amounts allegedly owed and outstanding. Specifically, Nostrum lists the following amounts allegedly due and owing: (1) $2,382,322.00 under the RxCrossroads' portal; (2) $250,861.00, allegedly held back by McKesson on behalf of ClarusONE for services rendered by ClarusONE; (3) $264,793.00, in pre-petition amounts owed to RxCrossroads; and (4) $12 million allegedly due and owing from McKesson. Additionally, Nostrum alleges that McKesson is in possession of $1,693,320 worth of inventory that belongs to Nostrum.

20.     Nostrum provides no detail about how it arrived at any of these numbers. Indeed, the numbers appear to be approximations. For example, Nostrum alleges that it "*believes* they are currently owed at least $2,382,332.00" from McKesson. (Motion ¶ 11) (emphasis added). This amount is "[b]ased upon Debtor's assessment" of the various contracts. *Id.* No indication is given as to who made that "assessment," nor how that "assessment" was determined. *Id.* Regarding the amounts allegedly owed by RxCrossroads, Nostrum is equally uncertain: "It appears Debtor is owed $264,793.00 in pre-petition payments" from RxCrossroads. *Id.* ¶ 13.

21.     Nostrum's foggy calculations may be the result of the various setoff, recoupment, rebate and related rights detailed in the Distribution Agreements and the Logistics Agreement and

the complex "reconciliation process" as explained by the Grainer Testimony, but the Motion is unclear and imprecise as to who owes what to whom, whether conditions precedent to payment obligations have been met, etc. These issues should not be addressed in Court; they should be resolved in discussions among the accountants and other business people who understand the quilted relationships. And fundamental to that understanding is clarity as to whether the Customer Motion includes the Logistics Agreement and the setoff rights therein. The McKesson Entities will not exercise any setoff rights with respect to RxCrossroads' debt account unless it is included in the scope of the Customer Motion, and only after Court approval.

## LAW AND ARGUMENT

22.     The Motion must be denied because the "stay violations" Nostrum complains of, to the extent the actions have even occurred, are expressly allowed under the Interim Order. Moreover, the Motion entirely fails to articulate any alleged stay violation against McKesson. The primary basis for all requested relief in the Motion is the mistaken position that McKesson's passive retention of funds pursuant to its administrative freeze is violative of the automatic stay. It is not. Once that cornerstone argument dissolves, the remaining claims collapse.

23.     In total, the Motion alleges the following claims: (1) violations of the stay under Bankruptcy Code sections 362(a)(3) & (7) and 362(k); (2) entitlement to damages under Bankruptcy Code section 362(k) for alleged willful violation of the stay; (3) entitlement to turnover of funds under Bankruptcy Code section 542(a)-(b); (4) compulsion of performance under the parties' contracts; and (5) improper triangular setoff in violation of Bankruptcy Code section 553(a). None of these allegations holds water.

9

### I.     The Interim Order Governs This Dispute and Mandates Denial of the Motion.

24.     While the parties are still discussing whether RxCrossroads and the 3PL relationship are included within the parameters of the Customer Motion, the Interim Order could not be clearer in one respect: the actions Nostrum complains of, at least with respect to McKesson and ClarusONE, are expressly allowed under the Order.  The Order states: "The Debtor and **Customers**[12] **are authorized**, but not directed, in the ordinary course of business **to recoup and offset undisputed debts under their contracts** regardless of whether the debts arose pre-petition or post-petition."  Interim Order ¶ 6 (emphasis added).

25.     Again:  Why are we here?

26.     Even if the Interim Order were not to apply (and it does), the Motion nevertheless fails to allege that any actual violation has occurred.

### II.     McKesson Has Not Violated 11 U.S.C. § 362(a)(3).

27.     Section 362(a)(3) of the Bankruptcy Code prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . ."  11 U.S.C. § 362(a)(3).  Nostrum's position is that McKesson's retention of "over $1,693,320.00 in inventory that could and should be sold" amounts to exercising control over property of the estate.  (Motion ¶ 25).  Nostrum further alleges that the retention of funds allegedly due from ClarusONE, RxCrossroads, and McKesson "is in direct contravention of the benefits of the automatic stay."  Neither of these claims is supported by case law, and neither of these claims is factually accurate.

---

[12] The defined term "Customers" is defined in the Customer Motion as "Debtor's customers."  *See* Customer Motion ¶ 2.  It is this circular definition that has led to confusion as to the applicability of the Order to RxCrossroads and the 3PL relationship.  No party disputes that McKesson and ClarusONE are governed by the Interim Order.  Indeed, Nostrum expressly named McKesson as one of the customers to which the Customer Motion applied in the motion itself.  *Id.*

10

28.     Regarding the retained inventory, this appears to be inventory that McKesson purchased from Nostrum pursuant to the PSA and which therefore belongs to McKesson. As set forth in the STC's, "Title and risk of loss to the Products [ordered by McKesson] shall pass to McKesson upon acceptance of such delivery by McKesson . . . ." *See* STC's at 19. Accordingly, Nostrum does not hold title to the products being held and, thus, such inventory is not property of the estate, and cannot be subject to "turnover."

29.     Regarding the retention of funds, the Supreme Court has made clear that the passive retention of funds pursuant to an administrative freeze does not constitute a violation of the automatic stay. *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995) ("[W]e will not give § 362(a)(3) . . . an interpretation that would proscribe what § 542(b)'s 'except[ion]' and § 553(a)'s general rule were plainly intended to permit: the temporary refusal of a creditor to pay a debt that is subject to setoff against a debt owed by the bankrupt."); *see also City of Chicago, Illinois v. Fulton*, 592 U.S. 154, 161–62 (2021) ("We hold . . . that mere retention of estate property after the filing of a bankruptcy petition does not violate § 362(a)(3) of the Bankruptcy Code."). Because all that Nostrum alleges is that McKesson is withholding funds, such passive retention does not amount to a violation of the automatic stay under section 362(a)(3).

**III.    McKesson Has Not Violated 11 U.S.C. § 362(a)(6).**

30.     Section 362(a)(6) prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case . . . ." 11 U.S.C. § 362(a)(6). Again, Nostrum alleges violations of the stay for mere passive possession of the disputed funds. Nostrum tries to plead around this by arguing that McKesson is "seeking payment of fees" and that McKesson "unilaterally insists on payment of pre-petition debts as an unlawful precondition of payment of funds indisputably due and owing to the Debtor." (Motion ¶¶ 28-29). This is not the

11

case.  McKesson is not seeking any payment from Nostrum, it is merely preserving its setoff and related rights pending entry of the final order on the Customer Motion and agreement on normal reconciliations.  Nostrum is manufacturing a request for payment out of McKesson's retention of its recoupment and setoff rights—rights that were already granted to McKesson under the Interim Order.  This is improper and should not be countenanced.

31.     In support of its position, Nostrum relies on numerous cases, all of which are inapposite: *Malloy v. J&V Developers, Inc. (In re Malloy)*, 572 B.R. 551, 556 (Bankr. E.D. Pa 2017); *In re Miller*, 447 B.R. 425, 433 (Bankr. E.D. Pa. 2011); *In re Sechuan City, Inc.*, 96 B.R. 37, 41-42 (Bankr. E.D. Pa. 1989); *In re Sullivan*, 367 B.R. 54, 62 (Bankr. N.D.N.Y. 2007); *In re Draper*, 237 B.R. 502, 505 (Bankr. M.D. Fla. 1999); *Divane v. A & C Elec. Co.*, 193 B.R. 856, 859 (N.D. Ill. 1996).  Other than in *Malloy*, the creditor in each case took affirmative steps to collect or otherwise exert control over property of the estate; none of them deal with passive retention of funds: *In re Miller* (sending direct invoices despite knowledge of automatic stay); *In re Sechuan City, Inc.* (posting signs telling customers not to patronize debtor until debtor pays debts owed); *In re Sullivan* (sending letter requesting pre-petition fees in order to obtain release for debtor to sell its property); *In re Draper*, (continually sending invoices despite knowledge of bankruptcy case); and *Divane v. A & C Elec. Co.* (sending letter to debtor's employees that they would not receive health and welfare benefits unless debtor pays delinquent amounts).  Additionally, the court in the *Malloy* case, which Nostrum cites as "holding" in its favor, actually held that the allegations in the case were insufficient to amount to a stay violation.  572 B.R. at 559.

32.     In short, McKesson has not taken any affirmative action to collect on any obligations owed to it by Nostrum.  It has merely initiated a freeze while the parties work out numerous accounting and reconciliation issues that are particularly acute because of the complex

12

nature of the parties' relationships and the complications inherent with Nostrum's bankruptcy filing.  As described in the Grainer Testimony and as set forth in paragraph 11 of the Customer Motion, those issues include numerous setoff, recoupment, rebate, chargeback and related rights that affect the amounts owed by each party.  This is not a stay violation.

### IV.    McKesson Has Not Violated 11 U.S.C. § 362(a)(7).

33.    Next, Nostrum asserts that McKesson has violated section 362(a)(7), which prohibits "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor. . . ." 11 U.S.C. § 362(a)(7).  However, Nostrum does not actually allege that McKesson has exercised its setoff rights.  Instead, it merely explains what amounts it alleges are owed and then asserts that the improper withholdings are in violation of 11 U.S.C. § 362(a)(7).  In other words, Nostrum again argues that McKesson's passive retention of funds for which it has a recoupment right and court-granted setoff right is a violation of the stay.  Additionally, Nostrum curiously argues that McKesson is executing an "inventory setoff."  It is unclear from the Motion what this "inventory setoff" is, other than McKesson's alleged inaction in selling the subject inventory.  Both of these arguments fail.

34.    Since the passive retention of property of the estate does not constitute a stay violation, it certainly does not amount to an improper setoff.  In *Strumpf*, the Supreme Court was presented with nearly an identical argument: that the bank's administrative hold, initiated to preserve its setoff rights, amounted to an improper setoff in violation of section 362(a)(7). 516 U.S. at 18.  The Supreme Court rejected this argument, recognizing "[i]t would be an odd construction of § 362(a)(7) that required a creditor with a right of setoff to do immediately that which § 542(b) specifically excuses it from doing as a general matter: pay a claim to which a defense of setoff applies." *Strumpf*, 516 U.S. at 20.

35.     Regarding the "inventory setoff" claim, again, the inventory is not property of the estate, as it was purchased by McKesson.  Even if the inventory were property of the estate, it is unclear what Nostrum means by its allegation that McKesson is "offsetting" the inventory in some way.  At most, Nostrum alleges that McKesson is including the value of the inventory as part of the equation as to the amounts owed between the parties, not that McKesson is actually offsetting any amounts.  Substantively, all that is alleged is the passive retention of that inventory, which does not amount to violation of the stay.  *City of Chicago, Illinois v. Fulton*, 592 U.S. at 161–62 ("We hold . . . that mere retention of estate property after the filing of a bankruptcy petition does not violate § 362(a)(3) of the Bankruptcy Code.").

36.     Of note, Nostrum improperly misconstrues the holding of the primary case that it relies upon for this position.  Nostrum alleges that in *Welded Constr., L.P. v. The Williams Cos. (In re Welded Constr., L.P.)*, 609 B.R. 101, 128 (Bankr. D. Del. 2019), the court "held it was a violation of § 362(a)(7) for funds to be withheld from the debtor, withheld funds constituted property of the estate and refusal to turnover funds without relief from the automatic stay amounting to a post-petition setoff which is an impermissible violation of the stay."  (Motion ¶ 30).  This is a gross mischaracterization of the case.  The *Welded* case was decided at the motion to dismiss stage—in an actual adversary proceeding—and the court's actual holding was that "[t]aking the allegations as true and drawing all reasonable inferences in favor of the Debtor, the Complaint states a plausible claim that Defendants effectuated a setoff in violation of the automatic stay pursuant to section 362(a)(7)."  *Id.* at 129.  All that was held was that a colorable claim, drawing all inferences in the debtor's favor, was alleged, not that these actions actually amounted to violations.  Moreover, the *Welded* court rejected the debtor's argument that the creditor had violated section 362(a)(3) for withholding payments: "Failure to pay a disputed contract debt is merely a passive act that, even

14

if taken post-petition, does not satisfy the affirmative act requirement necessary for an automatic stay violation finding under Section 362(a)(3)." *Id.* at 127.

## V.    Nostrum Is Not Entitled to Damages for Willful Violation of the Stay.

37.    As set forth above, Nostrum has failed to establish that a stay violation has occurred. Accordingly, damages for "willful" violation of the stay are inappropriate. Nothing alleged constitutes a stay violation period, yet alone a "willful" violation sufficient to establish statutory damages.

38.    Of note, Nostrum cites *In re Miller* for the proposition that damages are available for a willful stay violation if: (1) the offending party violated the automatic stay; (2) the violation of the stay was willful; and (3) the willful violation must have caused debtor some injury. (Motion ¶ 38). Ironically, the *Miller* court held that the debtor in that case failed to establish that it had been harmed by the stay violation and denied the motion. *In re Miller*, 447 B.R. at 435.

39.    The same is true here. Nostrum has failed to establish that it has been damaged by McKesson's administrative freeze. Indeed, Nostrum brushes over this element as if damages were obvious on the face of the Motion, but in reality, again, all that is alleged is that McKesson is withholding funds while the parties work out the details of the Customer Motion order and the normal accounting and reconciliation process: "By McKesson withholding payments due and owing to Debtor in the amount of appropriately [*sic*] $2,382,332.00 and McKesson withholding approximately $1,693,320.00 in inventory Debtor is unable to collect funds which would help the already cash strapped Debtor to continue operating as a going concern through a sale for the benefit of the larger unsecured body." (Motion ¶ 39). Again, this is merely an allegation of passive retention of funds and inventory, not a stay violation.

15

40.    Moreover, in *Taggart*, the United States Supreme Court held that "[a] court may hold a creditor in civil contempt for violating a discharge order where there is not a 'fair ground of doubt' as to whether the creditor's conduct might be lawful under the discharge order." *Taggart v. Lorenzen*, 587 U.S. 554, 565 (2019).  The *Taggart* standard of "no fair ground of doubt" is met "when there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order." *Id*. at 560.

41.    Here, there is much more than a "fair ground of doubt" that McKesson violated the stay.  Because the exercise of any setoff rights is expressly permitted by the Interim Order, Nostrum has otherwise not met its burden in articulating a colorable claim for violation of the stay.  As such, sanctions for violation of the stay are not available to Nostrum.

**VI.    McKesson Should Not be Forced to Turn Over Any Property at this Time.**

42.    Next, Nostrum argues that turnover of "property of the estate" is appropriate under Section 542 of the Bankruptcy Code, which provides, in pertinent part: ""(a) . . . an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a). Section 542(b) provides: "Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."

43.    For this position, Nostrum relies on outdated, nonbinding case law that fails in light of the Supreme Court's ruling in *Fulton*.  Specifically, Nostrum cites *Rutherford v. Auto Cash, Inc.*

16

*(In re Rutherford)*, 329 B.R. 886 (Bankr. N.D. Ga. 2005) and *Hampton v. Yam's Choice Plus Auto,*

*Inc. (In re Hampton)*, 319 B.R. 163, 171 (Bankr. E.D. Ark. 2005) for the proposition that section

542 imposes an affirmative duty to creditors in control of estate property to return such property

and may not passively retain it lest they violate the automatic stay.    Nostrum cites *Rutherford* to

say that "refusal to comply with [the turnover duty under section 254] constitutes an 'act' within

the meaning of § 362(a)(3) in violation of the automatic stay."    (Motion ¶ 44).    This precise

argument was rejected by the Supreme Court in *Fulton*, which recognized that "[r]eading 'any act

. . . to exercise control' in § 362(a)(3) to include merely retaining possession of debtor's property

would make that section a blanket turnover provision" that would render section 542 superfluous.

592 U.S. at 591.    In short, Nostrum's case law on this point is not good law and, thus, this argument

should be rejected.

44.    Moreover, Nostrum's arguments for why turnover is appropriate mirror the same

arguments they make for every cause of action:    McKesson's passive retention constitutes a stay

violation.    First, Nostrum again argues that the inventory McKesson possesses and has title to (see

STC's at 19) is property of the estate and that it should be turned over or sold.    As there is no basis

to find that the inventory is property of the estate, this argument fails.    Next, Nostrum argues that

the retention of funds is a violation: "By failing to permit the Debtor to collect monies due and

owing, McKesson is impeding Debtor's ability to operate as a going concern and is harshly limiting

Debtor's abilities to exit the chapter 11."    (Motion ¶ 47).    This, again, is a passive retention

argument and, again, fails.

45.    Finally, Nostrum's requested relief in this section is baffling: "For these reasons,

this Court should require McKesson to turnover funds pursuant to 11 U.S.C. § 542 in the amount

of $2,382,332.00 for McKesson's invoices owed to Debtor and release the $540,861 that Debtor

owes ClarusOne so Debtor can pay ClarusOne directly, and the $336,325 owed to [RxCrossroads]

Debtor can pay [RxCrossroads] directly."   (Motion ¶ 47).   In short, Nostrum is asking for

McKesson to pay the money back to Nostrum, so it can then pay McKesson's affiliates the money

that is being withheld.   That is illogical.

**VII.    The McKesson Entities Have Not Breached the Parties' Contracts.**

46.    Nostrum's next argument is both premature and procedurally improper.   In short,

Nostrum argues that because there are payment deadlines under the parties' contracts, McKesson's

retention of the funds while the parties work out the details of the Customer Motion order and the

complex accounting issues amount to breaches of contract.   As a preliminary matter, a breach of

contract claim is a cause of action that should be addressed by a proper adversary proceeding, not

what is essentially a motion to compel.   Additionally, the parties have been in communication

regarding all of these issues and any "breach of contract" claim is improper in light of the parties'

ongoing discussions and McKesson's rights under the operative agreements.

47.    McKesson has not definitively asserted that it will not pay any amounts due and

owing to Nostrum.   Quite the opposite.   McKesson wants to work with Nostrum to ensure that the

relationship between the parties is able to move forward smoothly in light of the bankruptcy.   That

was supposed to be the purpose of the Customer Motion.   By alleging breach of contract now,

Nostrum is thumbing its nose at McKesson's good faith efforts to address these issues.   Any delays

in payment are accountable to at least three factors: (1) Nostrum's bankruptcy filing, (2) its delay

in filing the Customer Motion, and (3) the ambiguities in the Customer Motion.

48.    Additionally, Nostrum misstates the role ClarusONE has with respect to the parties'

relationship.   Nostrum argues that "ClarusOne provides Debtor's products to end users."   First, the

contract at issue is the SFA, which is between Nostrum and ClarusONE, not McKesson, so

McKesson could not have breached the contract.  Second, the SFA makes clear in the STC's that "ClarusONE only negotiates the terms of awards and other incentives for the benefit of Members and ClarusONE does not have authority to make any purchasing or other related commitments or obligations for, or to otherwise bind, a Member, except as explicitly agreed to in writing by a Member."  SFA at 2.  In other words, ClarusONE is acting as McKesson's agent and does not actually handle any of the products; its role is the negotiation of product sales between its members and Nostrum.  For all intents and purposes, ClarusONE is an agent of McKesson and a pass-through entity with respect to any payments made or received.

49.    With regard to RxCrossroads, McKesson maintains that any amounts due and owing from RxCrossroads will be appropriately addressed once a final order on the Customer Motion is entered.  Until such time, it is unclear whether the setoff rights for RxCrossroads' services are to be included in any calculation of accounts payable owed to Nostrum.  Again, this confusion was being addressed by the parties prior to Nostrum's unilateral, and unexpected, decision to file the Motion.

50.    Critically, with respect to all of the amounts allegedly owed, such amounts are not yet ripe for payment under the UCC, as they have not matured.  The relevant Agreements are governed by Delaware law and California law.  (Complaint at ¶ 18).  Delaware and California have both adopted the UCC, including the UCC's implied warranty of merchantability.   See 6 Del. Code § 2-314 and CA Com. Code § 2314.   Section 2-314 of the UCC provides that goods sold must be "merchantable" and be "fit for the ordinary purposes for which goods are used":

> Implied warranty; merchantability; usage of trade.
>
> (1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this

section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

51.    In the present case, it is unclear at this time whether the pharmaceutical goods will continue to be merchantable because doubt exists as to whether Nostrum will either remain a going concern or be sold.  Nostrum currently has obligations per FDA guidelines to ensure the efficacy and safety of its pharmaceutical products.  If this case does not result in a reorganization or sale, the goods at issue cannot be sold.  Accordingly, the amounts owed cannot properly be addressed until such time as either (a) the parties agree to the terms of a Customer Motion order that clarifies all parties' relationships or (b) Nostrum demonstrates the likelihood of a prospect of reorganization or sale under which the purchaser or purchasers will continue to fulfill all of the FDA's requirements with respect to pharmaceutical products.  At this time, neither of those events has occurred and, thus, the payments remain contingent and unmatured.

20

**VIII.   Any Recoupment Regarding ClarusONE Is Not a Triangular Setoff.**

52.     Finally, Nostrum argues that McKesson's actions in accounting for payments to ClarusONE and RxCrossroads in its interactions with Nostrum amount to impermissible "triangular setoffs" prohibited by section 553(a) of the Bankruptcy Code.  This argument is premised on an incorrect understanding of the relationship between the parties and the rights that McKesson is preserving to exercise.

A. *Any Adjustment by McKesson Would be a Recoupment, Not a Setoff.*

53.     If McKesson does adjust any amounts owed based on moneys owed or held by ClarusONE, such action would be a recoupment, and not a setoff.  Recoupment is an "equitable doctrine that has long been applied in the bankruptcy context." 5 COLLIER ON BANKRUPTCY, ¶ 553.10 (16th ed. 2021).  The doctrine of recoupment applies where "both the creditor's claim and the amount owed to the debtor . . . arise from a single contract or transaction." *In re Fischbach*, 2013 WL 1194850, at *2 (D.S.C. Mar. 22, 2013) (citing *In re Powell*, 284 BR. 573, 576 (Bankr. D. Md. 2002).  "The automatic stay provided for in the Bankruptcy Code does not apply to recoupment, and recoupment is not prohibited by the Bankruptcy Code's discharge injunction." *See id*.; *see also Ravenwood Healthcare, Inc. v. Maryland*, 2007 WL 1657421, at *3 (D. Md. June 5, 2007) ("Judicial approval is not required prior to recoupment because the right of recoupment does not constitute a debt which is dischargeable.") (internal citations omitted).

54.     "Recoupment is not limited to pre-petition claims and thus may be employed to recover across the petition date."  *Sims v. U.S. Dept. of Health and Human Services* (*In re TLC Hospitals, Inc.*), 224 F.3d 1008, 1011 (9th Cir. 2000) (internal citations omitted); 5 COLLIER ON BANKRUPTCY, ¶ 553.10 (16th ed. 2021) ("There is no requirement under the doctrine of

21

recoupment that the relevant obligation and the corresponding right of reduction must have arisen before the bankruptcy case.").

55.     "The crucial distinction between recoupment and setoff is whether the debt owed the creditor arose out of the same transaction as the debt the creditor owes the debtor . . . . Therefore, in order for the doctrine of recoupment to apply, both the creditor's claim and the amount owed to the debtor must arise from a single contract or transaction." *Fischbach*, 2013 WL 1194850, at *3 (internal citations and quotation marks omitted).

56.     In determining whether the same transaction requirement is satisfied, the *Fischbach* court has explained:

> The Third Circuit Court of Appeals has applied the more conservative "integrated transaction" test, which requires that "the obligations at issue 'arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of the transaction without also meeting its obligations.' " *Id.* (quoting *In re Univ. Med. Ctr.,* 973 F.2d at 1081).

*Id.*

57.     Under the Third Circuit's "integrated transaction" test, the funds withheld by McKesson are properly subject to the recoupment doctrine.  *Univ. Med. Ctr.,* 973 F.2d at 1081. Not only do the prospective recouped amounts arise from the same contract, but the PSA itself expressly provides McKesson with recoupment rights.  *See*, *e.g.*, PSA § 5(B)(3) (McKesson "may, without prior written notification, notice or separate authorization, set-off, recoup, deduct and apply any past due amounts owed by Supplier or Supplier's Affiliates to McKesson . . . .").

58.     As to RxCrossroads, McKesson is not asserting either setoff or recoupment rights. Rather it is waiting to determine the final outcome of the Customer Motion. Similarly, any adjustment for payments to or from RxCrossroads fits within the recoupment framework.

59.     Put simply, the contracts between McKesson and ClarusOne, on the one side, and Nostrum, on the other side, are interrelated and all speak to the same product purchase and distribution relationship. Accordingly, recoupment, not setoff, is the appropriate remedy available to McKesson.  Confusingly, rather than affording McKesson the opportunity to exercise its recoupment rights, Nostrum instead asks the Court for circular relief so that it can do precisely what McKesson seeks to do: offset payments to ClarusONE and RxCrossroads with funds from McKesson.

60.     As such, any recoupment that could occur (again, McKesson is merely holding funds at this point and has not allocated any specific funds to any specific payment) would not constitute an impermissible triangular setoff.

      **B.**  *Even if Viewed as a Setoff, the McKesson Entities Have Setoff Rights Which Can be Exercised.*

61.     Even if the Court were to view the adjustment of payments as a setoff and not a recoupment, at least with respect to ClarusONE, such setoff would nevertheless be appropriate. This is because McKesson holds setoff rights under the express terms of the PSA and T&C. Nostrum effectively concedes as much by requesting funds from McKesson to pay ClarusONE.

62.     Section 553 of the Bankruptcy Code, which governs setoffs, states, in relevant part: "this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . ." 11 U.S.C. § 553(a).  The primary issue Nostrum raises is that the alleged payments of ClarusONE are not mutual with McKesson such that setoff is appropriate.

63.     As established above, ClarusONE is an agent and pass-through entity with respect to McKesson for any purchases negotiated by ClarusONE.  It cannot bind McKesson or otherwise

take any actions outside the limited scope of its authority, which is expressly delineated in the STC's. SFA at 2 ("ClarusONE only negotiates the terms of awards and other incentives for the benefit of Members and ClarusONE does not have authority to make any purchasing or other related commitments or obligations for, or to otherwise bind, a Member, except as explicitly agreed to in writing by a Member."). As such, any and all purchases made "by ClarusONE" are actually made by McKesson. As such, mutuality exists in the payments at issue, thus making setoff appropriate.

## CONCLUSION

64.     McKesson has not violated the automatic stay, or any other provision of the Bankruptcy Code, through its permissible initiation of an administrative freeze of its accounts with Nostrum while the parties sort out their respective rights under the Customer Motion. Until that issue is resolved, none of the claims raised by Nostrum are appropriate. Because the Motion is premature and because it fails to state any claim on which Nostrum can obtain relief, McKesson respectfully requests that this Court enter an order denying the Motion and granting such further relief as this Court deems just and proper.

Dated: January 13, 2025

**McMANIMON, SCOTLAND & BAUMANN, LLC**
*Local Counsel to McKesson Corporation and two corporate affiliates, ClarusONE Sourcing Services LLP and RxCrossroads*

By:     */s/ Michele M. Dudas*
        MICHELE M. DUDAS

**BUCHALTER, A PROFESSIONAL CORPORATION**
*Counsel to McKesson Corporation and two corporate affiliates, ClarusONE Sourcing Services LLP and RxCrossroads*

By:     */s/ Jeffrey K. Garfinkle*
        JEFFREY K. GARFINKLE

24

# EXHIBIT "A"

1      **UNITED STATES DISTRICT COURT**
       **FOR THE DISTRICT OF NEW JERSEY**
2      _____

3      CITIZENS BANK, N.A.,                    CIVIL ACTION NUMBER:

4           Plaintiff,                         3:23-CV-20765-GC-DEA
       vs.
5
       NOSTRUM LABORATORIES, INC, and          EVIDENTIARY HEARING
6      NOSTRUM PHARMACEUTICALS, LLC,

7           Defendants.                        COURTROOM 5E
       _____

8
       Clarkson S. Fisher Federal Building & U.S. Courthouse
9      402 East State Street
       Trenton, New Jersey 08608
10     Monday, April 22, 2024
       Commencing at 9:12 a.m.
11

12     **B E F O R E:**            THE HONORABLE GEORGETTE CASTNER,
                                   UNITED STATES DISTRICT JUDGE
13
       **A P P E A R A N C E S:**
14

15     STRADLEY, RONON, STEVENS & YOUNG, LLP
       BY:  JULIE M. MURPHY, ESQUIRE
       BY:  JOSEPH WILLIAM CATUZZI, ESQUIRE,
16     Liberty View
       457 Haddonfield Road, Suite 100
17     Cherry Hill, NJ  08002
       For the Plaintiff
18
       LAW OFFICE OF BRIDGETTE Y. AHN
19     BY:  BRIDGETTE Y. AHN, ESQUIRE
       PMB 1236
20     111 Town Square Place, Suite 1203
       Jersey City, NJ  07310
21     For the Defendants

22
               Kimberly Wilson, Federal Official Court Reporter
23                    Kimberly_Wilson@njd.uscourts.gov
                            (609)815-2751
24
       Proceedings recorded by mechanical stenography; transcript
25            produced by computer-aided transcription.

1  A    No.

2  Q    Did you get paid on those invoices for that month?

3            MR. CATUZZI:  Objection, Your Honor.  Lack of

4  foundation in terms of what invoices.

5            THE COURT:  Yeah, Counsel.  It's tough for the Court

6  to follow without any reference to which invoices with the lack

7  of any documents before it to follow.  So you have to lay more

8  of a foundation.

9  BY MS. AHN:

10 Q    Mr. Slone indicated Nostrum has misrepresented the

11 accounts -- eligible receivables to Citizens Bank in May --

12 Citizens Bank.

13       In May 2023, Nostrum included in its borrowing base

14 approximately $4 million in accounts receivable attributable to

15 Cardinal Health, which the accounts receivable aging reports

16 show that current.  It is further stated that officers of

17 Nostrum have acknowledged that past due amounts from Cardinal

18 Health were cleaned up.  Dalto understands that cleanup, quote,

19 unquote, to include issuing a new invoice for past due amounts

20 or rebilling.  Did you get paid on those invoices referred in

21 those quotes?

22 A    Yes, we got paid, in part, and there's -- there's no

23 rebilling.

24 Q    And why is that?

25 A    The whole process is controlled by our third-party

1   logistics company.  When a product is shipped, they render an

2   invoice, okay, you have an invoice.  And over time that invoice

3   is subject to adjustments, approved and unapproved, it's

4   subject to cash payments.  So every month there's a

5   reconciliation of adjustments approved, adjustments unapproved

6   and cash received.  What happened between April and May, there

7   were adjustments that were unapproved in conjunction with

8   receiving cash, and when that happens, the receivable then

9   resets to being a current receivable.  It's normal industry

10  practice.  It's done industry-wide by every 3PL throughout the

11  pharmacy industry.  There's no re-invoicing.  There's one

12  invoice that is sent by our third-party logistics company when

13  the goods are shipped.

14  Q    You mentioned that there's a reconciliation process

15  associated with this invoicing.  What happens to the money

16  that's unpaid?

17  A    Unpaid?

18  Q    Yes.

19  A    There's an ongoing reconciliation process.  There's an

20  ongoing of new invoices, new adjustments, adjustments accepted,

21  unaccepted, it's an ongoing, continuous process.

22  Q    So when re-billing is referred to, what does that actually

23  mean, Mr. Grainer?  When rebilling is referred to, what does

24  that mean, Mr. Grainer?

25  A    Rebill, you said?

GRAINER - DIRECT - AHN

1    Q    Yes.

2    A    There is no rebilling.  There's one invoice sent when

3    products are shipped.  There is no second invoice sent.

4    Q    But do you issue a new invoice for the amount of the

5    adjustment?

6    A    No, there's never -- there's products are shipped, there's

7    one invoice.  That then commences a reconciliation process, as

8    I just enumerated.

9         THE COURT:  Well, what's involved in the

10   reconciliation process?

11        THE WITNESS:  Well, as I said, goods are shipped,

12   there's a receivable.  This is a very complex industry.  You

13   have all sorts of chargebacks, rebates, Medicaid adjustments,

14   whatever, returns.  So the goods are shipped.  There's an

15   invoice.  Then credits and adjustments come through, plus cash,

16   you have real hard cash plus adjustments.  Some of the

17   adjustments we accept, i.e., a credit to CVS or to whomever,

18   okay.  If there's something that's not accepted, it gets reset

19   as a new receivable, a current receivable, and it's just an

20   ongoing, continuous process of the reconciliation process.

21   It's a normal industry practice.

22        THE COURT:  When you refer to credit, do you mean a

23   reduction or deduction in the invoice?

24        THE WITNESS:  Correct, it's a credit to the customer.

25        THE COURT:  So then the invoice would be a lower

1    amount if there's a credit?

2            THE WITNESS:  Not the invoice, but the overall

3    receivable.

4            THE COURT:  The --

5            THE WITNESS:  The invoices might be, but there's an

6    overall adjustment on the receivable.  It's an ongoing process.

7            THE COURT:  The amount that's outstanding is a

8    receivable?

9            THE WITNESS:  The receivable can change as you're

10   constantly adjusting it, selling new product, having constant

11   adjustments, credits, adjustments, accepted adjustments, not

12   accepted, cash coming in.  It's an ongoing process.

13           THE COURT:  Meaning, the receivable could go up or

14   down?

15           THE WITNESS:  Yes.

16           THE COURT:  Okay.

17   BY MS. AHN:

18   Q    Did you use the words, quote, unquote, cleanup, and if so,

19   what did you mean?

20   A    Cleanup?

21   Q    Yes.

22   A    If I said it, you know, cleanup, reconciliation, whatever.

23   I mean, what's important is the process.

24   Q    Did you ever use the words rebilling or rebilled?

25   A    No.  We don't bill, we invoice.  And we don't send those

 1   out, as I said, no.

 2   Q    Can you rebill if you wanted to?

 3   A    No.

 4   Q    And why that?

 5   A    One, the process is completely controlled, the invoicing

 6   process is controlled by our third-party logistics company.

 7   It's all part of the much larger complicated process of

 8   shipping, billing, managing receivables, collecting, managing

 9   regulatory adjustments, having very sophisticated software.

10   And it's an infrastructure that Nostrum does not have, as do

11   many companies not have.

12   Q    Is this process governed by governmental regulations?

13   A    I'm sorry?

14   Q    This is process governed by governmental regulations?

15   A    Yes, there's regulations that impact it, yes.

16   Q    Could somebody in your accounting department just create

17   an invoice, as Mr. Slone said, and send it to Cardinal in this

18   case?

19   A    No.

20   Q    And why not?

21   A    Why not?

22   Q    Yes.

23   A    I think I've answered why not.  It's -- this has to come

24   from your 3PL logistics company.  It's a very sophisticated

25   process, all integrated on software, coordinated with shipping,

 1   highly regulated.  So, you know, even if there was -- it's not

 2   really highly likely -- some act of financial terrorism.

 3   Q    Did you understand the basis for Mr. Slone's objections in

 4   regard to this invoicing?

 5   A    I have no idea.  I'd be purely conjecturing.

 6        THE COURT:  Counsel, we have been going for over an

 7   hour now.

 8        MS. AHN:  I think a few more minutes, Your Honor.

 9        THE COURT:  Okay.

10        MS. AHN:  Thank you, Your Honor.

11   BY MS. AHN:

12   Q    What relationship did Nostrum have with Enem?

13   A    Enem is a service provider to Nostrum.  It handles all of

14   our biostudies, testing, R & D, similar to the same services we

15   had to go to a third-party.

16   Q    And does Enem provide services to Nostrum?

17   A    Yes.

18   Q    How long has Enem been providing services to Nostrum?

19   A    At least from 2007, maybe longer.

20   Q    Is Enem reported as a related party?

21   A    Only for maybe GAAP purposes.  There's no related

22   management.  No one from Nostrum sits on any executive

23   positions, has any managerial authority at Enem.

24   Q    What will happen if Enem stops working for Nostrum?

25   A    It would have very serious ramifications to our business.

1          THE COURTROOM DEPUTY:  All rise.

2          (Proceedings concluded at 5:45 PM)

3          - - - - - - - - - - - - - - - - - - - - -
           **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**
4          - - - - - - - - - - - - - - - - - - - - -

5          I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above-entitled matter.

7

8

     /S/ Kimberly Wilson, RMR, CRR, RDR          4/25/2024
9
     Court Reporter/Transcriber
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*