**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Timothy P. Neumann, Esq. [005081973]
Geoffrey P. Neumann, Esq. [59702019]
BROEGE, NEUMANN, FISCHER & SHAVER, LLC
25 Abe Voorhees Drive
Manasquan, NJ 08736
Tel.: (732) 223-8484
Email: timothy.neumann25@gmail.com
Email: geoff.neumann@gmail.com

*Counsel for and Debtor and Debtor-in-Possession*
*Nostrum Laboratories, Inc.*

**Order Filed on April 14, 2025**
**by Clerk**
**U.S. Bankruptcy Court**
**District of New Jersey**

In re:

**NOSTRUM LABORATORIES, INC**.,

Debtor.

Case No.: 24-19611/JKS

Chapter 11

Honorable John K. Sherwood, U.S.B.J.

**ORDER (I) AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTOR TO AVIV PHARMA FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS AND ENCUMBRANCES AND (II) APPROVING THE ASSET PURCHASE AGREEMENT BETWEEN AVIV PHARMA AND THE DEBTOR**

The relief set forth on the following pages numbered two (2) through seventeen (17) is hereby

**ORDERED**.

**DATED: April 14, 2025**

Honorable John K. Sherwood
United States Bankruptcy Court

**Page** 2 of 17

Debtor:  Nostrum Laboratories, Inc.

Case No.:  24-19611/JKS

Caption of Order:   *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II) Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

Upon the Motion[1] of Nostrum Laboratories, Inc. (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case") seeking entry of an order pursuant to Sections 105(a) and 363(b), (f) and (m) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004 of the Local Rules of the United States Bankruptcy Court, District of New Jersey (the "Local Rules"), approving and authorizing, (1) the sale of assets of the Debtor to Aviv Pharma Inc. ("Purchaser") and (2) the asset purchase agreement between the Purchaser and the Debtor; and Court finding that (i) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (iii) the relief requested in the Motion is in the best interests of the Debtor, their estates, and their creditors; and a hearing having been conducted on the Motion;

NOW, THEREFORE, upon the Motion and the record of the hearing held before this Court; and the Court having considered the pleadings in support of the Motion; and the Court having considered opposition to the Motion, if any; and after due deliberation and good and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED that:

A. **Fed. R. Bankr. P. 7052**. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. **Jurisdiction and Venue.** This Court has jurisdiction to decide the Sale Motion pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this chapter 11 case and the Sale Motion is proper under 28 U.S.C. §§ 1408 and 1409.

C. **Statutory and Rule Predicates.** The statutory and other legal predicates for the relief granted herein are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1.

---

1   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

**Page** 3 of 17
Debtor: Nostrum Laboratories, Inc.
Case No.:  24-19611/JKS
Caption of Order:   *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv
Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II)
Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

D.  **Opportunity to Object.** A fair and reasonable opportunity to object to, and be heard with respect to, the Sale Motion has been given to all Persons entitled to notice pursuant to the Bid Procedures Order, including, without limitation, the following: (i) all non-Debtor counterparties to executory contracts or unexpired leases, (ii) all parties who have requested notice in this chapter 11 case pursuant to Bankruptcy Rule 2002, (iii) any known bidders at the auction, and (iv) the Office of the United States Trustee.

E.  **Final Order.** This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a) and Rule 8001(a) of the Federal Rules of Bankruptcy Procedure.

F.  **Winning Bid.** At the Auction, the highest bid for the Transferred Assets (the "Sale Transaction") was submitted by the Purchaser, by way of a bid in the form of the Asset Purchase Agreement annexed hereto as Exhibit "A" (the "Asset Purchase Agreement"), which provides for the amount of consideration as set forth in Article 2 of the Asset Purchase Agreement (the "Winning Bid").  As used herein, the term "Transferred Assets" shall have the meaning set forth in the Asset Purchase Agreement.

G.  **Sound Business Purpose.** The Debtor has demonstrated good, sufficient, and sound business purposes and justifications for approval of the Asset Purchase Agreement and the related Sale Transaction, and for entering into the Asset Purchase Agreement.  The Asset Purchase Agreement, and the Debtor's entry into and performance under the Asset Purchase Agreement, (i) constitutes a sound and reasonable exercise of the Debtor's business judgment consistent with their fiduciary duties, (ii) provides value to and are beneficial to the Debtor's estates, and are in the best interests of the Debtor and its estate, creditors, and other parties in interest, and (iii) are reasonable and appropriate under the circumstances.  Business justifications for the Sale Transaction include, without limitation, the following: (i) the Asset Purchase Agreement constitutes the highest or otherwise best offer received for the Transferred Assets; (ii) the Asset Purchase Agreement presents the best opportunity to maximize the value of the Transferred Assets and to avoid deterioration in the value of the Transferred Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Asset Purchase Agreement are concluded expeditiously, as provided for pursuant to the Asset Purchase Agreement, recoveries to the estate may be materially diminished; and (iv) the value of the Debtor's estate will be maximized through the transactions effectuated pursuant to the Asset Purchase Agreement.

**Page** 4 of 17
Debtor:  Nostrum Laboratories, Inc.
Case No.:  24-19611/JKS
Caption of Order:  *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II) Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

H.  **Compliance with Bid Procedures Order.**  The Debtor, the Committee and the Purchaser have complied with the Bid Procedures Order and the Bid Procedures in all respects.  The Purchaser was the Successful Bidder at the Auction for the Transferred Assets in accordance with the Bid Procedures.

I.  **Marketing Process.**  (i)  The Debtor and their advisors, including, without limitation, Raymond James & Associates, Inc. ("Raymond James"), engaged in a robust and extensive marketing and sale process, in accordance with the Bid Procedures Order. The Debtor conducted a fair and open sale process.  The sale process, the Bid Procedures, and the Auction were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either expressed an interest in acquiring the Transferred Assets, or who the Debtor believed may have had an interest in acquiring the Transferred Assets, to make an offer to purchase the Purchase Assets.  The Debtor and the Purchaser have negotiated and undertaken their respective roles leading to the applicable Sale Transaction and entry into the applicable Asset Purchase Agreement in a diligent, non-collusive, fair, reasonable, and good faith manner.  The sale process conducted by the Debtor pursuant to the Bid Procedures Order and the Bid Procedures resulted in the highest or otherwise best value for the Transferred Assets, was in the best interests of the Debtor, their creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result.

J.  **Arm's-Length Sale; Fair Consideration.**  The consideration to be paid by the Purchaser under the Asset Purchase Agreement was negotiated at arm's-length and constitutes fair and reasonable consideration for the Transferred Assets.  The terms and conditions set forth in each Asset Purchase Agreement are fair and reasonable under these circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtor or their creditors under any applicable laws.

K.  **Good Faith.**  The Debtor the Purchaser and each of their respective management, boards of directors, members, officers, directors, employees, agents, and representatives, acted in good faith.  The Asset Purchase Agreement, and each of the transactions contemplated therein, were negotiated, proposed, and entered into by the Debtor and the Purchaser in good faith, without collusion or fraud, and from arm's-length bargaining positions. The Purchaser is a "good faith purchaser" within the meaning of sections 363(m) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby in the event that this Sale Order is modified, amended, vacated,

**Page** 5 of 17
Debtor: Nostrum Laboratories, Inc.
Case No.: 24-19611/JKS
Caption of Order:    *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II) Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

or reversed by a subsequent order of this Court or any other court on appeal.  No such appeal, modification, amendment, or vacatur shall affect the validity and enforcement of the sale or the liens or priority authorized or created under the Asset Purchase Agreement or this Sale Order.  Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided and/or costs and damages to be imposed under section 363(n) of the Bankruptcy Code, or that would prevent the application of section 363(m) of the Bankruptcy Code.  The Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  The Debtor was free to deal with any other party interested in buying or selling on behalf of the Debtor's estate some or all of the Transferred Assets.  The Purchaser has not acted in a collusive manner with any Person and was not controlled by any agreement among bidders.  The Purchaser's payment and assumption of amounts owing under the Asset Purchase Agreement is in good faith and for valid business purposes and uses.

L.    **Notice.**  Proper, timely, adequate, and sufficient notice of the Sale Motion and the Sale  Hearing has been provided in accordance with sections 102(1), 105(a), and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 6004, and in compliance with orders and determinations of the Court.  As evidenced by the certificates of service filed with the Court: (i) proper, timely, adequate, and sufficient notice of the Sale Motion, the bidding process (including, without limitation, the deadline for submitting bids and the Auction), the Sale Hearing, and the Sale Transaction was provided by the Debtor; (ii) such notice was good, sufficient, and appropriate under the circumstances and complied with the Bid Procedures Order entered by the Court; and (iii) no other or further notice of the Sale Motion, the Sale Transaction, the Bid Procedures, the Sale Hearing, or this Sale Order is required.

M.    **Satisfaction of Section 363(f) Standards.**  The Debtor may sell the Transferred Assets free and clear of any claim within the meaning of Section 101(5) of the Bankruptcy Code; any claim, community or other marital property interest, condition, equitable interest, right of way, encroachment, servitude, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other attribute of ownership; any interest within the meaning of Section 363(f) of the Bankruptcy Code, and all other interests, pledges, security interests, rights of setoff, restrictions or limitations on use, successor liabilities, conditions, rights of first refusal, options to purchase, obligations to allow participation, agreements or rights, rights asserted in litigation matters, competing rights of possession, obligations to lend, matters

**Page** 6 of 17
Debtor: Nostrum Laboratories, Inc.
Case No.: 24-19611/JKS
Caption of Order: *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II) Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

filed of record that relate to, evidence or secure an obligation of the Debtor (and all created expenses and charges) of any type under, among other things, any document, instrument, agreement, affidavit, matter filed of record, cause, or state or federal law, whether known or unknown, legal or equitable, and all liens, rights of offset, replacement liens, adequate protection liens, charges, obligations, or claims granted, allowed or directed in any order; any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising; lien (statutory or otherwise), deed of trust, right of first offer, easement, transfer restriction under any shareholder or similar agreement, mortgage, charge, option, security agreement or other encumbrance or restriction on the use or transfer of any property, hypothecation, license, preference, priority, covenant, right of recovery, decree, or any other order, to the fullest extent of the law, in each case, of any kind or nature, including, without limitation, (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any license, or other right, in favor of a third party or a seller, to use any portion of the applicable Transferred Assets, whether imposed by agreement, understanding, law, equity, or otherwise, whether derivatively, vicariously, as a transferee or successor or otherwise, and whether known or unknown, pre- petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, perfected or unperfected, liquidated or unliquidated, statutory or non-statutory, matured or unmatured, legal or equitable, of any kind or nature, including, without limitation, product liability claims, environmental liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against the Debtor (collectively, "Claims, Encumbrances, Interests, Liabilities and Liens"), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those holders of any Claims, Encumbrances, Interests, Liabilities and Liens who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Sale Motion have consented or are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Upon the Closing, all Persons having Claims, Encumbrances, Interests, Liabilities and Liens of any kind or nature whatsoever against the Debtor or the Transferred Assets shall be forever

**Page** 7 of 17
Debtor:  Nostrum Laboratories, Inc.
Case No.:  24-19611/JKS
Caption of Order:   *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II) Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

barred from pursuing or asserting such Claims, Encumbrances, Interests, Liabilities and Liens against the Purchaser or any of their assets, property, affiliates, successors, assigns, or the Transferred Assets.

N.    **Validity of the Transfer.**  As of the closing of the applicable Sale Transaction (the "Closing"), the transfer of the applicable Transferred Assets to the Purchaser will be a legal, valid, and effective transfer of such Transferred Assets, and will vest in the Purchaser with all right, title, and interest of the Debtor in the Transferred Assets, free and clear of all Claims, Encumbrances, Interests, Liabilities and Liens, except for those Claims, Encumbrances, Interest, Liabilities and Liens specifically assumed by the Purchaser as set forth in the Asset Purchase Agreement.

O.    **Authority.**  The Debtor has the full corporate power and authority to execute, deliver, and perform its obligations under the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by the necessary corporate action of the Debtor.

P.    **Transferred Assets Are Property of the Estate.** The Transferred Assets constitute property of the Debtor's estate and good title is vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.

Q.    **Valid Contract.**  The Asset Purchase Agreement (or other purchase agreement) is a valid and binding contract between the Debtor and the Purchaser and shall be enforceable pursuant to its terms.  From and after the closing of the Sale Transaction, the Asset Purchase Agreement and the Sale Transaction, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtor, its estate and any chapter 7 or chapter 11 trustee appointed in this chapter 11 case, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

R.    **No Successor or Other Derivative Liability.**   The Purchaser is not, nor will be, a mere continuation, alter ego, or successor in interest, and the Purchaser is not holding itself out as a mere continuation, alter ego, or successor in interest, of the Debtor or their estates, and there is no continuity between the Purchaser and the Debtor.  The Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of the Purchaser, on the one hand, and the Debtor or a Debtor, on the other hand.

**Page** 8 of 17

Debtor:  Nostrum Laboratories, Inc.

Case No.:  24-19611/JKS

Caption of Order:   *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II) Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

S.   <u>**Waiver of Bankruptcy Rules 6004(h) and 6006(d).**</u>  Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the sale of the Transferred Assets must be approved and consummated promptly to preserve the value thereof. Time, therefore, is of the essence in effectuating the Asset Purchase Agreement and consummating the sale of the Transferred Assets.  The Debtor have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the sale of the Transferred Assets as contemplated by the Asset Purchase Agreement.  Accordingly, there is sufficient cause to waive the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d).

T.   <u>**Legal and Factual Bases.**</u>  The legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.   <u>**Sale Motion is Granted.**</u>  The Sale Motion and the relief requested therein is granted and approved as set forth herein.

2.   <u>**Objections.**</u>  All objections to the Sale Motion, including, without limitation, to the Closing or the Sale Transaction have been resolved or overruled as set forth on the record at the Sale Hearing or as set forth in this Sale Order.

3.   <u>**Notice.**</u>  Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

4.   <u>**Fair Purchase Price.**</u>  The consideration provided by the Purchaser under the Asset Purchase Agreement is fair and reasonable.

5.   <u>**Approval of the Asset Purchase Agreement.**</u>  The Asset Purchase Agreement and the Sale Transaction, including, without limitation, all transactions contemplated therein or in connection therewith, and all of the terms and conditions thereof, is hereby approved in its entirety.  The failure to include any particular provision of the Asset Purchase Agreement specifically in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety. Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

Debtor: Nostrum Laboratories, Inc.
Case No.: 24-19611/JKS
Caption of Order:  *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II) Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

6.  **Approval of the Winning Bid.**  The Debtor's acceptance of the Purchaser as the Winning Bid for the Transferred Assets, the Asset Purchase Agreement and entry into the Bill of Sale, including, without limitation, any transaction contemplated thereby or in connection therewith, and all of the terms and conditions thereof, are hereby approved in their entirety.

7.  **Consummation of the Sale Transactions.**  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtor and their respective officers, employees, and agents, are authorized to execute, deliver, and perform their obligations under and comply with the terms of the Asset Purchase Agreement and to consummate the Sale Transaction.  The Debtor, their officers, employees, and agents, are authorized to execute and deliver, and authorized to perform under, consummate, and implement all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and to take all further actions as may be (i) reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to possession, the Transferred Assets, or (ii) necessary or appropriate to the performance of the Debtor's obligations contemplated by the Asset Purchase Agreement, all without further order of the Court.

8.  **Possession**.  Except as otherwise directed by the Purchaser, all Persons that are currently in possession of any or all of the Transferred Assets are hereby directed to surrender possession of the Transferred Assets to the Purchaser, as of the Closing Date.

9.  **Transfer of Transferred Assets Free and Clear.**  Subject to the Closing, pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtor is authorized to transfer the Transferred Assets in accordance with the terms of the Asset Purchase Agreement.  The Transferred Assets shall be transferred to the Purchaser, and, upon the Closing, such transfer shall: (i) be valid, legal, binding, and effective; (ii) vest the Purchaser with all right, title, and interest of the Debtor in the Transferred Assets; and (iii) be free and clear of all Claims, Encumbrances, Interests, Liabilities and Liens in accordance with section 363(f) of the Bankruptcy Code or otherwise, with all Claims, Encumbrances, Interests, Liabilities and Liens that represent interests in property to attach to the net proceeds of the Sale Transaction, in the same amount and order of their priority, with the same validity, force, and

**Page** 10 of 17

Debtor:  Nostrum Laboratories, Inc.

Case No.:  24-19611/JKS

Caption of Order:  *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II) Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

effect that they have against the Transferred Assets, and subject to any claims and defenses the Debtor may possess with respect thereto, in each case immediately before the Closing.

10.     **Raymond James**.  No commission fees are due to Raymond James.

11.     Subject to and upon the Closing, all Persons (and their respective successors and assigns) including, without limitation, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, employees, former employees, trade creditors, and any other creditors holding Claims, Encumbrances, Interests, Liabilities and Liens against the Debtor or the Transferred Assets, are hereby forever barred and estopped from asserting or pursuing such Claims, Encumbrances, Interests, Liabilities and Liens against the Purchaser, or its respective Affiliates, successors, or assigns, their property, or the applicable Transferred Assets, including, without limitation, taking any of the following actions with respect to any Claims, Encumbrances, Interests, Liabilities and Liens (other than Assumed Liabilities; as defined in the Asset Purchase Agreement): (i) commencing or continuing in any manner any action or other proceeding against the Purchaser or its Affiliates, successors or assigns, assets, or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser or its Affiliates, successors or assigns, assets, or properties; (iii) creating, perfecting, or enforcing any Liens against the Purchaser or its Affiliates, successors or assigns, assets, or properties; (iv) asserting any Claims, Encumbrances, Interests, Liabilities and Liens as a setoff, right of subrogation, or recoupment of any kind against any obligation due to the Purchaser or its Affiliates, successors or assigns, assets, or properties; or (v) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof.  No such Persons shall assert or pursue against the Purchaser or its Affiliates, successors, or assigns any such Claims, Encumbrances, Interests, Liabilities and Liens.

12.     Following the Closing of the Sale Transaction, no holder of any Claims, Encumbrances, Interests, Liabilities and Liens shall interfere with the Purchaser's title to or use and enjoyment of the Transferred Assets based on or related to any such Claims, Encumbrances, Interests, Liabilities and Liens or based on any actions or inactions the Debtor and/or the Committee may take in this chapter 11 case.

**Page** 11 of 17
Debtor:  Nostrum Laboratories, Inc.
Case No.:  24-19611/JKS
Caption of Order:    *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II) Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

13.    Subject to and upon the Closing, the Purchaser and its Affiliates (defined in the Asset Purchase Agreement), successors and assigns shall have no liability for any Claims, Encumbrances, Interests, Liabilities and Liens in, on, or against the Debtor or its assets, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee or successor or otherwise, of any kind, nature or character whatsoever, including, without limitation: (i) the Debtor's business operations or the cessation thereof; (ii) any litigation involving the Debtor; (iii) any antitrust laws; (iv) any product liability or similar laws, whether state or federal or otherwise; (v) any bulk sales or similar laws; (vi) any federal, state, or local tax statutes, regulations, or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (vii) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory, or any other theory of or related to successor liability, and the Debtor and the Committee hereby waive and release the Purchaser from any such Claims, Encumbrances, Interests, Liabilities and Liens.

14.    This Sale Order (i) shall be effective as a determination that, as of the Closing, the conveyances and transfers described herein have been effected and (ii) is and shall be binding upon and govern the acts of all Persons, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing Persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement and this Sale Order.

15.    Upon the Closing, except if any Person that has filed financing statements, mortgages, mechanic's liens,   *lis pendens*, or other documents or agreements evidencing Claims, Encumbrances, Interests, Liabilities and Liens against the Debtor or the applicable Transferred Assets shall not have delivered to the Debtor prior to the Closing of the Sale Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all interests that the Person has with respect to the Debtor or the Transferred Assets, such entity is hereby directed to deliver all such statements, instruments, and releases and, if they do not, then:

**Page** 12 of 17
Debtor:  Nostrum Laboratories, Inc.
Case No.:  24-19611/JKS
Caption of Order:    *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv
Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II)
Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

(i) the Debtor are hereby authorized and directed to execute and file such statements, instruments, or releases on behalf

of the Person with respect to the Transferred Assets; and (ii) Purchaser is hereby authorized to file, register, or

otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall

constitute conclusive evidence of the release of all Claims, Encumbrances, Interests, Liabilities and Liens against the

Transferred Assets.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording

system of each and every federal, state, or local government agency, department, or office is hereby directed to accept

any and all documents and instruments necessary or appropriate to give effect to the Sale Transactions.

16.  **No Successor or Other Derivative Liability.**  By virtue of the sale of the Transferred Assets, the

Purchaser shall not be deemed to: (i) be a legal successor, or otherwise be deemed a successor to the Debtor; (ii) have,

*de facto* or otherwise, merged with or into the Debtor; or (iii) be a mere continuation or substantial continuation of the

Debtor or the enterprise or operations of the Debtor.

17.  **Statutory Mootness**.  The transactions contemplated by this Sale Order are undertaken by the

Purchaser in good faith, as that term is used in sections 363(m) of the Bankruptcy Code, and, accordingly, the reversal,

modification, amendment, or vacatur on appeal of the authorization provided herein (including without limitation the

terms and provisions of the Asset Purchase Agreement and the Sale Transaction) shall not affect the validity and

enforceability of the Asset Purchase Agreement or the Sale Transaction, the transfer of the Transferred Assets to the

Purchaser free and clear of Claims, Encumbrances, Interests, Liabilities and Liens, or the Claims, Encumbrances,

Interests, Liabilities and Liens or priority authorized or created under the Asset Purchase Agreement, absent entry of

a Court order imposing a stay before the Closing pending such appeal.

18.  **No Avoidance of Asset Purchase Agreement.**  Neither the Debtor, the Committee, nor the

Purchaser have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or

costs and damages to be imposed under section 363(n) of the Bankruptcy Code.

19.  **Waiver of Bankruptcy Rules 6004(h) and 6006(d).**  This Sale Order shall be effective immediately

upon entry pursuant to Rules 7062 and 9014, and notwithstanding the provisions of Rule 62(a) of the Federal Rules

of Civil Procedure, Bankruptcy Rules 6004(h) and 6006(d), or any applicable provisions of the Local Rules, this Sale

Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and

**Page** 13 of 17
Debtor:  Nostrum Laboratories, Inc.
Case No.:  24-19611/JKS
Caption of Order:   *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II) Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

the fourteen (14) day stay provided in Rule 62(a), and/or Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.

20.  **Binding Effect of this Sale Order.**  The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estates, and its creditors (whether known or unknown), the Committee, the Purchaser, and its Affiliates, successors, and assigns, and any affected third parties, including, without limitation, all Persons asserting Claims, Encumbrances, Interests, Liabilities and Liens (collectively, the "Bound Parties"), notwithstanding any subsequent appointment of any trustee, examiner, or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary under any chapter of the Bankruptcy Code or any other law with respect to any of the Bound Parties, and all such terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary, and shall not be subject to rejection or avoidance by the Debtor, their estates, their creditors or any trustee, examiner, receiver, party, entity, or other fiduciary. The provisions of this Sale Order and the terms and provisions of the Asset Purchase Agreement, shall survive the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtor or converting this chapter 11 case to a case under chapter 7, and the terms and provisions of the Asset Purchase Agreement, as well as the rights and interests granted pursuant to this Sale Order and the Asset Purchase Agreement shall continue in these or any superseding cases and shall be binding upon the Bound Parties and their respective successors and permitted assigns including, without limitation, any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtor's estate under chapter 7 or chapter 11 of the Bankruptcy Code.  Any trustee appointed for the Debtor under any provision of the Bankruptcy Code, whether the Debtor are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized and directed to perform under the Asset Purchase Agreement and this Sale Order without the need for further order of the Court.

21.  The Purchaser is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Sale Order, the Sale Transaction, and any issues related to or otherwise connected to the Sale Transaction and the Asset Purchase Agreement.

**Page** 14 of 17

Debtor:  Nostrum Laboratories, Inc.

Case No.:  24-19611/JKS

Caption of Order:    *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II) Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

22.    Subject to and upon the Closing, the Debtor and the Committee hereby waive any and all actions related to, and hereby release the Purchaser and its property, from any and all claims and causes of action relating to the Sale Transaction, whether known or unknown, now existing or hereafter arising, asserted or unasserted, mature or inchoate, contingent or non-contingent, liquidated or unliquidated, material or non-material, disputed or undisputed, and whether imposed by agreement, understanding, law, equity, or otherwise, except to the extent arising under, or specifically assumed or established under the Asset Purchase Agreement or this Sale Order.

23.    **Conflicts; Precedence.**  In the event that there is a direct conflict between the terms of this Sale Order and the terms of the Asset Purchase Agreement, the terms of this Sale Order shall control.  Nothing contained in any chapter 11 plan hereinafter confirmed in this chapter 11 case or any order confirming such chapter 11 plan, or any other order of the Court, shall conflict with or derogate from the provisions of the applicable Asset Purchase Agreement or the terms of this Sale Order.

24.    **Modification of the Asset Purchase Agreements.**  The Asset Purchase Agreement and any related agreements, documents, or other instruments, may be modified, amended, or supplemented by the parties thereto, in a writing signed by each and every party, and in accordance with the terms thereof, without further order of the Court provided that any such modification, amendment, or supplement does not materially change the terms of the Asset Purchase Agreement or any related agreements, documents, or other instruments.

25.    **Retention of Jurisdiction.**  This Court shall retain exclusive jurisdiction to, among other things, (i) interpret, enforce, and implement the terms and provisions of this Sale Order and the Asset Purchase Agreement (including, without limitation, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith) and (ii) adjudicate disputes related to this Sale Order and the Asset Purchase Agreement (including, without limitation, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith).

26.    **No Revocation of Permits and Licenses.**  To the extent provided by Section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the Transferred Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of this chapter 11 case or the consummation of the transactions contemplated by the Asset Purchase Agreement.

**Page** 15 of 17
Debtor: Nostrum Laboratories, Inc.
Case No.: 24-19611/JKS
Caption of Order:   *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II) Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

27.     Nothing in this Order shall be deemed to waive, release, extinguish, or estop the Debtor, its estate or its creditors from asserting, or impairing or diminishing such rights to assert, any right (including any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any Excluded Asset or other assets of the Debtor remaining after the completion of the Closing.  On the date of the Closing, all proceeds from the consummation of the Sale shall paid first to fund the Carve-Out, as such term is defined in the *Final Order (I) Authorizing the Debtor to Utilize Cash Collateral to (A) Pay Postpetition Associates' Wages, Salaries, Other Compensation and Reimbursable Expenses, (B) Continue the Associate Benefits Programs, and (C) Continue to Pay Key Vendors; and (II) Granting Related Relief* [Dkt. No. 186] (the "**Cash Collateral Order**"), whereupon such funding Citizens Bank N.A. (the "**Prepetition Lender**"), shall have no further obligation to fund the Carve-Out, and second for permanent application against the Prepetition Obligations, accrued Replacement Liens (as defined in the Cash Collateral Order) and the Adequate Protection Superpriority Claims (as defined in the Cash Collateral Order), which payments shall be deemed final and indefeasible.  All payments to Prepetition Lender in connection herewith shall not be subject to subordination, defense, counterclaim or offset of any kind and shall otherwise be unavoidable.

28.     In respect of any Excluded Asset (as defined in the APAs) or other assets of the Debtor remaining after the consummation of the Sales, nothing in this Order shall (i) be deemed a waiver of the rights and remedies of the Prepetition Lender under the Cash Collateral Order or the Prepetition Loan Documents (as such term is defined in the Cash Collateral Order); (ii) affect in any way the validity, perfection, priority or enforcement of the liens and claims granted to the Prepetition Lender under the Prepetition Loan Documents or in connection with the Cash Collateral Order; or (iii) affect or limit in any way the validity, perfection, priority or enforcement of the Prepetition Liens, the Adequate Protection Superpriority Liens, or Replacement Liens, (each as defined in the Cash Collateral Order), or any other rights and protections granted to the Prepetition Lender under the Cash Collateral Order or under the Prepetition Loan Documents (as defined in the Cash Collateral Order).

**Page** 16 of 17

Debtor:  Nostrum Laboratories, Inc.

Case No.:  24-19611/JKS

Caption of Order:    *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II) Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

      29.      Notwithstanding any provision to the contrary in this Sale Order ("Order"), any Asset Purchase Agreement, or any other document related to the Sale Transaction, nothing shall:

    (a)      release, nullify, preclude or enjoin the enforcement of any police or regulatory power or any liability that any entity would be subject to as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the date of entry of this Order;

    (b)      affect the setoff or recoupment rights of the United States;

    (c)      confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code);

    (d)      authorize the assumption, assignment, sale or other transfer of any federal (a) grants, (b) grant funds, (c) contracts, (d) agreements, (e) awards, (f) task orders, (g) property, (h) intellectual property, (i) patents, (j) leases, (k) certifications, (l) applications, (m) registrations, (n) billing numbers, (o) national provider identifiers, (p) provider transaction access numbers, (q) licenses, (r) permits, (s) covenants, (t) inventory, (u) guarantees, (v) indemnifications, (w) data, (x) records, or (y) any other interests belonging to the United States (collectively, "Federal Interests") without compliance by the Debtor and Purchaser with all terms of the Federal Interests and with all applicable non-bankruptcy law;

    (e)      be interpreted to set cure amounts or to require the United States to novate, approve or otherwise consent to the sale, assumption, assignment or other transfer of any Federal Interests;

    (f)      waive, alter or otherwise limit the United States' property rights; or

    (g)      expand the scope of 11 U.S.C.§ 525.

In the event of an inconsistency or conflict between any provision of the Asset Purchase Agreement and any provision of this Order, as to the United States, the provisions of this Order and federal law shall govern.

**Page** 17 of 17
Debtor:  Nostrum Laboratories, Inc.
Case No.:  24-19611/JKS
Caption of Order:   *Order (I) Authorizing the Sale of Certain Assets of the Debtor to Aviv
Pharma Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances And (II)
Approving the Asset Purchase Agreement Between Aviv Pharma and the Debtor*

# EXHIBIT A

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**

**by and between**

**AVIV PHARMA INC. or its designee, as Purchaser,**

**and**

**NOSTRUM LABORATORIES, INC., as Seller**

**Dated as of April 8, 2025**

## Table of Contents

**Page**

ARTICLE 1 DEFINED TERMS ...................................................................................- 2 -

    1.1    **Defined Terms** ...........................................................................- 2 -

    1.2    **Other Definitional and Interpretive Matters** ...........................- 9 -

ARTICLE 2 THE PURCHASE AND SALE; CLOSING ......................................- 11 -

    2.1    **Purchase and Sale** ...................................................................- 11 -

    2.2    **Excluded Assets** .....................................................................- 12 -

    2.3    **No Assumption of Liabilities** ................................................- 13 -

    2.4    **Excluded Contracts** ...............................................................- 13 -

    2.5    **Closing** ...................................................................................- 13 -

    2.6    **Closing Deliveries of the Parties** ...........................................- 14 -

    2.7    **Purchase Price; No Assumed Liabilities; Deposits** ................- 14 -

    2.8    **Taxes Related to Transferred Assets** ......................................-15-

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLER ....................- 15 -

    3.1    **Organization, Good Standing and Other Matters** .....................- 15 -

    3.2    **Authority and Enforceability** .................................................- 15 -

    3.3    **No Conflict; Required Filings and Consents** ..........................- 16 -

    3.4    **Litigation** ...............................................................................- 16 -

    3.5    **Brokers and Finders** ..............................................................- 16 -

    3.6    **Title to Assets; FDA Matters** ................................................- 16 -

    3.7    **No Other Representations or Warranties** ...............................- 17 -

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER .....................- 17 -

    4.1    **Organization, Good Standing and Other Matters** ...................- 17 -

    4.2    **Authority and Enforceability** .................................................- 17 -

    4.3    **No Conflict: Required Filings and Consents** ..........................- 18 -

    4.4    **Financing** ...............................................................................- 18 -

    4.5    **Solvency** .................................................................................- 18 -

    4.6    **Litigation** ...............................................................................- 18 -

    4.7    **Brokers and Finders** ..............................................................- 18 -

    4.8    **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties** ...............- 18 -

    4.9    **No Other Representations or Warranties** ...............................- 19 -

ARTICLE 5 BANKRUPTCY COURT MATTERS ................................................................... - 19 -

    5.1    **Competing Transaction** ............................................................................ - 20 -

    5.2    **Bankruptcy Court Filings** ...................................................................... - 20 -

ARTICLE 6 PRE-CLOSING COVENANTS ........................................................................ - 21 -

    6.1    **Conduct of Business** ............................................................................... - 21 -

    6.2    **Access to Information; Confidentiality** ................................................. - 22 -

    6.3    **Efforts to Consummate** .......................................................................... - 23 -

    6.4    **Update of Schedules; Knowledge of Breach** ......................................... - 23 -

ARTICLE 7 CONDITIONS PRECEDENT ......................................................................... - 24 -

    7.1    **Conditions to Each Party's Obligation** .................................................. - 24 -

    7.2    **Conditions to Obligation of Purchaser** ................................................. - 24 -

    7.3    **Conditions to Obligations of the Seller** ................................................. - 25 -

    7.4    **Waiver of Condition; Frustration of Conditions** .................................. - 25 -

    7.5    **Delivery of a Notice of Readiness to Close** ........................................... - 25 -

ARTICLE 8 TERMINATION ........................................................................................... - 25 -

    8.1    **Events of Termination** ........................................................................... - 25 -

    8.2    **Effect of Termination** ............................................................................ - 27 -

ARTICLE 9 GENERAL PROVISIONS .............................................................................. - 27 -

    9.1    **Survival of Representations, Warranties and Covenants** ................... - 27 -

    9.2    **Entire Agreement** .................................................................................. - 27 -

    9.3    **Amendment; No Waiver** ........................................................................ - 28 -

    9.4    **Severability; Specific Verss General Provisions** ................................. - 28 -

    9.5    **Expenses and Obligations** ...................................................................... - 28 -

    9.6    **Notices** .................................................................................................... - 29 -

    9.7    **Counterparts** .......................................................................................... - 30 -

    9.8    **Mutual Drafting** .................................................................................... - 30 -

    9.9    **Governing Law** ...................................................................................... - 30 -

    9.10    **Submission to Jurisdiction; Consent to Service of Process** ................. - 31 -

    9.11    **Waiver of Jury Trial** ............................................................................. - 31 -

    9.12    **Rights Cumulative** ................................................................................. - 31 -

    9.13    **Assignment** ............................................................................................. - 32 -

    9.14    **Specific Enforcement; Remedies** .......................................................... - 32 -

9.15   **Third-Party Beneficiaries**..................................................................................- 32 -

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bid Procedures Order |
| Exhibit B | Form of Bill of Sale |
| Exhibit C | Form of Sale Order |
| Exhibit D | Form of FDA Transfer Letter (Seller) |
| Exhibit E | Form of FDA Transfer Letter (Purchaser) |

## SCHEDULES

| | |
|---|---|
| Schedule 2.1(c) | Products ANDAs |
| Schedule 3.3 | Consents |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of April 8, 2025 (the "**Agreement Date**") is entered into by and between **AVIV PHARMA INC**., a Nevada corporation, or its designee ("**Purchaser**"), and **NOSTRUM LABORATORIES, INC**., a New Jersey corporation (the "**Seller**").

## RECITALS

**WHEREAS,** on September 30, 2024 (the "**Petition Date**"), Seller filed voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), Bankruptcy Case No. 24-19611 (JKS), thereby commencing a chapter 11 case (the "**Bankruptcy Case**"). No trustee has been appointed and the Seller is continuing in the management of its businesses and possession of its property as a debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, the Seller desires to sell (or cause to be sold) to Purchaser, and Purchaser desires to purchase from the Seller, all of the Transferred Assets Free and Clear upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure; and

**WHEREAS**, the Transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court and will only be consummated pursuant to, among other things, the Sale Order to be entered in the Bankruptcy Case; and

**WHEREAS,** on February 14, 2024, the Bankruptcy Court entered an Order granting the Official Committee of Unsecured Creditors of the Seller's estate to market the Seller's assets for sale in a joint capacity with the Seller subject to certain rules and procedures that all bidders must comply with as a condition to participating in the bidding process (the "**Bidding Procedures**"); and

**WHEREAS,** Seller anticipates filing a motion (the "**Sale Motion**") to approve the sale of certain assets and the assignment of certain contracts to the highest bidder pursuant to Sections 363 and 365 of the Bankruptcy Code; and

**WHEREAS**, in the event there are bidders wishing to bid, an auction will be held at which the Purchaser shall be allowed to participate, subject to its compliance with the Bidding Procedures, and there will occur a hearing in the Bankruptcy Court at which time the sale to the successful bidder shall be approved by the Bankruptcy Court (the "**Sale Hearing**") by order of the Bankruptcy Court; and

**WHEREAS**, concurrently with the execution of this Agreement, Purchaser shall deposit (or cause to be deposited) an aggregate amount equal to the Deposit Escrow Amount into the trust account of Seller's bankruptcy counsel, Broege, Neumann, Fischer & Shaver, LLC (the "**Deposit Trust Account**").

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and the Purchaser (collectively, the "**Parties**"), intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.1    **Defined Terms**. The following terms shall have the following meanings in this Agreement:

"**Action**" means any action, proceeding, arbitration or litigation (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator.

"**Affiliate**" of any particular Person means any other Person, directly or indirectly, controlling, controlled by, or under common control with, such particular Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Agreement Date**" has the meaning set forth in the preamble.

"**Alternate Transaction**" has the meaning set forth in Section 8.1(b).

"**ANDA**" means Abbreviated New Drug Application.

"**Applicable Law**" means, with respect to any Person, any federal, provincial, state, local law, ordinance, principle of common law, code, regulation or statute applicable to such Person or such Person's subsidiaries or to any of their respective securities, assets, properties or businesses.

"**Auction**" has the meaning set forth in Section 5.1(e).

"**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other claims, actions, rights, or remedies that may be brought by or on behalf of the Seller or its estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including, but not limited to, actions or remedies under sections 510, 542, 543, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"**Back-Up Bid**" means the second highest or otherwise best bid if the successful bidder fails to consummate its bid in accordance with the Bid Procedures.

"**Back-up Termination Date**" means the first to occur of (a) 5 days after the entry of the Sale Order, (b) consummation of the Transactions with the winning bidder at the Auction, (c)

Purchaser's receipt of notice from the Seller of the release by the Seller of Purchaser's obligations under Section 5.4 and (d) April 18, 2025.

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bid Procedures**" means those certain bidding procedures for the Sale of the Seller's assets approved by the Bankruptcy Court.

"**Bid Procedures Order**" means an Order of the Bankruptcy Court approving the Bid Procedures substantially in the form attached hereto as Exhibit A.

"**Bill of Sale**" means the bill of sale and assignment and assumption agreement, dated as of the Closing Date, by and between the Seller and Purchaser, as set forth in Exhibit B hereto.

"**Business**" means the business of the Seller as currently conducted.

"**Business Day**" means any day other than (a) a Saturday, Sunday or federal holiday or (b) a day on which commercial banks in San Francisco, California are authorized or required to be closed.

"**Closing**" has the meaning set forth in Section 2.5.

"**Closing Date**" has the meaning set forth in Section 2.5.

"**Code**" means the Internal Revenue Code of 1986, as amended, or any successor law, and regulations issued by the IRS pursuant thereto.

"**Competing Bid**" has the meaning set forth in Section 5.1.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of November 20, 2024 by and between the Seller and Purchaser.

"**Consent**" means any consent, approval, authorization, waiver or license.

"**Contract**" means any written agreement, mortgage, indenture, lease (whether for real or personal property), contract or subcontract.

"**Deposit Escrow Amount**" means the amount which equals ten percent of the Purchase Price.

"**Deposit Trust Account**" has the meaning set forth in the Recitals.

"**Enforceability Exceptions**" means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar Applicable Laws affecting the enforcement of creditors' rights generally and general equitable principles.

"**Expense Reimbursement**" means the reimbursement by the Seller of Purchaser's actual and reasonable out-of-pocket legal, accounting, and other third-party advisory or service costs and expenses incurred in connection with the Transactions, as evidenced by invoice(s) provided to the Seller, on the terms and subject to the conditions of Section 9.3.

"**FDA**" means the U.S. Food and Drug Administration.

"**FDA Transfer Letter**" means the letter(s) from the Seller to FDA as set forth in Exhibit D and Exhibit E hereto, notifying FDA of the transfer from the Seller to Purchaser of all of Seller's rights in the Transferred Assets.

"**Final Order**" means an Order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect; provided, that such Order shall be considered a Final Order only after the time period for third parties seeking appeal has expired without the filing of any appeal or motion for reconsideration.

"**Free and Clear**" means free and clear of all Liens to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

"**GAAP**" means generally accepted accounting principles in the United States as of the Agreement Date.

"**GDUFA Fees**" means Generic Drug User Fee Amendments fees established by the FDA pursuant to Applicable Law.

"**Governmental Authority**" means any domestic or foreign national, provincial, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, any court (including the Bankruptcy Court) or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS and the FDA).

"**Intellectual Property**" means any and all intellectual property and proprietary rights in any jurisdiction throughout the world, including rights arising from the following: (i) patents and patent applications, design rights, industrial design registrations and applications therefor, divisions, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, reexaminations, extensions and any provisional applications, and any foreign or international equivalent of any of the foregoing; (ii) trademarks (whether registered, unregistered or applied for), service marks, trade dress, service names, trade names, brand names, product names, slogans, logos, business names, corporate names, and other source or business identifiers, all registrations and applications for registration thereof, and, in each case, together with all of the goodwill associated therewith; (iii) works of authorship, copyrights and all registrations and applications for registration thereof; (iv) trade secrets and know-how; (v) rights in formulae, methods, techniques, processes, assembly procedures, software, software code (in any form, including source code and executable or object code), subroutines, test results, test vectors, user interfaces, protocols, schematics, specifications, drawings, prototypes, molds and models, and other forms of technology (whether or not embodied in any tangible form and including all tangible

embodiments of the foregoing), and (vi) social media accounts, social media identifiers, internet domain name registrations.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge**" means (a) with regard to the Seller, the actual knowledge, without any implication of verification or investigation concerning such knowledge, of [●], in each case as of the Agreement Date (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate) and (b) with regard to Purchaser, the actual knowledge, without any implication of verification or investigation concerning such knowledge, of Philip A. Epstein, in each case as of the Agreement Date (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate).

"**Liabilities**" shall mean debts, liabilities, duties, obligations or commitments of any nature whatsoever, whether direct or indirect, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, whenever or however arising (including whether arising out of any Contract or in a tort claim based on negligence or strict liability).

"**Lien**" means all forms of lien (including mechanic's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Transferred Assets, and liens arising under the Bankruptcy Code), claims, encumbrance, defect or irregularity in title, pledge, mortgage, deed of trust, deed to secure debt, security interest, charge, transfer restriction or similar agreement or encumbrance, including any dedication under any gathering, transportation, treating, processing, fractionating, purchase, sale or similar agreements, or any other rights granted or consensual as or against any Transferred Assets including but not limited to easements, encroachments, rights of first refusal, options, or any other interest or right in property that constitutes a lien or interest within the definition or adjudication of such terms under Section 101(37) of the Bankruptcy Code.

"**Material Adverse Effect**" means a material adverse effect on the business, financial condition or results of operations of the Business (including the Transferred) taken as a whole; provided, however, that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or may be, a Material Adverse Effect: (a) any change in, or effects arising from or relating to, general business or economic conditions affecting any industry in which the Business operates; (b) any change in, or effects arising from or relating to, the United States or foreign economies, or securities, banking or financial markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) debt defaults or other restructuring events of any country with respect to which bondholders take a discount to the debt of any country or any increases in the interest rates for any country's debt, (iii) any change in currency exchange rates, (iv) any decline or rise in the price of any security, commodity, contract or index and (v) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (c) any change from, or effects arising from or relating to, the occurrence, escalation or material worsening of any act of God or other calamity, natural disaster, pandemic or disease, outbreak, hostility, act of war, sabotage, cyber-attack or terrorism or military action; (d) any action taken by Purchaser or its Affiliates with respect to the

Transactions or with respect to the Business; (e) any action taken, or failed to be taken, by the Seller at the request of or with the consent of Purchaser or otherwise in compliance with the terms of this Agreement or any change from, or effects arising from or relating to, Purchaser's failure to consent to any action restricted by Section 6.1; (f) any change in, or effects arising from or relating to changes in, Applicable Law or accounting rules (including GAAP) or any interpretation thereof; (g) the failure of the Business to meet any of its projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or representatives); (h) national or international political, labor or social conditions; (i) any matter described in the Schedules or any matter of which Purchaser is aware as of the Agreement Date; (j) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement and the Transactions or the identity of the Parties to this Agreement, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the Business; (k) the sale of any assets other than the Transferred Assets to any third parties by Seller or any of its Affiliates; (l) any effect arising or resulting from or related to the filing of the Bankruptcy Case; (m) any action required to be taken under any Applicable Law or Order or any existing Contract by which Seller (or any of its properties) are bound; (n) seasonal changes in the results of operations of the Seller; (o) any epidemic, pandemic, outbreak of disease or other public health emergency (including COVID-19) or any escalation or worsening of any such conditions; (p) (1) any results, outcomes, data, adverse events or side effects arising from any clinical trials being conducted by or on behalf of the Seller or any competitor of the Seller (or the announcements thereof), (2) results of meetings with the FDA or other Governmental Entity (including any minutes of, or communications from, any Governmental Entity in connection with such meetings), (3) the determination by, or the delay of a determination by, the FDA or any other applicable Governmental Authority, or any panel or advisory body empowered or appointed thereby, with respect to a clinical hold, acceptance, filing, designation (including de-designation for the accelerated approval pathway), approval, clearance, non-acceptance, hold, refusal to file, refusal to designate, non-approval, disapproval or non-clearance, or requirement to conduct additional clinical studies or trials, with respect to any of the Seller's or any competitor's product candidates or (4) FDA approval (or other clinical or regulatory developments), market entry or pending market entry of any product competitive with or related to any of the products or product candidates of the Seller, or any guidance, announcement or publication by the FDA or other applicable Governmental Authority relating to any product candidates of the Seller or any competitor; or (q) any objections made in the Bankruptcy Court to this Agreement, the Transactions, the Sale Order or the reorganization, any orders of the Bankruptcy Court and any actions or omissions of the Seller in compliance with any order of the Bankruptcy Court and the assumption or rejection of any Assigned Contract.

"**Order**" means any award, decision, injunction, judgment, ruling or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator.

"**Organizational Documents**" means (a) the articles or certificates of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar

document adopted or filed in connection with the creation, formation or organization of a Person not described in <u>clauses (a)</u> through <u>(d)</u>, and (f) any amendment to or equivalent of any of the foregoing.

"**Outside Date**" has the meaning set forth in <u>Section 8.1(g)</u>.

"**Owned Intellectual Property**" means the Intellectual Property owned by the Seller that is exclusively used in the Business.

"**Permit**" means all permits, authorizations, certificates, franchises, consents and other approvals from any Governmental Authority.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Product ANDA**" means, for each of the Products listed on <u>Schedule 2.1</u>(c), the following properties, assets and rights of whatever kind and nature, tangible or intangible format of Seller existing on the Closing Date that relate solely and exclusively to the ANDA for each Product, and any and all submissions, amendments and supplements thereto, that have been filed with (whether or not accepted for filing) and approved by (or filed with) the FDA granting or seeking authorization and approval to manufacture, package, ship and sell such Products, as more fully defined in 21 C.F.R. Part 314. The term "Product ANDA(s)" includes the materials contained in the official ANDA dossier and files, including all ANDA submissions, amendments, correspondence (including correspondence with the FDA field offices, FDA laboratories, FDA compliance offices and OPDP), reports and memoranda of telephone conversations, constituting or reflecting communications regarding any of the Product ANDAs. The term "Product ANDA(s)" also includes such materials in the working regulatory and clinical files of Seller or in the Seller's control pertaining to the conduct of upcoming annual reviews of the Products and required reports to the FDA that have yet to be filed.

"**Products**" means the approved products, which may be manufactured pursuant to a Product ANDA to be purchased pursuant to this Agreement, as listed on <u>Schedule 2.1(c)</u>.

"**Public Health Measures**" means any closures, "shelter-in-place," "stay at home," workforce reduction, social distancing, shut down, closure, curfew or other restrictions or any other Applicable Law, Orders, directives, guidelines or recommendations issued by any Governmental Authority, the Centers for Disease Control and Prevention, the World Health Organization, or any industry group in connection with COVID-19 or any other epidemic, pandemic, or outbreak of disease, or in connection with or in response to any other public health conditions.

"**Purchase Price**" means $600,000.00.

"**Purchaser**" has the meaning set forth in the preamble.

"**Related Claims**" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents and any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions or the relationship between the Parties (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

"**Related Documents**" means the Bill of Sale and FDA Transfer Letters; provided, however, that the Bill of Sale  and the FDA Transfer Letter shall not be a Related Document solely for purposes of applying the provisions in Article 9 to the extent, and only to the extent, that any such document expressly conflicts with Article 9.

"**Sale Motion**" means the motion of the Seller seeking entry of the Sale Order approving the terms herein, to be filed on or about March 10, 2025 in the Bankruptcy Case.

"**Sale Order**" means an Order of the Bankruptcy Court issued pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code substantially in the form of Exhibit C.

"**Schedules**" has the meaning set forth in Article 3.

"**Seller**" has the meaning set forth in the preamble.

"**Solvent**" when used with respect to any Person, means that, as of any date of determination, (a) the fair salable value (determined on a going concern basis) of its assets and property will, as of such date, exceed the amounts required to pay its debts as they become absolute and mature, as of such date, (b) such Person will have adequate capital to carry on its business and (c) such Person will be able to pay its debts as they become absolute and mature, in the ordinary course of business, taking into account the timing of and amounts of cash to be received by it and the timing of and amounts of cash to be payable on or in respect of its indebtedness.

"**Tax**" means any tax (including any income tax, franchise tax, branch profits tax, capital gains tax, value-added tax, sales tax, use tax, property tax, transfer tax, payroll tax, social security tax or withholding tax), and any related fine, penalty, interest, or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority.

"**Tax Return**" means any return (including any information return), report, statement, schedule, notice, form, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection, or payment, of any Tax.

"**Transactions**" means the transactions contemplated by this Agreement and the Related Documents.

"**Transfer Taxes**" has the meaning set forth in Section 2.8.

"**Transferred Assets**" has the meaning set forth in <u>Section 2.1</u>.

1.2    **Other Definitional and Interpretive Matters**.

(a)    Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

(i)    <u>Calculation of Time Period</u>. All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    <u>Dollars</u>. Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement, the Related Documents or the Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the Parties hereto to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement, the Related Documents or the Schedules.

(iii)    <u>Exhibits/Schedules</u>. The Exhibits and Schedules to this Agreement are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Applicable Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    <u>Gender and Number</u>. Any reference to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    <u>Headings</u>. The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or Related Document, as applicable. Unless otherwise specified, all references in this Agreement to any "Section" or other

subdivision are to the corresponding section or subdivision of this Agreement, and all references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vi)     <u>Herein</u>. The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    <u>Or</u>. The word "or" shall be construed in the inclusive sense of "and/or" unless otherwise specified.

(viii)   <u>Including</u>. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)     <u>Successors</u>. A reference to any party to this Agreement, any Related Document or any other agreement or document shall include such party's successors and permitted assigns.

(x)      <u>Legislation</u>. A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(xi)     <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statement, to the extent any such phrase appears in such representation or warranty, if (a) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that relates to the subject matter of such representation, (b) such item is otherwise specifically set forth on the balance sheet or financial statement or (c) such item is set forth in the notes to the balance sheet or financial statement.

(xii)    <u>Made Available</u>. Any reference in this Agreement to "made available" means a document or other item of information that was provided or made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions.

(b)      All representations and warranties set forth in this Agreement or the Related Documents are contractual in nature only and subject to the sole and exclusive remedies set forth herein. No Person is asserting the truth of any representation and warranty set forth in this Agreement or the Related Documents; rather, the Parties have agreed that should any representations and warranties of any Party prove untrue, the other Party shall have the specific

- 10 -

rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort or otherwise) are permitted to any party hereto as a result of the untruth of any such representation and warranty. The phrase "to Seller's Knowledge" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c)     The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and the Related Documents and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement and the Related Documents. The Parties hereto agree that changes from earlier drafts to the final version of this Agreement do not necessarily imply that the party agreeing to such change is agreeing to a change in meaning (as the party agreeing to such change may believe the change is stylistic and non-substantive); consequently, no presumption should exist by virtue of a change from a prior draft.

## ARTICLE 2
## THE PURCHASE AND SALE; CLOSING

2.1     **Purchase and Sale**. Upon the terms and subject to the conditions set forth in this Agreement and the entry of the Sale Order, at the Closing, in exchange for an aggregate payment from Purchaser to the Seller equal to the Purchase Price, Purchaser shall purchase, assume and accept from the Seller, and the Seller shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear, all of the rights, title and interests in, to and under the following assets and interests as the same shall exist on the Closing Date (collectively, the "**Transferred Assets**"):

(a)     the Product ANDAs set forth in Schedule 2.1(c);

(b)     all material original books and records, documents, data and information of the Seller solely related to the Transferred Assets, including: (i) supplier and vendor lists, (ii) promotional materials, (iii) customer lists, (iv) market research materials, (v) materials used in connection with the sale and promotion of the products, and (vi) other business records required to be transferred to Purchaser under applicable law, other than the Excluded Books and Records; provided, however, that the Seller shall be entitled to retain copies of any such materials;

(c)     annual and periodic reports relating to the Product ANDAs which have been filed by or on behalf of Seller or a prior owner of the Product ANDAs with the FDA or equivalent Government Entity and adverse event reports pertaining to the Products, in each case as are in Seller's or its Affiliate's possession or control;

(d)     all intangible assets and Intellectual Property, including without limitation, the names, logos and symbols used by Seller, solely in connection with the Product ANDAs;

- 11 -

(e)     all websites, computer software, programs, hardware, data processing equipment, manuals and related documents used by Seller solely in connection with the Product ANDAs; and

(f)     all goodwill associated with or symbolized by any of the foregoing Transferred Assets described in clauses (a) through (e) above.

2.2     **Excluded Assets**. Notwithstanding the provisions of Section 2.1 or anything to the contrary herein, any and all assets, rights and properties of the Seller that are not specifically identified in Section 2.1 as Transferred Assets, including the following (collectively, the "**Excluded Assets**"), shall be retained by the Seller, and Purchaser and its designees shall acquire no right, title or interest in the Excluded Assets in connection with the Transaction:

(a)     all (i) cash and cash equivalents, wherever located, including bank balances and bank accounts or safe deposit boxes, monies in the possession of any banks, savings and loans or trust companies and similar cash items, (ii) escrow monies and deposits in the possession of landlords and utility companies, and (iii) investment securities and other short- and medium-term investments;

(b)     all records, documents or other information exclusively relating to current or former employees of the Seller that are not hired by Purchaser, and any materials to the extent containing information about any employee, disclosure of which would violate Applicable Law or such employee's reasonable expectation of privacy;

(c)     any interest of the Seller under this Agreement or the Related Documents, including, without limitation, the right to receive the Purchase Price and to enforce the Seller's rights and remedies thereunder;

(d)     any (i) attorney-client work product or communications prior to the Closing Date between Seller (including any one or more officers, directors or stockholders of Seller), on the one hand, and its counsel, on the other hand, and (ii) claims under any director and officer, errors and omissions, fiduciary and commercial crime insurance policies;

(e)     any rights of the Seller to Tax refunds or credits for overpayment of Taxes in lieu of a refund attributable to any taxable period (or portion thereof) ending on or before the Closing Date;

(f)     all Permits (including applications therefor and any trade or import/export Permits) that (i) are not solely related to the Transferred Assets, or (ii) are not transferable to Purchaser under Applicable Law;

(g)     the Excluded Books and Records;

(h)     accounts receivable, intercompany obligations and other amounts receivable by Seller;

(i)     any assets not otherwise designated as Transferred Assets or from time to time designated by the Parties hereto as Excluded Assets;

- 12 -

(j)      the Avoidance Actions;

(k)      all of the Seller's rights, claims or causes of action (i) against third parties relating to the assets, properties, business or operations of the Seller (including all guaranties, warranties, indemnities and similar rights in favor of the Seller or any of its Affiliates) to the extent arising under the Bankruptcy Code or relating to any of the Excluded Assets or Excluded Liabilities, or (ii) against any third parties that have a familial relationship with any members of the Debtor's management team or entities in which such third parties hold an interest, the Debtor's owners or the Debtor's employees, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date; for the avoidance of doubt and notwithstanding anything else herein to the contrary, except for any cause of action related to a transferred Asset, all of the Seller's rights, claims and causes of action, including Avoidance Actions, against any of the Seller's affiliates, insiders, subsidiaries, and parents shall be Excluded Assets; and

(l)      all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively related to or exclusively used in or held for use for the Excluded Assets listed in clauses (a) through (l) above.

Notwithstanding anything to the contrary contained in this Agreement or any of the other Related Documents, Purchaser acknowledges and agrees that all of the following are also Excluded Assets, and all right, title and interest in and to all Excluded Assets shall be retained by the Seller and shall remain the property of the Seller (and shall expressly be excluded from the sale, transfer, assignment and conveyance to Purchaser hereunder), and neither Purchaser nor any of its Affiliates shall have any interest therein: (x) all records and reports prepared or received by the Seller or any of its Affiliates in connection with the sale of the Business and the Transactions, including all analyses relating to the Business or Purchaser so prepared or received; and (y) all confidentiality agreements with prospective purchasers of the Business or any portion thereof and all bids and expressions of interest received from third parties with respect thereto.

2.3      **No Assumption of Liabilities**. The Parties agree that Purchaser shall not assume any liabilities or obligations of the Seller, nor of any nature with respect to the Transferred Assets.

2.4      **No Assumed Contracts**. The Parties agree that Purchaser shall not, and elects not to, purchase or assume any Contract relating to the Transferred.

2.5      **Closing**. The closing of the Transactions (the "**Closing**") will take place remotely by electronic exchange of documents on the date (the "**Closing Date**") that is the second (2nd) Business Day after the date on which all of the conditions set forth in Article 7 (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the party hereto entitled the benefit of the same, unless another time or date is agreed to in writing by the Parties hereto. Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all Parties hereto at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents

executed or delivered until all have been taken, executed and delivered. The Closing Date shall be no later than April 18, 2025.

2.6    **Closing Deliveries of the Parties**. At or prior to the Closing:

(a)    Purchaser and the Seller shall execute and deliver the Bill of Sale and the FDA Letters;

(b)    Purchaser and the Seller shall transmit Purchaser's FDA Transfer Letter and Seller's FDA Transfer Letters, respectively, to the FDA and shall take other actions reasonably necessary to effect the transfer of the Transferred Assets from Seller to Purchaser;

(c)    Purchaser shall deliver, or cause to be delivered, to the Seller or the applicable Person each of the following:

(i)    a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in Section 7.3(a) and Section 7.3(b); and

(ii)    payment of the closing payments set forth in Section 2.7.

(d)    the Seller shall deliver, or cause to be delivered, to Purchaser or the applicable Person each of the following:

(i)    a certificate, dated as of the Closing Date, executed by or on behalf of the Seller as to the satisfaction of the conditions set forth in Section 7.2(a) and Section 7.2(b); and

(ii)    an IRS Form W-9 with respect to the Seller, duly completed and executed;

(iii)    A true and correct copy of the Sale Order as entered by the Bankruptcy Court;

(iv)    Proof of service on (1) all entities claiming to have a Lien on the Transferred Assets, (2) on all creditors of the Nostrum Laboratories, Inc., and (3) all parties that have filed a notice of appearance in the bankruptcy case; and

(v)    all tangible and/or electronic copies of the Transferred Assets including, without limitation, the Product ANDAs and all other materials set forth in Section 2.1(b) through and including 2.1(e) of this Agreement.

2.7    **Purchase Price; No Assumed Liabilities; Deposits**.

(a)    At the Closing, upon the terms and subject to the conditions set forth herein, in full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to, Purchaser shall pay to the Seller an aggregate amount equal to the Purchase Price *minus* the Deposit Escrow Amount.

(b)    The Deposit Escrow Amount shall be released to Seller or Purchaser in accordance with the applicable terms of this Agreement.  Any issue regarding the entitlement to the Deposit Escrow Amount shall be determined by the Bankruptcy Court, and Purchaser consents to the jurisdiction of the Bankruptcy Court for any issue related to this Agreement.

2.8    **Taxes Related to Transferred Assets.**  All state and local sales, use, gross-receipts, transfer, gains, excise, value-added or other similar Taxes required by law or the Bankruptcy Court to be paid in connection with the transfer of the Transferred Assets, and all recording and filing fees required by law or the Bankruptcy Court to be paid by reason of the sale, transfer, assignment and delivery of the Transferred Assets (collectively, "***Transfer Taxes***"), shall be paid by Purchaser on or prior to their due date.

# ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as disclosed in a document herewith delivered by the Seller to Purchaser (the "**Schedules**"), the Seller hereby makes the representations and warranties contained in this Article 3 to Purchaser.

3.1    **Organization, Good Standing and Other Matters**. The Seller is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite corporate power and authority to operate the Business and necessary to own, lease or operate the properties and assets owned, leased or operated by it to carry on the Business as now being conducted, except where the failure to be so duly organized, validly existing and in good standing, or to have such power and authority, would not, individually or in the aggregate, have a Material Adverse Effect. The Seller is duly qualified to do business as a foreign company in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

3.2    **Authority and Enforceability**. Subject to Bankruptcy Court approval pursuant to the Sale Order, the Seller has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which the Seller is (or at Closing, will be) a party thereto, and the consummation by the Seller of the Transactions, has been duly authorized and approved by all necessary limited liability company action on the part of the Seller and are subject to the approval of the Bankruptcy Court pursuant to the Sale Order. This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by the Seller and, assuming the due execution and delivery by the other Party hereto or thereto, and subject to the approval of the Bankruptcy Court pursuant to the Sale Order, constitutes a valid and binding obligation of the Seller, enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

3.3    **No Conflict; Required Filings and Consents**. Except (a)  such filings as may be required in connection with the Transfer Taxes and (b) as otherwise set forth on <u>Schedule 3.3</u>, the execution and delivery of this Agreement by the Seller does not and the execution and delivery of the Related Documents by the Seller will not, and the consummation of the Transactions hereby and thereby will not (i) violate the provisions of the Organizational Documents of the Seller, (ii) subject to the entry of the Sale Order, violate any Applicable Law or Order to which Seller is subject or by which its properties or assets are bound or (iii) require Seller to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order); excluding from the foregoing <u>clauses (ii)</u> and <u>(iii)</u> any Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, have a Material Adverse Effect.

3.4    **Litigation**. As of the Agreement Date, there is no Action pending or, to the Seller's Knowledge, formally threatened in writing, against Seller before any Governmental Authority that would have a Material Adverse Effect or affect the Transferred Assets in any material respect after the entry of the Sale Order, if determined adversely and after taking into effect applicable insurance coverage.

3.5    **Brokers and Finders**. Except for Raymond James & Associates, Inc., the Seller has not, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

3.6    **Title to Assets; FDA Matters.**

(a)    The Seller owns and has the legal right to all Transferred Assets and has good, legal valid and marketable title to, and the right to transfer (or cause to be transferred in accordance with the terms of this Agreement, all of the Transferred Assets Free and Clear.

(b)    The Seller is transferring to Purchaser good and marketable title to one hundred percent (100%) of the Transferred Assets pursuant to the terms of this Agreement.

(c)    Seller is not a party to, or bound by, any license, royalty agreement, or other agreement relating to the use of any material Transferred Assets.

(d)    No current or former Affiliate, partner, director, stockholder, officer, member, manager, employee, consultant or contractor of the Seller will, after giving effect to the Transactions, own, license or retain any Transferred Assets.

(e)    To Seller's Knowledge, no interference, opposition, reissue, reexamination, or other proceeding is or has been pending or threatened, in which the scope, validity, or enforceability of any of the Transferred Assets is being or has been challenged.

(f)    Purchaser will acquire the Transferred Assets free of any obligation to pay, any GDUFA Fees or other fees owed to the FDA with respect to the Transferred Assets.

(g)    Except for (i) ANDA Nos. 073685 & 073686 relating to Lactulose Solution 10GM/15mL, and (ii) ANDA No. 074127 relating to Atenolol Tablets, 50 mg, and 100 mg, each

of the Product ANDAs listed on Schedule 2.1(c) are approved ANDAs and not and have not been withdrawn by the Seller, FDA or any Governmental Authority under any Applicable Law (as defined herein).

3.7 **No Other Representations or Warranties**.

Except for the representations and warranties contained in this Article 3, the Seller does not, nor do any other Persons on behalf of the Seller, make any other express or implied representation or warranty with respect to itself, the Business or the Transferred Assets, or with respect to any other information provided to Purchaser or its representatives, and the Seller disclaims any other representations or warranties, whether made by or on behalf of the Seller or any other Person. The Seller will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

# ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed in a document herewith delivered by Purchaser to the Seller (the "**Purchaser Schedules**"), Purchaser hereby makes the representations and warranties contained in this Article 4 to the Seller.

4.1 **Organization, Good Standing and Other Matters**. Purchaser is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has all requisite corporate power or other entity power and authority to own its properties and to carry on its business as now being conducted. Purchaser is duly qualified or licensed to conduct its business as currently conducted and is in good standing in each jurisdiction in which the location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary, except where the failure to be so qualified or licensed would not, individually or in the aggregate, materially impair or delay Purchaser's ability to consummate the Transactions.

4.2 **Authority and Enforceability**. Purchaser has all requisite corporate power or other entity power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized and approved by its board of directors (or equivalent governing body) and, other than entry of the Sale Order, no other action on the part of Purchaser or its stockholders is necessary to authorize the execution, delivery and performance of this Agreement and the Related Documents by Purchaser and the consummation of the Transactions. This Agreement has been, and each Related Document will be at or prior to

- 17 -

Closing, duly executed and delivered by Purchaser and, assuming the due execution and delivery by the other Party hereto or thereto, and, subject to Bankruptcy Court approval pursuant to the Sale Order, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

4.3 **No Conflict: Required Filings and Consents**. Except (a) such filings as may be required in connection with the Transfer Taxes described in Section 2.8 and (b) as set forth on Schedule 4.3, the execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (i) violate the provisions of its Organizational Documents, (ii) violate any Applicable Law or Order to which it is subject or by which any of its properties or assets are bound or (iii) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date.

4.4 **Financing**. Purchaser has, and at the Closing will have, (a) sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price in accordance with the terms hereof and any other payments required hereunder and any expenses incurred or required to be paid by Purchaser in connection with the Transactions, and (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Documents. Purchaser has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

4.5 **Solvency**. Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors. Immediately after giving effect to all of the Transactions, including the making of the payments contemplated by Section 2.7, and assuming satisfaction of the conditions to Purchaser's obligation to consummate the Transactions as set forth herein, the accuracy of the representations and warranties of Purchaser set forth herein and the performance by Purchaser of its obligations hereunder in all material respects, Purchaser will be Solvent.

4.6 **Litigation**. There is no Action pending or, to Purchaser's Knowledge, formally threatened in writing against Purchaser or involving any of its properties or assets that would be reasonably be expected to (a) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (b) otherwise prevent, hinder or delay the consummation of the Transactions.

4.7 **Brokers and Finders**. None of Purchaser or its Affiliates have, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

4.8 **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties**.

(a) Purchaser acknowledges that it and its representatives have received access to such books and records, facilities, equipment, contracts and other assets of the Business which it and its representatives have desired or requested to review. Purchaser acknowledges and agrees

- 18 -

that (i) it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Seller and the Transferred Assets, and  (ii) the Transferred Assets are being transferred and acquired on a "where is" and, as to condition, "as is" and "with all faults" basis.

(b)    Except for the specific representations and warranties expressly made by the Seller in <u>Article 3</u> as further limited by the specifically bargained-for exclusive remedies as set forth in <u>Article 9</u> of this Agreement, Purchaser acknowledges and agrees that (i) the Seller is not making and have not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Business, the Transferred Assets, or any of its operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, stockholder, agent, Affiliate, advisor, representative or employee of the Seller has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in <u>Article 3</u> and subject to the limited remedies herein provided.

(c)    Other than the specific representations and warranties expressly set forth in <u>Article 3</u> as further limited by the specifically bargained-for exclusive remedies as set forth in <u>Article 9</u> of this Agreement, Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Seller and the Seller's Affiliates have specifically disclaimed and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance on any such other representation or warranty made by any Person. Purchaser specifically waives any obligation or duty by the Seller or the Seller's Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties expressly set forth in <u>Article 3</u> and disclaim reliance on any information not specifically required to be provided or disclosed pursuant to the specific representations and warranties set forth in <u>Article 3</u>.

(d)    Purchaser is acquiring the Transferred Assets subject only to the specific representations and warranties expressly set forth in <u>Article 3</u> as further limited by the specifically bargained-for exclusive remedies as set forth in <u>Section 9</u> of this Agreement.

4.9    <u>**No Other Representations or Warranties.**</u> Except for the representations and warranties contained in this <u>Article 4</u>, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Seller or its representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Affiliates, officers, directors, employees, agents or representatives.

## ARTICLE 5
## BANKRUPTCY COURT MATTERS

5.1   **Competing Transaction**. This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise) in accordance with the terms of the Bid Procedures Order (each, a "**Competing Bid**"). From the Agreement Date (and any prior time) and until the Closing, the Seller is permitted to, and to cause its representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any reorganization, sale or other disposition of the Transferred Assets. In addition, the Seller shall have the authority to respond to any inquiries or offers to reorganize, purchase all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bid Procedures Order or other Applicable Law, including supplying information relating to the Business and the assets of the Seller to prospective plan sponsors or purchasers.

5.4   **Bankruptcy Court Filings**.

(a)    Subject to its right to pursue a Competing Bid in accordance with the Bid Procedures Order, the Seller shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Transferred Assets to Purchaser free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code. The Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)    Seller shall use its best efforts to effect the transactions contemplated by this Agreement in accordance with the Bid Procedures Order, Stalking Horse Order and the Sale Order.

(c)    Seller agrees to do such further acts and things and to execute and deliver such additional agreements and instruments as may reasonably be required to consummate, evidence, confirm or obtain Bankruptcy Court approval of the sale of the Transferred Assets or any other agreement contemplated hereby and to consummate the transaction contemplated hereby.

(d)    From and after the date hereof, except as specifically set forth in this Agreement, or as otherwise required by applicable law, the Bankruptcy Code or Federal Rules of Bankruptcy Procedure, Seller shall not take any action, or fail to take any action, which action or failure to act would reasonably be expected to: (i) prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement; or

(ii) result in (A) the reversal, avoidance, revocation, vacating or modification of the Bid Procedures Order, Stalking Horse Order or the Sale Order (in any manner that would reasonably be expected to materially and adversely affect Purchaser's rights hereunder) or (B) the entry of a stay pending appeal of such Order; provided, however, that Seller shall not be prevented by this Section  from providing information to or responding to inquiries from potential bidders for the Transferred Assets.

(e)     The Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at an auction undertaken pursuant to the Bid Procedures Order (the "**Auction**"), and (i) Purchaser submits the Back-Up Bid at the Auction or (ii) the terms of this Agreement are deemed to constitute a Back-Up Bid, then Purchaser shall be obligated to promptly consummate the Transactions upon the terms and conditions as set forth herein, including the payment of the Purchase Price as the same may be increased by Purchaser at the Auction; provided that, the Seller gives written notice to Purchaser on or before the Back-up Termination Date, stating that the Seller (A) failed to consummate the sale of the Transferred Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder.

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1     **Conduct of Business**. Except (i) as set forth on Schedule 6.1, (ii) as may be approved by Purchaser (which approval will not be unreasonably withheld, delayed or conditioned; provided, however, that the consent of Purchaser shall be deemed to have been given if Purchaser does not object within 48 hours after written request for such consent is provided by the Seller to Purchaser), (iii) for actions taken or omitted to be taken by Seller in response to any Public Health Measure, or (iv) as is otherwise permitted, contemplated or required by this Agreement, any Assigned Contract, by Applicable Laws or by order of the Bankruptcy Court, from the Agreement Date through the earlier of the Closing Date or the termination of this Agreement in accordance with its terms:

(a)     The Seller shall use its commercially reasonable efforts to carry on the Business in all material respects in the ordinary course of business as it has been conducted since the Petition Date; and

(b)     The Seller shall not:

(i)     sell, license, abandon or otherwise dispose of any material asset or property constituting Transferred Assets other than, in each case, in the ordinary course of business or for the purpose of disposing of obsolete or worthless assets;

(ii)     without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), permit, offer, agree or commit (in writing or otherwise) to permit, any of the Transferred Assets to become subject, directly or indirectly, to any Lien apart from liens of record perfected prior to the filing of the Bankruptcy Case;

(iii)    without Purchaser's prior written consent (which consent may be delivered via electronic mail and may withheld for any reason or no reason at all), Seller shall not enter into any transaction or take any other action that could be reasonably expected to cause or constitute a breach of any representation or warranty made by Seller in this Agreement;

(iv)    except in the ordinary course of business, acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of any business or any corporation, partnership or other business organization or otherwise acquire any assets (except inventory), that as of the Closing would constitute Transferred Assets, except for the acquisition of assets in the ordinary course of business; or

(v)    change its present accounting methods or principles in any material respect, except as required by GAAP or Applicable Law.

(c)    Notwithstanding anything to the contrary, nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the Business, assets and operations prior to the Closing. Prior to the Closing, the Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its Business, assets and operations.

6.2    **Access to Information; Confidentiality**.

(a)    From the Agreement Date until the earlier of the Closing Date and the termination of this Agreement, the Seller shall grant Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon reasonable notice (and in the event of a facility visit request, at least 48 hours prior notice), and subject to any limitations resulting from any Public Health Measures, to the personnel, facilities, book and records of the Seller related to the Business or the Transferred Assets that are in the possession or under the control of the Seller; provided, however, that (i) all requests for access shall be directed to James Grainer or such other person(s) as the Seller may designate in writing from time to time (the "**Seller Access Contact**"), (ii) such activities do not unreasonably interfere with the ongoing business or operations of the Seller, (iii) the Seller shall have the right to have one or more of its representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.2(a), (iv) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing, (v) such access or related activities would not cause a violation of any agreement to which the Seller is a party, (vi) no Personal Information shall be disclosed or used other than in compliance with applicable privacy law and (vii) nothing herein shall require Seller or its representatives to furnish to Purchaser or provide Purchaser with access to information that (A) is subject to an attorney-client or an attorney work-product privilege, (B) legal counsel for the Seller reasonably concludes may give rise to antitrust or competition law issues or violate a protective order or otherwise may not be disclosed pursuant to Applicable Law (including any

Public Health Measure) or (C) would cause significant competitive harm to the Seller if the Transactions are not consummated.

(b)      Notwithstanding anything to the contrary contained in this Agreement, from the Agreement Date until the Closing Date, Purchaser shall not, and shall cause its representatives not to, have any contact or discussions concerning Seller, the Business, the Transaction or any other matters with any lender, borrower, creditor, guarantor, business partner, bank, landlord, tenant, supplier, customer, employee, manager, franchisee, distributer, noteholder, independent contractor, consultant or other material business relation of the Seller, in each case, without the prior written consent of the Seller Access Contact (which consent may be withheld in the Seller's sole discretion and, if given, may be conditioned on the Seller Access Contact or his or her designee having the right to participate in any meeting or discussion).

(c)      Any information provided to or obtained by Purchaser or its representatives, including pursuant to this Section 6.2 is confidential information and subject to the terms of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference. Effective upon (and only upon) the Closing, the Confidentiality Agreement shall automatically terminate and none of the Parties thereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained by Purchaser or its representatives concerning the Seller, which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. If this Agreement is terminated prior to Closing for any reason, the terms of the Confidentiality Agreement shall remain in full force and effect.

6.3      **Efforts to Consummate.** Except as otherwise provided in this Agreement, each of the Parties hereto agrees to use its commercially reasonable efforts to cause the Closing to occur as soon as possible after the Agreement Date, including satisfying the conditions precedent set forth in Article 7 applicable to such party including (a) defending against any Actions, judicial or administrative, challenging this Agreement or the consummation of the Transactions, (b) seeking to have any preliminary injunction, temporary restraining order, stay or other legal restraint or prohibition entered or imposed by any court or other Governmental Authority that is not yet final and nonappealable vacated or reversed, and (c) executing any additional instruments reasonably requested by another party hereto (without cost or expense to the executing party) necessary to carry out the Transactions and to fully carry out the purposes of this Agreement; provided, however, that, for purposes of "commercially reasonable efforts" standard as required by this Section 6.3, Section 6.1(a), or Section 2.6(b) neither the Seller nor its Affiliates or representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party or to otherwise expend any money or suffer any detriment, to expend any money to remedy any breach of any representation or warranty hereunder, to commence any Action, to waive or surrender any right, to modify any agreement or to provide financing to Purchaser for the consummation of the Transactions.

6.4      **Update of Schedules; Knowledge of Breach**. From time to time prior to the Closing, the Seller may supplement or amend the Schedules with respect to any matter hereafter arising or discovered which if existing or known by the Seller at the Agreement Date would have been required to be set forth or described in such Schedules and also with respect to events or

- 23 -

conditions arising after the date hereof and prior to Closing. Any such supplemental or amended disclosure shall not be deemed to have cured any such breach of representation or warranty for purposes of determining whether or not the conditions set forth in <u>Section 7.2(a)</u> have been satisfied. From and after the Closing, references to the Schedules shall be references to the Schedules as supplemented, modified and/or updated. If, prior to the Closing, Purchaser shall have reason to believe that any breach of a representation or warranty of the Seller has occurred (other than through notice from the Seller), Purchaser shall promptly so notify the Seller, in reasonable detail. Nothing in this Agreement, including this <u>Section 6.5</u>, shall imply that the Seller is making any representation or warranty as of any date other than the Closing Date (other than representations and warranties that are expressly made as of an earlier date).

## ARTICLE 7
## CONDITIONS PRECEDENT

7.1 **<u>Conditions to Each Party's Obligation</u>**. The respective obligations of the Parties hereto to effect the Transactions are subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller and Purchaser), at or prior to the Closing, of the following conditions:

(a) <u>No Injunctions or Restraints</u>. No preliminary or permanent injunction or other Order or Applicable Law preventing the consummation of the Transactions shall be in effect.

(b) <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order approving the transactions contemplated under this Agreement in a form satisfactory to Purchaser, in its sole and absolute discretion. The Sale Order shall include a provision approving these transactions under Section 363(m) of the Bankruptcy Code and the effectiveness of the Sale Order shall not have been modified, reversed, stayed, vacated, restrained or enjoined as of the Closing Date.

7.2 **<u>Conditions to Obligation of Purchaser</u>**. The obligations of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by Purchaser), at or prior to the Closing, of the following conditions:

(a) <u>Representations and Warranties</u>. Each of the representations and warranties of the Seller set forth in <u>Article 3</u> shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality", "Material Adverse Effect" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not have, individually or in the aggregate, a Material Adverse Effect.

(b) <u>Performance of Covenants and Obligations</u>. The Seller shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing, except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the Transactions.

(c)  <u>Closing Deliverables</u>. The Seller shall have delivered to Purchaser the closing deliveries required to be delivered by the Seller pursuant to <u>Section 2.6(a)</u>, <u>Section 2.6(b)</u> and <u>Section 2.6(d)</u>.

7.3  **<u>Conditions to Obligations of the Seller</u>**. The obligation of the Seller to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller), at or prior to the Closing, of the following conditions:

(a)  <u>Representations and Warranties</u>. Each of the representations and warranties of Purchaser set forth in <u>Article 4</u> shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, (i) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (ii) otherwise prevent, hinder or delay the consummation of the Transactions.

(b)  <u>Performance of Covenants and Obligations of Purchaser</u>. Purchaser shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing, except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the Transactions.

(c)  <u>Closing Deliverables</u>. Purchaser shall have delivered to the Seller the closing deliveries required to be delivered by Purchaser pursuant to <u>Section 2.6(a)</u>, <u>Section 2.6(b)</u> and <u>Section 2.6(c)</u>.

7.4  **<u>Waiver of Condition; Frustration of Conditions</u>**. All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Purchaser nor the Seller may rely on the failure of any condition set forth in this <u>Article 7</u>, as applicable, to be satisfied if such failure was caused by such party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions.

7.5  **<u>Delivery of a Notice of Readiness to Close</u>**. At any time after the Seller's satisfaction of its conditions to Closing in accordance with the terms of <u>Section 7.1</u> and <u>Section 7.3</u> of this Agreement, the Seller may deliver a notice to the Purchaser (a "**Notice of Readiness to Close**"). The Purchaser shall have three (3) Business Days from delivery of a Notice of Readiness to Close to satisfy its conditions to Closing in accordance with the terms of <u>Section 7.1</u> and <u>Section 7.2</u> of this Agreement and consummate the Transactions. If Purchaser does not satisfy its conditions to Closing and consummate the Transaction within three (3) Business Days, Purchaser shall forfeit the entire Deposit Escrow Amount to the Seller.

## ARTICLE 8
## TERMINATION

8.1  **<u>Events of Termination</u>**. Notwithstanding anything to the contrary, this Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing:

(a)      by mutual written consent of Purchaser and the Seller;

(b)      automatically, upon the consummation of a sale or other disposition in an Alternative Transaction.;

(c)      by Purchaser or the Seller by written notice to Purchaser or the Seller from the other, if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(d)      by Purchaser, by written notice from Purchaser to the Seller, if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement, such that the conditions in <u>Section 77.1</u> or <u>Section 77.2</u> are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Seller prior to the earlier of (i) 20 Business Days after receipt of written notice from Purchaser requesting such breach be cured or (ii) the Outside Date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 8.1(d)</u> shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in <u>Section 7.1</u> or <u>Section 7.3</u> are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(e)      by the Seller, by written notice from the Seller to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in <u>Section 7.1</u> or <u>Section 7.3</u> are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) 20 Business Days after receipt of written notice from the Seller requesting such breach be cured or (ii) the Outside Date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> shall not be available to the Seller if the failure of the Seller to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in <u>Section 7.1</u> or <u>Section 7.3</u> are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement;

(f)      by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Applicable Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Transactions and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 8.1(f)</u> shall not be available to the party seeking to terminate if any action of such party or any failure of such party to act has contributed to such Order or other action and such action or failure constitutes a breach of this Agreement;

(g)      by Purchaser, by written notice from Purchaser to the Seller, if the Closing has not occurred on or prior to April 18, 2025 (the "**Outside Date**"); <u>provided</u>, <u>however</u>, that the party exercising the right to terminate this Agreement pursuant to this <u>Section 8.1(g)</u> shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a

covenant, representation or warranty contained in this Agreement; and further provided that time is of the essence with respect to the Outside Date.

8.2   **Effect of Termination**.

(a)   In the event that this Agreement shall be terminated pursuant to Section 9.1, (a) Purchaser and its representatives shall promptly return all documents, work papers and other materials of the Seller including any confidential information and (b) all further obligations of the Parties hereto under this Agreement shall terminate without further Liability or obligation to the other Party hereto; provided, however, that, notwithstanding the foregoing, the Liabilities and obligations under (i) the Confidentiality Agreement, and (ii) Section 2.7(b), Section 6.2(c), this Section 8.2 and Articles 8 and 9 shall continue in full force and effect.

(b)   Notwithstanding anything to the contrary in this Agreement, in the event of valid termination of this Agreement pursuant to Section 8.1, no such termination shall relieve Purchaser from any Liability hereunder for any and all breaches of this Agreement prior to such termination of this Agreement (including if this Agreement is terminated by the Seller pursuant to Section 8.1(e)) and the Seller shall be entitled to all remedies available at law or in equity, including without limitation, payment of the Deposit Escrow Amount pursuant to Section 2.9(c) and/or specific performance pursuant to Section 9.15 of this Agreement.

## ARTICLE 9
## GENERAL PROVISIONS

9.1   **Survival of Representations, Warranties and Covenants.** All covenants and agreements contained in this Agreement that by their term are to be performed in whole or in part, or which prohibit actions, subsequent to Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive Closing and shall therefore terminate, including any Action for damages in respect of any breach or inaccuracy thereof. Notwithstanding the foregoing, the provisions of Section 2.7(b), Section 6.2, Section 8.2 and this Article 9 shall survive the Closing.

9.2   **Entire Agreement**. This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the Parties hereto with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the Parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings. The Parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the Parties hereto expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents. Furthermore, the Parties each hereby acknowledge that this Agreement, the Confidentiality

- 27 -

Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all Parties to this Agreement, the Confidentiality Agreement and the Related Documents specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction. The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the Parties hereby agree that neither party hereto shall have any remedies or cause of action (whether in contract or in tort or otherwise) of any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

9.3     **Amendment; No Waiver**. This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and, if applicable, the Related Documents) executed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any party of a breach of any provision of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

9.4     **Severability; Specific Versus General Provisions**. Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any term or other provision of this Agreement or the Related Documents is invalid, illegal, or incapable of being enforced by any Applicable Law or public policy, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the Parties to the greatest extent consistent with being valid and enforceable under Applicable Law. No party hereto shall assert, and Purchaser shall cause its Affiliates or related parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable. Notwithstanding anything to the contrary, to the extent that a representation, warranty, covenant or agreement of the Seller contained in this Agreement or the Schedules (each, a "**Provision**") addresses a particular issue with specificity (a "**Specific Provision**"), and no breach by the Seller exists under such Specific Provision, the Seller shall not be deemed to be in breach of any other Provision (with respect to such issue) that addresses such issue with less specificity than the Specific Provision, and if such Specific Provision is qualified or limited by the Seller's Knowledge, or in any other manner, no other Provision shall supersede or limit such qualification in any manner.

9.5     **Expenses and Obligations**. Except as otherwise provided in this Agreement, all costs and expenses incurred by the Parties hereto in connection with the Transactions, including

the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the party that has incurred such expenses.

   9.6  **Notices**. All notices, consents, waivers, and other communications under this Agreement or the Related Documents must be in writing and will be deemed to have been duly given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing for next day delivery (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if delivered by electronic mail (unless the sender receives an automated message that the email has not been delivered) on the date of transmission if on a Business Day before 5:00 p.m. local time of the business address of the recipient party (otherwise on the next succeeding Business Day) and (d) if deposited in the United States mail, first-class postage prepaid, on the date of delivery, in each case to the appropriate addresses or email addresses set forth below (or to such other addresses as a party may designate by notice to the other Party in accordance with this <u>Section 9.6</u>):

If to Seller:

   Timothy P. Neumann, Esq.
   Broege, Neumann, Fischer & Shaver, LLC
   25 Abe Voorhees Drive
   Manasquan, New Jersey 08736
   (732)223-8484, ext. 214
   tneumann@bnfsbankruptcy.com

With a copy to Secured Creditor:

   Julie M. Murphy, Esq.
   Stradley Ronon Stevens & Young, LLP
   457 Haddonfield Rd., Suite 100
   Cherry Hill, New Jersey 08002
   E-Mail: jmmurphy@stradley.com

<u>With a copy to Official Committee of Unsecured Creditors:</u>

   Robert M. Schechter, Esq.
   Porzio, Bromberg & Newman, P.C.
   100 Southgate Parkway
   Morristown, NJ 07962
   (973) 889-4127
   Email: rmschechter@pbnlaw.com

If to Purchaser:

   Philip A. Epstein, Chairman
   Aviv Pharma Inc.
   300 Carnegie Center Suite 150
   Princeton, NJ 08540

Tel.: 917 912 0409
Email: paepstein@avivpharma.com

With a copy to:

Jeffrey A. Glazer, Chief Executive Officer
Aviv Pharma Inc.
300 Carnegie Center Suite 150
Princeton, NJ 08540
Tel.: 732 547 5353
Email: jaglazer@avivpharma.com

and

Alan J. Brody, Esq.
Greenberg Traurig LLP.
500 Campus Drive, Suite 400
Florham Park, NJ 07932
(973) 443-3543
Email: brodya@gtlaw.com

9.7     **Counterparts**. This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format, or other agreed format shall be sufficient to bind the Parties to the terms and conditions of this Agreement. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

9.8     **Mutual Drafting**.  This Agreement is the result of the joint efforts of Purchaser and Seller, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against either party based on any presumption of that party's involvement in the drafting thereof.

9.9     **Governing Law.** This Agreement, the Related Documents and all Related Claims shall be governed by the internal laws of the State of New Jersey (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Applicable Laws of any other jurisdiction.

9.10    **Submission to Jurisdiction; Consent to Service of Process**.

(a)     Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Related Document, any breach or default hereunder or

thereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 9.6; provided, however, that if the Bankruptcy Case has closed, the Parties agree to irrevocably submit to the exclusive jurisdiction of the of the Superior Court of the State of New Jersey. The Parties hereto hereby irrevocably and unconditionally waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

(b)     Each of the Parties hereto hereby consents to process being served by any party to this Agreement in any Related Claim by the delivery of a copy thereof in accordance with the provisions of Section 9.6 (other than by email) along with a notification that service of process is being served in conformance with this Section 0(b). Nothing in this Agreement will affect the right of any party to serve process in any other manner permitted by Applicable Law.

9.12    **Waiver of Jury Trial**. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS.

9.12    **Rights Cumulative**. All rights and remedies of each of the Parties under this Agreement and the Related Documents will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement, the Related Documents or Applicable Law.

9.13    **Assignment**. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the Parties hereto. No assignment of this Agreement or any of the rights, interests or obligations under this Agreement may be made by any party hereto at any time, whether or not by operation of law, without the prior written consent of the Seller and Purchaser, and any attempted assignment without the required consent shall be void; provided, however, that (a) Purchaser may assign (i) any of its rights or delegate any of its duties under this Agreement to any of its Affiliates, and (ii) its rights, but not its duties, under this Agreement to any of its financing sources and (b) the Seller may assign any of its rights or delegate any of its duties under this Agreement to any successor thereto, including any liquidating trustee or other agent; provided, further, however, that, in each case, such assignment shall not release Purchaser from its obligations under this Agreement and the Seller shall have no obligation to pursue remedies against any assignee of Purchaser before proceeding against Purchaser for any breach of Purchaser's obligations hereunder.

9.14   **Specific Enforcement; Remedies**. The Parties hereto agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the Purchaser hereto in accordance with their specific terms or were otherwise breached. It is accordingly agreed that (i) the Seller shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of the Seller to cause Purchaser to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and Applicable Laws and to thereafter cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (ii) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right the Seller would not have entered into this Agreement.

9.15   **Third-Party Beneficiaries**. Except as expressly set forth herein, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Parties hereto any rights or remedies of any nature whatsoever under or by reason of this Agreement.

*{THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK SIGNATURES FOLLOW}*

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed as of the date first written above.

**PURCHASER**:

AVIV PHARMA INC.

By:_____
Name: Philip A. Epstein
Title:   Chairman

**SELLER:**

NOSTRUM LABORATORIES, INC.

By:_____
    Name: James Grainer
    Title:  Chief Financial Officer

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**SELLER:**

NOSTRUM LABORATORIES, INC.

By: _James L. Grainer_
Name: James Grainer
Title:  Chief Financial Officer

*Signature Page to Asset Purchase Agreement*

## **EXHIBIT A**

**Form of Bid Procedures Order**

See 24-19611-JKS [ECF No. 268].

## EXHIBIT B

### Form of Bill of Sale

### BILL OF SALE

THIS BILL OF SALE, dated April __, 2025, is executed by Nostrum Laboratories, Inc. ("Seller") a corporation organized under the laws of New Jersey in favor of Aviv Pharma Inc. ("Purchaser"), a corporation organized under the laws of Nevada, pursuant to the Asset Purchase Agreement, dated April __, 2025 (the "Agreement"), by and between Seller and Purchaser. Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

    i.       The Agreement provides for, among other things, the sale of the Transferred Assets by Seller to Purchaser.

    ii.      In consideration of the payment of the amounts set forth in the Agreement, Seller by this Bill of Sale does hereby, sell, transfer, assign and deliver to Purchaser, all of its rights, title and interest in and to the Transferred Assets.

    iii.     Seller hereby represents that from time to time after the delivery of this instrument, at Purchaser's request and without further consideration, Seller will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, conveyances,  transfers, assignments, powers of attorney and assurances as reasonably may be required more effectively to convey, transfer to and vest in Purchaser, and to put Purchaser in possession of, the Transferred Assets.

    iv.     This instrument is executed by, and will be binding upon, Seller and its successors and assigns for the uses and purposes set forth herein.

    v.      This Bill of Sale shall be construed and enforced in accordance with the laws of the State of New Jersey.

**IN WITNESS WHEREOF**, this Bill of Sale has been duly executed and delivered by Seller as of the date and year first written above.

**NOSTRUM LABORATORIES, INC.**


By: _____
Name:
Title:

## EXHIBIT C

**Form of Sale Order**

## **Exhibit D**

## **Change in Ownership of an Application (Seller)**

**[DATE]**

Office of Generic Drugs
Food and Drug Administration
Center for Drug Evaluation and Research
Document Control Room
Metro Park North II
7500 Standish Place, Room 150
Rockville, MD 20855-2773

### Re: **ANDA Nos. [XXXXX] Change In Ownership**

Dear Sir/Madam:

Reference is made to our Abbreviated New Drug Applications submitted pursuant to section 505(j) of the Federal Food, Drug and Cosmetic Act for _____ (the "Product(s)").

This is to inform you that on **[DATE]** Nostrum Laboratories, Inc. transferred ownership of ANDA No. [INSERT NUMBER(s)] for the Product(s) to:

> Aviv Pharma Inc.
> 300 Carnegie Center Suite 150
> Princeton, NJ 08540
> Tel.: 917 913 0408
> Email: paepstein@avivpharma.com

All rights to this application have been transferred to the new owner.

Sincerely,

**Nostrum Laboratories, Inc.**

By: _____
Name:
Title:

## Exhibit E

## Change in Ownership of an Application (Purchaser)

**[DATE]**

Office of Generic Drugs
Food and Drug Administration
Center for Drug Evaluation and Research
Document Control Room
Metro Park North II
7500 Standish Place, Room 150
Rockville, MD 20855-2773

### Re: Change in Ownership for ANDA Nos. [INSERT NUMBER(s)]

Dear Sir/Madam:

Aviv Pharma Inc. ("Aviv") hereby provides this change in ownership letter for the above-referenced Abbreviated New Drug Application ("ANDA") previously submitted and approved under the Federal Food, Drug and Cosmetic Act §505(j) for [PRODUCT(s) NAME(s)].

In a separate letter dated [DATE] addressed to your attention, Nostrum Laboratories, Inc. (the "Company") has provided notification that these ANDA have been transferred in their entirety to Aviv. A copy of the Company's letter is attached hereto for your convenience. In accordance with the provisions of 21 CFR §314.72, we are notifying the Agency that Aviv accepts the ownership of these ANDA from the Company along with all rights and obligations thereto, effective immediately. Aviv confirms that the Company has provided us with a copy of the ANDA and associated amendments and Agency correspondence.

Please be advised that Aviv is responsible for all future regulatory communications concerning these ANDA. Please direct all future correspondence concerning these ANDA to the following contact:

> Aviv Pharma Inc.
> 300 Carnegie Center Suite 150
> Princeton, NJ 08540
> Tel.: 917 913 0408
> Email: paepstein@avivpharma.com

As a result of the transfer of ownership of these ANDA, Aviv requests that this change in ownership be appropriately reflected in the drug product listing contained in the FDA's "Orange Book".

> Sincerely,
>
> **Aviv Pharma Inc.**
>
>
> By: _____
> Name:  Philip A. Epstein
> Title:   Chairman

| SCHEDULES | |
|---|---|
| Schedule 1.1(a) – Other Permitted Liens | None |
| Schedule 2.1(b) - Inventories | None |
| Schedule 2.1(c) – Product ANDAs | See attached |
| Schedule 2.1(d) – Material Permits | None |
| Schedule 2.1(e) – All Material Contracts | None |
| Schedule 2.1(g) - Owned Intellectual Property | None |
| Schedule 2.3(h) – Other Liabilities | None |
| Schedule 2.1(i) – Material Licenses | None |
| Schedule 2.1(j) – Equipment; Tangible Personal Property | None |
| Schedule 2.1(k) – Owned Real Property | None |
| Schedule 2.2(l) - Other mutually-agreed Excluded Assets | None |
| Schedule 3.34.3 – Consents Required | See Attached |
| Schedule 6.1 – Conduct of Business | None |

## SCHEDULE 2.1(c)
## List of Approved ANDAs

| ANDA # | Product Name |
|---|---|
| 074127 | Atenolol Tablets, 50 mg, and 100 mg |
| 075929 | Butalbital, Acetaminophen, Caffeine and Codeine Capsules USP,50mg/325mg/40mg/30mg (CIII) |
| 209560 | Doxycycline Hyclate Tablets USP, 100 mg |
| 204705 | Dutasteride Capsules 0.5 mg |
| 203087 | Eszopiclone Tablets, 1 mg, 2 mg, and 3 mg (CIV) |
| 073685 & 073686 | Lactulose Solution 10GM/15mL |
| 065468 | Neomycin Sulfate Tablets USP, 500 mg |
| 078472 | Pioglitazone Hydrochloride Tablets, 15 mg, 30 mg, and 45 mg |
| 091450 | Pramipexole Dihydrochloride Tablets 0.125 mg, 0.25 mg, 0.5 mg, 1 mg and 1.5 mg |

## Schedule 3.3 – Required Consents

None, except as follows: FDA acknowledgement of Seller's satisfaction of GDUFA Fees with respect to the Product ANDAs and FDA acceptance of transfer to Purchaser of the Product ANDAs.