**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Timothy P. Neumann, Esq. [005081973]
Geoffrey P. Neumann, Esq. [59702019]
BROEGE, NEUMANN, FISCHER & SHAVER, LLC
25 Abe Voorhees Drive
Manasquan, NJ 08736
Tel.: (732) 223-8484
Email: timothy.neumann25@gmail.com
Email: geoff.neumann@gmail.com

*Counsel for Debtor-in-Possession
Nostrum Laboratories, Inc.*

Order Filed on April 14, 2025
by Clerk
U.S. Bankruptcy Court
District of New Jersey

In re:

**NOSTRUM LABORATORIES, INC.**,

Debtor.

Case No.: 24-19611

Chapter 11

Honorable John K. Sherwood, U.S.B.J.

**ORDER PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY
CODE AND BANKRUPTCY RULES 2002, 6004 AND 6006 APPROVING THE SALE OF
CERTAIN OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND
ENCUMBRANCES TO PRASCO, LLC AND ITS DESIGNEE**

The relief set forth on the following page numbered two (2) through twenty-two (22) is

hereby ORDERED.

**DATED: April 14, 2025**

Honorable John K. Sherwood
United States Bankruptcy Court

Page 2 of 22
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    to Prasco, LLC and its Designee

---

WHEREAS, this matter being opened to the Court by motion (the "**Sale Motion**") of Nostrum Laboratories, Inc. (the "Debtor") seeking entry of an order of this court authorizing the Debtor to sell certain assets (the "**Transferred Assets**") more fully described and defined in that certain asset purchase agreement, dated as of April 8, 2025 (copy annexed hereto as **Exhibit A**, the "**APA**") between the Debtor and Prasco, LLC, as the party submitting the highest and best offer for the Transferred Assets (the "**Purchaser**"); and

WHEREAS, on April 7, 2025, Purchaser submitted a Qualified Bid for the Transferred Assets pursuant to the Bid Procedures (as defined herein); and

WHEREAS, the Court held a hearing on April 8, 2025, at 2:00 p.m. (the "**Sale Hearing**") at which any higher and better offers were considered pursuant to the Bidding Procedures previously approved by this Court and during which the Court considered the Qualified Bid from Purchaser[1]; and

WHEREAS, by this order (the "**Sale Order**") the Court hereby approves the sale ("**Sale**") of the Transferred Assets to the Purchaser pursuant to the terms set forth herein; and for good cause shown,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Sale Motion.

Page 3 of 22
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    to Prasco, LLC and its Designee

---

the United States District Court for the District of New Jersey, dated September 18, 2012 (Simandle, C.J.). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this case (the "**Bankruptcy Case**") in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.      The Court's findings of fact and conclusions of law are set forth herein pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014 (the "**Bankruptcy Rules**"). To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      The statutory and other legal predicates for the relief granted herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1.

D.      Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing and the Sale has been provided in accordance with the Bankruptcy Code, including 11 U.S.C. §§ 102, 105(a), 363, 365, the Bankruptcy Rules, including Bankruptcy Rules, 2002, 6004, 6006 and 9014, the Local Rules of this Court (the "**Local Rules**") and the Bid Procedures Order (as defined herein) to all parties entitled to such notice and such notice was good and sufficient, and appropriate under the particular circumstances, and no other or further notice of the Sale Motion, the Sale Hearing or the Sale, is necessary or required.

E.      A fair and reasonable opportunity to object to, and be heard with respect to, the Sale Motion and the Sale has been given to all entities entitled to notice pursuant to the Bankruptcy

In Re:          Nostrum Laboratories, Inc
Case No.:       24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    to Prasco, LLC and its Designee

---

Code, the Bankruptcy Rules and the Local Rules in accordance with the Bid Procedures Order including, without limitation, to the following: (i) all non-Debtor counterparties to executory contracts or unexpired leases, (ii) all parties who have requested notice in this Chapter 11 case pursuant to Bankruptcy Rule 2002, (iii) any known bidders at the auction (the "**Auction**"), (iv) all parties having any interest of record in the Transferred Assets, and (v) the Office of the United States Trustee.

F.      This Court may enter a final order on the Sale Motion consistent with Article III of the United States Constitution.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a) and Bankruptcy Rule 8001(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to the extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court finds there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.

G.      The Debtor conducted the sale process in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Bid Procedures Order and the Bid Procedures (as defined herein) and the Debtor, the Official Committee of Unsecured Creditors (the "**Committee**"), the Prepetition Lender (as defined herein) and the Purchaser have complied with the Bid Procedures Order and the Bid Procedures in all respects. The Purchaser was named the "Successful Bidder" (as defined in the Bid Procedures Order) for the Transferred Assets at the Sale Hearing in accordance with the Bid Procedures.

Page 5 of 22
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    to Prasco, LLC and its Designee

---

H.      The Debtor and its advisors, including, without limitation, Raymond James & Associates, Inc. ("**Raymond James**"), engaged in a robust and extensive marketing and sale process, in accordance with the Bid Procedures Order.  The Debtor conducted a fair and open sale process.  The sale process, the Bid Procedures, and the Auction were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either expressed an interest in acquiring the Transferred Assets, or who the Debtor and the Committee believed may have had an interest in acquiring the Transferred Assets, to make an offer to purchase the Transferred Assets.  The Debtor and the Purchaser have negotiated and undertaken their respective roles that have resulted in the APA and the proposed Sale in a diligent, non-collusive, fair, reasonable, and good faith manner.  The sale process conducted by the Debtor pursuant to the Bid Procedures Order and the Bid Procedures resulted in the highest or otherwise best value for the Transferred Assets, was in the best interests of the Debtor, its creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result.

I.      No consents or approvals, other than those expressly set forth herein, are required for the Debtor to consummate the Sale.

J.      Approval of the Sale Motion at this time is in the best interests of the Chapter 11 estate, creditors, and other parties-in-interest.

I.      The Debtor has demonstrated both (i) good, sufficient, and sound business purpose and justification; and (ii) compelling circumstances for the Sale pursuant to 11 U.S.C. § 363(b).

Page 6 of 22
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    to Prasco, LLC and its Designee

---

K.     A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and the Bid Procedures Order.

L.     The Purchase Price (as defined in the APA) was negotiated, proposed and agreed to by the Debtor and Purchaser without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtor nor Purchaser have engaged in any conduct that would cause or permit the Sale to be avoided under 11 U.S.C. § 363(n).

M.     The Purchaser is purchasing the Transferred Assets in good faith and for fair and reasonable consideration and Purchaser is a good faith buyer as contemplated in 11 U.S.C. § 363(m) and, as such, is entitled to all of the privileges and protections afforded thereby. Purchaser has acted in good faith within the meaning of 11 U.S.C. § 363(m) in connection with the APA and the Sale.

N.     The Purchase Price to be paid by the Purchaser under APA was negotiated at arm's-length and constitutes fair and reasonable consideration for the Transferred Assets. The terms and conditions set forth in the APA are fair and reasonable under these circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtor or its creditors under any applicable laws. Neither the Debtor nor the Purchaser are entering into transactions contemplated by the APA fraudulently for purposes of statutory or common law fraudulent conveyance and fraudulent transfer laws.

Page 7 of 22
In Re:                  Nostrum Laboratories, Inc
Case No.:               24-19611
Caption of Order:       Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                        and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                        Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                        to Prasco, LLC and its Designee

---

O.      Purchaser would not have offered the Purchase Price nor agreed to purchase the Transferred Assets and would not consummate the transactions contemplated herein, if the transfer of the Transferred Assets to the Purchaser pursuant to the APA and the Sale were not free and clear of all Liens (as defined in the APA), claims, encumbrances, and interests of any kind or nature whatsoever, or if Purchaser would, or in the future could, be liable for any such Liens, claims, encumbrances or interests including, among other things, any Successor or Other Liabilities (as defined below).

P.      The Transferred Assets constitute property of the Debtor's estate, the Debtor is the sole and lawful owner of, and has clear and marketable title to, the Transferred Assets to be sold pursuant to the APA, and good title subject only to Liens being released pursuant to this Sale Order to the Transferred Assets is vested in the Debtor's estate pursuant to 11 U.S.C. § 541(a).

Q.      The Debtor may sell the Transferred Assets free and clear of all Liens, claims, encumbrances and interests of any kind or nature whatsoever including, among others, any Successor or Other Liabilities because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(l)-(5) have been satisfied.  Any non-debtor entities with interests in the Transferred Assets who did not object, or who withdrew their objections, to the Sale Motion have consented, or are deemed to have consented, pursuant to 11 U.S.C. § 363(f)(2), to the Sale.  Those non-debtor entities with interests in the Transferred Assets who did object fall within one or more of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by having their interests, if any, attach to the cash proceeds from the Sale of the Transferred Assets in which they claim an interest.

Page 8 of 22

| | |
|---|---|
| In Re: | Nostrum Laboratories, Inc |
| Case No.: | 24-19611 |
| Caption of Order: | Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 Approving the Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances to Prasco, LLC and its Designee |

---

R.     The Purchaser is not a "successor" to, a mere continuation of, or alter ego of the Debtor or its estate, and there is no continuity of enterprise or common identity between the Purchaser and the Debtor.  The Purchaser is not holding itself out to the public as a successor to or a continuation of the Debtor or its estate.  The Purchaser is not, and shall not be deemed to be in the future, a successor to the Debtor or its bankruptcy estate by reason of any theory of law or equity (including, without limitation, under federal or state common law or with respect to any claims under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; any similar state false claims act or similar statute; or for purposes of any liability or responsibility for recall events), and the Sale does not amount to a consolidation, succession, merger, or *de facto* merger of the Purchaser and the Debtor.  The Purchaser is and was not at any time an "insider" or "affiliate" of the Debtor, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists or has ever existed between the Debtor and the Purchaser.  The transfer of the Transferred Assets to the Purchaser does not, and shall not, subject the Purchaser to any liability whatsoever, with respect to the Debtor or the operation of the Debtor's businesses prior to the Closing (as defined in the APA) or by reason of such transaction or transfer, or to any of the Debtors' creditors including under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any foreign jurisdiction, based, in whole or in part, directly or indirectly, on any, or any theory of, successor, vicarious, antitrust, environmental, revenue, pension, ERISA, tax, labor (including any WARN

Page 9 of 22
In Re:                  Nostrum Laboratories, Inc
Case No.:               24-19611
Caption of Order:       Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                        and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                        Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                        to Prasco, LLC and its Designee

---

Act), employment or benefits, de facto merger, business continuation, substantial continuity, alter

ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere continuation,

product line, or products liability or law, or other applicable law, rule, or regulation (including

filing and reporting requirements under any such law, rule, or regulation), or theory of liability,

whether legal, equitable, or otherwise (including, without limitation, with respect to claims under

the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. §

1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; any similar state false

claims act or similar statute; or for purposes of any liability or responsibility for recall events)

(collectively, the "**Successor or Other Liabilities**").  For avoidance of doubt, Successor or Other

Liabilities shall be deemed to constitute Excluded Liabilities under the APA, and the Purchaser

shall have no liability nor obligation with respect to any such Excluded Liabilities, all of which

shall be exclusively retained by the Debtor.

S.      On February 14, 2025, the Court entered a certain *Order Granting in Part and

Denying in Part Motion of Official Committee of Unsecured Creditors for an Order Authorizing

the Committee to Market the Debtors' Assets for Sale in a Joint Capacity with the Debtor and

Approving Bidding Procedures* [Dkt. No. 268] (the "**Bid Procedures Order**"), pursuant to which

the Court, *inter alia*, approved the Debtor's proposed bid procedures (the "**Bid Procedures**").

T.      Entry of this Order approving the Sale, the APA, and all provisions hereof and

thereof are a necessary condition precedent to the Purchaser consummating the Sale. The

provisions of this Order and the APA and the transactions contemplated by this Order and the APA

Page 10 of 22
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    to Prasco, LLC and its Designee

---

and the Sale of the Transferred Assets to the Purchaser are inextricably linked and technically and collectively constitute a single, integrated transaction.

U.    The consummation of the Sale outside a plan of reorganization pursuant to the APA and the transactions contemplated thereby neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtor. The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

**NOW THEREFORE, IT IS HEREBY ORDERED:**

1.    The Sale Motion as it pertains to the Transferred Assets is GRANTED as set forth herein, and the Sale and the APA, and all of the terms and conditions thereof, except only as expressly modified by this Sale Order, are hereby approved.

2.    All objections to or reservations of rights with respect to the Sale Motion or the relief requested therein that have not been withdrawn or resolved are overruled.  All persons and entities who did not object or withdraw their objections to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code, to the Sale of the Transferred Assets to the Purchaser pursuant to the terms and conditions set forth in the APA.

3.    The APA and all other ancillary documents, including any other documents contemplated by the APA or that are necessary or appropriate to complete the transactions provided for in the APA and all of the terms and conditions thereof, and the Sale and related transactions contemplated therewith, are hereby approved in all respects. The failure specifically to include any particular terms of the APA in this Sale Order shall not diminish or impair the

Page 11 of 22
In Re:                    Nostrum Laboratories, Inc
Case No.:                 24-19611
Caption of Order:         Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                          and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                          Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                          to Prasco, LLC and its Designee

---

effectiveness of such provision, it being the intent of the Court that the APA and the transactions

contemplated therein including the Sale be authorized and approved in their entireties.

4.      Pursuant to section 363(b) of the Bankruptcy Code, entry by the Debtor into the APA

is hereby authorized and approved as a valid exercise of the Debtor's business judgment. Pursuant

to sections 105, 363 and 365 of the Bankruptcy Code, the Debtor and its officers, employees, and

agents are authorized, empowered, and directed to take any and all actions necessary or appropriate

to consummate the Sale of the Transferred Assets to the Purchaser pursuant to and in accordance

with the terms and conditions of the APA.

5.      The Debtor and the Purchaser are authorized and empowered to perform under,

consummate and implement, the Sale, together with all additional instruments and documents that

may be reasonably necessary or desirable to implement the transactions contemplated in the APA,

and to take all further actions as may be requested by the Purchaser for the purpose of assigning,

transferring, granting, conveying, conferring or reducing to possession the Transferred Assets to

the Purchaser, or as may be necessary or appropriate to the performance of the obligations as

contemplated by the APA.  The Debtor and the Purchaser are hereby authorized to take any and

all steps necessary to effectuate, consummate and/or implement the terms of this Sale Order.  To

the extent of any discrepancies between this Sale Order and the Sale Motion, this Sale Order shall

control.

6.      The Debtor, together with all entities in possession of property of the Debtor's estate

constituting Transferred Assets, including, without limitation, all stability samples, batches, data

protocols and other documentation with respect to stability testing for the Transferred Assets, or

Page 12 of 22
In Re:            Nostrum Laboratories, Inc
Case No.:         24-19611
Caption of Order: Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                  and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                  Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                  to Prasco, LLC and its Designee

---

information necessary to consummate the Sale including, but not limited to, EnEm Nostrum Remedies, Pvt. Ltd., the Debtor and each of their respective representatives including, but not limited to, Nirmal Mulye, Bernard Berk, James Grainer, and Shraddha Dhamankar shall surrender possession of such property constituting Transferred Assets and cooperate in all respects with the Debtor, the Purchaser, the Committee and Raymond James in order to effectuate a timely closing of the Sale including, but not limited to, by providing all information necessary to consummate the Sale.

7.    Pursuant to the terms set forth in the APA, the Purchaser shall pay the Purchase Price in exchange for the Transferred Assets at the Closing.

8.    Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Transferred Assets shall be transferred to the Purchaser at Closing, free and clear of all adverse interests and other Liens, liabilities, claims and encumbrances of any kind or nature whatsoever (except for the Assumed Liabilities (as defined in the APA)) including, among others, any Successor or Other Liabilities, and such adverse interests and other Liens, liabilities, claims and encumbrances have been and shall be terminated and declared to be unconditionally released, discharged and terminated as to the Transferred Assets, and such termination and release shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Transferred Assets

Page 13 of 22
In Re:            Nostrum Laboratories, Inc
Case No.:         24-19611
Caption of Order: Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                  and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                  Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                  to Prasco, LLC and its Designee

---

conveyed to the Purchaser (each, a "**Registration Party**"), provided that all Liens and encumbrances shall attach to the sale proceeds with the same validity, and in the same priority, immediately prior to Closing.  Each Registration Party shall accept for filing any and all of the documents and instruments necessary and appropriate to release, discharge, and terminate any lien and encumbrance on, or interests in or to, the Transferred Assets or to otherwise consummate the Sale and implement the terms of this Sale Order, including without limitation a certified copy of this Sale Order.  All persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the Debtor, the Transferred Assets, and the ownership, sale, or operation of the Transferred Assets prior to the Closing or any transfer of any Transferred Assets to the Purchaser or its assignees, are hereby forever barred, estopped, and permanently enjoined from asserting such claims against Purchaser and its property (including, without limitation, the Transferred Assets), unless otherwise provided by further order of this Court.  Following the Closing, no holder of any claim against or interest in the Debtor or tis assets shall interfere with the Purchaser's title to or use and enjoyment of the Transferred Assets based on or related to any such claim or interest.

9.     The closing of the Sale shall occur on or before the earlier of (such earliest date, the "**Closing Date**") April 18, 2025 and the date that is fifteen (15) days from the hearing at which the Court granted the Debtor's Sale Motion (the "**Closing Window**") which Closing shall take place at the offices of Debtor's counsel, or at some other place and manner as agreed by the parties,

Page 14 of 22
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    to Prasco, LLC and its Designee

---

which may be through a remote electronic exchange of documents. The Purchaser may take title to or assignment of one or more of the Transferred Assets through one or more designees. All disbursements pursuant to the terms of this Sale Order shall be made within two (2) days of the Closing. To the extent the Debtor is ready willing and able to deliver good and marketable title to the Transferred Assets in accordance with the provisions of the APA including, among others, the Debtor's timely delivery of a Notice of Readiness to Close (as defined in the APA) and Closing does not occur by the conclusion of the Closing Window due to no fault of the Debtor and the Closing Window is not extended on the consent of the parties, the Debtor shall be authorized to retain such Purchaser's Deposit and to pursue such other remedies available to the Debtor, in each case as permitted under the APA. The Debtor and the Purchaser may amend the Closing Window (with respect to the Transferred Assets that such Purchaser is purchasing) by written agreement, in consultation with the Prepetition Lender (hereinafter defined) without further relief from this Court.

10.    The transfers of the Transferred Assets to the Purchaser pursuant to this Sale Order constitute legal, valid, and effective transfers of the Transferred Assets, and shall vest the Purchaser with all right, title, and interest of the Debtor in and to the Transferred Assets, free and clear of all Liens and adverse interests including, among others, any Successor or Other Liabilities. The Debtor and the Purchaser are authorized to effect the Sale and transfers of the Transferred Assets pursuant to the terms of this Sale Order, and any compliance with State or local bulk sales and similar laws and regulations, if any, is hereby waived.

Page 15 of 22
In Re:               Nostrum Laboratories, Inc
Case No.:            24-19611
Caption of Order:    Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                     and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                     Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                     to Prasco, LLC and its Designee

---

11.    The Debtor has the full corporate power and authority to execute, deliver, and perform its obligations under the APA and all other documents contemplated thereby, and the Sale has been duly and validly authorized by the necessary corporate action of the Debtor.

### **Miscellaneous Provisions**

12.    In connection with the Closing, this Sale Order shall be construed and shall constitute a full and complete general assignment, conveyance, and transfer to the Purchaser of all of the Debtor's interests in and to the Transferred Assets.  Each and every federal, state, and local governmental agency, department, or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by this Sale Order.

13.    All entities that are presently, or on the Closing Date may be, in possession of some or all of the Transferred Assets are hereby directed to surrender possession of such Transferred Assets to the Purchaser on the Closing Date.

14.    Following the Closing Date, no holder of a claim against, Lien upon or adverse interest in the Transferred Assets or against the Debtor shall interfere with the Purchaser's right, title and interest in and to or use and enjoyment of the Transferred Assets based on or related to such claim, Lien or adverse interests, or any actions that the Debtor may take in this Chapter 11 case.

15.    This Court shall retain jurisdiction to enforce and implement the terms and provisions of this Sale Order, including, but not limited to, retaining jurisdiction to compel delivery of the

Page 16 of 22
In Re:                Nostrum Laboratories, Inc
Case No.:             24-19611
Caption of Order:     Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                      and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                      Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                      to Prasco, LLC and its Designee

---

Transferred Assets to the Purchaser, interpret, implement, and enforce the provisions of this Sale Order, and protect the Purchaser against any Liens, claims, or adverse interests asserted against the Debtor, the Transferred Assets and/or the proceeds of the Sale.

16. Nothing contained in any plan of reorganization or liquidation confirmed in the Bankruptcy Case or any order of this Court (including future orders) in the Bankruptcy Case (including any order dismissing the Bankruptcy Case and order(s) entered after any conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with or derogate from the terms of this Sale Order and, to the extent of any such alteration, conflict or derogation, the terms of this Sale Order shall control.

17. For cause shown, any applicable law or rule including, without limitation, Bankruptcy Rules 6004(h) and 6006(d) that might otherwise delay the effectiveness of this Sale Order are hereby waived and shall not apply, and this Sale Order shall be effective and enforceable immediately upon its entry. Accordingly, the Debtor and Purchaser are authorized and empowered to close the Sale without regard to any delay in the implementation of this Sale Order.

18. The Debtor, the Committee, the Prepetition Lender (hereinafter defined), the Purchaser and each of their respective management, boards of directors, members, officers, directors, employees, agents, and representatives, acted in good faith. The APA, and each of the transactions contemplated therein, were negotiated, proposed, and entered into by the Debtor and the Purchaser in good faith, without collusion or fraud, and from arm's-length bargaining positions. The Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the

Page 17 of 22
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    to Prasco, LLC and its Designee

---

Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby in the event that this Sale Order is modified, amended, vacated, or reversed by a subsequent order of this Court or any other court on appeal. No such appeal, modification, amendment, or vacatur shall affect the validity and enforcement of the Sale or the liens or priority in the proceeds of the Sale authorized or created by this Sale Order. Neither the Debtor, the Committee, the Prepetition Secured Lender nor the Purchaser has engaged in any conduct that would cause or permit the APAs to be avoided and/or costs and damages to be imposed under section 363(n) of the Bankruptcy Code, or that would prevent the application of section 363(m) of the Bankruptcy Code. The Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction. The Debtor and the Committee were free to deal with any other party interested in buying or selling on behalf of the Debtor's estate some or all of the Transferred Assets. The Purchaser has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among bidders. The Purchaser's payment of the Purchase Price and its assumption of the Assumed Liabilities in exchange for the Transferred Assets under the APAs or pursuant to the terms of this Sale Order are in good faith and for valid business purposes and uses. The terms and provisions of this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, the Purchaser, and their respective affiliates, successors and assigns, the Debtor's estate and creditors, and any affected third parties including, but not limited to, all persons asserting Liens or adverse interests upon or against the Transferred Assets to be sold to the Purchaser pursuant hereto, notwithstanding any subsequent appointment of any trustee, responsible person, estate administrator, representative or similar person (a "**Responsible Person**") for, or in connection

Page 18 of 22
In Re:                  Nostrum Laboratories, Inc
Case No.:               24-19611
Caption of Order:       Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                        and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                        Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                        to Prasco, LLC and its Designee

---

with, the Debtor's estate or affairs in this case or in any subsequent case under the Bankruptcy

Code or State proceeding involving the Debtor, as to which Responsible Person(s) such terms and

provisions likewise shall be binding in all respects.

19.     Except with respect to the Assumed Liabilities, all persons and entities, including,

but not limited to, all debt security holders, equity security holders, governmental, tax and

regulatory authorities, lenders, trade creditors, subcontractors, vendors, suppliers, materialmen,

litigation claimants and other creditors holding any Liens, claims, rights, interests, or

encumbrances of any kind or nature whatsoever including, among other things, any Successor or

Other Liabilities, against or in all or any portion of the Transferred Assets (whether legal or

equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated

or unliquidated or subordinate), arising under or out of, in connection with, or in any way relating

to the Debtor, the Transferred Assets, the operation of the Debtor's business prior to the Closing

Date or the transfer of the Transferred Assets to the Purchaser, hereby are forever barred, estopped

and permanently enjoined from asserting, against any Purchaser, any of each Purchaser's affiliates,

successors or assigns, their property, or the Transferred Assets, such persons' or entities' Liens,

claims, rights, interest, or encumbrances in and to the Transferred Assets, including, without

limitation the following actions: (i) commencing or continuing in any manner any action or other

proceeding against any Purchaser, any of their affiliates, successors, assets or properties; (ii)

enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order

against any of the Purchaser, any of its affiliates, successors, assets or properties; (iii) creating,

perfecting or enforcing any lien or claim against the Transferred Assets, the Purchaser, or any of

Page 19 of 22
In Re:            Nostrum Laboratories, Inc
Case No.:         24-19611
Caption of Order: Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                  and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                  Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                  to Prasco, LLC and its Designee

---

its affiliates, successors, assets or; (iv) commencing or continuing any action in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (v) revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization to operate any of the Transferred Assets or conduct any of the business operated with the Transferred Assets.

20.     Nothing in this Sale Order shall be deemed to waive, release, extinguish, or estop the Debtor, its estate or its creditors from asserting, or impairing or diminishing such rights to assert, any right (including any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any Excluded Asset or other assets of the Debtor that are not Transferred Assets remaining after the completion of the Closing.  On the date of the Closing, all proceeds from the consummation of the Sale shall be paid first to fund the Carve-Out, as such term is defined in the *Final Order (I) Authorizing the Debtor to Utilize Cash Collateral to (A) Pay Postpetition Associates' Wages, Salaries, Other Compensation and Reimbursable Expenses, (B) Continue the Associate Benefits Programs, and (C) Continue to Pay Key Vendors; and (II) Granting Related Relief* [Dkt. No. 186] (the "**Cash Collateral Order**"), with such Carve-Out funds to be deposited in the Debtor's counsel's trust account at closing and earmarked for funding the Carve-Out, whereupon such funding Citizens Bank N.A. (the "**Prepetition Lender**"), shall have no further obligation to fund the Carve-Out, and second for permanent application against the Prepetition Obligations, accrued Replacement Liens (as defined in the Cash Collateral Order) and the Adequate Protection Superpriority Claims (as defined in the Cash Collateral Order), which payments shall be deemed final and indefeasible.   Notwithstanding the

Page 20 of 22
In Re:                Nostrum Laboratories, Inc
Case No.:             24-19611
Caption of Order:     Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                      and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                      Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                      to Prasco, LLC and its Designee

---

foregoing, $100,000 of the proceeds of the Sale shall be deposited in the Debtor's counsel's trust

account at closing and earmarked for Prepetition Lender and the Committee.  If the Prepetition

Lender and the Committee do not agree as to the disposition of such earmarked funds on or

before April 25, 2025, either party may file an appropriate application with the Court to release

such funds, which may be on short notice.  Both the Prepetition Lender and the Committee

reserve all rights with respect to the disposition of such earmarked funds.

21.     All payments to Prepetition Lender in connection herewith shall not be subject to

subordination, defense, counterclaim or offset of any kind and shall otherwise be unavoidable.

22.   In respect of any Excluded Asset (as defined in the APA) or other assets of the Debtor

that are not Transferred Assets remaining after the consummation of the Sale, nothing in this Sale

Order shall (i) be deemed a waiver of the rights and remedies of the Prepetition Lender under the

Cash Collateral Order or the Prepetition Loan Documents (as such term is defined in the Cash

Collateral Order); (ii) affect in any way the validity, perfection, priority or enforcement of the liens

and claims granted to the Prepetition Lender under the Prepetition Loan Documents or in

connection with the Cash Collateral Order; or (iii) affect or limit in any way the validity, perfection,

priority or enforcement of the Prepetition Liens, the Adequate Protection Superpriority Liens, or

Replacement Liens, (each as defined in the Cash Collateral Order), or any other rights and

protections granted to the Prepetition Lender under the Cash Collateral Order or under the

Prepetition Loan Documents (as defined in the Cash Collateral Order).

23.   The APA and any related agreements, documents, or other instruments may be

modified, amended, or supplemented by the parties thereto and in accordance with the terms

Page 21 of 22
In Re:               Nostrum Laboratories, Inc
Case No.:            24-19611
Caption of Order:    Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                     and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                     Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                     to Prasco, LLC and its Designee

---

thereof, and in consultation with the Prepetition Lender and the Committee, without further order

of the Court, provided that any such modification, amendment, or supplement does not have a

material adverse effect on the estate or on any non-consenting third party.

24.    The failure specifically to reference any particular provision of the APA in this Sale

Order shall not diminish or impair the effectiveness of such provision, it being the intent of the

Court that the APA is authorized and approved in its entirety; provided, however, that this Sale

Order shall govern if any inconsistency exists between the APA (including all ancillary documents

executed in connection therewith) and this Sale Order.  Likewise, all of the provisions of this Sale

Order are nonseverable and mutually dependent.

25.    Notwithstanding any provision to the contrary in this Sale Order , the APA, or any

other document related to the Sale, nothing shall:

(a)    release, nullify, preclude or enjoin the enforcement of any police or regulatory

       power or any liability that any entity would be subject to as the owner, lessor,

       lessee or operator of property that such entity owns, operates or leases after the

       date of entry of this Sale Order;

(b)    affect the setoff or recoupment rights of the United States;

(c)    confer exclusive jurisdiction to the Bankruptcy Court except to the extent set

       forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States

       Code);

(d)    authorize the assumption, assignment, sale or other transfer of any federal (a)

Page 22 of 22
In Re:                  Nostrum Laboratories, Inc
Case No.:               24-19611
Caption of Order:       Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                        and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                        Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                        to Prasco, LLC and its Designee

---

grants, (b) grant funds, (c) contracts, (d) agreements, (e) awards, (f) task orders, (g) property, (h) intellectual property, (i) patents, (j) leases, (k) certifications, (l) applications, (m) registrations, (n) billing numbers, (o) national provider identifiers, (p) provider transaction access numbers, (q) licenses, (r) permits, (s) covenants, (t) inventory, (u) guarantees, (v) indemnifications, (w) data, (x) records, or (y) any other interests belonging to the United States (collectively, "Federal Interests") without compliance by the Debtor and Purchaser with all terms of the Federal Interests and with all applicable non-bankruptcy law;

(e)     be interpreted to set cure amounts or to require the United States to novate, approve or otherwise consent to the sale, assumption, assignment or other transfer of any Federal Interests;

(f)     waive, alter or otherwise limit the United States' property rights; or

(g)     expand the scope of 11 U.S.C. § 525.

In the event of an inconsistency or conflict between any provision of the APA and any provision of this Sale Order, as to the United States, the provisions of this Sale Order and federal law shall govern.

26.    The Court retains jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order, the APA, and to adjudicate, if necessary, any disputes concerning or in any way relating to the Sale and this Sale Order.

# EXHIBIT A

**ASSET PURCHASE AGREEMENT**

**by and between**

**PRASCO, LLC, as Purchaser,**

**and**

**NOSTRUM LABORATORIES, INC., as Seller**

**Dated as of April 8, 2025**

**Table of Contents**

**Page**

ARTICLE 1 DEFINED TERMS ...................................................................2

    1.1   **Defined Terms** ...............................................................2

    1.2   **Other Definitional and Interpretive Matters** ................10

ARTICLE 2 THE PURCHASE AND SALE; CLOSING.................................12

    2.1   **Purchase and Sale** ........................................................12

    2.2   **Excluded Assets** ...........................................................14

    2.3   **Assumption of Liabilities**..............................................15

    2.4   **Excluded Liabilities** .....................................................16

    2.5   **Excluded Contracts** ......................................................16

    2.6   **Nontransferable Assets and Liabilities** ........................16

    2.7   **Closing**.........................................................................17

    2.8   **Closing Deliveries of the Parties** .................................17

    2.9   **Purchase Price; Assumed Liabilities; Deposits** ...........18

    2.10  **Transfer Taxes** ............................................................18

    2.11  **Allocation of Purchase Price** ......................................19

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLER .........19

    3.1   **Organization, Good Standing and Other Matters** .........19

    3.2   **Authority and Enforceability**.......................................19

    3.3   **No Conflict; Required Filings and Consents** ................20

    3.4   **Litigation**......................................................................20

    3.5   **Brokers and Finders** ....................................................20

    3.6   **Title to Assets**..............................................................21

    3.7   **No Other Representations or Warranties**......................21

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER .........21

    4.1   **Organization, Good Standing and Other Matters** .........21

    4.2   **Authority and Enforceability**.......................................21

    4.3   **No Conflict: Required Filings and Consents** ...............22

    4.4   **Financing**.....................................................................22

    4.5   **Solvency** ......................................................................22

    4.6   **Litigation**......................................................................22

i

|  | 4.7 | **Brokers and Finders** | 22 |
|  | 4.8 | **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties** | 23 |
|  | 4.9 | **No Other Representations or Warranties** | 24 |
| ARTICLE 5 | | BANKRUPTCY COURT MATTERS | 24 |
|  | 5.1 | **Competing Transaction** | 24 |
|  | 5.2 | **Bankruptcy Court Filings** | 24 |
|  | 5.3 | **Intentionally Omitted** | 25 |
| ARTICLE 6 | | PRE-CLOSING COVENANTS | 25 |
|  | 6.1 | **Conduct of Business** | 25 |
|  | 6.2 | **Access to Information; Confidentiality** | 25 |
|  | 6.3 | **Efforts to Consummate** | 26 |
|  | 6.4 | **Public Announcements** | 27 |
|  | 6.5 | **Update of Schedules; Knowledge of Breach** | 27 |
| ARTICLE 7 | | POST-CLOSING COVENANTS | 27 |
|  | 7.1 | **Access to Information; Books and Records** | 27 |
|  | 7.2 | **Post-Closing Receipt and Possession of Assets** | 28 |
|  | 7.3 | **Tax Matters** | 28 |
| ARTICLE 8 | | CONDITIONS PRECEDENT | 30 |
|  | 8.1 | **Conditions to Each Party's Obligation** | 30 |
|  | 8.2 | **Conditions to Obligation of Purchaser** | 31 |
|  | 8.3 | **Conditions to Obligations of the Seller** | 31 |
|  | 8.4 | **Waiver of Condition; Frustration of Conditions** | 31 |
|  | 8.5 | **Delivery of a Notice of Readiness to Close** | 32 |
| ARTICLE 9 | | TERMINATION | 32 |
|  | 9.1 | **Events of Termination** | 32 |
|  | 9.2 | **Effect of Termination** | 33 |
|  | 9.3 | **Termination Fee and Expense Reimbursement** | 33 |
| ARTICLE 10 | | GENERAL PROVISIONS | 35 |
|  | 10.1 | **Survival of Representations, Warranties and Covenants** | 35 |
|  | 10.2 | **Entire Agreement** | 35 |
|  | 10.3 | **Amendment; No Waiver** | 35 |

10.4    **Severability; Specific Versus General Provisions** .............................................36

10.5    **Expenses and Obligations** .................................................................36

10.6    **Notices** .................................................................................36

10.7    **Counterparts** ...........................................................................37

10.8    **Governing Law** .........................................................................37

10.9    **Submission to Jurisdiction; Consent to Service of Process** ...........................37

10.10   **Waiver of Jury Trial** ...................................................................38

10.11   **Rights Cumulative** .....................................................................38

10.12   **Assignment** .............................................................................38

10.13   **Specific Enforcement; Remedies** .....................................................39

10.14   **Third-Party Beneficiaries** .............................................................39

## EXHIBITS

Exhibit A                       Form of Bid Procedures Order
Exhibit B                       Form of Bill of Sale and Assignment and Assumption
                                Agreement
Exhibit C                       Form of Sale Order

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of April 8, 2025 (the "**Agreement Date**") is entered into by and between **PRASCO, LLC,** an Ohio limited liability company ("**Purchaser**") and **NOSTRUM LABORATORIES, INC**., a  New Jersey corporation (the "**Seller**").

## RECITALS

**WHEREAS,** on September 30, 2024 (the "**Petition Date**"), Seller filed voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), Case No. 24-19611/JKS thereby commencing a chapter 11 case (the "**Bankruptcy Case**").  No trustee has been appointed and the Seller is continuing in the management of its businesses and possession of its property as a debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, the Seller desires to sell (or cause to be sold) to Purchaser, and Purchaser desires to purchase from the Seller, all of the Transferred Assets Free and Clear, and the Seller desires Purchaser to assume, and Purchaser desires to assume from the Seller, all of the Assumed Liabilities, in each case upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, the Transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court and will only be consummated pursuant, among other things, to the Sale Order to be entered in the Bankruptcy Case; and

**WHEREAS,** Seller anticipates filing a motion (the "**Sale Motion**") to approve the sale of certain assets and the assignment of certain contracts to the highest bidder pursuant to Sections 363 and 365 of the United States Bankruptcy Code (11 U.S.C. 101 *et seq*., hereinafter the "**Bankruptcy Code**") and subject to certain rules and procedures that all bidders must comply with as a condition to participating in the bidding process (the "**Bidding Procedures**," copy annexed hereto as Exhibit A); and

**WHEREAS**, in the event there are bidders wishing to bid, an auction will be held at which the Purchaser shall be allowed to participate, subject to its compliance with the Bidding Procedures, and there will occur a hearing in the Bankruptcy Court at which time the sale to the successful bidder shall be approved by the Bankruptcy Court (the "**Sale Hearing**") by order of the Bankruptcy Court;

**WHEREAS**, concurrently with the execution of this Agreement, Purchaser shall deposit (or cause to be deposited) an aggregate amount equal to the Deposit Escrow Amount into the trust account of Seller's bankruptcy counsel, Broege, Neumann, Fischer & Shaver, LLC (the "**Deposit Trust Account**").

**NOW**, **THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.1    **Defined Terms**. The following terms shall have the following meanings in this Agreement:

"**Action**" means any action, proceeding, arbitration or litigation (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator.

"**Affiliate**" of any particular Person means any other Person, directly or indirectly, controlling, controlled by, or under common control with, such particular Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Agreement Date**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in Section 2.11(a).

"**Alternate Transaction**" has the meaning set forth in Section 9.1(b).

"**ANDA**" means Abbreviated New Drug Application.

"**Applicable Law**" means, with respect to any Person, any federal, provincial, state, local law, ordinance, principle of common law, code, regulation or statute applicable to such Person or such Person's subsidiaries or to any of their respective securities, assets, properties or businesses.

"**Asset Tax Return**" means a Tax Return relating to an obligation to pay Taxes that are determined based upon the ownership or operation of the Transferred Assets (but, for the avoidance of doubt, not including any Tax Returns relating to Transfer Taxes).

"**Asset Taxes**" means any Taxes with respect to the ownership or operation of the Transferred Assets other than (a) Taxes based on net or gross income, and (b) Transfer Taxes.

"**Assumed Liabilities**" has the meaning set forth in Section 2.3.

"**Auction**" has the meaning set forth in Section 5.2(b).

2

"**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other claims, actions, rights, or remedies that may be brought by or on behalf of the Seller or its estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including, but not limited to, actions or remedies under sections 510, 542, 543, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"**Back-Up Bid**" means the second highest or otherwise best bid if the successful bidder fails to consummate its bid in accordance with the Bid Procedures.

"**Back-up Termination Date**" means the first to occur of (a) [ten] days after the entry of the Sale Order, (b) consummation of the Transactions with the winning bidder at the Auction, (c) Purchaser's receipt of notice from the Seller of the release by the Seller of Purchaser's obligations under Section 5.2(b) and (d) April [18], 2025.

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bid Procedures**" means those certain bidding procedures for the Sale of the Seller's assets approved by the Bankruptcy Court.

"**Bid Procedures Order**" means an Order of the Bankruptcy Court approving the Bid Procedures substantially in the form attached hereto as Exhibit A.

"**Bill of Sale and Assignment and Assumption Agreement**" means the bill of sale and assignment and assumption agreement, dated as of the Closing Date, by and between the Seller and Purchaser, in a form reasonably acceptable to counsel for Seller and Purchaser.

"**Business**" means the business of the Seller as currently conducted as related to the Transferred Assets.

"**Business Intellectual Property**" means all Owned Intellectual Property Assets together with all Intellectual Property in-licensed by the Seller and related to the Transferred Assets.

"**Business Day**" means any day other than (a) a Saturday, Sunday or federal holiday or (b) a day on which commercial banks in San Francisco, California are authorized or required to be closed.

"**Closing**" has the meaning set forth in Section 2.7.

"**Closing Date**" has the meaning set forth in Section 2.7.

"**Code**" means the Internal Revenue Code of 1986, as amended, or any successor law, and regulations issued by the IRS pursuant thereto.

"**Company Related Parties**" has the meaning set forth in Section 9.3(d).

"**Competing Bid**" has the meaning set forth in Section 5.1.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of March 6, 2025 by and between the Seller and Purchaser or one of Purchaser's Affiliates.

"**Consent**" means any consent, approval, authorization, waiver or license.

"**Contract**" means any written agreement, mortgage, indenture, lease (whether for real or personal property), contract or subcontract.

"**Deposit Escrow Amount**" means the amount which equals ten percent of the Purchase Price.

"**Deposit Trust Account**" has the meaning set forth in the Recitals.

"**Enforceability Exceptions**" means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar Applicable Laws affecting the enforcement of creditors' rights generally and general equitable principles.

"**Environmental Laws**" means any Applicable Law relating to pollution or protection of the environment or worker health and safety (in respect of exposure to Hazardous Substances), including such Applicable Laws relating to the use, treatment, storage, disposal, Release or transportation of Hazardous Substances.

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Books and Records**" means the following originals and copies of those books and records, documents, data and information (in whatever form maintained) of the Seller and the Business: (i) all corporate minute books (and other similar corporate records) and stock records of the Seller, (ii) any books and records relating to the Excluded Assets or (iii) any books, records or other materials that Seller (x) is required by Applicable Law to retain (copies of which, to the extent permitted by Applicable Law, will be made available to Purchaser upon Purchaser's reasonable request), (y) reasonably believes is necessary to enable it to prepare and/or file Tax Returns (copies of which will be made available to Purchaser upon Purchaser's reasonable request) or (z) is prohibited by Applicable Law from delivering to Purchaser or include attorney client communications, work product or other privileged materials.

"**Excluded Contracts**" has the meaning set forth in Section 2.5.

"**Excluded Liabilities**" has the meaning set forth in Section 2.4.

"**Expense Reimbursement**" means the reimbursement by the Seller of Purchaser's actual and reasonable out-of-pocket legal, accounting, and other third-party advisory or service costs and expenses incurred in connection with the Transactions, as evidenced by invoice(s) provided to the Seller, on the terms and subject to the conditions of Section 9.3.

"**FDA**" means the U.S. Food and Drug Administration.

"**FDA Transfer Letter**" means the letter(s) from the Seller to FDA in form and substance acceptable to Purchaser, in its reasonable discretion, notifying FDA of the transfer from the Seller to Purchaser of all of Seller's rights in the Transferred Assets set forth in Schedule 2.1c) and (d)).

"**Final Order**" means an Order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect; provided, that such Order shall be considered a Final Order only after the time period for third parties seeking appeal has expired without the filing of any appeal or motion for reconsideration.

"**Free and Clear**" means free and clear of all Liens (other than the Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

"**GAAP**" means generally accepted accounting principles in the United States as of the Agreement Date.

"**Governmental Authority**" means any domestic or foreign national, provincial, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, any court (including the Bankruptcy Court) or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS and the FDA).

"**Hazardous Substances**" means any substances, materials or wastes which are defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "toxic substances", "pollutants" or "contaminants" under any Environmental Law, including any petroleum or refined petroleum products, radioactive materials, friable asbestos or polychlorinated biphenyls.

"**Intellectual Property**" means any and all intellectual property and proprietary rights in any jurisdiction throughout the world, including rights arising from the following: (i) patents and patent applications, design rights, industrial design registrations and applications therefor, divisions, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, reexaminations, extensions and any provisional applications, and any foreign or international equivalent of any of the foregoing; (ii) trademarks (whether registered, unregistered or applied for), service marks, trade dress, service names, trade names, brand names, product names, slogans, logos, business names, corporate names, and other source or business identifiers, all registrations and applications for registration thereof, and, in each case, together with all of the goodwill associated therewith; (iii) works of authorship, copyrights and all registrations and applications for registration thereof; (iv) trade secrets and know-how; (v) rights in formulae, methods, techniques, processes, assembly procedures, software, software code (in any form, including source code and executable or object code), subroutines, test results, test vectors, user interfaces, protocols, schematics, specifications, drawings, prototypes, molds and models, and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing), and (vi) social media accounts, social media identifiers, internet domain name registrations.

"**Intellectual Property Assignment Agreement**" means the assignment agreement assigning the Intellectual Property to Purchaser, in a form reasonably acceptable to Purchaser and the Seller and executed and delivered at Closing.

"**Intellectual Property Registrations**" means, as to any Owned Intellectual Property Assets, any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including domain names, registered trademarks and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge**" means (a) with regard to the Seller, the actual knowledge, without any implication of verification or investigation concerning such knowledge, of Dr. Nirmal Mulye, in each case as of the Agreement Date (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate) and (b) with regard to Purchaser, the actual knowledge, without any implication of verification or investigation concerning such knowledge, of Christopher H. Arington, in each case as of the Agreement Date (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate).

"**Liabilities**" shall mean debts, liabilities, duties, obligations or commitments of any nature whatsoever, whether direct or indirect, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, whenever or however arising (including whether arising out of any Contract or in a tort claim based on negligence or strict liability).

"**Lien**" means all forms of lien (including mechanic's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Transferred Assets, and liens arising under the Bankruptcy Code), encumbrance, defect or irregularity in title, pledge, mortgage, deed of trust, deed to secure debt, security interest, charge, transfer restriction or similar agreement or encumbrance, including any dedication under any gathering, transportation, treating, processing, fractionating, purchase, sale or similar agreements, or any other rights granted or consensual as or against any Transferred Assets including but not limited to easements, encroachments, rights of first refusal, options, or any other interest or right in property that constitutes a lien or interest within the definition or adjudication of such terms under Section 101(37) of the Bankruptcy Code.

"**Material Adverse Effect**" means a material adverse effect on the business, financial condition or results of operations of the Business (including the Transferred Assets and Assumed Liabilities) taken as a whole; provided, however, that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or may be, a Material Adverse Effect: (a) any change in, or effects arising from or relating to, general business or economic conditions affecting any industry in which the Business operates; (b) any change in, or effects arising from or relating to, the United States or foreign economies, or securities, banking or financial markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) debt defaults or other restructuring events of any country with respect to

6

which bondholders take a discount to the debt of any country or any increases in the interest rates for any country's debt, (iii) any change in currency exchange rates, (iv) any decline or rise in the price of any security, commodity, contract or index and (v) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (c) any change from, or effects arising from or relating to, the occurrence, escalation or material worsening of any act of God or other calamity, natural disaster, pandemic or disease, outbreak, hostility, act of war, sabotage, cyber-attack or terrorism or military action; (d) any action taken by Purchaser or its Affiliates with respect to the Transactions or with respect to the Business; (e) any action taken, or failed to be taken, by the Seller at the request of or with the consent of Purchaser or otherwise in compliance with the terms of this Agreement or any change from, or effects arising from or relating to, Purchaser's failure to consent to any action restricted by <u>Section 6.1</u>; (f) any change in, or effects arising from or relating to changes in, Applicable Law or accounting rules (including GAAP) or any interpretation thereof; (g) the failure of the Business to meet any of its projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or representatives); (h) national or international political, labor or social conditions; (i) any matter described in the Schedules or any matter of which Purchaser is aware as of the Agreement Date; (j) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement and the Transactions or the identity of the parties to this Agreement, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the Business; (k) the sale of any assets other than the Transferred Assets to any third parties by Seller or any of its Affiliates; (l) any effect arising or resulting from or related to the filing of the Bankruptcy Case; (m) any action required to be taken under any Applicable Law or Order or any existing Contract by which Seller (or any of its properties) are bound; (n) seasonal changes in the results of operations of the Seller; (o) any epidemic, pandemic, outbreak of disease or other public health emergency (including COVID-19) or any escalation or worsening of any such conditions; (p) (1) any results, outcomes, data, adverse events or side effects arising from any clinical trials being conducted by or on behalf of the Seller or any competitor of the Seller (or the announcements thereof), (2) results of meetings with the FDA or other Governmental Entity (including any minutes of, or communications from, any Governmental Entity in connection with such meetings), (3) the determination by, or the delay of a determination by, the FDA or any other applicable Governmental Authority, or any panel or advisory body empowered or appointed thereby, with respect to a clinical hold, acceptance, filing, designation (including de-designation for the accelerated approval pathway), approval, clearance, non-acceptance, hold, refusal to file, refusal to designate, non-approval, disapproval or non-clearance, or requirement to conduct additional clinical studies or trials, with respect to any of the Seller's or any competitor's product candidates or (4) FDA approval (or other clinical or regulatory developments), market entry or pending market entry of any product competitive with or related to any of the products or product candidates of the Seller, or any guidance, announcement or publication by the FDA or other applicable Governmental Authority relating to any product candidates of the Seller or any competitor; or (q) any objections made in the Bankruptcy Court to this Agreement, the Transactions, the Sale Order or the reorganization, any orders of the Bankruptcy Court and any actions or omissions of the Seller in compliance with any order of the Bankruptcy Court.

   "<u>**Non-Transferred Asset**</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"**Order**" means any award, decision, injunction, judgment, ruling or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator.

"**Organizational Documents**" means (a) the articles or certificates of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in clauses (a) through (d), and (f) any amendment to or equivalent of any of the foregoing.

"**Outside Date**" has the meaning set forth in Section 9.1(g).

"**Owned Intellectual Property**" means the Intellectual Property owned by the Seller that is exclusively used in the Business.

"**Permit**" means all permits, authorizations, certificates, franchises, consents and other approvals from any Governmental Authority.

"**Permitted Liens**" means (a) Liens for Taxes, assessments or other governmental charges not yet due and payable or being contested in good faith by appropriate proceedings; (b) mechanics', carriers', workers', repairers' and other similar Liens arising or incurred in the ordinary course of business for obligations that are not overdue or are being contested in good faith by appropriate proceedings; (c) zoning, entitlement and building regulations and land use restrictions; (d) purchase money Liens and Liens securing rental payments under capital lease arrangements; (e) Liens arising under leases of property or equipment in favor of the owner thereof; (f) pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security; (g) deposits to secure the performance of bids, Contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; (h) licenses of Intellectual Property granted in the ordinary course of business; (i) gaps in the chain of title of Intellectual Property applications or registrations that are evident from the records of the relevant Governmental Authority maintaining such applications or registrations; (j) Liens arising under or created by this Agreement or any of the Related Documents; (k) Liens arising in the ordinary course of business which would not reasonably be expected to have a Material Adverse Effect; and (l) Liens set forth on Schedule 1.1(a).

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

"**Personal Information**" means any information in the possession or control of the Seller (solely as related to the Business) about an identifiable individual other than the name, title or business address, business email address or telephone number of any employee of the Seller.

"**Petition Date**" has the meaning set forth in the Recitals.

8

"**Public Health Measures**" means any closures, "shelter-in-place," "stay at home," workforce reduction, social distancing, shut down, closure, curfew or other restrictions or any other Applicable Law, Orders, directives, guidelines or recommendations issued by any Governmental Authority, the Centers for Disease Control and Prevention, the World Health Organization, or any industry group in connection with COVID-19 or any other epidemic, pandemic, or outbreak of disease, or in connection with or in response to any other public health conditions.

"**Purchase Price**" means $1,750,000.00.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Schedules**" has the meaning set forth in Article 4.

"**Related Claims**" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents and any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions or the relationship between the parties (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

"**Related Documents**" means the Bill of Sale and Assignment and Assumption Agreement and the Intellectual Property Assignment Agreement; provided, however, that the Bill of Sale and Assignment and Assumption Agreement and the Intellectual Assignment Agreement shall not be a Related Document solely for purposes of applying the provisions in Article 10 to the extent, and only to the extent, that any such document expressly conflicts with Article 10.

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment of any Hazardous Substances.

"**Sale Motion**" means the motion of the Seller seeking entry of the Sale Order approving the terms herein, to be filed on or about April 8, 2025, in the Bankruptcy Case.

"**Sale Order**" means an Order of the Bankruptcy Court issued pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code substantially in the form of Exhibit C.

"**Schedules**" has the meaning set forth in Article 3.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Tax Claim**" has the meaning set forth in Section 7.3(e).

"**Solvent**" when used with respect to any Person, means that, as of any date of determination, (a) the fair salable value (determined on a going concern basis) of its assets and property will, as of such date, exceed the amounts required to pay its debts as they become absolute

and mature, as of such date, (b) such Person will have adequate capital to carry on its business and (c) such Person will be able to pay its debts as they become absolute and mature, in the ordinary course of business, taking into account the timing of and amounts of cash to be received by it and the timing of and amounts of cash to be payable on or in respect of its indebtedness.

"**<u>Tax</u>**" means any tax (including any income tax, franchise tax, branch profits tax, capital gains tax, value-added tax, sales tax, use tax, property tax, transfer tax, payroll tax, social security tax or withholding tax), and any related fine, penalty, interest, or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority.

"**<u>Tax Return</u>**" means any return (including any information return), report, statement, schedule, notice, form, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection, or payment, of any Tax.

"**<u>Termination Fee</u>**" means a fee equal to $0.

"**<u>Transactions</u>**" means the transactions contemplated by this Agreement and the Related Documents.

"**<u>Transfer Taxes</u>**" has the meaning set forth in <u>Section 2.10</u>.

"**<u>Transferred Assets</u>**" has the meaning set forth in <u>Section 2.1</u>.

1.2    **<u>Other Definitional and Interpretive Matters</u>**.

(a)    Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

(i)    <u>Calculation of Time Period</u>. All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    <u>Dollars</u>. Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement, the Related Documents or the Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties hereto to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement, the Related Documents or the Schedules.

(iii)    Exhibits/Schedules. The Exhibits and Schedules to this Agreement are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Applicable Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    Gender and Number. Any reference to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    Headings. The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or Related Document, as applicable. Unless otherwise specified, all references in this Agreement to any "Section" or other subdivision are to the corresponding section or subdivision of this Agreement, and all references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vi)    Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    Or. The word "or" shall be construed in the inclusive sense of "and/or" unless otherwise specified.

(viii)    Including. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)    Successors. A reference to any party to this Agreement, any Related Document or any other agreement or document shall include such party's successors and permitted assigns.

(x)    Legislation. A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment

11

thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(xi)    <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statement, to the extent any such phrase appears in such representation or warranty, if (a) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that relates to the subject matter of such representation, (b) such item is otherwise specifically set forth on the balance sheet or financial statement or (c) such item is set forth in the notes to the balance sheet or financial statement.

(xii)    <u>Made Available</u>. Any reference in this Agreement to "made available" means a document or other item of information that was provided or made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions.

(b)    All representations and warranties set forth in this Agreement or the Related Documents are contractual in nature only and subject to the sole and exclusive remedies set forth herein. No Person is asserting the truth of any representation and warranty set forth in this Agreement or the Related Documents; rather, the parties have agreed that should any representations and warranties of any party prove untrue, the other parties shall have the specific rights and remedies herein specified as the exclusive remedy thereof, but that no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort or otherwise) are permitted to any party hereto as a result of the untruth of any such representation and warranty. The phrase "to Seller's Knowledge" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the Related Documents and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement and the Related Documents. The parties hereto agree that changes from earlier drafts to the final version of this Agreement do not necessarily imply that the party agreeing to such change is agreeing to a change in meaning (as the party agreeing to such change may believe the change is stylistic and non-substantive); consequently, no presumption should exist by virtue of a change from a prior draft.

## ARTICLE 2
## THE PURCHASE AND SALE; CLOSING

2.1    **Purchase and Sale**. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, in exchange for an aggregate payment from

12

Purchaser to the Seller equal to the Purchase Price, Purchaser shall purchase, assume and accept from the Seller, and the Seller shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear (except for Permitted Liens), all of the rights, title and interests in, to and under the following assets and interests solely used in connection with the Transferred Assets as the same shall exist on the Closing Date (collectively, the "**Transferred Assets**"):

(a)     all equipment, and other tangible personal property, including without limitation office furniture and fixtures, computers, security systems, telephone and internet equipment and maintenance equipment and supplies, Used in the Business and owned by the Seller listed on Schedule 2.1(a) (the "**Tangible Personal Property**");

(b)     all licenses granted to the Seller as set forth in Schedule 2.1(b);

(c)     all of Seller's rights, title and interest in and to the following (collectively, the "**Owned Real Property**"):

1.     the land and improvements thereon owned by Seller in Bryan, Ohio, and associated structures as described on Schedule 2.1(c) (the "**Facilities Property**"); and

2.     all plants, buildings, structures, installments, improvements, permits, hereditaments, easements, fixtures, and real property, licenses, betterments, additions and improvements in the progress of construction, and situated or located thereon, minerals, oil, gas and other hydrocarbon, substances in, on or under the Facilities Property, and all air rights, water and water rights, development agreements, permits, conditional use permits, entitlements and authorizations issued by any governmental or quasi-governmental authority, all plans and specifications relating to the real property including, without limitation any architectural plans and drawings, any prepaid credits, deposits and prepaid fees and applicable to the Facilities Property;

(d)     computer software, programs, hardware, data processing equipment, manuals and related documents for the Facilities Property;

(e)     all of the Seller's rights, claims or causes of action against third parties relating to the assets, properties, business or operations of the Seller with respect to the Transferred Assets and the Assumed Liabilities (including all guaranties, warranties, indemnities and similar rights in favor of the Seller or any its Affiliates to the extent solely related to the Transferred Assets or the Assumed Liabilities), in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date, except for such rights, claims and causes of related to the Excluded Assets or Excluded Liabilities; and

(f)     all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, choses in action, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively used in or held for use for the Transferred Assets listed in clauses (a) through (e) above or the Assumed Liabilities; and

13

(g)    all goodwill associated with or symbolized by any of the foregoing Transferred assets described in clauses (a) through (f) above.

2.2    **Excluded Assets**. Notwithstanding the provisions of Section 2.1 or anything to the contrary herein, any and all assets, rights and properties of the Seller that are not specifically identified in Section 2.1 as Transferred Assets, including the following (collectively, the "**Excluded Assets**"), shall be retained by the Seller, and Purchaser and its designees shall acquire no right, title or interest in the Excluded Assets in connection with the Transaction:

(a)    all (i) cash and cash equivalents, wherever located, including bank balances and bank accounts or safe deposit boxes, monies in the possession of any banks, savings and loans or trust companies and similar cash items, (ii) escrow monies and deposits in the possession of landlords and utility companies, and (iii) investment securities and other short- and medium-term investments;

(b)    all records, documents or other information exclusively relating to current or former employees of the Seller that are not hired by Purchaser, and any materials to the extent containing information about any employee, disclosure of which would violate Applicable Law or such employee's reasonable expectation of privacy;

(c)    any interest of the Seller under this Agreement or the Related Documents, including, without limitation, the right to receive the Purchase Price and to enforce the Seller's rights and remedies thereunder;

(d)    all Excluded Contracts (including all prepaid assets relating to the Excluded Contracts) to which Seller is a party;

(e)    any (i) attorney-client work product or communications prior to the Closing Date between Seller (including any one or more officers, directors or stockholders of Seller), on the one hand, and its counsel, on the other hand, and (ii) claims under any director and officer, errors and omissions, fiduciary and commercial crime insurance policies;

(f)    any rights of the Seller to Tax refunds or credits for overpayment of Taxes in lieu of a refund attributable to any taxable period (or portion thereof) ending on or before the Closing Date;

(g)    all Permits (including applications therefor and any trade or import/export Permits) that (i) are not solely related to the Transferred Assets, or (ii) are not transferable to Purchaser under Applicable Law;

(h)    the Excluded Books and Records;

(i)    accounts receivable, intercompany obligations and other amounts receivable by Seller;

(j)    any assets not otherwise designated as Transferred Assets or from time to time designated by the parties hereto as Excluded Assets;

(k)      the Avoidance Actions;

(l)      all of the Seller's rights, claims or causes of action (i) against third parties relating to the assets, properties, business or operations of the Seller (including all guaranties, warranties, indemnities and similar rights in favor of the Seller or any of its Affiliates) to the extent arising under the Bankruptcy Code or relating to any of the Excluded Assets or Excluded Liabilities, or (ii) against any third parties that have a familial relationship with any members of the Debtor's management team or entities in which such third parties hold an interest, the Debtor's owners or the Debtor's employees, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date; for the avoidance of doubt and notwithstanding anything else herein to the contrary, all of the Seller's rights, claims and causes of action, including Avoidance Actions, against any of the Seller's affiliates, insiders, subsidiaries, and parents shall be Excluded Assets.

(m)      all of the Seller's right, title and interest to any the assets set forth on Schedule 2.2(m)[1]; and

(n)      all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively related to or exclusively used in or held for use for the Excluded Assets listed in clauses (a) through (m) above.

Notwithstanding anything to the contrary contained in this Agreement or any of the other Related Documents, Purchaser acknowledges and agrees that all of the following are also Excluded Assets, and all right, title and interest in and to all Excluded Assets shall be retained by the Seller and shall remain the property of the Seller (and shall expressly be excluded from the sale, transfer, assignment and conveyance to Purchaser hereunder), and neither Purchaser nor any of its Affiliates shall have any interest therein: (x) all records and reports prepared or received by the Seller or any of its Affiliates in connection with the sale of the Business and the Transactions, including all analyses relating to the Business or Purchaser so prepared or received; and (y) all confidentiality agreements with prospective purchasers of the Business or any portion thereof and all bids and expressions of interest received from third parties with respect thereto.

2.3      **Assumption of Liabilities**. On the terms and subject to the conditions set forth in this Agreement, Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms all Liabilities of the Seller arising from or related to the Transferred Assets as the same shall exist on the Closing Date and irrespective of whether the same shall arise on or after the Closing Date (collectively, the "**Assumed Liabilities**"), including:

(a)      all Liabilities arising from and after the Closing relating to the Transferred Assets;

(b)      all Taxes for which Purchaser is liable pursuant to this Agreement;

---

[1] To include any other Excluded Assets mutually agreed between the parties.

(c)    all Liabilities accruing on or after the Closing Date, relating in any way to the environment, natural resources, or human health and safety, or arising under Environmental Laws in connection with the ownership or operation of the Business (including the Transferred Assets) on or after the Closing Date;

(d)    all Liabilities arising out of or relating to any action, charge, claim (including any cross-claim or counter-claim), suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation with respect to the Transferred Assets relating to any period from and after the Closing; and

(e)    other Liabilities that are listed on Schedule 2.3(e).

2.4    **Excluded Liabilities**. Notwithstanding Section 2.3, Purchaser is assuming only the Assumed Liabilities of the Seller and will not assume or be liable for any Excluded Liabilities, and the Seller shall retain and shall be responsible for, all Liabilities that are not Assumed Liabilities, including all Liabilities related to Excluded Assets (all such Liabilities not being assumed herein referred to as the "**Excluded Liabilities**").

2.5    **Excluded Contracts**.  Purchaser shall not purchase or assume any contracts related to the Business or the Transferred Assets.  All contracts of Seller are excluded contracts ("**Excluded Contract**") (and shall constitute an Excluded Asset and not be included in the Transferred Assets) for all purposes of this Agreement and Purchaser shall not have any obligation to satisfy or pay any cure costs or other Liabilities with respect to such Excluded Contract.

2.6    **Nontransferable Assets and Liabilities**.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Governmental Authority) (after giving effect to the Sale Order or any other applicable order of the Bankruptcy Court that effects such transfer without any required Consents), would constitute a breach or other contravention thereof or a violation of Applicable Law (each, a "**Non-Transferred Asset**").

(b)    If, on the Closing Date, any third-party Consent is not obtained for a Non-Transferred Asset, or if an attempted transfer or assignment thereof would be ineffective or a violation of Applicable Law, then, until any requisite consent is obtained therefor and the same is transferred and assigned to Purchaser or its designee, each such Non-Transferred Asset shall be held by the Seller as agent for the Purchaser, and the Seller shall, to the extent permitted by Applicable Law, provide to Purchaser the benefits and Purchaser shall assume the obligations and bear the economic burdens associated with such Non-Transferred Asset. The Seller and Purchaser shall use commercially reasonable efforts to enter into agreements (including subcontracting, sublicensing or subleasing, if permitted) by which (i) the Seller shall, at Purchaser's sole expense, without interruption of the Business, provide Purchaser with the economic and operational equivalent of obtaining the requisite third-party Consent and assigning the applicable Non-Transferred Asset to Purchaser (including, with the prior written consent of Purchaser, enforcing

16

for the benefit of Purchaser, and at Purchaser's sole expense, all claims or rights arising thereunder) and (ii) Purchaser shall perform, at its sole expense, the obligations and assume the economic burdens of the Seller to be performed after the Closing with respect to such Non-Transferred Asset. Purchaser shall promptly, upon receipt of a written request therefor from the Seller, reimburse the Seller for all monies paid by the Seller on Purchaser's behalf in connection with any Assumed Liability not assigned or transferred to Purchaser pursuant to this Section 2.6.

2.7     **Closing**. The closing of the Transactions (the "**Closing**") will take place remotely by electronic exchange of documents on the date (the "**Closing Date**") that is the second (2nd) Business Day after the date on which all of the conditions set forth in Article 8 (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the party hereto entitled the benefit of the same, unless another time or date is agreed to in writing by the parties hereto. Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all parties hereto at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.  The Closing Date shall be no later than April 18, 2025.  The parties acknowledge that Purchaser may, prior to the Closing Date, assign this Agreement and all of Purchaser's obligations and rights under this Agreement to an Affiliate of Purchaser, which Affiliate will consummate the transactions contemplated by this Agreement, including the Closing, on its own behalf.

2.8     **Closing Deliveries of the Parties**. At or prior to the Closing:

(a)     Purchaser and the Seller shall execute and deliver the Bill of Sale and Assignment and Assumption Agreement;

(b)     Purchaser and the Seller shall execute and deliver the Intellectual Property Assignment Agreement, in a form reasonably acceptable to Purchaser and the Seller;

(c)     Purchaser and the Seller shall transmit Purchaser's FDA Transfer Letter and Seller's FDA Transfer Letters, respectively, to the FDA and shall take other actions reasonably necessary to effect the transfer of the Transferred Assets from Seller to Purchaser;

(d)     Purchaser shall deliver, or cause to be delivered, to the Seller or the applicable Person each of the following:

(i)     a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in Section 8.3(a) and Section 8.3(b); and

(ii)     payment of the closing payments set forth in Section 2.9.

(e)     the Seller shall deliver, or cause to be delivered, to Purchaser or the applicable Person each of the following:

(i)       a certificate, dated as of the Closing Date, executed by or on behalf of the Seller as to the satisfaction of the conditions set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u>; and

(ii)      a limited warranty deed conveying title to the Owned Real Property to Purchaser (the "Deed") to a title company specified by Purchaser prior to the Closing (the "Title Company") in the form reasonably acceptable to Purchaser and Title Company, properly executed and conveying marketable fee simple title to the Owned Real Property to Purchaser: and

(iii)     If required by Purchaser, a standard form Seller's American Land Title Association affidavit, against mechanics liens and against parties in possession, and such other documents, if any, as may be required by Title Company, on forms customarily used by Title Company and reasonably satisfactory to Seller, in order to issue an owner's policy of title insurance; and

(iv)      certificates, dated as of the Closing Date, of the Seller's non-foreign status, in accordance with Treasury Regulation § 1.1445-2(b); and

(v)       the Sale Order.

2.9       **<u>Purchase Price; Assumed Liabilities; Deposits</u>**.

(a)       At the Closing, upon the terms and subject to the conditions set forth herein, in full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser and assumption of the Assumed Liabilities by Purchaser, Purchaser shall (i) pay to the Seller an aggregate amount equal to the Purchase Price *minus* the Deposit Escrow Amount; and (ii) assume the Assumed Liabilities.

(b)       At the Closing, on the terms and subject to the conditions set forth in this Agreement, Purchaser will assume and become responsible for the Assumed Liabilities. Purchaser agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms hereof.

(c)       The Deposit Escrow Amount shall be released to Seller or Purchaser in accordance with the applicable terms of this Agreement.  Any issue regarding the entitlement to the Deposit Escrow Amount shall be determined by the Bankruptcy Court, and Purchaser consents to the jurisdiction of the Bankruptcy Court for any issue related to this Agreement.

2.10      **<u>Transfer Taxes</u>**. It is the intention of the Purchaser and the Seller that the Transactions be exempt from all transfer, documentary, sales, use, excise, stock transfer, value-added, stamp, recording, registration and other similar taxes, levies and fees (including any penalties, fines and interest), together with any conveyance fees, recording charges and other similar fees and charges, incurred in connection with this Agreement and the Transactions (collectively, "**<u>Transfer Taxes</u>**") pursuant to Bankruptcy Code section 1146(a). Purchaser and the Seller shall cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes due with respect to the Transactions. In the event any Transfer Taxes are required to be paid with respect to the Transactions, Purchaser shall be solely responsible

for such Transfer Taxes and shall indemnify, defend and hold harmless the Seller against any such Transfer Taxes.

2.11 **Allocation of Purchase Price**.

(a)    The Purchase Price (including all other amounts treated as consideration for U.S. federal income tax purposes) and Assumed Liabilities shall be allocated as set forth on Schedule 2.11 (the "**Preliminary Allocation Schedule**"). Within 90 days following the Closing, Purchaser shall deliver to the Seller a schedule allocating the Purchase Price (and all other amounts treated as consideration for U.S. federal income tax purposes) among the Transferred Assets (the "**Allocation Schedule**"). The Allocation Schedule shall be reasonable and shall be prepared in accordance with the Preliminary Allocation Schedule, and Purchaser and the Seller shall negotiate in good faith to resolve disputed items, if any, in the Allocation Schedule as promptly as practicable. If Purchaser and the Seller are unable to reach agreement with respect to the Allocation Schedule within 30 days after the delivery of the Allocation Schedule by Purchaser to the Seller, the parties shall be entitled to use their own Purchase Price allocations for Tax reporting purposes.

(b)    To the extent Purchaser and the Seller agree on the Allocation Schedule pursuant to Section 2.11(a), Purchaser and the Seller shall (i) timely file all Tax Returns required to be filed in connection with the Allocation Schedule, and (ii) prepare and file all Tax Returns and determine all Taxes in a manner consistent with the Allocation Schedule, except as may be required by Applicable Law and except as may be necessary to reflect adjustments to the Allocation Schedule resulting from post-Closing payments or events. Purchaser, on the one hand, and the Seller, on the other hand, shall notify the other if it receives notice that any Governmental Authority proposes any allocation different from Allocation Schedule.

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

Except as disclosed in a document herewith delivered by the Seller to Purchaser (the "**Schedules**"), the Seller hereby makes the representations and warranties contained in this Article 3 to Purchaser.

3.1 **Organization, Good Standing and Other Matters**. The Seller is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite corporate power and authority to operate the Business and necessary to own, lease or operate the properties and assets owned, leased or operated by it to carry on the Business as now being conducted, except where the failure to be so duly organized, validly existing and in good standing, or to have such power and authority, would not, individually or in the aggregate, have a Material Adverse Effect. The Seller is duly qualified to do business as a foreign company in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

3.2 **Authority and Enforceability**. Subject to Bankruptcy Court approval, the Seller has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder

19

and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which the Seller is (or at Closing, will be) a party thereto, and the consummation by the Seller of the Transactions, has been duly authorized and approved by all necessary limited liability company action on the part of the Seller and are subject to the approval of the Bankruptcy Court. This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by the Seller and, assuming the due execution and delivery by the other parties hereto or thereto, and subject to the approval of the Bankruptcy Court, constitutes a valid and binding obligation of the Seller, enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

3.3    **No Conflict; Required Filings and Consents**. Except (a)  such filings as may be required in connection with the Transfer Taxes described in Section 2.10 and (b) as otherwise set forth on Schedule 3.3, the execution and delivery of this Agreement by the Seller does not and the execution and delivery of the Related Documents by the Seller will not, and the consummation of the Transactions hereby and thereby will not (i) violate the provisions of the Organizational Documents of the Seller, (ii) subject to the entry of the Sale Order, violate any Applicable Law or Order to which Seller is subject or by which its properties or assets are bound or (iii) require Seller to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order); excluding from the foregoing clauses (ii) and (iii) any Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, have a Material Adverse Effect.

3.4    **Litigation**. As of the Agreement Date, there is no Action pending or, to the Seller's Knowledge, formally threatened in writing, against Seller before any Governmental Authority that would have a Material Adverse Effect or affect the Transferred Assets in any material respect after the entry of the Sale Order, if determined adversely and after taking into effect applicable insurance coverage.

3.5    **Brokers and Finders**. Except for Raymond James & Associates, Inc. the Seller has not, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

3.6    **Title to Assets.**

(a)    The Seller owns, leases or has the legal right to use all Transferred Assets and has good, legal valid and marketable title to, and the right to transfer (or cause to be transferred in accordance with the terms of this Agreement, all of the Transferred Assets Free and Clear except for Permitted Liens.

(b)    Except as set forth on Schedule 3.6, and Seller is not a party to, or bound by, any license, royalty agreement, or other agreement relating to the use of any material Transferred Assets.

20

(c)      Other than with respect to Excluded Contracts, no current or former Affiliate, partner, director, stockholder, officer, member, manager, employee, consultant or contractor of the Seller will, after giving effect to the Transactions, own, license or retain any Transferred Assets.

(d)      To Seller's Knowledge, no interference, opposition, reissue, reexamination, or other proceeding is or has been pending or threatened, in which the scope, validity, or enforceability of any material Assets is being, has been challenged.

3.7      **No Other Representations or Warranties**.

Except for the representations and warranties contained in this Article 3, the Seller does not, nor do any other Persons on behalf of the Seller, make any other express or implied representation or warranty with respect to itself, the Business, the Transferred Assets or the Assumed Liabilities, or with respect to any other information provided to Purchaser or its representatives, and the Seller disclaims any other representations or warranties, whether made by or on behalf of the Seller or any other Person. The Seller will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed in a document herewith delivered by Purchaser to the Seller (the "**Purchaser Schedules**"), Purchaser hereby makes the representations and warranties contained in this Article 4 to the Seller.

4.1      **Organization, Good Standing and Other Matters**. Purchaser is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has all requisite corporate power or other entity power and authority to own its properties and to carry on its business as now being conducted. Purchaser is duly qualified or licensed to conduct its business as currently conducted and is in good standing in each jurisdiction in which the location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary, except where the failure to be so qualified or licensed would not, individually or in the aggregate, materially impair or delay Purchaser's ability to consummate the Transactions.

4.2      **Authority and Enforceability**. Purchaser has all requisite corporate power or other entity power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized and approved by its board

of directors (or equivalent governing body) and no other action on the part of Purchaser or its members is necessary to authorize the execution, delivery and performance of this Agreement and the Related Documents by Purchaser and the consummation of the Transactions. This Agreement has been, and each Related Document will be at or prior to Closing, duly executed and delivered by Purchaser and, assuming the due execution and delivery by the other parties hereto or thereto, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

4.3    **No Conflict: Required Filings and Consents**. Except (a) such filings as may be required in connection with the Transfer Taxes described in Section 2.10 and (b) as set forth on Schedule 4.3, the execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (i) violate the provisions of its Organizational Documents, (ii) violate any Applicable Law or Order to which it is subject or by which any of its properties or assets are bound or (iii) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date.

4.4    **Financing**. Purchaser has, and at the Closing will have, (a) sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price in accordance with the terms hereof and any other payments required hereunder and any expenses incurred or required to be paid by Purchaser in connection with the Transactions, and (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Documents. Purchaser has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

4.5    **Solvency**. Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors. Immediately after giving effect to all of the Transactions, including the making of the payments contemplated by Section 2.9, and assuming satisfaction of the conditions to Purchaser's obligation to consummate the Transactions as set forth herein, the accuracy of the representations and warranties of Purchaser set forth herein and the performance by Purchaser of its obligations hereunder in all material respects, Purchaser will be Solvent.

4.6    **Litigation**. There is no Action pending or, to Purchaser's Knowledge, formally threatened in writing against Purchaser or involving any of its properties or assets that would be reasonably be expected to (a) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (b) otherwise prevent, hinder or delay the consummation of the Transactions.

4.7    **Brokers and Finders**. None of Purchaser or its Affiliates have, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

4.8 **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties**.

(a)     Purchaser acknowledges that it and its representatives have received access to such books and records, facilities, equipment, contracts and other assets of the Business which it and its representatives have desired or requested to review. Purchaser acknowledges and agrees that (i) it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Seller, the Business, the Transferred Assets and the Assumed Liabilities and (ii) the Business, the Transferred Assets and the Assumed Liabilities are being transferred and acquired on a "where is" and, as to condition, "as is" and "with all faults" basis.

(b)     Except for the specific representations and warranties expressly made by the Seller in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement, Purchaser acknowledges and agrees that (i) the Seller is not making and have not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Business, the Transferred Assets, the Assumed Liabilities, or any of its operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, stockholder, agent, Affiliate, advisor, representative or employee of the Seller has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in Article 3 and subject to the limited remedies herein provided.

(c)     Other than the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement, Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Seller and the Seller's Affiliates have specifically disclaimed and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance on any such other representation or warranty made by any Person. Purchaser specifically waives any obligation or duty by the Seller or the Seller's Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties expressly set forth in Article 3 and disclaim reliance on any information not specifically required to be provided or disclosed pursuant to the specific representations and warranties set forth in Article 3.

(d)     Purchaser is acquiring the Business, the Transferred Assets and the Assumed Liabilities subject only to the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Section 9 of this Agreement.

4.9    **No Other Representations or Warranties.** Except for the representations and warranties contained in this <u>Article 4</u>, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Seller or its representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Affiliates, officers, directors, employees, agents or representatives.

## ARTICLE 5
## BANKRUPTCY COURT MATTERS

5.1    **Competing Transaction**. This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise) in accordance with the terms of the Bid Procedures Order (each, a "**Competing Bid**"). From the Agreement Date (and any prior time) and until the Closing, the Seller is permitted to, and to cause its representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any reorganization, sale or other disposition of the Transferred Assets. In addition, the Seller shall have the authority to respond to any inquiries or offers to reorganize, purchase all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bid Procedures Order or other Applicable Law, including supplying information relating to the Business and the assets of the Seller to prospective plan sponsors or purchasers.

5.2    **Bankruptcy Court Filings**.

(a)    Subject to its right to pursue a Competing Bid in accordance with the Bid Procedures Order, the Seller shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Transferred Assets and the Assumed Liabilities to Purchaser free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code. The Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)    The Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at an auction undertaken pursuant to the Bid Procedures Order (the "**Auction**"), and (i) Purchaser submits the Back-Up Bid at the Auction or (ii) the terms of this Agreement are deemed to constitute a Back-Up Bid, then Purchaser shall be obligated to promptly consummate the Transactions upon the terms and conditions as set forth herein, including the payment of the Purchase Price as the same may be increased by Purchaser at the Auction; <u>provided</u> that, the Seller

gives written notice to Purchaser on or before the Back-up Termination Date, stating that the Seller (A) failed to consummate the sale of the Transferred Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder.

5.3 **Intentionally Omitted**.

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1 **Conduct of Business**. Except (i) as set forth on <u>Schedule 6.1,</u> (ii) as may be approved by Purchaser (which approval will not be unreasonably withheld, delayed or conditioned; <u>provided, however</u>, that the consent of Purchaser shall be deemed to have been given if Purchaser does not object within 48 hours after written request for such consent is provided by the Seller to Purchaser), (iii) for actions taken or omitted to be taken by Seller in response to any Public Health Measure, or (iv) as is otherwise permitted, contemplated or required by this Agreement, by Applicable Laws or by order of the Bankruptcy Court, from the Agreement Date through the earlier of the Closing Date or the termination of this Agreement in accordance with its terms:

(a) The Seller shall use its commercially reasonable efforts to carry on the Business in all material respects in the ordinary course of business as it has been conducted since the Petition Date; and

(b) The Seller shall not:

(i) sell, license, abandon or otherwise dispose of any material asset or property constituting Transferred Assets other than, in each case, in the ordinary course of business or for the purpose of disposing of obsolete or worthless assets;

(ii) except in the ordinary course of business, acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of any business or any corporation, partnership or other business organization or otherwise acquire any assets (except inventory), that as of the Closing would constitute Transferred Assets, except for the acquisition of assets in the ordinary course of business; or

(iii) change its present accounting methods or principles in any material respect, except as required by GAAP or Applicable Law.

(c) Notwithstanding anything to the contrary, nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the Business, assets and operations prior to the Closing. Prior to the Closing, the Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its Business, assets and operations.

6.2 **Access to Information; Confidentiality**.

(a) From the Agreement Date until the earlier of the Closing Date and the termination of this Agreement, the Seller shall grant Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon

reasonable notice (and in the event of a facility visit request, at least 48 hours prior notice), and subject to any limitations resulting from any Public Health Measures, to the personnel, facilities, book and records of the Seller related to the Business or the Transferred Assets that are in the possession or under the control of the Seller; provided, however, that (i) all requests for access shall be directed to James Grainer or such other person(s) as the Seller may designate in writing from time to time (the "**Seller Access Contact**"), (ii) such activities do not unreasonably interfere with the ongoing business or operations of the Seller, (iii) the Seller shall have the right to have one or more of its representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.2(a), (iv) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing, (v) such access or related activities would not cause a violation of any agreement to which the Seller is a party, (vi) no Personal Information shall be disclosed or used other than in compliance with applicable privacy law and (vii) nothing herein shall require Seller or its representatives to furnish to Purchaser or provide Purchaser with access to information that (A) is subject to an attorney-client or an attorney work-product privilege, (B) legal counsel for the Seller reasonably concludes may give rise to antitrust or competition law issues or violate a protective order or otherwise may not be disclosed pursuant to Applicable Law (including any Public Health Measure) or (C) would cause significant competitive harm to the Seller if the Transactions are not consummated.

(b)    Notwithstanding anything to the contrary contained in this Agreement, from the Agreement Date until the Closing Date, Purchaser shall not, and shall cause its representatives not to, have any contact or discussions concerning Seller, the Business, the Transaction or any other matters with any lender, borrower, creditor, guarantor, business partner, bank, landlord, tenant, supplier, customer, employee, manager, franchisee, distributer, noteholder, independent contractor, consultant or other material business relation of the Seller, in each case, without the prior written consent of the Seller Access Contact (which consent may be withheld in the Seller's sole discretion and, if given, may be conditioned on the Seller Access Contact or his or her designee having the right to participate in any meeting or discussion).

(c)    Any information provided to or obtained by Purchaser or its representatives, including pursuant to this Section 6.2 is confidential information and subject to the terms of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference. Effective upon (and only upon) the Closing, the Confidentiality Agreement shall automatically terminate and none of the parties thereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained by Purchaser or its representatives concerning the Seller, which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. If this Agreement is terminated prior to Closing for any reason, the terms of the Confidentiality Agreement shall remain in full force and effect.

6.3    **Efforts to Consummate.** Except as otherwise provided in this Agreement, each of the parties hereto agrees to use its commercially reasonable efforts to cause the Closing to occur as soon as possible after the Agreement Date, including satisfying the conditions precedent set forth in Article 8 applicable to such party including (a) defending against any Actions, judicial or

administrative, challenging this Agreement or the consummation of the Transactions, (b) seeking to have any preliminary injunction, temporary restraining order, stay or other legal restraint or prohibition entered or imposed by any court or other Governmental Authority that is not yet final and nonappealable vacated or reversed, and (c) executing any additional instruments reasonably requested by another party hereto (without cost or expense to the executing party) necessary to carry out the Transactions and to fully carry out the purposes of this Agreement; provided, however, that, for purposes of "commercially reasonable efforts" standard as required by this Section 6.3, Section 6.1(a), or Section 2.6(b) neither the Seller nor its Affiliates or representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party or to otherwise expend any money or suffer any detriment, to expend any money to remedy any breach of any representation or warranty hereunder, to commence any Action, to waive or surrender any right, to modify any agreement or to provide financing to Purchaser for the consummation of the Transactions.

6.4    **Public Announcements**. Between the Agreement Date and the Closing Date, except to the extent required by any Applicable Law or Action (including the Bankruptcy Case), neither Purchaser nor the Seller shall, and Purchaser and the Seller shall cause their respective Affiliates and representatives not to, directly or indirectly, issue any press release or public announcement of any kind without the prior written consent of Purchaser and the Seller; provided, however, that the Seller and its Affiliates may make announcements from time to time to their respective employees, customers, suppliers, and other business relations and otherwise as the Seller may reasonably determine is necessary to comply with Applicable Law or the requirements of this Agreement or any other agreement to which the Seller or any such Affiliate is a party. Purchaser and the Seller shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the parties.

6.5    **Update of Schedules; Knowledge of Breach**. From time to time prior to the Closing, the Seller may supplement or amend the Schedules with respect to any matter hereafter arising or discovered which if existing or known by the Seller at the Agreement Date would have been required to be set forth or described in such Schedules and also with respect to events or conditions arising after the date hereof and prior to Closing. Any such supplemental or amended disclosure shall not be deemed to have cured any such breach of representation or warranty for purposes of determining whether or not the conditions set forth in Section 8.2(a) have been satisfied. From and after the Closing, references to the Schedules shall be references to the Schedules as supplemented, modified and/or updated. If, prior to the Closing, Purchaser shall have reason to believe that any breach of a representation or warranty of the Seller has occurred (other than through notice from the Seller), Purchaser shall promptly so notify the Seller, in reasonable detail. Nothing in this Agreement, including this Section 6.5, shall imply that the Seller is making any representation or warranty as of any date other than the Closing Date (other than representations and warranties that are expressly made as of an earlier date).

## ARTICLE 7
## POST-CLOSING COVENANTS

7.1    **Access to Information; Books and Records**. From and after the Closing, and without prejudice to the obligations of Purchaser pursuant to Section 7.3(g), Purchaser and its Affiliates shall (i) afford the Seller and its representatives reasonable access, during normal

27

business hours, upon reasonable advance notice and under reasonable circumstances, to the books and records of Purchaser and the Business shall permit the Seller and its representatives to examine and copy such books and records to the extent reasonably requested by such party and (ii) cause their representatives to furnish all information reasonably requested by the Seller or its representatives in connection with the administration of the Bankruptcy Case, any claims or interests asserted by parties in interest against Seller in the Bankruptcy Case, financial or regulatory reporting whether in the Bankruptcy Case or otherwise, audit, third party litigation, preparing or filing of any Tax Return or the defense of any Tax claim or assessment or any other business purpose; provided, however, that nothing in this Section 7.1 shall require Purchaser or its Affiliates to furnish to the Seller or its representatives any material that is subject to an attorney-client or solicitor-client privilege or an attorney or solicitor work-product privilege or which may not be disclosed pursuant to Applicable Law. For a period of six (6) years following the Closing Date, or such longer period as may be required by Applicable Law or necessitated by applicable statutes of limitations, Purchaser shall, and shall cause its Affiliates to, maintain all such books and records in the jurisdiction in which such books and records were located prior to the Closing Date and shall not destroy, alter or otherwise dispose of any such books and records. On and after the end of such period, Purchaser shall, and shall cause its Affiliates to, provide the Seller with at least ten (10) Business Days prior written notice before destroying, altering or otherwise disposing any such books and records, during which period the Seller may elect to take possession, at its own expense, of such books and records.

7.2    **Post-Closing Receipt and Possession of Assets**.

(a)    After the Closing Date, the Seller shall transfer promptly to Purchaser from time to time (but in any event on a monthly basis) any payments constituting Transferred Assets received by the Seller. After the Closing Date, Purchaser shall transfer promptly to the Seller, from time to time (but in any event on a monthly basis), any payments constituting Excluded Assets, received by Purchaser after the Closing.

(b)    In the event that, after the Closing Date, Purchaser receives or otherwise is in possession of any Excluded Asset, Purchaser shall promptly notify the Seller of its receipt or possession of such other Excluded Asset and transfer such Excluded Asset to the Seller. In the event that, after the Closing Date, the Seller receives or otherwise is in possession of any other Transferred Asset, the Seller shall promptly notify Purchaser of its receipt or possession of such other Transferred Asset and transfer, at Purchaser's expense, such Transferred Asset to Purchaser.

7.3    **Tax Matters**.

(a)    The Seller shall be responsible for preparing or causing to be prepared all Asset Tax Returns for itself for taxable periods ending on or before the Closing Date (each, a "**Pre-Closing Tax Period**") that are required to be filed after the Closing. After the Closing, Purchaser will assist and cooperate with the Seller in preparing such Asset Tax Returns. Purchaser shall be responsible for all Transfer Taxes, if any.

(b)    Purchaser shall prepare and timely file or cause to be prepared and timely filed (taking into account all extensions properly obtained) all Tax Returns that are required to be filed for any taxable period that begins on or before the Closing Date and ends after the Closing

28

Date (a "**Straddle Period**") and shall timely pay (subject to Purchaser's right to reimbursement of Seller Taxes), or cause to be timely paid, the amount of any Taxes due thereon. Purchaser shall prepare such Tax Returns in a manner consistent with past practice to the extent relevant and consistent with Applicable Law and shall provide the Seller with completed drafts of such Tax Returns for the Seller's review and reasonable comment at least thirty days prior to the due date for filing thereof, taking into account extensions (or, if such due date is within thirty days following the Closing Date, as promptly as practicable following the Closing Date) and shall make such revisions to such Tax Returns as are reasonably requested by the Seller, provided such requests are consistent with the prior practice of the Seller (to the extent relevant) and comply with Applicable Law.

(c)      The Seller shall be liable for any Asset Taxes with respect to a Pre-Closing Tax Period and the portion of any Straddle Period ending on the Closing Date ("**Seller Taxes**"). For purposes of this Agreement, in the case of any Straddle Period, (a) the amount of any Asset Taxes based on or measured by income or receipts, sales or use, employment, or withholding allocated to the portion of such Straddle Period ending on the Closing Date shall be determined based on an interim closing of the books as of the end of the day on the Closing Date and (b) any other Asset Taxes shall be allocated to the portion of such Straddle Period ending on the Closing Date by prorating the amount of such Tax for the entire premium or taxable period per diem.

(d)      Purchaser and its Affiliates shall not make or change any Tax election, amend, refile or otherwise modify (or grant an extension of any statute of limitation with respect to) any Tax Return, or take any other action that could cause or result in an increase in any Tax Liability or reduce any Tax Benefit in respect of any Pre-Closing Tax Period or Straddle Period relating to the Seller or the Business without the prior written consent of the Seller.

(e)      Purchaser shall promptly notify the Seller in writing upon receipt by Purchaser or any of its Affiliates of notice of any pending or threatened federal, state, local or foreign Tax audits, proceedings or assessments relating to Pre-Closing Tax Period, Straddle Period or otherwise relating to a Tax for which the Seller may be liable (a "**Seller Tax Claim**").

(f)      The Seller shall have the sole right to control the defense or resolution of any Seller Tax Claim, and to employ counsel of its choice at the Seller's expense; provided, however, that Purchaser and its representatives shall be permitted, at their expense, to observe and participate in any defense or resolution of such Seller Tax Claim. Neither Purchaser nor any of its Affiliates shall be entitled to settle, either administratively or after the commencement of litigation, any Seller Tax Claim without the prior written consent of the Seller, which shall not be unreasonably conditioned, denied or delayed. Notwithstanding anything to the contrary contained herein, without the prior written consent of Purchaser, which shall not be unreasonably conditioned, denied or delayed, the Seller shall not agree or consent to compromise or settle, either administratively or after the commencement of litigation, any issue or claim in a Tax audit or administrative or court proceeding it controls hereunder to the extent that any such compromise, settlement, consent or agreement may affect the Tax Liability of Purchaser or any of its Affiliates for which the Seller is not responsible hereunder. The provisions of this Section 7.3(f) shall control over any contrary provisions of Section 10.1.

29

(g)      After the Closing, each of the Seller and Purchaser shall (and Purchaser shall cause its Affiliates to):

(i)      timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce), or file Tax Returns or other reports with respect to, Transfer Taxes;

(ii)      cooperate fully in preparing for and defending any audits or proceedings of or disputes with Governmental Authorities regarding any Tax Returns required to be filed by, or Taxes related to the Transferred Assets due from, the Seller for any Pre-Closing Tax Period or Straddle Period;

(iii)      maintain and preserve until the expiration of the applicable statutes of limitations, and make available to the other parties as reasonably requested and to any Governmental Authority as reasonably required, all information, records and documents relating to Taxes related to the Transferred Assets for any Pre-Closing Tax Period or Straddle Period, and make employees available to the other parties as reasonably requested during business hours to supplement or explain such information, records and documents; and

(iv)      furnish the other parties with copies of all correspondence received from any Governmental Authority in connection with any Tax audit, proceeding, assessment or information request relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period, and furnish the other parties with copies of all records and documents relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period that are proposed to be destroyed (and not otherwise in the possession of such other party).

(h)      Purchaser shall pay, or cause to be paid, to the Seller the amount of any refunds of Taxes related to the Transferred Assets from a Pre-Closing Tax Period or the portion of a Straddle Period ending on the Closing Date to the Seller within five days of receipt of the refund in cash (or through offset against other cash Taxes payable).

## ARTICLE 8
## CONDITIONS PRECEDENT

8.1      **Conditions to Each Party's Obligation**. The respective obligations of the parties hereto to effect the Transactions are subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller and Purchaser), at or prior to the Closing, of the following conditions:

(a)      No Injunctions or Restraints. No Order or Applicable Law preventing the consummation of the Transactions shall be in effect.

(b)      Sale Order. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall remain in full force and effect and shall not have been stayed.

8.2     **Conditions to Obligation of Purchaser**. The obligations of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by Purchaser), at or prior to the Closing, of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties of the Seller set forth in Article 3 shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality", "Material Adverse Effect" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not have, individually or in the aggregate, a Material Adverse Effect.

(b)     Performance of Covenants and Obligations. The Seller shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing, except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the Transactions.

(c)     Closing Deliverables. The Seller shall have delivered to Purchaser the closing deliveries required to be delivered by the Seller pursuant to Section 2.8(a), Section 2.8(b) and Section 2.8(e).

8.3     **Conditions to Obligations of the Seller**. The obligation of the Seller to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller), at or prior to the Closing, of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties of Purchaser set forth in Article 4 shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, (i) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (ii) otherwise prevent, hinder or delay the consummation of the Transactions.

(b)     Performance of Covenants and Obligations of Purchaser. Purchaser shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing, except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the Transactions.

(c)     Closing Deliverables. Purchaser shall have delivered to the Seller the closing deliveries required to be delivered by Purchaser pursuant to Section 2.8(a), Section 2.8(b) and Section 2.8(c).

8.4     **Waiver of Condition; Frustration of Conditions**. All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Purchaser

nor the Seller may rely on the failure of any condition set forth in this <u>Article 8</u>, as applicable, to be satisfied if such failure was caused by such party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions.

8.5    **Delivery of a Notice of Readiness to Close**. At any time after the Seller's satisfaction of its conditions to Closing in accordance with the terms of <u>Section 8.1</u> and <u>Section 8.3</u> of this Agreement, the Seller may deliver a notice to the Purchaser (a "**Notice of Readiness to Close**"). The Purchaser shall have three (3) Business Days from delivery of a Notice of Readiness to Close to satisfy its conditions to Closing in accordance with the terms of <u>Section 8.1</u> and <u>Section 8.2</u> of this Agreement and consummate the Transactions. If Purchaser does not satisfy its conditions to Closing and consummate the Transaction within three (3) Business Days, Purchaser shall forfeit the entire Deposit Escrow Amount to the Seller.

## ARTICLE 9
## TERMINATION

9.1    **Events of Termination**. Notwithstanding anything to the contrary, this Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing:

(a)    by mutual written consent of Purchaser and the Seller;

(b)    automatically, upon the consummation of a sale or other disposition of all or substantially all of the Transferred Assets to a Person other than Purchaser (each, an "**Alternate Transaction**");

(c)    by Purchaser or the Seller by written notice to Purchaser or the Seller from the other, if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(d)    by Purchaser, by written notice from Purchaser to the Seller, if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement, such that the conditions in <u>Section 8.1</u> or <u>Section 8.2</u> are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Seller prior to the earlier of (i) 20 Business Days after receipt of written notice from Purchaser requesting such breach be cured or (ii) the Outside Date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 9.1(d)</u> shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in <u>Section 8.1</u> or <u>Section 8.3</u> are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(e)    by the Seller, by written notice from the Seller to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in <u>Section 8.1</u> or <u>Section 8.3</u> are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) 20 Business Days after receipt of written notice from the Seller requesting such breach be cured or (ii) the Outside Date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 9.1(e)</u> shall not be available to the Seller if the

failure of the Seller to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement;

(f)    by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Applicable Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Transactions and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(f) shall not be available to the party seeking to terminate if any action of such party or any failure of such party to act has contributed to such Order or other action and such action or failure constitutes a breach of this Agreement; or

(g)    by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if the Closing has not occurred on or prior to April 18, 2025 (the "**Outside Date**"); provided, however, that the party exercising the right to terminate this Agreement pursuant to this Section 9.1(g) shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement**.**

9.2    **Effect of Termination**.

(a)    In the event that this Agreement shall be terminated pursuant to Section 9.1, (a) Purchaser and its representatives shall promptly return all documents, work papers and other materials of the Seller including any confidential information and (b) all further obligations of the parties hereto under this Agreement shall terminate without further Liability or obligation to the other parties hereto; provided, however, that, notwithstanding the foregoing, the Liabilities and obligations under (i) the Confidentiality Agreement, and (ii) Section 2.9(c), Section 6.2(c), this Section 9.2 and Article 10 shall continue in full force and effect.

(b)    Notwithstanding anything to the contrary in this Agreement, in the event of valid termination of this Agreement pursuant to Section 9.1, (i) the Seller's Liability hereunder for any and all breaches of this Agreement prior to such termination of this Agreement shall be capped at an amount equal to the Termination Fee and Expense Reimbursement, and (ii) no such termination shall relieve Purchaser from any Liability hereunder for any and all breaches of this Agreement prior to such termination of this Agreement (including if this Agreement is terminated by the Seller pursuant to Section 9.1(e)) and the Seller shall be entitled to all remedies available at law or in equity, including payment of the Deposit Escrow Amount pursuant to Section 2.9(c).

9.3    **Termination Fee and Expense Reimbursement**.

(a)    Subject to limitations set forth in the Bid Procedures Order, in consideration of Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Transferred Assets, and to compensate Purchaser as a stalking-horse bidder, the Seller shall pay in cash to Purchaser, by wire transfer of immediately available funds to the account specified by Purchaser to the Seller in writing, an amount equal to the Termination Fee in the event that this

33

Agreement is terminated pursuant to <u>Section 9.1(b)</u>, in which case the Termination Fee shall be due and payable simultaneously with any termination of this Agreement; <u>provided</u> that, Purchaser shall not be entitled to the fee described in this <u>Section 9.3(a)</u> to the extent Purchaser is in material breach of this Agreement at the time this Agreement is terminated pursuant to <u>Section 9.1(b)</u>. The Termination Fee shall be payable solely from the proceeds of such Competing Bid or Alternative Transaction.

(b)    Subject to limitations set forth in the Bid Procedures Order, in consideration of Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Transferred Assets, if this Agreement is terminated in accordance with the terms set forth in <u>Section 9.1(b)</u>, then the Seller shall pay to Purchaser in cash not later than two Business Days following receipt of documentation supporting the request for reimbursement of costs, fees and expenses, the Expense Reimbursement, in an amount not to exceed $0, by wire transfer of immediately available funds to an account specified by Purchaser to the Seller in writing; <u>provided</u> that, Purchaser shall not be entitled to the fee described in this <u>Section 9.3(b)</u> to the extent Purchaser is in material breach of this Agreement at the time this Agreement is terminated. The Expense Reimbursement shall be payable solely from the cash proceeds of such Competing Bid or Alternative Transaction.

(c)    The Seller agrees and acknowledges that Purchaser's due diligence, efforts, negotiation, and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal, and other resources by Purchaser, and that such due diligence, efforts, negotiation, and execution have provided value to the Seller and, in the Seller's reasonable business judgment, is necessary for the preservation of the value of the Seller's estate. The Seller further agrees and acknowledges that the Termination Fee and the Expense Reimbursement are not a penalty, but rather represent liquidated damages that are reasonable in relation to Purchaser's efforts, Purchaser's lost opportunities from pursuing the Transactions, and the magnitude of the Transactions. The provision of the Termination Fee and the Expense Reimbursement is an integral part of this Agreement, without which the Purchaser would not have entered into this Agreement.

(d)    Notwithstanding anything to the contrary in this Agreement, if this Agreement is terminated under circumstances in which the Expense Reimbursement and/or the Termination Fee is payable and Purchaser is paid the Expense Reimbursement and/or Termination Fee pursuant to this <u>Section 9.3</u>, the Expense Reimbursement and/or Termination Fee shall be the sole and exclusive remedy (whether at law, in equity, in contract, in tort or otherwise) of the Purchaser against the Seller, its Subsidiary and any of their current or former respective former, current or future holders of equity, controlling Persons, directors, officers, employees, Affiliates, representatives, agents or any their respective assignees or successors (collectively, "**<u>Company Related Parties</u>**") for any loss or damage suffered as a result of the failure of the transactions contemplated by this Agreement to be consummated or for a breach of, or failure to perform under, this Agreement or any certificate or other document delivered in connection herewith or otherwise, and upon payment of such amounts, none of the Company Related Parties shall have any further liability or obligation relating to or arising out of, or in relation to, this Agreement or the transactions contemplated hereby.

34

## ARTICLE 10
## GENERAL PROVISIONS

10.1  <u>**Survival of Representations, Warranties and Covenants.**</u> All covenants and agreements contained in this Agreement that by their term are to be performed in whole or in part, or which prohibit actions, subsequent to Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive Closing and shall therefore terminate, including any Action for damages in respect of any breach or inaccuracy thereof. Notwithstanding the foregoing, the provisions of <u>Section 2.9(c)</u>, <u>Section 6.2</u>, <u>Section 9.2</u> and this <u>Article 10</u> shall survive the Closing.

10.2  <u>**Entire Agreement**</u>. This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings. The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the parties hereto expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents. Furthermore, the parties each hereby acknowledge that this Agreement, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all parties to this Agreement, the Confidentiality Agreement and the Related Documents specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction. The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the parties hereby agree that neither party hereto shall have any remedies or cause of action (whether in contract or in tort or otherwise) of any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

10.3  <u>**Amendment; No Waiver**</u>. This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and, if applicable, the Related Documents) executed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any party of a breach of any provision of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising any right, power or remedy hereunder

35

shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.4    **Severability; Specific Versus General Provisions**. Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any term or other provision of this Agreement or the Related Documents is invalid, illegal, or incapable of being enforced by any Applicable Law or public policy, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the parties to the greatest extent consistent with being valid and enforceable under Applicable Law. No party hereto shall assert, and Purchaser shall cause its Affiliates or related parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable. Notwithstanding anything to the contrary, to the extent that a representation, warranty, covenant or agreement of the Seller contained in this Agreement or the Schedules (each, a "**Provision**") addresses a particular issue with specificity (a "**Specific Provision**"), and no breach by the Seller exists under such Specific Provision, the Seller shall not be deemed to be in breach of any other Provision (with respect to such issue) that addresses such issue with less specificity than the Specific Provision, and if such Specific Provision is qualified or limited by the Seller's Knowledge, or in any other manner, no other Provision shall supersede or limit such qualification in any manner.

10.5    **Expenses and Obligations**. Except as otherwise provided in this Agreement, all costs and expenses incurred by the parties hereto in connection with the Transactions, including the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the party that has incurred such expenses.

10.6    **Notices**. All notices, consents, waivers, and other communications under this Agreement or the Related Documents must be in writing and will be deemed to have been duly given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing for next day delivery (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if delivered by electronic mail (unless the sender receives an automated message that the email has not been delivered) on the date of transmission if on a Business Day before 5:00 p.m. local time of the business address of the recipient party (otherwise on the next succeeding Business Day) and (d) if deposited in the United States mail, first-class postage prepaid, on the date of delivery, in each case to the appropriate addresses or email addresses set forth below (or to such other addresses as a party may designate by notice to the other parties in accordance with this Section 10.6):

If to Seller:

    Timothy P. Neumann, Esq.
    Broege, Neumann, Fischer & Shaver, LLC
    25 Abe Voorhees Drive

Manasquan, New Jersey 08736
(732)223-8484, ext. 214
tneumann@bnfsbankruptcy.com

With a copy to Secured Creditor:

Julie M. Murphy, Esq.
Stradley Ronon Stevens & Young, LLP
457 Haddonfield Rd., Suite 100
Cherry Hill, New Jersey 08002
E-Mail: jmmurphy@stradley.com

With a copy to Official Committee of Unsecured Creditors:

Robert M. Schechter, Esq.
Porzio, Bromberg & Newman, P.C.
100 Southgate Parkway
Morristown, NJ 07962
(973) 889-4127
Email: rmschechter@pbnlaw.com

If to Purchaser:

I See, LLC
6125 Commerce Court
Mason, Ohio 45040
Legal Department

10.7   **Counterparts**. This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format, or other agreed format shall be sufficient to bind the parties to the terms and conditions of this Agreement. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

10.8   **Governing Law.** This Agreement, the Related Documents and all Related Claims shall be governed by the internal laws of the State of New Jersey (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Applicable Laws of any other jurisdiction.

10.9   **Submission to Jurisdiction; Consent to Service of Process**.

(a)      Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the

37

terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Related Document, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6; provided, however, that if the Bankruptcy Case has closed, the parties agree to irrevocably submit to the exclusive jurisdiction of the of the Superior Court of the State of New Jersey. The parties hereto hereby irrevocably and unconditionally waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any Related Claim by the delivery of a copy thereof in accordance with the provisions of Section 10.6 (other than by email) along with a notification that service of process is being served in conformance with this Section 10.9(b). Nothing in this Agreement will affect the right of any party to serve process in any other manner permitted by Applicable Law.

10.10    **Waiver of Jury Trial**. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS.

10.11    **Rights Cumulative**. All rights and remedies of each of the parties under this Agreement and the Related Documents will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement, the Related Documents or Applicable Law.

10.12    **Assignment**. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the parties hereto. No assignment of this Agreement or any of the rights, interests or obligations under this Agreement may be made by any party hereto at any time, whether or not by operation of law, without the prior written consent of the Seller and Purchaser, and any attempted assignment without the required consent shall be void; provided, however, that (a) Purchaser may assign (i) any of its rights or delegate any of its duties under this Agreement to any of its Affiliates, and (ii) its rights, but not its duties, under this Agreement to any of its financing sources and (b) the Seller may assign any of its rights or delegate any of its duties under this Agreement to any successor thereto, including any liquidating trustee or other agent; provided, further, however, that, in each case, such assignment shall not release Purchaser from its obligations under this Agreement and

38

the Seller shall have no obligation to pursue remedies against any assignee of Purchaser before proceeding against Purchaser for any breach of Purchaser's obligations hereunder.

10.13 **Specific Enforcement; Remedies**. The parties hereto agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the Purchaser hereto in accordance with their specific terms or were otherwise breached. It is accordingly agreed that (i) the Seller shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of the Seller to cause Purchaser to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and Applicable Laws and to thereafter cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (ii) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right the Seller would not have entered into this Agreement.

10.14 **Third-Party Beneficiaries**. Except as expressly set forth herein, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties hereto any rights or remedies of any nature whatsoever under or by reason of this Agreement.

*{THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK SIGNATURES FOLLOW}*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**PURCHASER**:

PRASCO, LLC
By: Arington Management, LLC, its Manager

By: _____
Name: E. Thomas Arington
Title:  Managing Member

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

SELLER:

NOSTRUM LABORATORIES, INC.

By: _James L. Grainer_

Name: James Grainer
Title: Chief Financial Officer

*Signature Page to Asset Purchase Agreement*

## **EXHIBIT A**

**Form of Bid Procedures Order**

See 24-19611-JKS [ECF No. 268]

## EXHIBIT B

**Form of Sale Order**

See attached.

| SCHEDULES | |
|---|---|
| Schedule 1.1(a) – Other Permitted Liens | None |
| Schedule 2.1(a) – Equipment; Tangible Personal Property Material Permits | See attached |
| Schedule 2.1(b) – Material Permits | See attached |
| Schedule 2.1(c) – Owned Real Property | See attached |
| Schedule 2.1(g) - Owned Intellectual Property | None |
| | |
| | |
| Schedule 2.2(m) - Other mutually-agreed Excluded Assets | None |
| Schedule 2.3(e) – Other Liabilities | None |
| Schedule 2.11 - Preliminary Allocation Schedule | See attached |
| Schedule 3.34.3 – Consents Required | See Attached |
| Schedule 6.1 – Conduct of Business | None |

# SCHEDULE 2.1(b)

# MATERIAL PERMITS

| Schedule 2.1(b) - Material Permits | | |
|---|---|---|
| **Site** | **State/County** | **License Type** |
| Ohio | Government | DEA Export |
| Ohio | Government | DEA Analytical |
| Ohio | Government | DEA Manufacturing |
| Ohio | State | EPA Infectious Waste Generator |
| Ohio | State | EPA Storm Water Permit |
| Ohio | State | EPA Air Pollution Emissions Permit |
| Ohio | State | Industrial Alcohol Permit |
| Ohio | State | Department of Commerce - Boiler |
| Ohio | County | RCRA Waste Management |
| Ohio | County | Recycling |
| Ohio | State | Board of Pharmacy |
| Ohio | State | Department of Transportation Hazmat Certifications |
| Ohio | State | Occupation Permit |

# SCHEDULE 2.1(a)

# EQUIPMENT; TANGIBLE PERSONAL PROPERTY

**Schedule 2.1(a) – Equipment; Tangible Personal Property**
**(Located in Byron, Ohio)**

| Qty. | Description |
|------|-------------|
| **MANUFACTURING** | |
| 1- | 100-Gallon Mixer, S/N 12408 |
| 1- | HK Technology Vibratory Sifter |
| 1- | San-I-Tanks 90-Gallon Stainless Steel Tank, S/N 21674 |
| 1- | MXD Process 100-Gallon Stainless Steel Tank, S/N 0041786-002A (New 2020) |
| 1- | Cleveland 150-Gallon Stainless Steel Kettle |
| 1- | Cleveland 150-Gallon Stainless Steel Kettle, with SPX Flow Mixer |
| 1- | 300-Gallon Jacketed Stainless Steel Tank, W/ Lightnin Mixer |
| 1- | 1,000-Gallon Stainless Steel Tank, W/ Lightnin Mixer |
| 1- | Chem-Tec 100-Gallon Stainless Steel Tank |
| 1- | MXD Process 100-Gallon Stainless Steel Tank, S/N 0041786-002B (New 2021) |
| 1- | MXD Process 40-Gallon Stainless Steel Tank, S/N 0041786-001A (New 2020) |
| 1- | 40-Gallon Stainless Steel Tank |
| 1- | Groen Model GN-60 SP, 60-Gallon Jacketed Stainless Steel Kettle |
| 1- | 1,500-Gallon Jacketed Stainless Steel Kettle |
| 1- | 4,000-Gallon Stainless Steel Tank |
| 1- | Terracon Engineering 2,500-Gallon Polly Tank |
| 1- | 500-Gallon Stainless Steel Tank, W/ Baldor Mixer |
| 1- | Perma-San Model OVS-61-500, 500-Gallon Stainless Steel Tank, S/N S-1214-1 |
| 1- | Triton Model ROS-IXC, Reverse Osmosis Water Purification System, S/N 2312401-03 |

| 1- | Triton Model ROS-IXC, Reverse Osmosis Water Purification System, S/N 2312401-02 |
|---|---|
| 1- | BellatRx Model VP-1, Piston Liquid Filler, S/N 0802 (New 2020), For Liquid Capsules |
| 1- | Neslab Model CFT-300, Recirculating Chiller, S/N 199071043 |
| 1- | Fryma Model VME-50, 50 Liter Homogenizing Mixer, S/N M15236 (New 1992) |

### PACKAGING

| Lot- | Pack Line 1, Consisting of: |
|---|---|
| | • Brothers Stainless Steel Rotary Turntable  MGS Model |
| | • Topserter II, Topserter Machine, S/N 13939 (New 2009) |
| | • Little David Model ABAL Centurian 100, Uniform Carton Sealer, S/N 2120045 |
| | • CVC Model CVC300II, Wrap-Around Labeler, S/N 9909334 |
| | • Enercon Model LM5412-T05, Induction Cap Sealer, S/N C25464-01 (New 2011) |
| | • Tirelli Model Monoblocco, Bottle Filler/Capper (New 2005), W/ Cap Hopper |
| Lot- | Pack Line 2, Consisting of: |
| | • Brothers Stainless Steel Rotary Turntable |
| | • Brothers Air Jet Cleaning Machine |
| | • Brothers Stainless Steel Rotary Turntable |
| | • Brother 8 Head Bottle Filler |
| | • Kaps-All Model A6, Inline Automatic Capper, S/N 6632 |
| | • Enercon Model 3200 LM3285-0, Induction Cap Sealer, S/N 12187U |
| | • Brothers Stainless Steel Rotary Turntable |
| | • Brothers Labeler, W/ Video jet Data flex 6420 Serialization Display |
| | • Stainless Steel Rotary Turntable |

|  | • MGS Model Topserter II, Topserter Machine, S/N 13708 (New 2009) |
|---|---|
|  | • Stainless Steel Rotary Turntable |
|  | • Abal Model 14170018, Box Taper, S/N 080102 |

## QUALITY CONTROL LAB

| Lot- | Lab Equipment Throughout Facility, Consisting of: |
|---|---|
|  | • Thermo Scientific Model TSX5005SA, Freezer, S/N 11614624011200723 |
|  | • Thermo Scientific Model REL7504A, Freezer, S/N 1114190101180508 |
|  | • Caron Model 6032-1, Environmental Test Chamber, S/N 022310-6032-1-20 |
|  | • Caron Model 6031-1, Environmental Test Chamber, S/N 022310-6031-1-46 |
|  | • Thermo Scientific Temperature Controlled Chamber |
|  | • (3) VWR Model Symphony SCPPR-23, Pharmaceutical Refrigerators, S/N SYM-5114532-0910 |
|  | • Environmental Specialties Model ES2000 CDM-TW, Temperature Controlled Chamber, S/N 0608312661 |
|  | • Environmental Specialties Model ES2000 CDM, Temperature Controlled Chamber, S/N 0208061914 |
|  | • Thermo Scientific Model TSX2305SA, Freezer, S/N 116132001200611 |
|  | • VWR Model 1601, Horizontal Air Flow Oven, S/N 4861310 (New 2011) |
|  | • Hot Pack Model H6DA, Horizontal Air Flow Oven, S/N 80248 |
|  | • Fisher Brand Model FBG30RSGA, Refrigeration Unit, S/N 1145042401200414 |
|  | • (6) Binder Incubators |
|  | • Lab Line Model Imperial III 311M, Double Door Incubator, S/N 0205-3631 |
|  | • Fisher Scientific Low Temp Incubator |
|  | • Fisher Scientific Incubator |
|  | • (2) VWR Model 1470-ZZMFG, Vacuum Drying Ovens, S/N 12020609 |

- (2) Isotemp Model 281A, Vacuum Drying Ovens, S/N 911N0057

- Thermo Scientific Model 51028540, Heratherm Advanced Protocol Security Oven, S/N 42619215

- Thermo Scientific Model Thermolyne, Muffle Furnace, S/N 0151311901140206, With Disi-Sense Dual Input Meter, Model: 91428-03

- Thermo Scientific Model Thermolyne 48000, Muffle Furnace, S/N 1058990655734

- (4) Vankel Model VK 7000, Dissolution Testers, S/N 31-544-0299, With Vankel 750-D Heater/Circulator

- Brookfield Model TC-200, Viscometer Recirculating Water Bath, S/N T95355041, With Brookfield TC350 Flow Cooler

- Perkin Elmer Model Lambda 25, UV/VIS Spectrometer, S/N 601509101905

- Jasco Model P-2000, Digital Polarimeter Machine, S/N A008161232

- Perkin Elmer Model Lambda 25, UV/VIS Spectrometer, S/N 601909101901

- Mettler Toledo Model V30, Titrator, S/N B248571339

- Mettler Toledo Model DL38, Titrator, S/N 5117496098

- Perkin Elmer Model Spectrum 100, FTIR Spectrometer, S/N 76355

- (11) Waters Model 2695, Seperations Modules, S/N M03SMC423M, With interface, Model: Series 970, S/N: 4162271384

- Perkin Elmer Model AutosystemXL, Gas Chromatograph, S/N 610N9012211, With Perkin Elmer TurboMatrix 110 Gas Chromatographer

- Parker Balston Model HPZA-3500, Zero Air Generator, S/N HPZA35000246A

- Perkin Elmer Model Clarus 680, Gas Chromatograph, S/N 680S10082404, With Perkin Elmer TurboMatrix 110

- Perkin Elmer Model Clarus 500, Gas Chromatograph, S/N 650N6040407, With Perkin Elmer TurboMatrix 110

- Shimadzu Model GC-2010, Gas Chromatograph, S/N SHGC2010, With Shimadzu AGC-5000 Auto Sampler

- (6) Waters Acquity Model 186015020, UPLC Systems, S/N J07UPO 829M

| | |
|---|---|
| | <ul><li>Agilent Model 1260 Infinity II HPLC,</li><li>Liquid Chromatograph, S/N DEAGZ02257, With Auto Sampler</li><li>Thermo Scientific Model CL-2, Compact Benchtop Centrifuge, S/N 42620503</li><li>Eppendorf Model 5702 RH, Low Speed Centrifuge</li><li>Branson Model 5510, Ultrasonic Bath, S/N RNA109802844E</li><li>Milliq Model Advantage, Water Purification System, S/N F7KN65802E</li><li>Elix Model Advantage-10, Water Purification System, S/N F9HA40357D</li><li>Branson Model 5800, Ultrasonic Bath</li><li>Waters Model 2690, Seperations Module, S/N F99487561M, With Dual Absorbance Detector</li><li>JMP Fume Hood, S/N 001 (New 2009)</li><li>(4) Labconco Model Logic +, Fume Hoods, S/N FH-1430</li></ul> |
| **COMPRESSOR ROOM** | |
| 1- | Ingersoll Rand Model OL 15, Air Compressor, S/N 950267 |
| 1- | Gardner Denver Model RNC125A1, Air Dryer, S/N 100002772629 |
| 1- | Gardner Denver Model EBE99M, 30-HP Air Compressor, S/N S091883 |
| 1- | Kaeser Model SM8, 10-HP Air Compressor |
| 1- | Kaeser Model SM11, 10-HP Air Compressor, S/N 1106 (New 2005) |
| 1- | Wayne Air Dryer (New 1974) |
| 1- | North American 5.2 BTU Boiler, S/N 4513 (New 1968) |
| 1- | Torit Model VS 2400, Dust Collection System, S/N IG3K 6210 |
| **MOBILE EQUIPMENT** | |
| | Landoll Model B40E1600 Series 11, Forklift Truck, S/N B40-7076-00439 |

| 1- | |
|---|---|
| 1- | Landoll Model B55/56AC180D, Forklift Truck, S/N B55/56AC/CE-2006A-12565 |
| 1- | Clark Model EWP 45, Pallet Jack |
| | **STORAGE** |
| 1- | Thermo Scientific Temperature Controlled Chamber |
| 1- | Pro-Cut Model KMG-32, Meat Grinder, S/N K20-067312 (New 2020) |
| 1- | Hamilton 100-Gallon Stainless Steel Mixer, S/N B5423 (New 1975) |
| 1- | Mueller 1,500-Liter Stainless Steel Tank, S/N P-31164 (New 1989) |
| 1- | Aerni Model AR 139, Hemoginizer Machine, S/N 4404 (New 2020) |

# SCHEDULE 2.1(c) – OWNED REAL PROPERTY

| SCHEDULE 2.1(c) – OWNED REAL PROPERTY | |
|---|---|
| **Property Address** | **Parcel Numbers[2]** |
| 604 E. Edgerton St., E. Trevitt St., and 721-725 E. Mulberry St., Bryan, Ohio | 063-170-21-002.000<br>063-170-21-024.000<br>063-170-36-012.000<br>063-170-36-019.000<br>063-170-36-020.000<br>[063-170-36-021.001] |
| 705 E. Mulberry St., Bryan, Ohio | 063-170-36-014.000<br>063-170-36-015.000<br>063-170-36-016.000<br>063-170-36-017.000<br>063-170-36-018.000 |
| 705 E. Mulberry St., Bryan, Ohio | 063-170-36-013.000 |

---

[2] Seller to provide full legal descriptions of each property, encompassing all parcels nos., to Purchaser prior to Closing.  Confirm that parcel 063-170-36-021.001 is included in the sale.

**Schedule 2.11 – Purchase Price Allocation**

Owned Real Property - $1,450,000.00

Tangible Personal Property - $300,000.00

# SCHEDULE 3.3 – REQUIRED CONSENTS

## **Schedule 3.3 – Required Consents**

None.