**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Timothy P. Neumann, Esq. [005081973]
Geoffrey P. Neumann, Esq. [59702019]
BROEGE, NEUMANN, FISCHER & SHAVER, LLC
25 Abe Voorhees Drive
Manasquan, NJ 08736
Tel.: (732) 223-8484
Email: timothy.neumann25@gmail.com
Email: geoff.neumann@gmail.com

*Proposed Substituted Counsel for Debtor-in-Possession Nostrum Laboratories, Inc.*

Order Filed on April 14, 2025
by Clerk
U.S. Bankruptcy Court
District of New Jersey

In re:

**NOSTRUM LABORATORIES, INC.,**

                    Debtor.

Case No.: 24-19611

Chapter 11

Honorable John K. Sherwood, U.S.B.J.

**ORDER PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004 AND 6006 APPROVING THE SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS**

        The relief set forth on the following page numbered two (2) through twenty-four (24) is hereby ORDERED.

**DATED: April 14, 2025**

_____
Honorable John K. Sherwood
United States Bankruptcy Court

Page 2 of 24
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    and the Assumption and Assignment of Certain Contracts

---

WHEREAS, this matter being opened to the Court by motion (the "**Sale Motion**") of Nostrum Laboratories, Inc. (the" Debtor") seeking entry of an order of this court authorizing the Debtor to sell certain assets (including certain Abbreviated New Drug Applications ("**ANDAs**") or licenses therefor, the "**Sale Assets**") as described in the asset purchase agreements, copies of which are annexed hereto as **Exhibit A** ("**APAs**"), between the Debtor and each of the purchasers who made the highest and best offer ("**Purchasers**"); and

WHEREAS, the Court held a hearing on April 8, 2025, at 2:00 p.m. (the "**Sale Hearing**") at which any higher and better offers were considered pursuant to the Bidding Procedures previously approved by this Court[1]; and

WHEREAS, by this order (this "**Order**") the Court approves the sales ("**Sales**") of the Sale Assets pursuant to the terms set forth herein; and for good cause shown,

**IT IS HEREBY FOUND AND DETERMINED THAT:[2]**

A.    The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United States District Court for the District of New Jersey, dated September 18, 2012 (Simandle, C.J.).* This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this case (the "**Bankruptcy Case**") in this District is proper under 28 U.S.C. §§ 1408 and 1409.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Sale Motion.

[2] The Court's findings of fact and conclusions of law are set forth herein pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such.

Page 3 of 24
In Re:                Nostrum Laboratories, Inc
Case No.:             24-19611
Caption of Order:     Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                      and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                      Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                      and the Assumption and Assignment of Certain Contracts

---

B.      The finding and conclusions set forth herein constitute the Court's findings of fact
and conclusions of law pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure (the
"**Bankruptcy Rules**"). To the extent any of the following findings of fact constitute conclusions
of law, they are adopted as such. To the extent any of the following conclusions of law constitute
findings of fact, they are adopted as such.

C.      The statutory and other legal predicates for the relief granted herein are sections
105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local
Rule 6004-1.

D.      Proper, timely, adequate and sufficient notice of the Sale Motion and the Sales has
been provided in accordance with 11 U.S.C. §§ 102, 105(a), 363, 365 and Bankruptcy Rules 2002,
6004, 6006 and 9014, and the Sale Motion, such notice was good and sufficient, and appropriate
under the particular circumstances, and no other or further notice of the Sale Hearing or the Sales,
shall be required.

E.      A fair and reasonable opportunity to object to, and be heard with respect to, the Sale
Motion has been given to all entities entitled to notice pursuant to the Bid Procedures Order
including, without limitation, the following: (i) all non-Debtor counterparties to executory
contracts or unexpired leases, (ii) all parties who have requested notice in this Chapter 11 case
pursuant to Bankruptcy Rule 2002, (iii) any known bidders at the auction (the "**Auction**"), and (iv)
the Office of the United States Trustee.

In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    and the Assumption and Assignment of Certain Contracts

---

F.      This Court may enter a final order on the Sale Motion consistent with Article III of the United States Constitution.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a) and Bankruptcy Rule 8001(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to the extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court finds there is no just reason for delay in the implementation of this Order, waives any stay, and expressly directs entry of judgment as set forth herein.

G.      The Debtor has conducted the sale process in compliance with the Bankruptcy Code, and the Debtor, the Official Committee of Unsecured Creditors (the "**Committee**"), the Prepetition Lender (as defined herein) and the Purchasers have complied with the Bid Procedures Order and the Bid Procedures (as defined herein) in all respects. Each of the Purchasers was a Successful Bidder (as defined in the Bid Procedures Order) at the Auction for the applicable Sale Assets in accordance with the Bid Procedures.

H.      The Debtor and their advisors, including, without limitation, Raymond James & Associates, Inc. ("**Raymond James**"), engaged in a robust and extensive marketing and sale process, in accordance with the Bid Procedures Order.  The Debtor conducted a fair and open sale process.  The sale process, the Bid Procedures, and the Auction were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either expressed an interest in acquiring the Sale Assets, or who the Debtor believed may have had an interest in acquiring the Sale Assets, to make an offer to purchase the Sale Assets.  The Debtor and the

Page 5 of 24
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    and the Assumption and Assignment of Certain Contracts

---

Purchasers have negotiated and undertaken their respective roles leading to the applicable Sales and entry into the applicable APAs in a diligent, non-collusive, fair, reasonable, and good faith manner. The sale process conducted by the Debtor pursuant to the Bid Procedures Order and the Bid Procedures resulted in the highest or otherwise best value for the Sale Assets, was in the best interests of the Debtor, their creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result.

I.      No consents or approvals, other than those expressly set forth herein, are required for the Debtor to consummate the Sales.

J.      Approval of the Sale Motion at this time is in the best interests of the Chapter 11 estate, creditors, and other parties-in-interest.

I.      The Debtor has demonstrated both (i) good, sufficient, and sound business purpose and justification; and (ii) compelling circumstances for the Sales pursuant to 11 U.S.C. § 363(b).

K.      A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities in accordance with the Sale Motion.

L.      The Purchase Prices (as defined herein) were negotiated, proposed and entered into by the Debtor and Purchasers without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtor nor Purchasers, have engaged in any conduct that would cause or permit the Sale to be avoided under 11 U.S.C. § 363(n).

Page 6 of 24
In Re:                Nostrum Laboratories, Inc
Case No.:             24-19611
Caption of Order:     Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                      and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                      Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                      and the Assumption and Assignment of Certain Contracts

---

M.      Each of the Purchasers are purchasing the Sale Assets in good faith and for fair and

reasonable consideration and each Purchaser is a good faith buyer as set forth in 11 U.S.C. §

363(m) and, as such, is entitled to all of the privileges and protections afforded thereby.  Each

Purchaser has and will continue to act in good faith within the meaning of 11 U.S.C. § 363(m) in

closing the transaction at all times after the entry of this Order.

N.      The Purchase Prices to be paid by the Purchasers under APAs were negotiated at

arm's-length and constitute fair and reasonable consideration for the relevant Sale Assets.  The

terms and conditions set forth in each APA are fair and reasonable under these circumstances and

were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or

defrauding the Debtor or their creditors under any applicable laws.  Neither the Debtor nor the

Purchasers are entering into transactions contemplated by the APAs fraudulently for purposes of

statutory or common law fraudulent conveyance and fraudulent transfer laws.

O.      Purchasers would not have offered the Purchase Prices nor agreed to purchase the

relevant Sale Assets and would not consummate the transactions contemplated herein, if the Sales

were not free and clear of all liens, claims, encumbrances, and interests of any kind or nature

whatsoever, or if Purchasers would, or in the future could, be liable for any such liens, claims,

encumbrances or interests including, among other things, any Successor or Other Liabilities (as

defined below).

In Re:            Nostrum Laboratories, Inc
Case No.:         24-19611
Caption of Order: Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                  and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                  Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                  and the Assumption and Assignment of Certain Contracts

---

P.      Certain of Purchasers also submitted Qualified Bids at the Auction constituting Back-Up Bids (as such term is defined in the APAs), which are set forth in the Sale Motion (the "Back Up Bids").

Q.      The Transferred Assets constitute property of the Debtor's estate and good title thereto is vested in the Debtor's estate pursuant to 11 U.S.C. § 541(a).

R.      The Debtor may sell the Sale Assets free and clear of all liens, claims, encumbrances and interests of any kind or nature whatsoever including, among others, any Successor or Other Liabilities because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(l)-(5) have been satisfied.  Any non-debtor entities with interests in the Sale Assets who did not object, or who withdrew their objections, to the Sale Motion have consented, or are deemed to have consented, pursuant to 11 U.S.C. § 363(f)(2), to the Sales.  Those non-debtor entities with interests in the Sale Assets who did object fall within one or more of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by having their interests, if any, attach to the cash proceeds of the sale ultimately attributable to the property against or in which they claim an interest.

S.      None of the Purchasers are a "successor" to, a mere continuation of, or alter ego of the Debtor or its estate, and there is no continuity of enterprise or common identity between any Purchaser and the Debtor.  None of the Purchasers are holding themselves out to the public as a successor to or a continuation of the Debtor or its estate.  The Purchasers are not, and shall not be deemed to be in the future, a successor to the Debtor or its estates by reason of any theory of law

| | |
|---|---|
| In Re: | Nostrum Laboratories, Inc |
| Case No.: | 24-19611 |
| Caption of Order: | Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 Approving the Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances and the Assumption and Assignment of Certain Contracts |

---

or equity (including, without limitation, under federal or state common law with respect to any

claims under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law,

42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; any

similar state false claims act or similar statute; or for purposes of any liability or responsibility for

recall events), and the Sale does not amount to a consolidation, succession, merger, or de facto

merger of any one or more of the Purchasers and the Debtor.  Immediately prior to the Closing

Date, the Purchasers were not "insiders" or "affiliates" of the Debtor, as those terms are defined

in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling

stockholders existed between the Debtor and any of the Purchasers.  The transfer of the Sale Assets

to the Purchasers does not, and shall not, subject any Purchaser to any liability whatsoever, with

respect to the Debtor or the operation of the Debtor's businesses prior to the Closing or by reason

of such transaction or transfer, including under the laws of the United States, any state, territory,

or possession thereof, or the District of Columbia, or any foreign jurisdiction, based, in whole or

in part, directly or indirectly, on any, or any theory of, successor, vicarious, antitrust,

environmental, revenue, pension, ERISA, tax, labor (including any WARN Act), employment or

benefits, de facto merger, business continuation, substantial continuity, alter ego, derivative,

transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or

products liability or law, or other applicable law, rule, or regulation (including filing and reporting

requirements under any such law, rule, or regulation), or theory of liability, whether legal,

equitable, or otherwise (including, without limitation, with respect to claims under the False

Page 9 of 24
In Re:                Nostrum Laboratories, Inc
Case No.:            24-19611
Caption of Order:    Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                     and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                     Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                     and the Assumption and Assignment of Certain Contracts

---

Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a;

the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; any similar state false claims act

or similar statute; or for purposes of any liability or responsibility for recall events) (collectively,

the "**Successor or Other Liabilities**").  For avoidance of doubt, Successor or Other Liabilities

shall be deemed to constitute Excluded Liabilities under the APAs, and the Purchasers shall have

no liability nor obligation with respect to any such Excluded Liabilities, all of which shall be

exclusively retained by the Debtor.

T.     On February 14, 2025, the Court entered a certain *Order Granting in Part and

Denying in Part Motion of Official Committee of Unsecured Creditors for an Order Authorizing

the Committee to Market the Debtors' Assets for Sale in a Joint Capacity with the Debtor and

Approving Bidding Procedures* [Dkt. No. 268] (the "**Bid Procedures Order**"), pursuant to which

the Court, *inter alia*, approved the Debtor's proposed bid procedures (the "**Bid Procedures**").

**NOW THEREFORE, IT IS HEREBY ORDERED:**

1.     The Sales as set forth in the Sale Motion and the APAs, and all of the terms and

conditions thereof, except only as modified pursuant to this Order, are hereby approved.

2.     Pursuant to section 363(b) of the Bankruptcy Code, the Debtor and the Purchasers are

authorized and directed to consummate the Sales, pursuant to and in accordance with the terms

and conditions of the APAs.

3.     The Debtor and the Purchasers are authorized and empowered to perform under,

consummate and implement, the sale, together with all additional instruments and documents that

Page 10 of 24
In Re:            Nostrum Laboratories, Inc
Case No.:         24-19611
Caption of Order: Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                  and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                  Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                  and the Assumption and Assignment of Certain Contracts

---

may be reasonably necessary or desirable to implement the transactions contemplated in the Sale Motion, and to take all further actions as may be requested by the Purchasers for the purpose of assigning, transferring, granting, conveying, conferring or reducing to possession the relevant Sale Assets to the Purchasers, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Sale Motion. The Debtor and the Purchasers are hereby authorized to take any and all steps necessary to effectuate, consummate and/or implement the terms of this Order.  To the extent of any discrepancies between this Order and the Sale Motion, this Order shall control.

4.      The Debtor, together with all entities in possession of property of the Debtor's estate, including, without limitation, the inventories and works-in-progress relating to the Sale Assets (including raw materials and active pharmaceutical ingredients), all stability samples, batches, data protocols and other documentation with respect to stability testing for the Sale Assets, or information necessary to consummate the Sales including, but not limited to, EnEm Nostrum Remedies, Pvt. Ltd., the Debtor and each of their respective representatives including, but not limited to, Nirmal Mulye, Bernard Berk, James Grainer, and Shraddha Dhamankar shall surrender possession of such property and cooperate in all respects with the Debtor, the Purchasers, the Committee and Raymond James in order to effectuate a timely closing of the Sales including, but not limited to, by providing all information necessary to consummate the Sales.

5.      Pursuant to the terms set forth in the Sale Motion, the Purchasers shall pay (each a "**Purchase Price**" and collectively, the "**Purchase Prices**") with respect to the assets of the Debtor as follows:

Page 11 of 24
In Re:               Nostrum Laboratories, Inc
Case No.:            24-19611
Caption of Order:    Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                     and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                     Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                     and the Assumption and Assignment of Certain Contracts

---

a. ANI: $1,500,000, with respect to the following ANDAs:

- 012546 TENUATE® DOSPAN
- 088629 Acetaminophen and Codeine Phosphate
- 076697 Carbamazepine

b. Bionpharma: $50,000, with respect to the following ANDA:

- 209393 Doxycycline Capsules

c. Chartwell: $4,625,000, with respect to the following ANDAs:

- 074415 Sucralfate
- 090180 Promethazine Hydrochloride and Codeine Phosphate
- 088764 Promethazine, Phenylephrine Hydrochloride and Codeine Phosphate

d. PAI: $350,000, with respect to the following ANDA:

- 077105 Valproic Acid

e. Solis: $1,225,000, with respect to the following ANDAs:

- 074118 Piroxicam
- 077708 Cilostazol
- 203887 Dapsone
- 085186 Elixophyllin
- 210663 Hydrocodone Bitartrate /Homatropine Methylbromide
- 075292 Fluoxetine Hydrochloride
- 201011 Morphine Sulfate

Page 12 of 24
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    and the Assumption and Assignment of Certain Contracts

---

- 201448 Oxycodone Hydrochloride and Acetaminophen

- 202060 PEG-3350

6.    The following are the Back-Up Bids, which are approved to the full extent of this Order, in the event that the sales of the corresponding assets set forth in Paragraph 5 hereof do not close:

a.    Kesin, $150,000, with respect to the following ANDA:

- 040891 Promethazine Hydrochloride

b.    PAI: $225,000, with respect to the following ANDAs:

- 085186 Elixophyllin

- 210663 Hydrocodone Bitartrate /Homatropine Methylbromide

- 201011 Morphine Sulfate

- 201448 Oxycodone Hydrochloride and Acetaminophen

- 202060 PEG-3350

c.    Solis, with respect to the following ANDAs:

- 076697 Carbamazepine, $750,000

- 077105 Valporic Acid, $325,000

8.    Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Sale Assets shall be transferred to the respective Purchasers, and, except with respect to Assumed Liabilities and Determined Cure Costs, as applicable and as expressly provided in APAs and this Order, upon consummation (the "**Closing**") shall be free and clear of all adverse interests and other liens, liabilities, claims and encumbrances of any kind or nature whatsoever including, among others,

Page 13 of 24
In Re:                  Nostrum Laboratories, Inc
Case No.:               24-19611
Caption of Order:       Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                        and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                        Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                        and the Assumption and Assignment of Certain Contracts

---

any Successor or Other Liabilities, and such adverse interests and other liens, liabilities, claims and encumbrances have been and shall be terminated and declared to be unconditionally released, discharged and terminated, and such termination and release shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Sale Assets conveyed to the Purchasers (each, a "**Registration Party**"), provided that all liens and encumbrances shall attach to the sale proceeds with the same validity, and in the same priority, immediately prior to closing. Each Registration Party shall accept for filing any and all of the documents and instruments necessary and appropriate to release, discharge, and terminate any lien and encumbrance on, or interests in or to, the Sale Assets or to otherwise consummate the Sales and implement the terms of this Order.

7.    The closing of the Sales shall occur on or before the earlier of (such earliest date, the "**Closing Date**") April 18, 2025 and the date that is fifteen (15) days from the hearing at which the Court granted the Debtor's Sale Motion (the "**Closing Window**") which Closing shall take place at the offices of Debtor's counsel, or at some other place and manner as agreed by the parties, which may be through a remote electronic exchange of documents. The Purchasers may take title or assignment of one or more of the Sale Assets through one or more designees. All disbursements pursuant to the terms of this Order shall be made within two (2) days of the Closing. To the extent the Debtor is ready willing and able to deliver good and marketable title to the Sale Assets in

Page 14 of 24
In Re:                Nostrum Laboratories, Inc
Case No.:          24-19611
Caption of Order:  Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                        and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                        Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                        and the Assumption and Assignment of Certain Contracts

---

accordance with the provisions of the APAs including, among others, the Debtor's delivery of a

Notice of Readiness to Close (as defined in the APAs) and Closing does not occur by the

conclusion of the Closing Window and the Closing Window is not extended on the consent of the

parties, the Debtor shall be authorized to-retain such Purchaser's Deposit and to pursue such other

remedies available to the Debtor, in each case as permitted under the APAs.  The Debtor and each

Purchaser may amend the Closing Window (with respect to the Sale Assets that such Purchaser is

purchasing) by written agreement, in consultation with the Prepetition Lender (hereinafter defined)

without further relief from this Court.

8.    The transfers of the Sale Assets to the Purchasers pursuant to the Sale Motion

constitute legal, valid, and effective transfers of the Sale Assets, and shall vest the Purchasers  with

all right, title, and interest of the Debtor and to the relevant Sale Assets, free and clear of all adverse

interests including, among others, any Successor or Other Liabilities. The Debtor and the

Purchasers are authorized to effect the sales and transfers of property pursuant to the terms of this

Order and the Sale Motion, and compliance with State or local bulk sales and similar laws and

regulations, if any, is hereby waived.

9.    The Debtor has the full corporate power and authority to execute, deliver, and perform

its obligations under the APAs and all other documents contemplated thereby, and the Sales have

been duly and validly authorized by the necessary corporate action of the Debtor.

## Approval of the Assumptions and Assignments

Page 15 of 24
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    and the Assumption and Assignment of Certain Contracts

---

10.    The Debtor is hereby authorized and directed in accordance with sections 105(a) and

365 of the Bankruptcy Code to (a) assume and assign to the applicable Purchasers, effective upon

the Closing of the Sale, the applicable Assigned Contracts free and clear of all liens, claims, and

other interests of any kind or nature whatsoever, including any Successor or Other Liabilities, and

(b) execute and deliver to the applicable Purchasers such documents or other instruments as the

applicable Purchasers reasonably deem necessary to assign and transfer the applicable Assigned

Contracts.

11.    The Assigned Contracts are executory contracts under section 365 of the Bankruptcy

Code.  Any provisions in the Assigned Contracts that purport to prohibit or condition the assignment

of the Assigned Contracts or allow counterparties to the Assigned Contracts (the

"**Counterparties**") to terminate, recapture, impose any penalty, or modify any term or condition

upon the assignment of the Assigned Contracts, constitute unenforceable anti-assignment

provisions that are void and of no force and effect; all other requirements and conditions under

sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to

the Purchasers of the Assigned Contracts have been satisfied. The applicable Assigned Contracts

shall be transferred and assigned to, and following the closing of the Sale remain in full force and

effect for the benefit of, the applicable Purchasers, notwithstanding any provision in such Assigned

Contracts (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy

Code) that purports to prohibit, restrict, or condition such assignment or transfer.  Upon Closing, in

accordance with sections 363 and 365 of the Bankruptcy Code, the applicable Purchaser shall be

Page 16 of 24
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    and the Assumption and Assignment of Certain Contracts

---

fully and irrevocably vested in all rights and title to the applicable Assigned Contracts that it acquires at Closing.

12.   Purchasers acquiring Assigned Contracts shall pay any applicable Cure Costs (as defined in the APAs) relating solely to the Assigned Contract(s) that such Purchase acquires at Closing, or at such later time as may be mutually agreed upon by the Purchasers and any applicable Counterparties.  The applicable Purchaser's payment of the Cure Costs associated with Assigned Contracts that it acquires shall be in full satisfaction of the Counterparties' claims for defaults that may have arisen under such Assigned Contracts.  For the avoidance of doubt, only those executory Assigned Contracts that remain identified as Designated Contracts (as defined in the applicable APAs) as of the Closing Date will constitute Assigned Contracts and will be assumed by the Debtor and assigned to the respective Purchasers pursuant to this Order.  No Purchaser shall have any obligation to pay Cure Costs or any other obligation under any Contract that is not a Designated Contract.

## Miscellaneous Provisions

13.   On the Closing Date, this Order shall be construed and shall constitute a full and complete general assignment, conveyance, and transfer of the Debtor's interests in the applicable Sale Assets to the respective Purchasers.  Each and every federal, state, and local governmental agency, department, or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Sale Motion.

Page 17 of 24
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    and the Assumption and Assignment of Certain Contracts

---

14. All entities that are presently, or on the Closing Date may be, in possession of some or all of the Sale Assets are hereby directed to surrender possession of the relevant property to the Purchasers on the Closing Date.

15. Following the Closing Date, no holder of a claim against, lien upon or adverse interest in the Sale Assets or against the Debtor shall interfere with any of the Purchasers' title to or use and enjoyment of the Sale Assets based on or related to such claim, lien or adverse interests, or any actions that the Debtor may take in his Chapter 11 cases.

16. This Court shall retain jurisdiction to enforce and implement the terms and provisions of this Order, including, but not limited to, retaining jurisdiction to compel delivery of the Sale Assets to the Purchasers, interpret, implement, and enforce the provisions of this Order, and protect the Purchasers against any adverse interests against the Debtor, the Sale Assets and/or the proceeds of the Sale.

17. Nothing contained in any plan of reorganization or liquidation confirmed in the Bankruptcy Case or any order of this Court (including future orders) in the Bankruptcy Case (including any order dismissing the Bankruptcy Case and order(s) entered after any conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with or derogate from the terms of this Order and, to the extent of any such alteration, conflict or derogation, the terms of this Order shall control.

18. For cause shown, any applicable law or rule including, without limitation, Bankruptcy Rules 6004(h) and 6006(d) that might otherwise delay the effectiveness of this Order are hereby

Page 18 of 24
In Re:                  Nostrum Laboratories, Inc
Case No.:               24-19611
Caption of Order:       Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                        and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                        Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                        and the Assumption and Assignment of Certain Contracts

---

waived and shall not apply, and this Order shall be effective and enforceable immediately upon its entry. Accordingly, the Debtor and Purchasers are authorized and empowered to close the Sales without regard to any delay in the implementation of this Order.

19. The Debtor, the Committee, the Prepetition Lender (hereinafter defined), the Purchasers and each of their respective management, boards of directors, members, officers, directors, employees, agents, and representatives, acted in good faith. The APAs, and each of the transactions contemplated therein, were negotiated, proposed, and entered into by the Debtor and the Purchasers in good faith, without collusion or fraud, and from arm's-length bargaining positions. Each of the Purchasers is a "good faith purchaser" within the meaning of sections 363(m) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby in the event that this Order is modified, amended, vacated, or reversed by a subsequent order of this Court or any other court on appeal. No such appeal, modification, amendment, or vacatur shall affect the validity and enforcement of the sale or the liens or priority authorized or created under the APAs or this Order. Neither the Debtor, the Committee, the Prepetition Secured Lender nor any of the Purchasers has engaged in any conduct that would cause or permit the APAs to be avoided and/or costs and damages to be imposed under section 363(n) of the Bankruptcy Code, or that would prevent the application of section 363(m) of the Bankruptcy Code. The Purchasers have not violated section 363(n) of the Bankruptcy Code by any action or inaction. The Debtor was free to deal with any other party interested in buying or selling on behalf of the Debtor's estate some or all of the Sale Assets. The Purchasers have not acted in a collusive manner with any

In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    and the Assumption and Assignment of Certain Contracts

---

person and were not controlled by any agreement among bidders. The Purchasers' payments and

assumptions of amounts owing under the APAs are in good faith and for valid business purposes

and uses. The terms and provisions of the Sale Motion and this Order shall be binding in all

respects upon, and shall inure to the benefit of, the Debtor, the Purchasers, and their respective

affiliates, successors and assigns, the Debtor's estate and creditors, and any affected third parties

including, but not limited to, all persons asserting adverse interests upon or against the Sale Assets

to be sold to the Purchasers pursuant hereto, notwithstanding any subsequent appointment of any

trustee, responsible person, estate administrator, representative or similar person (a "**Responsible**

**Person**") for, or in connection with, the Debtor's estate or affairs in this case or in any subsequent

case under the Bankruptcy Code or State proceeding involving the Debtor, as to which Responsible

Person(s) such terms and provisions likewise shall be binding in all respects.

20.    Except with respect to the Assumed Liabilities and Determined Cure Costs, as

defined in the APAs, all persons and entities, including, but not limited to, all debt security holders,

equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors,

subcontractors, vendors, suppliers, materialmen, litigation claimants and other creditors holding

any liens, claims, rights, interest, or encumbrances of any kind or nature whatsoever including,

among other things, any Successor or Other Liabilities, against or in all or any portion of the Sale

Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or

non-contingent, liquidated or unliquidated or subordinate), arising under or out of, in connection

with, or in any way relating to the Debtor, the Sale Assets, the operation of the Debtor's business

prior to the Closing Date or the transfer of the Sale Assets to the Purchasers, hereby are forever

Page 20 of 24
In Re:            Nostrum Laboratories, Inc
Case No.:        24-19611
Caption of Order:    Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                 and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                 Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                 and the Assumption and Assignment of Certain Contracts

---

barred, estopped and permanently enjoined from asserting, against any Purchaser, any of each

Purchaser's affiliates, successors or assigns, their property, or the Sale Assets, such persons' or

entities' liens, claims, rights, interest, or encumbrances, other than with respect to any Assumed

Liabilities or Determined Cure Costs in and to the Sale Assets, including, without limitation the

following actions: (i) commencing or continuing in any manner any action or other proceeding

against any Purchaser, any of their affiliates, successors, assets or properties; (ii) enforcing,

attaching, collecting or recovery in any manner any judgment, award, decree or order against any

of the Purchasers, any of their affiliates, successors, assets or properties; (iii) creating, perfecting

or enforcing any lien or claim against the Purchasers, or any of their affiliates, successors, assets

or; (iv) commencing or continuing any action in any manner or place, that does not comply or is

inconsistent with the provisions of this Order other orders of the Court, or the agreements or actions

contemplated or taken in respect thereof; or (v) revoking, terminating or failing or refusing to

transfer or renew any license, permit or authorization to operate any of the Sale Assets or conduct

any of the business operated with the Sale Assets.

21.    Nothing in this Order shall be deemed to waive, release, extinguish, or estop the

Debtor, its estate or its creditors from asserting, or impairing or diminishing such rights to assert,

any right (including any right of recoupment), claim, cause of action, defense, offset or

counterclaim in respect of any Excluded Asset or other assets of the Debtor remaining after the

completion of the Closing.  On the date of the Closing, all proceeds from the consummation of

the Sale shall be paid first to fund the Carve-Out, as such term is defined in the *Final Order (I)*

*Authorizing the Debtor to Utilize Cash Collateral to (A) Pay Postpetition Associates' Wages,*

Page 21 of 24
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    and the Assumption and Assignment of Certain Contracts

---

*Salaries, Other Compensation and Reimbursable Expenses, (B) Continue the Associate Benefits Programs, and (C) Continue to Pay Key Vendors; and (II) Granting Related Relief* [Dkt. No. 186] (the "**Cash Collateral Order**"), with such Carve-Out funds to be deposited in the Debtor's counsel's trust account at closing and earmarked for funding the Carve-Out, whereupon such funding Citizens Bank N.A. (the "**Prepetition Lender**"), shall have no further obligation to fund the Carve-Out, and second for permanent application against the Prepetition Obligations, accrued Replacement Liens (as defined in the Cash Collateral Order) and the Adequate Protection Superpriority Claims (as defined in the Cash Collateral Order), which payments shall be deemed final and indefeasible. Notwithstanding the foregoing, Mylan Pharmaceuticals, Inc. ("Mylan") claims a first lien on and security interest in ANDA #076697 (Carbamazepine) and ANDA # 074118 (Piroxicam) (together, the "**Shared Proceeds ANDAS**"). In recognition of Prepetition Lender's funding of, among other things, the Carve-Out and the Debtor's use of Prepetition Lender's Cash Collateral, 51.9% of the gross proceeds of each of the Shared Proceeds ANDAs shall be paid over to Prepetition Lender and 48.1% of the gross proceeds of each of the Shared Proceeds ANDAs shall be paid over to Mylan, in each case which payments (a) shall be paid on the date of the Closing to each of Prepetition Lender and Mylan and (b) shall be deemed final and indefeasible.

22.    All payments to Prepetition Lender in connection herewith shall not be subject to subordination, defense, counterclaim or offset of any kind and shall otherwise be unavoidable.

23.    In respect of any Excluded Asset (as defined in the APAs) or other assets of the Debtor remaining after the consummation of the Sales, nothing in this Order shall (i) be deemed a waiver

Page 22 of 24
In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    and the Assumption and Assignment of Certain Contracts

---

of the rights and remedies of the Prepetition Lender under the Cash Collateral Order or the

Prepetition Loan Documents (as such term is defined in the Cash Collateral Order); (ii) affect in

any way the validity, perfection, priority or enforcement of the liens and claims granted to the

Prepetition Lender under the Prepetition Loan Documents or in connection with the Cash

Collateral Order; or (iii) affect or limit in any way the validity, perfection, priority or enforcement

of the Prepetition Liens, the Adequate Protection Superpriority Liens, or Replacement Liens, (each

as defined in the Cash Collateral Order), or any other rights and protections granted to the

Prepetition Lender under the Cash Collateral Order or under the Prepetition Loan Documents (as

defined in the Cash Collateral Order).

24.    Each APA and any related agreements, documents, or other instruments may be

modified, amended, or supplemented by the parties thereto and in accordance with the terms

thereof, and in consultation with the Prepetition Lender and the Committee, without further order

of the Court, provided that any such modification, amendment, or supplement does not have a

material adverse effect on the estate or on any non-consenting third party.

25.    The failure specifically to reference any particular provision of an APA in this Order

shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that

each APA is authorized and approved in its entirety; provided, however, that this Order shall

govern if any inconsistency exists between the APA (including all ancillary documents executed

in connection therewith) and this Order. Likewise, all of the provisions of this Order are

nonseverable and mutually dependent.

In Re:              Nostrum Laboratories, Inc
Case No.:           24-19611
Caption of Order:   Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code
                    and Bankruptcy Rules 2002, 6004 and 6006 Approving the
                    Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances
                    and the Assumption and Assignment of Certain Contracts

---

26.    Notwithstanding any provision to the contrary in this Order, any APAs, or any other document related to the Sales, nothing shall:

(a)    release, nullify, preclude or enjoin the enforcement of any police or regulatory power or any liability that any entity would be subject to as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the date of entry of this Order;

(b)    affect the setoff or recoupment rights of the United States;

(c)    confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code);

(d)    authorize the assumption, assignment, sale or other transfer of any federal (a) grants, (b) grant funds, (c) contracts, (d) agreements, (e) awards, (f) task orders, (g) property, (h) intellectual property, (i) patents, (j) leases, (k) certifications, (l) applications, (m) registrations, (n) billing numbers, (o) national provider identifiers, (p) provider transaction access numbers, (q) licenses, (r) permits, (s) covenants, (t) inventory, (u) guarantees, (v) indemnifications, (w) data, (x) records, or (y) any other interests belonging to the United States (collectively, "Federal Interests") without compliance by the Debtor and Purchasers with all terms of the Federal Interests and with all applicable non-bankruptcy law;

(e)    be interpreted to set cure amounts or to require the United States to novate, approve or otherwise consent to the sale, assumption, assignment or other

Page 24 of 24

| | |
|---|---|
| In Re: | Nostrum Laboratories, Inc |
| Case No.: | 24-19611 |
| Caption of Order: | Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 Approving the Sale of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances and the Assumption and Assignment of Certain Contracts |

---

transfer of any Federal Interests;

(f)    waive, alter or otherwise limit the United States' property rights; or

(g)    expand the scope of 11 U.S.C. § 525.

In the event of an inconsistency or conflict between any provision of the APAs and any provision of this Order, as to the United States, the provisions of this Order and federal law shall govern.

27.    The Court retains jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the APAs, and to adjudicate, if necessary, any disputes concerning or in any way relating to the Sales and this Order.

**ASSET PURCHASE AGREEMENT**

**by and between**

**BIONPHARMA, INC., as Purchaser,**

**and**

**NOSTRUM LABORATORIES, INC., as Seller**

**Dated as of _____, 2025[1]**

---

[1] Date to be inserted upon receipt of countersigned version.

## Table of Contents

**Page**

ARTICLE 1 DEFINED TERMS ...................................................................................2

    1.1    **Defined Terms** ...........................................................................2

    1.2    **Other Definitional and Interpretive Matters** ...................9

ARTICLE 2 THE PURCHASE AND SALE; CLOSING.............................................12

    2.1    **Purchase and Sale** .................................................................12

    2.2    **Excluded Assets** .....................................................................13

    2.3    **Assumption of Liabilities**.....................................................14

    2.4    **Excluded Liabilities** ...............................................................15

    2.5    **[Reserved]** ...................................................**Error! Bookmark not defined.**

    2.6    **Nontransferable Assets and Liabilities** ...............................15

    2.7    **Closing**....................................................................................15

    2.8    **Closing Deliveries of the Parties** .........................................16

    2.9    **Closing Consideration; Assumed Liabilities; Deposits; Holdback Amount**.......................................................................16

    2.10    **Transfer Taxes** .......................................................................17

    2.11    **Allocation of Purchase Price** ...............................................17

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLER ..........18

    3.1    **Organization, Good Standing and Other Matters** ...........18

    3.2    **Authority and Enforceability**...............................................18

    3.3    **No Conflict; Required Filings and Consents** .....................18

    3.4    **Litigation** ................................................................................19

    3.5    **Brokers and Finders** .............................................................19

    3.6    **Title to Assets.** .......................................................................19

    3.7    **Compliance with Applicable Laws; Regulatory Matters** ..19

    3.8    **No Other Representations or Warranties**............................20

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER ..........20

    4.1    **Organization, Good Standing and Other Matters** ...........20

    4.2    **Authority and Enforceability**...............................................21

    4.3    **No Conflict: Required Filings and Consents** .....................21

    4.4    **Financing** ................................................................................21

i

4.5 **Solvency** ........................................................................................21

4.6 **Litigation** .......................................................................................21

4.7 **Brokers and Finders** .....................................................................22

4.8 **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties** ...............22

4.9 **No Other Representations or Warranties** .....................................23

ARTICLE 5 BANKRUPTCY COURT MATTERS ..........................................23

5.1 **Competing Transaction** .................................................................23

5.2 **Bankruptcy Court Filings** ............................................................23

5.3 **[Reserved]** ..........................................................**Error! Bookmark not defined.**

ARTICLE 6 PRE-CLOSING COVENANTS .....................................................24

6.1 **Conduct of Business** ......................................................................24

6.2 **Access to Information; Confidentiality** ........................................24

6.3 **Efforts to Consummate** .................................................................25

6.4 **Public Announcements** ..................................................................26

6.5 **Update of Schedules; Knowledge of Breach** ................................26

ARTICLE 7 POST-CLOSING COVENANTS ...................................................26

7.1 **Access to Information; Books and Records** ..................................26

7.2 **Post-Closing Receipt and Possession of Assets** ...........................27

7.3 **Tax Matters** ...................................................................................27

ARTICLE 8 CONDITIONS PRECEDENT ........................................................28

8.1 **Conditions to Each Party's Obligation** ........................................28

8.2 **Conditions to Obligation of Purchaser** ........................................29

8.3 **Conditions to Obligations of the Seller** ........................................29

8.4 **Waiver of Condition; Frustration of Conditions** .........................29

8.5 **Delivery of a Notice of Readiness to Close** ...................................29

ARTICLE 9 TERMINATION .............................................................................30

9.1 **Events of Termination** ...................................................................30

9.2 **Effect of Termination** ....................................................................31

ARTICLE 10 GENERAL PROVISIONS ...........................................................31

10.1 **Survival of Representations, Warranties and Covenants** ...............31

10.2 **Entire Agreement** ..........................................................................31

10.3   **Amendment; No Waiver** ........................................................................................32

10.4   **Severability** ...........................................................................................................32

10.5   **Expenses and Obligations** ...................................................................................32

10.6   **Notices** ...................................................................................................................33

10.7   **Counterparts** .........................................................................................................34

10.8   **Governing Law** .....................................................................................................34

10.9   **Submission to Jurisdiction; Consent to Service of Process** ............................34

10.10  **Waiver of Jury Trial** ...........................................................................................35

10.11  **Rights Cumulative** ...............................................................................................35

10.12  **Assignment** ............................................................................................................35

10.13  **Specific Enforcement; Remedies** ........................................................................35

10.14  **Third-Party Beneficiaries** ...................................................................................36

## EXHIBITS

Exhibit A                              Bid Procedures Order

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of _____, 2025[2] (the "**Agreement Date**") is entered into by and between **BIONPHARMA INC.**, a Delaware corporation ("**Purchaser**") and **NOSTRUM LABORATORIES, INC.**, a New Jersey corporation (the "**Seller**").

## RECITALS

**WHEREAS,** on September 30, 2024 (the "**Petition Date**"), Seller filed voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), Case No. 24-19611/JKS thereby commencing a chapter 11 case (the "**Bankruptcy Case**"). No trustee has been appointed and the Seller is continuing in the management of its businesses and possession of its property as a debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Seller desires to sell (or cause to be sold) to Purchaser, and Purchaser desires to purchase from the Seller, all of the Transferred Assets Free and Clear, and the Seller desires Purchaser to assume, and Purchaser desires to assume from the Seller, all of the Assumed Liabilities, in each case upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, the Transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court and will only be consummated pursuant, among other things, to the Sale Order to be entered in the Bankruptcy Case;

**WHEREAS,** Seller anticipates filing a motion (the "**Sale Motion**") to approve the sale of certain assets and the assignment of certain contracts to the highest bidder pursuant to Sections 363 and 365 of the Bankruptcy Code and subject to certain rules and procedures that all bidders must comply with as a condition to participating in the bidding process (the "**Bidding Procedures**," copy annexed hereto as <u>Exhibit A</u>);

**WHEREAS**, in the event there are bidders wishing to bid, an auction will be held at which the Purchaser shall be allowed to participate, subject to its compliance with the Bidding Procedures, and there will occur a hearing in the Bankruptcy Court at which time the sale to the successful bidder shall be approved by the Bankruptcy Court by order of the Bankruptcy Court;

**WHEREAS**, concurrently with the execution of this Agreement, Purchaser shall deposit (or cause to be deposited) an aggregate amount equal to the Deposit Escrow Amount into the trust account of Seller's bankruptcy counsel, Broege, Neumann, Fischer & Shaver, LLC (the "**Deposit Trust Account**").

---

[2] Date to be inserted upon receipt of countersigned version.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.1 **Defined Terms**. The following terms shall have the following meanings in this Agreement:

"**Action**" means any action, proceeding, arbitration or litigation (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator.

"**Affiliate**" of any particular Person means any other Person, directly or indirectly, controlling, controlled by, or under common control with, such particular Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Agreement Date**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in Section 2.11(a).

"**ANDA**" means an Abbreviated New Drug Application (including any amendments and supplements thereto) filed with the FDA in accordance with Section 505(j) of the Federal Food, Drug and Cosmetic Act of 1938.

"**Applicable Law**" means, with respect to any Person, any federal, provincial, state, or local law, ordinance, principle of common law, code, regulation or statute applicable to such Person or such Person's subsidiaries or to any of their respective securities, assets, properties or businesses, including, but not limited to, the Federal Food Drug and Cosmetic Act (21 U.S.C. §§ 301 et seq.).

"**Assumed Liabilities**" means only the Liabilities arising solely out of Purchaser's ownership or operation of the Transferred Assets after the Closing Date and only to the extent not otherwise paid, performed, discharged or otherwise satisfied prior to the Closing.

"**Assumption Notice**" has the meaning set forth in Section 5.3(a).

"**Auction**" has the meaning set forth in Section 5.2(b).

"**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other claims, actions, rights, or remedies that may be brought by or on behalf of the Seller or its estate

2

or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including, but not limited to, actions or remedies under sections 510, 542, 543, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"**Back-Up Bid**" means the second highest or otherwise best bid if the successful bidder fails to consummate its bid in accordance with the Bid Procedures.

"**Back-up Termination Date**" means the first to occur of (a) fifteen days after the entry of the Sale Order, (b) consummation of the Transactions with the winning bidder at the Auction, (c) Purchaser's receipt of notice from the Seller of the release by the Seller of Purchaser's obligations under Section 5.2(b) and (d) April 25, 2025.

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bid Procedures**" means those certain bidding procedures for the sale of the Seller's assets approved by the Bankruptcy Court.

"**Bid Procedures Order**" means an Order of the Bankruptcy Court approving the Bid Procedures attached hereto as Exhibit A.

"**Bill of Sale and Assignment and Assumption Agreement**" means the bill of sale and assignment and assumption agreement, dated as of the Closing Date, by and between the Seller and Purchaser, in a form reasonably acceptable to counsel for Seller and Purchaser.

"**Business**" means the business of the Seller as currently conducted.

"**Business Day**" means any day other than (a) a Saturday, Sunday or federal holiday or (b) a day on which commercial banks in San Francisco, California are authorized or required to be closed.

"**Closing**" has the meaning set forth in Section 2.7.

"**Closing Consideration**" means the Purchase Price.

"**Closing Date**" has the meaning set forth in Section 2.7.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Competing Bid**" has the meaning set forth in Section 5.1.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of November 13, 2024, by and between the Seller and Purchaser.

"**Consent**" means any consent, approval, authorization, waiver or license.

"**Contract**" means any written agreement, mortgage, indenture, lease (whether for real or personal property), contract or subcontract.

"**Deposit Escrow Amount**" means the amount which equals the Purchase Price. Purchaser has paid $130,000 and $80,000 shall be returned to Purchaser.

"**Deposit Trust Account**" has the meaning set forth in the Recitals.

"**Designated Contracts**" has the meaning set forth in Section 5.3(b).

"**Designation Deadline**" has the meaning set forth in Section 5.3(b).

"**Enforceability Exceptions**" means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar Applicable Laws affecting the enforcement of creditors' rights generally and general equitable principles.

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Books and Records**" means the following originals and copies of those books and records, documents, data and information (in whatever form maintained) of the Seller and the Business: (a) all corporate minute books (and other similar corporate records) and stock records of the Seller, (b) any books and records relating to the Excluded Assets or (c) any books, records or other materials that Seller (i) is required by Applicable Law to retain (copies of which, to the extent permitted by Applicable Law, will be made available to Purchaser upon Purchaser's reasonable request) or (ii) is prohibited by Applicable Law from delivering to Purchaser or include attorney client communications, work product or other privileged materials.

"**Excluded Liabilities**" has the meaning set forth in Section 2.4.

"**FDA**" means the United States Food and Drug Administration.

"**FDA Transfer Letter**" means the letter(s) from the Seller to FDA in form and substance acceptable to Purchaser, in its reasonable discretion, notifying FDA of the transfer from the Seller to Purchaser of all of Seller's rights in the Transferred Assets set forth in Schedule 2.1(b).

"**Final Order**" means an Order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect; provided, that such Order shall be considered a Final Order only after the time period for third parties seeking appeal has expired without the filing of any appeal or motion for reconsideration.

"**Final Resolution**" has the meaning set forth in Section 2.9(d).

"**Free and Clear**" means free and clear of all Liens and Liabilities (other than Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

"**GAAP**" means generally accepted accounting principles in the United States as of the Agreement Date.

"**Governmental Authority**" means any domestic or foreign national, provincial, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, any court (including the Bankruptcy Court) or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS and the FDA).

"**Intellectual Property**" means any and all intellectual property and proprietary rights in any jurisdiction throughout the world, including rights arising from the following: (a) patents and patent applications, design rights, industrial design registrations and applications therefor, divisions, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, reexaminations, extensions and any provisional applications, and any foreign or international equivalent of any of the foregoing; (b) trademarks (whether registered, unregistered or applied for), service marks, trade dress, service names, trade names, brand names, product names, slogans, logos, business names, corporate names, and other source or business identifiers, all registrations and applications for registration thereof, and, in each case, together with all of the goodwill associated therewith; (c) works of authorship, copyrights and all registrations and applications for registration thereof; (d) trade secrets and know-how; (e) rights in formulae, methods, techniques, processes, assembly procedures, software, software code (in any form, including source code and executable or object code), subroutines, test results, test vectors, user interfaces, protocols, schematics, specifications, drawings, prototypes, molds and models, and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing), and (f) social media accounts, social media identifiers, internet domain name registrations.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge**" means (a) with regard to the Seller, the actual knowledge, after due inquiry, of Dr. Nirmal Mulye, John Foster, and Carlton Asher and (b) with regard to Purchaser, the actual knowledge, after due inquiry, of Meredith Cook.

"**Liabilities**" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to, or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"**Lien**" means all forms of lien (including mechanic's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Transferred Assets, and liens arising under the Bankruptcy Code), encumbrance, claim, defect or irregularity in title, pledge, mortgage, deed of trust, deed to secure debt, security interest, charge, transfer restriction or similar agreement or encumbrance, including any dedication under any gathering, transportation, treating, processing, fractionating, purchase, sale or similar agreements, or any other rights granted or consensual as or against any Transferred Assets including but not limited to easements, encroachments, rights of first refusal, options, or any other interest or right in

5

property that constitutes a lien or interest within the definition or adjudication of such terms under Section 101(37) of the Bankruptcy Code.

"**Loss**" means any loss, Liability, demand, claim, action, cause of action, cost, damage deficiency, Tax, penalty, fine or expense, whether or not arising out of any claims by or on behalf of any third party, including interest, penalties, reasonable legal fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing.  For the avoidance of doubt, "Loss" shall exclude punitive damages, except to the extent payable to a third party.

"**Material Adverse Effect**" means a material adverse effect on the Transferred Assets and Assumed Liabilities taken as a whole; provided, however, that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or may be, a Material Adverse Effect: (a) any change in, or effects arising from or relating to, general business or economic conditions affecting any industry in which the Business operates; (b) any change in, or effects arising from or relating to, the United States or foreign economies, or securities, banking or financial markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) debt defaults or other restructuring events of any country with respect to which bondholders take a discount to the debt of any country or any increases in the interest rates for any country's debt, (iii) any change in currency exchange rates, (iv) any decline or rise in the price of any security, commodity, contract or index and (v) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (c) any change from, or effects arising from or relating to, the occurrence, escalation or material worsening of any act of God or other calamity, natural disaster, pandemic or disease, outbreak, hostility, act of war, sabotage, cyber-attack or terrorism or military action; (d) any action taken by Purchaser or its Affiliates with respect to the Transactions or with respect to the Business; (e) any action taken, or failed to be taken, by the Seller at the request of or with the consent of Purchaser or any change from, or effects arising from or relating to, Purchaser's failure to consent to any action restricted by Section 6.1; (f) any change in, or effects arising from or relating to changes in, Applicable Law or accounting rules (including GAAP) or any interpretation thereof; (g) the failure of the Business to meet any of its projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or representatives); (h) national or international political, labor or social conditions; (i) any matter described in the Schedules or any matter of which Purchaser is aware as of the Agreement Date; (j) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement and the Transactions or the identity of the parties to this Agreement, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the Business; (k) the sale of any assets other than the Transferred Assets to any third parties by Seller or any of its Affiliates; (l) any effect arising or resulting from or related to the filing of the Bankruptcy Case; (m) any action required to be taken under any Applicable Law or Order; (n) seasonal changes in the results of operations of the Seller; (o) any epidemic, pandemic, outbreak of disease or other public health emergency (including COVID-19) or any escalation or worsening of any such conditions; (p) (1) any results, outcomes, data, adverse events or side effects arising from any clinical trials being conducted by or on behalf of the Seller or any competitor of the Seller (or the announcements thereof), (2) the determination by, or the delay of a determination by, the

6

FDA or any other applicable Governmental Authority, or any panel or advisory body empowered or appointed thereby, with respect to a clinical hold, acceptance, filing, designation (including de-designation for the accelerated approval pathway), approval, clearance, non-acceptance, hold, refusal to file, refusal to designate, non-approval, disapproval or non-clearance, or requirement to conduct additional clinical studies or trials, with respect to any of the Seller's or any competitor's product candidates or (3) FDA approval (or other clinical or regulatory developments), market entry or pending market entry of any product competitive with or related to any of the products or product candidates of the Seller, or any guidance, announcement or publication by the FDA or other applicable Governmental Authority relating to any product candidates of the Seller or any competitor; or (q) any objections made in the Bankruptcy Court to this Agreement, the Transactions, the Sale Order or the reorganization, any orders of the Bankruptcy Court and any actions or omissions of the Seller in compliance with any order of the Bankruptcy Court and the assumption or rejection of any Assigned Contract.

"**Non-Transferred Asset**" has the meaning set forth in Section 2.6(a).

"**Order**" means any award, decision, injunction, judgment, ruling or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator, whether preliminary, interlocutory or final, including by the Bankruptcy Court.

"**Organizational Documents**" means (a) the articles or certificates of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in clauses (a) through (d), and (f) any amendment to or equivalent of any of the foregoing.

"**Outside Date**" has the meaning set forth in Section 9.1(g).

"**Owned Intellectual Property**" means the Intellectual Property owned by the Seller that is exclusively related to the Transferred Assets.

"**Permit**" means all permits, authorizations, certificates, franchises, consents, waivers, licenses, filings and other approvals from any Governmental Authority.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

"**Personal Information**" means any information in the possession or control of the Seller (solely as related to the Business) about an identifiable individual other than the name, title or business address, business email address or telephone number of any employee of the Seller.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Pre-Closing Tax Claim**" has the meaning set forth in Section 7.3(d).

"**Pre-Closing Tax Period**" has the meaning set forth in <u>Section 7.3(a)</u>.

"**Product ANDA**" means, for each of the Products listed on <u>Schedule 2.1(b)</u>, the ANDA for each Product, and any and all submissions, amendments and supplements thereto, that have been filed with (whether or not accepted for filing) and approved by (or filed with) the FDA granting or seeking authorization and approval to manufacture, package, ship and sell such Products, as more fully defined in 21 C.F.R. Part 314. The term "Product ANDA(s)" includes the materials contained in the official ANDA dossier and files, including all ANDA submissions, amendments, correspondence (including correspondence with the FDA field offices, FDA laboratories, FDA compliance offices and OPDP), reports and memoranda of telephone conversations, constituting or reflecting communications regarding any of the Product ANDAs. The term "Product ANDA(s)" also includes such materials in the working regulatory and clinical files of Seller or in the Seller's control pertaining to the conduct of upcoming annual reviews of the Products and required reports to the FDA that have yet to be filed.

"**Products**" means the approved products, which are manufactured pursuant to a Product ANDA to be purchased pursuant to this Agreement, as listed on <u>Schedule 2.1(b)</u>.

"**Public Health Measures**" means any closures, "shelter-in-place," "stay at home," workforce reduction, social distancing, shut down, closure, curfew or other restrictions or any other Applicable Law, Orders, directives, guidelines or recommendations issued by any Governmental Authority, the Centers for Disease Control and Prevention, the World Health Organization, or any industry group in connection with COVID-19 or any other epidemic, pandemic, or outbreak of disease, or in connection with or in response to any other public health conditions.

"**Purchase Price**" means $50,000.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Schedules**" has the meaning set forth in <u>Article 4</u>.

"**Related Claims**" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents and any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions or the relationship between the parties (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

"**Related Documents**" means the Bill of Sale and Assignment and Assumption Agreement; <u>provided</u>, <u>however</u>, that the Bill of Sale and Assignment and Assumption Agreement shall not be a Related Document solely for purposes of applying the provisions in <u>Article 10</u> to the extent, and only to the extent, that any such document expressly conflicts with <u>Article 10</u>.

"**Sale Motion**" has the meaning set forth in the Recitals.

8

"**Sale Order**" means an Order of the Bankruptcy Court issued pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code in form and substance reasonably satisfactory to the Seller and Purchaser in all material respects.

"**Schedules**" has the meaning set forth in Article 3.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Taxes**" has the meaning set forth in Section 7.3(c).

"**Solvent**" when used with respect to any Person, means that, as of any date of determination, (a) the fair salable value (determined on a going concern basis) of its assets and property will, as of such date, exceed the amounts required to pay its debts as they become absolute and mature, as of such date, (b) such Person will have adequate capital to carry on its business and (c) such Person will be able to pay its debts as they become absolute and mature, in the ordinary course of business, taking into account the timing of and amounts of cash to be received by it and the timing of and amounts of cash to be payable on or in respect of its indebtedness.

"**Straddle Period**" has the meaning set forth in Section 7.3(b).

"**Tax**" means (i) any ad valorem, alternative or add-on (including Section 59A of the Code), income, franchise, branch profits, capital gains, gross receipts, estimated, employment, excise, goods and services, severance, stamp, documentary, value-added, sales, use, property, registration, transfer, payroll, social security, withholding or other tax, duty, charge, fee, levy or other assessment, and any related fine, penalty, interest, or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority and (ii) any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation, agreement or arrangement to indemnify any Person or other entity.

"**Tax Proceeding**" means any audit, appeal, challenge, proceeding, controversy, dispute, claim, information request or assessment with respect to Taxes.

"**Tax Return**" means any return (including any information return), disclosure, report, statement, schedule, notice, form, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection, or payment, of any Tax.

"**Transactions**" means the transactions contemplated by this Agreement and the Related Documents.

"**Transfer Taxes**" has the meaning set forth in Section 2.10.

"**Transferred Assets**" has the meaning set forth in Section 2.1.

1.2    **Other Definitional and Interpretive Matters**.

(a)      Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

(i)      <u>Calculation of Time Period</u>. All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)      <u>Dollars</u>. Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement, the Related Documents or the Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties hereto to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement, the Related Documents or the Schedules.

(iii)      <u>Exhibits/Schedules</u>. The Exhibits and Schedules to this Agreement are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent the relevance of such disclosure to such other Schedule is reasonably apparent on the face of such disclosure. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Applicable Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)      <u>Gender and Number</u>. Any reference to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)      <u>Headings</u>. The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or Related Document, as applicable. Unless otherwise specified, all references in this Agreement to any "Section" or other subdivision are to the corresponding section or subdivision of this Agreement, and all references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vi)  Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)  Or. The word "or" shall be construed in the inclusive sense of "and/or" unless otherwise specified.

(viii)  Including. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)  Successors. A reference to any party to this Agreement, any Related Document or any other agreement or document shall include such party's successors and permitted assigns.

(x)  Legislation. A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(xi)  Reflected On or Set Forth In. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statement, to the extent any such phrase appears in such representation or warranty, if (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that relates to the subject matter of such representation, (B) such item is otherwise specifically set forth on the balance sheet or financial statement or (C) such item is set forth in the notes to the balance sheet or financial statement.

(xii)  Made Available. Any reference in this Agreement to "made available" means a document or other item of information that was provided or made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions.

(b)  All representations and warranties set forth in this Agreement or the Related Documents are contractual in nature only and subject to the sole and exclusive remedies set forth herein. The parties have agreed that should any representations and warranties of any party prove untrue, the other parties shall have the specific rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort or otherwise) are permitted to any party hereto as a result of the untruth of any such representation and warranty. The phrase "to Seller's Knowledge" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or

11

warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c)      The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the Related Documents and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement and the Related Documents. The parties hereto agree that changes from earlier drafts to the final version of this Agreement do not necessarily imply that the party agreeing to such change is agreeing to a change in meaning (as the party agreeing to such change may believe the change is stylistic and non-substantive); consequently, no presumption should exist by virtue of a change from a prior draft.

## ARTICLE 2
## THE PURCHASE AND SALE; CLOSING

2.1    **Purchase and Sale**. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, in exchange for an aggregate payment from Purchaser to the Seller equal to the Closing Consideration, Purchaser shall purchase, assume and accept from the Seller, and the Seller shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear, all of the rights, title and interests in, to and under the following assets and interests (collectively, the "**Transferred Assets**"):

(a)      Finished goods product samples and any raw materials and active pharmaceutical ingredients for the Transferred Assets in Seller's possession and control and that is further described by category, quantity and unit of measure, lot number and storage location in Schedule 2.1(a);

(b)      the Product ANDAs set forth in Schedule 2.1(b);

(c)      [Reserved];

(d)      all material original books and records, documents, data and information of the Seller solely related to the Transferred Assets, including: (i) supplier and vendor lists, (ii) promotional materials, (iii) customer lists, (iv) market research materials, (v) materials used in connection with the sale and promotion of the products, and (vi) other business records required to be transferred to Purchaser under applicable law, other than the Excluded Books and Records; provided, however, that the Seller shall be entitled to retain copies of any such materials;

(e)      annual and periodic reports relating to the Product ANDAs which have been filed by or on behalf of Seller or a prior owner of the Product ANDAs with the FDA or equivalent Governmental Authority and adverse event reports pertaining to the Products, in each case as are in Seller's or its Affiliate's possession or control;

(f)      all intangible assets, including without limitation, the names, logos and symbols used by Seller in connection with the Transferred Assets;

(g)     all of the Seller's rights, claims or causes of action against third parties relating to the assets, properties, business or operations of the Seller with respect to the Transferred Assets and the Assumed Liabilities (including all guaranties, warranties, indemnities and similar rights in favor of the Seller or any its Affiliates to the extent solely related to the Transferred Assets or the Assumed Liabilities), in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date, except for such rights, claims and causes of related to the Excluded Assets or Excluded Liabilities; and

(h)     all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, choses in action, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively used in or held for use for the Transferred Assets listed in clauses (a) through (g) above or the Assumed Liabilities; and

(i)     all goodwill associated with or symbolized by any of the foregoing Transferred Assets described in clauses (a) through (h) above.

2.2     **Excluded Assets**. Notwithstanding the provisions of Section 2.1 or anything to the contrary herein, any and all assets, rights and properties of the Seller that are not specifically identified in Section 2.1 as Transferred Assets, including the following (collectively, the "**Excluded Assets**"), shall be retained by the Seller, and Purchaser and its designees shall acquire no right, title or interest in the Excluded Assets in connection with the Transaction:

(a)     all (i) cash and cash equivalents, wherever located, including bank balances and bank accounts or safe deposit boxes, monies in the possession of any banks, savings and loans or trust companies and similar cash items, (ii) escrow monies and deposits in the possession of landlords and utility companies, and (iii) investment securities and other short- and medium-term investments;

(b)     all records, documents or other information exclusively relating to current or former employees of the Seller that are not hired by Purchaser, and any materials to the extent containing information about any employee, disclosure of which would violate Applicable Law or such employee's reasonable expectation of privacy;

(c)     any interest of the Seller under this Agreement or the Related Documents, including, without limitation, the right to receive the Purchase Price and to enforce the Seller's rights and remedies thereunder;

(d)     all Contracts (including all prepaid assets relating to such Contracts), other than the Designated Contracts, to which Seller is a party;

(e)     any (i) attorney-client work product or communications prior to the Closing Date between Seller (including any one or more officers, directors or stockholders of Seller), on the one hand, and its counsel, on the other hand, and (ii) claims under any director and officer, errors and omissions, fiduciary and commercial crime insurance policies;

13

(f)     all Permits (including applications therefor and any trade or import/export Permits) that (i) are not solely related to the Transferred Assets, or (ii) are not transferable to Purchaser under Applicable Law;

(g)     the Excluded Books and Records;

(h)     accounts receivable, intercompany obligations and other amounts receivable by Seller;

(i)     any assets not otherwise designated as Transferred Assets or from time to time designated by the parties hereto as Excluded Assets;

(j)     the Avoidance Actions;

(k)     all of the Seller's rights, claims or causes of action (i) against third parties relating to the assets, properties, business or operations of the Seller (including all guaranties, warranties, indemnities and similar rights in favor of the Seller or any of its Affiliates) to the extent arising under the Bankruptcy Code or relating to any of the Excluded Assets or Excluded Liabilities, or (ii) against any third parties that have a familial relationship with any members of the Debtor's management team or entities in which such third parties hold an interest, the Debtor's owners or the Debtor's employees, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date; for the avoidance of doubt and notwithstanding anything else herein to the contrary, all of the Seller's rights, claims and causes of action, including Avoidance Actions, against any of the Seller's affiliates, insiders, subsidiaries, and parents shall be Excluded Assets; and

(l)     [Reserved]

(m)     all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively related to or exclusively used in or held for use for the Excluded Assets listed in clauses (a) through (l) above.

Notwithstanding anything to the contrary contained in this Agreement or any of the other Related Documents, Purchaser acknowledges and agrees that all of the following are also Excluded Assets, and all right, title and interest in and to all Excluded Assets shall be retained by the Seller and shall remain the property of the Seller (and shall expressly be excluded from the sale, transfer, assignment and conveyance to Purchaser hereunder), and neither Purchaser nor any of its Affiliates shall have any interest therein: (x) all records and reports prepared or received by the Seller or any of its Affiliates in connection with the sale of the Business and the Transactions, including all analyses relating to the Business or Purchaser so prepared or received; and (y) all confidentiality agreements with prospective purchasers of the Business or any portion thereof and all bids and expressions of interest received from third parties with respect thereto.

2.3     **Assumption of Liabilities**. On the terms and subject to the conditions set forth in this Agreement, Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms the Assumed Liabilities.

2.4    **Excluded Liabilities**. Notwithstanding Section 2.3, Purchaser is assuming only the Assumed Liabilities of the Seller and will not assume or be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, in each case, that are not Assumed Liabilities (all such Liabilities not being assumed herein referred to as the "**Excluded Liabilities**"), and the Seller shall retain, be responsible for, pay, perform, discharge, or otherwise satisfy in accordance with their respective terms all Liabilities that are not Assumed Liabilities, including all Liabilities related to Excluded Assets. For the avoidance of doubt, "Excluded Liabilities" includes any and all Liabilities arising out of, relating to, resulting from or in connection with any credits, rebates, returns or chargebacks, in each case to the extent attributable to the Products distributed or sold by the Seller prior to the Closing Date.

[Reserved].

2.5    **Nontransferable Assets and Liabilities**.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Governmental Authority) (after giving effect to the Sale Order or any other applicable order of the Bankruptcy Court that effects such transfer without any required Consents), would constitute a breach or other contravention thereof or a violation of Applicable Law (each, a "**Non-Transferred Asset**").

(b)    If, on the Closing Date, any third-party Consent is not obtained for a Non-Transferred Asset, or if an attempted transfer or assignment thereof would be ineffective or a violation of Applicable Law, then, until any requisite consent is obtained therefor and the same is transferred and assigned to Purchaser or its designee, each such Non-Transferred Asset shall be held by the Seller as agent for the Purchaser, and the Seller shall, to the extent permitted by Applicable Law, provide to Purchaser the benefits and, subject to Purchaser's receipt of such benefits, Purchaser shall assume the obligations and bear the economic burdens associated with such Non-Transferred Asset. The Seller and Purchaser shall use commercially reasonable efforts to enter into agreements (including subcontracting, sublicensing or subleasing, if permitted) by which (i) the Seller shall without interruption of the Business, provide Purchaser with the economic and operational equivalent of obtaining the requisite third-party Consent and assigning the applicable Non-Transferred Asset to Purchaser (including, with the prior written consent of Purchaser, enforcing for the benefit of Purchaser, and at Purchaser's sole expense, all claims or rights arising thereunder) and (ii) Purchaser shall perform, at its sole expense, the obligations and assume the economic burdens of the Seller to be performed after the Closing with respect to such Non-Transferred Asset.

2.6    **Closing**. The closing of the Transactions (the "**Closing**") will take place remotely by electronic exchange of documents on the date (the "**Closing Date**") that is the second (2nd)

15

Business Day after the date on which all of the conditions set forth in <u>Article 8</u> (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the party hereto entitled the benefit of the same, unless another time or date is agreed to in writing by the parties hereto. Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all parties hereto at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.  The Closing Date shall be no later than the Outside Date.

2.7    **Closing Deliveries of the Parties**. At or prior to the Closing:

(a)    Purchaser and the Seller shall execute and deliver the Bill of Sale and Assignment and Assumption Agreement;

(b)    Purchaser and the Seller shall transmit Purchaser's FDA Transfer Letter and the Seller's FDA Transfer Letters, respectively, to the FDA and shall take other actions reasonably necessary to effect the transfer of the Transferred Assets from the Seller to Purchaser;

(c)    Purchaser shall deliver, or cause to be delivered, to the Seller or the applicable Person each of the following:

(i)    a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in <u>Section 8.3(a)</u> and <u>Section 8.3(b)</u>; and

(ii)    payment of the Closing Consideration, less the Deposit Escrow Amount, as set forth in <u>Section 2.9</u>.

(d)    the Seller shall deliver, or cause to be delivered, to Purchaser or the applicable Person each of the following:

(i)    a certificate, dated as of the Closing Date, executed by or on behalf of the Seller as to the satisfaction of the conditions set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u>; and

(ii)    an accurate, executed and complete IRS Form W-9 of the Seller;

(iii)    the Sale Order; and

(iv)    all stability samples, batches, data, protocols and other documentation with respect to stability testing for the Products.

2.8    **Closing Consideration; Assumed Liabilities; Deposits; Holdback Amount**.

(a)    At the Closing, upon the terms and subject to the conditions set forth in this Agreement, in full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser, the use and benefit of any Non-Transferred Asset, and assumption

16

of the Assumed Liabilities by Purchaser, Purchaser shall (i) pay to the Seller an aggregate amount equal to the Closing Consideration *minus* the Deposit Escrow Amount; and (ii) assume the Assumed Liabilities.

(b)     At the Closing, upon the terms and subject to the conditions set forth in this Agreement, Purchaser will assume and become responsible for the Assumed Liabilities. Purchaser agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms hereof.

(c)     The Deposit Escrow Amount shall be released to Seller or Purchaser in accordance with the applicable terms of this Agreement.  Any issue regarding the entitlement to the Deposit Escrow Amount shall be determined by the Bankruptcy Court, and Purchaser consents to the jurisdiction of the Bankruptcy Court for any issue related to this Agreement.

(d)     [Reserved]

(e)     Purchaser and each of its Affiliates and agents shall be entitled to deduct and withhold from the payment of any amounts (or any portion thereof) payable pursuant to this Agreement (or any agreements, documents or instruments entered into pursuant to this Agreement) that Purchaser is required to deduct and withhold with respect to the making of such payment under any Applicable Law.  If Purchaser intends to deduct or withhold any amount as required by any Tax law from any payment made to the Seller pursuant to this Agreement, Purchaser shall (i) promptly provide the Seller advance notice of its intent to deduct or withhold such amounts, and (ii) provide a reasonable opportunity for the Seller to provide forms, documents or other evidence that would mitigate, reduce or eliminate such deduction or withholding. To the extent that amounts are so deducted and withheld, Purchaser shall promptly remit such amounts to the applicable Governmental Authority and such amounts shall be treated for all purposes of this Agreement as having been paid to the applicable payee to whom such amounts would otherwise have been paid.

2.9     **Transfer Taxes**. It is the intention of the Purchaser and the Seller that the Transactions be exempt from all transfer, documentary, sales, use, excise, stock transfer, value-added, stamp, recording, registration and other similar Taxes, together with any conveyance fees, recording charges and other similar fees and charges, incurred in connection with this Agreement and the Transactions (collectively, "**Transfer Taxes**") pursuant to the Bankruptcy Code. Purchaser and the Seller shall cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes due with respect to the Transactions. In the event any Transfer Taxes are required to be paid with respect to the Transactions, Purchaser shall pay such Transfer Taxes, and Purchaser and the Seller shall cooperate in the preparation and filing of any Tax Returns required under Applicable Law with respect to such Transfer Taxes.

2.10     **Allocation of Purchase Price**.

(a)     The Purchase Price (including all other amounts treated as consideration for U.S. federal income tax purposes) and Assumed Liabilities shall be allocated among the Transferred Assets as set forth on Schedule 2.11 (the "**Allocation Schedule**").

(b)      Purchaser and the Seller shall (i) timely file all Tax Returns required to be filed in connection with the Allocation Schedule, and (ii) prepare and file all Tax Returns and determine all Taxes in a manner consistent with the Allocation Schedule, except as may be required by a change in law after the date of this Agreement, a closing agreement with an applicable Governmental Authority, or a final judgment of a court of competent jurisdiction and, except as may be necessary to reflect adjustments to the Allocation Schedule resulting from post-Closing payments. Purchaser, on the one hand, and the Seller, on the other hand, shall notify the other if it receives notice that any Governmental Authority proposes any allocation different from Allocation Schedule.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as disclosed in a document herewith delivered by the Seller to Purchaser (the "**Schedules**"), the Seller hereby makes the representations and warranties contained in this Article 3 to Purchaser.

3.1      **Organization, Good Standing and Other Matters**. The Seller is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite corporate power and authority to operate the Business and necessary to own, lease or operate the properties and assets owned, leased or operated by it to carry on the Business as now being conducted, except where the failure to be so duly organized, validly existing and in good standing, or to have such power and authority, would not, individually or in the aggregate, have a Material Adverse Effect. The Seller is duly qualified to do business as a foreign company in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

3.2      **Authority and Enforceability**. Subject to Bankruptcy Court approval, the Seller has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which the Seller is (or at Closing, will be) a party thereto, and the consummation by the Seller of the Transactions, have been duly authorized and approved by all necessary corporate action on the part of the Seller and are subject to the approval of the Bankruptcy Court. This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by the Seller and, assuming the due execution and delivery by the other parties hereto or thereto, and subject to the approval of the Bankruptcy Court, constitutes a valid and binding obligation of the Seller, enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

3.3      **No Conflict; Required Filings and Consents**. The execution and delivery of this Agreement by the Seller does not and the execution and delivery of the Related Documents by the Seller will not, and the consummation of the Transactions hereby and thereby will not (a) violate the provisions of the Organizational Documents of the Seller, (b) subject to the entry of the Sale Order, violate any Applicable Law or Order to which Seller is subject or by which its properties

18

or assets are bound, (c) require Seller to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order), (d) violate, conflict with, result in a breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both would become a default) under, any Contract to which the Transferred Assets are bound, or (e) result in the creation of any Lien upon any of the Transferred Assets; excluding from the foregoing <u>clauses (b), (c), (d)</u> and (<u>e</u>) any Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, have a Material Adverse Effect.

3.4    **<u>Litigation</u>**. There is no Action pending or, to the Seller's Knowledge, formally threatened in writing, against Seller before any Governmental Authority that would have a Material Adverse Effect or affect the Transferred Assets in any material respect after the entry of the Sale Order.

3.5    **<u>Brokers and Finders</u>**. Except for Raymond James & Associates, Inc. the Seller has not, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

3.6    <u>**Title to Assets.**</u>

(a)    The Seller owns all Transferred Assets and has good, legal valid and marketable title to, and the right to transfer (or cause to be transferred) in accordance with the terms of this Agreement, all of the Transferred Assets Free and Clear.

(b)    Seller is not a party to, or bound by, (i) any license, royalty agreement, or other agreement relating to the use of any Transferred Assets or (ii) any Contract required for the ownership, use or operation of the Transferred Assets.

(c)    [Reserved]

(d)    No current or former Affiliate, partner, director, stockholder, officer, member, manager, employee, consultant or contractor of the Seller will, after giving effect to the Transactions, own, license or retain any Transferred Assets.

(e)    To Seller's Knowledge, no interference, opposition, reissue, reexamination, or other proceeding is or has been pending or threatened, in which the scope, validity, or enforceability of any Transferred Assets is being, has been challenged.

(f)    There is no Owned Intellectual Property.

3.7    **<u>Compliance with Applicable Laws; Regulatory Matters</u>**.

(a)    Any representations made in Sections (b) and (c) herein are subject to the exclusions and/or additional representations provided on Schedule 3.7 attached hereto.

(b)    Except in each case as would not, individually or in the aggregate, reasonably be expected have a Material Adverse Effect, (i) the Seller is and since January 1, 2022

has been, in compliance with all Applicable Laws and (ii) the Seller is not and since January 1, 2022, has not been subject to any Action or Order relating to or arising under a violation of any Applicable Laws, and, to the Knowledge of the Seller, no such Action has been threatened in writing.

(c)     The Seller is in compliance in all material respects with the Seller's adverse event reporting and other obligations with respect to the Product ANDAs. The Seller has not received any notice from the FDA that would be expected to lead to revocation of a Product ANDA.

3.8     <u>**No Other Representations or Warranties**</u>.

(a)     Except for the representations and warranties contained in this <u>Article 3</u>, the Seller does not, nor do any other Persons on behalf of the Seller, make any other express or implied representation or warranty with respect to itself, the Business, the Transferred Assets or the Assumed Liabilities, or with respect to any other information provided to Purchaser or its representatives, and the Seller disclaims any other representations or warranties, whether made by or on behalf of the Seller or any other Person. The Seller will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

(b)     Except for the specific representations and warranties expressly made by Purchaser in <u>Article 4</u> as further limited by the specifically bargained-for exclusive remedies as set forth in <u>Article 9</u> and <u>Article 10</u> of this Agreement, the Seller acknowledges and agrees that Purchaser is not making and has not made any representation or warranty, expressed or implied, at law or in equity.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed in a document herewith delivered by Purchaser to the Seller (the "**Purchaser Schedules**"), Purchaser hereby makes the representations and warranties contained in this <u>Article 4</u> to the Seller.

4.1     <u>**Organization, Good Standing and Other Matters**</u>. Purchaser is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has all requisite corporate power or other entity power and authority to own its properties and to carry on its business as now being conducted. Purchaser is duly qualified or licensed to conduct its business as currently conducted and is in good standing in each jurisdiction in which the location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary, except where the failure to be so qualified or licensed would not,

20

individually or in the aggregate, materially impair or delay Purchaser's ability to consummate the Transactions.

4.2     **Authority and Enforceability**. Purchaser has all requisite corporate power or other entity power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized and approved by its board of directors (or equivalent governing body) and no other action on the part of Purchaser or its stockholders is necessary to authorize the execution, delivery and performance of this Agreement and the Related Documents by Purchaser and the consummation of the Transactions. This Agreement has been, and each Related Document will be at or prior to Closing, duly executed and delivered by Purchaser and, assuming the due execution and delivery by the other parties hereto or thereto, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

4.3     **No Conflict: Required Filings and Consents**. The execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (a) violate the provisions of its Organizational Documents, (b) violate any Applicable Law or Order to which it is subject or by which any of its properties or assets are bound or (c) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order).

4.4     **Financing**. Purchaser has, and at the Closing will have, (a) sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price in accordance with the terms hereof and any other payments required hereunder and any expenses incurred or required to be paid by Purchaser in connection with the Transactions, and (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Documents. Purchaser has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

4.5     **Solvency**. Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors. Immediately after giving effect to all of the Transactions, including the making of the payments contemplated by Section 2.9, and assuming satisfaction of the conditions to Purchaser's obligation to consummate the Transactions as set forth herein, the accuracy of the representations and warranties of Purchaser set forth herein and the performance by Purchaser of its obligations hereunder in all material respects, Purchaser will be Solvent.

4.6     **Litigation**. There is no Action pending or, to Purchaser's Knowledge, formally threatened in writing against Purchaser or involving any of its properties or assets that would be reasonably be expected to (a) have a material adverse effect on the ability of Purchaser to perform

its obligations under this Agreement or (b) otherwise prevent, hinder or delay the consummation of the Transactions.

4.7   **Brokers and Finders**. None of Purchaser or its Affiliates have, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

4.8   **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties**.

(a)   Purchaser acknowledges that it and its representatives have received access to such books and records, facilities, equipment, contracts and other assets of the Business which it and its representatives have desired or requested to review. Purchaser acknowledges and agrees that (i) it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Seller, the Business, the Transferred Assets and the Assumed Liabilities and (ii) the Business, the Transferred Assets and the Assumed Liabilities are being transferred and acquired on a "where is" and, as to condition, "as is" and "with all faults" basis.

(b)   Except for the specific representations and warranties expressly made by the Seller in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement, Purchaser acknowledges and agrees that (i) the Seller is not making and has not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Business, the Transferred Assets, the Assumed Liabilities, or any of its operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, stockholder, agent, Affiliate, advisor, representative or employee of the Seller has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in Article 3 and subject to the limited remedies herein provided.

(c)   Other than the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement, Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Seller and the Seller's Affiliates have specifically disclaimed and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance on any such other representation or warranty made by any Person. Purchaser specifically waives any obligation or duty by the Seller or the Seller's Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties expressly set forth in Article 3 and disclaim reliance on any information not specifically required to be provided or disclosed pursuant to the specific representations and warranties set forth in Article 3.

(d)    Purchaser is acquiring the Business, the Transferred Assets and the Assumed Liabilities subject only to the specific representations and warranties expressly set forth in <u>Article 3</u> as further limited by the specifically bargained-for exclusive remedies as set forth in <u>Article 9</u> of this Agreement.

4.9    <u>**No Other Representations or Warranties.**</u> Except for the representations and warranties contained in this <u>Article 4</u>, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Seller or its representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Affiliates, officers, directors, employees, agents or representatives.

**ARTICLE 5**
**BANKRUPTCY COURT MATTERS**

5.1    <u>**Competing Transaction**</u>.    This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise) in accordance with the terms of the Bid Procedures Order (each, a "<u>**Competing Bid**</u>"). From the Agreement Date (and any prior time) and until the completion of the Auction, the Seller is permitted to, and to cause its representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any reorganization, sale or other disposition of the Transferred Assets. In addition, the Seller shall have the authority to respond to any inquiries or offers to reorganize, purchase all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bid Procedures Order or other Applicable Law, including supplying information relating to the Business and the assets of the Seller to prospective plan sponsors or purchasers.

<u>**Bankruptcy Court Filings**</u>.

(a)    The Seller shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Transferred Assets and the Assumed Liabilities to Purchaser Free and Clear and free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code and provide that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. The Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order and causing such Sale Order to be a Final Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

23

(b)      [Reserved]

(c)      [Reserved]

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1      **Conduct of Business**. Except as may be approved by Purchaser (which approval will not be unreasonably withheld, delayed or conditioned; provided, however, that the consent of Purchaser shall be deemed to have been given if Purchaser does not object within 48 hours after written request for such consent is provided by the Seller to Purchaser), (iii) for actions taken or omitted to be taken by the Seller in response to any Public Health Measure, or (iv) as is otherwise contemplated or required by this Agreement, any Assigned Contract, by Applicable Laws or by order of the Bankruptcy Court, from the Agreement Date through the earlier of the Closing Date or the termination of this Agreement in accordance with its terms:

(a)      The Seller shall use its commercially reasonable efforts to carry on the Business in all material respects in the ordinary course of business as it has been conducted since the Petition Date; and

(b)      The Seller shall not:

(i)      sell, license, abandon or otherwise dispose of any material asset or property constituting Transferred Assets other than inventory in the ordinary course of business;

(ii)      (A) change any material Tax election, file any material amended Tax Return, enter into any closing agreement, settle any material Tax Proceeding, in each case, relating to the Business or the Transferred Assets, or (B) consent to any extension or waiver of the limitation period applicable to any material Tax Proceeding relating to the Business or the Transferred Assets; or

(iii)      change its present accounting methods or principles in any material respect, except as required by GAAP or Applicable Law.

(c)      Notwithstanding anything to the contrary, nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the Business, assets and operations prior to the Closing. Prior to the Closing, the Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its Business, assets and operations.

6.2      **Access to Information; Confidentiality**.

(a)      From the Agreement Date until the earlier of the Closing Date and the termination of this Agreement, the Seller shall grant Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon reasonable notice (and in the event of a facility visit request, at least 48 hours prior notice), and subject to any limitations resulting from any Public Health Measures, to the personnel, facilities,

book and records of the Seller related to the Business or the Transferred Assets that are in the possession or under the control of the Seller; provided, however, that (i) all requests for access shall be directed to James Grainer or such other person(s) as the Seller may designate in writing from time to time (the "**Seller Access Contact**"), (ii) such activities do not unreasonably interfere with the ongoing business or operations of the Seller, (iii) the Seller shall have the right to have one or more of its representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.2(a), (iv) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing, (v) such access or related activities would not cause a violation of any agreement to which the Seller is a party, (vi) no Personal Information shall be disclosed or used other than in compliance with applicable privacy law and (vii) nothing herein shall require Seller or its representatives to furnish to Purchaser or provide Purchaser with access to information that (A) is subject to an attorney-client or an attorney work-product privilege, (B) legal counsel for the Seller reasonably concludes may give rise to antitrust or competition law issues or violate a protective order or otherwise may not be disclosed pursuant to Applicable Law (including any Public Health Measure) or (C) would cause significant competitive harm to the Seller if the Transactions are not consummated.

(b)    Notwithstanding anything to the contrary contained in this Agreement, from the Agreement Date until the Closing Date, Purchaser shall not, and shall cause its representatives not to, have any contact or discussions concerning Seller, the Business, the Transactions or any other matters with any lender, borrower, creditor, guarantor, business partner, bank, landlord, tenant, supplier, customer, employee, manager, franchisee, distributer, noteholder, independent contractor, consultant or other material business relation of the Seller, in each case, without the prior written consent of the Seller Access Contact (which consent may be withheld in the Seller's sole discretion and, if given, may be conditioned on the Seller Access Contact or his or her designee having the right to participate in any meeting or discussion).

(c)    Any information provided to or obtained by Purchaser or its representatives, including pursuant to this Section 6.2 is confidential information and subject to the terms of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference. Effective upon (and only upon) the Closing, the Confidentiality Agreement shall automatically terminate and none of the parties thereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained by Purchaser or its representatives concerning the Seller, which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. If this Agreement is terminated prior to Closing for any reason, the terms of the Confidentiality Agreement shall remain in full force and effect.

6.3    **Efforts to Consummate.** Except as otherwise provided in this Agreement, each of the parties hereto agrees to use its commercially reasonable efforts to cause the Closing to occur as soon as possible after the Agreement Date, including satisfying the conditions precedent set forth in Article 8 applicable to such party including (a) defending against any Actions, judicial or administrative, challenging this Agreement or the consummation of the Transactions, (b) seeking to have any preliminary injunction, temporary restraining order, stay or other legal restraint or

25

prohibition entered or imposed by any court or other Governmental Authority that is not yet final and nonappealable vacated or reversed, and (c) executing any additional instruments reasonably requested by another party hereto (without cost or expense to the executing party) necessary to carry out the Transactions and to fully carry out the purposes of this Agreement; provided, however, that, for purposes of "commercially reasonable efforts" standard as required by this Section 6.3, Section 6.1(a), or Section 2.6(b) neither the Seller nor its Affiliates or representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party or to otherwise expend any money or suffer any detriment, to expend any money to remedy any breach of any representation or warranty hereunder, to commence any Action, to waive or surrender any right, to modify any agreement (including any Assigned Contract) or to provide financing to Purchaser for the consummation of the Transactions.

6.4    **Public Announcements**. Between the Agreement Date and the Closing Date, except to the extent required by any Applicable Law or Action (including the Bankruptcy Case), neither Purchaser nor the Seller shall, and Purchaser and the Seller shall cause their respective Affiliates and representatives not to, directly or indirectly, issue any press release or public announcement of any kind without the prior written consent of Purchaser and the Seller; provided, however, that the Seller and its Affiliates may make announcements from time to time to their respective employees, customers, suppliers, and other business relations and otherwise as the Seller may reasonably determine is necessary to comply with Applicable Law or the requirements of this Agreement or any other agreement to which the Seller or any such Affiliate is a party. Purchaser and the Seller shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the parties.

6.5    **Update of Schedules; Knowledge of Breach**. From time to time prior to the Closing, the Seller may supplement or amend the Schedules with respect to any matter hereafter arising or discovered which if existing or known by the Seller at the Agreement Date would have been required to be set forth or described in such Schedules and also with respect to events or conditions arising after the date hereof and prior to Closing. Any such supplemental or amended disclosure shall not be deemed to have cured any such breach of representation or warranty for purposes of determining whether or not the conditions set forth in Section 8.2(a) have been satisfied. From and after the Closing, references to the Schedules shall be references to the Schedules as supplemented, modified and/or updated. If, prior to the Closing, Purchaser shall have reason to believe that any breach of a representation or warranty of the Seller has occurred (other than through notice from the Seller), Purchaser shall promptly so notify the Seller, in reasonable detail. Nothing in this Agreement, including this Section 6.5, shall imply that the Seller is making any representation or warranty as of any date other than the Closing Date (other than representations and warranties that are expressly made as of an earlier date).

# ARTICLE 7
# POST-CLOSING COVENANTS

7.1    **Access to Information; Books and Records**. From and after the Closing, each of Purchaser and the Seller shall cause their representatives to furnish all information reasonably requested by the other party or its representatives in connection with the administration of the Bankruptcy Case, any claims or interests asserted by parties in interest against Seller in the Bankruptcy Case, financial or regulatory reporting whether in the Bankruptcy Case or otherwise,

audit, third party litigation, preparing or filing of any Tax Return or the defense in any Tax Proceeding; provided, however, that nothing in this Section 7.1 shall require a party to furnish to the other party or its representatives any material that is subject to an attorney-client or solicitor-client privilege or an attorney or solicitor work-product privilege or which may not be disclosed pursuant to Applicable Law.

7.2    **Post-Closing Receipt and Possession of Assets**.

(a)    After the Closing Date, the Seller shall transfer promptly to Purchaser from time to time (but in any event on a monthly basis) any payments constituting Transferred Assets received by the Seller. After the Closing Date, Purchaser shall transfer promptly to the Seller, from time to time (but in any event on a monthly basis), any payments constituting Excluded Assets, received by Purchaser after the Closing.

(b)    In the event that, after the Closing Date, Purchaser receives or otherwise is in possession of any Excluded Asset, Purchaser shall promptly notify the Seller of its receipt or possession of such other Excluded Asset and transfer such Excluded Asset to the Seller. In the event that, after the Closing Date, the Seller receives or otherwise is in possession of any other Transferred Asset, the Seller shall promptly notify Purchaser of its receipt or possession of such other Transferred Asset and transfer, at Purchaser's expense, such Transferred Asset to Purchaser.

7.3    **Tax Matters**.

(a)    The Seller shall be responsible for preparing or causing to be prepared all Tax Returns with respect to the Business and the Transferred Assets for taxable periods ending on or before the Closing Date (each, a "**Pre-Closing Tax Period**") that are required to be filed on or before the Closing Date. After the Closing Date, Purchaser will assist and cooperate with the Seller in preparing any such Tax Return with respect to the Transferred Assets.

(b)    Purchaser shall prepare and timely file or cause to be prepared and timely filed (taking into account all extensions properly obtained) all Tax Returns with respect to the Transferred Assets that are required to be filed for any taxable period that begins on or before the Closing Date and ends after the Closing Date (a "**Straddle Period**") and shall timely pay (subject to Purchaser's right to reimbursement of Seller Taxes), or cause to be timely paid, the amount of any Taxes due thereon. Purchaser shall provide the Seller with completed drafts of such Tax Returns for the Seller's review and reasonable comment at least fifteen days prior to the due date for filing thereof, taking into account extensions (or, if such due date is within fifteen days following the Closing Date, as promptly as practicable following the Closing Date) and shall consider any comments of Seller in good faith to such Tax Returns as are reasonably requested by the Seller, provided such requests are consistent with the prior practice of the Seller (to the extent relevant) and comply with Applicable Law.

(c)    The Seller shall be liable for any Taxes with respect to a Pre-Closing Tax Period and the portion of any Straddle Period ending on the Closing Date ("**Seller Taxes**"). For purposes of this Agreement, in the case of any Straddle Period, (a) the amount of any Taxes based on or measured by income or receipts, sales or use, employment, or withholding allocated to the portion of such Straddle Period ending on the Closing Date shall be determined based on an interim

closing of the books as of the end of the day on the Closing Date and (b) any other Taxes shall be allocated to the portion of such Straddle Period ending on the Closing Date by prorating the amount of such Tax for the entire taxable period on a per diem basis.

(d)    Purchaser shall promptly notify the Seller in writing upon receipt by Purchaser or any of its Affiliates of notice of any pending or threatened U.S. federal, state, local or foreign Tax audits, proceedings or assessments relating to Pre-Closing Tax Period, Straddle Period or otherwise relating to a Tax for which the Seller is liable pursuant to Section 7.3(c) (a "**Pre-Closing Tax Claim**").

(e)    Purchaser shall have the sole right to control the defense or resolution of any Pre-Closing Tax Claim, and to employ counsel of its choice.

(f)    After the Closing, each of the Seller and Purchaser shall (and Purchaser shall cause its Affiliates to):

(i)    timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce), or file Tax Returns or other reports with respect to, Transfer Taxes;

(ii)    cooperate fully in preparing for and defending any Tax Proceeding with Governmental Authorities regarding any Tax Returns required to be filed by, or Taxes related to the Transferred Assets due from, the Seller for any Pre-Closing Tax Period or Straddle Period; and

(iii)    furnish the other party with copies of all correspondence received from any Governmental Authority in connection with any Tax Proceeding, related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period, and furnish the other parties with copies of all records and documents relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period that are proposed to be destroyed (and not otherwise in the possession of such other party).

## ARTICLE 8
## CONDITIONS PRECEDENT

8.1    **Conditions to Each Party's Obligation**. The respective obligations of the parties hereto to effect the Transactions are subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller and Purchaser), at or prior to the Closing, of the following conditions:

(a)    No Injunctions or Restraints. No Order or Applicable Law preventing the consummation of the Transactions shall be in effect.

(b)    Sale Order. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be a Final Order.

8.2    <u>**Conditions to Obligation of Purchaser**</u>. The obligations of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by Purchaser), at or prior to the Closing, of the following conditions:

(a)    <u>Representations and Warranties</u>. Each of the representations and warranties of the Seller set forth in <u>Article 3</u> shall be true and correct in all material respects (without giving effect to any qualifications or limitations as to "materiality", "Material Adverse Effect" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date).

(b)    <u>Performance of Covenants and Obligations</u>. The Seller shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c)    <u>Closing Deliverables</u>. The Seller shall have delivered to Purchaser the closing deliveries required to be delivered by the Seller pursuant to <u>Section 2.8</u>.

8.3    <u>**Conditions to Obligations of the Seller**</u>. The obligation of the Seller to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller), at or prior to the Closing, of the following conditions:

(a)    <u>Representations and Warranties</u>. Each of the representations and warranties of Purchaser set forth in <u>Article 4</u> shall be true and correct in all material respects (without giving effect to any qualifications or limitations as to "materiality" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date).

(b)    <u>Performance of Covenants and Obligations of Purchaser</u>. Purchaser shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c)    <u>Closing Deliverables</u>. Purchaser shall have delivered to the Seller the closing deliveries required to be delivered by Purchaser pursuant to <u>Section 2.8</u>.

8.4    <u>**Waiver of Condition; Frustration of Conditions**</u>. All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Purchaser nor the Seller may rely on the failure of any condition set forth in this <u>Article 8</u>, as applicable, to be satisfied if such failure was caused by such party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions.

8.5    <u>**Delivery of a Notice of Readiness to Close**</u>. At any time after the Seller's satisfaction of its conditions to Closing in accordance with the terms of <u>Section 8.1</u> and <u>Section 8.3</u> of this Agreement, the Seller may deliver a notice to the Purchaser (a "**Notice of Readiness to Close**"). The Purchaser shall have five (5) Business Days from delivery of a Notice of Readiness to Close to satisfy its conditions to Closing in accordance with the terms of <u>Section 8.1</u> and <u>Section 8.2</u> of this Agreement and consummate the Transactions; <u>provided</u>, that in no event shall Purchaser be required to close prior to the Outside Date. If Purchaser does not satisfy its conditions

to Closing and consummate the Transaction within the timeframe set forth in the preceding sentence, Purchaser shall forfeit the entire Deposit Escrow Amount to the Seller.

## ARTICLE 9
## TERMINATION

9.1     __Events of Termination__. Notwithstanding anything to the contrary, this Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing:

(a)     by mutual written consent of Purchaser and the Seller;

(b)      [Reserved]

(c)     by Purchaser or the Seller by written notice to Purchaser or the Seller from the other, if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(d)     by Purchaser, by written notice from Purchaser to the Seller, if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement, such that the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Seller prior to the earlier of (i) five Business Days after receipt of written notice from Purchaser requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(d) shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, provided however that, as an alternative to termination, Purchaser shall be entitled to specific performance pursuant to Section 10.13 of this Agreement;

(e)     by the Seller, by written notice from the Seller to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) five Business Days after receipt of written notice from the Seller requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(e) shall not be available to the Seller if the failure of the Seller to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement;

(f)     by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Applicable Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Transactions and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; provided, however, that the right to

terminate this Agreement pursuant to this Section 9.1(f) shall not be available to the party seeking to terminate if any action of such party or any failure of such party to act has contributed to such Order or other action and such action or failure constitutes a breach of this Agreement; or

(g)    by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if the Closing has not occurred on the later of April 18, 2025 and two (2) Business Days after the Sale Order becomes a Final Order (the "**Outside Date**"); provided, however, that the party exercising the right to terminate this Agreement pursuant to this Section 9.1(g) shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement.

9.2    **Effect of Termination**.

(a)    In the event that this Agreement shall be terminated pursuant to Section 9.1, (a) Purchaser and its representatives shall promptly return all documents, work papers and other materials of the Seller including any confidential information and (b) all further obligations of the parties hereto under this Agreement shall terminate without further Liability or obligation to the other parties hereto; provided, however, that, notwithstanding the foregoing, the Liabilities and obligations under (i) the Confidentiality Agreement, and (ii) Section 2.9(c), Section 6.2(c), this Section 9.2 and Article 10 shall continue in full force and effect.

(b)    Notwithstanding anything to the contrary in this Agreement, in the event of valid termination of this Agreement pursuant to Section 9.1(e), Seller shall be entitled to all remedies available at law or in equity, including without limitation, retention of the Deposit Escrow Amount, damages, and/or specific performance pursuant to Section 10.13 of this Agreement.

## ARTICLE 10
## GENERAL PROVISIONS

10.1    **Survival of Representations, Warranties and Covenants.** All covenants and agreements contained in this Agreement that by their term are to be performed in whole or in part, or which prohibit actions, subsequent to Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive Closing and shall therefore terminate, including any Action for damages in respect of any breach or inaccuracy thereof. Notwithstanding the foregoing, the provisions of Section 2.9(c), Section 6.2, Section 9.2 and this Article 10 shall survive the Closing.

10.2    **Entire Agreement**. This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the parties with respect to such subject matter (other than, for the

avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings. The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the parties hereto expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents. Furthermore, the parties each hereby acknowledge that this Agreement, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all parties to this Agreement, the Confidentiality Agreement and the Related Documents specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction. The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the parties hereby agree that neither party hereto shall have any remedies or cause of action (whether in contract or in tort or otherwise) of any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

10.3    **Amendment; No Waiver**. This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and, if applicable, the Related Documents) executed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any party of a breach of any provision of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.4    **Severability**. Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any term or other provision of this Agreement or the Related Documents is invalid, illegal, or incapable of being enforced by any Applicable Law or public policy, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the parties to the greatest extent consistent with being valid and enforceable under Applicable Law. No party hereto shall assert, and Purchaser shall cause its Affiliates or related parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable.

10.5    **Expenses and Obligations**. Except as otherwise provided in this Agreement, all costs and expenses incurred by the parties hereto in connection with the Transactions, including

the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the party that has incurred such expenses.

      10.6   **Notices**. All notices, consents, waivers, and other communications under this Agreement or the Related Documents must be in writing and will be deemed to have been duly given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing for next day delivery (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if delivered by electronic mail (unless the sender receives an automated message that the email has not been delivered) on the date of transmission if on a Business Day before 5:00 p.m. local time of the business address of the recipient party (otherwise on the next succeeding Business Day) and (d) if deposited in the United States mail, first-class postage prepaid, on the date of delivery, in each case to the appropriate addresses or email addresses set forth below (or to such other addresses as a party may designate by notice to the other parties in accordance with this <u>Section 10.6</u>):

If to Seller:

      Timothy P. Neumann, Esq.
      Broege, Neumann, Fischer & Shaver, LLC
      25 Abe Voorhees Drive
      Manasquan, New Jersey 08736
      (732)223-8484, ext. 214
      tneumann@bnfsbankruptcy.com

With a copy to Secured Creditor:

      Julie M. Murphy, Esq.
      Stradley Ronon Stevens & Young, LLP
      457 Haddonfield Rd., Suite 100
      Cherry Hill, New Jersey 08002
      E-Mail: jmmurphy@stradley.com

With a copy to Official Committee of Unsecured Creditors:

      Robert M. Schechter, Esq.
      Porzio, Bromberg & Newman, P.C.
      100 Southgate Parkway
      Morristown, NJ 07962
      (973) 889-4127
      Email: rmschechter@pbnlaw.com

If to Purchaser:

      Lavesh L. Samtani, Esq.
      Bionpharma Inc.
      400 Alexander Park, Suite 2-4B
      Princeton, NJ 08540

Telephone: (609) 380-3310
Facsimile:  (609) 380-3311
Email;  admin@bionpharma.com

With a copy (which shall not constitute notice) to:

Mintz, Levin, Cohn, Ferris Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
Telephone: (212) (617)348-4913
Facsimile: (617) 542.2241
Attn:  Eric Blythe
Email:  ERBlythe@mintz.com

10.7    **Counterparts**. This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format, or other agreed format shall be sufficient to bind the parties to the terms and conditions of this Agreement. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

10.8    **Governing Law.** This Agreement, the Related Documents and all Related Claims shall be governed by the internal laws of the State of New Jersey (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Applicable Laws of any other jurisdiction.

10.9    **Submission to Jurisdiction; Consent to Service of Process**.

(a)      Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Related Document, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6; provided, however, that if the Bankruptcy Case has closed, the parties agree to irrevocably submit to the exclusive jurisdiction of the of the Superior Court of the State of New Jersey. The parties hereto hereby irrevocably and unconditionally waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any Related Claim by the delivery of a copy thereof in accordance with the provisions of <u>Section 10.6</u> (other than by email) along with a notification that service of process is being served in conformance with this <u>Section 10.9(b)</u>. Nothing in this Agreement will affect the right of any party to serve process in any other manner permitted by Applicable Law.

10.10    <u>**Waiver of Jury Trial**</u>. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS.

10.11    <u>**Rights Cumulative**</u>. All rights and remedies of each of the parties under this Agreement and the Related Documents will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement, the Related Documents or Applicable Law.

10.12    <u>**Assignment**</u>. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the parties hereto. No assignment of this Agreement or any of the rights, interests or obligations under this Agreement may be made by any party hereto at any time, whether or not by operation of law, without the prior written consent of the Seller and Purchaser, and any attempted assignment without the required consent shall be void; <u>provided</u>, <u>however</u>, that (a) Purchaser may assign (i) any of its rights or delegate any of its duties under this Agreement to any of its Affiliates, and (ii) its rights, but not its duties, under this Agreement to any of its financing sources and (b) the Seller may assign any of its rights or delegate any of its duties under this Agreement to any successor thereto, including any liquidating trustee or other agent; <u>provided</u>, <u>further</u>, <u>however</u>, that, in each case, such assignment shall not release Purchaser from its obligations under this Agreement and the Seller shall have no obligation to pursue remedies against any assignee of Purchaser before proceeding against Purchaser for any breach of Purchaser's obligations hereunder.

10.13    <u>**Specific Enforcement; Remedies**</u>. The parties hereto agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the parties hereto in accordance with their specific terms or were otherwise breached. It is accordingly agreed that (a) each party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of each party to cause the other party to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and Applicable Laws and to thereafter cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right each party would not have

entered into this Agreement. Notwithstanding anything to the contrary set forth herein, the parties hereto agree that (i) the Seller's right to retain the Deposit Escrow Amount, as set forth in <u>Section 2.9(c)</u>, is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

10.14.  **<u>Third-Party Beneficiaries</u>**. Except as expressly set forth herein, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties hereto any rights or remedies of any nature whatsoever under or by reason of this Agreement.

*{THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK*
*SIGNATURES FOLLOW}*

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first written above.

PURCHASER:

**BIONPHARMA, INC.**

By: _____
    Name: Lavesh Samtani
    Title: EVP & General Counsel

IN WJTNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

SELLER:

NOSTRUM LABORATORIES, INC.

By: _____
Name: James Grainer
Title: Chief Financial Officer

## <u>EXHIBIT A</u>

**Bid Procedures Order**

See 24-19611JKS [ECF No. 268].

| SCHEDULES | |
|---|---|
| Schedule 2.1(a) – Finished product samples, API and Raw Materials | To be supplied |
| Schedule 2.1(b) - Product ANDAs | See attached |
| Schedule 2.11 - Allocation Schedule | See attached |

# SCHEDULE 2.1(b)

# PRODUCT ANDAS

**Schedule 2.1(b)**
**Product ANDAs**

**Kansas City:**

209393          **Doxycycline Hyclate Capsules USP, 50 mg and 100 mg**


# SCHEDULE 2.11

# ALLOCATION SCHEDULE

## Schedule 2.11
## Allocation Schedule

209393          Doxycycline Hyclate Capsules USP, 50 mg and 100 mg
                $50,000

## Schedule 3.7

1.  The Generic Drug User Fee Administration ("GDUFA") fees due in total are about $4.3 million, approximately $440,000 of which is attributable to facility fees and $3.9 million is attributable to program fees.

2.  The Debtor has received notices from the FDA that the Debtor is not in compliance with the GDUFA fees owed and reminders of the amounts due.

3.  The Debtor currently owes the Center for Medicare and Medicaid Services is approximately $4,000,000.00.

4.  The Debtor has entered into a settlement with the Department of Justice in total for $1.989 million, the federal component owed is $967,000 and the state component is approximately $1,022,000. This settlement relates rebates owed from previous sales of the Debtor's products.

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**by and between**

**PAI HOLDINGS, LLC D/B/A PAI PHARMA, as Purchaser,**

**and**

**NOSTRUM LABORATORIES, INC., as Seller**

**Dated as of April _____, 2025**

## Table of Contents

Page

ARTICLE 1 DEFINED TERMS ...............................................................2

    1.1    **Defined Terms** ..................................................................2

    1.2    **Other Definitional and Interpretive Matters** ...............10

ARTICLE 2 THE PURCHASE AND SALE; CLOSING .....................12

    2.1    **Purchase and Sale** ............................................................12

    2.2    **Excluded Assets** ...............................................................13

    2.3    **Assumption of Liabilities** ................................................15

    2.4    **Excluded Liabilities** .........................................................15

    2.5    **Excluded Contracts** .........................................................15

    2.6    **Nontransferable Assets and Liabilities** ..........................16

    2.7    **Closing** ..............................................................................16

    2.8    **Closing Deliveries of the Parties** ....................................16

    2.9    **Closing Consideration; Assumed Liabilities; Deposits; Holdback Amount** ...............................................................17

    2.10    **Transfer Taxes** .................................................................18

    2.11    **Allocation of Purchase Price** ..........................................19

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLER ..........................19

    3.1    **Organization, Good Standing and Other Matters** .........19

    3.2    **Authority and Enforceability** .........................................19

    3.3    **No Conflict; Required Filings and Consents** ..................20

    3.4    **Litigation** ..........................................................................20

    3.5    **Brokers and Finders** ........................................................20

    3.6    **Title to Assets.** .................................................................20

    3.7    **Compliance with Applicable Laws; Regulatory Matters** ...............21

    3.8    **No Other Representations or Warranties** .......................21

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER ..........................21

    4.1    **Organization, Good Standing and Other Matters** .........22

    4.2    **Authority and Enforceability** .........................................22

    4.3    **No Conflict: Required Filings and Consents** ..................22

    4.4    **Financing** ..........................................................................22

i

| 4.5 | **Solvency** | 22 |
| 4.6 | **Litigation** | 23 |
| 4.7 | **Brokers and Finders** | 23 |
| 4.8 | **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties** | 23 |
| 4.9 | **No Other Representations or Warranties** | 24 |

ARTICLE 5 BANKRUPTCY COURT MATTERS .................................................. 24

| 5.1 | **Competing Transaction** | 24 |
| 5.2 | **Bankruptcy Court Filings** | 24 |
| 5.3 | **Assumption of Assigned Contracts** | 25 |

ARTICLE 6 PRE-CLOSING COVENANTS ........................................................... 26

| 6.1 | **Conduct of Business** | 26 |
| 6.2 | **Access to Information; Confidentiality** | 27 |
| 6.3 | **Efforts to Consummate** | 28 |
| 6.4 | **Public Announcements** | 29 |
| 6.5 | **Update of Schedules; Knowledge of Breach** | 29 |

ARTICLE 7 POST-CLOSING COVENANTS ......................................................... 29

| 7.1 | **Access to Information; Books and Records** | 29 |
| 7.2 | **Post-Closing Receipt and Possession of Assets** | 29 |
| 7.3 | **Tax Matters** | 30 |

ARTICLE 8 CONDITIONS PRECEDENT ............................................................ 31

| 8.1 | **Conditions to Each Party's Obligation** | 31 |
| 8.2 | **Conditions to Obligation of Purchaser** | 31 |
| 8.3 | **Conditions to Obligations of the Seller** | 32 |
| 8.4 | **Waiver of Condition; Frustration of Conditions** | 32 |
| 8.5 | **Delivery of a Notice of Readiness to Close** | 32 |

ARTICLE 9 TERMINATION ................................................................................. 32

| 9.1 | **Events of Termination** | 32 |
| 9.2 | **Effect of Termination** | 33 |

ARTICLE 10 GENERAL PROVISIONS ............................................................... 34

| 10.1 | **Survival of Representations, Warranties and Covenants** | 34 |
| 10.2 | **Entire Agreement** | 34 |

10.3    **Amendment; No Waiver**..................................................................................35

10.4    **Severability** ...................................................................................................35

10.5    **Expenses and Obligations** .............................................................................35

10.6    **Notices** ..........................................................................................................35

10.7    **Counterparts** .................................................................................................36

10.8    **Governing Law** .............................................................................................37

10.9    **Submission to Jurisdiction; Consent to Service of Process**...........................37

10.10   **Waiver of Jury Trial** .....................................................................................37

10.11   **Rights Cumulative** ........................................................................................37

10.12   **Assignment**...................................................................................................38

10.13   **Specific Enforcement; Remedies** ..................................................................38

10.14   **Third-Party Beneficiaries**.............................................................................38

**EXHIBITS**

Exhibit A                          Bid Procedures Order  - See 24-19611JKS [ECF No. 268]

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of April _____, 2025 (the "**Agreement Date**") is entered into by and between **PAI HOLDINGS, LLC D/B/A PAI PHARMA**, a South Carolina limited liability company ("**Purchaser**") and **NOSTRUM LABORATORIES, INC**., a New Jersey corporation (the "**Seller**").

## RECITALS

**WHEREAS,** on September 30, 2024 (the "**Petition Date**"), Seller filed voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), Case No. 24-19611/JKS thereby commencing a chapter 11 case (the "**Bankruptcy Case**").  No trustee has been appointed and the Seller is continuing in the management of its businesses and possession of its property as a debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Seller desires to sell (or cause to be sold) to Purchaser, and Purchaser desires to purchase from the Seller, all of the Transferred Assets Free and Clear, and the Seller desires Purchaser to assume, and Purchaser desires to assume from the Seller, all of the Assumed Liabilities, in each case upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, the Transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court and will only be consummated pursuant, among other things, to the Sale Order to be entered in the Bankruptcy Case;

**WHEREAS,** Seller anticipates filing a motion (the "**Sale Motion**") to approve the sale of certain assets and the assignment of certain contracts to the highest bidder pursuant to Sections 363 and 365 of the Bankruptcy Code and subject to certain rules and procedures that all bidders must comply with as a condition to participating in the bidding process (the "**Bidding Procedures**," copy annexed hereto as Exhibit A);

**WHEREAS**, in the event there are bidders wishing to bid, an auction will be held at which the Purchaser shall be allowed to participate, subject to its compliance with the Bidding Procedures, and there will occur a hearing in the Bankruptcy Court at which time the sale to the successful bidder shall be approved by the Bankruptcy Court by order of the Bankruptcy Court;

**WHEREAS**, concurrently with the execution of this Agreement, Purchaser shall deposit (or cause to be deposited) an aggregate amount equal to the Deposit Escrow Amount into the trust account of Seller's bankruptcy counsel, Broege, Neumann, Fischer & Shaver, LLC (the "**Deposit Trust Account**").

**NOW**, **THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.1    **Defined Terms**. The following terms shall have the following meanings in this Agreement:

"**Action**" means any action, proceeding, arbitration or litigation (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator.

"**Affiliate**" of any particular Person means any other Person, directly or indirectly, controlling, controlled by, or under common control with, such particular Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Agreement Date**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in Section 2.11(a).

"**Alternate Transaction**" has the meaning set forth in Section 9.1(b).

"**ANDA**" means an Abbreviated New Drug Application (including any amendments and supplements thereto) filed with the FDA in accordance with Section 505(j) of the Federal Food, Drug and Cosmetic Act of 1938.

"**Applicable Law**" means, with respect to any Person, any federal, provincial, state, or local law, ordinance, principle of common law, code, regulation or statute applicable to such Person or such Person's subsidiaries or to any of their respective securities, assets, properties or businesses, including, but not limited to, the Federal Food Drug and Cosmetic Act (21 U.S.C. §§ 301 et seq.).

"**Assigned Contracts**" has the meaning set forth in Section 2.1(c).

"**Assumed Liabilities**" means only the Liabilities arising out of Purchaser's ownership or operation of the Transferred Assets solely to the extent arising from periods occurring after the Closing Date and only to the extent not otherwise paid, performed, discharged or otherwise satisfied prior to the Closing.

"**Assumption Notice**" has the meaning set forth in Section 5.3(a).

"**Auction**" has the meaning set forth in Section 5.2(b).

2

"**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other claims, actions, rights, or remedies that may be brought by or on behalf of the Seller or its estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including, but not limited to, actions or remedies under sections 510, 542, 543, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"**Back-Up Bid**" means the second highest or otherwise best bid if the successful bidder fails to consummate its bid in accordance with the Bid Procedures.

"**Back-up Termination Date**" means the first to occur of (a) fifteen days after the entry of the Sale Order, (b) consummation of the Transactions with the winning bidder at the Auction, (c) Purchaser's receipt of notice from the Seller of the release by the Seller of Purchaser's obligations under Section 5.2(b) and (d) April 18, 2025.

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bid Procedures**" means those certain bidding procedures for the sale of the Seller's assets approved by the Bankruptcy Court.

"**Bid Procedures Order**" means an Order of the Bankruptcy Court approving the Bid Procedures attached hereto as Exhibit A.

"**Bill of Sale and Assignment and Assumption Agreement**" means the bill of sale and assignment and assumption agreement, dated as of the Closing Date, by and between the Seller and Purchaser, in a form reasonably acceptable to counsel for Seller and Purchaser.

"**Business**" means the business of the Seller as currently conducted.

"**Business Day**" means any day other than (a) a Saturday, Sunday or federal holiday or (b) a day on which commercial banks in San Francisco, California are authorized or required to be closed.

"**Closing**" has the meaning set forth in Section 2.7.

"**Closing Consideration**" means the Purchase Price *minus* the Holdback Amount.

"**Closing Date**" has the meaning set forth in Section 2.7.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Competing Bid**" has the meaning set forth in Section 5.1.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of November 13, 2024, by and between the Seller and Purchaser.

"**Consent**" means any consent, approval, authorization, waiver or license.

"**Contract**" means any written agreement, mortgage, indenture, lease (whether for real or personal property), contract or subcontract.

"**Cure Costs**" means all monetary amounts that must be paid and obligations that otherwise must be satisfied pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts, as agreed upon by the parties hereto or otherwise determined by the Bankruptcy Court, provided, however, that Purchaser shall have no obligation to pay any Cure Costs for Assigned Contracts that are not Designated Contracts.

"**Deposit Escrow Amount**" means $57,500.

"**Deposit Trust Account**" has the meaning set forth in the Recitals.

"**Designated Contracts**" has the meaning set forth in Section 5.3(b).

"**Designation Deadline**" has the meaning set forth in Section 5.3(b).

"**Determined Cure Costs**" means, in the aggregate, all Cure Costs payable in respect of the Assigned Contracts as determined pursuant to the Sale Order or by separate order of the Bankruptcy Court.

"**Enforceability Exceptions**" means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar Applicable Laws affecting the enforcement of creditors' rights generally and general equitable principles.

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Books and Records**" means the following originals and copies of those books and records, documents, data and information (in whatever form maintained) of the Seller and the Business: (a) all corporate minute books (and other similar corporate records) and stock records of the Seller, (b) any books and records relating to the Excluded Assets or (c) any books, records or other materials that Seller (i) is required by Applicable Law to retain (copies of which, to the extent permitted by Applicable Law, will be made available to Purchaser upon Purchaser's reasonable request) or (ii) is prohibited by Applicable Law from delivering to Purchaser or include attorney client communications, work product or other privileged materials.

"**Excluded Contracts**" has the meaning set forth in Section 2.5.

"**Excluded Liabilities**" has the meaning set forth in Section 2.4.

"**FDA**" means the United States Food and Drug Administration.

"**FDA Transfer Letter**" means the letter(s) from the Seller to FDA in form and substance acceptable to Purchaser, in its reasonable discretion, notifying FDA of the transfer from the Seller to Purchaser of all of Seller's rights in the Transferred Assets set forth in Schedule 2.1(b).

4

"**Final Order**" means an Order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect; provided, that such Order shall be considered a Final Order only after the time period for third parties seeking appeal has expired without the filing of any appeal or motion for reconsideration.

"**Final Resolution**" has the meaning set forth in Section 2.9(d).

"**Free and Clear**" means free and clear of all Liens and Liabilities (other than Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

"**GAAP**" means generally accepted accounting principles in the United States as of the Agreement Date.

"**Governmental Authority**" means any domestic or foreign national, provincial, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, any court (including the Bankruptcy Court) or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS and the FDA).

"**Holdback Amount**" means $0.

"**Holdback Period**" has the meaning set forth in Section 2.9(d).

"**Intellectual Property**" means any and all intellectual property and proprietary rights in any jurisdiction throughout the world, including rights arising from the following: (a) patents and patent applications, design rights, industrial design registrations and applications therefor, divisions, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, reexaminations, extensions and any provisional applications, and any foreign or international equivalent of any of the foregoing; (b) trademarks (whether registered, unregistered or applied for), service marks, trade dress, service names, trade names, brand names, product names, slogans, logos, business names, corporate names, and other source or business identifiers, all registrations and applications for registration thereof, and, in each case, together with all of the goodwill associated therewith; (c) works of authorship, copyrights and all registrations and applications for registration thereof; (d) trade secrets and know-how; (e) rights in formulae, methods, techniques, processes, assembly procedures, software, software code (in any form, including source code and executable or object code), subroutines, test results, test vectors, user interfaces, protocols, schematics, specifications, drawings, prototypes, molds and models, and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing), and (f) social media accounts, social media identifiers, internet domain name registrations.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge**" means (a) with regard to the Seller, the actual knowledge, after due inquiry, of Dr. Nirmal Mulye, John Foster, and Carlton Asher and (b) with regard to Purchaser, the actual knowledge, after due inquiry, of Meredith Cook.

"**Liabilities**" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to, or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"**Lien**" means all forms of lien (including mechanic's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Transferred Assets, and liens arising under the Bankruptcy Code), encumbrance, claim, defect or irregularity in title, pledge, mortgage, deed of trust, deed to secure debt, security interest, charge, transfer restriction or similar agreement or encumbrance, including any dedication under any gathering, transportation, treating, processing, fractionating, purchase, sale or similar agreements, or any other rights granted or consensual as or against any Transferred Assets including but not limited to easements, encroachments, rights of first refusal, options, or any other interest or right in property that constitutes a lien or interest within the definition or adjudication of such terms under Section 101(37) of the Bankruptcy Code.

"**Loss**" means any loss, Liability, demand, claim, action, cause of action, cost, damage deficiency, Tax, penalty, fine or expense, whether or not arising out of any claims by or on behalf of any third party, including interest, penalties, reasonable legal fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing. For the avoidance of doubt, "Loss" shall exclude punitive damages, except to the extent payable to a third party.

"**Material Adverse Effect**" means a material adverse effect on the Transferred Assets and Assumed Liabilities taken as a whole; provided, however, that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or may be, a Material Adverse Effect: (a) any change in, or effects arising from or relating to, general business or economic conditions affecting any industry in which the Business operates; (b) any change in, or effects arising from or relating to, the United States or foreign economies, or securities, banking or financial markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) debt defaults or other restructuring events of any country with respect to which bondholders take a discount to the debt of any country or any increases in the interest rates for any country's debt, (iii) any change in currency exchange rates, (iv) any decline or rise in the price of any security, commodity, contract or index and (v) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (c) any change from, or effects arising from or relating to, the occurrence, escalation or material worsening of any act of God or other calamity, natural disaster, pandemic or disease, outbreak, hostility, act of war, sabotage, cyber-attack or terrorism or military action; (d) any action taken by Purchaser or its Affiliates with respect to the Transactions or with respect to the Business; (e) any action taken, or failed to be taken, by the Seller at the request of or with the consent of Purchaser or any change from, or effects arising from or relating to, Purchaser's failure to consent to any action restricted by Section 6.1; (f) any change in, or effects arising from or relating to changes in, Applicable Law or accounting rules (including GAAP) or any interpretation thereof; (g) the failure of the Business to meet any of its projections, forecasts, estimates, plans, predictions, performance

metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or representatives); (h) national or international political, labor or social conditions; (i) any matter described in the Schedules or any matter of which Purchaser is aware as of the Agreement Date; (j) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement and the Transactions or the identity of the parties to this Agreement, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the Business; (k) the sale of any assets other than the Transferred Assets to any third parties by Seller or any of its Affiliates; (l) any effect arising or resulting from or related to the filing of the Bankruptcy Case; (m) any action required to be taken under any Applicable Law or Order; (n) seasonal changes in the results of operations of the Seller; (o) any epidemic, pandemic, outbreak of disease or other public health emergency (including COVID-19) or any escalation or worsening of any such conditions; (p) (1) any results, outcomes, data, adverse events or side effects arising from any clinical trials being conducted by or on behalf of the Seller or any competitor of the Seller (or the announcements thereof), (2) the determination by, or the delay of a determination by, the FDA or any other applicable Governmental Authority, or any panel or advisory body empowered or appointed thereby, with respect to a clinical hold, acceptance, filing, designation (including de-designation for the accelerated approval pathway), approval, clearance, non-acceptance, hold, refusal to file, refusal to designate, non-approval, disapproval or non-clearance, or requirement to conduct additional clinical studies or trials, with respect to any of the Seller's or any competitor's product candidates or (3) FDA approval (or other clinical or regulatory developments), market entry or pending market entry of any product competitive with or related to any of the products or product candidates of the Seller, or any guidance, announcement or publication by the FDA or other applicable Governmental Authority relating to any product candidates of the Seller or any competitor; or (q) any objections made in the Bankruptcy Court to this Agreement, the Transactions, the Sale Order or the reorganization, any orders of the Bankruptcy Court and any actions or omissions of the Seller in compliance with any order of the Bankruptcy Court and the assumption or rejection of any Assigned Contract.

"**Non-Transferred Asset**" has the meaning set forth in <u>Section 2.6(a)</u>.

"**Order**" means any award, decision, injunction, judgment, ruling or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator, whether preliminary, interlocutory or final, including by the Bankruptcy Court.

"**Organizational Documents**" means (a) the articles or certificates of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in <u>clauses (a)</u> through <u>(d)</u>, and (f) any amendment to or equivalent of any of the foregoing.

"**Outside Date**" has the meaning set forth in <u>Section 9.1(g)</u>.

"**Owned Intellectual Property**" means the Intellectual Property owned by the Seller that is exclusively related to the Transferred Assets.

"**Permit**" means all permits, authorizations, certificates, franchises, consents, waivers, licenses, filings and other approvals from any Governmental Authority.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

"**Personal Information**" means any information in the possession or control of the Seller (solely as related to the Business) about an identifiable individual other than the name, title or business address, business email address or telephone number of any employee of the Seller.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Pre-Closing Tax Claim**" has the meaning set forth in Section 7.3(d).

"**Pre-Closing Tax Period**" has the meaning set forth in Section 7.3(a).

"**Product ANDA**" means, for each of the Products listed on Schedule 2.1(b), the ANDA for each Product, and any and all submissions, amendments and supplements thereto, that have been filed with (whether or not accepted for filing) and approved by (or filed with) the FDA granting or seeking authorization and approval to manufacture, package, ship and sell such Products, as more fully defined in 21 C.F.R. Part 314. The term "Product ANDA(s)" includes the materials contained in the official ANDA dossier and files, including all ANDA submissions, amendments, correspondence (including correspondence with the FDA field offices, FDA laboratories, FDA compliance offices and OPDP), reports and memoranda of telephone conversations, constituting or reflecting communications regarding any of the Product ANDAs. The term "Product ANDA(s)" also includes such materials in the working regulatory and clinical files of Seller or in the Seller's control pertaining to the conduct of upcoming annual reviews of the Products and required reports to the FDA that have yet to be filed.

"**Products**" means the approved products, which are manufactured pursuant to a Product ANDA to be purchased pursuant to this Agreement, as listed on Schedule 2.1(b).

"**Public Health Measures**" means any closures, "shelter-in-place," "stay at home," workforce reduction, social distancing, shut down, closure, curfew or other restrictions or any other Applicable Law, Orders, directives, guidelines or recommendations issued by any Governmental Authority, the Centers for Disease Control and Prevention, the World Health Organization, or any industry group in connection with COVID-19 or any other epidemic, pandemic, or outbreak of disease, or in connection with or in response to any other public health conditions.

"**Purchase Price**" means $350,000.00.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Schedules**" has the meaning set forth in Article 4.

8

"**Recall Claim**" has the meaning set forth in <u>Section 2.9(d)</u>.

"**Related Claims**" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents and any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions or the relationship between the parties (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

"**Related Documents**" means the Bill of Sale and Assignment and Assumption Agreement; <u>provided</u>, <u>however</u>, that the Bill of Sale and Assignment and Assumption Agreement shall not be a Related Document solely for purposes of applying the provisions in <u>Article 10</u> to the extent, and only to the extent, that any such document expressly conflicts with <u>Article 10</u>.

"**Sale Motion**" has the meaning set forth in the Recitals.

"**Sale Order**" means an Order of the Bankruptcy Court issued pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code in form and substance reasonably satisfactory to the Seller and Purchaser in all material respects.

"**Schedules**" has the meaning set forth in <u>Article 3</u>.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Taxes**" has the meaning set forth in <u>Section 7.3(c)</u>.

"**Solvent**" when used with respect to any Person, means that, as of any date of determination, (a) the fair salable value (determined on a going concern basis) of its assets and property will, as of such date, exceed the amounts required to pay its debts as they become absolute and mature, as of such date, (b) such Person will have adequate capital to carry on its business and (c) such Person will be able to pay its debts as they become absolute and mature, in the ordinary course of business, taking into account the timing of and amounts of cash to be received by it and the timing of and amounts of cash to be payable on or in respect of its indebtedness.

"**Straddle Period**" has the meaning set forth in <u>Section 7.3(b)</u>.

"**Tax**" means (i) any ad valorem, alternative or add-on (including Section 59A of the Code), income, franchise, branch profits, capital gains, gross receipts, estimated, employment, excise, goods and services, severance, stamp, documentary, value-added, sales, use, property, registration, transfer, payroll, social security, withholding or other tax, duty, charge, fee, levy or other assessment, and any related fine, penalty, interest, or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority and (ii) any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation, agreement or arrangement to indemnify any Person or other entity.

"**Tax Proceeding**" means any audit, appeal, challenge, proceeding, controversy, dispute, claim, information request or assessment with respect to Taxes.

"**Tax Return**" means any return (including any information return), disclosure, report, statement, schedule, notice, form, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection, or payment, of any Tax.

"**Transactions**" means the transactions contemplated by this Agreement and the Related Documents.

"**Transfer Taxes**" has the meaning set forth in Section 2.10.

"**Transferred Assets**" has the meaning set forth in Section 2.1.

1.2    **Other Definitional and Interpretive Matters**.

(a)    Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

(i)    Calculation of Time Period. All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Dollars. Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement, the Related Documents or the Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties hereto to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement, the Related Documents or the Schedules.

(iii)    Exhibits/Schedules. The Exhibits and Schedules to this Agreement are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent the relevance of such disclosure to such other Schedule is reasonably apparent on the face of such disclosure. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the

ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Applicable Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    <u>Gender and Number</u>. Any reference to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    <u>Headings</u>. The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or Related Document, as applicable. Unless otherwise specified, all references in this Agreement to any "Section" or other subdivision are to the corresponding section or subdivision of this Agreement, and all references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vi)    <u>Herein</u>. The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    <u>Or</u>. The word "or" shall be construed in the inclusive sense of "and/or" unless otherwise specified.

(viii)    <u>Including</u>. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)    <u>Successors</u>. A reference to any party to this Agreement, any Related Document or any other agreement or document shall include such party's successors and permitted assigns.

(x)    <u>Legislation</u>. A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(xi)    <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statement, to the extent any such phrase appears in such representation or warranty, if (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that relates to the subject matter of

such representation, (B) such item is otherwise specifically set forth on the balance sheet or financial statement or (C) such item is set forth in the notes to the balance sheet or financial statement.

(xii)    <u>Made Available</u>. Any reference in this Agreement to "made available" means a document or other item of information that was provided or made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions.

(b)    All representations and warranties set forth in this Agreement or the Related Documents are contractual in nature only and subject to the sole and exclusive remedies set forth herein. The parties have agreed that should any representations and warranties of any party prove untrue, the other parties shall have the specific rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort or otherwise) are permitted to any party hereto as a result of the untruth of any such representation and warranty. The phrase "to Seller's Knowledge" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the Related Documents and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement and the Related Documents. The parties hereto agree that changes from earlier drafts to the final version of this Agreement do not necessarily imply that the party agreeing to such change is agreeing to a change in meaning (as the party agreeing to such change may believe the change is stylistic and non-substantive); consequently, no presumption should exist by virtue of a change from a prior draft.

## ARTICLE 2
## THE PURCHASE AND SALE; CLOSING

2.1    **Purchase and Sale**. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, in exchange for an aggregate payment from Purchaser to the Seller equal to the Closing Consideration, Purchaser shall purchase, assume and accept from the Seller, and the Seller shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear, all of the rights, title and interests in, to and under the following assets and interests (collectively, the "**Transferred Assets**"):

(a)    the inventories of those Products (including raw materials and active pharmaceutical ingredients) in Seller's possession and control and that is further described by category, quantity and unit of measure, lot number and storage location in Schedule 2.1(a);

(b)      the Product ANDAs set forth in <u>Schedule 2.1(b)</u>;

(c)      all Contracts listed on <u>Schedule 2.1(c)</u> (as may be amended prior to Closing) (collectively, the "**Assigned Contracts**"), but expressly excluding (i) Contracts that expire or are terminated prior to the Closing and (ii) any Contracts that Purchaser elects to exclude pursuant to <u>Section 5.3(b)</u>;

(d)      all material original books and records, documents, data and information of the Seller solely related to the Transferred Assets, including: (i) supplier and vendor lists, (ii) promotional materials, (iii) customer lists, (iv) market research materials, (v) materials used in connection with the sale and promotion of the products, and (vi) other business records required to be transferred to Purchaser under applicable law, other than the Excluded Books and Records; <u>provided</u>, <u>however</u>, that the Seller shall be entitled to retain copies of any such materials;

(e)      annual and periodic reports relating to the Product ANDAs which have been filed by or on behalf of Seller or a prior owner of the Product ANDAs with the FDA or equivalent Governmental Authority and adverse event reports pertaining to the Products, in each case as are in Seller's or its Affiliate's possession or control;

(f)      all intangible assets, including without limitation, the names, logos and symbols used by Seller in connection with the Transferred Assets;

(g)      all of the Seller's rights, claims or causes of action against third parties relating to the assets, properties, business or operations of the Seller with respect to the Transferred Assets and the Assumed Liabilities (including all guaranties, warranties, indemnities and similar rights in favor of the Seller or any its Affiliates to the extent solely related to the Transferred Assets or the Assumed Liabilities), in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date, except for such rights, claims and causes of related to the Excluded Assets or Excluded Liabilities; and

(h)      all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, choses in action, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively included in or held for use for the Transferred Assets listed in <u>clauses (a)</u> through <u>(g)</u> above or the Assumed Liabilities; and

(i)      all goodwill associated with or symbolized by any of the foregoing Transferred Assets described in <u>clauses (a)</u> through <u>(h)</u> above.

2.2    **Excluded Assets**. Notwithstanding the provisions of <u>Section 2.1</u> or anything to the contrary herein, any and all assets, rights and properties of the Seller that are not specifically identified in <u>Section 2.1</u> as Transferred Assets, including the following (collectively, the "**Excluded Assets**"), shall be retained by the Seller, and Purchaser and its designees shall acquire no right, title or interest in the Excluded Assets in connection with the Transaction:

(a)      all (i) cash and cash equivalents, wherever located, including bank balances and bank accounts or safe deposit boxes, monies in the possession of any banks, savings and loans or trust companies and similar cash items, (ii) escrow monies and deposits in the possession of

landlords and utility companies, and (iii) investment securities and other short- and medium-term investments;

(b)        all records, documents or other information exclusively relating to current or former employees of the Seller that are not hired by Purchaser, and any materials to the extent containing information about any employee, disclosure of which would violate Applicable Law or such employee's reasonable expectation of privacy;

(c)        any interest of the Seller under this Agreement or the Related Documents, including, without limitation, the right to receive the Purchase Price and to enforce the Seller's rights and remedies thereunder;

(d)        all Contracts (including all prepaid assets relating to such Contracts), other than the Designated Contracts, to which Seller is a party;

(e)        any (i) attorney-client work product or communications prior to the Closing Date between Seller (including any one or more officers, directors or stockholders of Seller), on the one hand, and its counsel, on the other hand, and (ii) claims under any director and officer, errors and omissions, fiduciary and commercial crime insurance policies;

(f)        all Permits (including applications therefor and any trade or import/export Permits) that (i) are not solely related to the Transferred Assets, or (ii) are not transferable to Purchaser under Applicable Law;

(g)        the Excluded Books and Records;

(h)        accounts receivable, intercompany obligations and other amounts receivable by Seller;

(i)        any assets not otherwise designated as Transferred Assets or from time to time designated by the parties hereto as Excluded Assets;

(j)        the Avoidance Actions;

(k)        all of the Seller's rights, claims or causes of action (i) against third parties relating to the assets, properties, business or operations of the Seller (including all guaranties, warranties, indemnities and similar rights in favor of the Seller or any of its Affiliates) to the extent arising under the Bankruptcy Code or relating to any of the Excluded Assets or Excluded Liabilities, or (ii) against any third parties that have a familial relationship with any members of the Debtor's management team or entities in which such third parties hold an interest, the Debtor's owners or the Debtor's employees, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date; for the avoidance of doubt and notwithstanding anything else herein to the contrary, all of the Seller's rights, claims and causes of action, including Avoidance Actions, against any of the Seller's affiliates, insiders, subsidiaries, and parents shall be Excluded Assets.

(l)        all of the Seller's right, title and interest to any the assets set forth on Schedule 2.2(l); and

14

(m)    all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively related to or exclusively used in or held for use for the Excluded Assets listed in clauses (a) through (l) above.

Notwithstanding anything to the contrary contained in this Agreement or any of the other Related Documents, Purchaser acknowledges and agrees that all of the following are also Excluded Assets, and all right, title and interest in and to all Excluded Assets shall be retained by the Seller and shall remain the property of the Seller (and shall expressly be excluded from the sale, transfer, assignment and conveyance to Purchaser hereunder), and neither Purchaser nor any of its Affiliates shall have any interest therein: (x) all records and reports prepared or received by the Seller or any of its Affiliates in connection with the sale of the Business and the Transactions, including all analyses relating to the Business or Purchaser so prepared or received; and (y) all confidentiality agreements with prospective purchasers of the Business or any portion thereof and all bids and expressions of interest received from third parties with respect thereto.

2.3    **Assumption of Liabilities**. On the terms and subject to the conditions set forth in this Agreement, Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms the Assumed Liabilities.

2.4    **Excluded Liabilities**. Notwithstanding Section 2.3, Purchaser is assuming only the Assumed Liabilities of the Seller and will not assume or be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, in each case, that are not Assumed Liabilities (all such Liabilities not being assumed herein referred to as the "**Excluded Liabilities**"), and the Seller shall retain, be responsible for, pay, perform, discharge, or otherwise satisfy in accordance with their respective terms all Liabilities that are not Assumed Liabilities, including all Liabilities related to Excluded Assets. For the avoidance of doubt, "Excluded Liabilities" includes any and all Liabilities arising out of, relating to, resulting from or in connection with any credits, rebates, returns or chargebacks, in each case to the extent attributable to the Products distributed or sold by the Seller prior to the Closing Date.

2.5    **Excluded Contracts**. Pursuant to Section 5.3(b), Purchaser shall be entitled, in its sole discretion, by written notice to the Seller up to three (3) Business Days prior to the Closing Date, to elect not to purchase or assume one or more Assigned Contract, in which case, notwithstanding anything in this Agreement or any Related Document to the contrary, such Contract shall not be an Assigned Contract or Designated Contract and shall be considered an excluded contract ("**Excluded Contract**") (and shall constitute an Excluded Asset and not be included in the Transferred Assets) for all purposes of this Agreement and Purchaser shall not have any obligation to satisfy or pay any Cure Costs or other Liabilities with respect to such Excluded Contract. Each assignable Assigned Contract that Purchaser does not elect to remove from the list of Assigned Contracts pursuant to Section 5.3(b) shall be an Assigned Contract.

15

2.6    **Nontransferable Assets and Liabilities**.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Governmental Authority) (after giving effect to the Sale Order or any other applicable order of the Bankruptcy Court that effects such transfer without any required Consents), would constitute a breach or other contravention thereof or a violation of Applicable Law (each, a "**Non-Transferred Asset**").

(b)    If, on the Closing Date, any third-party Consent is not obtained for a Non-Transferred Asset, or if an attempted transfer or assignment thereof would be ineffective or a violation of Applicable Law, then, until any requisite consent is obtained therefor and the same is transferred and assigned to Purchaser or its designee, each such Non-Transferred Asset shall be held by the Seller as agent for the Purchaser, and the Seller shall, to the extent permitted by Applicable Law, provide to Purchaser the benefits and, subject to Purchaser's receipt of such benefits, Purchaser shall assume the obligations and bear the economic burdens associated with such Non-Transferred Asset. The Seller and Purchaser shall use commercially reasonable efforts to enter into agreements (including subcontracting, sublicensing or subleasing, if permitted) by which (i) the Seller shall without interruption of the Business, provide Purchaser with the economic and operational equivalent of obtaining the requisite third-party Consent and assigning the applicable Non-Transferred Asset to Purchaser (including, with the prior written consent of Purchaser, enforcing for the benefit of Purchaser, and at Purchaser's sole expense, all claims or rights arising thereunder) and (ii) Purchaser shall perform, at its sole expense, the obligations and assume the economic burdens of the Seller to be performed after the Closing with respect to such Non-Transferred Asset.

2.7    **Closing**. The closing of the Transactions (the "**Closing**") will take place remotely by electronic exchange of documents on the date (the "**Closing Date**") that is the second (2nd) Business Day after the date on which all of the conditions set forth in <u>Article 8</u> (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the party hereto entitled the benefit of the same, unless another time or date is agreed to in writing by the parties hereto. Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all parties hereto at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.  The Closing Date shall be no later than April 18, 2025.

2.8    **Closing Deliveries of the Parties**. At or prior to the Closing:

(a)    Purchaser and the Seller shall execute and deliver the Bill of Sale and Assignment and Assumption Agreement;

(b)    Purchaser and the Seller shall transmit Purchaser's FDA Transfer Letter and the Seller's FDA Transfer Letters, respectively, to the FDA and shall take other actions reasonably necessary to effect the transfer of the Transferred Assets from the Seller to Purchaser;

16

(c)    Purchaser shall deliver, or cause to be delivered, to the Seller or the applicable Person each of the following:

(i)    a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in Section 8.3(a) and Section 8.3(b); and

(ii)    payment of the Closing Consideration, less the Deposit Escrow Amount, as set forth in Section 2.9.

(d)    the Seller shall deliver, or cause to be delivered, to Purchaser or the applicable Person each of the following:

(i)    a certificate, dated as of the Closing Date, executed by or on behalf of the Seller as to the satisfaction of the conditions set forth in Section 8.2(a) and Section 8.2(b); and

(ii)    an accurate, executed and complete IRS Form W-9 of the Seller;

(iii)    the Sale Order; and

(iv)    all stability samples, batches, data, protocols and other documentation with respect to stability testing for the Products.

2.9    **Closing Consideration; Assumed Liabilities; Deposits; Holdback Amount**.

(a)    At the Closing, upon the terms and subject to the conditions set forth in this Agreement, in full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser, the use and benefit of any Non-Transferred Asset, and assumption of the Assumed Liabilities by Purchaser, Purchaser shall (i) pay to the Seller an aggregate amount equal to the Closing Consideration *minus* the Deposit Escrow Amount; and (ii) assume the Assumed Liabilities.

(b)    At the Closing, upon the terms and subject to the conditions set forth in this Agreement, Purchaser will assume and become responsible for the Assumed Liabilities. Purchaser agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms hereof, including paying or causing to be paid, at or prior to the Closing, all Determined Cure Costs.

(c)    The Deposit Escrow Amount shall be released to Seller or Purchaser in accordance with the applicable terms of this Agreement.  Any issue regarding the entitlement to the Deposit Escrow Amount shall be determined by the Bankruptcy Court, and Purchaser consents to the jurisdiction of the Bankruptcy Court for any issue related to this Agreement.

(d)    The Holdback Amount shall be retained by Seller in the Deposit Trust Account at the Closing and shall be available to the Parties hereto as security to compensate for any Losses incurred as a result of any recalls or market withdrawals (whether voluntary or involuntary) that were reasonably necessary and occur prior to, or after, the Closing Date, in each

case to the extent attributable to the Products distributed or sold by the Seller prior to the Closing Date. On the date that is six (6) months after the Closing Date, fifty percent (50%) of any remaining portion of the Holdback Amount (net of any amounts owed to Purchaser or subject to pending but unresolved claims by the Purchaser with respect to any Losses set forth in the preceding sentence, each a "**Recall Claim**"), if any, shall be distributed to the Seller. On the date that is twelve (12) months after the Closing Date (the "**Holdback Period**"), any remaining portion of the Holdback Amount (net of any amounts owed to Purchaser or subject to pending but unresolved Recall Claims by Purchaser), if any, shall be distributed to the Seller. Any portion of the Holdback Amount held following the end of the Holdback Period with respect to a Recall Claim that is not awarded to Purchaser upon the final resolution of such Recall Claim (whether through a Final Order, termination, settlement or otherwise) (a "**Final Resolution**") shall be, within five (5) Business Days after such Final Resolution, disbursed to Seller. Any portion of the Holdback Amount that is requested by Purchaser for reimbursement of Losses shall be subject to a reasonableness standard for the amounts incurred by Purchaser related to any recalls or market withdrawals and any such request shall be supported by documentary evidence. Any Losses incurred in relation to any recall or market withdrawal attributable to the Products that is in excess of the Holdback Amount shall be the sole responsibility of the Purchaser.

(e)     Purchaser and each of its Affiliates and agents shall be entitled to deduct and withhold from the payment of any amounts (or any portion thereof) payable pursuant to this Agreement (or any agreements, documents or instruments entered into pursuant to this Agreement) that Purchaser is required to deduct and withhold with respect to the making of such payment under any Applicable Law. If Purchaser intends to deduct or withhold any amount as required by any Tax law from any payment made to the Seller pursuant to this Agreement, Purchaser shall (i) promptly provide the Seller advance notice of its intent to deduct or withhold such amounts, and (ii) provide a reasonable opportunity for the Seller to provide forms, documents or other evidence that would mitigate, reduce or eliminate such deduction or withholding. To the extent that amounts are so deducted and withheld, Purchaser shall promptly remit such amounts to the applicable Governmental Authority and such amounts shall be treated for all purposes of this Agreement as having been paid to the applicable payee to whom such amounts would otherwise have been paid.

2.10    **Transfer Taxes**. It is the intention of the Purchaser and the Seller that the Transactions be exempt from all transfer, documentary, sales, use, excise, stock transfer, value-added, stamp, recording, registration and other similar Taxes, together with any conveyance fees, recording charges and other similar fees and charges, incurred in connection with this Agreement and the Transactions (collectively, "**Transfer Taxes**") pursuant to the Bankruptcy Code. Purchaser and the Seller shall cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes due with respect to the Transactions. In the event any Transfer Taxes are required to be paid with respect to the Transactions, Purchaser shall pay such Transfer Taxes, and Purchaser and the Seller shall cooperate in the preparation and filing of any Tax Returns required under Applicable Law with respect to such Transfer Taxes.

2.11 **Allocation of Purchase Price**.

(a)    The Purchase Price (including all other amounts treated as consideration for U.S. federal income tax purposes) and Assumed Liabilities shall be allocated among the Transferred Assets as set forth on Schedule 2.11 (the "**Allocation Schedule**").

(b)    Purchaser and the Seller shall (i) timely file all Tax Returns required to be filed in connection with the Allocation Schedule, and (ii) prepare and file all Tax Returns and determine all Taxes in a manner consistent with the Allocation Schedule, except as may be required by a change in law after the date of this Agreement, a closing agreement with an applicable Governmental Authority, or a final judgment of a court of competent jurisdiction and, except as may be necessary to reflect adjustments to the Allocation Schedule resulting from post-Closing payments. Purchaser, on the one hand, and the Seller, on the other hand, shall notify the other if it receives notice that any Governmental Authority proposes any allocation different from Allocation Schedule.

# ARTICLE 3
# REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as disclosed in a document herewith delivered by the Seller to Purchaser (the "**Schedules**"), the Seller hereby makes the representations and warranties contained in this Article 3 to Purchaser.

3.1    **Organization, Good Standing and Other Matters**. The Seller is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite corporate power and authority to operate the Business and necessary to own, lease or operate the properties and assets owned, leased or operated by it to carry on the Business as now being conducted, except where the failure to be so duly organized, validly existing and in good standing, or to have such power and authority, would not, individually or in the aggregate, have a Material Adverse Effect. The Seller is duly qualified to do business as a foreign company in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

3.2    **Authority and Enforceability**. Subject to Bankruptcy Court approval, the Seller has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which the Seller is (or at Closing, will be) a party thereto, and the consummation by the Seller of the Transactions, have been duly authorized and approved by all necessary corporate action on the part of the Seller and are subject to the approval of the Bankruptcy Court. This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by the Seller and, assuming the due execution and delivery by the other parties hereto or thereto, and subject to the approval of the Bankruptcy Court, constitutes a valid and binding obligation of the Seller, enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

3.3    **No Conflict; Required Filings and Consents**. Except as otherwise set forth on Schedule 3.3, the execution and delivery of this Agreement by the Seller does not and the execution and delivery of the Related Documents by the Seller will not, and the consummation of the Transactions hereby and thereby will not (a) violate the provisions of the Organizational Documents of the Seller, (b) subject to the entry of the Sale Order, violate any Applicable Law or Order to which Seller is subject or by which its properties or assets are bound, (c) require Seller to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order), (d) violate, conflict with, result in a breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both would become a default) under, any Contract to which the Transferred Assets are bound, or (e) result in the creation of any Lien upon any of the Transferred Assets; excluding from the foregoing clauses (b), (c), (d) and (e) any Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, have a Material Adverse Effect.

3.4    **Litigation**. There is no Action pending or, to the Seller's Knowledge, formally threatened in writing, against Seller before any Governmental Authority that would have a Material Adverse Effect or affect the Transferred Assets in any material respect after the entry of the Sale Order.

3.5    **Brokers and Finders**. Except for Raymond James & Associates, Inc. the Seller has not, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

3.6    **Title to Assets.**

     (a)    The Seller owns all Transferred Assets and has good, legal valid and marketable title to, and the right to transfer (or cause to be transferred) in accordance with the terms of this Agreement, all of the Transferred Assets Free and Clear.

     (b)    Seller is not a party to, or bound by, (i) any license, royalty agreement, or other agreement relating to the use of any Transferred Assets or (ii) any Contract required for the ownership, use or operation of the Transferred Assets.

     (c)    Schedule 3.6(c) sets forth a true, correct and complete list of the amounts of all Cure Costs applicable with respect to each Assigned Contract, and such Cure Costs do not exceed the amounts set forth therein.

     (d)    No current or former Affiliate, partner, director, stockholder, officer, member, manager, employee, consultant or contractor of the Seller will, after giving effect to the Transactions, own, license or retain any Transferred Assets.

     (e)    To Seller's Knowledge, no interference, opposition, reissue, reexamination, or other proceeding is or has been pending or threatened, in which the scope, validity, or enforceability of any Transferred Assets is being, has been challenged.

     (f)    There is no Owned Intellectual Property.

3.7    **Compliance with Applicable Laws; Regulatory Matters**.

(a)    Any representations made in Sections (b) and (c) herein are subject to the exclusions and/or additional representations provided on Schedule 3.7 attached hereto.

(b)    Except in each case as would not, individually or in the aggregate, reasonably be expected have a Material Adverse Effect, (i) the Seller is and since January 1, 2022 has been, in compliance with all Applicable Laws and (ii) the Seller is not and since January 1, 2022, has not been subject to any Action or Order relating to or arising under a violation of any Applicable Laws, and, to the Knowledge of the Seller, no such Action has been threatened in writing.

(c)    The Seller is in compliance in all material respects with the Seller's adverse event reporting and other obligations with respect to the Product ANDAs.  The Seller has not received any notice from the FDA that would be expected to lead to revocation of a Product ANDA.

3.8    **No Other Representations or Warranties**.

(a)    Except for the representations and warranties contained in this Article 3, the Seller does not, nor do any other Persons on behalf of the Seller, make any other express or implied representation or warranty with respect to itself, the Business, the Transferred Assets or the Assumed Liabilities, or with respect to any other information provided to Purchaser or its representatives, and the Seller disclaims any other representations or warranties, whether made by or on behalf of the Seller or any other Person. The Seller will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

(b)    Except for the specific representations and warranties expressly made by Purchaser in Article 4 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 and Article 10 of this Agreement, the Seller acknowledges and agrees that Purchaser is not making and has not made any representation or warranty, expressed or implied, at law or in equity.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed in a document herewith delivered by Purchaser to the Seller (the "**Purchaser Schedules**"), Purchaser hereby makes the representations and warranties contained in this Article 4 to the Seller.

4.1    **Organization, Good Standing and Other Matters**. Purchaser is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has all requisite corporate power or other entity power and authority to own its properties and to carry on its business as now being conducted. Purchaser is duly qualified or licensed to conduct its business as currently conducted and is in good standing in each jurisdiction in which the location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary, except where the failure to be so qualified or licensed would not, individually or in the aggregate, materially impair or delay Purchaser's ability to consummate the Transactions.

4.2    **Authority and Enforceability**. Purchaser has all requisite corporate power or other entity power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized and approved by its board of directors (or equivalent governing body) and no other action on the part of Purchaser or its members is necessary to authorize the execution, delivery and performance of this Agreement and the Related Documents by Purchaser and the consummation of the Transactions. This Agreement has been, and each Related Document will be at or prior to Closing, duly executed and delivered by Purchaser and, assuming the due execution and delivery by the other parties hereto or thereto, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

4.3    **No Conflict: Required Filings and Consents**. Except as set forth on Schedule 4.3, the execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (a) violate the provisions of its Organizational Documents, (b) violate any Applicable Law or Order to which it is subject or by which any of its properties or assets are bound or (c) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order).

4.4    **Financing**. Purchaser has, and at the Closing will have, (a) sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price in accordance with the terms hereof and any other payments required hereunder and any expenses incurred or required to be paid by Purchaser in connection with the Transactions, and (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Documents. Purchaser has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

4.5    **Solvency**. Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors. Immediately after giving effect to all of the Transactions, including the making of the payments contemplated by Section 2.9, and assuming satisfaction of the conditions to Purchaser's obligation to consummate the Transactions as set forth herein, the accuracy of the representations and warranties of Purchaser set forth herein and the

22

Docusign Envelope ID: 2BD5F3A5-9E4D-4A36-99C3-D5A929ABEA61

performance by Purchaser of its obligations hereunder in all material respects, Purchaser will be Solvent.

4.6    **Litigation**. There is no Action pending or, to Purchaser's Knowledge, formally threatened in writing against Purchaser or involving any of its properties or assets that would be reasonably be expected to (a) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (b) otherwise prevent, hinder or delay the consummation of the Transactions.

4.7    **Brokers and Finders**. None of Purchaser or its Affiliates have, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

4.8    **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties**.

(a)    Purchaser acknowledges that it and its representatives have received access to such books and records, facilities, equipment, contracts and other assets of the Business which it and its representatives have desired or requested to review. Purchaser acknowledges and agrees that (i) it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Seller, the Business, the Transferred Assets and the Assumed Liabilities and (ii) the Transferred Assets and the Assumed Liabilities are being transferred and acquired on a "where is" and, as to condition, "as is" and "with all faults" basis.

(b)    Except for the specific representations and warranties expressly made by the Seller in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement, Purchaser acknowledges and agrees that (i) the Seller is not making and has not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Business, the Transferred Assets, the Assumed Liabilities, or any of its operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, stockholder, agent, Affiliate, advisor, representative or employee of the Seller has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in Article 3 and subject to the limited remedies herein provided.

(c)    Other than the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement, Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Seller and the Seller's Affiliates have specifically disclaimed and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance

Docusign Envelope ID: 8BD5E3A5-9E4D-4A36-89C3-D5A929ABEA61

on any such other representation or warranty made by any Person. Purchaser specifically waives any obligation or duty by the Seller or the Seller's Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties expressly set forth in Article 3 and disclaim reliance on any information not specifically required to be provided or disclosed pursuant to the specific representations and warranties set forth in Article 3.

(d)    Purchaser is acquiring the Transferred Assets and the Assumed Liabilities subject only to the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement.

4.9    **No Other Representations or Warranties.** Except for the representations and warranties contained in this Article 4, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Seller or its representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Affiliates, officers, directors, employees, agents or representatives.

## ARTICLE 5
## BANKRUPTCY COURT MATTERS

5.1    **Competing Transaction**. This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise) in accordance with the terms of the Bid Procedures Order (each, a "**Competing Bid**"). From the Agreement Date (and any prior time) and until the completion of the Auction, the Seller is permitted to, and to cause its representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any reorganization, sale or other disposition of the Transferred Assets. In addition, the Seller shall have the authority to respond to any inquiries or offers to reorganize, purchase all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bid Procedures Order or other Applicable Law, including supplying information relating to the Business and the assets of the Seller to prospective plan sponsors or purchasers.

5.2    **Bankruptcy Court Filings**.

(a)    Subject to its right to pursue a Competing Bid in accordance with the Bid Procedures Order, the Seller shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Transferred Assets and the Assumed Liabilities to Purchaser Free and Clear and free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code and provide that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. The Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order and

24

causing such Sale Order to be a Final Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)    The Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at an auction undertaken pursuant to the Bid Procedures Order (the "**Auction**"), and (i) Purchaser submits the Back-Up Bid at the Auction or (ii) the terms of this Agreement are deemed to constitute a Back-Up Bid, then Purchaser shall be obligated to promptly consummate the Transactions upon the terms and conditions as set forth herein, including the payment of the Purchase Price as the same may be increased by Purchaser at the Auction; provided that, the Seller gives written notice to Purchaser on or before the Back-up Termination Date, stating that the Seller (A) failed to consummate the sale of the Transferred Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder. For the avoidance of doubt, if Seller fails to give Purchaser the written notice as set forth in the foregoing sentence, Purchaser shall have no obligations under this Agreement following the occurrence of the Back-up Termination Date. The Back-Up Bids to which this Agreement relate are set forth on Schedule 5.2(b).

5.3    **Assumption of Assigned Contracts**.

(a)    On or before the date that is five (5) Business Days following the date on which the Bid Procedures Order is entered by the Bankruptcy Court, the Seller shall file (or cause to be filed) a notice of potential assumption (the "**Assumption Notice**") with the Bankruptcy Court and serve such notice on each counterparty to an Assigned Contract listed thereon. The Assumption Notice shall identify all Assigned Contracts that the Seller and Purchaser believe may be assumed and assigned in connection with the sale of the Transferred Assets and set forth a good faith estimate of the amount of Cure Costs applicable to each such Assigned Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Assigned Contract, the amount of such Cure Cost designated for such Assigned Contract shall be "$0.00"). In accordance with the Bid Procedures Order, the Seller reserves the right to supplement such list of Assigned Contracts and provide additional notice of assumption, and to remove an Assigned Contract from the list of Assigned Contracts, up to five (5) Business Days prior to the hearing by the Bankruptcy Court with respect to the Sale Motion.

(b)    On or before the date that is three (3) Business Days before the Closing Date (the "**Designation Deadline**"), Purchaser shall provide to the Seller a list of those Assigned Contracts that it elects to have assumed and assigned to Purchaser on the Closing Date (the "**Designated Contracts**"). Purchaser shall be entitled to remove any Assigned Contract from the list of Designated Contracts at any time prior to the Designation Deadline by providing the Seller written notice of such removal. In the event that Purchaser removes any of such Assigned Contracts from such list, the Seller will provide the relevant counterparty written notice that the applicable Assigned Contract is no longer identified as a Designated Contract and shall not be an Assigned Contract and shall be an Excluded Contract. For the avoidance of doubt, only those executory Assigned Contracts that remain identified as Designated Contracts as of the Closing Date will constitute Assigned Contracts and will be assumed by the Seller and assigned to

25

Purchaser pursuant to the Sale Order. Purchaser shall not have any obligation to pay Cure Costs or any other obligation under any Contract that is not a Designated Contract. The Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assigned Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude the Seller from filing one or more motion to reject any Contracts that are not Assigned Contracts.

(c)    Notwithstanding any provision in this Agreement to the contrary, a Contract shall not be a Designated Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is (i) deemed rejected under Section 365 of the Bankruptcy Code, (ii) the subject of an objection to assignment or assumption or requires the consent of any Governmental Authority or other third party (other than, and in addition to, the Bankruptcy Court) in order to permit the assumption and assignment by the Seller to Purchaser of such Contract pursuant to Section 365 of the Bankruptcy Code, and such objection has not been resolved or such consent has not been obtained prior to the thirtieth day following the Closing Date (as such period may be extended by mutual agreement of the Seller and Purchaser), or (iii) is terminated by any party thereto other than the Seller, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as a Designated Contract hereunder and is not continued or otherwise extended upon assumption. To the extent that any Assigned Contract is subject to a dispute or objection regarding its assignment or the Cure Costs, Purchaser shall be permitted to designate such Assigned Contract as a Designated Contract after the Closing Date by providing written notice to the Seller within ten (10) Business Days of the resolution of such dispute or objection. In no event shall the failure to assign to Purchaser any Contract in accordance with subsections (i) through (iii) above reduce the Purchase Price payable to the Seller or constitute a failure to satisfy the conditions precedent of the Seller under Section 8.3.

(d)    Subject to the terms of Section 2.5, Section 2.8, Section 5.3(a) and Section 5.3(b), Purchaser shall make provision for the payment of the Determined Cure Costs in cash at Closing in accordance with the Sale Order.

(e)    Notwithstanding any provision in this Agreement to the contrary, from and after the date of the Assumption Notice through the Closing Date, the Seller will not reject or take any action (or fail to take any action that would result in rejection by operation of Applicable Law) to reject, withdraw, repudiate or disclaim any Assigned Contract unless (i) Purchaser has provided its prior written consent or (ii) Purchaser has removed such Assigned Contract from the list of Designated Contracts.

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1    **Conduct of Business**. Except (i) as set forth on Schedule 6.1, (ii) as may be approved by Purchaser (which approval will not be unreasonably withheld, delayed or conditioned; provided, however, that the consent of Purchaser shall be deemed to have been given if Purchaser does not object within 48 hours after written request for such consent is provided by the Seller to Purchaser), (iii) for actions taken or omitted to be taken by the Seller in response to any Public Health Measure, or (iv) as is otherwise contemplated or required by this Agreement, any Assigned Contract, by Applicable Laws or by order of the Bankruptcy Court, from the Agreement Date

through the earlier of the Closing Date or the termination of this Agreement in accordance with its terms:

(a)    The Seller shall use its commercially reasonable efforts to carry on the Business in all material respects in the ordinary course of business as it has been conducted since the Petition Date; and

(b)    The Seller shall not:

(i)    sell, license, abandon or otherwise dispose of any material asset or property constituting Transferred Assets other than inventory in the ordinary course of business;

(ii)    (A) change any material Tax election, file any material amended Tax Return, enter into any closing agreement, settle any material Tax Proceeding, in each case, relating to the Business or the Transferred Assets, or (B) consent to any extension or waiver of the limitation period applicable to any material Tax Proceeding relating to the Business or the Transferred Assets; or

(iii)    change its present accounting methods or principles in any material respect, except as required by GAAP or Applicable Law.

(c)    Notwithstanding anything to the contrary, nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the Business, assets and operations prior to the Closing. Prior to the Closing, the Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its Business, assets and operations.

6.2    **Access to Information; Confidentiality**.

(a)    From the Agreement Date until the earlier of the Closing Date and the termination of this Agreement, the Seller shall grant Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon reasonable notice (and in the event of a facility visit request, at least 48 hours prior notice), and subject to any limitations resulting from any Public Health Measures, to the personnel, facilities, book and records of the Seller related to the Business or the Transferred Assets that are in the possession or under the control of the Seller; provided, however, that (i) all requests for access shall be directed to James Grainer or such other person(s) as the Seller may designate in writing from time to time (the "**Seller Access Contact**"), (ii) such activities do not unreasonably interfere with the ongoing business or operations of the Seller, (iii) the Seller shall have the right to have one or more of its representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.2(a), (iv) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing, (v) such access or related activities would not cause a violation of any agreement to which the Seller is a party, (vi) no Personal Information shall be disclosed or used other than in compliance with applicable privacy law and (vii) nothing herein shall require Seller or its representatives to furnish to Purchaser or provide Purchaser with access to information that

27

(A) is subject to an attorney-client or an attorney work-product privilege, (B) legal counsel for the Seller reasonably concludes may give rise to antitrust or competition law issues or violate a protective order or otherwise may not be disclosed pursuant to Applicable Law (including any Public Health Measure) or (C) would cause significant competitive harm to the Seller if the Transactions are not consummated.

(b)      Notwithstanding anything to the contrary contained in this Agreement, from the Agreement Date until the Closing Date, Purchaser shall not, and shall cause its representatives not to, have any contact or discussions concerning Seller, the Business, the Transactions or any other matters related to any of the foregoing with any lender, borrower, creditor, guarantor, business partner, bank, landlord, tenant, supplier, customer, employee, manager, franchisee, distributer, noteholder, independent contractor, consultant or other material business relation of the Seller, in each case, without the prior written consent of the Seller Access Contact (which consent may be withheld in the Seller's sole discretion and, if given, may be conditioned on the Seller Access Contact or his or her designee having the right to participate in any meeting or discussion).

(c)      Any information provided to or obtained by Purchaser or its representatives, including pursuant to this Section 6.2 is confidential information and subject to the terms of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference. Effective upon (and only upon) the Closing, the Confidentiality Agreement shall automatically terminate and none of the parties thereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained by Purchaser or its representatives concerning the Seller that is not related to the Transferred Assets, which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. If this Agreement is terminated prior to Closing for any reason, the terms of the Confidentiality Agreement shall remain in full force and effect.

6.3      **Efforts to Consummate.** Except as otherwise provided in this Agreement, each of the parties hereto agrees to use its commercially reasonable efforts to cause the Closing to occur as soon as possible after the Agreement Date, including satisfying the conditions precedent set forth in Article 8 applicable to such party including (a) defending against any Actions, judicial or administrative, challenging this Agreement or the consummation of the Transactions, (b) seeking to have any preliminary injunction, temporary restraining order, stay or other legal restraint or prohibition entered or imposed by any court or other Governmental Authority that is not yet final and nonappealable vacated or reversed, and (c) executing any additional instruments reasonably requested by another party hereto (without cost or expense to the executing party) necessary to carry out the Transactions and to fully carry out the purposes of this Agreement; provided, however, that, for purposes of "commercially reasonable efforts" standard as required by this Section 6.3, Section 6.1(a), or Section 2.6(b) neither the Seller nor its Affiliates or representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party or to otherwise expend any money or suffer any detriment, to expend any money to remedy any breach of any representation or warranty hereunder, to commence any Action, to waive or surrender any right, to modify any agreement (including any Assigned Contract) or to provide financing to Purchaser for the consummation of the Transactions.

6.4    **Public Announcements**. Between the Agreement Date and the Closing Date, except to the extent required by any Applicable Law or Action (including the Bankruptcy Case), neither Purchaser nor the Seller shall, and Purchaser and the Seller shall cause their respective Affiliates and representatives not to, directly or indirectly, issue any press release or public announcement of any kind without the prior written consent of Purchaser and the Seller; provided, however, that the Seller and its Affiliates may make announcements from time to time to their respective employees, customers, suppliers, and other business relations and otherwise as the Seller may reasonably determine is necessary to comply with Applicable Law or the requirements of this Agreement or any other agreement to which the Seller or any such Affiliate is a party. Purchaser and the Seller shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the parties.

6.5    **Update of Schedules; Knowledge of Breach**. From time to time prior to the Closing, the Seller may supplement or amend the Schedules with respect to any matter hereafter arising or discovered which if existing or known by the Seller at the Agreement Date would have been required to be set forth or described in such Schedules and also with respect to events or conditions arising after the date hereof and prior to Closing. Any such supplemental or amended disclosure shall not be deemed to have cured any such breach of representation or warranty for purposes of determining whether or not the conditions set forth in Section 8.2(a) have been satisfied. From and after the Closing, references to the Schedules shall be references to the Schedules as supplemented, modified and/or updated. If, prior to the Closing, Purchaser shall have reason to believe that any breach of a representation or warranty of the Seller has occurred (other than through notice from the Seller), Purchaser shall promptly so notify the Seller, in reasonable detail. Nothing in this Agreement, including this Section 6.5, shall imply that the Seller is making any representation or warranty as of any date other than the Closing Date (other than representations and warranties that are expressly made as of an earlier date).

# ARTICLE 7
# POST-CLOSING COVENANTS

7.1    **Access to Information; Books and Records**. From and after the Closing, each of Purchaser and the Seller shall cause their representatives to furnish all information reasonably requested by the other party or its representatives in connection with the administration of the Bankruptcy Case, any claims or interests asserted by parties in interest against Seller in the Bankruptcy Case, financial or regulatory reporting whether in the Bankruptcy Case or otherwise, audit, third party litigation, preparing or filing of any Tax Return or the defense in any Tax Proceeding; provided, however, that nothing in this Section 7.1 shall require a party to furnish to the other party or its representatives any material that is subject to an attorney-client or solicitor-client privilege or an attorney or solicitor work-product privilege or which may not be disclosed pursuant to Applicable Law.

7.2    **Post-Closing Receipt and Possession of Assets**.

(a)    After the Closing Date, the Seller shall transfer promptly to Purchaser from time to time (but in any event on a monthly basis) any payments constituting Transferred Assets received by the Seller. After the Closing Date, Purchaser shall transfer promptly to the Seller, from

Docusign Envelope ID: 8BD5E2A5-9E4D-4A36-89C3-D5A229ABEA61

time to time (but in any event on a monthly basis), any payments constituting Excluded Assets, received by Purchaser after the Closing.

(b)    In the event that, after the Closing Date, Purchaser receives or otherwise is in possession of any Excluded Asset, Purchaser shall promptly notify the Seller of its receipt or possession of such other Excluded Asset and transfer such Excluded Asset to the Seller. In the event that, after the Closing Date, the Seller receives or otherwise is in possession of any other Transferred Asset, the Seller shall promptly notify Purchaser of its receipt or possession of such other Transferred Asset and transfer, at Purchaser's expense, such Transferred Asset to Purchaser.

7.3    **Tax Matters**.

(a)    The Seller shall be responsible for preparing or causing to be prepared all Tax Returns with respect to the Business and the Transferred Assets for taxable periods ending on or before the Closing Date (each, a "**Pre-Closing Tax Period**") that are required to be filed on or before the Closing Date. After the Closing Date, Purchaser will assist and cooperate with the Seller in preparing any such Tax Return with respect to the Transferred Assets.

(b)    Purchaser shall prepare and timely file or cause to be prepared and timely filed (taking into account all extensions properly obtained) all Tax Returns with respect to the Transferred Assets that are required to be filed for any taxable period that begins on or before the Closing Date and ends after the Closing Date (a "**Straddle Period**") and shall timely pay, or cause to be timely paid, the amount of any Taxes due thereon other than Seller Taxes. Purchaser shall provide the Seller with completed drafts of such Tax Returns for the Seller's review and reasonable comment at least fifteen days prior to the due date for filing thereof, taking into account extensions (or, if such due date is within fifteen days following the Closing Date, as promptly as practicable following the Closing Date) and shall consider any comments of Seller in good faith to such Tax Returns as are reasonably requested by the Seller, provided such requests are consistent with the prior practice of the Seller (to the extent relevant) and comply with Applicable Law.

(c)    The Seller shall be liable for any Taxes with respect to a Pre-Closing Tax Period and the portion of any Straddle Period ending on the Closing Date ("**Seller Taxes**"). For purposes of this Agreement, in the case of any Straddle Period, (a) the amount of any Taxes based on or measured by income or receipts, sales or use, employment, or withholding allocated to the portion of such Straddle Period ending on the Closing Date shall be determined based on an interim closing of the books as of the end of the day on the Closing Date and (b) any other Taxes shall be allocated to the portion of such Straddle Period ending on the Closing Date by prorating the amount of such Tax for the entire taxable period on a per diem basis.

(d)    Purchaser shall promptly notify the Seller in writing upon receipt by Purchaser or any of its Affiliates of notice of any pending or threatened U.S. federal, state, local or foreign Tax audits, proceedings or assessments relating to Pre-Closing Tax Period, Straddle Period or otherwise relating to a Tax for which the Seller is liable pursuant to Section 7.3(c) (a "**Pre-Closing Tax Claim**").

(e)    Purchaser shall have the sole right to control the defense or resolution of any Pre-Closing Tax Claim, and to employ counsel of its choice.

(f)    After the Closing, each of the Seller and Purchaser shall (and Purchaser shall cause its Affiliates to):

(i)    timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce), or file Tax Returns or other reports with respect to, Transfer Taxes;

(ii)    cooperate fully in preparing for and defending any Tax Proceeding with Governmental Authorities regarding any Tax Returns required to be filed by, or Taxes related to the Transferred Assets due from, the Seller for any Pre-Closing Tax Period or Straddle Period; and

(iii)    furnish the other party with copies of all correspondence received from any Governmental Authority in connection with any Tax Proceeding, related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period, and furnish the other parties with copies of all records and documents relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period that are proposed to be destroyed (and not otherwise in the possession of such other party).

## ARTICLE 8
## CONDITIONS PRECEDENT

8.1    __Conditions to Each Party's Obligation__. The respective obligations of the parties hereto to effect the Transactions are subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller and Purchaser), at or prior to the Closing, of the following conditions:

(a)    <u>No Injunctions or Restraints</u>. No Order or Applicable Law preventing the consummation of the Transactions shall be in effect.

(b)    <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be a Final Order.

8.2    __Conditions to Obligation of Purchaser__. The obligations of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by Purchaser), at or prior to the Closing, of the following conditions:

(a)    <u>Representations and Warranties</u>. Each of the representations and warranties of the Seller set forth in <u>Article 3</u> shall be true and correct in all material respects (without giving effect to any qualifications or limitations as to "materiality", "Material Adverse Effect" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date).

(b)    <u>Performance of Covenants and Obligations</u>. The Seller shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c)    <u>Closing Deliverables</u>. The Seller shall have delivered to Purchaser the closing deliveries required to be delivered by the Seller pursuant to <u>Section 2.8</u>.

8.3    **Conditions to Obligations of the Seller**. The obligation of the Seller to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller), at or prior to the Closing, of the following conditions:

(a)    <u>Representations and Warranties</u>. Each of the representations and warranties of Purchaser set forth in <u>Article 4</u> shall be true and correct in all material respects (without giving effect to any qualifications or limitations as to "materiality" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date).

(b)    <u>Performance of Covenants and Obligations of Purchaser</u>. Purchaser shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c)    <u>Closing Deliverables</u>. Purchaser shall have delivered to the Seller the closing deliveries required to be delivered by Purchaser pursuant to <u>Section 2.8</u>.

8.4    **Waiver of Condition; Frustration of Conditions**. All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Purchaser nor the Seller may rely on the failure of any condition set forth in this <u>Article 8</u>, as applicable, to be satisfied if such failure was caused by such party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions.

8.5    **Delivery of a Notice of Readiness to Close**. At any time after the Seller's satisfaction of its conditions to Closing in accordance with the terms of <u>Section 8.1</u> and <u>Section 8.3</u> of this Agreement, the Seller may deliver a notice to the Purchaser (a "**Notice of Readiness to Close**"). The Purchaser shall have five (5) Business Days from delivery of a Notice of Readiness to Close to satisfy its conditions to Closing in accordance with the terms of <u>Section 8.1</u> and <u>Section 8.2</u> of this Agreement and consummate the Transactions; <u>provided</u>, that in no event shall Purchaser be required to close prior to the Outside Date. If Purchaser does not satisfy its conditions to Closing and consummate the Transaction within the timeframe set forth in the preceding sentence, Purchaser shall forfeit the entire Deposit Escrow Amount to the Seller.

**ARTICLE 9**
**TERMINATION**

9.1    **Events of Termination**. Notwithstanding anything to the contrary, this Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing:

(a)    by mutual written consent of Purchaser and the Seller;

(b)    automatically, upon the consummation of a sale or other disposition of all or substantially all of the Transferred Assets to a Person other than Purchaser (each, an "**Alternate Transaction**");

32

Docusign Envelope ID: 8BD5E3A5-9E4D-4A36-89C3-D5A929ABEA61

(c)    by Purchaser or the Seller by written notice to Purchaser or the Seller from the other, if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(d)    by Purchaser, by written notice from Purchaser to the Seller, if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement, such that the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Seller prior to the earlier of (i) five Business Days after receipt of written notice from Purchaser requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(d) shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(e)    by the Seller, by written notice from the Seller to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) five Business Days after receipt of written notice from the Seller requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(e) shall not be available to the Seller if the failure of the Seller to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement;

(f)    by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Applicable Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Transactions and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(f) shall not be available to the party seeking to terminate if any action of such party or any failure of such party to act has contributed to such Order or other action and such action or failure constitutes a breach of this Agreement; or

(g)    by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if the Closing has not occurred on or prior to April 18, 2025 (the "**Outside Date**"); provided, however, that the party exercising the right to terminate this Agreement pursuant to this Section 9.1(g) shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement.

9.2    **Effect of Termination**.

(a)    In the event that this Agreement shall be terminated pursuant to Section 9.1, (a) Purchaser and its representatives shall promptly return all documents, work papers and other

materials of the Seller including any confidential information and (b) all further obligations of the parties hereto under this Agreement shall terminate without further Liability or obligation to the other parties hereto; provided, however, that, notwithstanding the foregoing, the Liabilities and obligations under (i) the Confidentiality Agreement, and (ii) Section 2.9(c), Section 6.2(c), this Section 9.2 and Article 10 shall continue in full force and effect.

(b)    Notwithstanding anything to the contrary in this Agreement, in the event of valid termination of this Agreement pursuant to Section 9.1(e), Seller shall be entitled to all remedies available at law or in equity, including without limitation, retention of the Deposit Escrow Amount, damages, and/or specific performance pursuant to Section 10.13 of this Agreement.

## ARTICLE 10
## GENERAL PROVISIONS

10.1    **Survival of Representations, Warranties and Covenants.** All covenants and agreements contained in this Agreement that by their term are to be performed in whole or in part, or which prohibit actions, subsequent to Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive Closing and shall therefore terminate, including any Action for damages in respect of any breach or inaccuracy thereof. Notwithstanding the foregoing, the provisions of Section 2.9(c), Section 6.2, Section 9.2 and this Article 10 shall survive the Closing.

10.2    **Entire Agreement**. This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings. The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the parties hereto expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents. Furthermore, the parties each hereby acknowledge that this Agreement, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all parties to this Agreement, the Confidentiality Agreement and the Related Documents specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction. The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the parties hereby agree that neither party hereto shall have any

34

remedies or cause of action (whether in contract or in tort or otherwise) of any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

10.3    **Amendment; No Waiver**. This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and, if applicable, the Related Documents) executed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any party of a breach of any provision of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.4    **Severability**. Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any term or other provision of this Agreement or the Related Documents is invalid, illegal, or incapable of being enforced by any Applicable Law or public policy, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the parties to the greatest extent consistent with being valid and enforceable under Applicable Law. No party hereto shall assert, and Purchaser shall cause its Affiliates or related parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable.

10.5    **Expenses and Obligations**. Except as otherwise provided in this Agreement, all costs and expenses incurred by the parties hereto in connection with the Transactions, including the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the party that has incurred such expenses.

10.6    **Notices**. All notices, consents, waivers, and other communications under this Agreement or the Related Documents must be in writing and will be deemed to have been duly given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing for next day delivery (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if delivered by electronic mail (unless the sender receives an automated message that the email has not been delivered) on the date of transmission if on a Business Day before 5:00 p.m. local time of the business address of the recipient party (otherwise on the next succeeding Business Day) and (d) if deposited in the United States mail, first-class postage prepaid, on the date of delivery, in each case to the appropriate addresses or email addresses set forth below (or to such other addresses as a party may designate by notice to the other parties in accordance with this Section 10.6):

If to Seller:

Timothy P. Neumann, Esq.
Broege, Neumann, Fischer & Shaver, LLC
25 Abe Voorhees Drive
Manasquan, New Jersey 08736
(732)223-8484, ext. 214
tneumann@bnfsbankruptcy.com

With a copy to Secured Creditor:

Julie M. Murphy, Esq.
Stradley Ronon Stevens & Young, LLP
457 Haddonfield Rd., Suite 100
Cherry Hill, New Jersey 08002
E-Mail: jmmurphy@stradley.com

With a copy to Official Committee of Unsecured Creditors:

Robert M. Schechter, Esq.
Porzio, Bromberg & Newman, P.C.
100 Southgate Parkway
Morristown, NJ 07962
(973) 889-4127
Email: rmschechter@pbnlaw.com

If to Purchaser:

PAI Holdings, LLC d/b/a PAI Pharma
20 Waterview Blvd
Parsippany, NJ 07054
Telephone:  1-864-277-7282
Attn:  Kurt Orlofski, CEO
Email: KOrlofski@PAIPHARMA.COM

With a copy (which shall not constitute notice) to:

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Attn:  Nicholas G. Mehler
Email: nmehler@lowenstein.com

10.7   **Counterparts**. This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF

format, or other agreed format shall be sufficient to bind the parties to the terms and conditions of this Agreement. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

10.8    **Governing Law.** This Agreement, the Related Documents and all Related Claims shall be governed by the internal laws of the State of New Jersey (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Applicable Laws of any other jurisdiction.

10.9    **Submission to Jurisdiction; Consent to Service of Process**.

(a)    Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Related Document, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6; provided, however, that if the Bankruptcy Case has closed, the parties agree to irrevocably submit to the exclusive jurisdiction of the of the Superior Court of the State of New Jersey. The parties hereto hereby irrevocably and unconditionally waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any Related Claim by the delivery of a copy thereof in accordance with the provisions of Section 10.6 (other than by email) along with a notification that service of process is being served in conformance with this Section 10.9(b). Nothing in this Agreement will affect the right of any party to serve process in any other manner permitted by Applicable Law.

10.10    **Waiver of Jury Trial**. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS.

10.11    **Rights Cumulative**. All rights and remedies of each of the parties under this Agreement and the Related Documents will be cumulative, and the exercise of one or more rights

or remedies will not preclude the exercise of any other right or remedy available under this Agreement, the Related Documents or Applicable Law.

10.12  **Assignment**. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the parties hereto. No assignment of this Agreement or any of the rights, interests or obligations under this Agreement may be made by any party hereto at any time, whether or not by operation of law, without the prior written consent of the Seller and Purchaser, and any attempted assignment without the required consent shall be void; provided, however, that (a) Purchaser may assign (i) any of its rights or delegate any of its duties under this Agreement to any of its Affiliates, and (ii) its rights, but not its duties, under this Agreement to any of its financing sources and (b) the Seller may assign any of its rights or delegate any of its duties under this Agreement to any successor thereto, including any liquidating trustee or other agent; provided, further, however, that, in each case, such assignment shall not release Purchaser from its obligations under this Agreement and the Seller shall have no obligation to pursue remedies against any assignee of Purchaser before proceeding against Purchaser for any breach of Purchaser's obligations hereunder.

10.13  **Specific Enforcement; Remedies**. The parties hereto agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the Purchaser hereto in accordance with their specific terms or were otherwise breached. It is accordingly agreed that (a) each party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of each party to cause the other party to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and Applicable Laws and to thereafter cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right each party would not have entered into this Agreement. Notwithstanding anything to the contrary set forth herein, the parties hereto agree that (i) the Seller's right to retain the Deposit Escrow Amount, as set forth in Section 2.9(c), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

10.14.  **Third-Party Beneficiaries**. Except as expressly set forth herein, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties hereto any rights or remedies of any nature whatsoever under or by reason of this Agreement.

*{THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK
SIGNATURES FOLLOW}*

Docusign Envelope ID: 8BD5E3A5-9E4D-4A36-99C3-D5A929ABEA61

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**PURCHASER**:

**PAI HOLDINGS, LLC D/B/A PAI PHARMA**

By: _____
     Name: Kurt Orlofski
     Title: CEO

*Signature Page to Asset Purchase Agreement*

**IN WJTNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**SELLER:**

NOSTRUM LABORATORIES, INC.

By: _James L. Grainer_
Name: James Grainer
Title: Chief Financial Officer

# EXHIBIT A

## Bid Procedures Order

See attached.

24-19611JKS  [ECF No. 268].

| SCHEDULES | |
|---|---|
| Schedule 2.1(a) - Inventories | To be supplied |
| Schedule 2.1(b) - Product ANDAs | See attached |
| Schedule 2.1(c) - Assigned Contracts | See attached |
| Schedule 2.2(l) - Other mutually-agreed Excluded Assets | None |
| Schedule 2.11 - Allocation Schedule | To be supplied |
| Schedule 3.3 - Consents Required | None |
| Schedule 3.6(c) - Cure Costs | None |
| Schedule 6.1 - Conduct of Business | None |

# SCHEDULE 2.1(a)
# INVENTORY

| category | quantity | unit of measure | lot number | storage location |
|---|---|---|---|---|
| **Valproic Acid Oral Solution USP, 250 mg/5 mL** | | | | |

# SCHEDULE 2.1(b)

# PRODUCT ANDAS

**Schedule 2.1(b)**
**Product ANDAs**

077105        **Valproic Acid Oral Solution USP, 250 mg/5 mL**

# SCHEDULE 2.1(c)

# ASSIGNED CONTRACTS

**Schedule 2.1(c)**
**Assigned Contracts**

None.[1]

---

[1] Subject to update pursuant to Section 2.1(c).

# SCHEDULE 3.3

# REQUIRED CONSENTS

**Schedule 3.3**
**Required Consents**

None.

**Schedule 3.7**

1. The Generic Drug User Fee Administration ("GDUFA") fees due in total are about $4.3 million, approximately $440,000 of which is attributable to facility fees and $3.9 million is attributable to program fees.

2. The Debtor has received notices from the FDA that the Debtor is not in compliance with the GDUFA fees owed and reminders of the amounts due.

3. The Debtor currently owes the Center for Medicare and Medicaid Services approximately $4,000,000.00.

4. The Debtor has entered into a settlement with the Department of Justice in total for $1.989 million, the federal component owed is $967,000 and the state component is approximately $1,022,000. This settlement relates rebates owed from previous sales of the Debtor's products. The Debtor has defaulted in its obligations under the settlement.

# Schedule 5.2(b)
# Back-Up Bids

Purchase Price of $225,000 with 0% Holdback, with respect to the following ANDAs:

- 085186 Elixophyllin

- 210663 Hydrocodone Bitartrate /Homatropine Methylbromide

- 201011 Morphine Sulfate

- 201448 Oxycodone Hydrochloride and Acetaminophen

- 202060 PEG-3350

**docusign**

| **Certificate Of Completion** | | |
|---|---|---|
| Envelope Id: 8BD5F3A5-9E4D-4A36-80C3-DFA929ABEA61 | | Status: Completed |
| Subject: Complete with Docusign: Project Cure APA - ANDA - PAI  (execution copy 4.4.25).pdf | | |
| Source Envelope: | | |
| Document Pages: 54 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 1 | Initials: 0 | Elizabeth Hatfield |
| AutoNav: Enabled | | 1 Lowenstein Drive |
| EnvelopeId Stamping: Enabled | | Roseland, NJ  07068 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | ehatfield@lowenstein.com |
| | | IP Address: 163.116.254.46 |

| **Record Tracking** | | |
|---|---|---|
| Status: Original | Holder: Elizabeth Hatfield | Location: DocuSign |
| 4/4/2025 1:22:06 PM | ehatfield@lowenstein.com | |

| **Signer Events** | **Signature** | **Timestamp** |
|---|---|---|
| Kurt Orlofski<br>korlofski@paipharma.com<br>CEO<br>Security Level: Email, Account Authentication<br>(None) | DocuSigned by:<br>*Kurt Orlofski*<br>72A4DC1F37594EE...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 173.220.145.234 | Sent: 4/4/2025 1:24:05 PM<br>Viewed: 4/4/2025 5:04:43 PM<br>Signed: 4/4/2025 5:07:06 PM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via Docusign | | |

| **In Person Signer Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Editor Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Agent Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Intermediary Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Certified Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Carbon Copy Events** | **Status** | **Timestamp** |
|---|---|---|

| **Witness Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Notary Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Envelope Summary Events** | **Status** | **Timestamps** |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 4/4/2025 1:24:06 PM |
| Certified Delivered | Security Checked | 4/4/2025 5:04:43 PM |
| Signing Complete | Security Checked | 4/4/2025 5:07:06 PM |
| Completed | Security Checked | 4/4/2025 5:07:06 PM |

| **Payment Events** | **Status** | **Timestamps** |
|---|---|---|

**ASSET PURCHASE AGREEMENT**


**by and between**


**CHARTWELL PHARMACEUTICALS, LLC, as Purchaser,**


**and**


**NOSTRUM LABORATORIES, INC., as Seller**


**Dated as of April 3, 2025**

**Table of Contents**

**Page**

ARTICLE 1 DEFINED TERMS ...................................................................................2

    1.1    **Defined Terms** ............................................................................2

    1.2    **Other Definitional and Interpretive Matters** ...................10

ARTICLE 2 THE PURCHASE AND SALE; CLOSING.....................................12

    2.1    **Purchase and Sale** ....................................................................12

    2.2    **Excluded Assets** .......................................................................13

    2.3    **Assumption of Liabilities**.......................................................15

    2.4    **Excluded Liabilities** ................................................................15

    2.5    **Excluded Contracts** .................................................................15

    2.6    **Nontransferable Assets and Liabilities** ..............................16

    2.7    **Closing** .......................................................................................16

    2.8    **Closing Deliveries of the Parties** ..........................................16

    2.9    **Purchawe Price; Assumed Liabilities; Deposits** .................17

    2.10    **Transfer Taxes** ........................................................................18

    2.11    **Allocation of Purchase Price** ...............................................18

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLER ........................18

    3.1    **Organization, Good Standing and Other Matters** ............18

    3.2    **Authority and Enforceability**................................................19

    3.3    **No Conflict; Required Filings and Consents** .....................19

    3.4    **Litigation** ..................................................................................19

    3.5    **Brokers and Finders** ...............................................................19

    3.6    **Title to Assets,** .........................................................................20

    3.7    **Compliance with Applicable Laws; Regulatory Matters** ...20

    3.8    **No Other Representations or Warranties** ............................20

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER ........................21

    4.1    **Organization, Good Standing and Other Matters** ............21

    4.2    **Authority and Enforceability**................................................21

    4.3    **No Conflict: Required Filings and Consents** ......................22

    4.4    **Financing** ...................................................................................22

    4.5    **Solvency** .....................................................................................22

    

| 4.6 | **Litigation** | 22 |
| 4.7 | **Brokers and Finders** | 22 |
| 4.8 | **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties** | 22 |
| 4.9 | **No Other Representations or Warranties** | 23 |

ARTICLE 5 BANKRUPTCY COURT MATTERS ........................................... 23

| 5.1 | **Competing Transaction** | 23 |
| 5.2 | **Bankruptcy Court Filings** | 24 |
| 5.3 | **Assumption of Assigned Contracts** | 24 |

ARTICLE 6 PRE-CLOSING COVENANTS ............................................... 26

| 6.1 | **Conduct of Business** | 26 |
| 6.2 | **Access to Information; Confidentiality** | 27 |
| 6.3 | **Efforts to Consummate** | 28 |
| 6.4 | **Public Announcements** | 28 |
| 6.5 | **Update of Schedules; Knowledge of Breach** | 28 |

ARTICLE 7 POST-CLOSING COVENANTS .............................................. 28

| 7.1 | **Access to Information; Books and Records** | 29 |
| 7.2 | **Post-Closing Receipt and Possession of Assets** | 29 |
| 7.3 | **Tax Matters** | 29 |

ARTICLE 8 CONDITIONS PRECEDENT ................................................ 30

| 8.1 | **Conditions to Each Party's Obligation** | 30 |
| 8.2 | **Conditions to Obligation of Purchaser** | 31 |
| 8.3 | **Conditions to Obligations of the Seller** | 31 |
| 8.4 | **Waiver of Condition; Frustration of Conditions** | 31 |
| 8.5 | **Delivery of a Notice of Readiness to Close** | 31 |

ARTICLE 9 TERMINATION .......................................................... 32

| 9.1 | **Events of Termination** | 32 |
| 9.2 | **Effect of Termination** | 33 |

ARTICLE 10 GENERAL PROVISIONS .................................................. 33

| 10.1 | **Survival of Representations, Warranties and Covenants** | 33 |
| 10.2 | **Entire Agreement** | 33 |
| 10.3 | **Amendment; No Waiver** | 34 |

10.4     **Severability** ........................................................................................34

10.5     **Expenses and Obligations** ...............................................................35

10.6     **Notices** ..............................................................................................35

10.7     **Counterparts** ....................................................................................36

10.8     **Governing Law** .................................................................................36

10.9     **Submission to Jurisdiction; Consent to Service of Process** ............36

10.10    **Waiver of Jury Trial** ........................................................................37

10.11    **Rights Cumulative** ...........................................................................37

10.12    **Assignment** .......................................................................................37

10.13    **Specific Enforcement; Remedies** .....................................................37

10.14.   **Third-Party Beneficiaries** ...............................................................38

## EXHIBITS

Exhibit A                          Bid Procedures Order

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of April 3, 2025 (the "**Agreement Date**") is entered into by and between CHARTWELL PHARMACEUTICALS, LLC, a Delaware limited liability company ("**Purchaser**") and **NOSTRUM LABORATORIES, INC**., a New Jersey corporation (the "**Seller**").

## RECITALS

**WHEREAS,** on September 30, 2024 (the "**Petition Date**"), Seller filed voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), Case No. 24-19611/JKS thereby commencing a chapter 11 case (the "**Bankruptcy Case**").  No trustee has been appointed and the Seller is continuing in the management of its businesses and possession of its property as a debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Seller desires to sell (or cause to be sold) to Purchaser, and Purchaser desires to purchase from the Seller, all of the Transferred Assets Free and Clear, and the Seller desires Purchaser to assume, and Purchaser desires to assume from the Seller, all of the Assumed Liabilities, in each case upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, the Transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court and will only be consummated pursuant, among other things, to the Sale Order to be entered in the Bankruptcy Case;

**WHEREAS,** Seller anticipates filing a motion (the "**Sale Motion**") to approve the sale of certain assets and the assignment of certain contracts to the highest bidder pursuant to Sections 363 and 365 of the Bankruptcy Code and subject to certain rules and procedures that all bidders must comply with as a condition to participating in the bidding process (the "**Bidding Procedures,**" copy annexed hereto as Exhibit A);

**WHEREAS**, in the event there are bidders wishing to bid, an auction will be held at which the Purchaser shall be allowed to participate, subject to its compliance with the Bidding Procedures, and there will occur a hearing in the Bankruptcy Court at which time the sale to the successful bidder shall be approved by the Bankruptcy Court by order of the Bankruptcy Court;

**WHEREAS**, concurrently with the execution of this Agreement, Purchaser shall deposit (or cause to be deposited) an aggregate amount equal to the Deposit Escrow Amount into the trust account of Seller's bankruptcy counsel, Broege, Neumann, Fischer & Shaver, LLC (the "**Deposit Trust Account**").

**NOW**, **THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.1     **Defined Terms**. The following terms shall have the following meanings in this Agreement:

"**Action**" means any action, proceeding, arbitration or litigation (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator.

"**Affiliate**" of any particular Person means any other Person, directly or indirectly, controlling, controlled by, or under common control with, such particular Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Agreement Date**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in Section 2.11(a).

"**Alternate Transaction**" has the meaning set forth in Section 9.1(b).

"**ANDA**" means an Abbreviated New Drug Application (including any amendments and supplements thereto) filed with the FDA in accordance with Section 505(j) of the Federal Food, Drug and Cosmetic Act of 1938.

"**Applicable Law**" means, with respect to any Person, any federal, provincial, state, or local law, ordinance, principle of common law, code, regulation or statute applicable to such Person or such Person's subsidiaries or to any of their respective securities, assets, properties or businesses, including, but not limited to, the Federal Food Drug and Cosmetic Act (21 U.S.C. §§ 301 et seq.).

"**Assigned Contracts**" has the meaning set forth in Section 2.1(c).

"**Assumed Liabilities**" means only the Liabilities arising out of Purchaser's ownership or operation of the Transferred Assets solely to the extent arising from periods occurring after the Closing Date and only to the extent not otherwise paid, performed, discharged or otherwise satisfied prior to the Closing.

"**Assumption Notice**" has the meaning set forth in Section 5.3(a).

"**Auction**" has the meaning set forth in Section 5.2(b).

"**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other claims, actions, rights, or remedies that may be brought by or on behalf of the Seller or its estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including, but not limited to, actions or remedies under sections 510, 542, 543, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"**Back-Up Bid**" means the second highest or otherwise best bid if the successful bidder fails to consummate its bid in accordance with the Bid Procedures.

"**Back-up Termination Date**" means the first to occur of (a) fifteen days after the entry of the Sale Order, (b) consummation of the Transactions with the winning bidder at the Auction, (c) Purchaser's receipt of notice from the Seller of the release by the Seller of Purchaser's obligations under Section 5.2(b) and (d) April 18, 2025.

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bid Procedures**" means those certain bidding procedures for the sale of the Seller's assets approved by the Bankruptcy Court.

"**Bid Procedures Order**" means an Order of the Bankruptcy Court approving the Bid Procedures attached hereto as Exhibit A.

"**Bill of Sale and Assignment and Assumption Agreement**" means the bill of sale and assignment and assumption agreement, dated as of the Closing Date, by and between the Seller and Purchaser, in a form reasonably acceptable to counsel for Seller and Purchaser.

"**Business**" means the business of the Seller as currently conducted.

"**Business Day**" means any day other than (a) a Saturday, Sunday or federal holiday or (b) a day on which commercial banks in San Francisco, California are authorized or required to be closed.

"**Closing**" has the meaning set forth in Section 2.7.

"**Closing Date**" has the meaning set forth in Section 2.7.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Competing Bid**" has the meaning set forth in Section 5.1.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of November 13, 2024, by and between the Seller and Purchaser.

"**Consent**" means any consent, approval, authorization, waiver or license.

"**Contract**" means any written agreement, mortgage, indenture, lease (whether for real or personal property), contract or subcontract.

"**Cure Costs**" means all monetary amounts that must be paid and obligations that otherwise must be satisfied pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts, as agreed upon by the parties hereto or otherwise determined by the Bankruptcy Court, provided, however, that Purchaser shall have no obligation to pay any Cure Costs for Assigned Contracts that are not Designated Contracts.

"**Deposit Escrow Amount**" means the amount which equals ten percent of the Purchase Price.

"**Deposit Trust Account**" has the meaning set forth in the Recitals.

"**Designated Contracts**" has the meaning set forth in Section 5.3(b).

"**Designation Deadline**" has the meaning set forth in Section 5.3(b).

"**Determined Cure Costs**" means, in the aggregate, all Cure Costs payable in respect of the Assigned Contracts as determined pursuant to the Sale Order or by separate order of the Bankruptcy Court.

"**Enforceability Exceptions**" means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar Applicable Laws affecting the enforcement of creditors' rights generally and general equitable principles.

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Books and Records**" means the following originals and copies of those books and records, documents, data and information (in whatever form maintained) of the Seller and the Business: (a) all corporate minute books (and other similar corporate records) and stock records of the Seller, (b) any books and records relating to the Excluded Assets or (c) any books, records or other materials that Seller (i) is required by Applicable Law to retain (copies of which, to the extent permitted by Applicable Law, will be made available to Purchaser upon Purchaser's reasonable request) or (ii) is prohibited by Applicable Law from delivering to Purchaser or include attorney client communications, work product or other privileged materials.

"**Excluded Contracts**" has the meaning set forth in Section 2.5.

"**Excluded Liabilities**" has the meaning set forth in Section 2.4.

"**FDA**" means the United States Food and Drug Administration.

"**FDA Transfer Letter**" means the letter(s) from the Seller to FDA in form and substance acceptable to Purchaser, in its reasonable discretion, notifying FDA of the transfer from the Seller to Purchaser of all of Seller's rights in the Transferred Assets set forth in Schedule 2.1(b).

"**Final Order**" means an Order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect; provided, that such Order shall be considered a Final Order only after the time period for third parties seeking appeal has expired without the filing of any appeal or motion for reconsideration.

"**Final Resolution**" has the meaning set forth in Section **Error! Reference source not found.**.

"**Free and Clear**" means free and clear of all Liens and Liabilities (other than Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

"**GAAP**" means generally accepted accounting principles in the United States as of the Agreement Date.

"**Governmental Authority**" means any domestic or foreign national, provincial, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, any court (including the Bankruptcy Court) or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS and the FDA).

"**Intellectual Property**" means any and all intellectual property and proprietary rights in any jurisdiction throughout the world, including rights arising from the following: (a) patents and patent applications, design rights, industrial design registrations and applications therefor, divisions, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, reexaminations, extensions and any provisional applications, and any foreign or international equivalent of any of the foregoing; (b) trademarks (whether registered, unregistered or applied for), service marks, trade dress, service names, trade names, brand names, product names, slogans, logos, business names, corporate names, and other source or business identifiers, all registrations and applications for registration thereof, and, in each case, together with all of the goodwill associated therewith; (c) works of authorship, copyrights and all registrations and applications for registration thereof; (d) trade secrets and know-how; (e) rights in formulae, methods, techniques, processes, assembly procedures, software, software code (in any form, including source code and executable or object code), subroutines, test results, test vectors, user interfaces, protocols, schematics, specifications, drawings, prototypes, molds and models, and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing), and (f) social media accounts, social media identifiers, internet domain name registrations.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge**" means (a) with regard to the Seller, the actual knowledge, after due inquiry, of Dr. Nirmal Mulye, John Foster, and Carlton Asher and (b) with regard to Purchaser, the actual knowledge, after due inquiry, of Meredith Cook.

"**Liabilities**" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to, or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee,

penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"**Lien**" means all forms of lien (including mechanic's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Transferred Assets, and liens arising under the Bankruptcy Code), encumbrance, claim, defect or irregularity in title, pledge, mortgage, deed of trust, deed to secure debt, security interest, charge, transfer restriction or similar agreement or encumbrance, including any dedication under any gathering, transportation, treating, processing, fractionating, purchase, sale or similar agreements, or any other rights granted or consensual as or against any Transferred Assets including but not limited to easements, encroachments, rights of first refusal, options, or any other interest or right in property that constitutes a lien or interest within the definition or adjudication of such terms under Section 101(37) of the Bankruptcy Code.

"**Loss**" means any loss, Liability, demand, claim, action, cause of action, cost, damage deficiency, Tax, penalty, fine or expense, whether or not arising out of any claims by or on behalf of any third party, including interest, penalties, reasonable legal fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing.  For the avoidance of doubt, "Loss" shall exclude punitive damages, except to the extent payable to a third party.

"**Material Adverse Effect**" means a material adverse effect on the Transferred Assets and Assumed Liabilities taken as a whole; provided, however, that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or may be, a Material Adverse Effect: (a) any change in, or effects arising from or relating to, general business or economic conditions affecting any industry in which the Business operates; (b) any change in, or effects arising from or relating to, the United States or foreign economies, or securities, banking or financial markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) debt defaults or other restructuring events of any country with respect to which bondholders take a discount to the debt of any country or any increases in the interest rates for any country's debt, (iii) any change in currency exchange rates, (iv) any decline or rise in the price of any security, commodity, contract or index and (v) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (c) any change from, or effects arising from or relating to, the occurrence, escalation or material worsening of any act of God or other calamity, natural disaster, pandemic or disease, outbreak, hostility, act of war, sabotage, cyber-attack or terrorism or military action; (d) any action taken by Purchaser or its Affiliates with respect to the Transactions or with respect to the Business; (e) any action taken, or failed to be taken, by the Seller at the request of or with the consent of Purchaser or any change from, or effects arising from or relating to, Purchaser's failure to consent to any action restricted by Section 6.1; (f) any change in, or effects arising from or relating to changes in, Applicable Law or accounting rules (including GAAP) or any interpretation thereof; (g) the failure of the Business to meet any of its projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or representatives); (h) national or international political, labor or social conditions; (i) any matter described in the Schedules or any matter of which Purchaser is aware as of the

Agreement Date; (j) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement and the Transactions or the identity of the parties to this Agreement, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the Business; (k) the sale of any assets other than the Transferred Assets to any third parties by Seller or any of its Affiliates; (l) any effect arising or resulting from or related to the filing of the Bankruptcy Case; (m) any action required to be taken under any Applicable Law or Order; (n) seasonal changes in the results of operations of the Seller; (o) any epidemic, pandemic, outbreak of disease or other public health emergency (including COVID-19) or any escalation or worsening of any such conditions; (p) (1) any results, outcomes, data, adverse events or side effects arising from any clinical trials being conducted by or on behalf of the Seller or any competitor of the Seller (or the announcements thereof), (2) the determination by, or the delay of a determination by, the FDA or any other applicable Governmental Authority, or any panel or advisory body empowered or appointed thereby, with respect to a clinical hold, acceptance, filing, designation (including de-designation for the accelerated approval pathway), approval, clearance, non-acceptance, hold, refusal to file, refusal to designate, non-approval, disapproval or non-clearance, or requirement to conduct additional clinical studies or trials, with respect to any of the Seller's or any competitor's product candidates or (3) FDA approval (or other clinical or regulatory developments), market entry or pending market entry of any product competitive with or related to any of the products or product candidates of the Seller, or any guidance, announcement or publication by the FDA or other applicable Governmental Authority relating to any product candidates of the Seller or any competitor; or (q) any objections made in the Bankruptcy Court to this Agreement, the Transactions, the Sale Order or the reorganization, any orders of the Bankruptcy Court and any actions or omissions of the Seller in compliance with any order of the Bankruptcy Court and the assumption or rejection of any Assigned Contract.

"**Non-Transferred Asset**" has the meaning set forth in Section 2.6(a).

"**Order**" means any award, decision, injunction, judgment, ruling or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator, whether preliminary, interlocutory or final, including by the Bankruptcy Court.

"**Organizational Documents**" means (a) the articles or certificates of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in clauses (a) through (d), and (f) any amendment to or equivalent of any of the foregoing.

"**Outside Date**" has the meaning set forth in Section 9.1(g).

"**Owned Intellectual Property**" means the Intellectual Property owned by the Seller that is exclusively related to the Transferred Assets.

"**Permit**" means all permits, authorizations, certificates, franchises, consents, waivers, licenses, filings and other approvals from any Governmental Authority.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

"**Personal Information**" means any information in the possession or control of the Seller (solely as related to the Business) about an identifiable individual other than the name, title or business address, business email address or telephone number of any employee of the Seller.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Pre-Closing Tax Claim**" has the meaning set forth in Section 7.3(d).

"**Pre-Closing Tax Period**" has the meaning set forth in Section 7.3(a).

"**Product ANDA**" means, for each of the Products listed on Schedule 2.1(b), the ANDA for each Product, and any and all submissions, amendments and supplements thereto, that have been filed with (whether or not accepted for filing) and approved by (or filed with) the FDA granting or seeking authorization and approval to manufacture, package, ship and sell such Products, as more fully defined in 21 C.F.R. Part 314. The term "Product ANDA(s)" includes the materials contained in the official ANDA dossier and files, including all ANDA submissions, amendments, correspondence (including correspondence with the FDA field offices, FDA laboratories, FDA compliance offices and OPDP), reports and memoranda of telephone conversations, constituting or reflecting communications regarding any of the Product ANDAs. The term "Product ANDA(s)" also includes such materials in the working regulatory and clinical files of Seller or in the Seller's control pertaining to the conduct of upcoming annual reviews of the Products and required reports to the FDA that have yet to be filed.

"**Products**" means the approved products, which are manufactured pursuant to a Product ANDA to be purchased pursuant to this Agreement, as listed on Schedule 2.1(b).

"**Public Health Measures**" means any closures, "shelter-in-place," "stay at home," workforce reduction, social distancing, shut down, closure, curfew or other restrictions or any other Applicable Law, Orders, directives, guidelines or recommendations issued by any Governmental Authority, the Centers for Disease Control and Prevention, the World Health Organization, or any industry group in connection with COVID-19 or any other epidemic, pandemic, or outbreak of disease, or in connection with or in response to any other public health conditions.

"**Purchase Price**" means $4,625,000.00.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Schedules**" has the meaning set forth in Article 4.

"**Recall Claim**" has the meaning set forth in Section **Error! Reference source not found.**

"**Related Claims**" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents and any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions or the relationship between the parties (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

"**Related Documents**" means the Bill of Sale and Assignment and Assumption Agreement; provided, however, that the Bill of Sale and Assignment and Assumption Agreement shall not be a Related Document solely for purposes of applying the provisions in Article 10 to the extent, and only to the extent, that any such document expressly conflicts with Article 10.

"**Sale Motion**" has the meaning set forth in the Recitals.

"**Sale Order**" means an Order of the Bankruptcy Court issued pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code in form and substance reasonably satisfactory to the Seller and Purchaser in all material respects.

"**Schedules**" has the meaning set forth in Article 3.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Taxes**" has the meaning set forth in Section 7.3(c).

"**Solvent**" when used with respect to any Person, means that, as of any date of determination, (a) the fair salable value (determined on a going concern basis) of its assets and property will, as of such date, exceed the amounts required to pay its debts as they become absolute and mature, as of such date, (b) such Person will have adequate capital to carry on its business and (c) such Person will be able to pay its debts as they become absolute and mature, in the ordinary course of business, taking into account the timing of and amounts of cash to be received by it and the timing of and amounts of cash to be payable on or in respect of its indebtedness.

"**Straddle Period**" has the meaning set forth in Section 7.3(b).

"**Tax**" means (i) any ad valorem, alternative or add-on (including Section 59A of the Code), income, franchise, branch profits, capital gains, gross receipts, estimated, employment, excise, goods and services, severance, stamp, documentary, value-added, sales, use, property, registration, transfer, payroll, social security, withholding or other tax, duty, charge, fee, levy or other assessment, and any related fine, penalty, interest, or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority and (ii) any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation, agreement or arrangement to indemnify any Person or other entity.

"**Tax Proceeding**" means any audit, appeal, challenge, proceeding, controversy, dispute, claim, information request or assessment with respect to Taxes.

"**Tax Return**" means any return (including any information return), disclosure, report, statement, schedule, notice, form, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection, or payment, of any Tax.

"**Transactions**" means the transactions contemplated by this Agreement and the Related Documents.

"**Transfer Taxes**" has the meaning set forth in Section 2.10.

"**Transferred Assets**" has the meaning set forth in Section 2.1.

1.2      **Other Definitional and Interpretive Matters**.

(a)      Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

(i)      Calculation of Time Period. All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)      Dollars. Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement, the Related Documents or the Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties hereto to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement, the Related Documents or the Schedules.

(iii)      Exhibits/Schedules. The Exhibits and Schedules to this Agreement are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent the relevance of such disclosure to such other Schedule is reasonably apparent on the face of such disclosure. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the

ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Applicable Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    <u>Gender and Number</u>. Any reference to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    <u>Headings</u>. The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or Related Document, as applicable. Unless otherwise specified, all references in this Agreement to any "Section" or other subdivision are to the corresponding section or subdivision of this Agreement, and all references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vi)    <u>Herein</u>. The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    <u>Or</u>. The word "or" shall be construed in the inclusive sense of "and/or" unless otherwise specified.

(viii)    <u>Including</u>. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)    <u>Successors</u>. A reference to any party to this Agreement, any Related Document or any other agreement or document shall include such party's successors and permitted assigns.

(x)    <u>Legislation</u>. A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(xi)    <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statement, to the extent any such phrase appears in such representation or warranty, if (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that relates to the subject matter of

such representation, (B) such item is otherwise specifically set forth on the balance sheet or financial statement or (C) such item is set forth in the notes to the balance sheet or financial statement.

(xii)    Made Available. Any reference in this Agreement to "made available" means a document or other item of information that was provided or made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions.

(b)    All representations and warranties set forth in this Agreement or the Related Documents are contractual in nature only and subject to the sole and exclusive remedies set forth herein. The parties have agreed that should any representations and warranties of any party prove untrue, the other parties shall have the specific rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort or otherwise) are permitted to any party hereto as a result of the untruth of any such representation and warranty. The phrase "to Seller's Knowledge" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the Related Documents and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement and the Related Documents. The parties hereto agree that changes from earlier drafts to the final version of this Agreement do not necessarily imply that the party agreeing to such change is agreeing to a change in meaning (as the party agreeing to such change may believe the change is stylistic and non-substantive); consequently, no presumption should exist by virtue of a change from a prior draft.

# ARTICLE 2
# THE PURCHASE AND SALE; CLOSING

2.1    **Purchase and Sale**. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, in exchange for an aggregate payment from Purchaser to the Seller equal to the Purchase Price, Purchaser shall purchase, assume and accept from the Seller, and the Seller shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear, all of the rights, title and interests in, to and under the following assets and interests (collectively, the "**Transferred Assets**"):

(a)    the inventories of those Products (including raw materials and active pharmaceutical ingredients) in Seller's possession and control and that is further described by category, quantity and unit of measure, lot number and storage location in Schedule 2.1(a);

(b)        the Product ANDAs set forth in Schedule 2.1(b);

(c)        all Contracts listed on Schedule 2.1(c) (as may be amended prior to Closing) (collectively, the "**Assigned Contracts**"), but expressly excluding (i) Contracts that expire or are terminated prior to the Closing and (ii) any Contracts that Purchaser elects to exclude pursuant to Section 5.3(b);

(d)        all material original books and records, documents, data and information of the Seller solely related to the Transferred Assets, including: (i) supplier and vendor lists, (ii) promotional materials, (iii) customer lists, (iv) market research materials, (v) materials used in connection with the sale and promotion of the products, and (vi) other business records required to be transferred to Purchaser under applicable law, other than the Excluded Books and Records; provided, however, that the Seller shall be entitled to retain copies of any such materials;

(e)        annual and periodic reports relating to the Product ANDAs which have been filed by or on behalf of Seller or a prior owner of the Product ANDAs with the FDA or equivalent Governmental Authority and adverse event reports pertaining to the Products, in each case as are in Seller's or its Affiliate's possession or control;

(f)        all intangible assets, including without limitation, the names, logos and symbols used by Seller in connection with the Transferred Assets;

(g)        all of the Seller's rights, claims or causes of action against third parties relating to the assets, properties, business or operations of the Seller with respect to the Transferred Assets and the Assumed Liabilities (including all guaranties, warranties, indemnities and similar rights in favor of the Seller or any its Affiliates to the extent solely related to the Transferred Assets or the Assumed Liabilities), in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date, except for such rights, claims and causes of related to the Excluded Assets or Excluded Liabilities; and

(h)        all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, choses in action, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively used in or held for use for the Transferred Assets listed in clauses (a) through (g) above or the Assumed Liabilities; and

(i)        all goodwill associated with or symbolized by any of the foregoing Transferred Assets described in clauses (a) through (h) above.

2.2        **Excluded Assets**. Notwithstanding the provisions of Section 2.1 or anything to the contrary herein, any and all assets, rights and properties of the Seller that are not specifically identified in Section 2.1 as Transferred Assets, including the following (collectively, the "**Excluded Assets**"), shall be retained by the Seller, and Purchaser and its designees shall acquire no right, title or interest in the Excluded Assets in connection with the Transaction:

(a)        all (i) cash and cash equivalents, wherever located, including bank balances and bank accounts or safe deposit boxes, monies in the possession of any banks, savings and loans or trust companies and similar cash items, (ii) escrow monies and deposits in the possession of

landlords and utility companies, and (iii) investment securities and other short- and medium-term investments;

(b)     all records, documents or other information exclusively relating to current or former employees of the Seller that are not hired by Purchaser, and any materials to the extent containing information about any employee, disclosure of which would violate Applicable Law or such employee's reasonable expectation of privacy;

(c)     any interest of the Seller under this Agreement or the Related Documents, including, without limitation, the right to receive the Purchase Price and to enforce the Seller's rights and remedies thereunder;

(d)     all Contracts (including all prepaid assets relating to such Contracts), other than the Designated Contracts, to which Seller is a party;

(e)     any (i) attorney-client work product or communications prior to the Closing Date between Seller (including any one or more officers, directors or stockholders of Seller), on the one hand, and its counsel, on the other hand, and (ii) claims under any director and officer, errors and omissions, fiduciary and commercial crime insurance policies;

(f)     all Permits (including applications therefor and any trade or import/export Permits) that (i) are not solely related to the Transferred Assets, or (ii) are not transferable to Purchaser under Applicable Law;

(g)     the Excluded Books and Records;

(h)     accounts receivable, intercompany obligations and other amounts receivable by Seller;

(i)     any assets not otherwise designated as Transferred Assets or from time to time designated by the parties hereto as Excluded Assets;

(j)     the Avoidance Actions;

(k)     all of the Seller's rights, claims or causes of action (i) against third parties relating to the assets, properties, business or operations of the Seller (including all guaranties, warranties, indemnities and similar rights in favor of the Seller or any of its Affiliates) to the extent arising under the Bankruptcy Code or relating to any of the Excluded Assets or Excluded Liabilities, or (ii) against any third parties that have a familial relationship with any members of the Debtor's management team or entities in which such third parties hold an interest, the Debtor's owners or the Debtor's employees, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date; for the avoidance of doubt and notwithstanding anything else herein to the contrary, all of the Seller's rights, claims and causes of action, including Avoidance Actions, against any of the Seller's affiliates, insiders, subsidiaries, and parents shall be Excluded Assets.

(l)     all of the Seller's right, title and interest to any the assets set forth on Schedule 2.2(l); and

(m)    all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively related to or exclusively used in or held for use for the Excluded Assets listed in clauses (a) through (l) above.

Notwithstanding anything to the contrary contained in this Agreement or any of the other Related Documents, Purchaser acknowledges and agrees that all of the following are also Excluded Assets, and all right, title and interest in and to all Excluded Assets shall be retained by the Seller and shall remain the property of the Seller (and shall expressly be excluded from the sale, transfer, assignment and conveyance to Purchaser hereunder), and neither Purchaser nor any of its Affiliates shall have any interest therein: (x) all records and reports prepared or received by the Seller or any of its Affiliates in connection with the sale of the Business and the Transactions, including all analyses relating to the Business or Purchaser so prepared or received; and (y) all confidentiality agreements with prospective purchasers of the Business or any portion thereof and all bids and expressions of interest received from third parties with respect thereto.

2.3    **Assumption of Liabilities**. On the terms and subject to the conditions set forth in this Agreement, Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms the Assumed Liabilities.

2.4    **Excluded Liabilities**. Notwithstanding Section 2.3, Purchaser is assuming only the Assumed Liabilities of the Seller and will not assume or be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, in each case, that are not Assumed Liabilities (all such Liabilities not being assumed herein referred to as the "**Excluded Liabilities**"), and the Seller shall retain, be responsible for, pay, perform, discharge, or otherwise satisfy in accordance with their respective terms all Liabilities that are not Assumed Liabilities, including all Liabilities related to Excluded Assets. For the avoidance of doubt, "Excluded Liabilities" includes any and all Liabilities arising out of, relating to, resulting from or in connection with any credits, rebates, returns or chargebacks, in each case to the extent attributable to the Products distributed or sold by the Seller prior to the Closing Date.

2.5    **Excluded Contracts**. Pursuant to Section 5.3(b), Purchaser shall be entitled, in its sole discretion, by written notice to the Seller up to three (3) Business Days prior to the Closing Date, to elect not to purchase or assume one or more Assigned Contract, in which case, notwithstanding anything in this Agreement or any Related Document to the contrary, such Contract shall not be an Assigned Contract or Designated Contract and shall be considered an excluded contract ("**Excluded Contract**") (and shall constitute an Excluded Asset and not be included in the Transferred Assets) for all purposes of this Agreement and Purchaser shall not have any obligation to satisfy or pay any Cure Costs or other Liabilities with respect to such Excluded Contract. Each assignable Assigned Contract that Purchaser does not elect to remove from the list of Assigned Contracts pursuant to Section 5.3(b) shall be an Assigned Contract.

2.6    **Nontransferable Assets and Liabilities**.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Governmental Authority) (after giving effect to the Sale Order or any other applicable order of the Bankruptcy Court that effects such transfer without any required Consents), would constitute a breach or other contravention thereof or a violation of Applicable Law (each, a "**Non-Transferred Asset**").

(b)    If, on the Closing Date, any third-party Consent is not obtained for a Non-Transferred Asset, or if an attempted transfer or assignment thereof would be ineffective or a violation of Applicable Law, then, until any requisite consent is obtained therefor and the same is transferred and assigned to Purchaser or its designee, each such Non-Transferred Asset shall be held by the Seller as agent for the Purchaser, and the Seller shall, to the extent permitted by Applicable Law, provide to Purchaser the benefits and, subject to Purchaser's receipt of such benefits, Purchaser shall assume the obligations and bear the economic burdens associated with such Non-Transferred Asset. The Seller and Purchaser shall use commercially reasonable efforts to enter into agreements (including subcontracting, sublicensing or subleasing, if permitted) by which (i) the Seller shall without interruption of the Business, provide Purchaser with the economic and operational equivalent of obtaining the requisite third-party Consent and assigning the applicable Non-Transferred Asset to Purchaser (including, with the prior written consent of Purchaser, enforcing for the benefit of Purchaser, and at Purchaser's sole expense, all claims or rights arising thereunder) and (ii) Purchaser shall perform, at its sole expense, the obligations and assume the economic burdens of the Seller to be performed after the Closing with respect to such Non-Transferred Asset.

2.7    **Closing**. The closing of the Transactions (the "**Closing**") will take place remotely by electronic exchange of documents on the date (the "**Closing Date**") that is the second (2nd) Business Day after the date on which all of the conditions set forth in Article 8 (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the party hereto entitled the benefit of the same, unless another time or date is agreed to in writing by the parties hereto. Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all parties hereto at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered. The Closing Date shall be no later than April 18, 2025.

2.8    **Closing Deliveries of the Parties**. At or prior to the Closing:

(a)    Purchaser and the Seller shall execute and deliver the Bill of Sale and Assignment and Assumption Agreement;

(b)    Purchaser and the Seller shall transmit Purchaser's FDA Transfer Letter and the Seller's FDA Transfer Letters, respectively, to the FDA and shall take other actions reasonably necessary to effect the transfer of the Transferred Assets from the Seller to Purchaser;

(c)    Purchaser shall deliver, or cause to be delivered, to the Seller or the applicable Person each of the following:

(i)    a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in Section 8.3(a) and Section 8.3(b); and

(ii)    payment of the Purchase Price, less the Deposit Escrow Amount, as set forth in Section 2.9.

(d)    the Seller shall deliver, or cause to be delivered, to Purchaser or the applicable Person each of the following:

(i)    a certificate, dated as of the Closing Date, executed by or on behalf of the Seller as to the satisfaction of the conditions set forth in Section 8.2(a) and Section 8.2(b); and

(ii)    an accurate, executed and complete IRS Form W-9 of the Seller;

(iii)    the Sale Order; and

(iv)    all stability samples, batches, data, protocols and other documentation with respect to stability testing for the Products.

2.9    **Purchase Price; Assumed Liabilities; Deposits**.

(a)    At the Closing, upon the terms and subject to the conditions set forth in this Agreement, in full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser, the use and benefit of any Non-Transferred Asset, and assumption of the Assumed Liabilities by Purchaser, Purchaser shall (i) pay to the Seller an aggregate amount equal to the Purchase Price *minus* the Deposit Escrow Amount; and (ii) assume the Assumed Liabilities.

(b)    At the Closing, upon the terms and subject to the conditions set forth in this Agreement, Purchaser will assume and become responsible for the Assumed Liabilities. Purchaser agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms hereof, including paying or causing to be paid, at or prior to the Closing, all Determined Cure Costs.

(c)    The Deposit Escrow Amount shall be released to Seller or Purchaser in accordance with the applicable terms of this Agreement.  Any issue regarding the entitlement to the Deposit Escrow Amount shall be determined by the Bankruptcy Court, and Purchaser consents to the jurisdiction of the Bankruptcy Court for any issue related to this Agreement.

(d)    Purchaser and each of its Affiliates and agents shall be entitled to deduct and withhold from the payment of any amounts (or any portion thereof) payable pursuant to this Agreement (or any agreements, documents or instruments entered into pursuant to this Agreement) that Purchaser is required to deduct and withhold with respect to the making of such payment under

any Applicable Law. If Purchaser intends to deduct or withhold any amount as required by any Tax law from any payment made to the Seller pursuant to this Agreement, Purchaser shall (i) promptly provide the Seller advance notice of its intent to deduct or withhold such amounts, and (ii) provide a reasonable opportunity for the Seller to provide forms, documents or other evidence that would mitigate, reduce or eliminate such deduction or withholding. To the extent that amounts are so deducted and withheld, Purchaser shall promptly remit such amounts to the applicable Governmental Authority and such amounts shall be treated for all purposes of this Agreement as having been paid to the applicable payee to whom such amounts would otherwise have been paid.

2.10    **Transfer Taxes**. It is the intention of the Purchaser and the Seller that the Transactions be exempt from all transfer, documentary, sales, use, excise, stock transfer, value-added, stamp, recording, registration and other similar Taxes, together with any conveyance fees, recording charges and other similar fees and charges, incurred in connection with this Agreement and the Transactions (collectively, "**Transfer Taxes**") pursuant to the Bankruptcy Code. Purchaser and the Seller shall cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes due with respect to the Transactions. In the event any Transfer Taxes are required to be paid with respect to the Transactions, Purchaser shall pay such Transfer Taxes, and Purchaser and the Seller shall cooperate in the preparation and filing of any Tax Returns required under Applicable Law with respect to such Transfer Taxes.

2.11    **Allocation of Purchase Price**.

(a)    The Purchase Price (including all other amounts treated as consideration for U.S. federal income tax purposes) and Assumed Liabilities shall be allocated among the Transferred Assets as set forth on Schedule 2.11 (the "**Allocation Schedule**").

(b)    Purchaser and the Seller shall (i) timely file all Tax Returns required to be filed in connection with the Allocation Schedule, and (ii) prepare and file all Tax Returns and determine all Taxes in a manner consistent with the Allocation Schedule, except as may be required by a change in law after the date of this Agreement, a closing agreement with an applicable Governmental Authority, or a final judgment of a court of competent jurisdiction and, except as may be necessary to reflect adjustments to the Allocation Schedule resulting from post-Closing payments. Purchaser, on the one hand, and the Seller, on the other hand, shall notify the other if it receives notice that any Governmental Authority proposes any allocation different from Allocation Schedule.

# ARTICLE 3
# REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as disclosed in a document herewith delivered by the Seller to Purchaser (the "**Schedules**"), the Seller hereby makes the representations and warranties contained in this Article 3 to Purchaser.

3.1    **Organization, Good Standing and Other Matters**. The Seller is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite corporate power and authority to operate the Business and necessary to own, lease or operate the properties and

assets owned, leased or operated by it to carry on the Business as now being conducted, except where the failure to be so duly organized, validly existing and in good standing, or to have such power and authority, would not, individually or in the aggregate, have a Material Adverse Effect. The Seller is duly qualified to do business as a foreign company in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

3.2    **Authority and Enforceability**. Subject to Bankruptcy Court approval, the Seller has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which the Seller is (or at Closing, will be) a party thereto, and the consummation by the Seller of the Transactions, have been duly authorized and approved by all necessary corporate action on the part of the Seller and are subject to the approval of the Bankruptcy Court. This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by the Seller and, assuming the due execution and delivery by the other parties hereto or thereto, and subject to the approval of the Bankruptcy Court, constitutes a valid and binding obligation of the Seller, enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

3.3    **No Conflict; Required Filings and Consents**. Except as otherwise set forth on Schedule 3.3, the execution and delivery of this Agreement by the Seller does not and the execution and delivery of the Related Documents by the Seller will not, and the consummation of the Transactions hereby and thereby will not (a) violate the provisions of the Organizational Documents of the Seller, (b) subject to the entry of the Sale Order, violate any Applicable Law or Order to which Seller is subject or by which its properties or assets are bound, (c) require Seller to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order), (d) violate, conflict with, result in a breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both would become a default) under, any Contract to which the Transferred Assets are bound, or (e) result in the creation of any Lien upon any of the Transferred Assets; excluding from the foregoing clauses (b), (c), (d) and (e) any Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, have a Material Adverse Effect.

3.4    **Litigation**. There is no Action pending or, to the Seller's Knowledge, formally threatened in writing, against Seller before any Governmental Authority that would have a Material Adverse Effect or affect the Transferred Assets in any material respect after the entry of the Sale Order.

3.5    **Brokers and Finders**. Except for Raymond James & Associates, Inc. the Seller has not, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

3.6     **Title to Assets.**

(a)     The Seller owns all Transferred Assets and has good, legal valid and marketable title to, and the right to transfer (or cause to be transferred) in accordance with the terms of this Agreement, all of the Transferred Assets Free and Clear.

(b)     Seller is not a party to, or bound by, (i) any license, royalty agreement, or other agreement relating to the use of any Transferred Assets or (ii) any Contract required for the ownership, use or operation of the Transferred Assets.

(c)     Schedule 3.6(c) sets forth a true, correct and complete list of the amounts of all Cure Costs applicable with respect to each Assigned Contract, and such Cure Costs do not exceed the amounts set forth therein.

(d)     No current or former Affiliate, partner, director, stockholder, officer, member, manager, employee, consultant or contractor of the Seller will, after giving effect to the Transactions, own, license or retain any Transferred Assets.

(e)     To Seller's Knowledge, no interference, opposition, reissue, reexamination, or other proceeding is or has been pending or threatened, in which the scope, validity, or enforceability of any Transferred Assets is being, has been challenged.

(f)     There is no Owned Intellectual Property.

3.7     **Compliance with Applicable Laws; Regulatory Matters**.

(a)     Any representations made in Sections (b) and (c) herein are subject to the exclusions and/or additional representations provided on Schedule 3.7 attached hereto.

(b)     Except in each case as would not, individually or in the aggregate, reasonably be expected have a Material Adverse Effect, (i) the Seller is and since January 1, 2022 has been, in compliance with all Applicable Laws and (ii) the Seller is not and since January 1, 2022, has not been subject to any Action or Order relating to or arising under a violation of any Applicable Laws, and, to the Knowledge of the Seller, no such Action has been threatened in writing.

(c)     The Seller is in compliance in all material respects with the Seller's adverse event reporting and other obligations with respect to the Product ANDAs.  The Seller has not received any notice from the FDA that would be expected to lead to revocation of a Product ANDA.

3.8     **No Other Representations or Warranties**.

(a)     Except for the representations and warranties contained in this Article 3, the Seller does not, nor do any other Persons on behalf of the Seller, make any other express or implied representation or warranty with respect to itself, the Business, the Transferred Assets or the

Assumed Liabilities, or with respect to any other information provided to Purchaser or its representatives, and the Seller disclaims any other representations or warranties, whether made by or on behalf of the Seller or any other Person. The Seller will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

(b)    Except for the specific representations and warranties expressly made by Purchaser in Article 4 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 and Article 10 of this Agreement, the Seller acknowledges and agrees that Purchaser is not making and has not made any representation or warranty, expressed or implied, at law or in equity.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed in a document herewith delivered by Purchaser to the Seller (the "**Purchaser Schedules**"), Purchaser hereby makes the representations and warranties contained in this Article 4 to the Seller.

4.1    **Organization, Good Standing and Other Matters**. Purchaser is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has all requisite corporate power or other entity power and authority to own its properties and to carry on its business as now being conducted. Purchaser is duly qualified or licensed to conduct its business as currently conducted and is in good standing in each jurisdiction in which the location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary, except where the failure to be so qualified or licensed would not, individually or in the aggregate, materially impair or delay Purchaser's ability to consummate the Transactions.

4.2    **Authority and Enforceability**. Purchaser has all requisite corporate power or other entity power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized and approved by its board of directors (or equivalent governing body) and no other action on the part of Purchaser or its stockholders is necessary to authorize the execution, delivery and performance of this Agreement and the Related Documents by Purchaser and the consummation of the Transactions. This Agreement has been, and each Related Document will be at or prior to Closing, duly executed and delivered by Purchaser and, assuming the due execution and delivery by the other parties hereto or thereto, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

4.3    **No Conflict: Required Filings and Consents**. Except as set forth on Schedule 4.3, the execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (a) violate the provisions of its Organizational Documents, (b) violate any Applicable Law or Order to which it is subject or by which any of its properties or assets are bound or (c) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order).

4.4    **Financing**. Purchaser has, and at the Closing will have, (a) sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price in accordance with the terms hereof and any other payments required hereunder and any expenses incurred or required to be paid by Purchaser in connection with the Transactions, and (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Documents. Purchaser has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

4.5    **Solvency**. Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors. Immediately after giving effect to all of the Transactions, including the making of the payments contemplated by Section 2.9, and assuming satisfaction of the conditions to Purchaser's obligation to consummate the Transactions as set forth herein, the accuracy of the representations and warranties of Purchaser set forth herein and the performance by Purchaser of its obligations hereunder in all material respects, Purchaser will be Solvent.

4.6    **Litigation**. There is no Action pending or, to Purchaser's Knowledge, formally threatened in writing against Purchaser or involving any of its properties or assets that would be reasonably be expected to (a) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (b) otherwise prevent, hinder or delay the consummation of the Transactions.

4.7    **Brokers and Finders**. None of Purchaser or its Affiliates have, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

4.8    **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties**.

(a)    Purchaser acknowledges that it and its representatives have received access to such books and records, facilities, equipment, contracts and other assets of the Business which it and its representatives have desired or requested to review. Purchaser acknowledges and agrees that (i) it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Seller, the Business, the Transferred Assets and the Assumed Liabilities and (ii) the Business, the Transferred Assets and the Assumed Liabilities are being transferred and acquired on a "where is" and, as to condition, "as is" and "with all faults" basis.

(b)    Except for the specific representations and warranties expressly made by the Seller in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement, Purchaser acknowledges and agrees that (i) the Seller is not making and has not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Business, the Transferred Assets, the Assumed Liabilities, or any of its operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, stockholder, agent, Affiliate, advisor, representative or employee of the Seller has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in Article 3 and subject to the limited remedies herein provided.

(c)    Other than the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement, Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Seller and the Seller's Affiliates have specifically disclaimed and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance on any such other representation or warranty made by any Person. Purchaser specifically waives any obligation or duty by the Seller or the Seller's Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties expressly set forth in Article 3 and disclaim reliance on any information not specifically required to be provided or disclosed pursuant to the specific representations and warranties set forth in Article 3.

(d)    Purchaser is acquiring the Business, the Transferred Assets and the Assumed Liabilities subject only to the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement.

4.9    **No Other Representations or Warranties.** Except for the representations and warranties contained in this Article 4, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Seller or its representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Affiliates, officers, directors, employees, agents or representatives.

## ARTICLE 5
## BANKRUPTCY COURT MATTERS

5.1    **Competing Transaction.** This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise)

in accordance with the terms of the Bid Procedures Order (each, a "**Competing Bid**"). From the Agreement Date (and any prior time) and until the completion of the Auction, the Seller is permitted to, and to cause its representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any reorganization, sale or other disposition of the Transferred Assets. In addition, the Seller shall have the authority to respond to any inquiries or offers to reorganize, purchase all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bid Procedures Order or other Applicable Law, including supplying information relating to the Business and the assets of the Seller to prospective plan sponsors or purchasers.

5.2    **Bankruptcy Court Filings**.

(a)    Subject to its right to pursue a Competing Bid in accordance with the Bid Procedures Order, the Seller shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Transferred Assets and the Assumed Liabilities to Purchaser Free and Clear and free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code and provide that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. The Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order and causing such Sale Order to be a Final Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)    The Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at an auction undertaken pursuant to the Bid Procedures Order (the "**Auction**"), and (i) Purchaser submits the Back-Up Bid at the Auction or (ii) the terms of this Agreement are deemed to constitute a Back-Up Bid, then Purchaser shall be obligated to promptly consummate the Transactions upon the terms and conditions as set forth herein, including the payment of the Purchase Price as the same may be increased by Purchaser at the Auction; provided that, the Seller gives written notice to Purchaser on or before the Back-up Termination Date, stating that the Seller (A) failed to consummate the sale of the Transferred Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder. For the avoidance of doubt, Purchaser shall have no obligations under this Agreement following the occurrence of the Back-up Termination Date.

5.3    **Assumption of Assigned Contracts**.

(a)    On or before the date that is five (5) Business Days following the date on which the Bid Procedures Order is entered by the Bankruptcy Court, the Seller shall file (or cause to be filed) a notice of potential assumption (the "**Assumption Notice**") with the Bankruptcy Court

and serve such notice on each counterparty to an Assigned Contract listed thereon. The Assumption Notice shall identify all Assigned Contracts that the Seller and Purchaser believe may be assumed and assigned in connection with the sale of the Transferred Assets and set forth a good faith estimate of the amount of Cure Costs applicable to each such Assigned Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Assigned Contract, the amount of such Cure Cost designated for such Assigned Contract shall be "$0.00"). In accordance with the Bid Procedures Order, the Seller reserves the right to supplement such list of Assigned Contracts and provide additional notice of assumption, and to remove an Assigned Contract from the list of Assigned Contracts, up to five (5) Business Days prior to the hearing by the Bankruptcy Court with respect to the Sale Motion.

(b)      On or before the date that is three (3) Business Days before the Closing Date (the "**Designation Deadline**"), Purchaser shall provide to the Seller a list of those Assigned Contracts that it elects to have assumed and assigned to Purchaser on the Closing Date (the "**Designated Contracts**"). Purchaser shall be entitled to remove any Assigned Contract from the list of Designated Contracts at any time prior to the Designation Deadline by providing the Seller written notice of such removal. In the event that Purchaser removes any of such Assigned Contracts from such list, the Seller will provide the relevant counterparty written notice that the applicable Assigned Contract is no longer identified as a Designated Contract and shall not be an Assigned Contract and shall be an Excluded Contract. For the avoidance of doubt, only those executory Assigned Contracts that remain identified as Designated Contracts as of the Closing Date will constitute Assigned Contracts and will be assumed by the Seller and assigned to Purchaser pursuant to the Sale Order. Purchaser shall not have any obligation to pay Cure Costs or any other obligation under any Contract that is not a Designated Contract.  The Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assigned Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude the Seller from filing one or more motion to reject any Contracts that are not Assigned Contracts.

(c)      Notwithstanding any provision in this Agreement to the contrary, a Contract shall not be a Designated Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is (i) deemed rejected under Section 365 of the Bankruptcy Code, (ii) the subject of an objection to assignment or assumption or requires the consent of any Governmental Authority or other third party (other than, and in addition to, the Bankruptcy Court) in order to permit the assumption and assignment by the Seller to Purchaser of such Contract pursuant to Section 365 of the Bankruptcy Code, and such objection has not been resolved or such consent has not been obtained prior to the thirtieth day following the Closing Date (as such period may be extended by mutual agreement of the Seller and Purchaser), or (iii) is terminated by any party thereto other than the Seller, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as a Designated Contract hereunder and is not continued or otherwise extended upon assumption.  To the extent that any Assigned Contract is subject to a dispute or objection regarding its assignment or the Cure Costs, Purchaser shall be permitted to designate such Assigned Contract as a Designated Contract after the Closing Date by providing written notice to the Seller within ten (10) Business Days of the resolution of such dispute or objection.  In no event shall the failure to assign to Purchaser any Contract in accordance with subsections (i) through (iii) above reduce the Purchase Price payable to the Seller or constitute a failure to satisfy the conditions precedent of the Seller under Section 8.3.

(d)    Subject to the terms of <u>Section 2.5</u>, <u>Section 2.8</u>, <u>Section 5.3(a)</u> and <u>Section 5.3(b),</u> Purchaser shall make provision for the payment of the Determined Cure Costs in cash at Closing in accordance with the Sale Order.

(e)    Notwithstanding any provision in this Agreement to the contrary, from and after the date of the Assumption Notice through the Closing Date, the Seller will not reject or take any action (or fail to take any action that would result in rejection by operation of Applicable Law) to reject, withdraw, repudiate or disclaim any Assigned Contract unless (i) Purchaser has provided its prior written consent or (ii) Purchaser has removed such Assigned Contract from the list of Designated Contracts.

**ARTICLE 6**
**PRE-CLOSING COVENANTS**

6.1    <u>**Conduct of Business**</u>. Except (i) as set forth on <u>Schedule 6.1,</u> (ii) as may be approved by Purchaser (which approval will not be unreasonably withheld, delayed or conditioned; <u>provided, however,</u> that the consent of Purchaser shall be deemed to have been given if Purchaser does not object within 48 hours after written request for such consent is provided by the Seller to Purchaser), (iii) for actions taken or omitted to be taken by the Seller in response to any Public Health Measure, or (iv) as is otherwise contemplated or required by this Agreement, any Assigned Contract, by Applicable Laws or by order of the Bankruptcy Court, from the Agreement Date through the earlier of the Closing Date or the termination of this Agreement in accordance with its terms:

(a)    The Seller shall use its commercially reasonable efforts to carry on the Business in all material respects in the ordinary course of business as it has been conducted since the Petition Date; and

(b)    The Seller shall not:

(i)    sell, license, abandon or otherwise dispose of any material asset or property constituting Transferred Assets other than inventory in the ordinary course of business;

(ii)    (A) change any material Tax election, file any material amended Tax Return, enter into any closing agreement, settle any material Tax Proceeding, in each case, relating to the Business or the Transferred Assets, or (B) consent to any extension or waiver of the limitation period applicable to any material Tax Proceeding relating to the Business or the Transferred Assets; or

(iii)    change its present accounting methods or principles in any material respect, except as required by GAAP or Applicable Law.

(c)    Notwithstanding anything to the contrary, nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the Business, assets and operations prior to the Closing. Prior to the Closing, the Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its Business, assets and operations.

6.2    **Access to Information; Confidentiality**.

(a)    From the Agreement Date until the earlier of the Closing Date and the termination of this Agreement, the Seller shall grant Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon reasonable notice (and in the event of a facility visit request, at least 48 hours prior notice), and subject to any limitations resulting from any Public Health Measures, to the personnel, facilities, book and records of the Seller related to the Business or the Transferred Assets that are in the possession or under the control of the Seller; provided, however, that (i) all requests for access shall be directed to James Grainer or such other person(s) as the Seller may designate in writing from time to time (the "**Seller Access Contact**"), (ii) such activities do not unreasonably interfere with the ongoing business or operations of the Seller, (iii) the Seller shall have the right to have one or more of its representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.2(a), (iv) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing, (v) such access or related activities would not cause a violation of any agreement to which the Seller is a party, (vi) no Personal Information shall be disclosed or used other than in compliance with applicable privacy law and (vii) nothing herein shall require Seller or its representatives to furnish to Purchaser or provide Purchaser with access to information that (A) is subject to an attorney-client or an attorney work-product privilege, (B) legal counsel for the Seller reasonably concludes may give rise to antitrust or competition law issues or violate a protective order or otherwise may not be disclosed pursuant to Applicable Law (including any Public Health Measure) or (C) would cause significant competitive harm to the Seller if the Transactions are not consummated.

(b)    Notwithstanding anything to the contrary contained in this Agreement, from the Agreement Date until the Closing Date, Purchaser shall not, and shall cause its representatives not to, have any contact or discussions concerning Seller, the Business, the Transactions or any other matters with any lender, borrower, creditor, guarantor, business partner, bank, landlord, tenant, supplier, customer, employee, manager, franchisee, distributor, noteholder, independent contractor, consultant or other material business relation of the Seller, in each case, without the prior written consent of the Seller Access Contact (which consent may be withheld in the Seller's sole discretion and, if given, may be conditioned on the Seller Access Contact or his or her designee having the right to participate in any meeting or discussion).

(c)    Any information provided to or obtained by Purchaser or its representatives, including pursuant to this Section 6.2 is confidential information and subject to the terms of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference. Effective upon (and only upon) the Closing, the Confidentiality Agreement shall automatically terminate and none of the parties thereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained by Purchaser or its representatives concerning the Seller, which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. If this Agreement is terminated prior to Closing for any reason, the terms of the Confidentiality Agreement shall remain in full force and effect.

6.3    **Efforts to Consummate.** Except as otherwise provided in this Agreement, each of the parties hereto agrees to use its commercially reasonable efforts to cause the Closing to occur as soon as possible after the Agreement Date, including satisfying the conditions precedent set forth in Article 8 applicable to such party including (a) defending against any Actions, judicial or administrative, challenging this Agreement or the consummation of the Transactions, (b) seeking to have any preliminary injunction, temporary restraining order, stay or other legal restraint or prohibition entered or imposed by any court or other Governmental Authority that is not yet final and nonappealable vacated or reversed, and (c) executing any additional instruments reasonably requested by another party hereto (without cost or expense to the executing party) necessary to carry out the Transactions and to fully carry out the purposes of this Agreement; provided, however, that, for purposes of "commercially reasonable efforts" standard as required by this Section 6.3, Section 6.1(a), or Section 2.6(b) neither the Seller nor its Affiliates or representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party or to otherwise expend any money or suffer any detriment, to expend any money to remedy any breach of any representation or warranty hereunder, to commence any Action, to waive or surrender any right, to modify any agreement (including any Assigned Contract) or to provide financing to Purchaser for the consummation of the Transactions.

6.4    **Public Announcements**. Between the Agreement Date and the Closing Date, except to the extent required by any Applicable Law or Action (including the Bankruptcy Case), neither Purchaser nor the Seller shall, and Purchaser and the Seller shall cause their respective Affiliates and representatives not to, directly or indirectly, issue any press release or public announcement of any kind without the prior written consent of Purchaser and the Seller; provided, however, that the Seller and its Affiliates may make announcements from time to time to their respective employees, customers, suppliers, and other business relations and otherwise as the Seller may reasonably determine is necessary to comply with Applicable Law or the requirements of this Agreement or any other agreement to which the Seller or any such Affiliate is a party. Purchaser and the Seller shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the parties.

6.5    **Update of Schedules; Knowledge of Breach**. From time to time prior to the Closing, the Seller may supplement or amend the Schedules with respect to any matter hereafter arising or discovered which if existing or known by the Seller at the Agreement Date would have been required to be set forth or described in such Schedules and also with respect to events or conditions arising after the date hereof and prior to Closing. Any such supplemental or amended disclosure shall not be deemed to have cured any such breach of representation or warranty for purposes of determining whether or not the conditions set forth in Section 8.2(a) have been satisfied. From and after the Closing, references to the Schedules shall be references to the Schedules as supplemented, modified and/or updated. If, prior to the Closing, Purchaser shall have reason to believe that any breach of a representation or warranty of the Seller has occurred (other than through notice from the Seller), Purchaser shall promptly so notify the Seller, in reasonable detail. Nothing in this Agreement, including this Section 6.5, shall imply that the Seller is making any representation or warranty as of any date other than the Closing Date (other than representations and warranties that are expressly made as of an earlier date).

## ARTICLE 7
## POST-CLOSING COVENANTS

7.1    **Access to Information; Books and Records**. From and after the Closing, each of Purchaser and the Seller shall cause their representatives to furnish all information reasonably requested by the other party or its representatives in connection with the administration of the Bankruptcy Case, any claims or interests asserted by parties in interest against Seller in the Bankruptcy Case, financial or regulatory reporting whether in the Bankruptcy Case or otherwise, audit, third party litigation, preparing or filing of any Tax Return or the defense in any Tax Proceeding; provided, however, that nothing in this Section 7.1 shall require a party to furnish to the other party or its representatives any material that is subject to an attorney-client or solicitor-client privilege or an attorney or solicitor work-product privilege or which may not be disclosed pursuant to Applicable Law.

7.2    **Post-Closing Receipt and Possession of Assets**.

(a)    After the Closing Date, the Seller shall transfer promptly to Purchaser from time to time (but in any event on a monthly basis) any payments constituting Transferred Assets received by the Seller. After the Closing Date, Purchaser shall transfer promptly to the Seller, from time to time (but in any event on a monthly basis), any payments constituting Excluded Assets, received by Purchaser after the Closing.

(b)    In the event that, after the Closing Date, Purchaser receives or otherwise is in possession of any Excluded Asset, Purchaser shall promptly notify the Seller of its receipt or possession of such other Excluded Asset and transfer such Excluded Asset to the Seller. In the event that, after the Closing Date, the Seller receives or otherwise is in possession of any other Transferred Asset, the Seller shall promptly notify Purchaser of its receipt or possession of such other Transferred Asset and transfer, at Purchaser's expense, such Transferred Asset to Purchaser.

7.3    **Tax Matters**.

(a)    The Seller shall be responsible for preparing or causing to be prepared all Tax Returns with respect to the Business and the Transferred Assets for taxable periods ending on or before the Closing Date (each, a "**Pre-Closing Tax Period**") that are required to be filed on or before the Closing Date. After the Closing Date, Purchaser will assist and cooperate with the Seller in preparing any such Tax Return with respect to the Transferred Assets.

(b)    Purchaser shall prepare and timely file or cause to be prepared and timely filed (taking into account all extensions properly obtained) all Tax Returns with respect to the Transferred Assets that are required to be filed for any taxable period that begins on or before the Closing Date and ends after the Closing Date (a "**Straddle Period**") and shall timely pay (subject to Purchaser's right to reimbursement of Seller Taxes), or cause to be timely paid, the amount of any Taxes due thereon. Purchaser shall provide the Seller with completed drafts of such Tax Returns for the Seller's review and reasonable comment at least fifteen days prior to the due date for filing thereof, taking into account extensions (or, if such due date is within fifteen days following the Closing Date, as promptly as practicable following the Closing Date) and shall consider any comments of Seller in good faith to such Tax Returns as are reasonably requested by the Seller, provided such requests are consistent with the prior practice of the Seller (to the extent relevant) and comply with Applicable Law.

(c)    The Seller shall be liable for any Taxes with respect to a Pre-Closing Tax Period and the portion of any Straddle Period ending on the Closing Date ("**Seller Taxes**"). For purposes of this Agreement, in the case of any Straddle Period, (a) the amount of any Taxes based on or measured by income or receipts, sales or use, employment, or withholding allocated to the portion of such Straddle Period ending on the Closing Date shall be determined based on an interim closing of the books as of the end of the day on the Closing Date and (b) any other Taxes shall be allocated to the portion of such Straddle Period ending on the Closing Date by prorating the amount of such Tax for the entire taxable period on a per diem basis.

(d)    Purchaser shall promptly notify the Seller in writing upon receipt by Purchaser or any of its Affiliates of notice of any pending or threatened U.S. federal, state, local or foreign Tax audits, proceedings or assessments relating to Pre-Closing Tax Period, Straddle Period or otherwise relating to a Tax for which the Seller is liable pursuant to Section 7.3(c) (a "**Pre-Closing Tax Claim**").

(e)    Purchaser shall have the sole right to control the defense or resolution of any Pre-Closing Tax Claim, and to employ counsel of its choice.

(f)    After the Closing, each of the Seller and Purchaser shall (and Purchaser shall cause its Affiliates to):

(i)    timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce), or file Tax Returns or other reports with respect to, Transfer Taxes;

(ii)    cooperate fully in preparing for and defending any Tax Proceeding with Governmental Authorities regarding any Tax Returns required to be filed by, or Taxes related to the Transferred Assets due from, the Seller for any Pre-Closing Tax Period or Straddle Period; and

(iii)    furnish the other party with copies of all correspondence received from any Governmental Authority in connection with any Tax Proceeding, related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period, and furnish the other parties with copies of all records and documents relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period that are proposed to be destroyed (and not otherwise in the possession of such other party).

## ARTICLE 8
## CONDITIONS PRECEDENT

8.1    **Conditions to Each Party's Obligation**. The respective obligations of the parties hereto to effect the Transactions are subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller and Purchaser), at or prior to the Closing, of the following conditions:

(a)    No Injunctions or Restraints. No Order or Applicable Law preventing the consummation of the Transactions shall be in effect.

(b)    <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be a Final Order.

8.2    **Conditions to Obligation of Purchaser**. The obligations of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by Purchaser), at or prior to the Closing, of the following conditions:

(a)    <u>Representations and Warranties</u>. Each of the representations and warranties of the Seller set forth in <u>Article 3</u> shall be true and correct in all material respects (without giving effect to any qualifications or limitations as to "materiality", "Material Adverse Effect" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date).

(b)    <u>Performance of Covenants and Obligations</u>. The Seller shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c)    <u>Closing Deliverables</u>. The Seller shall have delivered to Purchaser the closing deliveries required to be delivered by the Seller pursuant to <u>Section 2.8</u>.

8.3    **Conditions to Obligations of the Seller**. The obligation of the Seller to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller), at or prior to the Closing, of the following conditions:

(a)    <u>Representations and Warranties</u>. Each of the representations and warranties of Purchaser set forth in <u>Article 4</u> shall be true and correct in all material respects (without giving effect to any qualifications or limitations as to "materiality" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date).

(b)    <u>Performance of Covenants and Obligations of Purchaser</u>. Purchaser shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c)    <u>Closing Deliverables</u>. Purchaser shall have delivered to the Seller the closing deliveries required to be delivered by Purchaser pursuant to <u>Section 2.8</u>.

8.4    **Waiver of Condition; Frustration of Conditions**. All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Purchaser nor the Seller may rely on the failure of any condition set forth in this <u>Article 8</u>, as applicable, to be satisfied if such failure was caused by such party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions.

8.5    **Delivery of a Notice of Readiness to Close**. At any time after the Seller's satisfaction of its conditions to Closing in accordance with the terms of <u>Section 8.1</u> and <u>Section 8.3</u> of this Agreement, the Seller may deliver a notice to the Purchaser (a "**Notice of Readiness to Close**"). The Purchaser shall have five (5) Business Days from delivery of a Notice of Readiness

to Close to satisfy its conditions to Closing in accordance with the terms of <u>Section 8.1</u> and <u>Section 8.2</u> of this Agreement and consummate the Transactions; <u>provided</u>, that in no event shall Purchaser be required to close prior to the Outside Date.  If Purchaser does not satisfy its conditions to Closing and consummate the Transaction within the timeframe set forth in the preceding sentence, Purchaser shall forfeit the entire Deposit Escrow Amount to the Seller.

**ARTICLE 9**
**TERMINATION**

9.1     <u>**Events of Termination**</u>. Notwithstanding anything to the contrary, this Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing:

(a)     by mutual written consent of Purchaser and the Seller;

(b)     automatically, upon the consummation of a sale or other disposition of all or substantially all of the Transferred Assets to a Person other than Purchaser (each, an "<u>**Alternate Transaction**</u>");

(c)     by Purchaser or the Seller by written notice to Purchaser or the Seller from the other, if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(d)     by Purchaser, by written notice from Purchaser to the Seller, if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement, such that the conditions in <u>Section 8.1</u> or <u>Section 8.2</u> are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Seller prior to the earlier of (i) five Business Days after receipt of written notice from Purchaser requesting such breach be cured or (ii) the Outside Date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 9.1(d)</u> shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in <u>Section 8.1</u> or <u>Section 8.3</u> are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(e)     by the Seller, by written notice from the Seller to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in <u>Section 8.1</u> or <u>Section 8.3</u> are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) five Business Days after receipt of written notice from the Seller requesting such breach be cured or (ii) the Outside Date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 9.1(e)</u> shall not be available to the Seller if the failure of the Seller to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in <u>Section 8.1</u> or <u>Section 8.2</u> are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement;

(f)     by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order,

enacted any Applicable Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Transactions and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(f) shall not be available to the party seeking to terminate if any action of such party or any failure of such party to act has contributed to such Order or other action and such action or failure constitutes a breach of this Agreement; or

(g)      by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if the Closing has not occurred on or prior to April 18, 2025 (the "**Outside Date**"); provided, however, that the party exercising the right to terminate this Agreement pursuant to Section 9.1(g) shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement.

9.2      **Effect of Termination**.

(a)      In the event that this Agreement shall be terminated pursuant to Section 9.1, (a) Purchaser and its representatives shall promptly return all documents, work papers and other materials of the Seller including any confidential information and (b) all further obligations of the parties hereto under this Agreement shall terminate without further Liability or obligation to the other parties hereto; provided, however, that, notwithstanding the foregoing, the Liabilities and obligations under (i) the Confidentiality Agreement, and (ii) Section 2.9(c), Section 6.2(c), this Section 9.2 and Article 10 shall continue in full force and effect.

(b)      Notwithstanding anything to the contrary in this Agreement, in the event of valid termination of this Agreement pursuant to Section 9.1(e), Seller shall be entitled to all remedies available at law or in equity, including without limitation, retention of the Deposit Escrow Amount, damages, and/or specific performance pursuant to Section 10.13 of this Agreement.

## ARTICLE 10
## GENERAL PROVISIONS

10.1      **Survival of Representations, Warranties and Covenants.** All covenants and agreements contained in this Agreement that by their term are to be performed in whole or in part, or which prohibit actions, subsequent to Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive Closing and shall therefore terminate, including any Action for damages in respect of any breach or inaccuracy thereof. Notwithstanding the foregoing, the provisions of Section 2.9(c), Section 6.2, Section 9.2 and this Article 10 shall survive the Closing.

10.2      **Entire Agreement**. This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions,

negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings. The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the parties hereto expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents. Furthermore, the parties each hereby acknowledge that this Agreement, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all parties to this Agreement, the Confidentiality Agreement and the Related Documents specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction. The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the parties hereby agree that neither party hereto shall have any remedies or cause of action (whether in contract or in tort or otherwise) of any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

    10.3    **Amendment; No Waiver**. This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and, if applicable, the Related Documents) executed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any party of a breach of any provision of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

    10.4    **Severability**. Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any term or other provision of this Agreement or the Related Documents is invalid, illegal, or incapable of being enforced by any Applicable Law or public policy, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the parties to the greatest extent consistent with being valid and enforceable under Applicable Law. No party hereto shall assert, and Purchaser shall cause its Affiliates or related parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable.

10.5    **Expenses and Obligations**. Except as otherwise provided in this Agreement, all costs and expenses incurred by the parties hereto in connection with the Transactions, including the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the party that has incurred such expenses.

10.6    **Notices**. All notices, consents, waivers, and other communications under this Agreement or the Related Documents must be in writing and will be deemed to have been duly given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing for next day delivery (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if delivered by electronic mail (unless the sender receives an automated message that the email has not been delivered) on the date of transmission if on a Business Day before 5:00 p.m. local time of the business address of the recipient party (otherwise on the next succeeding Business Day) and (d) if deposited in the United States mail, first-class postage prepaid, on the date of delivery, in each case to the appropriate addresses or email addresses set forth below (or to such other addresses as a party may designate by notice to the other parties in accordance with this Section 10.6):

If to Seller:

> Timothy P. Neumann, Esq.
> Broege, Neumann, Fischer & Shaver, LLC
> 25 Abe Voorhees Drive
> Manasquan, New Jersey 08736
> (732)223-8484, ext. 214
> tneumann@bnfsbankruptcy.com

With a copy to Secured Creditor:

> Julie M. Murphy, Esq.
> Stradley Ronon Stevens & Young, LLP
> 457 Haddonfield Rd., Suite 100
> Cherry Hill, New Jersey 08002
> E-Mail: jmmurphy@stradley.com

With a copy to Official Committee of Unsecured Creditors:

> Robert M. Schechter, Esq.
> Porzio, Bromberg & Newman, P.C.
> 100 Southgate Parkway
> Morristown, NJ 07962
> (973) 889-4127
> Email: rmschechter@pbnlaw.com

If to Purchaser:

> Chartwell Pharmaceuticals, LLC
> 77 Brenner Drive

Congers, NY 10920
(846) 268-5000, Ext. 513
Attn: Jack Goldenberg
Email: jack@chartwellpharma.com

With a copy (which shall not constitute notice) to:

Warshaw Burstein, LLP
575 Lexington Avenue
New York, NY 10017
Telephone: (212) 984-7764
Attn: Steve Semian
Email: ssemian@wbny.com

10.7    **Counterparts**. This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format, or other agreed format shall be sufficient to bind the parties to the terms and conditions of this Agreement. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

10.8    **Governing Law.** This Agreement, the Related Documents and all Related Claims shall be governed by the internal laws of the State of New Jersey (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Applicable Laws of any other jurisdiction.

10.9    **Submission to Jurisdiction; Consent to Service of Process**.

(a)      Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Related Document, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6; provided, however, that if the Bankruptcy Case has closed, the parties agree to irrevocably submit to the exclusive jurisdiction of the of the Superior Court of the State of New Jersey. The parties hereto hereby irrevocably and unconditionally waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any Related Claim by the delivery of a copy thereof in accordance with the provisions of Section 10.6 (other than by email) along with a notification that service of process is being served in conformance with this Section 10.9(b). Nothing in this Agreement will affect the right of any party to serve process in any other manner permitted by Applicable Law.

10.10   **Waiver of Jury Trial**. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS.

10.11   **Rights Cumulative**. All rights and remedies of each of the parties under this Agreement and the Related Documents will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement, the Related Documents or Applicable Law.

10.12   **Assignment**. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the parties hereto. No assignment of this Agreement or any of the rights, interests or obligations under this Agreement may be made by any party hereto at any time, whether or not by operation of law, without the prior written consent of the Seller and Purchaser, and any attempted assignment without the required consent shall be void; provided, however, that (a) Purchaser may assign (i) any of its rights or delegate any of its duties under this Agreement to any of its Affiliates, and (ii) its rights, but not its duties, under this Agreement to any of its financing sources and (b) the Seller may assign any of its rights or delegate any of its duties under this Agreement to any successor thereto, including any liquidating trustee or other agent; provided, further, however, that, in each case, such assignment shall not release Purchaser from its obligations under this Agreement and the Seller shall have no obligation to pursue remedies against any assignee of Purchaser before proceeding against Purchaser for any breach of Purchaser's obligations hereunder.

10.13   **Specific Enforcement; Remedies**. The parties hereto agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the Purchaser hereto in accordance with their specific terms or were otherwise breached. It is accordingly agreed that (a) each party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of each party to cause the other party to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and Applicable Laws and to thereafter cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right each party would not have

entered into this Agreement. Notwithstanding anything to the contrary set forth herein, the parties hereto agree that (i) the Seller's right to retain the Deposit Escrow Amount, as set forth in <u>Section 2.9(c)</u>, is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

     10.14.   **<u>Third-Party Beneficiaries</u>**. Except as expressly set forth herein, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties hereto any rights or remedies of any nature whatsoever under or by reason of this Agreement.

*{THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK*
*SIGNATURES FOLLOW}*

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first written above.

PURCHASER:

**CHARTWELL PHARMACUETICALS, LLC**

By:_____  _

    Name:  Jack Goldenberg
    Title:  Member

*Signature Page lo Asset Purchase Agreement*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**SELLER:**

NOSTRUM LABORATORIES, INC.

By: _James L. Grainer_
Name: James Grainer
Title:  Chief Financial Officer

*Signature Page to Asset Purchase Agreement*

## EXHIBIT A

**Bid Procedures Order**

See 24-19611JKS [ECF No. 268].

| SCHEDULES | |
|---|---|
| Schedule 2.1(a) - Inventories | To be supplied |
| Schedule 2.1(b) - Product ANDAs | See attached |
| Schedule 2.1(c) - Assigned Contracts | See attached |
| Schedule 2.2(l) - Other mutually-agreed Excluded Assets | None |
| Schedule 2.11 - Allocation Schedule | To be supplied |
| Schedule 3.3 - Consents Required | None |
| Schedule 3.6(c) - Cure Costs | None |
| Schedule 6.1 - Conduct of Business | None |

# SCHEDULE 2.1(b)

# PRODUCT ANDAS

**Schedule 2.1(b)**
**Product ANDAs**

**Kansas City:**

**074415**        **Sucralfate Tablets USP, 1g**

**Ohio:**

**090180**        **Promethazine Hydrochloride and Codeine Phosphate Syrup, 6.25 mg and 10 mg/5 mL (CV)**
**088764**        **Promethazine, Phenylephrine Hydrochloride and Codeine Phosphate Oral Solution USP, 6.25 mg/5 mg/10 mg per 5 mL (CV)**

# SCHEDULE 2.1(c)

# ASSIGNED CONTRACTS

**Schedule 2.1(c)**
**Assigned Contracts**

None.

# SCHEDULE 3.3

# REQUIRED CONSENTS

**Schedule 3.3**
**Required Consents**

None.

**Schedule 3.7**

1. The Generic Drug User Fee Administration ("GDUFA") fees due in total are about $4.3 million, approximately $440,000 of which is attributable to facility fees and $3.9 million is attributable to program fees.

2. The Debtor has received notices from the FDA that the Debtor is not in compliance with the GDUFA fees owed and reminders of the amounts due.

3. The Debtor currently owes the Center for Medicare and Medicaid Services is approximately $4,000,000.00.

4. The Debtor has entered into a settlement with the Department of Justice in total for $1.989 million, the federal component owed is $967,000 and the state component is approximately $1,022,000. This settlement relates rebates owed from previous sales of the Debtor's products.

Execution Version

**ASSET PURCHASE AGREEMENT**

**by and between**

**ANI PHARMACEUTICALS, INC., as Purchaser,**

**and**

**NOSTRUM LABORATORIES, INC., as Seller**

**Dated as of April 8, 2025**

## Table of Contents

**Page**

ARTICLE 1 DEFINED TERMS ..................................................................................................2

    1.1   **Defined Terms** ..........................................................................................................2

    1.2   **Other Definitional and Interpretive Matters** .....................................................10

ARTICLE 2 THE PURCHASE AND SALE; CLOSING...........................................................12

    2.1   **Purchase and Sale** .................................................................................................12

    2.2   **Excluded Assets** ....................................................................................................13

    2.3   **Assumption of Liabilities**......................................................................................15

    2.4   **Excluded Liabilities** ..............................................................................................15

    2.5   **Excluded Contracts** ..............................................................................................15

    2.6   **Nontransferable Assets and Liabilities** ..............................................................15

    2.7   **Closing** ...................................................................................................................16

    2.8   **Closing Deliveries of the Parties** .........................................................................16

    2.9   **Purchase Price; Assumed Liabilities; Deposits** .................................................17

    2.10  **Transfer Taxes** ......................................................................................................17

    2.11  **Allocation of Purchase Price** ...............................................................................18

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLER .........................18

    3.1   **Organization, Good Standing and Other Matters** ............................................18

    3.2   **Authority and Enforceability**...............................................................................18

    3.3   **No Conflict; Required Filings and Consents** ......................................................19

    3.4   **Litigation**...............................................................................................................19

    3.5   **Brokers and Finders** ............................................................................................19

    3.6   **Title to Assets,** ......................................................................................................19

    3.7   **Compliance with Applicable Laws; Regulatory Matters** ..................................20

    3.8   **No Other Representations or Warranties** ..........................................................20

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER .........................21

    4.1   **Organization, Good Standing and Other Matters** ...........................................21

    4.2   **Authority and Enforceability**...............................................................................21

    4.3   **No Conflict: Required Filings and Consents** ......................................................21

    4.4   **Financing** ...............................................................................................................21

    4.5   **Solvency** .................................................................................................................22

| | | |
|---|---|---|
| 4.6 | **Litigation** | 22 |
| 4.7 | **Brokers and Finders** | 22 |
| 4.8 | **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties** | 22 |
| 4.9 | **No Other Representations or Warranties** | 23 |
| ARTICLE 5 | BANKRUPTCY COURT MATTERS | 23 |
| 5.1 | **Competing Transaction** | 23 |
| 5.2 | **Bankruptcy Court Filings** | 23 |
| 5.3 | **Assumption of Assigned Contracts** | 24 |
| ARTICLE 6 | PRE-CLOSING COVENANTS | 26 |
| 6.1 | **Conduct of Business** | 26 |
| 6.2 | **Access to Information; Confidentiality** | 26 |
| 6.3 | **Efforts to Consummate** | 27 |
| 6.4 | **Public Announcements** | 28 |
| 6.5 | **Update of Schedules; Knowledge of Breach** | 28 |
| ARTICLE 7 | POST-CLOSING COVENANTS | 28 |
| 7.1 | **Access to Information; Books and Records** | 28 |
| 7.2 | **Post-Closing Receipt and Possession of Assets** | 29 |
| 7.3 | **Tax Matters** | 29 |
| ARTICLE 8 | CONDITIONS PRECEDENT | 30 |
| 8.1 | **Conditions to Each Party's Obligation** | 30 |
| 8.2 | **Conditions to Obligation of Purchaser** | 30 |
| 8.3 | **Conditions to Obligations of the Seller** | 31 |
| 8.4 | **Waiver of Condition; Frustration of Conditions** | 31 |
| 8.5 | **Delivery of a Notice of Readiness to Close** | 31 |
| ARTICLE 9 | TERMINATION | 31 |
| 9.1 | **Events of Termination** | 32 |
| 9.2 | **Effect of Termination** | 33 |
| ARTICLE 10 | GENERAL PROVISIONS | 33 |
| 10.1 | **Survival of Representations, Warranties and Covenants** | 33 |
| 10.2 | **Entire Agreement** | 33 |
| 10.3 | **Amendment; No Waiver** | 34 |

10.4    **Severability** ...................................................................................................34

10.5    **Expenses and Obligations** .............................................................................34

10.6    **Notices** ...........................................................................................................34

10.7    **Counterparts** .................................................................................................36

10.8    **Governing Law** ..............................................................................................36

10.9    **Submission to Jurisdiction; Consent to Service of Process**............................36

10.10   **Waiver of Jury Trial**......................................................................................36

10.11   **Rights Cumulative** .........................................................................................37

10.12   **Assignment**....................................................................................................37

10.13   **Specific Enforcement; Remedies** ...................................................................37

10.14.  **Third-Party Beneficiaries**.............................................................................38

## EXHIBITS

Exhibit A                          Bid Procedures Order

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of April 8, 2025 (the "**Agreement Date**") is entered into by and between **ANI PHARMACEUTICALS, INC.**, a Delaware corporation ("**Purchaser**") and **NOSTRUM LABORATORIES, INC**., a New Jersey corporation (the "**Seller**").

## RECITALS

**WHEREAS,** on September 30, 2024 (the "**Petition Date**"), Seller filed voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), Case No. 24-19611/JKS thereby commencing a chapter 11 case (the "**Bankruptcy Case**").  No trustee has been appointed and the Seller is continuing in the management of its businesses and possession of its property as a debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Seller desires to sell (or cause to be sold) to Purchaser, and Purchaser desires to purchase from the Seller, all of the Transferred Assets Free and Clear, and the Seller desires Purchaser to assume, and Purchaser desires to assume from the Seller, all of the Assumed Liabilities, in each case upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, the Transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court and will only be consummated pursuant, among other things, to the Sale Order to be entered in the Bankruptcy Case;

**WHEREAS,** Seller anticipates filing a motion (the "**Sale Motion**") to approve the sale of certain assets and the assignment of certain contracts to the highest bidder pursuant to Sections 363 and 365 of the Bankruptcy Code and subject to certain rules and procedures that all bidders must comply with as a condition to participating in the bidding process (the "**Bidding Procedures**," copy annexed hereto as <u>Exhibit A</u>);

**WHEREAS**, in the event there are bidders wishing to bid, an auction will be held at which the Purchaser shall be allowed to participate, subject to its compliance with the Bidding Procedures, and there will occur a hearing in the Bankruptcy Court at which time the sale to the successful bidder shall be approved by the Bankruptcy Court by order of the Bankruptcy Court;

**WHEREAS**, concurrently with the execution of this Agreement, Purchaser shall deposit (or cause to be deposited) an aggregate amount equal to the Deposit Escrow Amount into the trust account of Seller's bankruptcy counsel, Broege, Neumann, Fischer & Shaver, LLC (the "**Deposit Trust Account**").

**NOW**, **THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.1 **Defined Terms**. The following terms shall have the following meanings in this Agreement:

"**Action**" means any action, proceeding, arbitration or litigation (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator.

"**Affiliate**" of any particular Person means any other Person, directly or indirectly, controlling, controlled by, or under common control with, such particular Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Agreement Date**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in Section 2.11(a).

"**Alternate Transaction**" has the meaning set forth in Section 9.1(b).

"**ANDA**" means an Abbreviated New Drug Application (including any amendments and supplements thereto) filed with the FDA in accordance with Section 505(j) of the Federal Food, Drug and Cosmetic Act of 1938.

"**Applicable Law**" means, with respect to any Person, any federal, provincial, state, or local law, ordinance, principle of common law, code, regulation or statute applicable to such Person or such Person's subsidiaries or to any of their respective securities, assets, properties or businesses, including, but not limited to, the Federal Food Drug and Cosmetic Act (21 U.S.C. §§ 301 et seq.).

"**Assigned Contracts**" has the meaning set forth in Section 2.1(c).

"**Assumed Liabilities**" means only the Liabilities arising out of Purchaser's ownership or operation of the Transferred Assets solely to the extent arising from periods occurring after the Closing Date and only to the extent not otherwise paid, performed, discharged or otherwise satisfied prior to the Closing.

"**Assumption Notice**" has the meaning set forth in Section 5.3(a).

"**Auction**" has the meaning set forth in Section 5.2(b).

2

"**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other claims, actions, rights, or remedies that may be brought by or on behalf of the Seller or its estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including, but not limited to, actions or remedies under sections 510, 542, 543, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"**Back-Up Bid**" means the second highest or otherwise best bid if the successful bidder fails to consummate its bid in accordance with the Bid Procedures.

"**Back-up Termination Date**" means the first to occur of (a) fifteen days after the entry of the Sale Order, (b) consummation of the Transactions with the winning bidder at the Auction, (c) Purchaser's receipt of notice from the Seller of the release by the Seller of Purchaser's obligations under Section 5.2(b) and (d) April 18, 2025.

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bid Procedures**" means those certain bidding procedures for the sale of the Seller's assets approved by the Bankruptcy Court.

"**Bid Procedures Order**" means an Order of the Bankruptcy Court approving the Bid Procedures attached hereto as Exhibit A.

"**Bill of Sale and Assignment and Assumption Agreement**" means the bill of sale and assignment and assumption agreement, dated as of the Closing Date, by and between the Seller and Purchaser, in a form reasonably acceptable to counsel for Seller and Purchaser.

"**Business**" means the business of the Seller as currently conducted.

"**Business Day**" means any day other than (a) a Saturday, Sunday or federal holiday or (b) a day on which commercial banks in San Francisco, California are authorized or required to be closed.

"**Closing**" has the meaning set forth in Section 2.7.

"**Closing Date**" has the meaning set forth in Section 2.7.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Competing Bid**" has the meaning set forth in Section 5.1.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of November 13, 2024, by and between the Seller and Purchaser.

"**Consent**" means any consent, approval, authorization, waiver or license.

3

"**Contract**" means any written agreement, mortgage, indenture, lease (whether for real or personal property), contract or subcontract.

"**Cure Costs**" means all monetary amounts that must be paid and obligations that otherwise must be satisfied pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts, as agreed upon by the parties hereto or otherwise determined by the Bankruptcy Court, provided, however, that Purchaser shall have no obligation to pay any Cure Costs for Assigned Contracts that are not Designated Contracts.

"**Deposit Escrow Amount**" means $300,000.00.

"**Deposit Trust Account**" has the meaning set forth in the Recitals.

"**Designated Contracts**" has the meaning set forth in Section 5.3(b).

"**Designation Deadline**" has the meaning set forth in Section 5.3(b).

"**Determined Cure Costs**" means, in the aggregate, all Cure Costs payable in respect of the Assigned Contracts as determined pursuant to the Sale Order or by separate order of the Bankruptcy Court.

"**Enforceability Exceptions**" means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar Applicable Laws affecting the enforcement of creditors' rights generally and general equitable principles.

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Books and Records**" means the following originals and copies of those books and records, documents, data and information (in whatever form maintained) of the Seller and the Business: (a) all corporate minute books (and other similar corporate records) and stock records of the Seller, (b) any books and records relating to the Excluded Assets or (c) any books, records or other materials that Seller (i) is required by Applicable Law to retain (copies of which, to the extent permitted by Applicable Law, will be made available to Purchaser upon Purchaser's reasonable request) or (ii) is prohibited by Applicable Law from delivering to Purchaser or include attorney client communications, work product or other privileged materials.

"**Excluded Contracts**" has the meaning set forth in Section 2.5.

"**Excluded Liabilities**" has the meaning set forth in Section 2.4.

"**FDA**" means the United States Food and Drug Administration.

"**FDA Transfer Letter**" means the letter(s) from the Seller to FDA in form and substance acceptable to Purchaser, in its reasonable discretion, notifying FDA of the transfer from the Seller to Purchaser of all of Seller's rights in the Transferred Assets set forth in Schedule 2.1(b).

"**Final Order**" means an Order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated,

modified or amended, is not stayed and remains in full force and effect; <u>provided</u>, that such Order shall be considered a Final Order only after the time period for third parties seeking appeal has expired without the filing of any appeal or motion for reconsideration.

"**Free and Clear**" means free and clear of all Liens and Liabilities (other than Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

"**GAAP**" means generally accepted accounting principles in the United States as of the Agreement Date.

"**Governmental Authority**" means any domestic or foreign national, provincial, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, any court (including the Bankruptcy Court) or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS and the FDA).

"**Intellectual Property**" means any and all intellectual property and proprietary rights in any jurisdiction throughout the world, including rights arising from the following: (a) patents and patent applications, design rights, industrial design registrations and applications therefor, divisions, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, reexaminations, extensions and any provisional applications, and any foreign or international equivalent of any of the foregoing; (b) trademarks (whether registered, unregistered or applied for), service marks, trade dress, service names, trade names, brand names, product names, slogans, logos, business names, corporate names, and other source or business identifiers, all registrations and applications for registration thereof, and, in each case, together with all of the goodwill associated therewith; (c) works of authorship, copyrights and all registrations and applications for registration thereof; (d) trade secrets and know-how; (e) rights in formulae, methods, techniques, processes, assembly procedures, software, software code (in any form, including source code and executable or object code), subroutines, test results, test vectors, user interfaces, protocols, schematics, specifications, drawings, prototypes, molds and models, and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing), and (f) social media accounts, social media identifiers, internet domain name registrations.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge**" means (a) with regard to the Seller, the actual knowledge, after due inquiry, of Dr. Nirmal Mulye, John Foster, and Carlton Asher and (b) with regard to Purchaser, the actual knowledge, after due inquiry, of Meredith Cook.

"**Liabilities**" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to, or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"**Lien**" means all forms of lien (including mechanic's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Transferred Assets, and liens arising under the Bankruptcy Code), encumbrance, claim, defect or irregularity in title, pledge, mortgage, deed of trust, deed to secure debt, security interest, charge, transfer restriction or similar agreement or encumbrance, including any dedication under any gathering, transportation, treating, processing, fractionating, purchase, sale or similar agreements, or any other rights granted or consensual as or against any Transferred Assets including but not limited to easements, encroachments, rights of first refusal, options, or any other interest or right in property that constitutes a lien or interest within the definition or adjudication of such terms under Section 101(37) of the Bankruptcy Code.

"**Material Adverse Effect**" means a material adverse effect on the Transferred Assets and Assumed Liabilities taken as a whole; provided, however, that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or may be, a Material Adverse Effect: (a) any change in, or effects arising from or relating to, general business or economic conditions affecting any industry in which the Business operates; (b) any change in, or effects arising from or relating to, the United States or foreign economies, or securities, banking or financial markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) debt defaults or other restructuring events of any country with respect to which bondholders take a discount to the debt of any country or any increases in the interest rates for any country's debt, (iii) any change in currency exchange rates, (iv) any decline or rise in the price of any security, commodity, contract or index and (v) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (c) any change from, or effects arising from or relating to, the occurrence, escalation or material worsening of any act of God or other calamity, natural disaster, pandemic or disease, outbreak, hostility, act of war, sabotage, cyber-attack or terrorism or military action; (d) any action taken by Purchaser or its Affiliates with respect to the Transactions or with respect to the Business; (e) any action taken, or failed to be taken, by the Seller at the request of or with the consent of Purchaser or any change from, or effects arising from or relating to, Purchaser's failure to consent to any action restricted by Section 6.1; (f) any change in, or effects arising from or relating to changes in, Applicable Law or accounting rules (including GAAP) or any interpretation thereof; (g) the failure of the Business to meet any of its projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or representatives); (h) national or international political, labor or social conditions; (i) any matter described in the Schedules or any matter of which Purchaser is aware as of the Agreement Date; (j) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement and the Transactions or the identity of the parties to this Agreement, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the Business; (k) the sale of any assets other than the Transferred Assets to any third parties by Seller or any of its Affiliates; (l) any effect arising or resulting from or related to the filing of the Bankruptcy Case; (m) any action required to be taken under any Applicable Law or Order; (n) seasonal changes in the results of operations of the Seller; (o) any epidemic, pandemic, outbreak of disease or other public health emergency (including COVID-19) or any escalation or worsening of any such conditions; (p) (1) any results, outcomes, data, adverse events or side effects arising

from any clinical trials being conducted by or on behalf of the Seller or any competitor of the Seller (or the announcements thereof), (2) the determination by, or the delay of a determination by, the FDA or any other applicable Governmental Authority, or any panel or advisory body empowered or appointed thereby, with respect to a clinical hold, acceptance, filing, designation (including de-designation for the accelerated approval pathway), approval, clearance, non-acceptance, hold, refusal to file, refusal to designate, non-approval, disapproval or non-clearance, or requirement to conduct additional clinical studies or trials, with respect to any of the Seller's or any competitor's product candidates or (3) FDA approval (or other clinical or regulatory developments), market entry or pending market entry of any product competitive with or related to any of the products or product candidates of the Seller, or any guidance, announcement or publication by the FDA or other applicable Governmental Authority relating to any product candidates of the Seller or any competitor; or (q) any objections made in the Bankruptcy Court to this Agreement, the Transactions, the Sale Order or the reorganization, any orders of the Bankruptcy Court and any actions or omissions of the Seller in compliance with any order of the Bankruptcy Court and the assumption or rejection of any Assigned Contract.

"**Non-Transferred Asset**" has the meaning set forth in Section 2.6(a).

"**Order**" means any award, decision, injunction, judgment, ruling or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator, whether preliminary, interlocutory or final, including by the Bankruptcy Court.

"**Organizational Documents**" means (a) the articles or certificates of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in clauses (a) through (d), and (f) any amendment to or equivalent of any of the foregoing.

"**Outside Date**" has the meaning set forth in Section 9.1(g).

"**Owned Intellectual Property**" means the Intellectual Property owned by the Seller that is exclusively related to the Transferred Assets.

"**Permit**" means all permits, authorizations, certificates, franchises, consents, waivers, licenses, filings and other approvals from any Governmental Authority.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

"**Personal Information**" means any information in the possession or control of the Seller (solely as related to the Business) about an identifiable individual other than the name, title or business address, business email address or telephone number of any employee of the Seller.

"**Petition Date**" has the meaning set forth in the Recitals.

7

"**Pre-Closing Tax Claim**" has the meaning set forth in <u>Section 7.3(d)</u>.

"**Pre-Closing Tax Period**" has the meaning set forth in <u>Section 7.3(a)</u>.

"**Product ANDA**" means, for each of the Products listed on <u>Schedule 2.1(b)</u>, the ANDA for each Product, and any and all submissions, amendments and supplements thereto, that have been filed with (whether or not accepted for filing) and approved by (or filed with) the FDA granting or seeking authorization and approval to manufacture, package, ship and sell such Products, as more fully defined in 21 C.F.R. Part 314. The term "Product ANDA(s)" includes the materials contained in the official ANDA dossier and files, including all ANDA submissions, amendments, correspondence (including correspondence with the FDA field offices, FDA laboratories, FDA compliance offices and OPDP), reports and memoranda of telephone conversations, constituting or reflecting communications regarding any of the Product ANDAs. The term "Product ANDA(s)" also includes such materials in the working regulatory and clinical files of Seller or in the Seller's control pertaining to the conduct of upcoming annual reviews of the Products and required reports to the FDA that have yet to be filed.

"**Products**" means the approved products, which are manufactured pursuant to a Product ANDA to be purchased pursuant to this Agreement, as listed on <u>Schedule 2.1(b)</u>.

"**Public Health Measures**" means any closures, "shelter-in-place," "stay at home," workforce reduction, social distancing, shut down, closure, curfew or other restrictions or any other Applicable Law, Orders, directives, guidelines or recommendations issued by any Governmental Authority, the Centers for Disease Control and Prevention, the World Health Organization, or any industry group in connection with COVID-19 or any other epidemic, pandemic, or outbreak of disease, or in connection with or in response to any other public health conditions.

"**Purchase Price**" means $1,500,000.00.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Schedules**" has the meaning set forth in <u>Article 4</u>.

"**Related Claims**" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents and any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions or the relationship between the parties (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

"**Related Documents**" means the Bill of Sale and Assignment and Assumption Agreement; <u>provided</u>, <u>however</u>, that the Bill of Sale and Assignment and Assumption Agreement shall not be a Related Document solely for purposes of applying the provisions in <u>Article 10</u> to the extent, and only to the extent, that any such document expressly conflicts with <u>Article 10</u>.

"**Sale Motion**" has the meaning set forth in the Recitals.

"**Sale Order**" means an Order of the Bankruptcy Court issued pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code in form and substance reasonably satisfactory to the Seller and Purchaser in all material respects.

"**Schedules**" has the meaning set forth in Article 3.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Taxes**" has the meaning set forth in Section 7.3(c).

"**Solvent**" when used with respect to any Person, means that, as of any date of determination, (a) the fair salable value (determined on a going concern basis) of its assets and property will, as of such date, exceed the amounts required to pay its debts as they become absolute and mature, as of such date, (b) such Person will have adequate capital to carry on its business and (c) such Person will be able to pay its debts as they become absolute and mature, in the ordinary course of business, taking into account the timing of and amounts of cash to be received by it and the timing of and amounts of cash to be payable on or in respect of its indebtedness.

"**Straddle Period**" has the meaning set forth in Section 7.3(b).

"**Tax**" means (i) any ad valorem, alternative or add-on (including Section 59A of the Code), income, franchise, branch profits, capital gains, gross receipts, estimated, employment, excise, goods and services, severance, stamp, documentary, value-added, sales, use, property, registration, transfer, payroll, social security, withholding or other tax, duty, charge, fee, levy or other assessment, and any related fine, penalty, interest, or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority and (ii) any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation, agreement or arrangement to indemnify any Person or other entity.

"**Tax Proceeding**" means any audit, appeal, challenge, proceeding, controversy, dispute, claim, information request or assessment with respect to Taxes.

"**Tax Return**" means any return (including any information return), disclosure, report, statement, schedule, notice, form, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection, or payment, of any Tax.

"**Transactions**" means the transactions contemplated by this Agreement and the Related Documents.

"**Transfer Taxes**" has the meaning set forth in Section 2.10.

"**Transferred Assets**" has the meaning set forth in Section 2.1.

1.2      **Other Definitional and Interpretive Matters**.

(a)      Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

(i)      Calculation of Time Period. All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)      Dollars. Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement, the Related Documents or the Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties hereto to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement, the Related Documents or the Schedules.

(iii)      Exhibits/Schedules. The Exhibits and Schedules to this Agreement are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent the relevance of such disclosure to such other Schedule is reasonably apparent on the face of such disclosure. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Applicable Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)      Gender and Number. Any reference to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)      Headings. The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or Related Document, as applicable. Unless otherwise specified, all references in this Agreement to any "Section" or other subdivision are to the corresponding section or subdivision of this Agreement, and all

references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vi)  <u>Herein</u>. The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)  <u>Or</u>. The word "or" shall be construed in the inclusive sense of "and/or" unless otherwise specified.

(viii)  <u>Including</u>. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)  <u>Successors</u>. A reference to any party to this Agreement, any Related Document or any other agreement or document shall include such party's successors and permitted assigns.

(x)  <u>Legislation</u>. A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(xi)  <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statement, to the extent any such phrase appears in such representation or warranty, if (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that relates to the subject matter of such representation, (B) such item is otherwise specifically set forth on the balance sheet or financial statement or (C) such item is set forth in the notes to the balance sheet or financial statement.

(xii)  <u>Made Available</u>. Any reference in this Agreement to "made available" means a document or other item of information that was provided or made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions.

(b)  All representations and warranties set forth in this Agreement or the Related Documents are contractual in nature only and subject to the sole and exclusive remedies set forth herein. The parties have agreed that should any representations and warranties of any party prove untrue, the other parties shall have the specific rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort or otherwise) are permitted to any party hereto as a result of the

11

untruth of any such representation and warranty. The phrase "to Seller's Knowledge" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the Related Documents and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement and the Related Documents. The parties hereto agree that changes from earlier drafts to the final version of this Agreement do not necessarily imply that the party agreeing to such change is agreeing to a change in meaning (as the party agreeing to such change may believe the change is stylistic and non-substantive); consequently, no presumption should exist by virtue of a change from a prior draft.

# ARTICLE 2
# THE PURCHASE AND SALE; CLOSING

2.1     **Purchase and Sale**. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, in exchange for an aggregate payment from Purchaser to the Seller equal to the Purchase Price, Purchaser shall purchase, assume and accept from the Seller, and the Seller shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear, all of the rights, title and interests in, to and under the following assets and interests (collectively, the "**Transferred Assets**"):

(a)     the inventories of those Products (including raw materials and active pharmaceutical ingredients) in Seller's possession and control and that is further described by category, quantity and unit of measure, lot number and storage location in Schedule 2.1(a);

(b)     the Product ANDAs set forth in Schedule 2.1(b);

(c)     all Contracts listed on Schedule 2.1(c) (as may be amended prior to Closing) (collectively, the "**Assigned Contracts**"), but expressly excluding (i) Contracts that expire or are terminated prior to the Closing and (ii) any Contracts that Purchaser elects to exclude pursuant to Section 5.3(b);

(d)     all material original books and records, documents, data and information of the Seller solely related to the Transferred Assets, including: (i) supplier and vendor lists, (ii) promotional materials, (iii) customer lists, (iv) market research materials, (v) materials used in connection with the sale and promotion of the products, and (vi) other business records required to be transferred to Purchaser under applicable law, other than the Excluded Books and Records; provided, however, that the Seller shall be entitled to retain copies of any such materials;

(e)     annual and periodic reports relating to the Product ANDAs which have been filed by or on behalf of Seller or a prior owner of the Product ANDAs with the FDA or equivalent

Governmental Authority and adverse event reports pertaining to the Products, in each case as are in Seller's or its Affiliate's possession or control;

(f)      all intangible assets, including without limitation, the names, logos and symbols used by Seller in connection with the Transferred Assets;

(g)      all of the Seller's rights, claims or causes of action against third parties relating to the assets, properties, business or operations of the Seller with respect to the Transferred Assets and the Assumed Liabilities (including all guaranties, warranties, indemnities and similar rights in favor of the Seller or any its Affiliates to the extent solely related to the Transferred Assets or the Assumed Liabilities), in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date, except for such rights, claims and causes of related to the Excluded Assets or Excluded Liabilities; and

(h)      all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, choses in action, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively used in or held for use for the Transferred Assets listed in <u>clauses (a)</u> through <u>(g)</u> above or the Assumed Liabilities; and

(i)      all goodwill associated with or symbolized by any of the foregoing Transferred Assets described in <u>clauses (a)</u> through <u>(h)</u> above.

2.2      **<u>Excluded Assets</u>**. Notwithstanding the provisions of <u>Section 2.1</u> or anything to the contrary herein, any and all assets, rights and properties of the Seller that are not specifically identified in <u>Section 2.1</u> as Transferred Assets, including the following (collectively, the "**<u>Excluded Assets</u>**"), shall be retained by the Seller, and Purchaser and its designees shall acquire no right, title or interest in the Excluded Assets in connection with the Transaction:

(a)      all (i) cash and cash equivalents, wherever located, including bank balances and bank accounts or safe deposit boxes, monies in the possession of any banks, savings and loans or trust companies and similar cash items, (ii) escrow monies and deposits in the possession of landlords and utility companies, and (iii) investment securities and other short- and medium-term investments;

(b)      all records, documents or other information exclusively relating to current or former employees of the Seller that are not hired by Purchaser, and any materials to the extent containing information about any employee, disclosure of which would violate Applicable Law or such employee's reasonable expectation of privacy;

(c)      any interest of the Seller under this Agreement or the Related Documents, including, without limitation, the right to receive the Purchase Price and to enforce the Seller's rights and remedies thereunder;

(d)      all Contracts (including all prepaid assets relating to such Contracts), other than the Designated Contracts, to which Seller is a party;

(e)     any (i) attorney-client work product or communications prior to the Closing Date between Seller (including any one or more officers, directors or stockholders of Seller), on the one hand, and its counsel, on the other hand, and (ii) claims under any director and officer, errors and omissions, fiduciary and commercial crime insurance policies;

(f)     all Permits (including applications therefor and any trade or import/export Permits) that (i) are not solely related to the Transferred Assets, or (ii) are not transferable to Purchaser under Applicable Law;

(g)     the Excluded Books and Records;

(h)     accounts receivable, intercompany obligations and other amounts receivable by Seller;

(i)     any assets not otherwise designated as Transferred Assets or from time to time designated by the parties hereto as Excluded Assets;

(j)     the Avoidance Actions;

(k)     all of the Seller's rights, claims or causes of action (i) against third parties relating to the assets, properties, business or operations of the Seller (including all guaranties, warranties, indemnities and similar rights in favor of the Seller or any of its Affiliates) to the extent arising under the Bankruptcy Code or relating to any of the Excluded Assets or Excluded Liabilities, or (ii) against any third parties that have a familial relationship with any members of the Seller's management team or entities in which such third parties hold an interest, the Seller's owners or the Seller's employees, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date; for the avoidance of doubt and notwithstanding anything else herein to the contrary, all of the Seller's rights, claims and causes of action, including Avoidance Actions, against any of the Seller's affiliates, insiders, subsidiaries, and parents shall be Excluded Assets.

(l)     all of the Seller's right, title and interest to any the assets set forth on Schedule 2.2(l); and

(m)     all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively related to or exclusively used in or held for use for the Excluded Assets listed in clauses (a) through (l) above.

Notwithstanding anything to the contrary contained in this Agreement or any of the other Related Documents, Purchaser acknowledges and agrees that all of the following are also Excluded Assets, and all right, title and interest in and to all Excluded Assets shall be retained by the Seller and shall remain the property of the Seller (and shall expressly be excluded from the sale, transfer, assignment and conveyance to Purchaser hereunder), and neither Purchaser nor any of its Affiliates shall have any interest therein: (x) all records and reports prepared or received by the Seller or any of its Affiliates in connection with the sale of the Business and the Transactions, including all analyses relating to the Business or Purchaser so prepared or received; and (y) all confidentiality

14

agreements with prospective purchasers of the Business or any portion thereof and all bids and expressions of interest received from third parties with respect thereto.

2.3    **Assumption of Liabilities**. On the terms and subject to the conditions set forth in this Agreement, Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms the Assumed Liabilities.

2.4    **Excluded Liabilities**. Notwithstanding <u>Section 2.3</u>, Purchaser is assuming only the Assumed Liabilities of the Seller and will not assume or be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, in each case, that are not Assumed Liabilities (all such Liabilities not being assumed herein referred to as the "**<u>Excluded Liabilities</u>**"), and the Seller shall retain, be responsible for, pay, perform, discharge, or otherwise satisfy in accordance with their respective terms all Liabilities that are not Assumed Liabilities, including all Liabilities related to Excluded Assets. For the avoidance of doubt, "Excluded Liabilities" includes any and all Liabilities arising out of, relating to, resulting from or in connection with any credits, rebates, returns or chargebacks, including, without limitation, any rebates or refunds due to the Center for Medicare and Medicaid Services, including those listed on <u>Schedule 3.7</u>, in each case to the extent attributable to the Products distributed or sold by the Seller prior to the Closing Date.

2.5    **Excluded Contracts**. Pursuant to <u>Section 5.3(b)</u>, Purchaser shall be entitled, in its sole discretion, by written notice to the Seller up to three (3) Business Days prior to the Closing Date, to elect not to purchase or assume one or more Assigned Contract, in which case, notwithstanding anything in this Agreement or any Related Document to the contrary, such Contract shall not be an Assigned Contract or Designated Contract and shall be considered an excluded contract ("**<u>Excluded Contract</u>**") (and shall constitute an Excluded Asset and not be included in the Transferred Assets) for all purposes of this Agreement and Purchaser shall not have any obligation to satisfy or pay any Cure Costs or other Liabilities with respect to such Excluded Contract. Each assignable Assigned Contract that Purchaser does not elect to remove from the list of Assigned Contracts pursuant to <u>Section 5.3(b)</u> shall be an Assigned Contract.

2.6    **<u>Nontransferable Assets and Liabilities</u>**.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Governmental Authority) (after giving effect to the Sale Order or any other applicable order of the Bankruptcy Court that effects such transfer without any required Consents), would constitute a breach or other contravention thereof or a violation of Applicable Law (each, a "**<u>Non-Transferred Asset</u>**").

(b)    If, on the Closing Date, any third-party Consent is not obtained for a Non-Transferred Asset, or if an attempted transfer or assignment thereof would be ineffective or a

violation of Applicable Law, then, until any requisite consent is obtained therefor and the same is transferred and assigned to Purchaser or its designee, each such Non-Transferred Asset shall be held by the Seller as agent for the Purchaser, and the Seller shall, to the extent permitted by Applicable Law, provide to Purchaser the benefits and, subject to Purchaser's receipt of such benefits, Purchaser shall assume the obligations and bear the economic burdens associated with such Non-Transferred Asset. The Seller and Purchaser shall use commercially reasonable efforts to enter into agreements (including subcontracting, sublicensing or subleasing, if permitted) by which (i) the Seller shall without interruption of the Business, provide Purchaser with the economic and operational equivalent of obtaining the requisite third-party Consent and assigning the applicable Non-Transferred Asset to Purchaser (including, with the prior written consent of Purchaser, enforcing for the benefit of Purchaser, and at Purchaser's sole expense, all claims or rights arising thereunder) and (ii) Purchaser shall perform, at its sole expense, the obligations and assume the economic burdens of the Seller to be performed after the Closing with respect to such Non-Transferred Asset.

2.7    **Closing**. The closing of the Transactions (the "**Closing**") will take place remotely by electronic exchange of documents on the date (the "**Closing Date**") that is the second (2nd) Business Day after the date on which all of the conditions set forth in Article 8 (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the party hereto entitled the benefit of the same, unless another time or date is agreed to in writing by the parties hereto. Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all parties hereto at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.  The Closing Date shall be no later than April 18, 2025.

2.8    **Closing Deliveries of the Parties**. At or prior to the Closing:

(a)    Purchaser and the Seller shall execute and deliver the Bill of Sale and Assignment and Assumption Agreement;

(b)    Purchaser and the Seller shall transmit Purchaser's FDA Transfer Letter and the Seller's FDA Transfer Letters, respectively, to the FDA and shall take other actions reasonably necessary to effect the transfer of the Transferred Assets from the Seller to Purchaser;

(c)    Purchaser shall deliver, or cause to be delivered, to the Seller or the applicable Person each of the following:

(i)    a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in Section 8.3(a) and Section 8.3(b); and

(ii)    payment of the Purchase Price, less the Deposit Escrow Amount, as set forth in Section 2.9.

(d)    the Seller shall deliver, or cause to be delivered, to Purchaser or the applicable Person each of the following:

16

(i)      a certificate, dated as of the Closing Date, executed by or on behalf of the Seller as to the satisfaction of the conditions set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u>; and

(ii)      an accurate, executed and complete IRS Form W-9 of the Seller;

(iii)      the Sale Order; and

(iv)      all stability samples, batches, data, protocols and other documentation with respect to stability testing for the Products.

2.9      **Purchase Price; Assumed Liabilities; Deposits**.

(a)      At the Closing, upon the terms and subject to the conditions set forth in this Agreement, in full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser, the use and benefit of any Non-Transferred Asset, and assumption of the Assumed Liabilities by Purchaser, Purchaser shall (i) pay to the Seller an aggregate amount equal to the Purchase Price *minus* the Deposit Escrow Amount; and (ii) assume the Assumed Liabilities.

(b)      At the Closing, upon the terms and subject to the conditions set forth in this Agreement, Purchaser will assume and become responsible for the Assumed Liabilities. Purchaser agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms hereof, including paying or causing to be paid, at or prior to the Closing, all Determined Cure Costs.

(c)      The Deposit Escrow Amount shall be released to Seller or Purchaser in accordance with the applicable terms of this Agreement.  Any issue regarding the entitlement to the Deposit Escrow Amount shall be determined by the Bankruptcy Court, and Purchaser consents to the jurisdiction of the Bankruptcy Court for any issue related to this Agreement.

(d)      Purchaser and each of its Affiliates and agents shall be entitled to deduct and withhold from the payment of any amounts (or any portion thereof) payable pursuant to this Agreement (or any agreements, documents or instruments entered into pursuant to this Agreement) that Purchaser is required to deduct and withhold with respect to the making of such payment under any Applicable Law.  If Purchaser intends to deduct or withhold any amount as required by any Tax law from any payment made to the Seller pursuant to this Agreement, Purchaser shall (i) promptly provide the Seller advance notice of its intent to deduct or withhold such amounts, and (ii) provide a reasonable opportunity for the Seller to provide forms, documents or other evidence that would mitigate, reduce or eliminate such deduction or withholding. To the extent that amounts are so deducted and withheld, Purchaser shall promptly remit such amounts to the applicable Governmental Authority and such amounts shall be treated for all purposes of this Agreement as having been paid to the applicable payee to whom such amounts would otherwise have been paid.

2.10      **Transfer Taxes**. It is the intention of the Purchaser and the Seller that the Transactions be exempt from all transfer, documentary, sales, use, excise, stock transfer, value-added, stamp, recording, registration and other similar Taxes, together with any conveyance fees,

recording charges and other similar fees and charges, incurred in connection with this Agreement and the Transactions (collectively, "**Transfer Taxes**") pursuant to the Bankruptcy Code. Purchaser and the Seller shall cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes due with respect to the Transactions. In the event any Transfer Taxes are required to be paid with respect to the Transactions, Purchaser shall pay such Transfer Taxes, and Purchaser and the Seller shall cooperate in the preparation and filing of any Tax Returns required under Applicable Law with respect to such Transfer Taxes.

2.11    **Allocation of Purchase Price**.

(a)    The Purchase Price (including all other amounts treated as consideration for U.S. federal income tax purposes) and Assumed Liabilities shall be allocated among the Transferred Assets as set forth on Schedule 2.11 (the "**Allocation Schedule**").

(b)    Purchaser and the Seller shall (i) timely file all Tax Returns required to be filed in connection with the Allocation Schedule, and (ii) prepare and file all Tax Returns and determine all Taxes in a manner consistent with the Allocation Schedule, except as may be required by a change in law after the date of this Agreement, a closing agreement with an applicable Governmental Authority, or a final judgment of a court of competent jurisdiction and, except as may be necessary to reflect adjustments to the Allocation Schedule resulting from post-Closing payments. Purchaser, on the one hand, and the Seller, on the other hand, shall notify the other if it receives notice that any Governmental Authority proposes any allocation different from Allocation Schedule.

# ARTICLE 3
# REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as disclosed in a document herewith delivered by the Seller to Purchaser (the "**Schedules**"), the Seller hereby makes the representations and warranties contained in this Article 3 to Purchaser.

3.1    **Organization, Good Standing and Other Matters**. The Seller is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite corporate power and authority to operate the Business and necessary to own, lease or operate the properties and assets owned, leased or operated by it to carry on the Business as now being conducted, except where the failure to be so duly organized, validly existing and in good standing, or to have such power and authority, would not, individually or in the aggregate, have a Material Adverse Effect. The Seller is duly qualified to do business as a foreign company in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

3.2    **Authority and Enforceability**. Subject to Bankruptcy Court approval, the Seller has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which the Seller is (or at Closing, will be)

18

a party thereto, and the consummation by the Seller of the Transactions, have been duly authorized and approved by all necessary corporate action on the part of the Seller and are subject to the approval of the Bankruptcy Court. This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by the Seller and, assuming the due execution and delivery by the other parties hereto or thereto, and subject to the approval of the Bankruptcy Court, constitutes a valid and binding obligation of the Seller, enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

3.3    **No Conflict; Required Filings and Consents**. Except as otherwise set forth on Schedule 3.3, the execution and delivery of this Agreement by the Seller does not and the execution and delivery of the Related Documents by the Seller will not, and the consummation of the Transactions hereby and thereby will not (a) violate the provisions of the Organizational Documents of the Seller, (b) subject to the entry of the Sale Order, violate any Applicable Law or Order to which Seller is subject or by which its properties or assets are bound, (c) require Seller to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order), (d) violate, conflict with, result in a breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both would become a default) under, any Contract to which the Transferred Assets are bound, or (e) result in the creation of any Lien upon any of the Transferred Assets; excluding from the foregoing clauses (b), (c), (d) and (e) any Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, have a Material Adverse Effect.

3.4    **Litigation**. There is no Action pending or, to the Seller's Knowledge, formally threatened in writing, against Seller before any Governmental Authority that would have a Material Adverse Effect or affect the Transferred Assets in any material respect after the entry of the Sale Order.

3.5    **Brokers and Finders**. Except for Raymond James & Associates, Inc. the Seller has not, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

3.6    **Title to Assets.**

(a)    The Seller owns all Transferred Assets and has good, legal valid and marketable title to, and the right to transfer (or cause to be transferred) in accordance with the terms of this Agreement, all of the Transferred Assets Free and Clear.

(b)    Seller is not a party to, or bound by, (i) any license, royalty agreement, or other agreement relating to the use of any Transferred Assets or (ii) any Contract required for the ownership, use or operation of the Transferred Assets.

(c)    Schedule 3.6(c) sets forth a true, correct and complete list of the amounts of all Cure Costs applicable with respect to each Assigned Contract, and such Cure Costs do not exceed the amounts set forth therein.

(d)     No current or former Affiliate, partner, director, stockholder, officer, member, manager, employee, consultant or contractor of the Seller will, after giving effect to the Transactions, own, license or retain any Transferred Assets.

(e)     To Seller's Knowledge, no interference, opposition, reissue, reexamination, or other proceeding is or has been pending or threatened, in which the scope, validity, or enforceability of any Transferred Assets is being, has been challenged.

(f)     There is no Owned Intellectual Property.

3.7     **Compliance with Applicable Laws; Regulatory Matters**.

(a)     Any representations made in Sections (b) and (c) herein are subject to the exclusions and/or additional representations provided on Schedule 3.7 attached hereto.

(b)     Except in each case as would not, individually or in the aggregate, reasonably be expected have a Material Adverse Effect, (i) the Seller is and since January 1, 2022 has been, in compliance with all Applicable Laws and (ii) the Seller is not and since January 1, 2022, has not been subject to any Action or Order relating to or arising under a violation of any Applicable Laws, and, to the Knowledge of the Seller, no such Action has been threatened in writing.

(c)     The Seller is in compliance in all material respects with the Seller's adverse event reporting and other obligations with respect to the Product ANDAs.  The Seller has not received any notice from the FDA that would be expected to lead to revocation of a Product ANDA.

3.8     **No Other Representations or Warranties**.

(a)     Except for the representations and warranties contained in this Article 3, the Seller does not, nor do any other Persons on behalf of the Seller, make any other express or implied representation or warranty with respect to itself, the Business, the Transferred Assets or the Assumed Liabilities, or with respect to any other information provided to Purchaser or its representatives, and the Seller disclaims any other representations or warranties, whether made by or on behalf of the Seller or any other Person. The Seller will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

(b)     Except for the specific representations and warranties expressly made by Purchaser in Article 4 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 and Article 10 of this Agreement, the Seller acknowledges and agrees that Purchaser is not making and has not made any representation or warranty, expressed or implied, at law or in equity.

# ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed in a document herewith delivered by Purchaser to the Seller (the "**Purchaser Schedules**"), Purchaser hereby makes the representations and warranties contained in this <u>Article 4</u> to the Seller.

4.1    **Organization, Good Standing and Other Matters**. Purchaser is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has all requisite corporate power or other entity power and authority to own its properties and to carry on its business as now being conducted. Purchaser is duly qualified or licensed to conduct its business as currently conducted and is in good standing in each jurisdiction in which the location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary, except where the failure to be so qualified or licensed would not, individually or in the aggregate, materially impair or delay Purchaser's ability to consummate the Transactions.

4.2    **Authority and Enforceability**. Purchaser has all requisite corporate power or other entity power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized and approved by its board of directors (or equivalent governing body) and no other action on the part of Purchaser or its stockholders is necessary to authorize the execution, delivery and performance of this Agreement and the Related Documents by Purchaser and the consummation of the Transactions. This Agreement has been, and each Related Document will be at or prior to Closing, duly executed and delivered by Purchaser and, assuming the due execution and delivery by the other parties hereto or thereto, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

4.3    **No Conflict: Required Filings and Consents**. Except as set forth on <u>Schedule 4.3</u>, the execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (a) violate the provisions of its Organizational Documents, (b) violate any Applicable Law or Order to which it is subject or by which any of its properties or assets are bound or (c) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order).

4.4    **Financing**. Purchaser has, and at the Closing will have, (a) sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price in accordance with the terms hereof and any other payments required hereunder and any expenses incurred or required to be paid by Purchaser in connection with the Transactions, and (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Documents. Purchaser has not incurred

any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

4.5     **Solvency**. Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors. Immediately after giving effect to all of the Transactions**,** including the making of the payments contemplated by Section 2.9, and assuming satisfaction of the conditions to Purchaser's obligation to consummate the Transactions as set forth herein, the accuracy of the representations and warranties of Purchaser set forth herein and the performance by Purchaser of its obligations hereunder in all material respects, Purchaser will be Solvent.

4.6     **Litigation**. There is no Action pending or, to Purchaser's Knowledge, formally threatened in writing against Purchaser or involving any of its properties or assets that would be reasonably be expected to (a) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (b) otherwise prevent, hinder or delay the consummation of the Transactions.

4.7     **Brokers and Finders**. None of Purchaser or its Affiliates have, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

4.8     **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties**.

(a)     Purchaser acknowledges that it and its representatives have received access to such books and records, facilities, equipment, contracts and other assets of the Business which it and its representatives have desired or requested to review. Purchaser acknowledges and agrees that (i) it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Seller, the Business, the Transferred Assets and the Assumed Liabilities and (ii) the Business, the Transferred Assets and the Assumed Liabilities are being transferred and acquired on a "where is" and, as to condition, "as is" and "with all faults" basis.

(b)     Except for the specific representations and warranties expressly made by the Seller in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement, Purchaser acknowledges and agrees that (i) the Seller is not making and has not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Business, the Transferred Assets, the Assumed Liabilities, or any of its operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, stockholder, agent, Affiliate, advisor, representative or employee of the Seller has any

22

authority, express or implied, to make any representations, warranties or agreements not specifically set forth in <u>Article 3</u> and subject to the limited remedies herein provided.

(c)    Other than the specific representations and warranties expressly set forth in <u>Article 3</u> as further limited by the specifically bargained-for exclusive remedies as set forth in <u>Article 9</u> of this Agreement, Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Seller and the Seller's Affiliates have specifically disclaimed and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance on any such other representation or warranty made by any Person. Purchaser specifically waives any obligation or duty by the Seller or the Seller's Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties expressly set forth in <u>Article 3</u> and disclaim reliance on any information not specifically required to be provided or disclosed pursuant to the specific representations and warranties set forth in <u>Article 3</u>.

(d)    Purchaser is acquiring the Business, the Transferred Assets and the Assumed Liabilities subject only to the specific representations and warranties expressly set forth in <u>Article 3</u> as further limited by the specifically bargained-for exclusive remedies as set forth in <u>Article 9</u> of this Agreement.

4.9    **<u>No Other Representations or Warranties</u>.** Except for the representations and warranties contained in this <u>Article 4</u>, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Seller or its representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Affiliates, officers, directors, employees, agents or representatives.

# ARTICLE 5
# BANKRUPTCY COURT MATTERS

5.1    **<u>Competing Transaction</u>**. This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise) in accordance with the terms of the Bid Procedures Order (each, a "**<u>Competing Bid</u>**"). From the Agreement Date (and any prior time) and until the completion of the Auction, the Seller is permitted to, and to cause its representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any reorganization, sale or other disposition of the Transferred Assets. In addition, the Seller shall have the authority to respond to any inquiries or offers to reorganize, purchase all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bid Procedures Order or other Applicable Law, including supplying information relating to the Business and the assets of the Seller to prospective plan sponsors or purchasers.

5.2    **<u>Bankruptcy Court Filings</u>**.

(a)     Subject to its right to pursue a Competing Bid in accordance with the Bid Procedures Order, the Seller shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Transferred Assets and the Assumed Liabilities to Purchaser Free and Clear and free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code and provide that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. The Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order and causing such Sale Order to be a Final Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)     The Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at an auction undertaken pursuant to the Bid Procedures Order (the "**Auction**"), and (i) Purchaser submits the Back-Up Bid at the Auction or (ii) the terms of this Agreement are deemed to constitute a Back-Up Bid, then Purchaser shall be obligated to promptly consummate the Transactions upon the terms and conditions as set forth herein, including the payment of the Purchase Price as the same may be increased by Purchaser at the Auction; provided that, the Seller gives written notice to Purchaser on or before the Back-up Termination Date, stating that the Seller (A) failed to consummate the sale of the Transferred Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder. For the avoidance of doubt, Purchaser shall have no obligations under this Agreement following the occurrence of the Back-up Termination Date.

5.3     **Assumption of Assigned Contracts**.

(a)     On or before the date that is five (5) Business Days following the date on which the Bid Procedures Order is entered by the Bankruptcy Court, the Seller shall file (or cause to be filed) a notice of potential assumption (the "**Assumption Notice**") with the Bankruptcy Court and serve such notice on each counterparty to an Assigned Contract listed thereon. The Assumption Notice shall identify all Assigned Contracts that the Seller and Purchaser believe may be assumed and assigned in connection with the sale of the Transferred Assets and set forth a good faith estimate of the amount of Cure Costs applicable to each such Assigned Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Assigned Contract, the amount of such Cure Cost designated for such Assigned Contract shall be "$0.00"). In accordance with the Bid Procedures Order, the Seller reserves the right to supplement such list of Assigned Contracts and provide additional notice of assumption, and to remove an Assigned Contract from the list of Assigned Contracts, up to five (5) Business Days prior to the hearing by the Bankruptcy Court with respect to the Sale Motion.

(b)     On or before the date that is three (3) Business Days before the Closing Date (the "**Designation Deadline**"), Purchaser shall provide to the Seller a list of those Assigned Contracts that it elects to have assumed and assigned to Purchaser on the Closing Date

(the "**Designated Contracts**"). Purchaser shall be entitled to remove any Assigned Contract from the list of Designated Contracts at any time prior to the Designation Deadline by providing the Seller written notice of such removal. In the event that Purchaser removes any of such Assigned Contracts from such list, the Seller will provide the relevant counterparty written notice that the applicable Assigned Contract is no longer identified as a Designated Contract and shall not be an Assigned Contract and shall be an Excluded Contract. For the avoidance of doubt, only those executory Assigned Contracts that remain identified as Designated Contracts as of the Closing Date will constitute Assigned Contracts and will be assumed by the Seller and assigned to Purchaser pursuant to the Sale Order. Purchaser shall not have any obligation to pay Cure Costs or any other obligation under any Contract that is not a Designated Contract. The Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assigned Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude the Seller from filing one or more motion to reject any Contracts that are not Assigned Contracts.

(c)     Notwithstanding any provision in this Agreement to the contrary, a Contract shall not be a Designated Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is (i) deemed rejected under Section 365 of the Bankruptcy Code, (ii) the subject of an objection to assignment or assumption or requires the consent of any Governmental Authority or other third party (other than, and in addition to, the Bankruptcy Court) in order to permit the assumption and assignment by the Seller to Purchaser of such Contract pursuant to Section 365 of the Bankruptcy Code, and such objection has not been resolved or such consent has not been obtained prior to the thirtieth day following the Closing Date (as such period may be extended by mutual agreement of the Seller and Purchaser), or (iii) is terminated by any party thereto other than the Seller, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as a Designated Contract hereunder and is not continued or otherwise extended upon assumption. To the extent that any Assigned Contract is subject to a dispute or objection regarding its assignment or the Cure Costs, Purchaser shall be permitted to designate such Assigned Contract as a Designated Contract after the Closing Date by providing written notice to the Seller within ten (10) Business Days of the resolution of such dispute or objection. In no event shall the failure to assign to Purchaser any Contract in accordance with subsections (i) through (iii) above reduce the Purchase Price payable to the Seller or constitute a failure to satisfy the conditions precedent of the Seller under Section 8.3.

(d)     Subject to the terms of Section 2.5, Section 2.8, Section 5.3(a) and Section 5.3(b), Purchaser shall make provision for the payment of the Determined Cure Costs in cash at Closing in accordance with the Sale Order.

(e)     Notwithstanding any provision in this Agreement to the contrary, from and after the date of the Assumption Notice through the Closing Date, the Seller will not reject or take any action (or fail to take any action that would result in rejection by operation of Applicable Law) to reject, withdraw, repudiate or disclaim any Assigned Contract unless (i) Purchaser has provided its prior written consent or (ii) Purchaser has removed such Assigned Contract from the list of Designated Contracts.

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1     **Conduct of Business**. Except (i) as set forth on <u>Schedule 6.1,</u> (ii) as may be approved by Purchaser (which approval will not be unreasonably withheld, delayed or conditioned; <u>provided, however</u>, that the consent of Purchaser shall be deemed to have been given if Purchaser does not object within 48 hours after written request for such consent is provided by the Seller to Purchaser), (iii) for actions taken or omitted to be taken by the Seller in response to any Public Health Measure, or (iv) as is otherwise contemplated or required by this Agreement, any Assigned Contract, by Applicable Laws or by order of the Bankruptcy Court, from the Agreement Date through the earlier of the Closing Date or the termination of this Agreement in accordance with its terms:

(a)     The Seller shall use its commercially reasonable efforts to carry on the Business in all material respects in the ordinary course of business as it has been conducted since the Petition Date; and

(b)     The Seller shall not:

(i)     sell, license, abandon or otherwise dispose of any material asset or property constituting Transferred Assets other than inventory in the ordinary course of business;

(ii)     (A) change any material Tax election, file any material amended Tax Return, enter into any closing agreement, settle any material Tax Proceeding, in each case, relating to the Business or the Transferred Assets, or (B) consent to any extension or waiver of the limitation period applicable to any material Tax Proceeding relating to the Business or the Transferred Assets; or

(iii)     change its present accounting methods or principles in any material respect, except as required by GAAP or Applicable Law.

(c)     Notwithstanding anything to the contrary, nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the Business, assets and operations prior to the Closing. Prior to the Closing, the Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its Business, assets and operations.

6.2     **Access to Information; Confidentiality**.

(a)     From the Agreement Date until the earlier of the Closing Date and the termination of this Agreement, the Seller shall grant Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon reasonable notice (and in the event of a facility visit request, at least 48 hours prior notice), and subject to any limitations resulting from any Public Health Measures, to the personnel, facilities, book and records of the Seller related to the Business or the Transferred Assets that are in the possession or under the control of the Seller; <u>provided, however</u>, that (i) all requests for access shall be directed to James Grainer or such other person(s) as the Seller may designate in writing

from time to time (the "**Seller Access Contact**"), (ii) such activities do not unreasonably interfere with the ongoing business or operations of the Seller, (iii) the Seller shall have the right to have one or more of its representatives present at all times during any visits, examinations, discussions or contacts contemplated by this <u>Section 6.2(a)</u>, (iv) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing, (v) such access or related activities would not cause a violation of any agreement to which the Seller is a party, (vi) no Personal Information shall be disclosed or used other than in compliance with applicable privacy law and (vii) nothing herein shall require Seller or its representatives to furnish to Purchaser or provide Purchaser with access to information that (A) is subject to an attorney-client or an attorney work-product privilege, (B) legal counsel for the Seller reasonably concludes may give rise to antitrust or competition law issues or violate a protective order or otherwise may not be disclosed pursuant to Applicable Law (including any Public Health Measure) or (C) would cause significant competitive harm to the Seller if the Transactions are not consummated.

(b)     Notwithstanding anything to the contrary contained in this Agreement, from the Agreement Date until the Closing Date, Purchaser shall not, and shall cause its representatives not to, have any contact or discussions concerning Seller, the Business, the Transactions or any other matters with any lender, borrower, creditor, guarantor, business partner, bank, landlord, tenant, supplier, customer, employee, manager, franchisee, distributer, noteholder, independent contractor, consultant or other material business relation of the Seller, in each case, without the prior written consent of the Seller Access Contact (which consent may be withheld in the Seller's sole discretion and, if given, may be conditioned on the Seller Access Contact or his or her designee having the right to participate in any meeting or discussion).

(c)     Any information provided to or obtained by Purchaser or its representatives, including pursuant to this <u>Section 6.2</u> is confidential information and subject to the terms of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference. Effective upon (and only upon) the Closing, the Confidentiality Agreement shall automatically terminate and none of the parties thereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained by Purchaser or its representatives concerning the Seller, which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. If this Agreement is terminated prior to Closing for any reason, the terms of the Confidentiality Agreement shall remain in full force and effect.

6.3     **Efforts to Consummate.** Except as otherwise provided in this Agreement, each of the parties hereto agrees to use its commercially reasonable efforts to cause the Closing to occur as soon as possible after the Agreement Date, including satisfying the conditions precedent set forth in <u>Article 8</u> applicable to such party including (a) defending against any Actions, judicial or administrative, challenging this Agreement or the consummation of the Transactions, (b) seeking to have any preliminary injunction, temporary restraining order, stay or other legal restraint or prohibition entered or imposed by any court or other Governmental Authority that is not yet final and nonappealable vacated or reversed, and (c) executing any additional instruments reasonably requested by another party hereto (without cost or expense to the executing party) necessary to

carry out the Transactions and to fully carry out the purposes of this Agreement; provided, however, that, for purposes of "commercially reasonable efforts" standard as required by this Section 6.3, Section 6.1(a), or Section 2.6(b) neither the Seller nor its Affiliates or representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party or to otherwise expend any money or suffer any detriment, to expend any money to remedy any breach of any representation or warranty hereunder, to commence any Action, to waive or surrender any right, to modify any agreement (including any Assigned Contract) or to provide financing to Purchaser for the consummation of the Transactions.

6.4   **Public Announcements**. Between the Agreement Date and the Closing Date, except to the extent required by any Applicable Law or Action (including the Bankruptcy Case), neither Purchaser nor the Seller shall, and Purchaser and the Seller shall cause their respective Affiliates and representatives not to, directly or indirectly, issue any press release or public announcement of any kind without the prior written consent of Purchaser and the Seller; provided, however, that the Seller and its Affiliates may make announcements from time to time to their respective employees, customers, suppliers, and other business relations and otherwise as the Seller may reasonably determine is necessary to comply with Applicable Law or the requirements of this Agreement or any other agreement to which the Seller or any such Affiliate is a party. Purchaser and the Seller shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the parties.

6.5   **Update of Schedules; Knowledge of Breach**. From time to time prior to the Closing, the Seller may supplement or amend the Schedules with respect to any matter hereafter arising or discovered which if existing or known by the Seller at the Agreement Date would have been required to be set forth or described in such Schedules and also with respect to events or conditions arising after the date hereof and prior to Closing. Any such supplemental or amended disclosure shall not be deemed to have cured any such breach of representation or warranty for purposes of determining whether or not the conditions set forth in Section 8.2(a) have been satisfied. From and after the Closing, references to the Schedules shall be references to the Schedules as supplemented, modified and/or updated. If, prior to the Closing, Purchaser shall have reason to believe that any breach of a representation or warranty of the Seller has occurred (other than through notice from the Seller), Purchaser shall promptly so notify the Seller, in reasonable detail. Nothing in this Agreement, including this Section 6.5, shall imply that the Seller is making any representation or warranty as of any date other than the Closing Date (other than representations and warranties that are expressly made as of an earlier date).

## ARTICLE 7
## POST-CLOSING COVENANTS

7.1   **Access to Information; Books and Records**. From and after the Closing, each of Purchaser and the Seller shall cause their representatives to furnish all information reasonably requested by the other party or its representatives in connection with the administration of the Bankruptcy Case, any claims or interests asserted by parties in interest against Seller in the Bankruptcy Case, financial or regulatory reporting whether in the Bankruptcy Case or otherwise, audit, third party litigation, preparing or filing of any Tax Return or the defense in any Tax Proceeding; provided, however, that nothing in this Section 7.1 shall require a party to furnish to the other party or its representatives any material that is subject to an attorney-client or solicitor-

client privilege or an attorney or solicitor work-product privilege or which may not be disclosed pursuant to Applicable Law.

7.2    **Post-Closing Receipt and Possession of Assets**.

(a)    After the Closing Date, the Seller shall transfer promptly to Purchaser from time to time (but in any event on a monthly basis) any payments constituting Transferred Assets received by the Seller. After the Closing Date, Purchaser shall transfer promptly to the Seller, from time to time (but in any event on a monthly basis), any payments constituting Excluded Assets, received by Purchaser after the Closing.

(b)    In the event that, after the Closing Date, Purchaser receives or otherwise is in possession of any Excluded Asset, Purchaser shall promptly notify the Seller of its receipt or possession of such other Excluded Asset and transfer such Excluded Asset to the Seller. In the event that, after the Closing Date, the Seller receives or otherwise is in possession of any other Transferred Asset, the Seller shall promptly notify Purchaser of its receipt or possession of such other Transferred Asset and transfer, at Purchaser's expense, such Transferred Asset to Purchaser.

7.3    **Tax Matters**.

(a)    The Seller shall be responsible for preparing or causing to be prepared all Tax Returns with respect to the Business and the Transferred Assets for taxable periods ending on or before the Closing Date (each, a "**Pre-Closing Tax Period**") that are required to be filed on or before the Closing Date. After the Closing Date, Purchaser will assist and cooperate with the Seller in preparing any such Tax Return with respect to the Transferred Assets.

(b)    Purchaser shall prepare and timely file or cause to be prepared and timely filed (taking into account all extensions properly obtained) all Tax Returns with respect to the Transferred Assets that are required to be filed for any taxable period that begins on or before the Closing Date and ends after the Closing Date (a "**Straddle Period**") and shall timely pay (subject to Purchaser's right to reimbursement of Seller Taxes), or cause to be timely paid, the amount of any Taxes due thereon. Purchaser shall provide the Seller with completed drafts of such Tax Returns for the Seller's review and reasonable comment at least fifteen days prior to the due date for filing thereof, taking into account extensions (or, if such due date is within fifteen days following the Closing Date, as promptly as practicable following the Closing Date) and shall consider any comments of Seller in good faith to such Tax Returns as are reasonably requested by the Seller, provided such requests are consistent with the prior practice of the Seller (to the extent relevant) and comply with Applicable Law.

(c)    The Seller shall be liable for any Taxes with respect to a Pre-Closing Tax Period and the portion of any Straddle Period ending on the Closing Date ("**Seller Taxes**"). For purposes of this Agreement, in the case of any Straddle Period, (a) the amount of any Taxes based on or measured by income or receipts, sales or use, employment, or withholding allocated to the portion of such Straddle Period ending on the Closing Date shall be determined based on an interim closing of the books as of the end of the day on the Closing Date and (b) any other Taxes shall be allocated to the portion of such Straddle Period ending on the Closing Date by prorating the amount of such Tax for the entire taxable period on a per diem basis.

29

(d)    Purchaser shall promptly notify the Seller in writing upon receipt by Purchaser or any of its Affiliates of notice of any pending or threatened U.S. federal, state, local or foreign Tax audits, proceedings or assessments relating to Pre-Closing Tax Period, Straddle Period or otherwise relating to a Tax for which the Seller is liable pursuant to Section 7.3(c) (a "**Pre-Closing Tax Claim**").

(e)    Purchaser shall have the sole right to control the defense or resolution of any Pre-Closing Tax Claim, and to employ counsel of its choice.

(f)    After the Closing, each of the Seller and Purchaser shall (and Purchaser shall cause its Affiliates to):

(i)    timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce), or file Tax Returns or other reports with respect to, Transfer Taxes;

(ii)    cooperate fully in preparing for and defending any Tax Proceeding with Governmental Authorities regarding any Tax Returns required to be filed by, or Taxes related to the Transferred Assets due from, the Seller for any Pre-Closing Tax Period or Straddle Period; and

(iii)    furnish the other party with copies of all correspondence received from any Governmental Authority in connection with any Tax Proceeding, related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period, and furnish the other parties with copies of all records and documents relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period that are proposed to be destroyed (and not otherwise in the possession of such other party).

## ARTICLE 8
## CONDITIONS PRECEDENT

8.1    **Conditions to Each Party's Obligation**. The respective obligations of the parties hereto to effect the Transactions are subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller and Purchaser), at or prior to the Closing, of the following conditions:

(a)    No Injunctions or Restraints. No Order or Applicable Law preventing the consummation of the Transactions shall be in effect.

(b)    Sale Order. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be a Final Order.

8.2    **Conditions to Obligation of Purchaser**. The obligations of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by Purchaser), at or prior to the Closing, of the following conditions:

(a)    Representations and Warranties. Each of the representations and warranties of the Seller set forth in Article 3 shall be true and correct in all material respects (without giving

effect to any qualifications or limitations as to "materiality", "Material Adverse Effect" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date).

        (b)    <u>Performance of Covenants and Obligations</u>. The Seller shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing.

        (c)    <u>Closing Deliverables</u>. The Seller shall have delivered to Purchaser the closing deliveries required to be delivered by the Seller pursuant to <u>Section 2.8</u>.

    8.3    **Conditions to Obligations of the Seller**. The obligation of the Seller to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller), at or prior to the Closing, of the following conditions:

        (a)    <u>Representations and Warranties</u>. Each of the representations and warranties of Purchaser set forth in <u>Article 4</u> shall be true and correct in all material respects (without giving effect to any qualifications or limitations as to "materiality" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date).

        (b)    <u>Performance of Covenants and Obligations of Purchaser</u>. Purchaser shall have performed or complied in all material respects with all obligations and covenants required to have performed or complied with by it under this Agreement at or prior to the Closing.

        (c)    <u>Closing Deliverables</u>. Purchaser shall have delivered to the Seller the closing deliveries required to be delivered by Purchaser pursuant to <u>Section 2.8</u>.

    8.4    **Waiver of Condition; Frustration of Conditions**. All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Purchaser nor the Seller may rely on the failure of any condition set forth in this <u>Article 8</u>, as applicable, to be satisfied if such failure was caused by such party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions.

    8.5    **Delivery of a Notice of Readiness to Close**. At any time after the Seller's satisfaction of its conditions to Closing in accordance with the terms of <u>Section 8.1</u> and <u>Section 8.3</u> of this Agreement, the Seller may deliver a notice to the Purchaser (a "**Notice of Readiness to Close**"). The Purchaser shall have five (5) Business Days from delivery of a Notice of Readiness to Close to satisfy its conditions to Closing in accordance with the terms of <u>Section 8.1</u> and <u>Section 8.2</u> of this Agreement and consummate the Transactions; <u>provided</u>, that in no event shall Purchaser be required to close prior to the Outside Date. If Purchaser does not satisfy its conditions to Closing and consummate the Transaction within the timeframe set forth in the preceding sentence, Purchaser shall forfeit the entire Deposit Escrow Amount to the Seller.

**ARTICLE 9**
**TERMINATION**

9.1     **Events of Termination**. Notwithstanding anything to the contrary, this Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing:

(a)     by mutual written consent of Purchaser and the Seller;

(b)     automatically, upon the consummation of a sale or other disposition of all or substantially all of the Transferred Assets to a Person other than Purchaser (each, an "**Alternate Transaction**");

(c)     by Purchaser or the Seller by written notice to Purchaser or the Seller from the other, if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(d)     by Purchaser, by written notice from Purchaser to the Seller, if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement, such that the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Seller prior to the earlier of (i) five Business Days after receipt of written notice from Purchaser requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(d) shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(e)     by the Seller, by written notice from the Seller to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) five Business Days after receipt of written notice from the Seller requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(e) shall not be available to the Seller if the failure of the Seller to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement;

(f)     by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Applicable Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Transactions and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(f) shall not be available to the party seeking to terminate if any action of such party or any failure of such party to act has contributed to such Order or other action and such action or failure constitutes a breach of this Agreement; or

(g)     by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if the Closing has not occurred on or prior to April 18, 2025 (the "**Outside Date**"); provided, however, that the party exercising the right to terminate this Agreement pursuant to this Section 9.1(g) shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement.

9.2     **Effect of Termination**.

(a)     In the event that this Agreement shall be terminated pursuant to Section 9.1, (a) Purchaser and its representatives shall promptly return all documents, work papers and other materials of the Seller including any confidential information and (b) all further obligations of the parties hereto under this Agreement shall terminate without further Liability or obligation to the other parties hereto; provided, however, that, notwithstanding the foregoing, the Liabilities and obligations under (i) the Confidentiality Agreement, and (ii) Section 2.9(c), Section 6.2(c), this Section 9.2 and Article 10 shall continue in full force and effect.

(b)     Notwithstanding anything to the contrary in this Agreement, in the event of valid termination of this Agreement pursuant to Section 9.1(e), Seller shall be entitled to all remedies available at law or in equity, including without limitation, retention of the Deposit Escrow Amount, damages, and/or specific performance pursuant to Section 10.13 of this Agreement.

**ARTICLE 10**
**GENERAL PROVISIONS**

10.1     **Survival of Representations, Warranties and Covenants.** All covenants and agreements contained in this Agreement that by their term are to be performed in whole or in part, or which prohibit actions, subsequent to Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive Closing and shall therefore terminate, including any Action for damages in respect of any breach or inaccuracy thereof. Notwithstanding the foregoing, the provisions of Section 2.9(c), Section 6.2, Section 9.2 and this Article 10 shall survive the Closing.

10.2     **Entire Agreement**. This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings. The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the parties hereto expressly disclaim that they are owed any duties or entitled to any remedies not

expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents. Furthermore, the parties each hereby acknowledge that this Agreement, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all parties to this Agreement, the Confidentiality Agreement and the Related Documents specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction. The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the parties hereby agree that neither party hereto shall have any remedies or cause of action (whether in contract or in tort or otherwise) of any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

10.3   **Amendment; No Waiver**. This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and, if applicable, the Related Documents) executed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any party of a breach of any provision of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.4   **Severability**. Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any term or other provision of this Agreement or the Related Documents is invalid, illegal, or incapable of being enforced by any Applicable Law or public policy, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the parties to the greatest extent consistent with being valid and enforceable under Applicable Law. No party hereto shall assert, and Purchaser shall cause its Affiliates or related parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable.

10.5   **Expenses and Obligations**. Except as otherwise provided in this Agreement, all costs and expenses incurred by the parties hereto in connection with the Transactions, including the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the party that has incurred such expenses.

10.6   **Notices**. All notices, consents, waivers, and other communications under this Agreement or the Related Documents must be in writing and will be deemed to have been duly given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service

of national standing for next day delivery (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if delivered by electronic mail (unless the sender receives an automated message that the email has not been delivered) on the date of transmission if on a Business Day before 5:00 p.m. local time of the business address of the recipient party (otherwise on the next succeeding Business Day) and (d) if deposited in the United States mail, first-class postage prepaid, on the date of delivery, in each case to the appropriate addresses or email addresses set forth below (or to such other addresses as a party may designate by notice to the other parties in accordance with this Section 10.6):

If to Seller:

> Timothy P. Neumann, Esq.
> Broege, Neumann, Fischer & Shaver, LLC
> 25 Abe Voorhees Drive
> Manasquan, New Jersey 08736
> (732)223-8484, ext. 214
> tneumann@bnfsbankruptcy.com

With a copy to Secured Creditor:

> Julie M. Murphy, Esq.
> Stradley Ronon Stevens & Young, LLP
> 457 Haddonfield Rd., Suite 100
> Cherry Hill, New Jersey 08002
> E-Mail: jmmurphy@stradley.com

With a copy to Official Committee of Unsecured Creditors:

> Robert M. Schechter, Esq.
> Porzio, Bromberg & Newman, P.C.
> 100 Southgate Parkway
> Morristown, NJ 07962
> (973) 889-4127
> Email: rmschechter@pbnlaw.com

If to Purchaser:

> ANI Pharmaceuticals, Inc.
> 210 W Main St
> Baudette, MN 56623
> Telephone: (609) 759-1810
> Attn:  General Counsel
> Email: legaldept@anipharmaceuticals.com

With a copy (which shall not constitute notice) to:

> Orrick, Herrington and Sutcliffe LLP

35

51 West 52nd Street
New York, NY  10019-6142
Telephone: (212) 506-5000
Facsimile: (302) 295-2013
Attn:  R. King Milling, Laura Metzger
Email:  kmilling@orrick.com, lmetzger@orrick.com

10.7    **Counterparts**. This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format, or other agreed format shall be sufficient to bind the parties to the terms and conditions of this Agreement. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

10.8    **Governing Law.** This Agreement, the Related Documents and all Related Claims shall be governed by the internal laws of the State of New Jersey (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Applicable Laws of any other jurisdiction.

10.9    **Submission to Jurisdiction; Consent to Service of Process**.

(a)    Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Related Document, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6; provided, however, that if the Bankruptcy Case has closed, the parties agree to irrevocably submit to the exclusive jurisdiction of the of the Superior Court of the State of New Jersey. The parties hereto hereby irrevocably and unconditionally waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any Related Claim by the delivery of a copy thereof in accordance with the provisions of Section 10.6 (other than by email) along with a notification that service of process is being served in conformance with this Section 10.9(b). Nothing in this Agreement will affect the right of any party to serve process in any other manner permitted by Applicable Law.

10.10    **Waiver of Jury Trial**. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT,

THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS.

10.11 **Rights Cumulative**. All rights and remedies of each of the parties under this Agreement and the Related Documents will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement, the Related Documents or Applicable Law.

10.12 **Assignment**. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the parties hereto. No assignment of this Agreement or any of the rights, interests or obligations under this Agreement may be made by any party hereto at any time, whether or not by operation of law, without the prior written consent of the Seller and Purchaser, and any attempted assignment without the required consent shall be void; provided, however, that (a) Purchaser may assign (i) any of its rights or delegate any of its duties under this Agreement to any of its Affiliates, and (ii) its rights, but not its duties, under this Agreement to any of its financing sources and (b) the Seller may assign any of its rights or delegate any of its duties under this Agreement to any successor thereto, including any liquidating trustee or other agent; provided, further, however, that, in each case, such assignment shall not release Purchaser from its obligations under this Agreement and the Seller shall have no obligation to pursue remedies against any assignee of Purchaser before proceeding against Purchaser for any breach of Purchaser's obligations hereunder.

10.13 **Specific Enforcement; Remedies**. The parties hereto agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the Purchaser hereto in accordance with their specific terms or were otherwise breached. It is accordingly agreed that (a) each party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of each party to cause the other party to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and Applicable Laws and to thereafter cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right each party would not have entered into this Agreement. Notwithstanding anything to the contrary set forth herein, the parties hereto agree that the Seller's right to retain the Deposit Escrow Amount, as set forth in Section 2.9(c), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

10.14.  **<u>Third-Party Beneficiaries</u>**. Except as expressly set forth herein, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties hereto any rights or remedies of any nature whatsoever under or by reason of this Agreement.

*{THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK*
*SIGNATURES FOLLOW}*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**PURCHASER**:

ANI PHARMACEUTICALS, INC.

By: _Nikhil Lalwani_____
        Name: Nikhil Lalwani
        Title: President & Chief Executive Officer

*Signature Page to Asset Purchase Agreement*

**IN WJTNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first written above.

SELLER:

NOSTRUM LABORATORIES, INC.

By: _James L. Grainer_
Name: James Grainer
Title:  Chief Financial Officer

# EXHIBIT A

## Bid Procedures Order

See 24-19611JKS [ECF No. 268].

| **SCHEDULES** | |
|---|---|
| Schedule 2.1(a) - Inventories | To be supplied |
| Schedule 2.1(b) - Product ANDAs | See attached |
| Schedule 2.1(c) - Assigned Contracts | See attached |
| Schedule 2.2(l) - Other mutually-agreed Excluded Assets | None |
| Schedule 2.11 - Allocation Schedule | To be supplied |
| Schedule 3.3 - Consents Required | None |
| Schedule 3.6(c) - Cure Costs | None |
| Schedule 6.1 - Conduct of Business | None |

# SCHEDULE 2.1(b)

# PRODUCT ANDAS

**Schedule 2.1(b)**
**Product ANDAs**

| Sr # | ANDA # | Product Name |
|------|--------|--------------|
| 1. | 088629 | Acetaminophen and Codeine Phosphate Tablets USP, 300 mg/15 mg, 300 mg/30 mg and  300 mg/60 mg (CIII) |
| 2. | 076697 | Carbamazepine Extended-Release Capsules, 100 mg, 200 mg and 300 mg |
| 3. | 012546 | TENUATE® DOSPAN (Diethylpropion HCl USP Controlled-Release Tablets), 75 mg |

# SCHEDULE 2.1(c)

# ASSIGNED CONTRACTS

**Schedule 2.1(c)**
**Assigned Contracts**

None.[1]

---

[1] Subject to update pursuant to Section 2.1(c).

# SCHEDULE 3.3

# REQUIRED CONSENTS

**Schedule 3.3**
**Required Consents**

None.

**Schedule 3.7**

1.  The Generic Drug User Fee Administration ("GDUFA") fees due in total are about $4.3 million, approximately $440,000 of which is attributable to facility fees and $3.9 million is attributable to program fees.

2.  The Seller has received notices from the FDA that the Seller is not in compliance with the GDUFA fees owed and reminders of the amounts due.

3.  The Seller currently owes the Center for Medicare and Medicaid Services is approximately $4,000,000.00.

4.  The Seller has entered into a settlement with the Department of Justice in total for $1.989 million, the federal component owed is $967,000 and the state component is approximately $1,022,000. This settlement relates rebates owed from previous sales of the Seller's products.

*Execution Version*

# ASSET PURCHASE AGREEMENT

**by and between**

**SOLIS PHARMACEUTICAL, INC., as Purchaser,**

**and**

**NOSTRUM LABORATORIES, INC., as Seller**

**Dated as of April _ , 2025**

Table of Contents

|  |  | Page |
|---|---|---|
| ARTICLE 1 DEFINED TERMS | | 2 |
| 1.1 | Defined Terms | 2 |
| 1.2 | Other Definitional and Interpretive Matters | 10 |
| ARTICLE 2 THE PURCHASE AND SALE; CLOSING | | 12 |
| 2.1 | Purchase and Sale | 12 |
| 2.2 | Excluded Assets | 13 |
| 2.3 | Assumption of Liabilities | 15 |
| 2.4 | Excluded Liabilities | 15 |
| 2.5 | Excluded Contracts | 15 |
| 2.6 | Nontransferable Assets and Liabilities | 16 |
| 2.7 | Closing | 16 |
| 2.8 | Closing Deliveries of the Parties | 16 |
| 2.9 | Closing Consideration; Assumed Liabilities; Deposits; Holdback Amount | 17 |
| 2.10 | Transfer Taxes | 18 |
| 2.11 | Allocation of Purchase Price | 19 |
| ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLER | | 19 |
| 3.1 | Organization, Good Standing and Other Matters | 19 |
| 3.2 | Authority and Enforceability | 19 |
| 3.3 | No Conflict; Required Filings and Consents | 20 |
| 3.4 | Litigation | 20 |
| 3.5 | Brokers and Finders | 20 |
| 3.6 | Title to Assets | 20 |
| 3.7 | Compliance with Applicable Laws; Regulatory Matters | 21 |
| 3.8 | No Other Representations or Warranties | 21 |
| ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER | | 21 |
| 4.1 | Organization, Good Standing and Other Matters | 22 |
| 4.2 | Authority and Enforceability | 22 |
| 4.3 | No Conflict: Required Filings and Consents | 22 |
| 4.4 | Financing | 22 |

i

4.5    Solvency ......................................................................................................... 22

4.6    Litigation ........................................................................................................ 23

4.7    Brokers and Finders ........................................................................................ 23

4.8    Investigation and Agreement by Purchaser; Non-Reliance of
Purchaser; No Other Representations and Warranties ................................. 23

4.9    No Other Representations or Warranties ......................................................... 24

ARTICLE 5 BANKRUPTCY COURT MATTERS ........................................................... 24

5.1    Competing Transaction .................................................................................... 24

5.2    Bankruptcy Court Filings ................................................................................ 24

5.3    Assumption of Assigned Contracts ................................................................ 25

ARTICLE 6 PRE-CLOSING COVENANTS ..................................................................... 26

6.1    Conduct of Business ........................................................................................ 26

6.2    Access to Information; Confidentiality ........................................................... 27

6.3    Efforts to Consummate .................................................................................... 28

6.4    Public Announcements ..................................................................................... 29

6.5    Update of Schedules  Knowledge of Breach .................................................. 29

ARTICLE 7 POST-CLOSING COVENANTS .................................................................... 29

7.1    Access to Information; Books and Records ..................................................... 29

7.2    Post-Closing Receipt and Possession of Assets ............................................. 29

7.3    Tax Matters ...................................................................................................... 30

ARTICLE 8 CONDITIONS PRECEDENT ......................................................................... 31

8.1    Conditions to Each Party's Obligation ........................................................... 31

8.2    Conditions to Obligation of Purchaser ........................................................... 31

8.3    Conditions to Obligations of the Seller .......................................................... 32

8.4    Waiver of Condition; Frustration of Conditions ............................................ 32

8.5    Delivery of a Notice of Readiness to Close .................................................... 32

ARTICLE 9 TERMINATION ............................................................................................... 32

9.1    Events of Termination ..................................................................................... 32

9.2    Effect of Termination ....................................................................................... 34

ARTICLE 10 GENERAL PROVISIONS ............................................................................. 34

10.1   Survival of Representations, Warranties and Covenants ................................ 34

10.2   Entire Agreement ............................................................................................. 34

10.3    Amendment; No Waiver ............................................................ 35

10.4    Severability ............................................................................ 35

10.5    Expenses and Obligations ........................................................ 35

10.6    Notices .................................................................................. 35

10.7    Counterparts .......................................................................... 37

10.8    Governing La,v ....................................................................... 37

10.9    Submission to Jurisdiction; Consent to Service of Process .......... 37

10.10   Waiver of Jury Trial ............................................................... 37

10.11   Rights Cumulative .................................................................. 38

10.12   Assignment. ........................................................................... 38

10.13   Specific Enforcement; Remedies .............................................. 38

10.14   Third-Party Beneficiaries ........................................................ 38

## EXHIBITS

Exhibit A                          Bid Procedures Order

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this **"Agreement"**), dated as of April _ , 2025 (the **"Agreement Date"**) is entered into by and between **SOLIS PHARMACEUTICAL INC.,** a Delaware corporation **("Purchaser")** and **NOSTRUM LABORATORIES, INC.,** a New Jersey corporation (the **"Seller"**).

## RECITALS

**WHEREAS,** on September 30, 2024 (the **"Petition Date"**), Seller filed voluntary petition for relief under chapter 11 of title **11** of the United States Code (the **"Bankruptcy Code"**) in the United States Bankruptcy Court for the District of New Jersey (the **"Bankruptcy Court"**), Case No. 24-19611/JKS thereby commencing a chapter 11 case (the **"Bankruptcy Case"**). No trustee has been appointed and the Seller is continuing in the management of its businesses and possession of its property as a debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS,** the Seller desires to sell (or cause to be sold) to Purchaser, and Purchaser desires to purchase from the Seller, all of the Transferred Assets Free and Clear, and the Seller desires Purchaser to assume, and Purchaser desires to assume from the Seller, all of the Assumed Liabilities, in each case upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS,** the Transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court and will only be consummated pursuant, among other things, to the Sale Order to be entered in the Bankruptcy Case;

**WHEREAS,** Seller anticipates filing a motion (the **"Sale Motion"**) to approve the sale of certain assets and the assignment of certain contracts to the highest bidder pursuant to Sections 363 and 365 of the Bankruptcy Code and subject to certain rules and procedures that all bidders must comply with as a condition to participating in the bidding process (the **"Bidding Procedures,"** copy annexed hereto as Exhibit A);

**WHEREAS,** in the event there are bidders wishing to bid, an auction will be held at which the Purchaser shall be allowed to participate, subject to its compliance with the Bidding Procedures, and there will occur a hearing in the Bankruptcy Court at which time the sale to the successful bidder shall be approved by the Bankruptcy Court by order of the Bankruptcy Court;

**WHEREAS,** concurrently with the execution of this Agreement, Purchaser shall deposit (or cause to be deposited) an aggregate amount equal to the Deposit Escrow Amount into the trust account of Seller's bankruptcy counsel, Broege, Neumann, Fischer & Shaver, LLC (the **"Deposit Trust Account"**).

**NOW, THEREFORE,** in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.1    **Defined Terms.** The following terms shall have the following meanings in this Agreement:

**"Action"** means any action, proceeding, arbitration or litigation (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator.

**"Affiliate"** of any particular Person means any other Person, directly or indirectly, controlling, controlled by, or under common control with, such particular Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

**"Agreement"** has the meaning set forth in the preamble.

**"Agreement Date"** has the meaning set forth in the preamble.

**"Allocation Schedule"** has the meaning set forth in Section 2.1 1(a).

**"ANDA"** means an Abbreviated New Drug Application (including any amendments and supplements thereto) filed with the FDA in accordance with Section 505G) of the Federal Food, Drug and Cosmetic Act of 1938.

**"Applicable Law"** means, with respect to any Person, any federal, provincial, state, or local law, ordinance, principle of common law, code, regulation or statute applicable to such Person or such Person's subsidiaries or to any of their respective securities, assets, properties or businesses, including, but not limited to, the Federal Food Drug and Cosmetic Act (21 U.S.C. §§ 301 et seq.).

**"Assigned Contracts"** has the meaning set forth in Section 2. 1(c).

**"Assumed Liabilities"** means only the Liabilities arising out of Purchaser's ownership or operation of the Transferred Assets solely to the extent arising from periods occurring after the Closing Date and only to the extent not otherwise paid, performed, discharged or otherwise satisfied prior to the Closing.

**"Assumption Notice"** has the meaning set forth in Section 5.3(a).

**"Auction"** has the meaning set forth in Section 5.2(b).

2

**"Avoidance Actions"** means any and all avoidance, recovery, subordination, or other claims, actions, rights, or remedies that may be brought by or on behalf of the Seller or its estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including, but not limited to, actions or remedies under sections 510, 542, 543, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

**"Back-Up Bid"** means the second highest or otherwise best bid if the successful bidder fails to consummate its bid in accordance with the Bid Procedures.

**"Back-up Termination Date"** means the first to occur of (a) fifteen days after the entry of the Sale Order, (b) consummation of the Transactions with the winning bidder at the Auction, (c) Purchaser's receipt of notice from the Seller of the release by the Seller of Purchaser's obligations under Section 5.2(b) and (d) April 18, 2025.

**"Bankruptcy Case"** has the meaning set forth in the Recitals.

**"Bankruptcy Code"** has the meaning set forth in the Recitals.

**"Bankruptcy Court"** has the meaning set forth in the Recitals.

**"Bid Procedures"** means those certain bidding procedures for the sale of the Seller's assets approved by the Bankruptcy Court.

**"Bid Procedures Order"** means an Order of the Bankruptcy Court approving the Bid Procedures attached hereto as Exhibit A.

**"Bill of Sale and Assignment and Assumption Agreement"** means the bill of sale and assignment and assumption agreement, dated as of the Closing Date, by and between the Seller and Purchaser, in a form reasonably acceptable to counsel for Seller and Purchaser.

**"Business"** means the business of the Seller as currently conducted.

**"Business Day"** means any day other than (a) a Saturday, Sunday or federal holiday or (b) a day on which commercial banks in San Francisco, California are authorized or required to be closed.

**"Closing"** has the meaning set forth in Section 2.7.

**"Closing Consideration"** means the Purchase Price *minus* the Holdback Amount.

**"Closing Date"** has the meaning set forth in Section 2.7.

**"Code"** means the Internal Revenue Code of 1986, as amended.

**"Competing Bid"** has the meaning set forth in Section 5.1.

**"Confidentiality Agreement"** means that certain Confidentiality Agreement, dated as of November 13, 2024, by and between the Seller and Purchaser.

3

**"Consent"** means any consent, approval, authorization, waiver or license.

**"Contract"** means any written agreement, mortgage, indenture, lease (whether for real or personal property), contract or subcontract.

**"Care Costs"** means all monetary amounts that must be paid and obligations that otherwise must be satisfied pursuant to Section 365(b)(l)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts, as agreed upon by the parties hereto or otherwise determined by the Bankruptcy Court, provided, however, that Purchaser shall have no obligation to pay any Cure Costs for Assigned Contracts that are not Designated Contracts.

**"Deposit Escrow Amount"** means the amount which equals ten percent of the Purchase Price.

**"Deposit Trust Account"** has the meaning set forth in the Recitals.

**"Designated Contracts"** has the meaning set forth in Section 5.3(b).

**"Designation Deadline"** has the meaning set forth in Section 5.3(b).

**"Determined Cure Costs"** means, in the aggregate, all Cure Costs payable in respect of the Assigned Contracts as determined pursuant to the Sale Order or by separate order of the Bankruptcy Court.

**"Enforceability Exceptions"** means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar Applicable Laws affecting the enforcement of creditors' rights generally and general equitable principles.

**"Excluded Assets"** has the meaning set forth in Section 2.2.

**"Excluded Books and Records"** means the following originals and copies of those books and records, documents, data and information (in whatever form maintained) of the Seller and the Business: (a) all corporate minute books (and other similar corporate records) and stock records of the Seller, (b) any books and records relating to the Excluded Assets or (c) any books, records or other materials that Seller (i) is required by Applicable Law to retain (copies of which, to the extent permitted by Applicable Law, will be made available to Purchaser upon Purchaser's reasonable request) or (ii) is prohibited by Applicable Law from delivering to Purchaser or include attorney client communications, work product or other privileged materials.

**"Excluded Contracts"** has the meaning set forth in Section 2.5.

**"Excluded Liabilities"** has the meaning set forth in Section 2.4.

**"FDA"** means the United States Food and Drug Administration.

**"FDA Transfer Letter"** means the letter(s) from the Seller to FDA in form and substance acceptable to Purchaser, in its reasonable discretion, notifying FDA of the transfer from the Seller to Purchaser of all of Seller's rights in the Transferred Assets set forth in Schedule 2.l(b).

**"Final Order"** means an Order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect <u>provided,</u> that such Order shall be considered a Final Order only after the time period for third parties seeking appeal has expired without the filing of any appeal or motion for reconsideration.

**"Final Resolution"** has the meaning set forth in <u>Section 2.9(d).</u>

**"Free and Clear"** means free and clear of all Liens and Liabilities (other than Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

**"GAAP"** means generally accepted accounting principles in the United States as of the Agreement Date.

**"Governmental Authority"** means any domestic or foreign national, provincial, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, any court (including the Bankruptcy Court) or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS and the FDA).

**"Hold back Amount"** has the meaning set forth in Schedule 2.1 (b)

**"Holdback Period"** has the meaning set forth in <u>Section 2.9(d).</u>

**"Intellectual Property"** means any and all intellectual property and proprietary rights in any jurisdiction throughout the world, including rights arising from the following: (a) patents and patent applications, design rights, industrial design registrations and applications therefor, divisions, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, reexaminations, extensions and any provisional applications, and any foreign or international equivalent of any of the foregoing; (b) trademarks (whether registered, unregistered or applied for), service marks, trade dress, service names, trade names, brand names, product names, slogans, logos, business names, corporate names, and other source or business identifiers, all registrations and applications for registration thereof, and, in each case, together with all of the goodwill associated therewith; (c) works of authorship, copyrights and all registrations and applications for registration thereof; (d) trade secrets and know-how; (e) rights in formulae, methods, techniques, processes, assembly procedures, software, software code (in any form, including source code and executable or object code), subroutines, test results, test vectors, user interfaces, protocols, schematics, specifications, drawings, prototypes, molds and models, and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing), and (f) social media accounts, social media identifiers, internet domain name registrations.

**"IRS"** means the United States Internal Revenue Service.

**"Knowledge"** means (a) with regard to the Seller, the actual knowledge, after due inquiry, of Dr. Nirmal Mulye, John Foster, and Carlton Asher and (b) with regard to Purchaser, the actual knowledge, after due inquiry, of Meredith Cook.

**"Liabilities"** means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to, or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

**"Lien"** means all forms of lien (including mechanic's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Transferred Assets, and liens arising under the Bankruptcy Code), encumbrance, claim, defect or irregularity in title, pledge, mortgage, deed of trust, deed to secure debt, security interest, charge, transfer restriction or similar agreement or encumbrance, including any dedication under any gathering, transportation, treating, processing, fractionating, purchase, sale or similar agreements, or any other rights granted or consensual as or against any Transferred Assets including but not limited to easements, encroachments, rights of first refusal, options, or any other interest or right in property that constitutes a lien or interest within the definition or adjudication of such terms under Section 101(37) of the Bankruptcy Code.

**"Loss"** means any loss, Liability, demand, claim, action, cause of action, cost, damage deficiency, Tax, penalty, fine or expense, whether or not arising out of any claims by or on behalf of any third party, including interest, penalties, reasonable legal fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing. For the avoidance of doubt, "Loss" shall exclude punitive damages, except to the extent payable to a third party.

**"Material Adverse Effect"** means a material adverse effect on the Transferred Assets and Assumed Liabilities taken as a whole; provided, **however,** that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or may be, a Material Adverse Effect: (a) any change in, or effects arising from or relating to, general business or economic conditions affecting any industry in which the Business operates; (b) any change in, or effects arising from or relating to, the United States or foreign economies, or securities, banking or financial markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) debt defaults or other restructuring events of any country with respect to which bondholders take a discount to the debt of any country or any increases in the interest rates for any country's debt, (iii) any change in currency exchange rates, (iv) any decline or rise in the price of any security, commodity, contract or index and (v) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (c) any change from, or effects arising from or relating to, the occurrence, escalation or material worsening of any act of God or other calamity, natural disaster, pandemic or disease, outbreak, hostility, act of war, sabotage, cyber-attack or terrorism or military action; (d) any action taken by Purchaser or its Affiliates with respect to the Transactions or with respect to the Business; (e) any action taken, or failed to be taken, by the Seller at the request of or with the consent of Purchaser or any change from, or effects arising from or relating to, Purchaser's failure to consent to any action restricted by Section 6.1; (f) any change in, or effects arising from or relating to changes in, Applicable Law or accounting rules (including GAAP) or any interpretation thereof; (g) the failure of the Business to meet any of its projections, forecasts, estimates, plans, predictions, performance

6

metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or representatives); (h) national or international political, labor or social conditions; (i) any matter described in the Schedules or any matter of which Purchaser is aware as of the Agreement Date; (j) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement and the Transactions or the identity of the parties to this Agreement, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the Business; (k) the sale of any assets other than the Transferred Assets to any third parties by Seller or any of its Affiliates; (l) any effect arising or resulting from or related to the filing of the Bankruptcy Case; (m) any action required to be taken under any Applicable Law or Order; (n) seasonal changes in the results of operations of the Seller; (o) any epidemic, pandemic, outbreak of disease or other public health emergency (including COVID-19) or any escalation or worsening of any such conditions; (p) (1) any results, outcomes, data, adverse events or side effects arising from any clinical trials being conducted by or on behalf of the Seller or any competitor of the Seller (or the announcements thereof), (2) the determination by, or the delay of a determination by, the FDA or any other applicable Governmental Authority, or any panel or advisory body empowered or appointed thereby, with respect to a clinical hold, acceptance, filing, designation (including de-designation for the accelerated approval pathway), approval, clearance, non-acceptance, hold, refusal to file, refusal to designate, non-approval, disapproval or non-clearance, or requirement to conduct additional clinical studies or trials, with respect to any of the Seller's or any competitor's product candidates or (3) FDA approval (or other clinical or regulatory developments), market entry or pending market entry of any product competitive with or related to any of the products or product candidates of the Seller, or any guidance, announcement or publication by the FDA or other applicable Governmental Authority relating to any product candidates of the Seller or any competitor; or (q) any objections made in the Bankruptcy Court to this Agreement, the Transactions, the Sale Order or the reorganization, any orders of the Bankruptcy Court and any actions or omissions of the Seller in compliance with any order of the Bankruptcy Court and the assumption or rejection of any Assigned Contract.

**"Non-Transferred Asset"** has the meaning set forth in Section 2.6(a).

**"Order"** means any award, decision, injunction, judgment, ruling or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator, whether preliminary, interlocutory or final, including by the Bankruptcy Court.

**"Organizational Documents"** means (a) the articles or certificates of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in clauses (a) through @ , and (f) any amendment to or equivalent of any of the foregoing.

**"Outside Date"** has the meaning set forth in Section 9.1 (g).

7

**"Owned Intellectual Property"** means the Intellectual Property owned by the Seller that is exclusively related to the Transferred Assets.

**"Permit"** means all permits, authorizations, certificates, franchises, consents, waivers, licenses, filings and other approvals from any Governmental Authority.

**"Person"** means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

**"Personal Information"** means any information in the possession or control of the Seller (solely as related to the Business) about an identifiable individual other than the name, title or business address, business email address or telephone number of any employee of the Seller.

**"Petition Date"** has the meaning set forth in the Recitals.

**"Pre-Closing Tax Claim"** has the meaning set forth in Section 7.3(d).

**"Pre-Closing Tax Period"** has the meaning set forth in Section 7.3(a).

**"Product ANDA"** means, for each of the Products listed on Schedule 2.1(b), the ANDA for each Product, and any and all submissions, amendments and supplements thereto, that have been filed with (whether or not accepted for filing) and approved by (or filed with) the FDA granting or seeking authorization and approval to manufacture, package, ship and sell such Products, as more fully defined in 21 C.F.R. Part 314. The term "Product ANDA(s)" includes the materials contained in the official ANDA dossier and files, including all ANDA submissions, amendments, correspondence (including correspondence with the FDA field offices, FDA laboratories, FDA compliance offices and OPDP), reports and memoranda of telephone conversations, constituting or reflecting communications regarding any of the Product ANDAs. The term "Product ANDA(s)" also includes such materials in the working regulatory and clinical files of Seller or in the Seller's control pertaining to the conduct of upcoming annual reviews of the Products and required reports to the FDA that have yet to be filed.

**"Products"** means the approved products, which are manufactured pursuant to a Product ANDA to be purchased pursuant to this Agreement, as listed on Schedule 2.1 (b).

**"Public Health Measures"** means any closures, "shelter-in-place," "stay at home," workforce reduction, social distancing, shut down, closure, curfew or other restrictions or any other Applicable Law, Orders, directives, guidelines or recommendations issued by any Governmental Authority, the Centers for Disease Control and Prevention, the World Health Organization, or any industry group in connection with COVID-19 or any other epidemic, pandemic, or outbreak of disease, or in connection with or in response to any other public health conditions.

**"Purchase Price"** means $1,225,000.

**"Purchaser"** has the meaning set forth in the preamble.

**"Purchaser Schedules"** has the meaning set forth in Article 4.

8

**"Recall Claim"** has the meaning set forth in Section 2.9(d).

**"Related Claims"** means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents and any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions or the relationship between the parties (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

**"Related Documents"** means the Bill of Sale and Assignment and Assumption Agreement; provided, however, that the Bill of Sale and Assignment and Assumption Agreement shall not be a Related Document solely for purposes of applying the provisions in Article 10 to the extent, and only to the extent, that any such document expressly conflicts with Article 10.

**"Sale Motion"** has the meaning set forth in the Recitals.

**"Sale Order"** means an Order of the Bankruptcy Court issued pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code in form and substance reasonably satisfactory to the Seller and Purchaser in all material respects.

**"Schedules"** has the meaning set forth in Article 3.

**"Seller"** has the meaning set forth in the preamble.

**"Seller Taxes"** has the meaning set forth in Section 7.3(c).

**"Solvent"** when used with respect to any Person, means that, as of any date of determination, (a) the fair salable value (determined on a going concern basis) of its assets and property will, as of such date, exceed the amounts required to pay its debts as they become absolute and mature, as of such date, (b) such Person will have adequate capital to carry on its business and (c) such Person will be able to pay its debts as they become absolute and mature, in the ordinary course of business, taking into account the timing of and amounts of cash to be received by it and the timing of and amounts of cash to be payable on or in respect of its indebtedness.

**"Straddle Period"** has the meaning set forth in Section 7.3(6).

**"Tax"** means (i) any ad valorem, alternative or add-on (including Section 59A of the Code), income, franchise, branch profits, capital gains, gross receipts, estimated, employment, excise, goods and services, severance, stamp, documentary, value-added, sales, use, property, registration, transfer, payroll, social security, withholding or other tax, duty, charge, fee, levy or other assessment, and any related fine, penalty, interest, or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority and (ii) any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation, agreement or arrangement to indemnify any Person or other entity.

**"Tax Proceeding"** means any audit, appeal, challenge, proceeding, controversy, dispute, claim, information request or assessment with respect to Taxes.

**"Tax Return"** means any return (including any information return), disclosure, report, statement, schedule, notice, form, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection, or payment, of any Tax.

**"Transactions"** means the transactions contemplated by this Agreement and the Related Documents.

**"Transfer Taxes"** has the meaning set forth in Section 2.10.

**"Transferred Assets"** has the meaning set forth in Section 2.1.

1.2    **Other Definitional and Interpretive Matters.**

(a)    Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

(i)    Calculation of Time Period. All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Dollars. Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement, the Related Documents or the Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties hereto to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement, the Related Documents or the Schedules.

(iii)    Exhibits/Schedules. The Exhibits and Schedules to this Agreement are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent the relevance of such disclosure to such other Schedule is reasonably apparent on the face of such disclosure. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the

10

ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Applicable Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     Gender and Number. Any reference to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     Headings. The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or Related Document, as applicable. Unless otherwise specified, all references in this Agreement to any "Section" or other subdivision are to the corresponding section or subdivision of this Agreement, and all references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vi)     Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)     Or. The word "or" shall be construed in the inclusive sense of "and/or" unless otherwise specified.

(viii)     Including. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)     Successors. A reference to any party to this Agreement, any Related Document or any other agreement or document shall include such party's successors and permitted assigns.

(x)     Legislation. A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(xi)     Reflected On or Set Forth In An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statement, to the extent any such phrase appears in such representation or warranty, if (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that relates to the subject matter of

such representation, (B) such item is otherwise specifically set forth on the balance sheet or financial statement or (C) such item is set forth in the notes to the balance sheet or financial statement.

(xii)    <u>Made Available.</u> Any reference in this Agreement to "made available" means a document or other item of information that was provided or made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions.

(b)    All representations and warranties set forth in this Agreement or the Related Documents are contractual in nature only and subject to the sole and exclusive remedies set forth herein. The parties have agreed that should any representations and warranties of any party prove untrue, the other parties shall have the specific rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort or otherwise) are permitted to any party hereto as a result of the untruth of any such representation and warranty. The phrase "to Seller's Knowledge" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the Related Documents and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement and the Related Documents. The parties hereto agree that changes from earlier drafts to the final version of this Agreement do not necessarily imply that the party agreeing to such change is agreeing to a change in meaning (as the party agreeing to such change may believe the change is stylistic and non-substantive); consequently, no presumption should exist by virtue of a change from a prior draft.

## ARTICLE 2
## THE PURCHASE AND SALE; CLOSING

2.1    **Purchase and Sale.** Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, in exchange for an aggregate payment from Purchaser to the Seller equal to the Closing Consideration, Purchaser shall purchase, assume and accept from the Seller, and the Seller shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear, all of the rights, title and interests in, to and under the following assets and interests (collectively, the **"Transferred Assets"):**

(a)    the inventories of those Products (including raw materials and active pharmaceutical ingredients) in Seller's possession and control and that is further described by category, quantity and unit of measure, lot number and storage location in <u>Schedule 2.1(a);</u>

(b)      the Product ANDAs set forth in Schedule 2.1 (b):

(c)      all Contracts listed on Schedule 2.1 (c) (as may be amended prior to Closing) (collectively, the **"Assigned Contracts"),** but expressly excluding (i) Contracts that expire or are terminated prior to the Closing and (ii) any Contracts that Purchaser elects to exclude pursuant to Section 5.3(b):

(d)      all material original books and records, documents, data and information of the Seller solely related to the Transferred Assets, including: (i) supplier and vendor lists, (ii) promotional materials, (iii) customer lists, (iv) market research materials, (v) materials used in connection with the sale and promotion of the products, and (vi) other business records required to be transferred to Purchaser under applicable law, other than the Excluded Books and Records; provided, however, that the Seller shall be entitled to retain copies of any such materials;

(e)      annual and periodic reports relating to the Product ANDAs which have been filed by or on behalf of Seller or a prior owner of the Product ANDAs with the FDA or equivalent Governmental Authority and adverse event reports pertaining to the Products, in each case as are in Seller's or its Affiliate's possession or control;

(f)      all intangible assets, including without limitation, the names, logos and symbols used by Seller in connection with the Transferred Assets;

(g)      all of the Seller's rights, claims or causes of action against third parties relating to the assets, properties, business or operations of the Seller with respect to the Transferred Assets and the Assumed Liabilities (including all guaranties, warranties, indemnities and similar rights in favor of the Seller or any its Affiliates to the extent solely related to the Transferred Assets or the Assumed Liabilities), in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date, except for such rights, claims and causes of related to the Excluded Assets or Excluded Liabilities; and

(h)      all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, choses in action, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively used in or held for use for the Transferred Assets listed in clauses (a) through .(g} above or the Assumed Liabilities; and

(i)      all goodwill associated with or symbolized by any of the foregoing Transferred Assets described in clauses (a) through _(h} above.

2.2      **Excluded Assets.** Notwithstanding the provisions of Section 2.1 or anything to the contrary herein, any and all assets, rights and properties of the Seller that are not specifically identified in Section 2.1 as Transferred Assets, including the following (collectively, the **"Excluded Assets"),** shall be retained by the Seller, and Purchaser and its designees shall acquire no right, title or interest in the Excluded Assets in connection with the Transaction:

(a)      all (i) cash and cash equivalents, wherever located, including bank balances and bank accounts or safe deposit boxes, monies in the possession of any banks, savings and loans or trust companies and similar cash items, (ii) escrow monies and deposits in the possession of

landlords and utility companies, and (iii) investment securities and other short- and medium-term investments;

(b)    all records, documents or other information exclusively relating to current or former employees of the Seller that are not hired by Purchaser, and any materials to the extent containing information about any employee, disclosure of which would violate Applicable Law or such employee's reasonable expectation of privacy;

(c)    any interest of the Seller under this Agreement or the Related Documents, including, without limitation, the right to receive the Purchase Price and to enforce the Seller's rights and remedies thereunder;

(d)    all Contracts (including all prepaid assets relating to such Contracts), other than the Designated Contracts, to which Seller is a party;

(e)    any (i) attorney-client work product or communications prior to the Closing Date between Seller (including any one or more officers, directors or stockholders of Seller), on the one hand, and its counsel, on the other hand, and (ii) claims under any director and officer, errors and omissions, fiduciary and commercial crime insurance policies;

(f)    all Permits (including applications therefor and any trade or import/export Permits) that (i) are not solely related to the Transferred Assets, or (ii) are not transferable to Purchaser under Applicable Law;

(g)    the Excluded Books and Records;

(h)    accounts receivable, intercompany obligations and other amounts receivable by Seller;

(i)    any assets not otherwise designated as Transferred Assets or from time to time designated by the parties hereto as Excluded Assets;

(j)    the Avoidance Actions;

(k)    all of the Seller's rights, claims or causes of action (i) against third parties relating to the assets, properties, business or operations of the Seller (including all guaranties, warranties, indemnities and similar rights in favor of the Seller or any of its Affiliates) to the extent arising under the Bankruptcy Code or relating to any of the Excluded Assets or Excluded Liabilities, or (ii) against any third parties that have a familial relationship with any members of the Debtor's management team or entities in which such third parties hold an interest, the Debtor's owners or the Debtor's employees, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date; for the avoidance of doubt and notwithstanding anything else herein to the contrary, all of the Seller's rights, claims and causes of action, including Avoidance Actions, against any of the Seller's affiliates, insiders, subsidiaries, and parents shall be Excluded Assets.

(l)    all of the Seller's right, title and interest to any the assets set forth on Schedule 2.2(1): and

14

(m)    all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively related to or exclusively used in or held for use for the Excluded Assets listed in clauses W through ill above.

Notwithstanding anything to the contrary contained in this Agreement or any of the other Related Documents, Purchaser acknowledges and agrees that all of the following are also Excluded Assets, and all right, title and interest in and to all Excluded Assets shall be retained by the Seller and shall remain the property of the Seller (and shall expressly be excluded from the sale, transfer, assignment and conveyance to Purchaser hereunder), and neither Purchaser nor any of its Affiliates shall have any interest therein: (x) all records and reports prepared or received by the Seller or any of its Affiliates in connection with the sale of the Business and the Transactions, including all analyses relating to the Business or Purchaser so prepared or received; and (y) all confidentiality agreements with prospective purchasers of the Business or any portion thereof and all bids and expressions of interest received from third parties with respect thereto.

2.3    **Assumption of Liabilities.** On the terms and subject to the conditions set forth in this Agreement, Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms the Assumed Liabilities.

2.4    **Excluded Liabilities.** Notwithstanding Section 2.3, Purchaser is assuming only the Assumed Liabilities of the Seller and will not assume or be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, in each case, that are not Assumed Liabilities (all such Liabilities not being assumed herein referred to as the **"Excluded Liabilities"),** and the Seller shall retain, be responsible for, pay, perform, discharge, or otherwise satisfy in accordance with their respective terms all Liabilities that are not Assumed Liabilities, including all Liabilities related to Excluded Assets. For the avoidance of doubt, "Excluded Liabilities" includes any and all Liabilities arising out of, relating to, resulting from or in connection with any credits, rebates, returns or chargebacks, in each case to the extent attributable to the Products distributed or sold by the Seller prior to the Closing Date.

2.5    **Excluded Contracts.** Pursuant to Section 5.3(b), Purchaser shall be entitled, in its sole discretion, by written notice to the Seller up to three (3) Business Days prior to the Closing Date, to elect not to purchase or assume one or more Assigned Contract, in which case, notwithstanding anything in this Agreement or any Related Document to the contrary, such Contract shall not be an Assigned Contract or Designated Contract and shall be considered an excluded contract **("Excluded Contract")** (and shall constitute an Excluded Asset and not be included in the Transferred Assets) for all purposes of this Agreement and Purchaser shall not have any obligation to satisfy or pay any Cure Costs or other Liabilities with respect to such Excluded Contract. Each assignable Assigned Contract that Purchaser does not elect to remove from the list of Assigned Contracts pursuant to Section 5.3(b) shall be an Assigned Contract.

2.6    **Nontransferable Assets and Liabilities**.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Governmental Authority) (after giving effect to the Sale Order or any other applicable order of the Bankruptcy Court that effects such transfer without any required Consents), would constitute a breach or other contravention thereof or a violation of Applicable Law (each, a "**Non-Transferred Asset**").

(b)    If, on the Closing Date, any third-party Consent is not obtained for a Non-Transferred Asset, or if an attempted transfer or assignment thereof would be ineffective or a violation of Applicable Law, then, until any requisite consent is obtained therefor and the same is transferred and assigned to Purchaser or its designee, each such Non-Transferred Asset shall be held by the Seller as agent for the Purchaser, and the Seller shall, to the extent permitted by Applicable Law, provide to Purchaser the benefits and, subject to Purchaser's receipt of such benefits, Purchaser shall assume the obligations and bear the economic burdens associated with such Non-Transferred Asset. The Seller and Purchaser shall use commercially reasonable efforts to enter into agreements (including subcontracting, sublicensing or subleasing, if permitted) by which (i) the Seller shall without interruption of the Business, provide Purchaser with the economic and operational equivalent of obtaining the requisite third-party Consent and assigning the applicable Non-Transferred Asset to Purchaser (including, with the prior written consent of Purchaser, enforcing for the benefit of Purchaser, and at Purchaser's sole expense, all claims or rights arising thereunder) and (ii) Purchaser shall perform, at its sole expense, the obligations and assume the economic burdens of the Seller to be performed after the Closing with respect to such Non-Transferred Asset.

2.7    **Closing.** The closing of the Transactions (the "**Closing**") will take place remotely by electronic exchange of documents on the date (the "**Closing Date**") that is the second (2nd) Business Day after the date on which all of the conditions set forth in Article 8 (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the party hereto entitled the benefit of the same, unless another time or date is agreed to in writing by the parties hereto, provided, however, that Purchaser may opt to extend the Closing Date to no later than April 18, 202 unless otherwise agreed by the parties hereto . Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all parties hereto at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

2.8    **Closing Deliveries of the Parties.** At or prior to the Closing:

(a)    Purchaser and the Seller shall execute and deliver the Bill of Sale and Assignment and Assumption Agreement;

(b)      Purchaser and the Seller shall transmit Purchaser's FDA Transfer Letter and the Seller's FDA Transfer Letters, respectively, to the FDA and shall take other actions reasonably necessary to effect the transfer of the Transferred Assets from the Seller to Purchaser;

(c)      Purchaser shall deliver, or cause to be delivered, to the Seller or the applicable Person each of the following:

(i)      a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in <u>Section 8.3(a)</u> and <u>Section 8.3(b)</u>; and

(ii)      payment of the Closing Consideration, less the Deposit Escrow Amount, as set forth in <u>Section 2.9.</u>

(d)      the Seller shall deliver, or cause to be delivered, to Purchaser or the applicable Person each of the following:

(i)      a certificate, dated as of the Closing Date, executed by or on behalf of the Seller as to the satisfaction of the conditions set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u>; and

(ii)      an accurate, executed and complete IRS Form W-9 of the Seller;

(iii)      the Sale Order; and

(iv)      all stability samples, batches, data, protocols and other documentation with respect to stability testing for the Products.

2.9    **<u>Closing Consideration; Assumed Liabilities; Deposits; Holdback Amount.</u>**

(a)      At the Closing, upon the terms and subject to the conditions set forth in this Agreement, in full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser, the use and benefit of any Non-Transferred Asset, and assumption of the Assumed Liabilities by Purchaser, Purchaser shall (i) pay to the Seller an aggregate amount equal to the Closing Consideration _minus_ the Deposit Escrow Amount; and (ii) assume the Assumed Liabilities.

(b)      At the Closing, upon the terms and subject to the conditions set forth in this Agreement, Purchaser will assume and become responsible for the Assumed Liabilities. Purchaser agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms hereof, including paying or causing to be paid, at or prior to the Closing, all Determined Cure Costs.

(c)      The Deposit Escrow Amount shall be released to Seller or Purchaser in accordance with the applicable terms of this Agreement. Any issue regarding the entitlement to the Deposit Escrow Amount shall be determined by the Bankruptcy Court, and Purchaser consents to the jurisdiction of the Bankruptcy Court for any issue related to this Agreement.

(d)      The Holdback Amount shall be retained by Seller in the Deposit Trust Account at the Closing and shall be available to the Parties hereto as security to compensate for any Losses incurred as a result of any recalls or market withdrawals (whether voluntary or involuntary) that were reasonably necessary and occur prior to, or after, the Closing Date, in each case to the extent attributable to the Products distributed or sold by the Seller prior to the Closing Date. On the date that is six (6) months after the Closing Date, fifty percent (50%) of any remaining portion of the Holdback Amount (net of any amounts owed to Purchaser or subject to pending but unresolved claims by the Purchaser with respect to any Losses set forth in the preceding sentence, each a **"Recall Claim"),** if any, shall be distributed to the Seller. On the date that is twelve (12) months after the Closing Date (the **"Holdback Period"),** any remaining portion of the Holdback Amount (net of any amounts owed to Purchaser or subject to pending but unresolved Recall Claims by Purchaser), if any, shall be distributed to the Seller. Any portion of the Holdback Amount held following the end of the Holdback Period with respect to a Recall Claim that is not awarded to Purchaser upon the final resolution of such Recall Claim (whether through a Final Order, termination, settlement or otherwise) (a **"Final Resolution")** shall be, within five (5) Business Days after such Final Resolution, disbursed to Seller. Any portion of the Holdback Amount that is requested by Purchaser for reimbursement of Losses shall be subject to a reasonableness standard for the amounts incurred by Purchaser related to any recalls or market withdrawals and any such request shall be supported by documentary evidence. Any Losses incurred in relation to any recall or market withdrawal attributable to the Products that is in excess of the Holdback Amount shall be the sole responsibility of the Purchaser.

(e)      Purchaser and each of its Affiliates and agents shall be entitled to deduct and withhold from the payment of any amounts (or any portion thereof) payable pursuant to this Agreement (or any agreements, documents or instruments entered into pursuant to this Agreement) that Purchaser is required to deduct and withhold with respect to the making of such payment under any Applicable Law. If Purchaser intends to deduct or withhold any amount as required by any Tax law from any payment made to the Seller pursuant to this Agreement, Purchaser shall (i) promptly provide the Seller advance notice of its intent to deduct or withhold such amounts, and (ii) provide a reasonable opportunity for the Seller to provide forms, documents or other evidence that would mitigate, reduce or eliminate such deduction or withholding. To the extent that amounts are so deducted and withheld, Purchaser shall promptly remit such amounts to the applicable Governmental Authority and such amounts shall be treated for all purposes of this Agreement as having been paid to the applicable payee to whom such amounts would otherwise have been paid.

2.10    **Transfer Taxes.** It is the intention of the Purchaser and the Seller that the Transactions be exempt from all transfer, documentary, sales, use, excise, stock transfer, value-added, stamp, recording, registration and other similar Taxes, together with any conveyance fees, recording charges and other similar fees and charges, incurred in connection with this Agreement and the Transactions (collectively, **"Transfer Taxes")** pursuant to the Bankruptcy Code. Purchaser and the Seller shall cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes due with respect to the Transactions. In the event any Transfer Taxes are required to be paid with respect to the Transactions, Purchaser shall pay such Transfer Taxes, and Purchaser and the Seller shall cooperate in the preparation and filing of any Tax Returns required under Applicable Law with respect to such Transfer Taxes.

2.11    **Allocation of Purchase Price.**

(a)      The Purchase Price (including all other amounts treated as consideration for U.S. federal income tax purposes) and Assumed Liabilities shall be allocated among the Transferred Assets as set forth on Schedule 2.11 (the **"Allocation Schedule").**

(b)      Purchaser and the Seller shall (i) timely file all Tax Returns required to be filed in connection with the Allocation Schedule, and (ii) prepare and file all Tax Returns and determine all Taxes in a manner consistent with the Allocation Schedule, except as may be required by a change in law after the date of this Agreement, a closing agreement with an applicable Governmental Authority, or a final judgment of a court of competent jurisdiction and, except as may be necessary to reflect adjustments to the Allocation Schedule resulting from post-Closing payments. Purchaser, on the one hand, and the Seller, on the other hand, shall notify the other if it receives notice that any Governmental Authority proposes any allocation different from Allocation Schedule.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as disclosed in a document herewith delivered by the Seller to Purchaser (the **"Schedules"),** the Seller hereby makes the representations and warranties contained in this Article 3 to Purchaser.

3.1      **Organization, Good Standing and Other Matters.** The Seller is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite corporate power and authority to operate the Business and necessary to own, lease or operate the properties and assets owned, leased or operated by it to carry on the Business as now being conducted, except where the failure to be so duly organized, validly existing and in good standing, or to have such power and authority, would not, individually or in the aggregate, have a Material Adverse Effect. The Seller is duly qualified to do business as a foreign company in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

3.2      **Authority and Enforceability.** Subject to Bankruptcy Court approval, the Seller has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which the Seller is (or at Closing, will be) a party thereto, and the consummation by the Seller of the Transactions, have been duly authorized and approved by all necessary corporate action on the part of the Seller and are subject to the approval of the Bankruptcy Court. This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by the Seller and, assuming the due execution and delivery by the other parties hereto or thereto, and subject to the approval of the Bankruptcy Court, constitutes a valid and binding obligation of the Seller, enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

19

3.3    **No Conflict; Required Filings and Consents.** Except as otherwise set forth on Schedule 3.3, the execution and delivery of this Agreement by the Seller does not and the execution and delivery of the Related Documents by the Seller will not, and the consummation of the Transactions hereby and thereby will not (a) violate the provisions of the Organizational Documents of the Seller, (b) subject to the entry of the Sale Order, violate any Applicable Law or Order to which Seller is subject or by which its properties or assets are bound, (c) require Seller to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order), (d) violate, conflict with, result in a breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both would become a default) under, any Contract to which the Transferred Assets are bound, or (e) result in the creation of any Lien upon any of the Transferred Assets; excluding from the foregoing clauses (b), (c), (d) and (fil any Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, have a Material Adverse Effect.

3.4    **Litigation.** There is no Action pending or, to the Seller's Knowledge, formally threatened in writing, against Seller before any Governmental Authority that would have a Material Adverse Effect or affect the Transferred Assets in any material respect after the entry of the Sale Order.

3.5    **Brokers and Finders.** Except for Raymond James & Associates, Inc. the Seller has not, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

3.6    **Title to Assets.**

(a)    The Seller owns all Transferred Assets and has good, legal valid and marketable title to, and the right to transfer (or cause to be transferred) in accordance with the terms of this Agreement, all of the Transferred Assets Free and Clear.

(b)    Seller is not a party to, or bound by, (i) any license, royalty agreement, or other agreement relating to the use of any Transferred Assets or (ii) any Contract required for the ownership, use or operation of the Transferred Assets.

(c)    Schedule 3.6(c) sets forth a true, correct and complete list of the amounts of all Cure Costs applicable with respect to each Assigned Contract, and such Cure Costs do not exceed the amounts set forth therein.

(d)    No current or former Affiliate, partner, director, stockholder, officer, member, manager, employee, consultant or contractor of the Seller will, after giving effect to the Transactions, own, license or retain any Transferred Assets.

(e)    To Seller's Knowledge, no interference, opposition, reissue, reexamination, or other proceeding is or has been pending or threatened, in which the scope, validity, or enforceability of any Transferred Assets is being, has been challenged.

(f)    There is no Owned Intellectual Property.

20

3.7    **Compliance with AppHcable Laws; Regulatory Matters.**

(a)    Any representations made in Sections (b) and (c) herein are subject to the exclusions and/or additional representations provided on Schedule 3.7 attached hereto.

(b)    Except in each case as would not, individually or in the aggregate, reasonably be expected have a Material Adverse Effect, (i) the Seller is and since January l, 2022 has been, in compliance with all Applicable Laws and (ii) the Seller is not and since January l, 2022, has not been subject to any Action or Order relating to or arising under a violation of any Applicable Laws, and, to the Knowledge of the Seller, no such Action has been threatened in writing.

(c)    The Seller is in compliance in all material respects with the Seller's adverse event reporting and other obligations with respect to the Product ANDAs. The Seller has not received any notice from the FDA that would be expected to lead to revocation of a Product ANDA.

3.8    **No Other Representations or Warranties.**

(a)    Except for the representations and warranties contained in this Article 3, the Seller does not, nor do any other Persons on behalf of the Seller, make any other express or implied representation or warranty with respect to itself, the Business, the Transferred Assets or the Assumed Liabilities, or with respect to any other information provided to Purchaser or its representatives, and the Seller disclaims any other representations or warranties, whether made by or on behalf of the Seller or any other Person. The Seller will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

(b)    Except for the specific representations and warranties expressly made by Purchaser in Article 4 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 and Article 10 of this Agreement, the Seller acknowledges and agrees that Purchaser is not making and has not made any representation or warranty, expressed or implied, at law or in equity.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed in a document herewith delivered by Purchaser to the Seller (the **"Purchaser Schedules"),** Purchaser hereby makes the representations and warranties contained in this Article 1 to the Seller.

4.1 **Organization, Good Standing and Other Matters.** Purchaser is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has all requisite corporate power or other entity power and authority to own its properties and to carry on its business as now being conducted. Purchaser is duly qualified or licensed to conduct its business as currently conducted and is in good standing in each jurisdiction in which the location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary, except where the failure to be so qualified or licensed would not, individually or in the aggregate, materially impair or delay Purchaser's ability to consummate the Transactions.

4.2 **Authority and Enforceability.** Purchaser has all requisite corporate power or other entity power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized and approved by its board of directors (or equivalent governing body) and no other action on the part of Purchaser or its stockholders is necessary to authorize the execution, delivery and performance of this Agreement and the Related Documents by Purchaser and the consummation of the Transactions. This Agreement has been, and each Related Document will be at or prior to Closing, duly executed and delivered by Purchaser and, assuming the due execution and delivery by the other parties hereto or thereto, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

4.3 **No Conflict: Regufred Filings and Consents.** Except as set forth on Schedule 4.3, the execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (a) violate the provisions of its Organizational Documents, (b) violate any Applicable Law or Order to which it is subject or by which any of its properties or assets are bound or (c) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order).

4.4 **Financing.** Purchaser has, and at the Closing will have, (a) sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price in accordance with the terms hereof and any other payments required hereunder and any expenses incurred or required to be paid by Purchaser in connection with the Transactions, and (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Documents. Purchaser has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

4.5 **Solvency.** Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors. Immediately after giving effect to all of the Transactions, including the making of the payments contemplated by Section 2.9, and assuming satisfaction of the conditions to Purchaser's obligation to consummate the Transactions as set forth herein, the accuracy of the representations and warranties of Purchaser set forth herein and the

performance by Purchaser of its obligations hereunder in all material respects, Purchaser will be Solvent.

4.6     **Litigation.** There is no Action pending or, to Purchaser's Knowledge, formally threatened in writing against Purchaser or involving any of its properties or assets that would be reasonably be expected to (a) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (b) otherwise prevent, hinder or delay the consummation of the Transactions.

4.7     **Brokers and Finders.** None of Purchaser or its Affiliates have, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

4.8     **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties.**

(a)     Purchaser acknowledges that it and its representatives have received access to such books and records, facilities, equipment, contracts and other assets of the Business which it and its representatives have desired or requested to review. Purchaser acknowledges and agrees that (i) it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Seller, the Business, the Transferred Assets and the Assumed Liabilities and (ii) the Business, the Transferred Assets and the Assumed Liabilities are being transferred and acquired on a "where is" and, as to condition, "as is" and "with all faults" basis.

(b)     Except for the specific representations and warranties expressly made by the Seller in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Alticle 9 of this Agreement, Purchaser acknowledges and agrees that (i) the Seller is not making and has not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Business, the Transferred Assets, the Assumed Liabilities, or any of its operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, stockholder, agent, Affiliate, advisor, representative or employee of the Seller has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in Article 3 and subject to the limited remedies herein provided.

(c)     Other than the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement, Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Seller and the Seller's Affiliates have specifically disclaimed

23

and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance on any such other representation or warranty made by any Person. Purchaser specifically waives any obligation or duty by the Seller or the Seller's Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties expressly set forth in Article 3 and disclaim reliance on any information not specifically required to be provided or disclosed pursuant to the specific representations and warranties set forth in Article 3.

(d)     Purchaser is acquiring the Business, the Transferred Assets and the Assumed Liabilities subject only to the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement.

4.9     **No Other Representations or Warranties.** Except for the representations and warranties contained in this Article 4, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Seller or its representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Affiliates, officers, directors, employees, agents or representatives.

## ARTICLE 5
## BANKRUPTCY COURT MATTERS

5.1     **Competing Transaction.** This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise) in accordance with the terms of the Bid Procedures Order (each, a **"Competing Bid").** From the Agreement Date (and any prior time) and until the completion of the Auction, the Seller is permitted to, and to cause its representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any reorganization, sale or other disposition of the Transferred Assets. In addition, the Seller shall have the authority to respond to any inquiries or offers to reorganize, purchase all or any part of the Transferred Assets (whether in combination with other assets of the Seller or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bid Procedures Order or other Applicable Law, including supplying information relating to the Business and the assets of the Seller to prospective plan sponsors or purchasers.

5.2     **Bankruptcy Court Filings.**

(a)     Subject to its right to pursue a Competing Bid in accordance with the Bid Procedures Order, the Seller shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Transferred Assets and the Assumed Liabilities to Purchaser Free and Clear and free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code and provide that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. The Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and

the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order and causing such Sale Order to be a Final Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)    The Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at an auction undertaken pursuant to the Bid Procedures Order (the **"Auction"),** and (i) Purchaser submits the Back-Up Bid at the Auction or (ii) the terms of this Agreement are deemed to constitute a Back-Up Bid, then Purchaser shall be obligated to promptly consummate the Transactions upon the terms and conditions as set forth herein, including the payment of the Purchase Price as the same may be increased by Purchaser at the Auction; provided that, the Seller gives written notice to Purchaser on or before the Back-up Termination Date, stating that the Seller (A) failed to consummate the sale of the Transferred Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder. For the avoidance of doubt, if Seller fails to provide the written notice set forth in the foregoing sentence, Purchaser shall have no obligations under this Agreement following the occurrence of the Back-up Termination Date. The Back-Up Bids to which this Agreement relate are set forth in Schedule 5.2(b).

5.3    **Assumption of Assigned Contracts.**

(a)    On or before the date that is five (5) Business Days following the date on which the Bid Procedures Order is entered by the Bankruptcy Court, the Seller shall file (or cause to be filed) a notice of potential assumption (the **"Assumption Notice")** with the Bankruptcy Court and serve such notice on each counterparty to an Assigned Contract listed thereon. The Assumption Notice shall identify all Assigned Contracts that the Seller and Purchaser believe may be assumed and assigned in connection with the sale of the Transferred Assets and set forth a good faith estimate of the amount of Cure Costs applicable to each such Assigned Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Assigned Contract, the amount of such Cure Cost designated for such Assigned Contract shall be "$0.00"). In accordance with the Bid Procedures Order, the Seller reserves the right to supplement such list of Assigned Contracts and provide additional notice of assumption, and to remove an Assigned Contract from the list of Assigned Contracts, up to five (5) Business Days prior to the hearing by the Bankruptcy Court with respect to the Sale Motion.

(b)    On or before the date that is three (3) Business Days before the Closing Date (the **"Designation Deadline"),** Purchaser shall provide to the Seller a list of those Assigned Contracts that it elects to have assumed and assigned to Purchaser on the Closing Date (the **"Designated Contracts").** Purchaser shall be entitled to remove any Assigned Contract from the list of Designated Contracts at any time prior to the Designation Deadline by providing the Seller written notice of such removal. In the event that Purchaser removes any of such Assigned Contracts from such list, the Seller will provide the relevant counterparty written notice that the applicable Assigned Contract is no longer identified as a Designated Contract and shall not be an Assigned Contract and shall be an Excluded Contract. For the avoidance of doubt, only those executory Assigned Contracts that remain identified as Designated Contracts as of the Closing

25

Date will constitute Assigned Contracts and will be assumed by the Seller and assigned to Purchaser pursuant to the Sale Order. Purchaser shall not have any obligation to pay Cure Costs or any other obligation under any Contract that is not a Designated Contract.  The Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assigned Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude the Seller from filing one or more motion to reject any Contracts that are not Assigned Contracts.

(c)      Notwithstanding any provision in this Agreement to the contrary, a Contract shall not be a Designated Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is (i) deemed rejected under Section 365 of the Bankruptcy Code, (ii) the subject of an objection to assignment or assumption or requires the consent of any Governmental Authority or other third party (other than, and in addition to, the Bankruptcy Court) in order to permit the assumption and assignment by the Seller to Purchaser of such Contract pursuant to Section 365 of the Bankruptcy Code, and such objection has not been resolved or such consent has not been obtained prior to the thirtieth day following the Closing Date (as such period may be extended by mutual agreement of the Seller and Purchaser), or (iii) is terminated by any party thereto other than the Seller, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as a Designated Contract hereunder and is not continued or otherwise extended upon assumption.  To the extent that any Assigned Contract is subject to a dispute or objection regarding its assignment or the Cure Costs, Purchaser shall be permitted to designate such Assigned Contract as a Designated Contract after the Closing Date by providing written notice to the Seller within ten (10) Business Days of the resolution of such dispute or objection.  In no event shall the failure to assign to Purchaser any Contract in accordance with subsections (i) through (iii) above reduce the Purchase Price payable to the Seller or constitute a failure to satisfy the conditions precedent of the Seller under Section 8.3.

(d)      Subject to the terms of Section 2.5, Section 2.8, Section 5.3(a) and Section 2.J.02, Purchaser shall make provision for the payment of the Determined Cure Costs in cash at Closing in accordance with the Sale Order.

(e)      Notwithstanding any provision in this Agreement to the contrary, from and after the date of the Assumption Notice through the Closing Date, the Seller will not reject or take any action (or fail to take any action that would result in rejection by operation of Applicable Law) to reject, withdraw, repudiate or disclaim any Assigned Contract unless (i) Purchaser has provided its prior written consent or (ii) Purchaser has removed such Assigned Contract from the list of Designated Contracts.

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1      **Conduct of Business.**  Except (i) as set forth on Schedule 6.1. (ii) as may be approved by Purchaser (which approval will not be unreasonably withheld, delayed or conditioned; provided, however, that the consent of Purchaser shall be deemed to have been given if Purchaser does not object within 48 hours after written request for such consent is provided by the Seller to Purchaser), (iii) for actions taken or omitted to be taken by the Seller in response to any Public Health Measure, or (iv) as is otherwise contemplated or required by this Agreement, any Assigned

Contract, by Applicable Laws or by order of the Bankruptcy Court, from the Agreement Date through the earlier of the Closing Date or the termination of this Agreement in accordance with its terms:

      (a)    The Seller shall use its commercially reasonable efforts to carry on the Business in all material respects in the ordinary course of business as it has been conducted since the Petition Date; and

      (b)    The Seller shall not:

      (i)    sell, license, abandon or otherwise dispose of any material asset or property constituting Transferred Assets other than inventory in the ordinary course of business;

      (ii)    (A) change any material Tax election, file any material amended Tax Return, enter into any closing agreement, settle any material Tax Proceeding, in each case, relating to the Business or the Transferred Assets, or (B) consent to any extension or waiver of the limitation period applicable to any material Tax Proceeding relating to the Business or the Transferred Assets; or

      (iii)    change its present accounting methods or principles in any material respect, except as required by GAAP or Applicable Law.

      (c)    Notwithstanding anything to the contrary, nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the Business, assets and operations prior to the Closing. Prior to the Closing, the Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its Business, assets and operations.

    6.2    **Access to Information; Confidentiality.**

      (a)    From the Agreement Date until the earlier of the Closing Date and the termination of this Agreement, the Seller shall grant Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon reasonable notice (and in the event of a facility visit request, at least 48 hours prior notice), and subject to any limitations resulting from any Public Health Measures, to the personnel, facilities, book and records of the Seller related to the Business or the Transferred Assets that are in the possession or under the control of the Seller: provided, however, that (i) all requests for access shall be directed to James Grainer or such other person(s) as the Seller may designate in writing from time to time (the **"Seller Access Contact"),** (ii) such activities do not unreasonably interfere with the ongoing business or operations of the Seller, (iii) the Seller shall have the right to have one or more of its representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.2(a), (iv) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing, (v) such access or related activities would not cause a violation of any agreement to which the Seller is a party, (vi) no Personal Information shall be disclosed or used other than in compliance with applicable privacy law and (vii) nothing herein shall require Seller

27

or its representatives to furnish to Purchaser or provide Purchaser with access to information that (A) is subject to an attorney-client or an attorney work-product privilege, (B) legal counsel for the Seller reasonably concludes may give rise to antitrust or competition law issues or violate a protective order or otherwise may not be disclosed pursuant to Applicable Law (including any Public Health Measure) or (C) would cause significant competitive harm to the Seller if the Transactions are not consummated.

(b)    Notwithstanding anything to the contrary contained in this Agreement, from the Agreement Date until the Closing Date, Purchaser shall not, and shall cause its representatives not to, have any contact or discussions concerning Seller, the Business, the Transactions or any other matters with any lender, borrower, creditor, guarantor, business partner, bank, landlord, tenant, supplier, customer, employee, manager, franchisee, distributer, noteholder, independent contractor, consultant or other material business relation of the Seller, in each case, without the prior written consent of the Seller Access Contact (which consent may be withheld in the Seller's sole discretion and, if given, may be conditioned on the Seller Access Contact or his or her designee having the right to participate in any meeting or discussion).

(c)    Any information provided to or obtained by Purchaser or its representatives, including pursuant to this <u>Section 6.2</u> is confidential information and subject to the terms of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference. Effective upon (and only upon) the Closing, the Confidentiality Agreement shall automatically terminate and none of the parties thereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained by Purchaser or its representatives concerning the Seller, which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. If this Agreement is terminated prior to Closing for any reason, the terms of the Confidentiality Agreement shall remain in full force and effect.

6.3    **Efforts to Consummate.** Except as otherwise provided in this Agreement, each of the parties hereto agrees to use its commercially reasonable efforts to cause the Closing to occur as soon as possible after the Agreement Date, including satisfying the conditions precedent set forth in <u>Article 8</u> applicable to such party including (a) defending against any Actions, judicial or administrative, challenging this Agreement or the consummation of the Transactions, (b) seeking to have any preliminary injunction, temporary restraining order, stay or other legal restraint or prohibition entered or imposed by any court or other Governmental Authority that is not yet final and nonappealable vacated or reversed, and (c) executing any additional instruments reasonably requested by another party hereto (without cost or expense to the executing party) necessary to carry out the Transactions and to fully carry out the purposes of this Agreement; <u>provided, however,</u> that, for purposes of "commercially reasonable efforts" standard as required by this <u>Section 6.3. Section 6.1 (a),</u> or <u>Section 2.6(b)</u> neither the Seller nor its Affiliates or representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party or to otherwise expend any money or suffer any detriment, to expend any money to remedy any breach of any representation or warranty hereunder, to commence any Action, to waive or surrender any right, to modify any agreement (including any Assigned Contract) or to provide financing to Purchaser for the consummation of the Transactions.

6.4    **Public Announcements.** Between the Agreement Date and the Closing Date, except to the extent required by any Applicable Law or Action (including the Bankruptcy Case), neither Purchaser nor the Seller shall, and Purchaser and the Seller shall cause their respective Affiliates and representatives not to, directly or indirectly, issue any press release or public announcement of any kind without the prior written consent of Purchaser and the Seller; provided, however, that the Seller and its Affiliates may make announcements from time to time to their respective employees, customers, suppliers, and other business relations and otherwise as the Seller may reasonably determine is necessary to comply with Applicable Law or the requirements of this Agreement or any other agreement to which the Seller or any such Affiliate is a party. Purchaser and the Seller shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the parties.

6.5    **Update of Schedules; Knowledge of Breach.** From time to time prior to the Closing, the Seller may supplement or amend the Schedules with respect to any matter hereafter arising or discovered which if existing or known by the Seller at the Agreement Date would have been required to be set forth or described in such Schedules and also with respect to events or conditions arising after the date hereof and prior to Closing. Any such supplemental or amended disclosure shall not be deemed to have cured any such breach of representation or warranty for purposes of determining whether or not the conditions set forth in Section 8.2(a) have been satisfied. From and after the Closing, references to the Schedules shall be references to the Schedules as supplemented, modified and/or updated. If, prior to the Closing, Purchaser shall have reason to believe that any breach of a representation or warranty of the Seller has occurred (other than through notice from the Seller), Purchaser shall promptly so notify the Seller, in reasonable detail. Nothing in this Agreement, including this Section 6.5, shall imply that the Seller is making any representation or warranty as of any date other than the Closing Date (other than representations and warranties that are expressly made as of an earlier date).

# ARTICLE 7
## POST-CLOSING COVENANTS

7.1    **Access to Information; Books and Records.** From and after the Closing, each of Purchaser and the Seller shall cause their representatives to furnish all information reasonably requested by the other party or its representatives in connection with the administration of the Bankruptcy Case, any claims or interests asserted by parties in interest against Seller in the Bankruptcy Case, financial or regulatory reporting whether in the Bankruptcy Case or otherwise, audit, third party litigation, preparing or filing of any Tax Return or the defense in any Tax Proceeding; provided, however, that nothing in this Section 7.1 shall require a party to furnish to the other party or its representatives any material that is subject to an attorney-client or solicitor-client privilege or an attorney or solicitor work-product privilege or which may not be disclosed pursuant to Applicable Law.

7.2    **Post-Closing Receipt and Possession of Assets.**

(a)    After the Closing Date, the Seller shall transfer promptly to Purchaser from time to time (but in any event on a monthly basis) any payments constituting Transferred Assets received by the Seller. After the Closing Date, Purchaser shall transfer promptly to the Seller, from

time to time (but in any event on a monthly basis), any payments constituting Excluded Assets, received by Purchaser after the Closing.

(b)      In the event that, after the Closing Date, Purchaser receives or otherwise is in possession of any Excluded Asset, Purchaser shall promptly notify the Seller of its receipt or possession of such other Excluded Asset and transfer such Excluded Asset to the Seller. In the event that, after the Closing Date, the Seller receives or otherwise is in possession of any other Transferred Asset, the Seller shall promptly notify Purchaser of its receipt or possession of such other Transferred Asset and transfer, at Purchaser's expense, such Transferred Asset to Purchaser.

7.3      **Tax Matters.**

(a)      The Seller shall be responsible for preparing or causing to be prepared all Tax Returns with respect to the Business and the Transferred Assets for taxable periods ending on or before the Closing Date (each, a **"Pre-Closing Tax Period")** that are required to be filed on or before the Closing Date. After the Closing Date, Purchaser will assist and cooperate with the Seller in preparing any such Tax Return with respect to the Transferred Assets.

(b)      Purchaser shall prepare and timely file or cause to be prepared and timely filed (taking into account all extensions properly obtained) all Tax Returns with respect to the Transferred Assets that are required to be filed for any taxable period that begins on or before the Closing Date and ends after the Closing Date (a **"Straddle Period")** and shall timely pay (subject to Purchaser's right to reimbursement of Seller Taxes), or cause to be timely paid, the amount of any Taxes due thereon. Purchaser shall provide the Seller with completed drafts of such Tax Returns for the Seller's review and reasonable comment at least fifteen days prior to the due date for filing thereof, taking into account extensions (or, if such due date is within fifteen days following the Closing Date, as promptly as practicable following the Closing Date) and shall consider any comments of Seller in good faith to such Tax Returns as are reasonably requested by the Seller, provided such requests are consistent with the prior practice of the Seller (to the extent relevant) and comply with Applicable Law.

(c)      The Seller shall be liable for any Taxes with respect to a Pre-Closing Tax Period and the portion of any Straddle Period ending on the Closing Date **("Seller Taxes").** For purposes of this Agreement, in the case of any Straddle Period, (a) the amount of any Taxes based on or measured by income or receipts, sales or use, employment, or withholding allocated to the portion of such Straddle Period ending on the Closing Date shall be determined based on an interim closing of the books as of the end of the day on the Closing Date and (b) any other Taxes shall be allocated to the portion of such Straddle Period ending on the Closing Date by prorating the amount of such Tax for the entire taxable period on a per diem basis.

(d)      Purchaser shall promptly notify the Seller in writing upon receipt by Purchaser or any of its Affiliates of notice of any pending or threatened U.S. federal, state, local or foreign Tax audits, proceedings or assessments relating to Pre-Closing Tax Period, Straddle Period or otherwise relating to a Tax for which the Seller is liable pursuant to Section 7.3(c) (a **"Pre-Closing Tax Claim").**

(e)     Purchaser shall have the sole right to control the defense or resolution of any Pre-Closing Tax Claim, and to employ counsel of its choice.

(f)     After the Closing, each of the Seller and Purchaser shall (and Purchaser shall cause its Affiliates to):

(i)     timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce), or file Tax Returns or other reports with respect to, Transfer Taxes;

(ii)     cooperate fully in preparing for and defending any Tax Proceeding with Governmental Authorities regarding any Tax Returns required to be filed by, or Taxes related to the Transferred Assets due from, the Seller for any Pre-Closing Tax Period or Straddle Period; and

(iii)     furnish the other party with copies of all correspondence received from any Governmental Authority in connection with any Tax Proceeding, related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period, and furnish the other parties with copies of all records and documents relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period that are proposed to be destroyed (and not otherwise in the possession of such other party).

## ARTICLE 8
## CONDITIONS PRECEDENT

8.1     **Conditions to Each Party's Obligation.** The respective obligations of the parties hereto to effect the Transactions are subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller and Purchaser), at or prior to the Closing, of the following conditions:

(a)     No Injunctions or Restraints. No Order or Applicable Law preventing the consummation of the Transactions shall be in effect.

(b)     Sale Order. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be a Final Order.

8.2     **Conditions to Obligation of Purchaser.** The obligations of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by Purchaser), at or prior to the Closing, of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties of the Seller set forth in Article 3 shall be true and correct in all material respects (without giving effect to any qualifications or limitations as to "materiality", "Material Adverse Effect" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date).

(b)     <u>Performance of Covenants and Obligations.</u> The Seller shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c)     <u>Closing Deliverables.</u> The Seller shall have delivered to Purchaser the closing deliveries required to be delivered by the Seller pursuant to <u>Section 2.8.</u>

8.3     **Conditions to Obligations of the Seller.** The obligation of the Seller to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller), at or prior to the Closing, of the following conditions:

(a)     <u>Representations and Warranties.</u> Each of the representations and warranties of Purchaser set forth in <u>Article 4</u> shall be true and correct in all material respects (without giving effect to any qualifications or limitations as to "materiality" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date).

(b)     <u>Performance of Covenants and Obligations of Purchaser.</u> Purchaser shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c)     <u>Closing Deliverables.</u> Purchaser shall have delivered to the Seller the closing deliveries required to be delivered by Purchaser pursuant to <u>Section 2.8.</u>

8.4     **Waiver of Condition; Frustration of Conditions.** All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Purchaser nor the Seller may rely on the failure of any condition set forth in this <u>Article 8</u>, as applicable, to be satisfied if such failure was caused by such party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions.

8.5     **Delivery of a Notice of Readiness to Close.** At any time after the Seller's satisfaction of its conditions to Closing in accordance with the terms of <u>Section 8.1</u> and <u>Section 8.3</u> of this Agreement, the Seller may deliver a notice to the Purchaser (a "**Notice of Readiness to Close").** The Purchaser shall have five (5) Business Days from delivery of a Notice of Readiness to Close to satisfy its conditions to Closing in accordance with the terms of <u>Section 8.1</u> and <u>Section 8.2</u> of this Agreement and consummate the Transactions; <u>provided,</u> that in no event shall Purchaser be required to close prior to the Outside Date.  If Purchaser does not satisfy its conditions to Closing and consummate the Transaction within the timeframe set forth in the preceding sentence, Purchaser shall forfeit the entire Deposit Escrow Amount to the Seller.

## ARTICLE 9
## TERMINATION

9.1     **Events of Termination.** Notwithstanding anything to the contrary, this Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing:

(a)     by mutual written consent of Purchaser and the Seller;

(b)      (Intentionally left blank);

(c)      by Purchaser or the Seller by written notice to Purchaser or the Seller from the other, if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(d)      by Purchaser, by written notice from Purchaser to the Seller, if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement, such that the conditions in <u>Section 8.1</u> or <u>Section 8.2</u> are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Seller prior to the earlier of (i) five Business Days after receipt of written notice from Purchaser requesting such breach be cured or (ii) the Outside Date: <u>provided, however,</u> that the right to terminate this Agreement pursuant to this <u>Section 9.1(d)</u> shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in <u>Section 8.1</u> or <u>Section 8.3</u> are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(e)      by the Seller, by written notice from the Seller to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in <u>Section 8.1</u> or <u>Section 8.3</u> are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) five Business Days after receipt of written notice from the Seller requesting such breach be cured or (ii) the Outside Date; <u>provided, however,</u> that the right to terminate this Agreement pursuant to this <u>Section 9.1(e)</u> shall not be available to the Seller if the failure of the Seller to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in <u>Section 8.1</u> or <u>Section 8.2</u> are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement;

(f)      by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Applicable Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Transactions and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; <u>provided, however,</u> that the right to terminate this Agreement pursuant to this <u>Section 9.1(f)</u> shall not be available to the party seeking to terminate if any action of such party or any failure of such party to act has contributed to such Order or other action and such action or failure constitutes a breach of this Agreement; or

(g)      by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if the Closing has not occurred on or prior to April 18, 2025 (the **"Outside Date");** <u>provided, however,</u> that the party exercising the right to terminate this Agreement pursuant to this <u>Section 9.1(g)</u> shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement.

9.2     **Effect of Termination.**

(a)     In the event that this Agreement shall be terminated pursuant to <u>Section 9. l.</u> (a) Purchaser and its representatives shall promptly return all documents, work papers and other materials of the Seller including any confidential information and (b) all further obligations of the parties hereto under this Agreement shall terminate without further Liability or obligation to the other parties hereto; <u>provided, however,</u> that, notwithstanding the foregoing, the Liabilities and obligations under (i) the Confidentiality Agreement, and (ii) <u>Section 2.9(c), Section 6.2(c),</u> this <u>Section 9.2</u> and <u>Article l0</u> shall continue in full force and effect.

(b)     Notwithstanding anything to the contrary in this Agreement, in the event of valid termination of this Agreement pursuant to <u>Section 9.l (e),</u> Seller shall be entitled to all remedies available at law or in equity, including without limitation, retention of the Deposit Escrow Amount, damages, and/or specific performance pursuant to <u>Section 10.13</u> of this Agreement.

**ARTICLE 10**
**GENERAL PROVISIONS**

10.1     **Survival of Representations, Warranties and Covenants.** All covenants and agreements contained in this Agreement that by their term are to be performed in whole or in part, or which prohibit actions, subsequent to Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive Closing and shall therefore terminate, including any Action for damages in respect of any breach or inaccuracy thereof. Notwithstanding the foregoing, the provlSlons of <u>Section 2.9(c), Section 6.2, Section 9.2</u> and this <u>Article l0</u> shall survive the Closing.

10.2     **Entire Agreement.** This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings. The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the parties hereto expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents. Furthermore, the parties each hereby acknowledge that this Agreement, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all parties to this Agreement, the Confidentiality Agreement and the Related Documents specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary

34

purchaser and an ordinary seller in an arm's-length transaction. The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the parties hereby agree that neither party hereto shall have any remedies or cause of action (whether in contract or in tort or otherwise) of any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

10.3   **Amendment; No Waiver.** This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and, if applicable, the Related Documents) executed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any party of a breach of any provision of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.4   **Severability.** Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any term or other provision of this Agreement or the Related Documents is invalid, illegal, or incapable of being enforced by any Applicable Law or public policy, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the parties to the greatest extent consistent with being valid and enforceable under Applicable Law. No party hereto shall assert, and Purchaser shall cause its Affiliates or related parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable.

10.5   **Expenses and Obligations.** Except as otherwise provided in this Agreement, all costs and expenses incurred by the parties hereto in connection with the Transactions, including the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the party that has incurred such expenses.

10.6   **Notices.** All notices, consents, waivers, and other communications under this Agreement or the Related Documents must be in writing and will be deemed to have been duly given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing for next day delivery (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if delivered by electronic mail (unless the sender receives an automated message that the email has not been delivered) on the date of transmission if on a Business Day before 5:00 p.m. local time of the business address of the recipient party (otherwise on the next succeeding Business Day) and (d) if deposited in the United States mail, first-class postage prepaid, on the date of delivery, in each case to the appropriate addresses or

email addresses set forth below (or to such other addresses as a party may designate by notice to the other parties in accordance with this Section 10.6):

If to Seller:

> Timothy P. Neumann, Esq.
> Broege, Neumann, Fischer & Shaver, LLC
> 25 Abe Voorhees Drive
> Manasquan, New Jersey 08736
> (732)223-8484, ext. 214
> tneumann@bnfsbankruptcy.com

With a copy to Secured Creditor:

> Julie M. Murphy, Esq.
> Stradley Ronon Stevens & Young, LLP
> 457 Haddonfield Rd., Suite 100
> Cherry Hill, New Jersey 08002
> E-Mail: jmmurphy@stradley.com

With a copy to Official Committee of Unsecured Creditors:

> Robert M. Schechter, Esq.
> Porzio, Bromberg & Newman, P.C.
> 100 Southgate Parkway
> Morristown, NJ 07962
> (973) 889-4127
> Email: rmschechter@pbnlaw.com

If to Purchaser:

> Solis Pharmaceutical Inc.
> Attn: Ankur Shah
> 20 Broadhollow Road, Suite 3011
> Melville, NY 11747
> E-Mail: ankur@solispharmaceuticalsinc.com

With a copy (which shall not constitute notice) to:

> White & Wolnerman, PLLC
> Attn: Randolph E. White
> 950 Third Ave., 11th Floor
> New York, NY 10022
> (212) 308-0604
> rwhite@wwlawgroup.com

10.7 **Counterparts.** This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format, or other agreed format shall be sufficient to bind the parties to the terms and conditions of this Agreement. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

10.8 **Governing Law.** This Agreement, the Related Documents and all Related Claims shall be governed by the internal laws of the State of New Jersey (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Applicable Laws of any other jurisdiction.

10.9 **Submission to Jurisdiction; Consent to Service of Process.**

(a) Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Related Document, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6; provided, however, that if the Bankruptcy Case has closed, the parties agree to irrevocably submit to the exclusive jurisdiction of the of the Superior Court of the State of New Jersey. The parties hereto hereby irrevocably and unconditionally waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

(b) Each of the parties hereto hereby consents to process being served by any party to this Agreement in any Related Claim by the delivery of a copy thereof in accordance with the provisions of Section 10.6 (other than by email) along with a notification that service of process is being served in conformance with this Section 10.9(b). Nothing in this Agreement will affect the right of any party to serve process in any other manner permitted by Applicable Law.

10.10 **Waiver of Jury Trial.** EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS.

10.11  **Rights Cumulative.** All rights and remedies of each of the parties under this Agreement and the Related Documents will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement, the Related Documents or Applicable Law.

10.12  **Assignment.** Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the parties hereto. No assignment of this Agreement or any of the rights, interests or obligations under this Agreement may be made by any party hereto at any time, whether or not by operation of law, without the prior written consent of the Seller and Purchaser, and any attempted assignment without the required consent shall be void: provided, however, that (a) Purchaser may assign (i) any of its rights or delegate any of its duties under this Agreement to any of its Affiliates, and (ii) its rights, but not its duties, under this Agreement to any of its financing sources and (b) the Seller may assign any of its rights or delegate any of its duties under this Agreement to any successor thereto, including any liquidating trustee or other agent; provided, further, however, that, in each case, such assignment shall not release Purchaser from its obligations under this Agreement and the Seller shall have no obligation to pursue remedies against any assignee of Purchaser before proceeding against Purchaser for any breach of Purchaser's obligations hereunder.

10.13  **Specific Enforcement; Remedies.** The parties hereto agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the Purchaser hereto in accordance with their specific terms or were otherwise breached. It is accordingly agreed that (a) each party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of each party to cause the other party to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and Applicable Laws and to thereafter cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right each party would not have entered into this Agreement. Notwithstanding anything to the contrary set forth herein, the parties hereto agree that (i) the Seller's right to retain the Deposit Escrow Amount, as set forth in Section 2.9(c), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

10.14.  **Third-Party Beneficiaries.** Except as expressly set forth herein, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties hereto any rights or remedies of any nature whatsoever under or by reason of this Agreement.

*{THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK SIGNATURES FOLLOW}*

IN **WITNESS WUF.REOP.** the parties hereto have cms of lhis Agreem:eol to be d.uiy <exeu.lled ac;<Ff the date fin;( writtt:n ahO\t:.

**SOLIS ruⱭRMAⱭt:liT.lCAL⬦ INC.**

By: _____

Nnmi::  ⬦\Jkui- Sba-b
Tille:    P⬦-si<lent

*Signature Page to Asset Purchase Agreement*

IN WJTNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

SELLER:

NOSTRUM LABORATORIES, INC.

By: _James L. Grainer_
Name: James Grainer
Title:  Chief Financial Officer

## EXHIBIT A

**Bid Procedures Order**

See 24-19611JKS [ECF No. 268].

| SCHEDULES | |
|---|---|
| Schedule 2.1 (a) - Inventories | To be supplied |
| Schedule 2.1 (b) - Product ANDAs | See attached |
| Schedule 2.1 (c) - Assigned Contracts | See attached |
| Schedule 2.2(1) - Other mutually-agreed Excluded Assets | None |
| Schedule 2.11 - Allocation Schedule | To be supplied |
| Schedule 3.3 - Consents Required | None |
| Schedule 3.6(c) - Cure Costs | None |
| Schedule 6.1 - Conduct of Business | None |

# SCHEDULE 2.l(b)

# PRODUCT ANDAS

Schedule 2.l(b)
Product ANDAs

**Kansas City:**

| ANDA# | Name | Holdback |
|---|---|---|
| 077708 | Cilostazol Tablets, 50 mg, and 100 mg | 0% |
| 203887 | Dapsone Tablets USP, 25 mg and 100 mg | 5% |
| 074118 | Piroxicam Capsules USP, 10 mg and 20 mg | 5% |

**Ohio:**

| ANDA# | Name | Hold back Amount |
|---|---|---|
| 085186 | Elixophyllin (Theophylline Oral Solution USP) 80 mg/15 mL | 0% |
| 075292 | Fluoxetine Hydrochloride Oral Solution USP, 20 mg/5 mL | 0% |
| 210663 | Hydrocodone Bitartrate /Homatropine Methylbromide Oral Solution, 5mg/1.5mg per 5mL (CII) | 0% |
| 201011 | Morphine Sulfate Oral Solution, lOmg/5 mL, 20 mg/5 mL and 100 mg/5 mL (CII) | 0% |
| 201448 | Oxycodone Hydrochloride and Acetaminophen Oral Solution, 5mg/ 325 mg per 5 mL | 0% |
| 202060 | PEG-3350, Sodium Chloride, Sodium Bicarbonate, Potassium Chloride for Oral Solution (420g / 11.2 g/ 5.72 g/ 1.48 g per bottle) | 0% |

# SCHEDULE 2.l(c)

# ASSIGNED CONTRACTS

**Schedule 2.l(c)**
**Assigned Contracts**

Royalty Agreement between Seller and Nostrum Pharmaceuticals, LLC dated December 12, 2024.[1]

---

[1] Subject to update pursuant to Section 2.1 (c).

# SCHEDULE 3.3

# REQUIRED CONSENTS

**Schedule 3.3**
**Required Consents**

None.

**Schedule 3.**7

1. The Generic Drug User Fee Administration ("GDUFA") fees due in total are about $4.3 million, approximately $440,000 of which is attributable to facility fees and $3.9 million is attributable to program fees.

2. The Debtor has received notices from the FDA that the Debtor is not in compliance with the GDUFA fees owed and reminders of the amounts due.

3. The Debtor currently owes the Center for Medicare and Medicaid Services is approximately $4,000,000.00.

4. The Debtor has entered into a settlement with the Department of Justice in total for $1.989 million, the federal component owed is $967,000 and the state component is approximately $1,022,000. This settlement relates rebates owed from previous sales of the Debtor's products.

**Schedule 5.2(b)**

**Back-Up Bids**

The following ANDAs and associated Purchase Price:

- 076697 Carbamazepine, $750,000

- 077105 Valporic Acid, $325,000