<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY**

Dwight Yellen [NJ Bar ID No. 007311979]
CHIDATMA LAW GROUP
325 Hudson Street – 4th Floor
New York, New York 10013
212.903-4546
Email: dwight@clglex.com

Attorneys for Secured Creditor
*Waterford Bank, N.A.*

</td></tr>
</table>

In re:

**NOSTRUM LABORATORIES, INC.**,

    Debtor.

Case No.: 24-19611 (JKS)

Chapter 11

Honorable John K. Sherwood

## LIMITED OBJECTION TO PROPOSED MOTION TO APPROVE SALE OF ASSETS TO PRASCO

Waterford Bank, N.A. ("***Waterford***") files this limited objection to the Debtor's motion pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 for an order approving the sale of debtor's assets free and clear of liens, claims and encumbrances to Prasco, LLC.

### Preliminary Statement

1.  The opioid epidemic represents "one of the largest public health crises in this nation's history." *In re Purdue Pharma L. P.,* 69 F. 4th 45, 56 (2d Cir. 2023). Between 1999 and 2019, about 247,000 people in the United States died from prescription-opioid overdoses. *In re Purdue Pharma L. P.*, 635 B.R. 26, 44 (S.D.N.Y. 2021). The U. S. Department of Health and Human Services estimates that the opioid epidemic has cost the country between $53 and $72 billion yearly. *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 144 S. Ct. 44 (2024). Ohio, the location of one of the Debtor's manufacturing facilities, was ground zero for this plague of opioid related deaths and abuse. As this bankruptcy proceeding winds down it has come to light that there is more than 70,000

pounds of Schedule II Controlled Substances at the Debtor's Ohio location that must be disposed

of in accordance with the strict mandates of the Drug Enforcement Agency and pursuant to the

Controlled Substances Act. Improper handling of the material poses a very real threat to the health,

safety, and welfare of the citizens of Ohio. Prasco LLC ("**Prasco**") the potential purchaser of the

Ohio location wants nothing to do with this material. And Citizens Bank, N.A. ("**Citizens**"), which

counts the Drugs as part of its collateral in Ohio, has washed its hand of the problem. The Debtor

essentially left a steaming pile of narcotics for someone else to deal with. Under the Sale Order

proposed by Debtor, Waterford, which holds the mortgage on the property where the Drugs are

located, is essentially being asked to bear the brunt of the cost of the clean-up and proper removal

and disposal of the controlled substances, finished goods inventory, API and raw materials for

pharmaceutical products. As a fully secured mortgagee this violates its status as a secured creditor

and is substantially unfair. Waterford seeks the Court's involvement in fashioning a more equitable

approach under section 105 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the

"**Bankruptcy Code**").

## FACTS

2.        Debtor is a pharmaceutical manufacturer. On September 30, 2024, (the "**Petition
Date**"), Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code. An

unsecured creditors' committee was appointed on October 21, 2024. No chapter 11 trustee has been

appointed. It became apparent rather quickly that Citizens, the secured lender and post-petition DIP

lender to Debtor was under-secured and an actual reorganization was impossible. An auction (the

"**Auction**") to sell Debtor's various assets was scheduled and procedures for this sale were ordered

by the Court **[ECF 268]**.

3.        **Waterford**. By mortgage dated March 19, 2020 (Exhibit A hereto) Waterford

financed Debtor's expansion of its facilities located in Bryan, Ohio. The mortgage has an

environmental provision along with a stand-alone environmental indemnity. Waterford was automatically paid the monthly mortgage amount both pre and post-petition including a payment on April 19, 2025. While Waterford received notice of this proceeding, the loan with Debtor was still performing.

4.      The mortgaged property included a 23,644 square foot warehouse and a 35,376 square foot manufacturing facility and two smaller buildings totaling about 6,600 square feet (the "*Premises*") located in Bryan, Ohio a small city about 50 miles southwest of Toledo, Ohio.  The Premises include a new warehouse and racking.  There are about eight rows of these with miscellaneous expired products.[1]

---

[1] The following photographs were taken by Robert Vogelsong, a senior Vice President of Waterford when he visited the Premises on April 29, 2025. This was the first time anyone from Waterford visited the Premises since the warehouse construction was finished (but not furnished) in 2020. At that time the Premises were appraised for $2,350,000.



There is a highly secure vault as required by the DEA for storage of the Schedule II Controlled

Substances[2] (the "***Drugs***"):

_____

[2] The drugs included Codeine Phosphate the Active Pharmaceutical Ingredient ("API") for codeine syrups, Hydrocodone Bitartrate API (brand name: Vicodin) , Morphine Sulfate API, Methylphenidate HCL, API (brand name: Ritalin) Methylphenidate dosage, and Oxycodone HCL API and Oxycodone dosage. The total amount of Drugs that need to be disposed of weigh more than 70,000 pounds and are mostly in liquid form.



5.      The following picture reflects miscellaneous packaged items ready for disposal.

(Note the unused shipping pallets).



6.    Interestingly, when narcotic products are made there are extra materials along with the clothing worn during manufacturing that needs packaged and destroyed.



7.       Also, there are temperature controlled outside chambers that store hazardous

products:



8.       *The Auction*. At the Auction on April 1, 2025 the Premises was a separate Lot to

differentiate it from Debtor's other location in Kansas City, and Debtor's intellectual property –

mostly abbreviated new drug applications ("***ANDA***"). In order to bid at the Auction a

representative of the bidder had to be present in person. At the Auction, hosted by the retained

investment banker Raymond James, the other locations and all the ANDAs were auctioned first. By

the time the Premises were auctioned, the parties had been at Raymond James for about 15 hours.

Waterford credit-bid ((Exhibit B hereto) the full amount of its Mortgage ($1,345,085.22), plus per

diem interest charges of $237.50, and attorney's fees (to the date of closing) for the Premises. No

one else bid on the Premises. Waterford incurred per diem attorneys' fees for attendance at the

Auction. The equipment at the Premises on which Citizens had a lien was separately auctioned and

the winning bidder at $275,000 was Big Shoulders Capital XII, LLC ("**Big Shoulders**") and was

conditioned on access to the Premises for 90 days.

9.      *The Hearing*. On April 8, 2025, a hearing was held to approve the sale of the various assets of the Debtor. Waterford was pleased when another party, JAS Diamond, submitted a bid for the Premises, the equipment in the Premises and several ANDAs [**ECF 353**]. Waterford is in the business of lending money and did not relish the thought of owning the Premises if its credit bid succeeded. At the hearing, Waterford's representative was advised that there was yet another bid (Exhibit C hereto) for the Property and Equipment. An affiliate of Prasco, an established generic drug manufacturer and distributor, submitted a bid totaling $1,750,000 comprised of $1.45m for the Premises and $300,000 for the equipment. Big Shoulders objected to Prasco strolling in at the last minute, not attending the auction and submitting a higher and better bid. Prasco's counsel said they did not know about the Auction. The Court deemed Prasco's bid the higher and better bid and accepted it. The Court let Big Shoulders file an administrative claim for $2,500 and gently hinted that Prasco pay that money to Big Shoulders. The Court set April 16, 2025 (later adjourned to April 18, 2025) as the closing date for all Debtor's assets.

10.     Waterford provided a payoff letter and wiring instructions (Exhibit D hereto) and waited for the funds to hit the account. The closing on the Premises did not take place and Waterford's counsel was advised there was a problem. And what a problem.

11.     *The Disposal Issue*.  It turned out that Debtor had been remiss in destroying outdated inventory including the Drugs. Prasco demanded an amendment to the Asset Purchase Agreement which required that the Drugs be removed. Implicitly, Prasco asserted that it did not know about the need for disposal of the Drugs when its bid was made on April 8, 2025. Thereupon the parties tried to determine how much this removal would cost. It turns out that removal of the Drugs is a complicated process. Ever since the opioid crisis, the government has been particularly sensitive to the existence of large amounts of scheduled drugs. If Drugs like those at the Premises, especially the large volume, were diverted by unscrupulous players, they would be worth tens of

millions of dollars and would wreak havoc upon the communities in which they could be distributed.

12.      Thus the DEA established extraordinary procedures for disposal of such drugs. In this instance where the Debtor is essentially out of business, two employees of the Debtor, certified by the DEA, had to be present and the Debtor has to be nominally present and have secure access to the vault containing the Drugs. Once that is maintained – no matter who is paying for it – offloading to a "reverse distributor" licensed by the DEA is required and delivered to an incineration location which is also licensed by the DEA. An audit trail is maintained of the controlled substances is to make sure there is no diversion. The Debtor secured a quote (Exhibit E hereto) on April 25, 2025 that it would cost $497,000[3] for proper disposal of the Drugs and a verbal quote of $125,000 for other chemicals, drugs, and precursors that were not controlled substances.

| Prasco Bid | $1,750,000 | |
| Less Controlled removal | ($497,000) | Quote |
| Less non controlled removal | ($125,000) | Estimate |
| Less employee Salary | ($35,000) | Estimate |
| Net | $1,093,000 | |

The removal costs effectively reduced the amount of Prasco's bid. Both Citizens, whose collateral was the source of the problem, and Waterford were going to be impaired.

13.      ***Knowledge of the Drugs***.  It is beyond dispute that the Debtor knew of the problem with the Drugs. Sadly, the Debtor's principal did not advise his counsel or any of the Consultation Parties about this issue. On further investigation it seems that Prasco could have gone

---

[3] The debtor's CFO was later able to negotiate with Veolia and obtain a reduced quote of about $350,000 for removal of the Drugs.

to the Auction. On April 29, 2025 Mr. Vogelsong visited the Premises and by looking in the Debtor's logbook could see that Prasco representatives had visited the Premises on March 20, 2025! Why would Prasco visit unless it knew the Premises was for sale? And if Prasco knew of the sale, why didn't it bother to go to the auction? Further, during the March 20, 2025 inspection Prasco representatives would have become aware of the disposal issue. See ¶¶4-7 *supra*. Surely, when Prasco visited the Premises again on April 8, 2025 – the day of the hearing – it would have known of the disposal issue. By not attending the auction and then sitting on the express knowledge of the need for the disposal of the Drugs, Prasco essentially threw a monkey wrench into the proceedings.

14.     Waterford began discussions with Prasco and the Consultation Parties in an effort to see if a fair arrangement could be structured to share the cost of the removal. While Prasco was willing to advance – paid out of its bid  – the costs of the removal, the salary of certain certified employees of the debtor approved by the DEA to remain on location, as well as the debtor remaining in custody of the premises to help with removal of the drugs, it was not willing to increase its bid. It would be paid out of its bid. Waterford's counsel was able to obtain a significantly lower quote ($275,000)  for the removal of the Drugs (Exhibit F hereto).

15.     There was a further issue involving the real estate. The following table reflects the real estate which Prasco intended to acquire.

| SCHEDULE 2.1(c) – OWNED REAL PROPERTY ||
| Property Address | Parcel Numbers[2] |
| 604 E. Edgerton St., E. Trevitt St., and   721-725 E. Mulberry St., Bryan, Ohio | 063-170-21-002.000  063-170-21-024.000  063-170-36-012.000  063-170-36-019.000  063-170-36-020.000  [063-170-36-021.001] |
| 705 E. Mulberry St., Bryan, Ohio | 063-170-36-014.000  063-170-36-015.000  063-170-36-016.000  063-170-36-017.000 |

| | | 063-170-36-018.000 |
|---|---|---|
| 705 E. Mulberry St., Bryan, Ohio | | 063-170-36-013.000 |

The yellow highlights reflect those parcels on which Waterford has a mortgage. As you can see, there are at least two unencumbered parcels. A question remained as to how much of the money would be attributable to the unmortgaged real estate and who would have the right to it -- Citizens or the Unsecured Creditors Committee.

16.    Prasco was unwilling to pay anything more than the amount it bid. Citizens would not budge from the amount bid for the equipment, leaving Waterford with a significant shortfall on its mortgaged real estate

| Prasco Bid | $1,750,000 | |
|---|---|---|
| Less Holdback | ($500,000) | APA |
| Less Citizens Equipment Claim | ($300,000) | Sale Order |
| Net to Waterford | $950,000 | Possible to recover more form holdback |

This is a mere 70% of Waterford's credit bid/principal amount of its mortgage. And here we have to look at the equities of the situation. Waterford had simply loaned money against real estate. Citizens was the secured lender and bank for the debtor. Further, it had two elements of collateral in Ohio: equipment and drugs. Citizens is cherry picking the right to get money from the equipment, yet abandoning the fact that its collateral included the Drugs. Citizens was in a position when it became a DIP lender to conduct due diligence and determine what was at each location. Waterford had no such privilege. Why is Waterford taking the hit?

## RELIEF REQUESTED

17.      Waterford does not object to the sale to Prasco in its entirety. It makes good business sense for Prasco to acquire the Premises and the Equipment. Prasco is in the generic pharma business.  It will hopefully keep jobs in the community. But there must be a more equitable way of bearing the burden of the removal of the Drugs. The only reason offered in discussions for Waterford to take the entire hit is in *in terrorem* threat that if the sale doesn't go through as projected in the Sales Order, Waterford would end up with the Premises pursuant to its credit bid. In that situation Waterford would be the last man standing and would be have to pay the clean-up costs. While we respect counsel's vigorous advocacy of their respective positions, this Argument come dangerously close to extortion.

## LAW AND ARGUMENT

18.      *The Bankruptcy Court is a Court of Equity.* Waterford's legal support for its limited objection stems from a number of ideas that are well known in bankruptcy practice. At the end of the day, Waterford argues that forcing it to pay for the clean-up is a prohibited taking under the Fifth Amendment. The Court is allowed to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code and to take any action necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process. 11 U.S.C. § 105(a). This provides the Court flexibility and enables it to exercise its discretion in fashioning appropriate remedies. See *e.g. Marrama v. Citizens Bank*, 549 U.S. 365, 375 (2007)(holding § 105(a) grants bankruptcy judges broad authority to take any action that is necessary or appropriate "to prevent an abuse of process" such as "abusive litigation practices"); *Donaldson v. Bernstein*, 104 F.3d 547, 552 (3d Cir. 1997) (§ 105(a) empowers the bankruptcy court to reopen a case on its own motion); *In re Potter,* 2021 Bankr. LEXIS 2728 at 15, 2021 WL 4494263 (Bankr. D.N.J. 2021)(§ 105(a) permits a bankruptcy court to reopen a case); *In re Schemelia*, 607 B.R. 455, 462

(Bankr. D.N.J 2019) (§ 105(a) authorized Court to impose sanctions despite creditor failure to comply with safe harbor provisions); *Wasserman v. Durie Props., LLC (In re Day),* 2014 Bankr. LEXIS 605, 2014 WL 636797 (Bankr. D.N.J. 2014) (§ 105(a) permitted the court to enjoin defendants from conduct that would violate the automatic stay); *In re Rivera*, 369 B.R. 193, 202 (Bankr. D.N.J. 2007)(Court permitted to impose sanctions and preliminary injunction pursuant to § 105(a)); *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 167 (Bankr. D.N.J. 2005) (determination that fee sharing, co-counsel and referral relationships are pertinent facts within the language of Bankruptcy Rule 2019 was within court's § 105(a) discretion); *Dobin v. Presidential Fin. Corp. (In re Cybridge Corp.),* 312 B.R. 262, 273 (Bankr. D.N.J. 2004) (finding § 105(a) empowers bankruptcy courts to grant equitable credits to transferees of avoided post-petition transfers where doing so does not otherwise conflict with the Bankruptcy Code); *In re Dennis*, 230 B.R. 244, 256 (Bankr. D.N.J. 1999)(noting court's discretion to raise *sua sponte* objections to tardy proofs of claim or objections to confirmation pursuant to § 105(a)).

19.    Section 503(b)(1)(A) of the Bankruptcy Code states that certain claims have the right to administrative priority since they were incurred as an actual and necessary cost of preserving the estate for the benefit of creditors. *In re Dant & Russell, Inc.*, 853 F.2d 700, 706-07 (9th Cir. 1988). As the Tenth Circuit explained in *In re Mid Region Petroleum, Inc.*, 1 F.3d 1130, 1134 (10th Cir. 1993), "[t]he policy behind giving priority to administrative expenses in Chapter 11 proceedings is 'to encourage creditors to supply necessary resources to debtors post-petition.'" (citations omitted). Environmental cleanup obligations are considered ongoing duties, not claims dischargeable in bankruptcy, because they arise from regulatory laws designed to protect public health and safety. *Ohio v. Kovacs*, 469 U.S. 274, 285 (1985). Environmental remediation costs incurred during the bankruptcy process are given priority as administrative expenses. Courts can justify cleanup orders by classifying the costs as necessary to preserve the estate or comply with non-bankruptcy law.

20.    The trustee may abandon property that is considered burdensome to the bankruptcy estate, or of inconsequential value or benefit to the estate. 11 U.S.C. § 554. However, it has long been hornbook law that this abandonment cannot occur in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards such as remediation of contamination or disposal of waste prior to abandonment. *Midlantic Nat'l Bank v. NJDEP,* 474 U.S. 494, 495 (1986).

21.    Controlled substances like opioids, which are regulated under the Controlled Substances Act (21 U.S.C. § 801 *et. seq.*, (the "***CSA***"), would probably fall under this category. The CSA governs the manufacturing, distribution, and disposal of controlled substances. Debtors must comply with strict Drug Enforcement Administration ("***DEA***") regulations for the handling and disposal of Schedule II drugs (*e.g.*, opioids and amphetamine derivatives which are contained in the Drugs), such as transferring the substances to a DEA-registered "reverse distributor" or arranging for their destruction, to prevent diversion and misuse of the same.

22.    Further, if the controlled substances are also classified as hazardous waste (*e.g.*, expired [which the Drugs are] or contaminated drugs), their disposal must comply with the: Resource Conservation and Recovery Act 42 U.SC. § 6901 *et. seq.* ("***RCRA***") and Comprehensive Environmental Response, Compensation, and Liability Act 42 U.S.C. § 9601 *et. seq.* ("***CERCLA***")for hazardous waste disposal and Environmental Protection Agency ("***EPA***") regulations for proper destruction.

23.    ***Disposal of the Drugs is the Debtor's Responsibility.*** But the Debtor has no financial resources to do this. Environmental remediation costs incurred during the bankruptcy process for compliance with CSA, RCRA, CERCLA, EPA Regulations and state level environmental laws are treated as administrative expenses pursuant to § 503(b) by whoever incurs them. However,

the general consensus is that the Debtor is administratively insolvent. Who then bears the burden of clean up.

24.    This was the question raised by Judge Gibbons in his dissent in *in Re Quanta Resources Corp.*, 739 F.2d 912, 924 (1984), *aff'd sub nom, Midlantic Nat'l Bank v. NJDEP,* 474 U.S. 494 (1986). Judge Gibbons felt that the majority opinion was inconsistent with the Supreme Court's then recent decision in *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407 (1982). There the Supreme Court held that the Bankruptcy Act should not be construed to destroy the interests of creditors when a substantial question arises as to whether the Act is a taking of property without just compensation. Judge Gibbons called the majority to task for dodging the important question of **who pays** for the clean-up: "there must be a source of funds before expenditures can be made." 739 F.2d at 927.

25.    *Citizens May not Engage in de facto Abandonment* . The posture that confronts the Court here is that the Debtor cannot pay for the clean-up. Citizens, who has a secured interest in the Drugs (and other collateral in Ohio), neither wants to spend any money nor discount the amount it is receiving for the equipment part of its Ohio collateral. Essentially, it is Citizens that is abandoning the Drugs.[4] And all parties want Waterford to essentially discount its return on its mortgaged property to pay for the clean-up. Wait a minute – doesn't this violate the Fifth Amendment's taking prohibition?

26.    This issue was discussed in an ECRA[5]/ context in *in re Heldor Industries, Inc.*, 131 B.R. 578, 586 (Bankr. D.N.J. 1991). There Judge Stripp held that cleanup costs under ECRA do not take

---

[4] There are other salvageable assets at the Premises which can be sold and which would benefit Citizens. The warehouse racks can be sold to a logistics company along with shipping pallets.

[5] We acknowledge that *Heldor* and the other cases involve ECRA and submit the clean-up in this case involves the CSA. We have been unable to locate any cases that involve clean-up under the CSA in a bankruptcy setting; however, given the short amount of time to reply to the Debtor's motion it is possible that we have overlooked more direct authority.

priority over claims secured by liens on personal property. *Synfax Mfg. Inc.*, supra, 126 B.R. at 35; *In re Corona Plastics, Inc.* 99 B.R. 231, 238 (Bkrtcy.D.N.J. 1989). *Synfax* and *Corona Plastics* are ultimately based on the fact that a security interest is property which is protected by the Takings Clause of the Fifth Amendment to the United States Constitution, which states that no private property shall be taken for public use without just compensation. *United States v. Security Industrial Bank*, 459 U.S. 70, 103 S.Ct. 407 (1982). A secured creditor has a constitutional right to preserve the value of its secured claim on the petition date. *Wright v. Union Central Life Ins. Co.,* 311 U.S. 273, 278, 61 S.Ct. 196, 199-200, (1940); 2 Collier on Bankruptcy ¶ 362.01, at 362-17 (15th Ed. 1982). It is clear from these authorities that it would violate the Takings Clause of the Fifth Amendment to hold that ECRA cleanup costs take priority over security interests in personal property.

27.     Admittedly Citizens could make a similar argument. However, in the balance of equities Citizens has been intimately involved in the operation of the Debtor's business since the Petition Date (and likely before) and had many opportunities to inspect its collateral. Waterford's collateral, in contrast, can be viewed on a simple drive by – is the building still standing?

28.     All interested parties want Prasco to acquire the Premises and the Equipment. Everyone – especially the DEA and Ohio regulators  – seek proper disposal of controlled substances, finished goods inventory, API and raw materials for pharmaceutical products located at the Premises. The question for today is the one that Judge Gibbon's highlighted in *n Re Quanta Resources Corp.* – who  pays for the disposal. Waterford argues that the law and equity demand that it is ***not*** the only entity that has to pay for the disposal.

29.     Waterford represents that the facts and circumstances set forth herein do not present novel questions of law, and, as such, respectfully requests that this Bankruptcy Court waive the requirement of the filing of a memorandum of law in accordance with D.N.J. LBR 9013-1(3).

**CONCLUSION**

**WHEREFORE**, Waterford requests entry of a modified Sales Order providing for a more
equitable way of paying for the disposal of the Drugs along with such other relief that the Court
deems just and proper.

Dated:          New York, New York
                May 15, 2025

                                        CHIDATMA LAW GROUP

                                        By:_____
                                               Dwight Yellen
                                        *Attorneys for Waterford Bank, N.A.*
                                         325 Hudson Street–4th Floor
                                         New York, New York 10013
                                         212.903-4546
                                         Fax 646.971-9359
                                         dwight@clglex.com

*Of Counsel*:

        Thomas W. Heintschel
        Frederickson, Heintschel & King, Co., L.P.A.
        405 Madison Avenue, Suite 1212
        Toledo, Ohio 43604
        Phone:  (419) 242-5100
        E-Mail:  theintschel@fhk-law.com