**Order Filed on January 23, 2026
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| In Re: | Case No.: | 24-19611 |
|---|---|---|
| | Chapter: | 11 |
| **NOSTRUM LABORATORIES, INC.,** | Judge: | John K. Sherwood |
| Debtor. | | |

### DECISION AND ORDER RE: DEBTOR'S MOTION FOR CONTEMPT AGAINST CHARTWELL PHARMACEUTICALS, LLC

The relief set forth on the following pages numbered two (2) through eleven (11), is hereby **ORDERED.**

**DATED: January 23, 2026**

Honorable John K. Sherwood
United States Bankruptcy Court

Page 2
Debtor:     Nostrum Laboratories, Inc.
Case No.:   24-19611
Caption:    **DECISION AND ORDER RE: DEBTOR'S MOTION FOR CONTEMPT AGAINST CHARTWELL PHARMACEUTICALS, LLC**

## INTRODUCTION

The Debtor, Nostrum Laboratories, Inc. ("Nostrum"), filed a Motion to enforce a sale order and for contempt against Chartwell Pharmaceuticals, LLC ("Chartwell"). [ECF No. 460]. The Motion seeks an order compelling Chartwell to release escrowed proceeds related to its purchase of abbreviated new drug applications ("ANDAs") at a bankruptcy auction. ANDAs are rights to manufacture and market generic drugs that are granted by the U.S. Food and Drug Administration ("FDA"). Nostrum's sale of ANDAs to Chartwell was governed by an Asset Purchase Agreement ("APA") and a Sale Order dated April 14, 2025 ("Sale Order"). [ECF No. 375]. This Motion was filed because Chartwell sought credits against a portion of the $4.625 million purchase price for: (1) a perceived shortfall in the inventory transferred under the APA, and (2) the costs Chartwell advanced for a recall of Sucralfate, one of the generic drugs produced under an ANDA purchased by Chartwell. The inventory shortfall issue has already been decided in favor of Nostrum. This decision addresses Chartwell's claim to recover the costs of the drug recall that occurred after the sale.

## JURISDICTION

The bankruptcy court has jurisdiction to hear this "core" matter under 28 U.S.C. § 157(b)(2)(N), (O) because the motion concerns the enforcement of an order approving the sale of assets to Chartwell in the Nostrum bankruptcy case. The Court retained jurisdiction within the terms of the Sale Order. [ECF No. 375, ¶¶ 16, 27].

Page 3
Debtor:     Nostrum Laboratories, Inc.
Case No.:   24-19611
Caption:    **DECISION AND ORDER RE: DEBTOR'S MOTION FOR CONTEMPT AGAINST CHARTWELL PHARMACEUTICALS, LLC**

## FACTS AND PROCEDURAL HISTORY

The Court heard oral arguments on Nostrum's Motion on October 8, 2025. The request for sanctions was denied because a good faith dispute existed as to the disposition of the sale proceeds. Chartwell's request for a credit of $147,500 for inventory not supplied was denied because the amount of inventory to be transferred was not material to the APA for the reasons stated on the record. [ECF No. 493]. The Court allowed supplemental pleadings to be filed on the remaining issue—which party should bear the costs of the voluntary Sucralfate recall that occurred post-closing?

Nostrum is a bankrupt pharmaceuticals distributor that has sold its assets and is winding up its operations. The asset sales were conducted under a sale process run by Raymond James & Associates, Inc. ("Raymond James") and an auction occurred on April 1, 2025. [ECF No. 268]. Chartwell, a manufacturer and distributer of pharmaceuticals, was the winning bidder for three of Nostrum's ANDAs (including Sucralfate) for the sum of $4.625 million. [ECF No. 375]. Chartwell alleges that it never intended to continue stability testing for pharmaceutical products that were manufactured and distributed by Nostrum. It also says that Nostrum and its representatives were aware of this. [ECF No. 480, ¶¶ 15-17]. Because neither party was willing to maintain the stability testing of Nostrum's drugs that were already sent to market, a recall was necessary under FDA regulations. [*Id.* at ¶ 31]. As the time for closing of the transaction approached, both parties understood that the recall was necessary but neither wanted to pay for it. [ECF No. 490-2]. Despite the open issues concerning the inventory shortfall and the costs of the recall, Chartwell paid the entire $4.625 million purchase price into an escrow account set up by Nostrum's counsel (Mr. Neumann). When the ANDAs were delivered to Chartwell, it authorized the release of $4 million

Page 4
Debtor:     Nostrum Laboratories, Inc.
Case No.:   24-19611
Caption:    **DECISION AND ORDER RE: DEBTOR'S MOTION FOR CONTEMPT AGAINST CHARTWELL PHARMACEUTICALS, LLC**

to Nostrum with the remaining $625,000 staying in escrow. This partial closing occurred on or about April 25, 2025. [*See* ECF No. 480, Ex. 3].

The record reflects that after the closing, Nostrum carried out a voluntary recall of Sucralfate in its own name with the assistance of an employee and legal counsel that were paid by Chartwell. [*See* ECF No. 485]. According to Chartwell, these costs were advanced "with the expectation that they would be credited against the Purchase Price." [ECF No. 480, ¶ 43]. However, this expectation was not well founded because Mr. Neumann had sent various emails stating that Nostrum was unwilling and unable to pay for the cost of the recall. Mr. Neumann demanded that Chartwell confirm in writing that it would cover the costs, but Chartwell claims it did not provide such confirmation. [ECF No. 480, ¶¶ 31-43]. There is one email in the record from Chartwell to Mr. Neumann dated May 16, 2025, which says that Chartwell "has indicated a willingness to cover the costs of such counsel." [ECF No. 482-3]. In another email, Chartwell indicated that it would pay the costs of the Nostrum employee that would be working on the recall. [ECF No. 480, Ex. 8]. There is no mention in these emails that Chartwell expected to get a credit against the purchase price for these costs. Nostrum says that this was written confirmation from Chartwell that it was going to pay the costs of the recall. The problem with this argument is that there are two emails from Mr. Neumann following the May 16, 2025 email suggesting that Nostrum still had not received a written commitment from Chartwell to fund the recall costs.[1] [ECF No. 480, Exs. 6, 7]. The Court concludes that even though the issue of who was going to be

---

[1] Nostrum also argues that Chartwell agreed to fund the recall post-closing by executing the engagement agreement to retain legal counsel on Nostrum's behalf and by agreeing to pay the attorney directly. [ECF No. 485]. Chartwell does not dispute that it agreed to fund the recall costs. The issue is whether there was an agreement that Chartwell would be reimbursed from the funds in escrow.

Case 24-19611-JKS    Doc 502    Filed 01/23/26    Entered 01/23/26 15:13:54    Desc Main
Document    Page 5 of 11

Page 5
Debtor:     Nostrum Laboratories, Inc.
Case No.:   24-19611
Caption:    **DECISION AND ORDER RE: DEBTOR'S MOTION FOR CONTEMPT AGAINST CHARTWELL PHARMACEUTICALS, LLC**

responsible for the recall costs was debated during this April–May 2025 period, there was not a resolution. Yet, the parties closed the transaction and established an escrow fund to deal with the issue later.

The recall occurred months after the ANDAs were transferred to Chartwell and $4 million of the purchase price was released to Nostrum. [*See* ECF No. 480, Ex. 9]. The total legal fees and expenses incurred by Chartwell was $220,750.59 as of October 14, 2025. [ECF No. 486]. The cost of the Nostrum employee paid by Chartwell is not in the record.

## ANALYSIS

The FDA is responsible to oversee the safe manufacturing of generic drugs and the issuance of ANDAs. Companies that manufacture and sell generic drugs pursuant to ANDAs are required by federal regulation to maintain stability testing for drugs that are in the marketplace. 21 CFR §§ 211.166-211.170. Stability testing ensures that the drugs remain effective throughout their shelf life. Where adequate stability testing is not maintained, federal regulations require a recall of impacted products, either voluntarily by the manufacturer or by enforcement action brought by the FDA. 21 CFR §§ 7.40-7.46.

The relevant regulations define the "recalling firm" as "the firm that initiates a recall or, in the case of a [FDA]-requested recall, the firm **that has primary responsibility for the manufacture and marketing of the product to be recalled.**" 21 CFR § 7.3(i) (emphasis added). Nostrum suggests that even though it initiated the recall, it did so as an accommodation to Chartwell, and only because Chartwell funded the costs. Nostrum arguably had some responsibility for the recall because it manufactured and sold the Sucralfate that was out in the marketplace. On the other hand, Chartwell was the owner of the ANDAs and the Sucralfate

Page 6
Debtor: Nostrum Laboratories, Inc.
Case No.: 24-19611
Caption: **DECISION AND ORDER RE: DEBTOR'S MOTION FOR CONTEMPT AGAINST CHARTWELL PHARMACEUTICALS, LLC**

samples that were subject to the stability testing regulation. And the recall occurred after the closing of the sale to Chartwell. As discussed below, the FDA has not taken a position on who would be primarily responsible for the recall here.

Both parties refer to language in the APA and Sale Order in support of their positions. Before the Court addresses those arguments, the meaning of the term "holdback" as used in the sale process deserves some attention. The Court has only seen small portions of the transcript from the auction on April 1, 2025. In the beginning of the auction, Raymond James indicated that it had circulated draft asset purchase agreements for each ANDA with "separate holdback percentages." [ECF No. 487-1, p. 3]. The Court has not seen the draft version of the asset purchase agreement provided to Chartwell and, for some reason, no one from Raymond James was called to testify as to the meaning of "holdback percentage." Chartwell indicated that its bid had "no holdback" or a "zero percent holdback." [ECF No. 482-1, p. 2]. Nostrum tried to explain this term by referring to the asset purchase agreement with PAI Holdings, LLC, d/b/a PAI Pharma ("PAI Pharma"), which has a holdback provision. [ECF No. 375, pp. 92-93 of 286]. The provision seems to cover the dispute now before the Court over responsibility for "recalls or market withdrawals" either before or after the closing date. In the PAI Pharma transaction, an escrow account was established to satisfy "Recall Claims" and to the extent it was not used, it would be turned over to Nostrum. Because such a holdback provision was not included in the APA between Nostrum and Chartwell, Nostrum argues that Chartwell agreed to assume the cost of a recall. Nostrum also notes that after the APA was approved by the Court, Chartwell sought to insert new language in the APA that would clarify that its "Assumed Liabilities" did not include the costs of recalls with respect to products manufactured or sold by Nostrum. [ECF No. 490-1, pp. 1, 10 of 66]. Nostrum did not

Case 24-19611-JKS    Doc 502    Filed 01/23/26    Entered 01/23/26 15:13:54    Desc Main
Document    Page 7 of 11

Page 7
Debtor:     Nostrum Laboratories, Inc.
Case No.:   24-19611
Caption:    **DECISION AND ORDER RE: DEBTOR'S MOTION FOR CONTEMPT AGAINST CHARTWELL PHARMACEUTICALS, LLC**

agree to the addition of this new language. [ECF No. 490-2]. At the very least, this demonstrates that Chartwell knew that the APA was unclear on the issue of responsibility for the recall costs.

Considering the language of the APA, the definitions of "Assumed Liabilities" and "Excluded Liabilities" are obviously important. Assumed Liabilities are those "arising out of [Chartwell's] ownership or operation of the Transferred Assets solely to the extent arising from periods occurring after the Closing Date . . . ." [ECF No. 375, p. 185 of 286]. Nostrum was responsible for all Excluded Liabilities which is everything that was not an Assumed Liability with the following clarification:

> For the avoidance of doubt, "Excluded Liabilities" includes any and all Liabilities arising out of, relating to, resulting from or in connection with any credits, rebates, returns or chargebacks, in each case to the extent attributable to Products distributed or sold by the Seller prior to the Closing Date.

[ECF No. 375, p. 145 of 286].

Recall costs are not specifically mentioned in either definition. Chartwell would be responsible for the recall costs if they (i) arise out of Chartwell's ownership of the ANDAs and other Transferred Assets and (ii) relate to a period after the Closing Date. Nostrum contends that the recall was solely caused by Chartwell's decision not to continue stability testing on Nostrum's Sucralfate samples that were purchased at the closing. Chartwell owned the samples and only had to continue to test them to avoid a recall. But the products that were subject to the recall did not belong to Chartwell—they were sold into the market by Nostrum. Chartwell's decision not to continue stability testing was made before the Closing Date and Nostrum was aware of this. The recall occurred after the Closing Date and Chartwell was anxious to have it done as reflected by

| | |
|---|---|
| Page 8 | |
| Debtor: | Nostrum Laboratories, Inc. |
| Case No.: | 24-19611 |
| Caption: | **DECISION AND ORDER RE: DEBTOR'S MOTION FOR CONTEMPT AGAINST CHARTWELL PHARMACEUTICALS, LLC** |

the fact that it advanced all the costs. The bottom line is that the definitions of Assumed Liabilities and Excluded Liabilities in the APA are helpful, but not dispositive.

Chartwell relies on the broad protection it received against successor liability in the Sale Order that approved the Chartwell APA and four others. In other words, the Sale Order applied universally to five separate transactions. In paragraph S of the Sale Order, the "Purchasers" (including Chartwell) are relieved from any state, federal, statutory or common law successor liability and any similar liabilities. Purchasers are not subject to "any liability whatsoever, with respect to [Nostrum] or the operation of [Nostrum's] business prior to the Closing . . . ." [ECF No. 375, p. 8]. Generally, the successor liability protections are necessary to protect purchasers of assets at the auction from being deemed responsible for Nostrum's pre-closing liabilities. Again, the recall obligation was triggered by the decision of both parties to terminate the stability testing on the Sucralfate samples and the recall was carried out post-closing. It is not clear that this was a pre-closing liability of Nostrum. However, there is some language at the end of paragraph S of the Sale Order that supports Chartwell's position:

> S. . . . The Purchasers are not, and shall not be deemed to be in the future**, a successor to the Debtor** or its estates by reason of any theory of law or equity (including, without limitation, under federal or state common law with respect to any claims under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; any similar state false claims act or similar statute; or **for purposes of any liability or responsibility for recall events**), and the Sale does not amount to a consolidation, succession, merger, or de facto merger of any one or more of the Purchasers and the Debtor.

[ECF No. 375, pp. 7-8 at ¶ S] (emphasis added). Chartwell argues that the obligation to recall the Sucralfate was a "recall event" and the Sale Order relieves it from any liability or responsibility for it. The Court agrees that this language appears to limit Chartwell's *successor liability* for recall

Case 24-19611-JKS    Doc 502    Filed 01/23/26    Entered 01/23/26 15:13:54    Desc Main
Document    Page 9 of 11

Page 9
Debtor: Nostrum Laboratories, Inc.
Case No.: 24-19611
Caption: **DECISION AND ORDER RE: DEBTOR'S MOTION FOR CONTEMPT AGAINST CHARTWELL PHARMACEUTICALS, LLC**

events, but what if Chartwell had direct liability due to its ownership of the ANDAs and related inventory?

The FDA appeared at the hearing on the sale of Nostrum's assets and insisted that its police power and regulations be enforced against all parties without regard to the language of the asset purchase agreements or the Sale Order. The Sale Order was modified prior to its entry at the request of the FDA's counsel with consent of all parties to include the following clause:

> 26. Notwithstanding any provision to the Contrary in this Order, any APAs, or any other document related to the Sales, nothing shall:
>
> (a) release, nullify, preclude or enjoin the enforcement of any police or regulatory power or any liability that any entity would be subject to as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the date of entry of this Order;
>
> * * *
>
> (d) authorize the assumption, assignment, sale or other transfer of any federal (a) grants, (b) grant funds, (c) contracts, (d) agreements, (e) awards, (f) task orders, (g) property, (h) intellectual property, (i) patents, (j) leases, (k) certifications, (l) applications, (m) registrations, (n) billing numbers, (o) national provider identifiers, (p) provider transaction access numbers, (q) licenses, (r) permits, (s) covenants, (t) inventory, (u) guarantees, (v) indemnifications, (w) data, (x) records, or (y) any other interests belonging to the United States (collectively, "Federal Interests") without compliance by the Debtor and Purchasers with all terms of the Federal Interests and with all applicable non-bankruptcy law;

[ECF No. 375, p. 23, ¶ 26(a), (d)]. Thereafter, paragraph Twenty-Six states, "[i]n the event of an inconsistency or conflict between any provision of the APAs and any provision of this Order, as to the United States, the provisions of this Order and federal law shall govern." [ECF No. 375, p. 24, ¶ 26].

The takeaway from this language is that the FDA could have assigned responsibility for the Sucralfate recall through an FDA enforcement action according to its own regulations no matter what the Sale Order or APA said. The FDA retained the right to pursue all Federal Interests against

both Chartwell and Nostrum. In fact, shortly after the closing, the FDA contacted Chartwell, not Nostrum, regarding commencement of the recall. [ECF No. 480, Ex. 3].

What occurred here was that both parties worked cooperatively to avoid an involuntary FDA enforcement action. Chartwell, as a concession to Nostrum, footed the costs of the recall. Nostrum carried out the recall in its own name per Chartwell's specifications and with the assistance of regulatory counsel recommended and paid by Chartwell. Despite threats by both sides, neither considered financial responsibility for the voluntary recall to be a deal breaker, and they have left it for the Court to decide.

## CONCLUSION

Though both parties were potential targets of the FDA, they avoided that risk by getting the recall done. As to the question of financial responsibility, the balance tips slightly in favor of Nostrum based on the following:

- Chartwell's use of the "no holdback" and "zero percent holdback" language at the auction coupled with the fact that there was an asset purchase agreement with language covering a holdback escrow for "Recall Claims" in the PAI Pharma transaction. Chartwell could have done the same.

- After the Court's approval of the Chartwell APA, Chartwell tried to clarify that its Assumed Liabilities did not include the costs of recalls. This should have been done in the original APA.

- Chartwell knew or should have known that it had genuine risk of responsibility for the recall due to its ownership of the ANDAs and the language of the Sale Order inserted by the FDA.

Case 24-19611-JKS    Doc 502    Filed 01/23/26    Entered 01/23/26 15:13:54    Desc Main
                          Document         Page 11 of 11

Page 11
Debtor:     Nostrum Laboratories, Inc.
Case No.:   24-19611
Caption:    **DECISION AND ORDER RE: DEBTOR'S MOTION FOR CONTEMPT AGAINST CHARTWELL PHARMACEUTICALS, LLC**

- Chartwell's emails confirming that it would cover the attorney and employee costs of the recall did not say that Chartwell expected to be reimbursed from the escrow funds.

As a Court of Equity, this Court recognizes that Chartwell raised the recall issue before the closing and Nostrum decided to close without a resolution. Nostrum could have insisted on clarity before closing because it was also a potential target of the FDA. Accordingly, the Court finds that Nostrum should bear some financial responsibility for the voluntary Sucralfate recall, but not as much as Chartwell.

**THEREFORE, IT IS ORDERED** that the escrowed proceeds shall be released to Chartwell in an amount equal to 25% of the costs advanced and/or outstanding for the voluntary recall of Sucralfate. The parties are directed to submit a proposed form of order to the Court authorizing the disposition of the sale proceeds in a manner consistent with this ruling.